JOHN MCINNES HENDERSON, M. D.
DIPLOMATE OF THE AMERICAN BOARD OF FORENSIC PSYCHIATRY
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
304 EAST PENNSYLVANIA AVENUE
FIRST FLOOR
TOWSON, MARYLAND 21286-5313

TELEPHONE (410) 296-1161
FAX (410) 583-1264

# MEDICAL REPORT

# MOHAMMED AMIN KAKEH

## May 11, 2006

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## TABLE OF CONTENTS

*TABLE OF CONTENTS* ............................................................ 2

*SUMMARY AND CONCLUSIONS* .............................................. 5

*APPENDIX I* ......................................................................... 11

**PSYCHIATRIC HISTORY:** ................................................... 11
IDENTIFYING DATA: ............................................................. 11
MARITAL STATUS AND CHILDREN: ....................................... 12
FAMILY HISTORY: ............................................................... 14
SIBLINGS: .......................................................................... 15
SCHOOL PERFORMANCE: ..................................................... 16
WORK PERFORMANCE: ........................................................ 17
LEISURE ACTIVITIES, HOBBIES, RECREATIONS AND ............... 19
PAST TIMES: ...................................................................... 19
PHYSICAL HEALTH HISTORY: ............................................... 19
HOSPITALIZATIONS: ........................................................... 21
SERIOUS ACCIDENTS INCLUDING CAR ACCIDENTS AND HEAD
INJURIES: ........................................................................... 22
ALLERGIES: ....................................................................... 22
MEDICATIONS PRIOR/AFTER THE INCIDENT: .......................... 22
MENTAL HEALTH HISTORY PRIOR TO INCIDENT: .................... 22
MENTAL HEALTH HISTORY AFTER THE INCIDENT: .................. 22
DRUG HISTORY: ................................................................. 23
FAMILY DOCTOR: ............................................................... 23
LEGAL HISTORY: ................................................................ 23

**MENTAL STATUS EXAMINATION** ........................................ 24
APPEARANCE AND BEHAVIOR: ............................................. 24
SPEECH: ............................................................................ 24
EMOTIONAL MOOD AND AFFECT: .......................................... 25
THOUGHT CONTENT: ........................................................... 25
SENSORIUM AND INTELLECT: ............................................... 25
JUDGMENT AND INSIGHT: .................................................... 25
CURRENT MEDICAL REGIMEN: ............................................. 26
CURRENT MEDICATIONS: ..................................................... 26
NEUROLOGICAL EVALUATION: .............................................. 26

*APPENDIX II* ....................................................................... 26

**NEUROPSYCHIATRIC TEST RESULTS:** ................................. 26

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

*APPENDIX III* ................................................................................................ *30*

   SYNOPSIS OF DOCUMENT REVIEW: ........................................................... *30*

*APPENDIX IV* ................................................................................................ *59*

*APPENDIX V* ................................................................................................. *61*

*APPENDIX VI* ................................................................................................ *63*

*APPENDIX VII* ............................................................................................... *64*

*APPENDIX VIII* .............................................................................................. *65*

JOHN McINNES HENDERSON, M. D.
DIPLOMATE OF THE AMERICAN BOARD OF FORENSIC PSYCHIATRY
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
304 EAST PENNSYLVANIA AVENUE
FIRST FLOOR
TOWSON, MARYLAND 21286-5313

TELEPHONE (410) 296-1161
FAX (410) 583-1264

May 11, 2006

Alison N. Davis, Esquire
Law Offices of Ford & Harrison, LLP
1300 19th Street, N.W.
Suite 700
Washington, D.C. 20036

Re:   *Mohammed Amin Kakeh v. United Planning Organization*
      *Civil Action No.: 05-1271 (GK/JF)*
      *Superior Court for the District of Columbia*
      DOI:     06/02/2004
      SSN:     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
      DOE:     04/26/2006
      DOB:     06/28/1944

Dear Ms. Davis:

Pursuant to your request I performed a psychiatric evaluation on the above-captioned individual, Mohammed Amin Kakeh on April 24, 2006. This evaluation lasted from 10:00 a.m. until approximately 5:45 p.m. During that time, I spent six hours taking a psychiatric history and performing a mental status examination. Subsequent to that he was given **The Minnesota Multiphasic Personality Inventory-2,** and this required an additional hour and forty-five minutes.

Prior to the commencement of the psychiatric evaluation I informed the patient that I was seeing him at the request of the defense attorneys in the suit which he had filed against the United Planning

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

Organization as Civil Action No.: 05-1271 in Washington, D.C. Superior Court. I informed him that this was a forensic (medico-legal) psychiatric evaluation, and that I was not his treating physician. Therefore, I further informed him that no physician/patient confidentiality pertained to our interview, and anything which he told me could well be relayed to the attorneys who asked for the evaluation, if pertinent. I informed him that if I asked him any questions which he did not wish to answer he merely had to state that he refused to answer and that this was acceptable.

Understanding these considerations, he consented to proceed with the evaluation.

## SUMMARY AND CONCLUSIONS

This now sixty-one year old male of Middle Eastern origin (Damascus, Syria) underwent a forensic psychiatric evaluation with me on April 24, 2006. It is clear, after a lengthy psychiatric interview, that he is not a candid historian, and when some of his statements are compared with the records, they do not mesh. One of the outstanding examples is the comparison between his work record as portrayed by Dr. Edelman, his work record as portrayed to me, and his work record as portrayed in an earlier resume, which is a portion of the medical and legal records (see Appendix IV).

During the interview he was superficially pleasant and agreeable, and appeared to attempt to strike up a "hail-fellow–well-met" relationship with this examiner, but was evasive and non-compliant on many issues concerning his dates, his employment, and the actual circumstances of his departure from UPO, among other things. In fact, he was generally not candid about the majority of his medical

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

history indicating that he had only been taking psychotropic medications since the tension and stress began at UPO, but the medical records indicate that it goes at least back to 1996 when he was having anxiety and stress issues as well as depression.

In general, this is a man who is heavily involved in a vengeful primary and secondary gain attack on his prior employers. As noted in Note No. 45 Appendix III below, there are various notes in the office material indicating that a woman named Shears was appointed as being in charge of the patient, and, given his cultural background as a middle eastern man, much of the trouble seems to have begun at this point when a woman was appointed as his boss.

He is entirely non-introspective in terms of his own psychological dynamics, and assumes no blame for anything which occurred during his employ. According to the history given to this examiner, he entirely fails to recognize any responsibility for stress and disharmony in the workplace, though this is clearly outlined in memos which were sent to him both at Manna and at UPO. Likewise, he circled carefully around the issue of being arrested for the abuse of his teenage daughter.

It is clear from prior records that he is an authoritarian, angry and heavy handed individual, and behaves so with those who do not do things exactly as he feels they should be done, and that he did create chaos and low morale in the accounting department at both Manna and UPO, at least in this examiner's opinion. He is angry, generally has low self-esteem, and a low threshold for, and low tolerance for, frustration with little patience and little capacity to work out problems through reasonable solutions in social situations.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

It is equally clear, in this examiner's opinion, that he has a longstanding personality disorder accompanied by some dysthymia and anxious mood dating back as far as records are available, which is 1996.

I feel that no psychiatric or psychological damage has accrued to him as a result of this layoff of almost eleven months which he projects as his first layoff, completely neglecting an earlier eighteen month layoff, which is clearly mentioned in the earlier medical records (see Appendix V). I feel that his pattern of behavior has changed very little over his career in finance and business management. I do not think he suffered any psychological, psychiatric, or emotional distress which was not already a significant part of his personality, and I do not feel that there was any exacerbation in what is a rigid and fixed personality disorder.

I have evaluated the patient with the following diagnoses from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR[1]). The following Multi-Axial Diagnostic Format[2] has been applied:

---

[1] The Diagnostic and Statistical Manual of The American Psychiatric Association, Fourth Edition-TR, published by the American Psychiatric Association, copyright 2000. This work should be viewed as "work in progress," has been, and will continue to be revised periodically as the complex diagnostic issues in medicine, and particularly in mental health become better understood through advances in research and technology. Any concept that it is definitive in terms of diagnostic formulations is misleading in terms of assuming that the diagnoses currently proffered represent formal or final diagnostic concepts even today, and certainly not for the future.

[2] **DSM-IV Cautionary Statement**

*Page 8*

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

*Axis I*

a.    Psychiatric evaluation for forensic purposes.

b.    Longstanding, unrelated dysthymia and generalized anxiety disorder.

c.    Factitious disorder versus malingering *(probably malingering).*

d.    No post-traumatic stress disorder.

e.    Primary and secondary gain.

f.    Non-compliant with medical treatment and with the psychiatric evaluation.

