UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,

        Plaintiff,

v.

UNITED PLANNING ORGANIZATION, INC.,

        Defendant.

CIVIL ACTION NO. 05-1271 (GK/JMF)

NEXT SCHEDULED EVENT: PRETRIAL
CONFERENCE MARCH 6, 2007 @ 4:00PM

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Defendant United Planning Organization, Inc. ("UPO" or "Defendant"), by and through

its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule

56.1, files this Memorandum of Points and Authorities in Support of its Motion for Summary

Judgment and states as follows:

**I.**     **INTRODUCTION**

Plaintiff Mohammed Amin Kakeh ("Kakeh" or "Plaintiff"), a former employee of UPO,

would have this Court believe that his position was eliminated because he set the wheels in

motion that led to the uncovering of the financial mismanagement at UPO.  In a futile attempt to

paint himself as a whistleblower, Plaintiff ignores years of declining audit results and the routine

nature of monitoring reviews of UPO.  Even if Plaintiff was instrumental in the airing of the

weaknesses in UPO's internal financial controls, the mere fact that Plaintiff was a

"whistleblower" is not enough to find that UPO wrongfully terminated Plaintiff's employment.

If an employer does not know that an employee has reported misconduct to those in a position to

take corrective action, it is nonsensical and impossible that the employer's actions were

motivated by whistleblowing.  That is the case here: UPO had no knowledge that Plaintiff was

clandestinely meeting with public officials. All that UPO knew was that Plaintiff was cooperating in a monitoring review and investigation into its financial management systems, as would be expected of anyone in his position – Controller. Furthermore, the elimination of Plaintiff's position had absolutely nothing to do with a prior discrimination complaint which he made internally and filed with the District of Columbia Office of Human Rights. Plaintiff was not singled out. Plaintiff's position as well as three (3) other management positions were eliminated as part of UPO's plan to address ongoing deficiencies in its Finance Office.

For those reasons, there is no genuine issue of material fact regarding Plaintiff's claims under Count I, the Employees of District Contractors and Instrumentality Whistleblower Protection Act, D.C. Code §2-223.01 ("D.C. Whistleblower Act"); Count II, wrongful discharge; Count III, the District of Columbia Human Rights Act of 1977, D.C. Code § 2-1402.61 ("DCHRA"); Count IV, the federal False Claims Act, 31 U.S.C.A. §3730(h); and Count V, the District of Columbia False Claims Act, D.C. Code § 2-308.16 (collectively, "the False Claims Laws").

First, UPO is entitled to summary judgment as a matter of law on Counts I, IV and V of the Complaint because Plaintiff cannot prove that he was terminated in violation of the D.C. Whistleblower Act or False Claims Laws. The undisputed evidence demonstrates that UPO had no knowledge of Plaintiff's alleged whistleblowing activities. The undisputed evidence further fails to show that either Plaintiff or a representative of the federal and/or D.C. government ever communicated to UPO that Plaintiff was responsible for the inquiries that raised questions regarding the financial management of UPO.

Second, UPO is entitled to summary judgment on Plaintiff's retaliation claim under the non-retaliation provisions of the DCHRA (Count III) because he cannot produce the requisite

causal connection between his protected activity and his separation from employment. Even if he could establish a *prima facie* case of retaliation, he cannot produce any evidence that UPO's legitimate business reason for his termination – a reduction-in-force – was pretextual.

Third, Plaintiff's wrongful discharge claim (Count II) fails because there are statutes which provide him a remedy for UPO's alleged wrongful conduct. Both Congress and the D.C. government have enacted laws which protect employees against retaliation for whistleblowing, assisting in the investigation of false claims or opposing discriminatory conduct. There is no need for this Court to create a remedy because Plaintiff's exclusive remedy is statutory. Further, Plaintiff fails to identify any other statutes, regulations or Constitutional provisions which UPO's conduct allegedly violated.

Plaintiff has no admissible evidence to support his claims. His "evidence" that he was terminated for unlawful reasons is based solely on his conjecture and speculation. That is not sufficient to defeat summary judgment. Accordingly, there is no genuine issue of any material fact and UPO is entitled to summary judgment as a matter of law against Plaintiff on all of his claims.

## II.    STATEMENT OF FACTS

### A.    PRELIMINARY STATEMENT

UPO is a District of Columbia private, non-profit corporation whose purpose is to address issues of poverty in the District of Columbia. Statement of Material Facts to Which There Is No Genuine Issue of Dispute ("SOF") at ¶ 1. Defendant is funded primarily through grants from both the District of Columbia and federal governments, including the Community Service Block Grant ("CSBG") and Head Start program.[1] SOF at ¶ 2. The CSBG is a federal anti-poverty

---

[1] The Head Start program provides funding for pre-school education and services. SOF at ¶ 39.

block grant which the U.S. Department of Health and Human Services ("DHHS") passes through state agencies, such as the District of Columbia Department of Human Services ("DHS"), to local community action agencies, like UPO.    SOF at ¶ 3.

UPO is governed by a Board of Trustees which is comprised of citizens of the District of Columbia, including judges, lawyers, D.C. government representatives, and other private citizens.  The day-to-day management of UPO is led by a Chief Executive Officer[2], Chief Operating Officer[3], Chief Financial Officer, Program Directors and the General Counsel.  SOF at ¶ 4.

**B.     MANAGEMENT OF UPO'S FINANCE ORGANIZATION**

UPO hired Plaintiff as its Controller in 1998.  SOF at ¶ 9. For almost five (5) years, Plaintiff supervised all of the accounting functions.  SOF at ¶ 5.  In October 2002, Benjamin Jennings, the Executive Director, hired Sheila Shears as a consultant to examine the accounting structure and make recommendations so the Finance Office would perform more efficiently.  Id.; SOF at ¶ 7.  Jennings also asked Shears to be a point of contact when UPO's independent auditor was performing the year-end audit of UPO for fiscal year 2002.  SOF at ¶ 7.   In the Spring of 2003, Jennings offered Shears the Chief Financial Officer position, which UPO had been trying to fill for at least a year to strengthen the Finance Office's performance.  SOF at ¶  5.

