UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,

      Plaintiff,

    v.

UNITED PLANNING ORGANIZATION, INC.,

      Defendant.

CIVIL ACTION NO. 05-1271 (GK/JMF)

NEXT SCHEDULED EVENT: PRETRIAL
CONFERENCE MARCH 6, 2007 @ 4:00PM

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

1.    United Planning Organization, Inc. ("UPO" or "Defendant") is a private, non-profit corporation whose purpose is to address issues of poverty in the District of Columbia. Deposition of Tunde Eboda ("Eboda Dep.") at 6:2-17, attached hereto as Exhibit 1.

2.    UPO receives funding grants from both the District of Columbia and the federal government. Pl.'s Second Am. Compl. at ¶ 8 (Docket No. 23).

3.    The Community Services Block Grant ("CSBG") is a federal antipoverty block grant that is coordinated and delivered on behalf of the D.C. Department of Human Services ("DHS") through service delivery organizations such as UPO. Eboda Dep. at 6:4 – 6:21 (Exhibit 1).

4.    UPO is governed by a Board of Trustees which is comprised of citizens of the District of Columbia, including judges, lawyers and other community representatives. The day-to-day management of UPO is led by a Chief Executive Officer[1], Chief

---

[1] During the relevant time period, the Chief Executive Officer was referred to as the Executive Director. Deposition of Dana Jones ("Jones Dep.") at 7:12-15, attached hereto as Exhibit 6.

Operating Officer[2], Chief Financial Officer, Program Directors and the General Counsel. Declaration of Dana Jones ("Jones Decl.") at ¶ 3, attached hereto as Exhibit 14.

5.    Sheila Shears was initially retained by UPO as a Consultant in October, 2002. Shears was hired as UPO's Chief Financial Officer in April of 2003 after UPO had been trying to fill the position for at least a year. Deposition of Sheila Shears ("Shears Dep.") at 8:21–9:11; 20:5-21; 21:18-23:8, attached hereto as Exhibit 3.

6.    UPO had been looking for a Chief Financial Officer because the leadership of the Finance Office was not accomplishing its goals, and performance needed to improve. Mack Dep. at 71:19-72:13 (Exhibit 2).

7.    Benjamin Jennings, then Executive Director, hired Shears to take a look at the accounting structure and make recommendations so the organization would perform more efficiently. Shears Dep. at 9:9-10:2 (Exhibit 3). Jennings also asked Shears to be UPO's point of contact when the independent auditor was performing the year-end audit for fiscal year 2002. Shears Dep. at 16:2-17 (Exhibit 3).

8.    Davidson Quashie began his employment at UPO on September 23, 1974. Deposition of Davidson Quashie ("Quashie Dep.") at 5:21-6:1; 29:4-5, attached hereto as Exhibit 4. During his tenure at UPO, he has been employed as a general accountant, external auditor, chief accountant, Deputy Controller and currently Accounting Director. Quashie Dep. at 6:2-12 (Exhibit 4). As Deputy Controller, he had broad responsibilities which included accounts payable, accounts receivable, payroll, preparation of financial statements and bank reconciliations. Quashie Dep. at 11:1-20 (Exhibit 4).

---

[2] After a 2005 reorganization, the Chief Operating Officer was created, and the Deputy Executive Director position was eliminated. Deposition of Gladys Mack ("Mack Dep.") at 5:19-6:20, attached hereto as Exhibit 2.

9.     Plaintiff began his employment with UPO as Controller, assigned to the Office of

Finance on June 29, 1998.  Defendant's Response to Plaintiff's First Req. for Produc. of

Doc. ("Def. Resp."), Bates No. MAK 0065, attached as Exhibit 17.  As Controller,

Plaintiff was responsible for all the financial operations and accounting transactions,

reporting, the annual audit, training the staff, implementing the new software system, new

computers [sic] accounting system, supervising the Office of Billing and Revenue, the

accounts receivables, the accounts payable, the payroll, the Budget Office, the Senior

Accountant in the Accounting Department, and the Financial Operation Managers, and

also the External Auditor.  Deposition of Mohammed Amin Kakeh ("Pl. Dep.") at 62:1 –

62:14, attached hereto as Exhibit 11.