---

The specified diagnostic criteria for each mental disorder are offered as guidelines for making diagnoses, because it has been demonstrated that the use of such criteria enhances agreement among clinicians and investigators. The proper use of these criteria requires specialized clinical training that provides both a body of knowledge and clinical skills.

These diagnostic criteria and the DSM-IV-TR Classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field. They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts.

The purpose of DSM-IV-TR is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

AXIS I    *Personality Disorder Not Otherwise Specified:*    With antisocial, compulsive, histrionic and hypochondriacal traits with a .65 stability index for test/retest values after a five year period.

AXIS III    *Physical Conditions:*    Status post myocardial infarction, diabetes mellitus, Athlete's foot, skin rashes, gastro esophageal reflux disorder, at least as diagnosed, and multiple other conditions including urinary tract infection for which he had multiple doctor visits at Kaiser Permanente.

AXIS IV    *Psychosocial Stressors -*    Marital disharmony especially concerning the chaos with his middle daughter Nabeelah (please see notes regarding police report; also noted in Note No. 86 of Appendix III below); litigation stress on which he spent a lot of money and time (by choice, instead of spending it to enhance the value of his family life).

AXIS V    *Current GAF* (Global Assessment of Functioning Scale): Current GAF is 85. The same level of function would be true for the prior year.

I hold all of the opinions to a reasonable degree of medical certainty.

In the meantime, if you have any questions or comments, please feel free to contact me at any time. Should you or the Court wish for me to appear and give testimony in person, please feel free to contact me at any time at the above telephone numbers. My e-mail address is

RE: Mohammed Amin Kakeh

***Sensitive Medical Information. Should Not Be Shown to Patient or Family!***
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

drhenderson5@comcast.net.  I would be happy to do so at the Court's convenience.  In the meantime, I remain,

Sincerely yours,

John M. Henderson, M.D.
JMH/dlb
Enclosures

RE: *Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## *APPENDIX I*

## PSYCHIATRIC HISTORY:

*IDENTIFYING DATA:*

The patient gave his name as Mohammed Amin Kakeh. He stated that his attorney was Omar Vincent Melehy who practices in the Rockville area.

Concerning his trial he stated that he did not know of any trial date, but believed there was a pretrial conference set for November.

He gave his home telephone number as 703-642-8921, and his office telephone number as 202-466-3686, extension 105, and stated that this is Equal Justice Works, a non-profit organization by whom he has been employed since late April or early May of 2005.

He gave his home address as 750³ Leestone Street, Springfield, Virginia 22151. He stated that he has lived there for the last twelve years with his wife and five children, two of whom are now attending college.

He stated that it is a townhouse, and that he has been renting it.

He drove himself to the office for his evaluation, and was slightly early.

---

³ His medical records reflect the address as 7050 Leestone Street.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

He stated that he was with Kaiser Permanente before when he worked with the United Planning Organization, and he now sees physicians in a group called Northern Virginia Clinical.

He gave his date of birth as June 28, 1944, and stated that he was born and reared in Damascus, Syria. He stated that he came to the United States in 1975, and obtained his citizenship in 1981.

He gave his current age as sixty-one, and added that he had a myocardial infarction (heart attack) in 1998 or 1999, approximately seven or eight years ago.

He gave his Social Security No. as 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.

Queried about his religious background he reported that he was born and reared Muslim, and was of the Sunni sect.

## MARITAL STATUS AND CHILDREN:

He reported that he is married, and he stated that he is married to Toni Lyle Kakeh whom he met in Hattiesburg, Mississippi where he had gone to teach after completing a significant portion of his education. He had known her for about six months before they married in 1980, and his wife is a native Mississippian. He gave her date of birth as August 10, 1957, and her age as forty-eight.

He went on to say that he had a friend who was Professor of Economics at the University of Southern Mississippi in Hattiesburg, Mississippi and that he had met Toni through his friend.

He stated that she is in good health, but has not worked, at his insistence, since the birth of their first child, twenty-one years ago.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

She nevertheless continues to hold her certificate as a medical records specialist, which is an extremely remunerative and difficult job to fill in most health care institutions.

He went on to report that they have five children[4], and they are, in order:

1.    Aminah, a daughter, currently age twenty-one and attending American University.

2.    Mohammed, a son, currently age nineteen and attending the University of Virginia.

3.    Nabeelah, a daughter, currently sixteen, living in Springfield, Va., and attending an Islamic School.

4.    Hamsa, a daughter, currently age seven, and in the second grade.

5.    Mustafa, a son, currently age five, and attending pre-school.

He stated that all of his children are in good health mentally and psychiatrically, though some doubt must be cast on this when we review the record of his confrontation with Nabeelah which is provided by Kaiser Permanente on several different provider notes about an event which occurred in the Kakeh home on December 8, 2004.   He dismissed the importance of the discipline which he inflicted on her because she had been running away and stayed out all night.   Apparently after several of these incidents, the patient cut Nabeelah's hair off and beat her on the feet with a stick.   She called

---

[4] See Appendix which is a Kaiser Permanente Provider Note indicating he has 7 children.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

the police and he was arrested for assault and battery and spent thirteen nights in prison. More about this incident at a later point.[5]

*FAMILY HISTORY:*

He stated that his mother is alive and well. Her name is Aminah, and she is seventy-five years old and still lives in Damascus. He stated that her health has been generally good throughout her life.

He reported that he lived with his mother and father throughout his childhood, and described it as a hard working childhood but denied any form of abuse by anyone either sexual, physical, emotional or psychological.

He went on to report that his father was named Mohammed Eid Kakeh and died four years ago at the age of seventy-eight. He stated that his father was a railroad inspector and died from natural causes which stemmed from the faulty implantation of an artificial hip which led to uremic failure and septicemia. The patient stated that he flew home to see his father days before his death, in contrast to his inability to do the same when his brother, Maumoon, died in 2004 from a stroke at the age of fifty-seven, and the patient could not afford to fly to Syria to see him because of his entanglement with the United Planning Organization. He blames the United Planning Organization (UPO) for this lapse in respect for his deceased brother.

---

[5] It should be noted that the cutting off of the hair of a female in the Islamic religion is a flagrant denunciation of that individual whether child or adult, and is purported to announce to the world that they are promiscuous or maladaptive in some fashion or other; hence it is an extreme form of expression of the fury which the patient must have felt towards his daughter, and the whipping of the feet with a stick is equally extreme.

*RE: Mohammed Amin Kakeh*

---

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

---

## SIBLINGS:

He stated that he is the eldest of eleven.  He stated that he does not remember the birth dates ( even though he states that his is a very close family, but he asserts that he remembers the approximate age of each of the siblings.  The sibship, in order, is:

1.    The patient himself.

2.    Maumoon, a Professor of Arabic language at the University of Damascus who, as noted above, died in 2004 at the age of fifty-seven of a stroke.

3.    Rukia, a sister, age fifty-four.

4.    Dalalal, a sister, age fifty-two.

5.    Mustafa, a brother, approximately forty-nine.

6.    Munser, a brother, approximately forty-seven.

7.    Mautaz, a brother, approximately forty-five.

8.    Mazen, a brother, approximately forty-three.

9.    Marwan, a brother, approximately forty.

10.    Maher, a brother, approximately thirty-eight.

11.    Barea, a sister, approximately thirty-five.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

When asked about the professions of the siblings and their status in life he stated that all the girls are married of course and have children; all the girls are housewives.

Concerning his brothers he stated that Maumoon, the deceased brother, was a Professor of Arabic language, that Mustafa is a civil engineer, that Munser is an agricultural engineer, that Mazen is a plant manager, that Marwan is a businessman who owns a store, and that Maher is a tailor who owns his own shop.

*SCHOOL PERFORMANCE:*

He stated that he attended the first through the fifth grades at the Damascus Elementary School, and went on to the middle school and high school which he explained were one single united school. He did say that this was interrupted briefly by his attendance in middle school when he went to a private school for a year or two.

He went on to report that he was in the top ten of his class when he graduated from high school in 1964, and in the top five in his class when he graduated from Damascus University in 1968. He received a degree in business and accounting.

He went on to explain that when a particularly gifted student graduated from the University in Syria he was appointed to a government job rather than having to apply for one, and he was appointed to a government job as an auditor and worked for the government for three years.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## WORK PERFORMANCE:

Continuing his work, he then went into the military service as an antiaircraft officer presumably as a reservist, which would have been a term of three years in the service after which he would come back to his normal life with the job.

However, this ordinary progression of events, according to the patient, was interrupted in that Hafez Assad who subsequently became the dictator of Syria insisted for the first time in 1974 that the military vote in an election. Hafez Assad was apparently the only candidate, and the patient states that he voted against him and for doing so wound up in jail for several months, as it was not a secret ballot.