**C.     CSBG AND HEAD START MONITORING REVIEW HIGHLIGHT WEAKNESSES IN UPO'S INTERNAL FINANCIAL CONTROLS**

One of the requirements of DHS's administration of CSBG is that it provide oversight to ensure that the funds are spent properly.  SOF at ¶ 17.  In this case, oversight came in three (3)

---

[2] During the relevant time period, the Chief Executive Officer was referred to as the Executive Director.  SOF at ¶ 4, n.1.
[3] During the relevant time period, the Chief Operating Officer was referred to as the Deputy Executive Director. SOF at ¶ 4, n.1.

different forms: (1) monthly programmatic and financial reporting, (2) quarterly meetings, and

(3) in-depth monitoring reviews. Id. During a monitoring review, DHS will review records,

conduct interviews and possibly use other monitoring tools, such as questionnaires. SOF ¶ 18.

If specific skills are needed, DHS will seek the expertise by contracting with third parties. Id.

In July 2003, Tunde Eboda, CSBG Program Manager, notified Jennings that DHS

intended to conduct a routine programmatic and financial review.[4] SOF at ¶ 20. UPO and DHS,

however, could not agree to a date for the review to begin. Id. In December 2003, Eboda told

Jennings that the review had to begin in March 2004 because DHS wanted to have its report

completed in time for a D.C. City Council public hearing, which was scheduled for the Summer

of 2004. SOF at ¶ 21. Thus, it was decided that the review would begin on February 18, 2004.

SOF at ¶ 23. Plaintiff was unaware of the scheduled monitoring review. SOF at ¶ 22.

On February 5, 2004, Plaintiff met with Eboda. Id. UPO did not learn about this meeting

until after Plaintiff was terminated under a reduction-in-force. On February 18, 2004, Eboda,

with his assistant, conducted an entrance interview with Jennings and other UPO senior

management staff. SOF at ¶ 24. DHS also requested financial information and met with

significant program managers and line staff, including Plaintiff. SOF at ¶ 25. Plaintiff was

UPO's Controller. UPO assumed that Plaintiff was cooperating in the monitoring review

because of his job duties to manage the finances of the UPO. SOF at ¶¶ 24-27.

During the initial interviews, Eboda discovered conflicting and contradictory information

that suggested CSBG grants may have been improperly allocated. SOF at ¶ 28. Further, because

Thompson, Cobb, Brazilio and Associates ("TCBA"), UPO's independent auditor, had not yet

completed the fiscal year 2003 ("FY03") audit, some of the financial information was not

---

[4] The prior review was in 2002. SOF at ¶ 23.

available.[5]  SOF at ¶ 16.  Eboda then determined that DHS would need additional technical

assistance in completing the monitoring review.  SOF at ¶ 28.  Since he was not able to obtain

the financial expertise from a D.C. agency, he entered into an agreement with the National

Association for State Community Services Programs ("NASCP"), which hired the Mid-Iowa

Community Action, Inc. ("MICA") to assist DHS.  Id.

On February 25, 2004, Ricardo Lyles, Administrator of the Family Services

Administration for DHS, sent a letter to Jennings confirming the continuation of the monitoring

review.  He told Jennings, "[t]his on-site monitoring visit should be considered a routine and

customary exercise and in keeping with *Section 678B* of the *CSBG Act of 1998 (42 U.S.C. 9901*

*et seq.)* as amended."  SOF at ¶ 29.  DHS returned to UPO with the MICA group during the

week of March 1-5, 2004, to continue the monitoring review.  SOF at ¶ 30.

On March 11, 2004, the Board of Trustees met with Eboda and Lyles, who had requested

the meeting to share the draft preliminary results of a review of UPO's handling of CSBG funds.

SOF at ¶ 31.  The draft preliminary report identified issues in the areas of financial management,

governance, planning and communications, personnel and programs.  The review of the financial

management system found it did "not meet Federal grant standards."  Among the findings were

that (1) bank reconciliations were not completed timely or accurately, (2) cash disbursement

procedures were circumvented by management, (3) large amounts of cash disbursements were

unsupported, (4) the accounting system could not generate timely financial statements, and (5)

deterioration in the liquidity of UPO.[6]  SOF at ¶ 34.

---

[5] TCBA had begun the FY03 audit in December 2003.  TCBA's audit was not finished when DHS conducted its
review because the UPO Finance Office had not provided to TCBA all of the information which it needed to
complete the audit.  SOF at ¶ 16.
[6] Even though the draft preliminary report was supposed to be confidential, articles about the conclusion of the
monitoring review appeared in the Washington Post.  SOF at ¶ 37.

In response, the Board immediately decided to suspend, with pay, the Executive Director, and appointed Gladys Mack, the Deputy Executive Director, to lead UPO in a temporary capacity. SOF at ¶ 36. The Board of Trustees also formed an Ad Hoc Management Committee comprised of Alexis Roberson, D.C. Court of Appeals Chief Judge Annice M. Wagner, Erias Hyman, Carol Caldwell, The Honorable Henry F. Greene, The Honorable Rafael Diaz and Brenda Kelly to address the issues raised in the preliminary report. SOF at ¶ 35. The Ad Hoc Management Committee also began the search for an interim Executive Director. Id.