10.     Plaintiff reported initially to Gladys Mack, UPO's then Deputy Executive

Director.  Pl. Dep. at 60:20-21 (Exhibit 11).  Mack's principal responsibilities were to

coordinate the programs that were funded by the CSBG funds.  She also was responsible

for developing UPO's overall budget, the strategic plan and a number of special

activities.  Mack Dep. at 7:16-8:3 (Exhibit 2).

11.     When Shears became the Chief Financial Officer in 2003, Plaintiff reported to

her.  Mack Dep. at 21:12-14 (Exhibit 2).  After Shears was hired, Plaintiff's

responsibilities did not change, including being responsible for the annual audit and

financial reporting.  Pl. Dep. at 69:14-16 (Exhibit 11).

12.     Plaintiff was an at-will employee.  Pl.'s Second Am. Compl. at ¶ 48 (Docket No.

23).

13.     On October 3, 2003, Plaintiff sent a memorandum to Jennings complaining that

Plaintiff's role had changed since Shears was hired.  Pl. Dep. at 137:7-138:3; Pl.'s Dep.

Ex. No. 5 (Exhibit 11).

14.     On October 16, 2003, Plaintiff sent a memorandum to Jennings accusing Shears

and Mack of harassment and discrimination.  Pl. Dep. at 137:4-5; Pl.'s Dep. Ex. No. 4

(Exhibit 11).

15.     In October 2003, UPO conducted an investigation of Plaintiff's complaint, and

determined that neither Shears nor Mack was harassing or discriminating against

Plaintiff.  Beckham Decl. at ¶ 3, attached hereto as Exhibit 13.

16.     At the end of each fiscal year, UPO is required to have an independent auditor

review UPO's finances.  Eboda Dep. at 15:10-16:3 (Exhibit 1).  On December 17, 2003,

Thompson Cobb Bazilio & Associates ("TCBA") began the audit of UPO's FY03

finances.  Declaration of Gladys Mack ("Mack Decl.") at ¶ 3, attached hereto as Exhibit

15.  TCBA was unable to complete the audit because the Finance Office had not

completed all of the financial reports.  Id.

17.     One of the requirements of DHS's administration of CSBG is that it provide

oversight to ensure that the funds are spent properly.  Eboda Dep. at 11:20-12:13 (Exhibit

1).  UPO requested payment of CSBG funds through invoices for one twelfth of the

amount of the grant on a monthly basis.  Eboda Dep. at 161:9-19 (Exhibit 1).  In this

case, oversight came in three different forms: (1) monthly programmatic and financial

reporting, (2) quarterly meetings, and (3) in-depth monitoring reviews.  Eboda Dep. at

20:12-18 (Exhibit 1); Jones Decl. at ¶ 4 (Exhibit 14).

18.     During a monitoring review, DHS will review records, conduct interviews and possibly use other monitoring tools, such as questionnaires. Eboda Dep. at 13:11-20 (Exhibit 1). If specific skills are needed, DHS will seek the expertise by contracting with third parties. Eboda Dep. at 13:7-10 (Exhibit 1).

19.     If, during a monitoring review, DHS believes there may be issues of criminal activity, fraud, waste or abuse, it may refer the matter to the DHS Inspector General. Eboda Dep. at 17:12-21 (Exhibit 1).

20.     In July 2003, Tunde Eboda, the CSBG Program Manager for D.C. DHS, notified Jennings that DHS intended to conduct a programmatic and financial review. UPO and DHS however could not agree to a date for the review to begin. Eboda Dep. at 21:14 – 23:7 (Exhibit 1); Jones Dep. at 106:7-20 (Exhibit 6).

21.     In December 2003, Eboda told Jennings that the review had to begin in February 2004 because DHS wanted to have its report completed in time for a District of Columbia City Council public hearing scheduled for the summer of 2004. Eboda Dep. at 22:7-23:11 (Exhibit 1).

22.     Plaintiff was not aware of the planned monitoring review. Pl. Dep. at 147:1-19 (Exhibit 11). Plaintiff had his first one-on-one meeting with Eboda on February 5, 2004. Pl. Dep. at 124:6-125:5; 147:12-21 (Exhibit 11).