After being released from jail he went back to his job as an auditor until 1974 which was when the first American Embassy was established in Syria after the Israeli war. He stated that he had friends in Detroit and eventually went there. He stated that he also corresponded with schools in Britain, and stated that he had a good friend from UCLA who told him that UCLA would be too expensive for him in Southern California, and that he should go to Baton Rouge, Louisiana where they had a good English program. Hence, he left Syria, apparently somewhat surreptitiously in May of 1975, and came to the United States through Europe.

He continued by stating that he knew his future wife Toni for about six months at the University of Southern Mississippi in Hattiesburg, Mississippi and stated that he wanted to be a hospital administrator, and take the necessary courses for that. His friend who was

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

apparently elevated in the administration at the University of Southern Mississippi wanted to send him to Tulane University in New Orleans, but it was too late for the application that year so Dr. Yarrow, his friend, sent him to the University of Houston, and he wound up in Beaumont where he also could not get accepted because of the lateness of his application. He went on to Detroit where he was accepted and got a Master's Degree at the University of Detroit.

He reported that he did not like Detroit because it was cold, gloomy, snowy and rainy so much of the year, but he did finish his degree, and then returned to the University of Southern Mississippi, which is the time at which he met his future wife.

He found that he was making too little money at the University of Mississippi and became in latter 1985 until 1990 the Controller of St. Mary's College in Southern Maryland where he remained until 1990.[6]

He stated subsequently to this examiner that he and his wife went overseas to Saudi Arabia, and he became a finance director for one of their centers.

He stated that he worked for a Saudi billionaire and remained in Saudi Arabia with his wife for four and one half years. He reported that he received good pay, housing, free transport, a free automobile, but felt that the lifestyle was too restrictive, and returned to the United States and became employed by Manna Corporation in about 1995.

---

[6] Like many other dates, including the resume in his reviewed records, the dates are difficult to reconcile, and quite puzzling sine he omitted 4½ to 5 years as an auditor for a member of the Royal Family.

*RE: Mohammed Amin Kakeh*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

Manna Corporation is another non-profit organization that builds low income housing. He reported "I gave them two years." "A friend of mine told me that the UPO was looking for someone, and I went there in 1998. I affected a lot of changes, and I changed their computer system from MS DOS to Windows." He reported that he remained at UPO from 1998 until June of 2004 when he was "riffed."

He neglected to point out something which the records make clear, and that is that Manna had decided to fire him because he was causing such chaos in the accounting department.

*LEISURE ACTIVITIES, HOBBIES, RECREATIONS AND PAST TIMES:*

It is very difficult to get him to describe anything that he does or has done which qualifies in this category (except for walking and riding an exercise bicycle at doctor's order as part of his cardiac health regime, and that only intermittently) as he stated that he worked fourteen hours a day for Manna and continued the same for UPO until he managed to cut it back to ten to twelve hours, and finally to eight and one half hours where he works now at Equal Justice Works.

*PHYSICAL HEALTH HISTORY:*

He reported that he smoked until 1998 when he had his myocardial infarction, but medical records indicate that it continued longer than this and was a problem. He stated that his salary at UPO was about $88,000 a year before taxes and his salary now at the Equal Justice Works is about $80,000 a year. However, he classifies himself as a "clerk" in his job at Equal Justice because he has no support staff.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

He stated that he has had multiple health problems, many of which were preexisting by many years.   He did, however, emphatically state that the eleven months of unemployment between UPO and Equal Justice Works was the most stressful year in his life.  He stated that prior to the confrontation with UPO[7] he had six to seven hours of good sleep per night, but during the year of unemployment he had only two to three hours, something which is contradicted by the records which shows that he went into periods of hypersomnia.

He stated that he lost a lot of weight, and that his favorite foods were of no interest to him.  He stated that he dropped from 185 pounds to 165 pounds.

In terms of his hedonia, he claimed that it was poor, and his enjoyment of life during that eleven months of unemployment was extremely poor.  Similarly, he claimed that his libido and sex drive went to zero during that eleven months, and there was no sexual activity at all.  He stated that it has now returned to 30% or so of the preexisting level[8].  He also reported that he had decreased memory and concentration during the eleven months of unemployment, and spent every waking hour applying for work, afraid that his letters would not be good enough.  He did, however, state that he made no trips for interviews, but spoke with people on the phone who, according to his history, immediately began to avoid him as soon as they learned he was involved in litigation with UPO.

---

[7] He, however, blames UPO for his 1998 heart attack.

[8] He does not know, or fails to consider the fact that his multiple medications (see attached chart), especially the anti-depressant SSRI inhibitors are noted for suppressing both sex drive, and the ability to perform sexually. Further, a number of the medications he is on can cause depression, and problems with concentration, as well as irritability and personality changes (e.g., Coreg, which causes depression, confusion, dizziness, drowsiness in a significant number of patients, along with lisinopril, ), so as with all medications there is a risk-benefit ratio consideration, especially when used in such a plethora of configurations as the patient is on.

RE: Mohammed Amin Kakeh

---

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

---

He reported that his sleep has returned to a good healthy pattern now, even though he is still experiencing litigation stress, which bothers him to some degree whenever he has a conference with his attorney. He states that nevertheless his sleep pattern, appetite, sex drive, etc. are still all improving.

At this point, he gave as an example of his difficulties at home the problem with his middle daughter, Nabeelah, who started acting out, and when he corrected her (implying only verbally) she started calling the police. This led up to the incident described earlier when he was arrested and spent thirteen nights in jail for cutting off her hair and whipping the bottom of her feet with a stick.

He gave his height as five feet, seven inches, and his weight as 175-180 pounds currently.

He states that he takes a number of medications for his blood pressure, and these are self-evident on the medication list sheet (see attachment below with patient's multiple medications).

HOSPITALIZATIONS:

He reported several hospitalizations for his stomach, his heart, and lower back pain, and in fact the medical/legal records are approximately eight inches high, and were in view on this examiner's desk, and pointed out to the patient during the evaluation.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

## SERIOUS ACCIDENTS INCLUDING CAR ACCIDENTS AND HEAD INJURIES:

He denied ever having any broken bones, head injuries, losses of consciousness or other serious illnesses.

## ALLERGIES:

He stated that he has a nasal allergy, but is vague about the attribution. He nevertheless takes Flonase twice a day.

## MEDICATIONS PRIOR/AFTER THE INCIDENT:

His medications are listed on Appendix VI, and he has been on a similar medication list both before and after the incident in question.

## MENTAL HEALTH HISTORY PRIOR TO INCIDENT:

Denied, but a review of the records reveals that he was seen by his family physician for panic attacks, anxiety and depressive moods.

## MENTAL HEALTH HISTORY AFTER THE INCIDENT:

He saw a woman, a Dr. Price[9], after refusing multiple times to go to any psychiatrist. He went to a social worker, however, who insisted that he see a psychiatrist, and he saw the woman psychiatrist about three or four times but felt he got nothing out of it.

---

[9] Note that records Susan L. Price, M.D., the psychiatrist, are not being released by Plaintiff's attorneys because they are saying she is a "fact witness."

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

The medications which he had been prescribed both before and after the incident in question were selective serotonin reuptake inhibitor antidepressants, and were Paxil and Prozac, among others.

*DRUG HISTORY:*

Denied, including alcohol.

*FAMILY DOCTOR:*

None except his cardiologist remains a Dr. Sharma, and a family practitioner named Price, but not the same as the psychiatrist whom he had seen earlier.

*LEGAL HISTORY:*

He denied ever having been in a lawsuit prior to the confrontation with the UPO and he denied lawsuits by anyone else in his family.

He states that he has a valid Virginia Driver's License, and a copy of this appears in this examiner's chart.

He states that he owns a red van, the year and make of which he was uncertain, but that he had to sell their second car when he ran into financial difficulties after having been "riffed" by UPO[10].

---

[10] He continued to maintain that he had never had a period of unemployment be fore, something which the records contradict.

23

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## MENTAL STATUS EXAMINATION

*APPEARANCE AND BEHAVIOR:*

This is an alert, neatly but casually dressed Arabic male who is superficially cooperative, but with much underlying hostility. He nevertheless puts up a good and quite sociable front, and becomes quite verbose to the point where he controls the interview keeping it away from sensitive subjects, and directing it to some degree where he wants to go. He maintains good eye contact throughout the interview, and has a distinct Arabic accent, though he is occasionally difficult to understand. However, he repeats clearly and understandably when this examiner requests.

Exploration of his ability to concentrate and attend is tested during the psychiatric history and mental status evaluation and he shows no difficulties in any of these areas, though he is evasive and misleading regarding material he does not wish to discuss in detail.

He does portray himself in the victim's role, as the hapless "fall guy" for UPO. He even goes so far as to say that "UPO caused my heart attack."