Shortly after the March 11, 2004 meeting, federal DHHS conducted an on-site monitoring review of UPO's Head Start/Early Head Start ("Head Start") program during the week of March 15-19, 2004. SOF at ¶ 40. The purpose of the review was to:

> [A]ssure that Head Start and Early Head Start grantee illegible the type and scope of services required by the Head Start Program Performance Standards and other relevant legislative, regulatory and policy requirements governing the administration of the Head Start and Early Head Start programs. Through monitoring, [DHHS] determines the degree to which programs are meeting requirements and, as necessary, directs technical assistance resources to those programs.

SOF at ¶ 41 (Exhibit 13 of the Deposition of Dana Jones). Like the DHS review, the Head Start program review was a regularly planned and scheduled monitoring review.[7] SOF at ¶ 41.

As a result of its monitoring review, DHHS sent UPO a letter on April 20, 2004. UPO was classified as a "Grantee with Deficiencies". SOF at ¶ 62 (Exhibit 13 of the Deposition of Dana Jones). DHHS informed UPO that it had to develop a Quality Improvement Plan ("QIP") to correct the deficiencies in program governance, recordkeeping and reporting, and fiscal management within one (1) year. If UPO failed to remedy the deficiencies within the required

---

[7] Unbeknownst to UPO, Eboda and Plaintiff met with the Head Start reviewers away from UPO's premises. SOF at ¶ 52.

timeframe, UPO risked termination of the Head Start grant.   SOF at ¶ 63.   UPO could not risk

losing its Head Start funding.   Id.

On April 26, 2004, DHHS designated UPO as a high-risk grantee.   SOF at ¶ 64.   A "high-

risk organization is one whose management practices raise serious questions about its ability to

assure proper financial stewardship of grant funds."   SOF at ¶ 64.   As a result of its high risk

status, UPO had to immediately establish proper internal controls to safeguard federal funds and

avoid a recurrence of the financial compliance deficiencies.   Id.

### D.    UPO DECIDES TO OUTSOURCE THE MANAGEMENT OF THE FINANCE OFFICE AND LAY OFF THE EMPLOYEES IN MANAGEMENT POSITIONS.

On March 18, 2004, prior to receiving the results of the Head Start monitoring review,

the Board of Trustees voted to have Jennings removed as the UPO Executive Director and to

commence the search for an Interim Executive Director.   SOF at ¶ 36.   In the meantime, Mack

and Shears endeavored to complete UPO's financial reports for FY03 so that TCBA could

complete the audit and UPO could satisfy its bank's demand for the audit results.   SOF at ¶ 42.

Plaintiff, however, refused to cooperate in the process because of unspecified legal and audit

issues.[8]   SOF at ¶ 44.   Despite Mack's request that Plaintiff identify the issues to her, he refused

to clarify his concerns.   Id.   Therefore, Shears, with the assistance of F.S. Taylor, a private

accounting firm, completed the financial reports.[9]   SOF at ¶ 45.

Aware that UPO was looking for an Executive Director, Eboda recommended Dana

Jones, who had been the President and Chief Executive Director of the Southern Maryland Tri-

---

[8] Plaintiff had changed the manner in which UPO presented its finances.  In the past, UPO had reallocated deferred revenue from CSBG to fund other programs which had exceeded their budgets.  The terms of the grant permitted the use of CSBG funds for related programs.  SOF at ¶ 43.  This practice also had been documented in prior audits, which were provided to DHS.
[9] F.S. Taylor had been retained to assist UPO in addressing issues which a prior Head Start review had uncovered. SOF at ¶ 45.

County Community Action Committee for 24 years. SOF at ¶ 48. On April 5, 2004, the Board

of Trustees approved the hiring of Jones as UPO's Interim Executive Director. SOF at ¶ 49.

UPO decided that it was imperative that all issues be identified and addressed immediately. SOF

at ¶ 71. Jones immediately focused on the financial management system which was the primary

area that DHS identified as problematic. SOF at ¶ 50. A couple of weeks later, Jones learned

that federal DHHS had similar concerns. SOF at ¶¶ 62-64.

    When Jones first met with the Board of Trustees shortly after he was hired, he told them

that the agencies' findings were not recent problems. SOF at ¶ 65. The 2001 and 2002 reports

from UPO's independent auditor indicated the declining quality in internal controls. Id.

Initially, Jones planned to recommend that UPO outsource the entire Finance Office and lay off

all of its employees.[10] SOF at ¶ 68. When Plaintiff learned of Jones' plan, he organized a

meeting of the employees in the Finance Office to fight outsourcing. SOF at ¶ 66. The

employees also expressed their displeasure to the President of the Board of Trustees in an April

29, 2004 memorandum, and demanded a meeting with the Board of Trustees to "stop the

outsourcing." Id. Employees also complained to Jones that the nonmanagement employees had

not received proper training or performance evaluations. SOF at ¶ 67.

    Jones then decided to recommend that only the management employees in the Finance

Office would be outsourced, and those employees holding the management positions would be

laid off. SOF at ¶ 68. On May 6, 2004, Jones recommended to the Board of Trustees that the

positions of CFO, Controller, Deputy Controller, Senior Auditor and Facilities Manager be

---

[10] This was not the first time that UPO had considered outsourcing the finance functions. Sheila Shears, as a
Consultant, had recommended to Jennings in the Spring of 2003 that the accounting department be outsourced. SOF
at ¶ 51.

outsourced.  SOF at ¶ 69.  The Board did not discuss the specific employees who would be affected by the outsourcing.  Id.

UPO sent requests for proposals ("RFPs") to a number of outside accounting and financial firms to assist UPO in strengthening the Finance Office.  SOF at ¶ 72.  UPO initially received proposals from F.S. Taylor and TCBA.  SOF at ¶ 73.  Eboda objected to UPO selecting F.S. Taylor because it had worked with UPO during the period that its financial controls were in question.  SOF at ¶ 74.