23.     The DHS monitoring exercise finally began on February 18, 2004. Eboda Dep. at 18:1-6 (Exhibit 1). It was a routine and planned review in accordance with a statutory requirement that monitoring exercises are conducted at a minimum every three years. Eboda Dep. at 12:4 – 12:20; 21:14 – 24:21 (Exhibit 1). DHS's prior monitoring review was in 2002. Eboda Dep. at 18:11-14 (Exhibit 1).

24.     Eboda and his assistant conducted a preliminary entrance interview for the monitoring review with Jennings, Mack and Shears on February 18, 2004.  Shears Dep. at 56:9-57:8 (Exhibit 3).  Plaintiff was not present during meetings between Jennings, Mack and Shears with Eboda.  Pl. Dep. at 149:15 – 150:4 (Exhibit 11).

25.     During the monitoring review, DHS requested financial and other information, and met with significant program managers and line staff, including Plaintiff.  Eboda Dep.at  24:3 –18(Exhibit 1); Deposition of Doris Stashenko ("Stashenko Dep.") at 43:2-44:1; 51:4-8, attached hereto as Exhibit 12.

26.     Because of his responsibility as Controller, Plaintiff produced financial statements, balance sheets, bank statements, reconciliation documents and other financial-related documents for the DHS review.  Eboda Dep. at 95:1-15 (Exhibit 1).

27.     Mack assumed Plaintiff was cooperating in the CSBG review.  Mack Dep. at 103:18-104:5 (Exhibit 2).

28.     During the initial interviews, Eboda discovered conflicting and contradictory information that suggested CSBG grants may have been improperly allocated.  Eboda Dep. at 37:1-38:12 (Exhibit 1).  Eboda determined that DHS would need additional technical assistance in completing the monitoring review.  Eboda Dep. at 40:6-43:4 (Exhibit 1).  Since he was not able to obtain the financial expertise from a D.C. agency, he entered into an agreement with the National Association for State Community Services Programs ("NASCP"), which hired the Mid-Iowa Community Action, Inc. ("MICA") to assist DHS.  Eboda Dep. at 43:7 – 44:6; 46:11 – 47:21 (Exhibit 1).

29.     On February 25, 2004, Ricardo Lyles, Administrator of the Family Services Administration for DHS sent a letter to Jennings confirming the continuation of the

monitoring review. He told Jennings, "[t]his on-site monitoring visit should be considered a routine and customary exercise and in keeping with *Section 678B* of the *CSBG Act of 1998 (42 U.S.C. 9901 et seq.)* as amended." Eboda Dep. at 156:11-157:9 (Exhibit 1) (emphasis in original).

30.    DHS returned to UPO with the MICA group during the week of March 1-5, 2004, to continue the monitoring review. Eboda Dep. 85:16 – 86:12 (Exhibit 1).

31.    As a result of DHS' planned monitoring review, DHS issued a draft preliminary report to UPO at its evening Board of Trustees Meeting on March 11, 2004. Eboda Dep. at 86:9-87:3 (Exhibit 1).

32.    Prior to the UPO Board of Trustees Meeting on March 11, 2004, Shears tendered her resignation effective April 30, 2004 to Jennings. Shears Dep. at 75:5-11 (Exhibit 3).

33.    The confidential DHS draft preliminary report to the Board of Trustees identified issues in the areas of financial management, governance, planning and communications, personnel and programs. Mack Decl. at ¶ 5 (Exhibit 15).

34.    The review of UPO's financial management found that it did "not meet Federal grant standards." Among the findings were that (1) bank reconciliations were not completed timely or accurately, (2) cash disbursement procedures were circumvented by management, (3) large amounts of cash disbursements were unsupported, (4) timely financial statements could not be generated, and (5) deterioration in the liquidity of UPO. Id.

35.    The Board of Trustees formed a subcommittee, the Ad Hoc Management Committee comprised of Alexis Roberson, D.C. Court of Appeals Chief Judge Annice M. Wagner, Erias Hyman, Carol Caldwell, The Hon. Henry F. Greene, The Hon. Rafael Diaz

and Brenda Kelly, to address the issues raised in the preliminary report.  Jones Dep. at

10:5-13 (Exhibit 6).