*SPEECH:*

His speech is coherent, goal directed, and organized with a quite reasonable vocabulary for someone who has English as a second language. His speech is characterized by a subtle bias built in for his own position in this litigation. There is no example of aphasia either receptive or expressive, and no dysarthria.

24

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## EMOTIONAL MOOD AND AFFECT:

He presents with an underlying, longstanding, unrelated dysthymia with anxiety which stems from childhood or early adulthood at the very latest. There is, however, only minimal flattening, blunting or constriction of affect, and his mood is level throughout evaluation and the testing.

## THOUGHT CONTENT:

He clinically appeared to be dependent in orientation, and histrionic with significant exaggeration concerning the multiple discomforts inflicted on him by his former employers. He himself assumes no responsibility, but feels that the blame is entirely theirs. He is neither suicidal nor homicidal. There is no evidence of paranoid ideation, delusions, hallucinations or thought disorganization. There is a repetitive tendency during the psychiatric interview and mental status examination to focus on physical problems.

## SENSORIUM AND INTELLECT:

He is oriented in all three spheres to time, person and place, and has a wide knowledge about world affairs, both here and abroad. Both recent and remote memory are intact as are intermediate and immediate memory. His intelligence quotient is clinically assessed as well above average.

## JUDGMENT AND INSIGHT:

This is difficult to assess as he is not candid as a historian; it is, however, estimated to be fair to good given his cultural and litigation bias.

*RE: Mohammed Amin Kakeh*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

## CURRENT MEDICAL REGIMEN:

He is seeing his family doctor and his cardiologist for studies relating to his heart and continuing medication which includes Coumadin, a medication which requires regulation.

## CURRENT MEDICATIONS:

These are listed above under "Medications."

## NEUROLOGICAL EVALUATION:

It is essentially within normal limits. There is no ataxia, antalgia, and extra ocular musculature is intact. There is no dysmetria, dysarthria, or paresis and the general neurological evaluation is entirely within normal limits. Psychological testing includes the MMPI-2 which will be covered under Neuropsychiatric Test Results at a later point.

## APPENDIX II

## NEUROPSYCHIATRIC TEST RESULTS:

➢ There was no objective issue of neurocognitive dysfunction from this patient beyond subjective complaints of poor memory, attention and concentration, which were difficult to evaluate because of his lack of candor. He was given one of the oldest, most reliable objective psychological tests in the world, which is the MMPI-2, now in its first revision in 1989 or 1990 and is now called the Minnesota Multiphasic Personality Inventory-2.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

➤ On his Validity Scales he shows no variable response in consistency, but an elevation in his false response in consistency which is difficult to interpret. He does not embellish complaints, either in the initiation of the test or toward the end, but he does elevate the L Scale significantly to a T Score of 83 indicating a "Pollyannaish" attitude, which he wishes to portray. His K Scale is not outside the normal range, but is nevertheless elevated and indicates significant defensiveness and unwillingness to explore psychiatric or psychological problems on his behalf. His S Scale is also within the upper levels of the normal range, indicating that he believes in human goodness, is serene, content with his daily life, is patient, and is not overly concerned with denial of moral flaws, a set of attitudes at odds with his clinical presentation, which was one of projective blaming of others, and a pervasive sense that he has been treated unfairly.

➤ The MMPI-2 Clinical and Supplementary Scales Profile reveal that he has a 3, 1, 2 elevation with Scale 1 being at 81, Scale 2 being at 70, and Scale 3 being at 84. This indicates a profile which is defensive, and in which there is significant hypochondriacal concern, longstanding depression, and much use of denial.

➤ Interestingly enough, even with the anguish which he describes in his home life during this eleven month layoff period after his work with UPO, his Marital Distress Score is low. There is also no elevation on the Post-Traumatic Stress Disorder Scale.

➤ On the Contents Scale Profile of the MMPI-2 his highest Contents Scale is on the Health Scale, and if we go to the

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

extended scores we see the same elevation on RC1, which is somatic complaints. Everything else is in or below the normal range including demoralization, low/position emotions, cynicism, antisocial behavior, ideas of persecution, dysfunctional negative emotions, aberrant experiences, and hypomanic activation.

➤ Interestingly enough, on the Supplementary Scales Profile his T Score on social dominance is at the very outer limits (high) and in fact just into the abnormal range as is his social responsibility T Score. His Repression Scale T Score is at 74 which is the highest of the Supplementary Scales, followed by the Dominance and Repression Scales, followed by over controlled hostility (emphasis mine) .

➤ His Raw Scores on the PSY-5 Scales are below normal for aggression, psychoticism, disconstraint, negativism, and slightly elevated to 69 for introversion and low/positive emotionality.

➤ The validity of the MMPI-2 is weakened by the patient's tendency to claim unrealistic virtue. This shows basic defensiveness and an unwillingness or inability on the part of the patient to disclose personal information and represents, in this examiner's opinion to a reasonable degree of medical certainty, a conscious distortion to present himself in a favorable light.

➤ This patient presents a picture of multiple physical issues and a reduced level of psychological functioning on the surface. The physical problems that he presents may be vague, and may have appeared after stress and are likely not traceable to actual

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

organic changes.   He is likely to have what is known as a "hysteroid" adjustment to life and will likely experience periods of exacerbated symptom development when stressed. These patients not infrequently develop a life style of "invalidism" in which they become incapacitated and dependent on others.

➤ The relative frequency of his profile on the Clinical Scales is informative.   This is one of the most frequent MMPI-2 High Point Clinical Scale Scores (Scale 1-Hy) occurring in 20.7% of men.  Additionally, 16.3% of men have the Hy Scale spike at or above a T Score of 65 and 9.3% of a well defined Hy point in that range.   This is a very common profile configuration in samples of medical patients (the 1/3, 3/1) configuration.  The stability of his Personality Profile on the MMPI-2 reflects high profile definition and high stability.  Short term retest studies have shown a correlation of .72 for these high point scores and a stability index of .65 for a large study of normals after a 5 year test – retest.  These patients likely receive an AXIS II diagnosis of dependent personality, or longstanding somatization disorder.  Factitious disorder versus malingering in the context of litigation must also be taken into consideration.

➤ Regarding treatment, this patient will appear to be extremely difficult if not impossible to approach with long term treatment goals or insight oriented approaches to psychotherapy and many patients with this profile type persist in pursuing medical treatment for problems that have no real organic basis. However, he was too defensive to engage in productive self-reflection, and these patients tend to lose interest in psychiatric treatment and prefer to utilize somatic explanations for problems and for attention.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

### *APPENDIX III*

## SYNOPSIS OF DOCUMENT REVIEW:

1. Another contradiction in the history given to me by Mr. Kakeh as represented by his naturalization and citizenship certificate which he stated was in 1981, but on the original appears to be 08/1984 in the U.S. District Court for the Eastern District of Virginia.

2. The resume of the patient (see Appendix IV) detailing his education at the University of Damascus and the University of Detroit with experience being at A & M. E. Services from 1993 to present, preceded by Federal Grants and Contracts Officer from 1992 to 1993, preceded by International Economics and Research Incorporated from 1990 to 1991 followed by Director of General Accounting at St. Mary's College of Maryland from 1985 to 1990 followed by Accounting Manager at the National Institute of Technology from 1980 to 1985, all of which job citations except St. Mary's College **were omitted** from his history to me even when specifically asked.

3. A diagnostic report of an MRI performed at the Dr. Erfan and Bagedo General Hospital in Jeddah, Saudi Arabia on 12/13/1993 by Dr. N. Mohammed which showed minimal decrease in the intensity with minimal circumferential bulging more significant on the left at

4. L-5/S1. The rest of the study was entirely normal.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

5. A Kaiser Permanente Provider Note (hereinafter referred to as "KPPN") dated 01/19/1996 filled out by Dr. Ryan who after almost a year of treatment noted that the patient got continuing dysuria and uses extremely powerful antibiotics including Cipro 500 mg twice a day.[11]

6. A KPPN dated 02/28/1996 (see Appendix VIII) dictated by Dr. Ryan who states that he has Major Depressive Disorder, DSM-III R Code 296.23 and he once again enumerates all the same symptoms mentioned in the preceding note.

7. A KPPN dated 05/07/1996 dictated Dr. Ryan whose first diagnosis is major depressive disorder. He states, in part: "follow up depression. Taking Paxil, 20 mg orally each day. Previously instructed to increase to 30 mg orally each day but 'forgot to break pills.' **New job, first employment in eighteen months**[12] (emphasis mine). Symptoms noted were anhedonia – diminished interest/pleasure in all or most activities. Sleep with insomnia or hypersomina. Guilt (inappropriate worthlessness or hopelessness; concentration; poor/indecisiveness; psychomotor agitation; or retardation). **Dr. Ryan raised his Paxil to 30 mg orally each day to 'increase compliance.'** (emphasis mine).