Mack had received a referral to Walker & Company, LLP ("Walker") and recommended to Jones that UPO send an RFP to the firm.  SOF at ¶ 75.  Unlike TCBA and F.S. Taylor, prior to submitting its proposal to UPO on May 19, 2004, Walker had not performed any services for UPO.  Id.  Based upon the RFP, Walker understood that UPO wanted a firm to come in and take over all of the finance functions.  SOF at ¶ 76.  Accordingly, Walker's proposal envisioned filling all of the management and staff positions.  Id.

After reviewing Walker's proposal, Jones and Mack met with Ron Walker, Roy Layne and another Walker employee.  SOF at ¶ 77.  Jones informed Walker that UPO did not intend to outsource the management of the Finance Office.  Rather, UPO employees would continue to fill the staff positions.  Id.  Walker still was interested, and was agreeable to being responsible for the filling of the positions in its two-tiered management structure with Walker employees.  Id.  Under Walker's proposal, there would be a Chief Financial Officer as the head of the Finance Office and three managers (Financial Operations Director, Grants Management Director and Accounting Director).  SOF at ¶ 78.

Well in advance of Walker submitting its proposal, Jones had discussion with the Human Resources department regarding UPO's reduction-in-force process.  SOF at ¶ 59.  UPO had a

reduction-in-force ("RIF") policy, which the Office of Human Resources administered with the

General Counsel's office. SOF at ¶ 59. Under the policy, Human Resources had to prepare a

retention register, which placed employees who would be laid off into groupings referred to as

competitive areas according to their duties, functions, responsibilities and pay schedules. Id.

Each RIF plan required every position in the affected competitive area to be assigned to a

"competitive level." Id.

> A "competitive level" consist[ed] of the grouping of positions by funding source,
> which are so similar in all important aspects that an employee can move from one
> position to another within the funding source without significant training and
> without undue interruption of the work program.

Id. Employees with the longest length of service with UPO were placed at the top of their

particular grouping. Id. If there was a position available for which employees in a particular

grouping were qualified, the person at the top of the competitive area was retained and offered

that position. SOF at ¶ 60. No employee is guranteed a reassignment if a vacancy exists. SOF

at ¶ 59.

Because the management of the Finance Office was to be outsourced, UPO applied the

RIF policy. SOF at ¶ 61. On April 15, 2004, Human Resources sent the job groupings to the

General Counsel for her review. SOF at ¶ 54. There was one position, however, which was not

placed in a competitive area. That was the Chief Financial Officer position, because the

incumbent, as an Office Director, was excluded from the RIF policy.[11] Id. Plaintiff was placed

in a competitive grouping with the Deputy Controller, Davidson Quashie, since they had similar

job duties and pay schedules, and could easily perform the other's job responsibilities. SOF at ¶

81. Quashie had been employed with UPO since September 23, 1974. SOF at ¶ 8. Plaintiff had

---

[11] Even if the Chief Financial Officer's position had been subject to the RIF policy, Shears had resigned on March
11, 2004. SOF at ¶ 32.

begun his employment with Defendant on June 29, 1998. SOF at ¶ 9. Since Quashie had been employed for almost 30 years and Plaintiff for less than six (6) years, Quashie was placed at the top of the competitive level. SOF at ¶ 82.

By May 27, 2004, UPO knew that Quashie held the top spot in his competitive area. SOF at ¶ 80. That same day, Walker finalized its cost proposal based upon the firm staffing only the Chief Financial Officer, Finance Operations Director and Grants Manager positions with Walker hires. SOF at ¶ 79.

UPO completed the RIF by finalizing notices for distribution on June 2, 2004 to the four (4) affected management employees in the Finance Office whose positions were being outsourced. SOF at ¶¶ 83-88. The RIF notices for Plaintiff[12] and Nona McLean, the Facilities Manager, stated that their employment would terminate on June 30, 2004. SOF at ¶ 86.[13] The RIF notice for William Isaac, the Senior Auditor, advised him that he was temporarily re-assigned to a vacant lower level position.[14] SOF at ¶ 87. Quashie was notified that he would be reassigned to the newly created position of Accounting Director. SOF at ¶ 88.

## E. THE D.C. AND FEDERAL INSPECTORS GENERAL INVESTIGATE UPO.

On May 12, 2004, UPO sent a letter to Eboda requesting that he facilitate a coordinated investigation by the Inspectors General by governmental agencies from which UPO received funding. SOF at ¶ 71. The UPO Board of Trustees wanted transparency in its plan to address the widespread concerns about its internal financial controls and to ensure that all issues were addressed immediately. Id. On June 2, 2004, representatives from the DHS and DHHS

---

[12] While Plaintiff did not receive his RIF notice until June 2, 2004, Eboda was told earlier that UPO intended to eliminate Plaintiff's position. SOF at ¶ 89.
[13] The notice also said that they would not be expected to work after June 2, 2004, but would be paid through June 30th. SOF at ¶ 83.
[14] Isaac, who received his notice on June 9, 2004 because he was on vacation on June 2, 2004, decided to retire in lieu of being demoted. SOF at ¶ 84.

Inspectors General, FBI and U.S. Attorneys' Office arrived at UPO to begin an investigation.

SOF at ¶ 91. UPO management had been expecting them because of the letter which was sent to

Eboda on May 12, 2004 in an effort to ensure transparency. Id.

Monica Scott Beckham, UPO's General Counsel, saw Plaintiff escorting these

individuals within a hallway in UPO's building, but did not initially know who they were. SOF

at ¶ 94. She recognized Shelly Elliot, a representative of the D.C. DHS Inspector General, who

had been conducting an investigation of a UPO security contract since August 2003. SOF at ¶

95. Upon seeing her, Beckham assumed her visit was part of that investigation. Id. During a

meeting later that day with the law enforcement agents, Beckham expressed surprise that they

had not contacted her in light of the Board of Trustees' letter to Eboda. SOF at ¶ 96. UPO also

learned that the Inspectors General were interested in UPO because of the articles in the

Washington Post. SOF at ¶ 37.