36.    On March 11, 2004, the UPO Board of Trustees suspended Jennings with pay and

appointed Mack to be the acting Executive Director.  Eboda Dep. at 91:1-3 (Exhibit 1).

UPO also began its search for an interim Executive Director.  Mack Decl. at 2 (Exhibit

15).

37.    There were two articles in the Washington Post regarding the DHS monitoring

review.  Jones Dep. at 112:16-18 (Exhibit 6).

38.    Jones believed that the source of the information in the Washington Post articles

was someone from MICA or a member of the Board of Trustees.  Jones Dep. at 113:1-

114:3 (Exhibit 6).

39.    The U.S. Department of Health and Human Services ("DHHS") provides federal

grant funds to UPO to administer the Head Start program, which provides pre-school

education and services.  Mack Decl. at ¶ 4 (Exhibit 15).

40.    DHHS conducted an on-site Program Instrument for Systems Monitoring

("PRISM") review for the Head Start program during the period March 15-19, 2004.

Jones Dep. at 104:14-105:5; Jones Dep. Ex. No. 13 (Exhibit 6).

41.    This monitoring review was a planned and scheduled review whose purpose was

to review UPO's Head Start program and finance data based on information provided

during the review.  Deposition of William Hughey ("Hughey Dep.") at 29:13 – 29:21,

attached hereto as Exhibit 5; Jones Dep. at 105:18-106:6, Jones Dep. Ex. No. 13 (Exhibit

6); Pl. Dep. at 126:12-16 (Exhibit 11).

42.    In March 2004, Mack and Shears were endeavoring to have all of the financial reports finalized so TCBA could complete the audit as required by UPO's bank. Jones Dep. at 69:15-20 (Exhibit 6); Pl.'s Resp. to Def.'s Req. for Prod. of Doc. ("Pl. Resp."), Bates No. 00164, attached hereto as Exhibit 16.

43.    On March 2, 2004, Plaintiff provided financial statements to TCBA. Pl. Resp., Bates Nos. 00131-00132 (Exhibit 16). Plaintiff had changed the manner in which UPO presented its finances. In the past, UPO had reallocated deferred revenue from CSBG to fund other programs which had exceeded their budgets. The terms of the grant permitted the use of CSBG funds for related programs. Eboda Dep. at 173:8 – 174:8 (Exhibit 1). Plaintiff did not review the financial statements with Mack or Shears prior to their dissemination even though he had changed the presentation of the data. Id. Jennings asked Plaintiff to work with Shears and Mack to make necessary changes to the financial statement. Id.

44.    Plaintiff refused to cooperate in the effort to complete the financial reports because of unspecified legal and audit issues. Mack Dep. at 106:17-107:13 (Exhibit 2); Pl. Resp., Bates No. 00124 (Exhibit 16). Even after Mack reminded Plaintiff of his legal obligation to disclose information regarding the financial statements, he did not comply. Id. Mack simply wanted Plaintiff to reallocate CSBG deferred revenue to other programs, which was permissible. Eboda Dep. at 164:8-10, 173:15-174:8 (Exhibit 1); Mack Dep. at 48:15-49:12 (Exhibit 2).

45.    Mack and Shears completed the financial reports with the assistance of Rachel Locus from F.S. Taylor, an accounting firm which had been working with UPO for a

couple of years to address issues arising out of the financial management of the Head

Start program. Mack Decl. at ¶ 6 (Exhibit 15).

46.     Shears and Locus disagreed with Plaintiff regarding the portion of UPO's deficit

that should be allocated to grant monies. Jones Dep. at 97:1-98:6 (Exhibit 6).

47.     Plaintiff filed a Charge of Discrimination with the D.C. Office of Human Rights

("DCOHR") on March 31, 2004, alleging that he was subjected to unlawful

discrimination and harassment based on his race (Caucasian), national origin (Syrian),

sex (male), color (light skinned), and religion (Muslim). Pl. Resp., Bates No. 00000

(Exhibit 16).

48.     Eboda recommended to the Board of Trustees Dana Jones, who had been the

President and Chief Executive Director of the Southern Maryland Tri-County

Community Action Committee for 24 years, for the interim Executive Director position.

Jones Dep. at 8:4-10 (Exhibit 6).