8. The report of an esophagoscopy performed by Bradley J. Winston, M.D. on 11/14/1996 which was done with an Olympus video upper endoscope and revealed a normal upper endoscopy.

---

[11] One of the obvious reasons for such a problem and a refractory one in terms of treatment would be that he is having extra marital involvements of some kind.

[12] Note that his resume (see Appendix IV) reveals no period of unemployment until his discharge by UPO in 06.2004.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

9.  A KPPN dated 05/15/1997 dictated by Dr. Ryan which reads, in part: "also follow up depression, on Paxil, 30 mg orally each day. Tried to decrease Paxil on own two months ago and had recurrence of depressed mood on 20 mg orally each day. On 30 mg orally each day has no depressed mood, anhedonia, or suicidal ideation. Began Paxil 04/29/1996."

10. A KPPN dated 08/01/1997 authored by Dr. Ryan which notes the patient's chronic medical problems to include depression, and one of his medications to be Paxil, 30 mg orally each morning.

11. A KPPN dated 11/14/1997 refers to the MRI in Saudi Arabia in 12/1993 which demonstrated the mild pathology at L-5/S-1, and is during the time when he told me he was working in Saudi Arabia as a financial controller.

12. Another memorandum from David Dorsey to the patient regarding job performance, dated 02/09/1998 which reads, in part: "the purpose of this memo is to share with you some concerns that George and I have with your supervision of the accounting staff. I have noted below the specifics of these concerns with some suggestions for improvement... 1) your **authoritarian style** (emphasis mine) of supervision does not work well at Manna. Your communication with your staff often is dictatorial. I have heard you make derogatory remarks about your staff in front of them with others present – particularly when they did not do something the way you wanted. This sets up an adversarial relationship and makes

RE: Mohammed Amin Kakeh

***Sensitive Medical Information. Should Not Be Shown to Patient or Family!***
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

effective teamwork impossible. What is needed is a coach or teacher...for example; last Friday you told me that Bunny was volunteering too much information to the auditors. You felt that the correct approach was to give the auditors only what they asked for. I agree with you. But when you told me this you showed a lot of anger toward Bunny and made a gesture that you would like to punch her for it. If Bunny shares too much, your job is to decide how you can educate Bunny so she will understand how you want her to work with the auditors and thereby improve her ability to work with auditors, not get mad at her... 2) I know that you feel that your staff does not always tell you of important events in your department that you feel you need to know. I also believe that you know that your department would completely bog down if you insisted on knowing every detail... 3) I want to raise the language issue. I often have a difficult time understanding what you are saying. I believe others have the same experience. This, in itself, does not have to be a problem. I feel the problem is that when subordinate staff do not understand you or misunderstand you, you take it as a sign of insubordination and get angry at them..." Mr. Dorsey ends the memorandum by stating that he is ordering audio cassettes on "how to supervise people" and "coaching skills for mangers and supervisors." He reports that Manna will be happy to pay for them.

13. A memorandum to the patient from David Dorsey regarding the termination of his employment dated 03/19/1998 in which he states, in part: "it is with great regret that I am informing you that your employment with Manna[13] terminates 03/20/1998 (emphasis mine) .

---

[13] The company for whom he had worked immediately previous to his employment with UPO.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

The reason for this termination is the fact that a real working team is not developed in the accounting department during the two years that you have been controller. The department is now in crisis. Shanita is leaving and Bunny is considering leaving.

I need to immediately rebuild the department and eliminate the tension and mistrust that has developed. I have decided that I need a new controller to do this..."

14. A District of Columbia Government Office of Unemployment Compensation letter dated 04/17/1998 stating that the patient has been determined eligible for unemployment benefits. No disqualification has been imposed based on separation from employment. The patient's address is given as 7050 Leestone Street, Springfield, Virginia and the employer from whom he was attempting to obtain unemployment was apparently Manna Incorporated in Washington, D.C.[14]

15. The admission and discharge summaries when he was seen at Inova Fairfax Hospital between 12/15/1998 and 12/20/1998 and was treated there for his acute anterior wall myocardial infarction, left ventricular thrombus and gastro esophageal reflux disease.

16. The report of a cardiac catheterization of the patient on December 15, 1998 by a cardiologist John Golden, M.D. at Inova Fairfax Hospital.

---

[14] This is curious, in that the address which he gave me during the history taking was 750 instead of 7050 Leestone Street.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.*

17. Records from Fairfax Colon and Rectal Surgery concerning the anorectal operation and the follow up in 03/1998.

18. A KPPN dated 12/23/1998 by Dr. Ryan notes that patient is positive cardiac arthrosclerotic disease with nicotine abuse.[15]

19. Another contact with Dr. Ryan and his team dated 01/25/1999 in which he is complaining of vomiting and hyperemesis.

20. A KPPN dated 02/09/1999 by Dr. Ryan which states, in part: "54 year old male with history of rationed hospitalization Fairfax for acute anteroseptal myocardial infarction...review of systems reveals patient has had difficulty adjusting to the fact he has had a serious coronary event and has increased depressed mood and anhedonia. Wife and family have noted withdrawal."

21. A KPPN dated 02/09/1999 by Dr. Ryan which reads in part: "extensively discussed behavioral modification for permanent nicotine cessation."[16]

22. A KPPN dated 03/08/1999 and dictated by Dr. Ryan whose diagnosis is depression, moderately controlled. The subjective findings are follow up depression with medications being Paxil, 40 mg orally at bedtime. Observation is that the patient is euthymic; assessment is that he has moderately controlled depression, and the plan is to elevate his Paxil to 60 mg orally at bedtime.

---

[15] This is three days after his discharge from Inova Fairfax for his cardiac catheterization and his severe myocardial infarction and is at the end of the first half year or so that he worked for UPO. He was also on Paxil as early as December 23, 1998 for depression.

[16] The patient advised me and has advised other doctors that he stopped smoking in 1998.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

23. Another KPPN dated 05/14/1999 when the patient is seen by Christopher Ryan, M.D. and is diagnosed as having multiple chronic medical problems one of which is depression.

24. A KPPN dated 05/14/1999 by Dr. Ryan in which he states, among other things, that "several episodes of depression warrant a lifelong pharmacologic intervention."

25. Another contact dated 10/15/1999 by telephone from the patient's wife in which he stated that her husband is complaining of red itchy burning eyes.

26. A KPPN dated 11/19/1999 for an urgent care appointment in which the patient told Susan L. Price, M.D.[17] that he had several years' history of depression with increasing doses of Paxil no longer helping. He also had a heart attack a year ago and has recent onset diabetes mellitus.

27. In a KPPN dated 11/19/1999 when he was still employed at UPO, he saw Dr. Price, a psychiatrist, and was diagnosed with an AXIS I depressive disorder not otherwise specified.[18] Dr. Price's plan was to add Wellbutrin 150 mg sustained release each day.

28. A number of communications with Dr. Ryan all in 2000 when he discusses at length various issues concerning the patient's health, and his care of him. All notes appear to continue to

---

[17] Refer to Footnote No. 4.
[18] This is the time at which he had been fired from Manna by Dana Jones as can be seen in prior notes.

RE: Mohammed Amin Kakeh

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

come from the patient's wife, and she relays information to him.

29. Hand written note apparently from Kaiser Permanente dated 05/15/2000 in which he is seen complaining for headaches complaining that they cross his entire head and have been present for five days. Denied fever, chills, nausea, vomiting, blurred vision. Past medical history – depression.

30. A contact with Dr. Ryan and his team concerning a headache which the patient (or his wife) apparently stated began approximately five days ago. The date of this contact was 05/16/2000.

31. Another note from Dr. Ryan dated 12/08/2000 in which the patient is seeking further explanation of his recent cholesterol and diabetes test results, and past medical history reveals diabetes managed by diet; heart attack in 1998, and reiterates many of the medications, some of which he is still taking including Lopressor, Coumadin, Paxil, Toperal, baby aspirin and Flonase.[19]

32. Another KPPN dated 12/08/2000 in which it is noted that emails to Dr. Ryan and KPPNs were written in the third person, not the first person and a call was made to the patient who stated that he did not write the email but the emails are written by his wife. This stimulated an explanation of the privacy/confidentiality issues to the patient.

---

[19] It should be noted that this contact with Dr. Ryan was in December of 2000, and the patient was even then on an antidepressant four years before his claimed depressive episode at his place of employment.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

33. Another KPPN from Dr. Golden on 01/04/2001 reiterating "significance of symptoms unclear. No obvious volume overload and recent workup would argue against coronary artery disease progression."

34. Another note from Dr. Ryan dated 01/06/2001 in which the triage nurse notes that she spoke with the patient and he stated that he prefers that this wife answer all questions regarding medications.