### III.   PROCEDURAL HISTORY

UPO has an internal grievance procedure through which employees can raise complaints

related to their employment. SOF at ¶¶ 14-15. In October 2003, Plaintiff utilized the grievance

process. Id. He accused Shears and Mack of harassing and discriminating against him. SOF at

¶¶14-15. UPO investigated his complaint and found no basis for his allegations. Id.

On April 7, 2004, UPO received notice that Plaintiff had filed a complaint with the D.C.

Office of Human Rights ("DCOHR") in which he alleged that UPO failed to select him for the

Chief Financial Officer position because of his national origin (Syrian), gender (male), and race

(Caucasian), color (light skinned) and religion (Muslim). SOF at ¶ 53. On June 18, 2004,

Plaintiff amended his complaint to assert a claim of retaliation. SOF at ¶ 99. Prior to amending

his DCOHR complaint, on June 3, 2004, Plaintiff challenged the elimination of his position

through UPO's internal grievance procedure. SOF at ¶ 98. He claimed that, "to terminate my position as Controller is incomprehensible and improper." Id.

Pursuant to UPO's RIF policy, an employee's appeal needed to "set forth the employee's reasons why the [RIF] should not be carried out with such offers of proof and pertinent documents as he [was] able to submit." SOF at ¶ 98. Plaintiff failed to provide any such proof. He never alleged that he was terminated because he cooperated with DHS or DHHS, or that UPO included him in the RIF because of his discrimination complaint. Because he did not state what was "incomprehensible" or "improper" about the RIF, as required by the internal grievance policy, UPO denied his appeal on July 16, 2004. SOF at ¶ 101. Plaintiff also requested that the DCOHR dismiss his discrimination and retaliation complaint. SOF at ¶ 102.

On May 31, 2005, Plaintiff filed his initial Complaint alleging that he was terminated in violation of the D.C. Whistleblower Act and the non-retaliation provisions of the DCHRA. SOF at ¶ 103. He also alleged that his separation from employment was a wrongful discharge under D.C. common law. Id. Plaintiff thereafter amended his Complaint to add two claims under the False Claims Acts. Id.

## IV.     ARGUMENT

### A.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotations omitted). See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor).

**B.  PLAINTIFF CANNOT PROVE THAT "BUT FOR" HIS PROTECTED DISCLOSURES, UPO WOULD NOT HAVE ELIMINATED HIS POSITION.**

The D.C. Whistleblower Act prohibits an employer from taking an adverse employment action or otherwise retaliating against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order.  See D.C. Code § 2-223.02.  To prevail under the D.C. Whistleblower Act, Plaintiff must demonstrate: (1) that he made a protected disclosure; and (2) that such a disclosure was a "contributing factor" in UPO's decision to take an adverse employment action.  See Anderson v. Ramsey, No. 04-56, 2006 U.S. Dist. LEXIS 21034, at *39 (D.D.C. Apr. 19, 2006) (citing D.C. Code § 1-615.54(b), applicable to employees of the District of Columbia and which is substantively identical to § 2-223.03).[15] Under the D.C. Whistleblower Act, a "protected disclosure" includes any disclosure of information by an employee to a supervisor or public body that the employee reasonably believes evidences:

> (1) gross mismanagement in connection with the administration of a public program or the execution of a public contract; (2) gross misuse or waste of public resources or funds; (3) abuse of authority in connection with the administration of a public program or

---

[15] The D.C. City Council is assumed to adopt the same judicial construction when a provision is borrowed directly from another statute.  Cf. Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S.Ct. 1503, 1513 (2006).

execution of a public contract; (4) a violation of a federal or state law, or of a contract with the District of Columbia government; or (5) a substantial and specific danger to the public health and safety.

See D.C. Code § 2-223.01(7). A plaintiff suing under the D.C. Whistleblower Act "must also demonstrate that the employer would not have taken the adverse action for 'legitimate' reasons independent of the protected disclosure." See Anderson v. Ramsey at *39 (citing Crawford v. Dist. of Columbia, 891 A.2d 216, 219-221 (D.D.C. 2006) (also citing §1-615.51 et al.)).

1.      **Plaintiff was not a covered employee under the D.C. Whistleblower Act.**

It is undisputed that Defendant is a private, non-profit corporation, so in order to take advantage of the D.C. Whistleblower Act's protections, Plaintiff must be "a former or current employee of any entity that has a contract with the District government to supply goods or services and who is engaged in performing such contract." § 223.01(3)(B).   Plaintiff was not a covered employee.   While UPO has contracts with the District of Columbia, Plaintiff was not engaged in performing services under those contracts.   He was UPO's Controller and was responsible for assisting with financial management of UPO.   His position existed to support UPO as a whole, not to support a specific grant or contract.   He did not provide direct services to the program participants.   Even if Plaintiff was a covered employee, as shown below, UPO was unaware that he had made protected disclosures.

2.      **Even if Plaintiff was a covered employee and did make protected disclosures, the record demonstrates that his termination was unrelated to that conduct.**

Plaintiff alleges that he made several "protected disclosures" within the meaning of the statute.   See Pl.'s Second Am. Compl. at ¶ 44.   Assuming Plaintiff made the alleged disclosures, Plaintiff's claim fails because he cannot prove that the disclosures were a contributing factor in his separation from employment.   There is no evidence that UPO had knowledge of Plaintiff's alleged disclosures.