49.     On April 5, 2004, the UPO Board of Trustees hired Jones as the Interim Executive

Director. Jones Dep. at 11:14-16 (Exhibit 6). Jones persuaded Shears to postpone her

resignation indefinitely. Jones Dep. at 34:1-6 (Exhibit 6).

50.     Jones immediately focused on financial management, which was the primary area

that DHS identified as problematic. Jones Decl. at ¶ 5 (Exhibit 14).

51.     Jones was aware that Jennings had 14 months prior to Jones coming on-board

requested proposals to outsource the Finance Office. Jones Dep. at 114:4-15 (Exhibit 1);

Shears Dep. at 14:6-9 (Exhibit 3).

52.     After Jones took over as Interim Executive Director, Eboda encouraged him to

speak to Plaintiff because Eboda had found him helpful during theDHS monitoring

review. Eboda Dep. at 99:1-6 (Exhibit 1). Eboda did not tell Jones that UPO was

reviewed because of Plaintiff. Eboda Dep. at 99:1-6 (Exhibit 1). Eboda did not tell Jones

that Eboda met with Plaintiff in February 2004 and that Plaintiff provided information to

him. Id. Eboda also did not tell Jones that Plaintiff had met with the Head Start

reviewers away from UPO. Eboda Dep. at 154:4 – 155:2.

53.     UPO received notice that Plaintiff had filed a discrimination complaint with the

DCOHR on April 7, 2004 in which he alleged discrimination based on race (White),

national origin (Syrian), sex (male), color (light skinned) and religion (Muslim). Pl.

Second Am. Compl. at 27 (Docket No. 23); Beckham Decl. at ¶ 4 (Exhibit 13).

54.     On April 15, 2004, Human Resources sent a retention register for the entire

Finance Office to the General Counsel. Beckham Decl. at ¶ 6 (Exhibit 13).

55.     UPO had been considering contracting out the finance functions for four (4) or

five (5) years, but the UPO Board of Trustees could not reach a consensus to execute the

plan. Mack Dep. at 72:14-73:7 (Exhibit 2).

56.     On April 20, 2004, UPO's Ad Hoc Management Committee voted to recommend

to the full Board of Trustees that F. S. Taylor be retained to perform functions in the

Finance Office for one year and to conduct a reduction-in-force in the Finance Office.

Jones Decl. at ¶ 5 (Exhibit 14).

57.     On April 27, 2004, the full UPO Board of Trustees approved the recommendation

to retain F. S. Taylor and conduct a reduction-in-force in the Finance Office. Jones Decl.

at ¶ 6 (Exhibit 14).

58.    On April 27, 2004, Jones advised the Board of Trustees that it would have to obtain approval from DHS to use $1.5 million in CSBG funds to help reduce the debt. Jones Decl. at ¶ 7 (Exhibit 14).

59.    UPO had a reduction-in-force policy, which the Human Resources Office administered with the General Counsel's office.  Under the policy, Human Resources had to prepare a retention register, which placed employees who would be laid off into groupings referred to as competitive areas according to their duties, functions, responsibilities and pay schedules.  Beckham Dep. at 40:7-41:8 (Exhibit 10).  Employees with the longest length of service with UPO were placed at the top of their particular grouping.  Beckham Decl. at ¶ 10 (Exhibit 13).

60.    If there was a position available for which employees in a particular grouping were qualified, the person at the top of the competitive area was retained and offered that position.  Beckham Dep. at 65:1-66:20 (Exhibit 10).

61.    UPO followed the reduction in force policy when it decided to outsource the management of the Finance Office.  Beckham Decl. at ¶ 5 (Exhibit 13).  There was one Finance Office position however which was not placed in a competitive area.  That was the Chief Financial Officer position because the incumbent, as an Office Director, was not subject to the RIF policy.  Beckham Dep. at 69:16-70:9; Beckham Dep. Ex. No. 7 (Exhibit 10).

62.    DHHS sent Defendant a letter on April 20, 2004, informing UPO that it had been designated as a "Grantee with Deficiencies."  Jones Dep. at 104:14-105:5; Jones Dep. Ex. No. 13 (Exhibit 6).