35. He returned to Kaiser Permanente on 03/16/2001 and was seen by Dr. Golden who noted that he had an "old anterior myocardial infarction" and Dr. Golden's impression was "etiology of symptoms remains unclear. We'll treat him spherically for heart failure with the addition of Lasix 20 mg each day."

36. A visit to the Inova Health System yielded a radiology report dated 04/08/2001 which read, in essence, that the lungs are normally inflated and essentially clear while the heart is upper limits of normal size. Stents are seen in the region of the left coronary artery. There is no evidence of overt heart failure at this time. No acute cardiopulmonary process demonstrated.

37. He visited Charles E. Brennt, M.D. at Inova Fairfax Hospital on 04/08/2001 and was discharged 04/13/2001; he underwent a coronary artery catheterization. He was diagnosed by Dr. Brennt has having coronary artery disease,

RE: *Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

hypercholesterolemia, depression[20], and gastro esophageal reflux disease.

38. A KPPN dated 04/30/2001 in which it is noted that, in part: "Mr. Kakeh had been doing well but in recent months has noted exertional dyspnea. Serial evaluation revealed no obvious cardiac precipitant. He ultimately was admitted to Fairfax Hospital after a sustained episode of chest pain. Cath. (catheterization) revealed a chronic mid left anterior descending artery occlusion (within the stented segment) with right to left collaterals, and mild moderate left coronary disease."

39. A visit with Dr. Ryan dated 06/26/2001 when the patient called in and was advised to take a diabetes sick day.

40. Another note from Dr. Ryan dated 07/01/2001 when the patient was seen for back pain.

41. A KPPN dated 07/12/2001 when the patient went to John Golden, M.D. and was noted to have a "fixed anterior wall perfusion defect on thallium imaging last year...generally doing well. Father died suddenly and Mr. Kakeh traveled to Syria for the funeral. Experienced two episodes of angina there. None since, however, and he is now bicycling 30 to 40 minutes per day without symptoms or difficulty."

---

[20] Note that he has been diagnosed as having depression and anxiety for a number of years before the confrontation with his employers came up.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

42. A KPPN dated 07/12/2001 which reads in part that: "generally doing well. Father died suddenly and Mr. Kakeh traveled to Syria for the funeral. Experienced two episodes of angina there. None since. However, and he is now bicycling 30 to 40 minutes per day without symptoms or difficulty."

43. Another note from Dr. Ryan dated 07/20/2001 for a foreign body abrasion of the eye.

44. The patient's history of adding physical symptoms constantly continues with KPPN dated July 26, 2001 when he was noted to have a myocardial infarction in approximately 1998, and "frozen shoulder" medications. He further reported lower back pain for years, but approximately one month ago in June noted radiating symptoms down right lower extremity to the lateral foot. Patient also noted that MRI was taken that shows nerve "problems" at L-5/S-1. Patient describes symptoms as intermittent numbness with mild tingling in right quadrant area to right hip and down lower extremity to right lateral foot S-1 dermatome. Patient notes intermittent aching and lower back pain with occasional sharp pain and waking with stiffness and pain around pubic bone and around waist (L-1/S-1 height). Patient also complains of both knees "giving out" with ascending and descending stairs.

45. There are various notes in the office material indicating that a woman named Shears was appointed as being in charge of the patient, and, given his cultural background as a Syrian, much of the trouble seems to have begun at this point when a woman was appointed as his boss.

RE: *Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

46. A KPPN dated 12/14/2002 at which time he apparently had a routine physical by M. Langford.

47. KPPN dated 09/30/2002 at which time the note by Stephen Bower, registered pharmacist, states that the patient had a colonoscopy and it was okay to restart his Coumadin this evening.

48. A group of notes generally written by nurse practitioners at Kaiser Permanente concerning follow up on his anterior myocardial infarction which occurred approximately 3 ½ years prior to this note which is dated 07/09/2002.

49. Another KPPN 06/08/2002 in which Dr. Bradley Winston states, in part: "Mr. Kakeh is a 57 year old gentleman who I have actually seen before for flexible sigmoidoscopy. He does have a history of anal stenosis which has apparently been repaired. He is here for a flexible sigmoidoscopy for screening. He has no history of colon cancer; however he does really strongly desire colonoscopy (emphasis mine)."

50. On 12/19/2003 there is a KPPN dealing with the regulation of his Warfarin by the pharmacy, and as it continues there are notes indicating that his medications at that time are Lipitor, Prilosec, Paxil, Aspirin, Aldactone, Fish Oil, Lasix, Actos, Coumadin, Toperal, Mevacor and Prinivil.

He is noted to be married with five children and to have a very happy home with good psychosocial support and no litigation, but an MRI was made with the radiograph of a lumbar spine and there was some desiccation of the L-5/S-1 with narrowing

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

of the disk space in the posterior aspect without evidence of cord compression.

51. A KPPN dated 01/06/2004 for an initial acupuncture evaluation which enunciates the past medical history of the patient as diabetes, congestive heart failure, hypercholesterolemia, gastro esophageal reflux disorder, hypertension, depression.

52. A variety of KPPN indicating his use of Coumadin as a blood thinner after his myocardial infarction which in fact occurred in 1998. He also has a past surgical history of an anal sphincterotomy and an angioplasty with stents twice.

53. These same KPPN continue with MRI findings that there is no evidence of low spinal cord compression and the thecal sac is well preserved in spite of his multiple back and lower extremity complaints. The rest of the disk spaces show no abnormality. The intra thecal structures show normal outline of the conus medullaris and cauda equine.

54. A series of KPPNs reflecting that the patient makes multiple visits for tinea between his toes, otherwise known as Athlete's Foot, and then a number of visits for acne. Interspersed with this are many visits for adjustment of his Coumadin level.

55. Mr. Kakeh's diary with multiple short pages, multiple entries of approximately a paragraph per page, set entries ranging in date almost entirely in the year 2004 in March, April and May.

56. In the KPPN dated 01/13/2004 his past medical history was noted to be diabetes mellitus, hypertension with myocardial

RE: Mohammed Amin Kakeh

Sensitive Medical Information. Should Not Be Shown to Patient or Family!
This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.

infarction, left ventricular thrombus, cardiac arterial disease, gastro esophageal reflux disease, **depression** (emphasis mine), and allergies.

Shortly after he was noted to have a conjunctiva hemorrhage and was sent to the eye clinic where he was told not to rub his eye.

57. This is followed by a series of notes concerning acne rosacea and tenia of the feet also from Kaiser Permanente.

58. Another KPPN which the assessment was normal colonoscopy to the cecum.

59. Another lengthy series of notes from Kaiser Permanente concerning a variety of visits and consultations by the patient including Coumadin regulation, cardiology and diabetes follow ups, low back and right lower extremity pain, physical therapy treatments and continued complaints of back and lower extremity pain.

60. Multiple other notes for various illnesses which have been described in prior entries.

61. Varieties of notes concerning chest pain and angina and gastro esophageal reflux disease.

62. A number of other contacts with Dr. Ryan and his team concerning vomiting, nausea, chest pain, bursitis, and various other illnesses.

63. A variety of telephone calls and email exchanges between Dr. Ryan and the patient and his wife, none apparently serious.

*RE: Mohammed Amin Kakeh*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

64. Call to KPPN from the patient's wife dated 01/13/2004 in which she stated that the patient had a broken blood vessel in his right eye, and a headache for three days.

65. On 02/02/2004 he came in to Kaiser Permanente complaining of myofacial lower back pain and came for treatments with new symptoms.

66. On 02/03/2004, the patient wrote a letter to Dana M. Jones who was the Interim Executive Director of UPO stating that he has been an experienced, talented, dedicated, hardworking, loyal, competent, honest and knowledgeable controller for UPO. He tried to make the point that to place him on administrative leave from June 2, 2004 through June 30, 2004 leading to termination as controller is "incomprehensible and improper."

67. The patient tends to continue with his treatment at Kaiser Permanente, but there are multiple KPPNs well before the job termination such as the note of 02/11/2004 when he came in complaining of right knee pain without an effusion, and had an MRI of the right knee.

68. A memorandum from Dana M. Jones to Amin Kakeh dated 04/13/2004 in which he states, in part: "I want you to understand that I have nothing to hide or gain for correcting UPO fiscal nightmare. As you indicated in your memo of 04/11, 'the controller is responsible for the accounting system, information and documents.' You and others who have been paid well to perform the many tasks (that have not been done) must stop pointing fingers and produce the work that is

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

absence (sic) from the ongoing memos…everyone in management and the board knows that FY (fiscal year) 2003 ended in a deficit. We only want to know why and how much. Until the audit is complete we have estimates that vary. You have produced numbers that have changed."

69. A note from Stewart C. Moore, psychotherapist who states on 06/14/2004 that the patient has been under some significant job related stress for about the last four months. He adds that the patient has been taking Paxil for about five years, but denies any past psychiatric history including medication.