Plaintiff cannot provide any evidence that any individuals at UPO with the authority to take an adverse employment action against him knew of his alleged protected activities. He was not present during any meetings between Mack, Shears and Eboda. SOF at ¶ 24. The decision to terminate Plaintiff's employment resulted from Jones' recommendation to the Board of Trustees that the management positions in the Finance Office be outsourced to an independent accounting firm in furtherance of UPO's efforts to end the years of declining quality in internal controls, as evidenced by the audits and CSBG and Head Start program monitoring reviews. SOF at ¶ 68. Jones testified in his deposition that Eboda never told him that UPO was being reviewed because Plaintiff had made disclosures to him, nor did Eboda tell Jones that Eboda had any private meetings with Plaintiff. SOF at ¶ 52. There is no evidence that either the scheduling of the monitoring reviews or Plaintiff's involvement in the monitoring reviews was not routine.

The DHS review had been in the works for at least nine (9) months prior to its initiation and was not the first monitoring review which DHS had conducted. SOF at ¶¶ 20, 23. Similarly, Alexis Roberson, the chairperson of the Board's Ad Hoc Management Committee, testified that Eboda never told her how Eboda came to know or investigate alleged improprieties, nor did Eboda tell her that he met with Plaintiff. SOF at ¶ 104. Mack testified that Eboda never discussed with her that Kakeh was cooperating or assisting in Eboda's investigation. SOF at ¶ 105.

There is no evidence that UPO management had any reason to believe Plaintiff was not simply providing the requested financial information to the CSBG and Head Start program reviewers. Until Shears became the Chief Financial Officer, Plaintiff was solely responsible for supervising the financial functions at UPO. SOF at ¶ 9. Even after Shears was hired, he

continued to be responsible for the coordination of the independent auditor's year-end audit of the financial reports. SOF at ¶ 11.

The information made known to UPO was that the DHS monitoring review was merely in furtherance of DHS's mandated monitoring responsibility and was scheduled in December 2003 prior to when Plaintiff allegedly began making protected disclosures in February 2004. SOF at ¶ 21-22. Many other individuals in the Finance Office and other Offices, and the independent auditors likewise cooperated with the CSBG and Head Start program monitoring reviews. SOF at ¶ 18, 24-25. The mere fact that Plaintiff was providing information to government reviewers is not enough to show that UPO had knowledge of his claimed whistleblowing activities. United States ex. rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996); Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 567 (6th Cir. 2003). There is no evidence that UPO had information which would lead it to infer that Plaintiff was not merely performing the role of a Controller in a routine monitoring review of UPO's finances. There simply is no evidence to demonstrate that Plaintiff's alleged protected disclosures were a contributing factor to UPO's decision to eliminate his position and lay him off.[16]

Finally, the undisputed evidence shows that UPO had a legitimate reason independent of the alleged protected disclosures for eliminating Plaintiff's position with UPO. See Crawford, 891 A.2d at 219-221. Plaintiff was separated from employment due to the outsourcing of the management positions in the Finance Office and the resulting RIF. SOF at ¶¶ 69, 83. It is well-settled that a RIF is a legitimate reason for terminating an employee. See Goss v. George Washington Univ., 942 F. Supp. 659, 664 (D.D.C. 1996) (RIF was legitimate, non-discriminatory reason to award summary judgment to employer); Fain v. Dist. of Columbia, 568

---

[16] As set forth more fully below, UPO also believed that Plaintiff was cooperating with the Inspectors General in accordance with his job duties. See Section D, infra.

F. Supp. 799, 804 (D.D.C. 1983) (*prima facie* case rebutted by presenting evidence that

discharge was caused by a non-discriminatory application of a RIF); Newton v. CBS, Inc., 841 F.

Supp. 19, 23 (D.D.C. 1994) (RIF was sufficient to sustain defendant's burden of production in

establishing a legitimate, non-discriminatory reason for the employment-related decision). There

is no evidence that Plaintiff's alleged disclosures to the CSBG and Head Start program reviewers

were a factor in the decision to outsource the Finance Office management positions and

consequently lay Plaintiff off. Accordingly, the Court should dismiss Plaintiff's claim that he

was terminated in violation of D.C.'s Whistleblower Act.

**C.     PLAINTIFF CANNOT PROVE A *PRIMA FACIE* CASE OF RETALIATION UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT.**

To establish a *prima facie* claim of retaliation under the DCHRA, Plaintiff must provide

evidence that: (1) he was engaged in a statutorily protected activity,[17] or that he opposed

practices made unlawful by the Act; (2) an adverse action was taken against him; and (3) a

causal connection existed between the two. See Jung v. George Washington Univ., 875 A.2d 95,

113 (D.C. 2005) (citations omitted). Once the plaintiff has established a *prima facie* case of

retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason

for the adverse action. See Guerrero v. Univ. of the Dist. of Columbia, 251 F. Supp. 2d 13, 33

(D.D.C. 2003) (citations omitted). If the employer proffers a non-retaliatory rationale for its

employment decisions, the plaintiff must show that the "asserted justification is a pretext for

discrimination and must prove both that the defendant's reason is false, and that discrimination

was the real reason for the action taken against him." Id. A plaintiff may not rest on mere

---

[17] Under the DCHRA, "protected activity" is defined as a person's opposition to any practice made unlawful by the DCHRA. See Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994).

speculation alone but must "produce some objective evidence showing that defendant's proffered reasons are mere pretext." Id.

It is undisputed that Plaintiff complained to UPO about allegedly discriminatory conduct in October 2003. SOF at ¶14.  For purposes of summary judgment, UPO will concede that this complaint was "protected activity." It is also undisputed that Plaintiff was separated from employment on June 30, 2004. SOF at ¶ 83.  Even if Plaintiff engaged in "protected activity" by invoking UPO's internal complaint process and suffered an adverse employment action, his termination did not follow shortly after his October 2003 complaint. Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 273 (2001) (adverse employment action must have followed shortly after protected activity).