63.     DHHS informed UPO that it had to develop a Quality Improvement Plan ("QIP")
to correct the deficiencies in program governance, recordkeeping and reporting, and
fiscal management within one (1) year.  If UPO failed to remedy the deficiencies within
the required timeframe, UPO risked termination of the Head Start grant.  Id.  UPO could
not risk losing its Head Start funding.  Jones Decl. at ¶ 7 (Exhibit 14).

64.     On April 26, 2004, DHHS designated UPO as a high-risk grantee.  A "high-risk
organization is one whose management practices raise serious questions about its ability
to assure proper financial stewardship of grant funds."  Jones Decl. at ¶ 6 (Exhibit 14);
Def. Resp, Bates No. MAK 0178-179 (Exhibit 17).  As a result of its high-risk status,
UPO had to immediately establish proper internal controls to safeguard federal funds and
avoid a recurrence of the financial compliance deficiencies.  Id.

65.     When Jones first met with the UPO Board of Trustees in April 2004, he told them
that the agencies' findings were not recent problems.  The 2001 and 2002 audit reports
from UPO's independent auditor indicated the declining quality in internal financial
controls.  Jones Dep. at 45:4-9 (Exhibit 6).

66.     On April 29, 2004, the employees in the UPO Finance Office sent a letter to the
President of the Board of Trustees expressing their opposition to outsourcing the
department.  Pl.'s Resp., Bates Nos. 00172-00173 (Exhibit 16).  Plaintiff had called
meetings of the Finance Office to develop a strategy to fight outsourcing.  Deposition of
William Isaac ("Isaac Dep.") at 19:1-5, attached hereto as Exhibit 9.

67.     Employees complained to Jones that the non-management employees had not
received proper training or performance evaluations.  Jones Decl. at ¶ 10 (Exhibit 14).

68.     Jones decided to recommend to the Board of Trustees that only the management employees in the Finance Office would be outsourced, and the employees holding the positions would be laid off in accordance with the RIF policy.   Jones Dep. at 29:4-16 (Exhibit 6).

69.     On May 6, 2004, the Board of Trustees voted to outsource the management of the Finance Office.  The affected positions were: the CFO, Controller, Deputy Controller, Senior Auditor and Facilities Manager. Jones Dep. at 27:4 – 28:20 (Exhibit 6).  The Board did not discuss the specific employees who would be affected by the outsourcing. Deposition of Alexis Roberson ("Roberson Dep.") at 38:19 – 40:5, attached hereto as Exhibit 8.

70.     Jones wanted the financial statement to recognize that UPO was claiming earned income. Jones Dep. at 101:18-102:15 (Exhibit 6).

71.     On May 12, 2004, Defendant's Board of Trustees voted unanimously to request Eboda's assistance in coordinating a review by the Inspectors General's Offices of UPO's funding agencies to ensure that any unresolved issues UPO was facing would be corrected.  UPO decided that it was imperative that all issues be identified and addressed immediately.  The Board also wanted a transparent process. Def.'s Resp., Bates No. MAK 4738 (Exhibit 17).

72.     Defendant sent requests for proposals ("RFPs") to a number of outside accounting and financial firms for proposals to assist UPO in strengthening the Finance Office. Jones Decl. at ¶ 8 (Exhibit 14).

73.     UPO received proposals from F.S. Taylor and TCBA to manage the Finance

Office. Jones Dep. at 91:10-20 (Exhibit 6).  On May 19, 2004, Walker & Company, LLP

("Walker") submitted its proposal.

74.     Eboda objected to UPO retaining F.S. Taylor because the firm had provided

services to UPO during the time period that internal financial controls were problematic.

Eboda Dep. at 102:14-103:21 (Exhibit 1).  Unlike TCBA and F.S. Taylor, Walker had not

performed any prior services for UPO.  Deposition of Roy Layne ("Layne Dep.") at 5:16-

20 (Exhibit 7).

75.     Mack had received a referral to Walker and recommended to Jones that UPO send

an RFP to the firm.  Mack Decl. at ¶ 6 (Exhibit 15).

76.     Based upon the RFP, Walker understood that UPO wanted a firm to come in and

take over all of the UPO finance functions.  Accordingly, Walker's proposal envisioned

filling all of the management and staff financial positions.  Jones Dep. at 122:3-16

(Exhibit 6); Layne Dep. at 10:6-19; 11:1-13; 20:13-17; Layne Dep. Ex. No. 3 (Exhibit 7).