70. The plaintiff's Second Amended Complaint in Civil Case No. 1:05-CV-1271 in the United States District Court for the District of Columbia in which the plaintiff brings suit against defendant for retaliating in violation of the Federal False Claims Act Whistleblower Protection Provision, 31 U.S.C. Art. 37, 29 (h). In this far-reaching complaint by <u>Mohammed Amin Kakeh v. UPO Incorporated,</u> he charges, among other things, that various officials at UPO had met and provided results of an audit which demonstrated that UPO had engaged in fraud, waste and abuse on 03/18/2004. He notes, under heading 26, that on or about 03/25/2004 Mr. Jennings was terminated from his position with the defendant and Dana Jones was appointed interim executive director. Subsequently in 27, on 03/31/2004 the plaintiff filed a charge of discrimination against the defendant for discrimination on the basis of his race, color, gender, national origin and religion with the District of Columbia Office of Human Rights. He alleged a pattern of harassment and discriminatory treatment. Continuing, under Article 42 of this Second Amended Complaint, it is noted that on 03/30/2005 the plaintiff withdrew his charge of

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

discrimination with the District of Columbia Office of Human Rights.

71. However, in Count I of the violations of the D.C. Whistleblower Statute, violation of D.C. Code 2-223.02 plaintiff alleged that he had made protected disclosures to supervisors and public bodies and that by terminating his employment on 06/02/2004 the defendant took a prohibited personnel action against plaintiff and/or retaliated against him as a result of his protected disclosures…the plaintiff further claimed that he had been damaged economically by the defendant's actions as he lost income and benefits of position, and stated that he also suffered humiliation, embarrassment and loss of self-esteem and has otherwise been damaged psychologically and emotionally by defendant's action.

72. In the KPPN dated 05/19/2004, approximately 2½ weeks before he received his termination letter, Nurse Langford reports as follows, in part: "patient calls with malaise, states extreme fatigue, head feels very heavy, unable to hold head up for any length of time. Denies fever. No sign of strainage. No cough, no orthopnea or paroxysmal noctural dyspnea. No swelling. No chest pain. Reports he has been sleeping a lot this week but having difficulty sleeping at night, off work all week. Cites significant work related stress. "

73. On 05/20/2004 he sees Dr. Chin in Internal Medicine, has a normal blood pressure, and his weight is taken as 190 pounds. Dr. Chin writes, in part, "59 year old male patient of Dr. Ryan who complains of fatigue and head 'feels heavy' and 'hard to stay up' at times. Symptoms for three days. No chest pain, no

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

dyspnea, no fever, no chills.  Working long hours and getting little sleep.   No depression/anxiety symptoms worse than before. "

74. In the KPPN dated 05/26/2004, he is noted as fatigued with work stress, and observations included "stressed" assessment includes "stress" and the plan is "therapy referral" and "follow up PRN."

75. A KPPN dated 06/07/2004 which states, in part, that Amin says that Friday (two weeks ago) he met with the U.S. Attorney, an FBI Agent, and the D.C. Inspector General...he states the following Tuesday (last week) he was informed that he has been "Riffed."  He states that he is a very proud man so he hasn't reached out to any of his friends.  He went home and told his family after dinner that he has an attorney.  There is a pending action (EEO Complaint) that will be mediated on 06/17.  He understands that in the middle of such a complaint that an employee cannot be terminated.  He plans to continue to fight this...he wants to make sure (and have it documented) that he is of sound mind.[21]

76. A KPPN from Mary Langford, nurse practitioner noting that she had received a phone call from the patient's wife asking that the patient's medications be sent to the Fairfax County Jail Infirmary.[22]

---

[21] Note from the psychiatrist whom he stated he was refusing to see in 2004 and 2005, that he had several years' history of depression with increasing doses of Paxil no longer helping.  He also had a heart attack a year ago and has recent onset diabetes mellitus.

[22] This was right after he had assaulted and battered his daughter and cut off her hair and beat her feet with sticks.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

77. A note from Dr. Ryan at Kaiser Permanente in which he notes various ailments which the patient complains of a physical nature, but also notes depression – denies depressed mood/anhedonic on current medications. Denies suicidal ideations. Lifetime treatment given greater than three episodes of depression.

It is also noted in this same note that he had an MRI in Saudi Arabia in December of 1993 which showed a minimal herniation at L-5/S-1. (The problem is that he left that off of his resume when he applied to Manna and to UPO.)

78. Medications: Paxil, a popular selective serotonin reuptake inhibitor antidepressant. Note that this was approximately four years before he was terminated by UPO.

79. A KPPN dictated by Dr. Ryan which states that he is following up the depression. That the patient is feeling depressed, sad, blue most of the day and almost daily; that he has anhedonia with diminished interest/pleasure in all or most activities; that he has disturbed insomnia or hypersomnia; irritability; guilt; decreased energy; poor concentration, indecisiveness; significant change in absence of internal efforts to alter weight; psychomotor agitation or retardation.

Dr. Ryan also notes that he is experiencing specific stress which is work related because he began a new job and feels overwhelmed. He further notes that the patient has a flat affect, and uses the diagnostic code of 296 for major depressive disorder.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

80. The resume of Richard Bruce Edelman, Professor Emeritus of Finance at American University in Washington who is expected to testify for the plaintiff. The report prepared by Dr. Edelman, and the "lost income questions for wrongful termination/wage dispute cases Professor Richard B. Edelman which contains large number of financial documents, tax documents, fiscal reports, evidently concerning UPO and subsequently Equal Justice Works where the patient is currently employed."

81. In the KPPN dated 07/27/2004 the patient is described as being in no acute distress but looking tired.

82. 09/22/2004 in speaking with Dr. Moore, the patient states that "he exercises daily (walks). He is not smoking though he is having urges to return to his former habit. His wife notes that Amin's family in Syria look to him as the leader so he cannot tell them about his misfortunes ("they would be devastated"); she goes on to note that his brother recently died and he, Amin, was unable to return home to be there for his family. He has no close friends that he can share this with either...We discussed the thinking of putting his limited resources into a court case versus putting all of his energy into getting another job. There seems to be a bit of a trauma bond that he is experiencing at this time."

83. A KPPN stating, in part, the patient takes Paxil for the last five years or so. He began taking this when he had lost a job, was under some financial stress, and was responding by agitation and **irritability** (emphasis mine).

84. A warrant of arrest for misdemeanor dated 10/23/2004 in which Mohammed Amin Kakeh was arrested for assaulting

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

and battering his daughter, Nabeelah Kakeh. He was tried and found guilty by a Fairfax County Judge, name illegible, and adjudication/disposition was deferred and accused placed on probation. From other history available to me it appears that he spent approximately 13 nights in jail and had to reimburse the Commonwealth of Virginia for investigatory medical fees. His bond was for $10,000 and he was not to have contact with the child/victim, Nabeelah Kakeh. The case number is JA333589-01-01.

85. In the KPPN dated 11/09/2004, Mary Langford, psychiatric nurse, notes that there was a "recent severe family crisis."

She went on to say that the patient has resumed all medications since his incarceration and is fasting for Ramadan holiday. He is noted to be in no acute distress.

86. KPPN event date 12/08/2004. In this case management note, Stewart Moore, psychotherapist states, in part: "Amin is here with his wife. They report that their daughter has been running away and lying and staying out all night. After several of these incidents they report that Amin cut her hair off and hit her on the foot with a stick. She called the police and he was arrested for assault and battery (spent 13 nights in prison) and goes to court tomorrow...I discussed Kaiser's policy on court mandated treatment and predicted that he would likely have to go to anger management and parenting classes. Amin feels like he is in control of everything else."

87. In a KPPN dated 02/10/2005 the patient is examined for his cardiac complaints, and it is noted that his wife handles the

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

medications. It is noted that a significant factor is recent family related stress, and he is under counseling for this.

88. In a continuing KPPN he is noted as continually depressed as he apparently was, based on their findings for ten years prior to the interruption of his employment.

89. He also filed a count for wrongful discharge, a count for retaliation for discrimination, a count for violation of Federal False Claims Act and the Whistleblower Protection Provision, and violations of the District of Columbia False Claims Act, all of which was certified as delivered by Omar Vincent Melehy, Esquire on the 9th day of December, 2005.