Since Plaintiff has no direct evidence that his separation from employment was prompted by his allegedly protected activity, he must "rely on circumstantial evidence of temporal proximity between his complaint of discrimination and [the adverse action] in order to establish a causal connection. See Nurriddin v. Goldin, 382 F. Supp. 2d 79, 105 (D.D.C. 2005).  Plaintiff was terminated nine (9) months after he made his internal complaint of discrimination.  This Court has held that an adverse employment action three (3) or four (4) months after an employee engages in protected activity is not sufficient to establish the temporal proximity necessary to show a causal connection" for a retaliation claim under the DCHRA. See Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  Accordingly, in this case, Plaintiff cannot prove causation as nine (9) months elapsed between his protected activity and UP's elimination of his position.

Moreover, any arguable temporal proximity is weakened by intervening unprotected activities of independent third parties. See Tenkku v. Normandy Bank, 348 F.3d 737, 742 (8th Cir. 2003) (strong criticism of independent auditors was an intervening event that eroded any

causal connection). DHS's draft preliminary report identified numerous deficiencies in UPO's financial system. Those findings, compounded with DHHS's grantee deficiency letter, made it critical for UPO to reevaluate its Finance Office and to implement an aggressive plan to rectify the shortcomings. SOF at ¶¶ 50, 64. As a result of the findings of the monitoring reviews, UPO decided that a RIF of the management of the Finance Office was necessary to strengthen the finances of the organization. SOF at ¶ 69.

Even assuming that Plaintiff could establish a *prima facie* case of retaliation, which he cannot, UPO still had a legitimate, non-retaliatory reason for Plaintiff's dismissal – termination in accordance with UPO's RIF policy. See Section IV.B., *supra*, at 18-19.

Finally, Plaintiff's position and the other affected management positions were subject to elimination as a result of a RIF in accordance with UPO's written policy. Human Resources placed Plaintiff into the same job grouping as Quashie because of their similar job duties, functions, responsibilities and schedules. SOF at ¶ 81. Due to Quashie's seniority, Plaintiff was number two (2) on the retention list and therefore he was released. SOF at ¶ 82; see Guerrero, 251 F. Supp. 2d at 34-35 (fact that plaintiff was fourth on a seniority list was a legitimate, non-retaliatory reason for her failure to be reinstated).

Since it is clear that UPO had legitimate, non-retaliatory reasons for its termination of Plaintiff, he must establish that UPO's proffered reasons were pretextual. Plaintiff can demonstrate pretext by proving that UPO's justifications are false or unworthy of belief. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 145 (2000). Other than Plaintiff's mere conjecture, there is no evidence that UPO's reason for terminating him are unworthy of credence. Plaintiff testified:

Q:      Did anyone ever tell you why the Board had decided to terminate your position?

A:    I have the documentation they gave me, that's what I know.

SOF at ¶ 107.    There is no mention in his RIF notice that he was being terminated because he

filed a complaint with the DCOHR.   In addition, Nona McLean, another UPO employee in the

Finance Office, also had her position eliminated.  There is no evidence that she ever filed a

complaint of discrimination against UPO.  UPO treated Plaintiff and McLean the same under its

RIF policy.  Accordingly, the Court should dismiss Plaintiff's retaliation claim under the

DCHRA.

**D.    PLAINTIFF'S FALSE CLAIMS COUNTS FAIL BECAUSE HE CANNOT PROVE HE WAS DISCRIMINATED AGAINST BECAUSE OF PROTECTED ACTIVITY.**

The language in both the District of Columbia and federal False Claims Acts is virtually

identical. D.C. Code § 2-308.16; 31 U.S.C.A. §3730(h).  Both laws prohibit an employer from

taking an adverse employment action, including discharge, against an employee who discloses

information to a government or law enforcement agency concerning, or in furtherance, of a false

claims or private *qui tam* action.  Because the local government has borrowed directly from the

federal statute, it is presumed that the judicial construction has been borrowed as well.  Nolting

v. National Capital Group, Inc., 621 A.2d 1387, 1388 (D.C. 1993).

To make out a successful claim of retaliation, Plaintiff must demonstrate: (1) he engaged

in protected activity, that is, "acts done…in furtherance of an action under this section"; and (2)

he was discriminated against "because of" that activity under the False Claims Acts.  See United

States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998).  To establish that

he was discriminated against because of the activity, Plaintiff must show that: (1) UPO had

knowledge the employee was engaged in protected activity; and (2) the retaliation was

motivated, at least in part, by his engaging in that protected activity.  Id.

While neither the government nor the employee actually has to sue an employer for submitting a false claim for an employee to establish that he engaged in "protected activity", Plaintiff must provide evidence that the employer submitted a false claim to either the federal or D.C. government.  See Yesudian , 153 F.3d at 741 (private action does not have to be initiated); Cimorelli v. General Electric Corp., 1994 U.S. App. LEXIS 2224, **4-6 (1st Cir., February 4, 1994).  There is no evidence that UPO ever presented a false or fraudulent claim to the federal or D.C. government.  Contrary to Plaintiff's allegation, UPO would request payment from CSBG by submitting monthly invoices for one twelfth of the annual grant, not via a financial statement. SOF at ¶ 17.  Accordingly, Plaintiff could not have had a good faith belief that UPO was committing fraud against the government.

Even assuming UPO had submitted a false claim and Plaintiff engaged in protected activity for purposes of the False Claims Acts, he cannot prove that UPO knew he was engaged in protected activity.  Other than his own speculation, Plaintiff has no evidence that UPO believed he instigated the Inspectors General's investigation.  In fact, UPO itself sent a request to the Inspectors General to look into UPO to ensure that there were not additional issues which were not uncovered during the CSBG and Head Start program monitoring reviews.  SOF at ¶ 71.