77.     After reviewing Walker's proposal, Jones and Mack met with Ron Walker, Roy

Layne and another Walker employee.  Jones informed Walker that UPO intended to

outsource the management of the Finance Office, but UPO employees would continue to

fill the Finance Office staff positions.  Walker still was interested, and was agreeable to

being responsible for the filling of the positions in its two-tiered management structure

with Walker employees.  Jones Decl. at ¶ 15 (Exhibit 14).

78.     Walker's proposal was to create a two-tiered management structure with a Chief

Financial Officer as the head, and three managers (Financial Operations Director, Grants

Management Director and Accounting Director).  There was no Controller position in

Walker's proposal because Walker believed that it was not necessary in an organization of UPO's size.  Layne Dep. at 35:14-16; 36:17-37:3; 41:10-18 (Exhibit 7).

79.     Walker planned to definitely fill the Chief Financial Officer with a Walker employee, and possibly the other management positions as well.   Layne Dep. at 34:7-35:13; 56:1-18 (Exhibit 7).  Walker finalized its cost proposal based upon the firm staffing only the Chief Financial Officer, Finance Operations Director and Grants Manager positions with Walker hires.  Mack Decl. at 7 (Exhibit 15).

80.     The retention register for the Finance Office RIF was finalized by May 27, 2004.  Beckham Decl. at ¶ 12 (Exhibit 13).

81.     Plaintiff was placed in a competitive grouping with Quashie since they had similar job duties and pay schedules, and could easily perform the other's job responsibilities.  Beckham Decl. at ¶ 11 (Exhibit 13).

82.     Since Quashie had been employed for almost 30 years and Plaintiff for less than six (6) years, Quashie was placed at the top of the competitive level.  Beckham Decl. at ¶¶ 12-13 (Exhibit 13).

83.     Plaintiff, Nona McLean, Director, Institutional Services and a direct report to the Chief Financial Officer, and Quashie received RIF notices dated June 2, 2004.  Pl. Resp., Bates No. 00145 (Exhibit 16); Beckham Dep. at 37:11-12, Beckham Dep. Ex. Nos. 2- 4 (Exhibit 10).

84.     William Isaac, External Auditor, received a RIF notice dated June 9, 2004.  Isaac Dep. at 21:19-22:5, Isaac Dep. Ex. No. 1 (Exhibit 9).

85.    Walker was retained by UPO, to manage UPO's accounting and financial functions for the period of June 1, 2004, to May 31, 2005.  Layne Dep. at 73:4-16, Layne Dep. Ex. No. 4 (Exhibit 7).

86.    The RIF notices for Plaintiff and McLean stated that their employment would terminate on June 30, 2004, and they would not need to work after June 2, 2004. Beckham Dep. Ex. No. 2 (Exhibit 10).

87.    The RIF notice for Isaac told him that he was temporarily re-assigned to a vacant lower level position.  Isaac Dep. at 11:1-7, Isaac Dep. Ex. No. 1.  Isaac decided to retire rather than be demoted.  Id.

88.    Quashie was notified that he would be reassigned temporarily to the newly created position of Accounting Director.  Quashie Dep. at 19:1-2 (Exhibit 4).

89.    Eboda was told prior to June 2, 2004 that Plaintiff would be terminated from UPO based on the RIF policy.  Eboda Dep. at 109:15-21 (Exhibit 1).

90.    On June 1, 2004, Eboda denied UPO's request to cover the deficit using 2003 CSBG funds.  UPO appealed and on September 29, 2004, UPO received approval to use the funds.  Jones Dep. at 111:12-112:8 (Exhibit 6).

91.    On Wednesday, June 2, 2004, representatives from the D.C. DHS and federal DHHS Inspectors General, Federal Bureau of Investigation and U.S. Attorneys' Office arrived at UPO to begin an investigation.  UPO management had been expecting them because of the letter which was sent to Eboda on May 12, 2004, in an effort to be transparent.  Jones Dep. at 132:1-17 (Exhibit 6).

92.     UPO does not permit visitors to enter the premises without them signing in with security and a UPO employee being notified that a visitor has arrived. Beckham Decl. at ¶ 3 (Exhibit 13).