90. A KKPN dated 03/09/2005 in which the patient is stated, in part, as saying: "I want to sleep all the time. I'm crying inside and I've been on Paxil for the past 10 years but I do not feel that it is working."[23]

91. He is seen on 03/09/2005 by Derwin Harris in adult psychotherapy on a phone encounter, and his wife reported that he needs to see a psychiatrist. The quotation is "I have heart disease and they recommend that I need to see a psychiatrist, Dr. Price. My primary care provider referred me to see Dr. Price..." He reports that he has lost his job eight months ago and reported that he has seven children and he has not been able to find anything and adds "I want to sleep all the time."[24]

---

[23] Any history of either depression or anxiety was denied by the patient during my clinical interview. However, the Depression Scale did elevate moderately on the MMPI-2.
[24] This is in contradistinction to what he told this examiner which is that he could only sleep two hours per twenty four.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

92. She has another visit with him on 03/29/2005 in which she notes that the patient with history of depression with more anxious symptoms at this time including anxiety attacks and generalized anxiety that is starting to limit his ability to make phone calls to look for jobs. She continues with a diagnosis of panic disorder. She is tapering him off Paxil while starting Prozac up to 20 mg.

93. On 03/29/2005 she also starts him on Ativan .5 mg as needed for anxiety attacks. She further states that his anticipated achievement date for reduction in the above-mentioned target symptoms will be significant in two months.

94. At another point in the provider note she states that he has a past psychiatric long history of depression but has dealt with it. She further noted that his daughter did not do well on Paxil, but improved on Prozac.

95. A KPPN dated 04/05/2005 in which it was noted that he had no diabetic retinopathy after the eye examination.

96. 04/09/2004, KPPN summary of medical problems for the patient dictated by Christopher Ryan, M.D. and labeled as health assessment. Dr. Ryan lists the following conditions as pertinent to the patient's care:

- Allergic rhinitis – Flonase. Nasarel caused epistaxis. Antihistamines caused urinary symptoms.

- Back pain – use Tylenol ES given congestive heart failure. MRI Saudi Arabia, 12/1993: minimal herniation L-5/S-1.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

Prior relief with traction; home traction no relief. No non-steroidal anti-inflammatory drugs given. Ergonomic chair at work. Prior Kaiser Permanente back class.

- Colon cancer screening – average risk: greater than 50, asymptomatic, no family history. NEXT with scope 2012. Colonoscopy 09/2002 Dr. Winston: normal to the cecum. Flexible sigmoidoscopy 09/1997 normal to 60 centimeter upper endoscope/anal stenosis/now status post anoplasty. Report rectal bleeding, black stools, unanticipated weight loss.

- Coronary artery disease/anterior septal myocardial infarction 1998 – left anterior decending/D-1 PTCA/stent. Effective to 35%. Catheterization 04/2001: chronically collateralized left anterior descending occluded, otherwise non-critical coronary atherosclerotic disease. Left ventricular thrombus/anticoagulation. Toperal XL 50 mg tab., 0.5 tab each day. Low density lipoproteins lower than 100 with Lovastatin 80 mg each evening. Increase exercise. Low fat diet.

- Depression – denies depressed mood/anhedonic on current medications. Denied suicidal ideation. Lifetime treatment given greater than three episodes of depression.

- Degenerative joint disease bilateral knees – use Tylenol ES given gastro esophageal reflux disease.

- Eczema – Lidex cream.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

- Family history – father – hypertension, diabetes mellitus, lipids, myocardial infarction late 50's, CABG 72, died in his 70's from complications status-post hip fracture. Mother – hypertension, diabetes mellitus, lipids, congestive heart failure.   Brother – Maumoon – hypertension, cholesterol.

- Gastro esophageal reflux disease – normal esophageal gastric diagnosis 11/1996.   Complete relief on Prilosec. Drinks two cups of tea.  Discussed conservative measures extensively.

- Hemorrhoids – increase daily dietary fiber and water intake to avoid constipation.

- History of anal stenosis – resolved status post anoplasty by Dr. Colvin (colorectal surgeon, external).

- History dizziness – experienced during February 1999 admission for chest pain.   CT scan of the brain 03/1999 negative.

- History of nicotine abuse – patient quit nicotine 02/1999 after substantial counseling[25].

- Hyperlipidemia   –   described   NCEP   goals, cardioathrosclerotic disease attained on Lovastatin 80 mg each evening.  Goal - low density lipoprotein under 100, target 70.   Positive risk factors: hypertension, diabetes mellitus, history of tobacco, cardiac atherosclerotic disease, family history, obesity, lipids, male older than 45

---

[25] In this office he alleged he had stopped smoking in 1998.

*RE: Mohammed Amin Kakeh*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

years.   Increase aerobic exercise to 30 minutes per day. Low fat diet.

- Hypertension – stage 0 – Toperal XL 50 mg tab, 0.5 mg tab each morning, Prinivil, 10 mg each morning, Lasix 20 mg each morning.   Increase aerobic exercise.   Weight Watchers for weight loss.  Low sodium diet.

- Left ventricular mural thrombus.

- Prostate cancer screening – direct examination 04 a nodular prostate.

- Right shoulder calcific tendonitis – prior steroid injection, physical therapy and orthopedic consult (Dr. Kasmin).  X-ray 03/1998 documents calcifications.   Social history – married – finance controller for non-profit organization. Tobacco: quit 1998.  Smoked ½ pack per day for greater than 30 years.  Alcohol – none.  Drugs – none.  Seatbelt wearer – yes.

- Testicular cancer screening – testicular examination 04 negative.   Demonstrated testicular exam.   Advised to perform monthly.

- Type II diabetes mellitus – diagnosed 1999.  A1C.  Actos. Optometric annually.   Aspirin each day.   Low density lipoproteins to be maintained at less than 100 with Lovastatin 80 mg each evening.  Microalbumin/creatnine normal, Prinivil 10 mg each morning.  Monofilter normal. Prior to evaluation diabetes mellitus clinic.

*RE: Mohammed Amin Kakeh* *Page 56*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.*

✓ Medications – no non-steroidal anti-inflammatory drugs: congestive heart failure - -

✓ Alert – anticoagulation – this alert was initially created by a KP-IT auto load process.

✓ Cardiac atherosclerotic disease registry – this alert was initially created by KP-IT auto load process.

✓ Diabetes registry – this alert was initially created by KP-IT auto load process.

- Allergies – denies Latex/ Zylocaine/Iodine/No known drug allergies.

- Past Surgeries

  ✓ Anoplasty with house advancement flap – 1998.

  ✓ Cardiac stent – 1998.

  ✓ Extraction of wisdom teeth – 1972.

  ✓ Hemorrhoidectomy – 1970.

97. Approximately 80 pages of lab results over a period of years when he was being treated at Kaiser Permanente.

98. On 04/19/2005, she sees the patient again, and her primary diagnosis is panic disorder though she continues to carry the

*RE: Mohammed Amin Kakeh*                                                    *Page 57*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

generalized anxiety disorder and depressive order not
otherwise specified diagnosis. She notes that he is tapering off
of Paxil and will remain on 20 mg of Prozac.

99. In the KPPN dated 05/31/2005 Susan L. Price, M.D.
(psychiatrist) saw the patient and stated, among other things,
that he has seven children, something which confuses this
examiner as he relates only five. She further reports that he is
currently unemployed but actively looking for work and has
not lost hope that he will find a job. Most importantly, she
states he is taking Paxil, 40 mg per day for about **10 years**
(emphasis mine) for depression.

Regarding his mental status she states that he is alert, neat,
calm, oriented in three spheres, fluent speech, realistically
hopeful, expressive affect, thoughts goal directed, good
judgment and insight and intact memory. Her diagnoses are
panic disorder 300.02, generalized anxiety disorder, and
depressive disorder not otherwise specified, 311.

On AXIS III she notes that he has ischemic cardiomyopathy.
On AXIS IV she notes he has been unemployed for many
months and has problems with children and legal problems.
On AXIS V she stated his current level of function is 75 and that
is the same for the prior year.

100.     A KPPN from Dr. Ryan dated 06/17/2005 in which he
noted that the patient had NAD (no acute distress) but was
suffering from bronchitis.

RE: Mohammed Amin Kakeh

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

101.    In a KPPN dated 09/19/2005, he consulted with Susan Price, M.D., psychiatrist, with a diagnosis of panic disorder and she described the patient as having had a history of depression with more anxious symptoms at this time including anxiety attacks and generalized anxiety that is starting to limit his ability to make phone calls to look for jobs.

102.    In a KPPN dated 09/19/2005, the examiner reports (patient) "states not doing very well: constant chest heaviness lasting all day, not affected by exertion, seems better when sleeping. However, does have insomnia and feels he is having some panic. Decreased appetite, has increased fatigue, lack of sleep. Symptoms do seem worse with emotional upset.

Nevertheless he is described as being in no acute distress, and the findings of the examination include no chest pain, no arrhythmia, heart rate blunted due to blood pressure treatment, no ischemic ECG changes, below average exercise capacity."

103.    Another KPPN note from Dr. Christopher P. Ryan dated 01/06/2006 at which time he treated the patient for epistaxis (nosebleed).

104.    Another KPPN by Dr. Ryan also on 01/06/2006 concerning the patient's symptoms of gastro esophageal reflux disorder and chest pain.