Moreover, there is no evidence that Plaintiff took steps to put UPO on notice that he was furthering or intending to further an action under the False Claims Acts rather than merely engaging in activities in fulfillment of his job duties as the Controller.  The undisputed evidence shows that his duties as Controller made him very familiar with UPO's financial controls. United States ex rel. Scott v. Metro. Health Corp., 375 F. Supp.2d 626, 644 (W.D. Mich. 2005) (where the whistleblower had legal compliance responsibilities the corporation had to receive

heightened notice that the employee intended to further a *qui tam*/FCA action rather than merely warning the employer of the consequences of its conduct).

While it is undisputed that Beckham saw Plaintiff with the governmental investigators, Plaintiff testified that, other than his own speculation, he did not know whether there was a connection between what Beckham observed and his termination. Plaintiff testified:

Q:     Well, did Monica [Scott Beckham] ever tell you that you were selected for the reduction in force because you brought the FBI into the building?

A:     She didn't tell me personally.

Q:     Who did she tell?

A:     But I mean she was the witness when they came inside the building, and immediately she went and she called them. So that is at that time they went out and they brought them to their office and I went downstairs.

Q:     Did she ever tell anybody that the reason why you were selected for the Reduction In Force was because you brought the FBI into the building?

A:     If she tell some other party?

Q:     Yes. To your knowledge did she tell anybody else that that's the reason why you were selected for Reduction In Force?

A:     Well, as I said, that wasn't – that was the immediate reason. These things been building for a while, but that was the immediate reason <u>I believe. This is my belief.</u> I mean it's not the decision been made because I had them inside. These things been prepared. Until they saw them in their faces and all these people I <u>guess</u> at that time they made the decision. But Monica was part of the decision because she has to read about these things, legal thing.

SOF at ¶ 108 (emphasis added).  The evidence clearly shows that it was no secret that UPO

planned to outsource positions in the Finance Office.  Notably, Jones met with the staff to

discuss the reorganization of the Finance Office, and the staff in the Finance Office sent Russell

Simmons, the former President of the Board of Trustees, in April 2004 their objections to

outsourcing almost two (2) months prior to the Inspectors General commencing their onsite

investigation of UPO.  SOF at ¶¶ 66-67.  The retention register was finalized by May 27, 2004,

prior to Beckham's sighting of Plaintiff with the Inspectors General.  SOF at ¶ 80.  There simply

is no evidence that the Inspectors General's investigation played any part in the decision to

outsource the management of the Finance Office and concomitant elimination of Plaintiff's

position.

### E.    PLAINTIFF'S WRONGFUL DISCHARGE CLAIM IS BARRED BY STATUTORY REMEDIES.

It is undisputed that Plaintiff was an at-will employee of Defendant.  SOF at ¶ 12.  As an

at-will employee, UPO could discharge him for any reason or for no reason at all.  See Adams v.

George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991).  In his Complaint, Plaintiff asserts that

he "made a series of disclosures regarding Defendant's fraud, waste and abuse to both federal

and District of Columbia officials," that UPO was aware of these disclosures, and that he was

terminated for making said disclosures.  See Pl.'s Second Am. Compl. at ¶ 49.  Plaintiff argues

that because he was terminated for making disclosures, he is entitled to the public policy

exception to the at-will employment doctrine.

Whether or not Plaintiff is entitled to the public-policy exception to the at-will

employment doctrine is of no moment because there is no need for this Court to create a tort

remedy if Plaintiff was discharged because of alleged disclosures to federal and District of

Columbia officials.  There are statutes which provide that an employer cannot retaliate against an

employee who reports fraud, waste and abuse to governmental agencies, or participates in an investigation of the submission of false claims to the government.  In addition, those statutes contain a specific remedy to compensate the employee who is wronged.  Those statutes are the D.C. Whistleblower Act, and the False Claims Acts.  Accordingly, UPO's alleged wrongful conduct does not give rise to a common law wrongful discharge claim, and this tort claim should be dismissed.  Accord  Nolting, 621 A.2d at 1389.

Plaintiff  alleges that he was terminated in violation of public policy when he refused to prepare a fraudulent financial statement.  Pl. Second Am. Compl. at ¶ 50.  Unlike many jurisdictions, the District of Columbia has not adopted an expansive exception to the at-will employment doctrine.  See Adams, 597 A.2d at 34 ("there is a narrow exception to the at-will doctrine under which a discharged at-will employee may sue his former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation").

While UPO denies that Plaintiff ever was asked to prepare fraudulent financial statements, Plaintiff nevertheless fails to assert an "officially declared" policy grounded in a statute, municipal regulation or the Constitution which requires the Court to recognize a public policy exception to the at-will doctrine.  Fingerhut v. Children's National Medical Center, 738 A.2d 799, 803 (D.C. 1999) (citing majority opinion in Carl v. Children's Hospital, 702 A.2d 159 (D.C. 1997)).  If Plaintiff is relying on the False Claims Acts as the embodiment of the public policy which was contravened, then this claim likewise should be dismissed because the False Claims Acts provide him with a remedy.  Even if Plaintiff had relied on an officially declared public policy, there is no evidence that his refusal to comply with Mack's and Shears' instructions to complete the financial reports caused Jones to decide to outsource Plaintiff's

position. In fact, the evidence is that Plaintiff's position was eliminated because UPO had to take immediate action in response to the continuing declining quality of the audit results, the CSBG draft preliminary report and the federal DHHS grantee deficiency letter.

## VI.    **CONCLUSION**

For the forgoing reasons, UPO's motion for summary judgment should be granted. A proposed order granting UPO's motion for summary judgment is included herewith.

Dated: this 27th day of November, 2006      Respectfully submitted,

By: _____
    Alison N. Davis, DC Bar No. 429700
    Kevin M. Kraham, DC Bar No. 459077

    FORD & HARRISON LLP
    1300 19th Street, N.W., Suite 700
    Washington, DC 20036
    (202) 719-2000
    (202) 719-2077 (Fax)

    Attorneys for Defendant United Planning
    Organization, Inc.