93.     UPO also learned that the Inspectors General ("IG") were interested in UPO because of the Washington Post articles. Jones Dep. at 132:6-9 (Exhibit 6).

94.     Monica Scott Beckham, the General Counsel, saw Plaintiff escorting these government representatives on June 2, 2004 in a hallway in UPO's building, but did not initially know who they were. Beckham Dep. at 120:20 – 124:6 (Exhibit 10).

95.     Beckham recognized Shelly Elliot, a DHS IG, who had been conducting an investigation of a UPO security contract since August 2003. Upon seeing her, Beckham assumed her visit was part of the investigation of the security contract. Beckham Dep. at 118:11 – 121:18 (Exhibit 10).

96.     During a meeting later that day with the law enforcement agents, Beckham expressed surprise that they had not contacted her in light of the UPO Board of Trustees' letter to Eboda. Beckham Dep. at 123:5 - 124:6 (Exhibit 10).

97.     No one from the offices of DHS's and DHHS's Inspectors General, the FBI or the U.S. Attorney told UPO that Plaintiff was assisting them in the investigation of fraud on the federal or D.C. government. Jones Dep. at 132:1-17, 106:12 – 107:9 (Exhibit 6).

98.     On June 3, 2004, Plaintiff utilized UPO's internal grievance process to appeal the elimination of his position. Jones Decl. at ¶ 17 (Exhibit 14).

99.     On June 18, 2004, Plaintiff amended the complaint which he had filed with the DCOHR to assert a claim of retaliation. Amendment to Complaint, attached hereto as Exhibit 18.

100.    Shears' employment with UPO ended on June 30, 2004, after she had deferred her resignation to assist UPO in completing the FY03 audit and the transition to Walker. Shears Dep. at 127:3-19 (Exhibit 3).

101.    On July 16, 2004, UPO denied Plaintiff's appeal regarding the elimination of his position under the RIF policy. Jones Decl. at ¶ 18 (Exhibit 14).

102.    On March 30, 2004, Plaintiff voluntarily withdrew his complaint of discrimination and retaliation filed with the DCOHR, and his case was closed without a finding on merit. Pl. Resp., Bates No. 00233 (Exhibit 16).

103.    On May 31, 2005, Plaintiff filed his initial Complaint alleging that he was terminated in violation of the D.C. Whistleblower Act and the non-retaliation provisions of the D.C. Human Rights Act. He also alleged that his separation from employment was a wrongful discharge under D.C. common law. Compl. at ¶ 1 (Docket No. 1). Plaintiff thereafter amended his Complaint to add two claims under the federal and District of Columbia false claims laws. Pl. Second Am. Compl. at ¶ 2 (Docket No. 23).

104.    Eboda never told Alexis Roberson, Chairperson of the Ad Hoc Management Committee, how Eboda came to know or investigate alleged improprieties, nor did Eboda tell her that he met with Plaintiff. Roberson Dep. at 25:18 – 26:3 (Exhibit 8).

105.    Eboda never discussed with Mack that Plaintiff was cooperating or assisting in Eboda's investigation. Mack Dep. at 97:15-17(Exhibit 2).

106.    Had Plaintiff had more years of service than Quashie, Plaintiff would have been the employee reassigned and he would not have been separated from employment. Beckham Dep. at 64:19-65:18 (Exhibit 10).

107.    The only information that Plaintiff has regarding the reason for the elimination of

his position is what is in his RIF notice.  Pl. Dep. at 224:12-15 (Exhibit 11).

108.    Plaintiff does not believe that his position was eliminated because he escorted the

Inspectors General in to the UPO building.  Pl. Dep. at 232:17-233:20 (Exhibit 11).


Dated: November 27, 2006                    Respectfully submitted,


                                            By: _____
                                               Alison N. Davis, DC Bar No. 429700
                                               Kevin M. Kraham, DC Bar No. 459077

                                               FORD & HARRISON LLP
                                               1300 19th Street, N.W., Suite 700
                                               Washington, DC 20036
                                               (202) 719-2000
                                               (202) 719-2077 (fax)

                                               Attorneys for Defendant United Planning
                                               Organization, Inc.


DC:63174.1