# EXHIBIT 1

COPY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------x

MOHAMMED AMIN KAKEH,                 x

        Plaintiff,                x Civil Case No.

        v.                        x 1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC.,x

        Defendant.                x

------------------------------------ x

                Thursday, February 23, 2006

                Silver Spring, Maryland

The deposition of TUNDE EBODA called for

examination by counsel for Plaintiff in the

above-titled matter, pursuant to notice, in the

Offices of Zipin & Melehy, 8403 Colesville Road,

Silver Spring, Maryland, before Jonell Easton,

Notary public, at 10:00 a.m., when were present on

behalf of respective parties:



*Precise Reporting Services*

(301) 210-5092

*Serving MD, D.C. & VA*

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

6

1    A.    Correct.

2    Q.    From now on, if it is okay, we can refer

3    to CSBG grant.  What is a CSBG grant for?

4    A.    CSBG is a federal antipoverty block grant

5    administered by the state and program services

6    carried out through designated community services

7    organizations.

8        The purpose is to address poverty and

9    issues of poverty and seek to eliminate the causes

10   of poverty.

11       In the District, the program operates

12   through a network of service delivery organizations

13   that coordinate and deliver services on behalf of

14   the D.C. government.

15   Q.    One of those service delivery

16   organizations is United Planning Organization?

17   A.    Correct.

18   Q.    How long has UPO been a service delivery

19   organization?

20   A.    Under CSBG, since 1981, they have been

21   doing it.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

11

1    A.    Correct, ten is the minimum and the

2    contractual relationships vary from year to year.

3    Could be ten, 20, 30 and that is purely their

4    relationship with their service delivery centers.

5            In order for us to be assured that the

6    mission of community services block grant is being

7    carried out, DHS extends voluntarily interest and

8    oversight of what is being done at the direct

9    service levels.

10    Q.    You, basically DHS does oversight over

11    these entities?

12    A.    Our primary responsibility is UPO.

13            In order to do a sufficiently thorough

14    job, voluntarily, we extend interest and oversight

15    function to those other agencies when required.  We

16    understand that we cannot fully carry out the

17    community services themselves, so we extend

18    ourselves to where the services are being

19    delivered.

20    Q.    Does DHS have an obligation to safeguard

21    funds, to prevent fraud waste and abuse?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

12

1    A.    Yes, we have responsibility for funds

2  being used.

3    Q.    Did you say fiduciary responsibility?

4    A.    Maybe, that is technical, yes, we do have

5  the responsibility to make sure they, regardless of

6  fiduciary or not, but yeah, we have responsibility

7  to make sure funds are being used.

8         It is the intent of Congress we perform

9  regular monitoring site visits not audits, but

10 monitoring program site visits.

11   Q.    That would be one of the purposes of your

12 position to make sure that gets carried out?

13   A.    Correct.

14         Statutorily, it is once every three years.

15 There no limit to our frequency, at a minimum,

16 there is a site visit once every three years.

17   Q.    What is a site visit?

18   A.    A site visit is a monitoring exercise that

19 takes you to the location where the agency that

20 receives funds maintains its operations.

21   Q.    So when you go in to do the monitoring

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

13

1    exercise, who goes?

2    A.    Typically, I will lead the exercise.    I

3    don't necessarily have to remain on location for

4    the duration.    I lead the exercise, also I have

5    program managers, analysts on staff that join in

6    performing those functions.

7    Where we require specific skills, we

8    reserve the option to have a contractual

9    arrangement to seek the expertise outside of

10   government.

11   Q.    What typically happens during a monitoring

12   exercise?

13   Is it the case typically during a

14   monitoring exercise that you and/or your staff from

15   DHS go to the site and conduct a review?

16   A.    Correct, we review records, conduct

17   interviews, we have monitoring tools we use to

18   gather information like questionnaires, monitoring

19   tools, use of questionnaires, use of interviews,

20   review of records on-site and further interviews.

21   Q.    That is all done by DHS staff?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

15

1    independent accounting or auditing form?

2        A.    Yes.

3        Q.    The government would theoretically pay for

4    that, the federal government?

5        A.    Yes.

6        Q.    Advice and referral would come from

7    federal, employees of the federal agency you were

8    under?

9        A.    Yes.

10       Q.    Would that be in the form of auditors?

11       A.    Could be if the problem in question is

12   financial in nature, could be there is a

13   requirement for CSBG recipient to perform audits

14   annually and to submit the report of that to the

15   state office.

16       Q.    Who has to audit annually?

17       A.    Sub grantee.

18       Q.    Who would that be?

19       A.    Sub grantee would be UPO, the grantee is

20   the District of Columbia government and the sub

21   grantee is UPO.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

16

1    Q.    UPO would be obligated to do annual

2   audits?

3    A.    Correct, CSBG is audited on a single audit

4   basis, which happens once every three years, if

5   there are no findings, and it can be more

6   frequently if there are findings.

7    Q.    Say, for example, DHS is going on a

8   monitoring exercise, strike.

9         When would you request either federal

10  assistance, when would you request federal

11  assistance during a monitoring exercise, what would

12  trigger that?

13   A.    If we get in the field and we begin our

14  work and we recognize that there will need to be a

15  more in-depth review other than what is customary,

16  we have a monitoring tool, it is completed, we

17  conduct interviews, the questions check out with

18  what we see on the ground, and that will be

19  satisfactory.

20        If it is anything beyond that, if we

21  suspect activities that appear to be beyond the

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

17

1    scope of what a program monitor normally deals

2    with, we cannot conduct interviews, cannot

3    do--conduct investigations, we cannot conduct

4    in-depth fiscal exercises that can be called an

5    audit.

6             We cannot compel third parties to share

7    records with us.  For instance, if UPO has a

8    relationship with another entity, we cannot compel

9    that entity to share records, we can encourage UPO

10   to secure those records, if it will help shed

11   light.

12            And if we get calls from significant

13   people in the organization alerting us to issues of

14   a serious nature, fraud, waste and abuse, criminal

15   intent and criminal fraud and such, our protocol is

16   thar DHS refers it to the office of investigation

17   and they comply, we have the option to invite the

18   District Inspector General to take a look at such

19   cases.

20            Those would be, by far, above what the

21   program manager is required to do.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

18

1    Q.   As far as the history of doing the

2    monitoring exercises you did, started a monitoring

3    exercise with regard to UPO in February or March of

4    2004.  Correct?

5    A.   February of 2004 correct, February 18, 17,

6    19.

7    Q.   That is when you started the monitoring

8    exercise.  Correct?

9    A.   That is when we commenced the monitoring

10   exercise.

11   Q.   Prior to that monitoring exercise, when

12   was the previous monitoring exercise conducted?

13   A.   It was 2002, I believe, spring of 2002,

14   prior to 2004.

15   Q.   Prior to the spring of 2002 monitoring

16   exercise, when was the previous one done?

17   A.   I would like, I would have to check my

18   records, no more than a year or two focused on

19   different aspects, different agencies on any

20   particular year, there is something going on.

21   Q.   I want to make sure my questions are

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

20

1    initiative.

2            Other than that, it is, the schedule is

3    usually drawn up by mutual agreement between the

4    sub grantee and DHS.

5            For instance, we would like to come out

6    and we will discuss a time that will be convenient,

7    where significant program managers can be made

8    available for interviews and that kind of stuff.

9            And we will work around dates and go out.

10           We also may go out in the case of a close

11   out of a particular program.

12       Q.    How far in advance do you usually schedule

13   a monitoring exercise?

14       A.    We average, as a matter of practice,

15   quarterly meetings with the sub grantee

16   organization, with UPO, and there can be

17   discussions on schedules and we give a minimum of

18   30 days notice before we go out.

19       Q.    Do you know an individual by the name of

20   Delores Stanshenko?

21       A.    Yes.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

21

1    Q.    Stanshenko?

2    A.    Doris.

3    Q.    Doris not Delores, okay.

4          Did you receive a phone call from her in

5    February of 2004 regarding the finances at UPO?

6    A.    I don't recall that date.

7    Q.    Did you talk to Amin Kakeh in February of

8    2004 about UPO finances?

9    A.    I did.

10   Q.    Do you remember when you talked to him?

11   A.    Precise date, I don't, but it was in

12   advance, prior to the site visit of February 18,

13   2004.

14   Q.    The site visit of February 18, 2004, when

15   was that planned?

16   A.    Actually, the site visit I recall was

17   talked about at our July of 2003 quarterly meeting.

18   We began to discuss the interest that the

19   department has to come out, to come and do a

20   monitoring exercise based on key staff at UPO not

21   being available to participate, it was--the

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

22

1    schedule did not hold.

2         And I know we tried at least two other

3    times prior to that, after, I mean after that to

4    have, to conduct the monitoring exercise, and that

5    always, for one reason or the other, it did not

6    happen.

7         We pressed specifically that plans for the

8    monitoring exercise of February hold because there

9    were two things going on at that time.

10        We were up for a council hearing slated

11   for June, July of 2004 and my office determined we

12   would like to act, to have concluded the monitoring

13   exercise of the sub grantee organization before we

14   went to that hearing.

15        And if we were to conduct the exercise and

16   develop a report and give ourselves time to do any

17   follow up before we go before the council hearing

18   in June or July, it was the latest time we can

19   possibly do the monitoring exercise, so we pressed

20   for that.

21        There would be instances where we would

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

23

1    insist we come and do something, perform training,

2    a site visit.

3            If my office determines that there is a

4    strong reason, we will pick.

5            But generally speaking, we try to make it

6    a collaborative cooperative effort in terms of

7    scheduling.

8        Q.   As of when was the February 18 date

9    scheduled?

10       A.   It would have to be, I believe, the

11   quarterly meeting we conducted in December.

12       Q.   It wasn't--the quarterly meeting wasn't in

13   January?

14       A.   I could check on that.  It could be

15   January.  I am not sure.

16       Q.   At the quarterly meeting, you made it

17   clear that there would be an audit, a monitoring

18   exercise that went on, began on February 18?

19       A.   Correct, we are careful not to call the

20   exercise an audit.  It is a monitoring exercise,

21   correct.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

24

1       Q.    What had you planned to do, as of the

2   quarterly meeting, during that monitoring exercise?

3       A.    It was set up as a routine exercise where

4   we would go in, have an interview with the

5   executive, usually the executive director and

6   whatever the executive director includes in that

7   entrance interview, mostly, it would include the

8   deputy director and perhaps one or two other senior

9   management staff.

10          We would do the entrance interview and we

11  would have developed a list of significant program

12  managers that we would like--not only program

13  managers, but line staff we would like to interview

14  and in advance, documents of interest--we would

15  make that clear so they can have those documents

16  available for us.

17          So it was set out to be a routine program

18  monitoring exercise.

19      Q.    You had planned to do the monitoring

20  exercise with your own DHS staff?

21      A.    Correct.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

37

1    A.    It would have to be a few steps into my

2    meeting with him around the 18th, 17th of February,

3    I conducted the interview that was conducted with

4    the executive director and deputy executive

5    director, I think the same day as the entrance

6    interview, I went to interview the CFO for the

7    organization and went to interview the

8    controller for the organization.

9        There was information that I received from

10    a combined number of people I talked to that

11    conflicted and was contradictory to what other

12    people--what I recall most precisely was we had, in

13    the 2002 exercise, noted that UPO policy and

14    procedures, accounting policy and procedures

15    guidelines was a very old document.

16        And we had suggested that they review that

17    and update that document.  They had assured us

18    during many, many contacts between 2002 and 2004,

19    my coming out in 2004, that they had hired a

20    consultant to help them work on the policy and

21    procedures manual.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

38

1    One of the first things I asked to see

2    when I went out in 2004 was to ask to see the

3    policy and procedures manual that--this was being,

4    they said had they hired a consultant to help them

5    with its development.  I knew a consultant had

6    become full time staff with the agency and did not

7    produce the document in a timely manner.

8        That raised red flags in my eyes, so a

9    combination of that and perhaps interview responses

10   that I had gathered and Mr. Amin's alert led me to

11   conclude there may be things going on that are not

12   supposed to be going with on CSBG funds.

13   Q.    You said that meeting, the interview,

14   entrance interview, was done on February 17.

15   Correct?

16   A.    I could check, February 17 or February 18,

17   it may have been scheduled for the 17th, I probably

18   did note that on the 17th and my calendar clearly

19   will show that.

20       I can put my hands on my calendar for that

21   period.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

40

1    A.    I am not positive.  We may have met more

2    than once before February 18, but in this general

3    timeframe, it is possible.

4    Q.    When did you meet with Mr. Kakeh the third

5    time?

6    A.    After a few days on the ground at the site

7    visit, the location, the headquarters of UPO, I,

8    after my first few days, I cut off my exercise.  I

9    had determined, at that time, this was no longer

10   going to be routine and customary.

11          I suspect I, right after I made the

12   determination that we are going to need more than

13   just me and my staff conducting this exercise, plus

14   I had a conference coming up in town the following

15   week.

16          I believe February 17, 18 would have been

17   Tuesday and Wednesday.  By that Friday, I had

18   concluded I would take time off the exercise,

19   attend the conference in town the following week

20   and come back and resume my monitoring exercise.

21   Q.    You apparently decided at one point you

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

43

1    Q.    My question was what kind of help.

2         Did you think you needed auditors?

3    A.    I knew I needed people with finance

4    expertise, accounting and finance expertise.

5    Q.    What steps did you take to procure those

6    people?

7    A.    During the conference, I met with the

8    agency sponsoring it, the National Association for

9    State Community Service Programs.  That is a

10   membership organization that CSBG administrators

11   belong to.  They were sponsors, it was what they

12   called a mid winter training conference.

13        I met with the director of programs for

14   that organization.  And in the past, they have been

15   used by the federal oversight agency to perform a

16   number of CSBG data gathering exercises by contract

17   with the feds.

18        And they have also served as advisors to

19   CSBG administrators in matters where we needed

20   clarity or referral, so it was them.

21   Q.    What is the name?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

44

1      A.    National Association for State Community

2   Services Programs.

3      Q.    Did you hire that agency?

4      A.    Actually, I did.  I entered into an

5   arrangement with them to provide technical

6   assistance.

7           At the same time, I contacted my federal

8   oversight agency and talked to the program manager,

9   region three.  D.C. is region three.  I talked to

10  the region three manager that I was having,

11  potentially there may be a need for me to request

12  technical assistance from them.

13     Q.    What was the response?

14     A.    In the affirmative, if you need help, let

15  us know and we will get you some help.

16     Q.    When did you have this meeting with the

17  National Association for State Community Service

18  Programs?

19     A.    The week after February 18, the week of

20  the conference.

21     Q.    What was the week?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

47

1    Q.    Did the National Association, in fact, go

2    and do an investigation of UPO?

3    A.    It turned out that they also entered into

4    an arrangement with another group, Mid Iowa

5    Community Action Agency, National Services unit or

6    something.

7    They were members of that organization,

8    members of that organization were present at the

9    conference I attended, I did have discussions with

10   members, but my relationship with NASCP, I have

11   used expertise of MICA, the people that actually

12   were on the ground with me were members that MICA

13   put together.  They don't necessarily work for

14   MICA, but there are professionals in their own

15   different pursuits in the areas of accounting,

16   management and board governance that MICA can put

17   together.

18   Q.    Who hired what?  MICA hired?

19   A.    MICA was an entity that NASCP hired.

20   Q.    Who paid for the services of MICA?

21   A.    NASCP, I paid NASCP and NASCP paid MICA.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

85

1    potential things we could ask for and I think

2    subsequently our request was simply pointing to the

3    items or adding items to this list.

4           I don't recall that there was any other

5    written request for any other documents other than

6    what we had set out originally as the

7    possibilities.

8           MR. MELEHY:  At some point--let me have

9    some exhibits marked.

10          (Eboda Deposition Exhibits Nos. 3 through

11   6 were marked for identification.)

12          BY MR. MELEHY:

13   Q.   After February 20, what happened, the

14   auditors went in, correct, or members of MICA went

15   in.  Right?

16   A.   I worked with NASCP to develop the team to

17   go back in, we announced to the executive

18   management, to UPO, that we were coming back in and

19   we stated the dates we were coming and we informed

20   them we would be working with a team to continue

21   the exercise.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

86

1    Q.    Was that done by February 25, the letter?

2    A.    Yes, we went in March 1 and stayed on the

3    ground for the most part of that week conducting

4    interviews of the board of trustees, members of

5    management, program managers with UPO and perhaps

6    staff; reviewed documents; set up appointments to

7    talk to independent auditors of UPO.  That occurred

8    during that exercise.

9    Q.    How many days did you spent there during

10   that period?

11   A.    Five days a week, by the end of that week

12   we had made a request to address the entire board.

13          And the rules say we have to give them

14   three days' notice to convene the full body of the

15   board outside of what is previously scheduled as a

16   regular meeting.

17          I believe we made that request on Monday

18   to give them three days.

19          And I asked, I addressed the entire board

20   March 11 sharing with them preliminary findings of

21   our exercise and insisting that they take seriously

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

87

1    some of these actions, some of those findings and

2    take some actions, and that was the evening of

3    March 11.

4        Q.    How long did that meeting last?

5        A.    We started about 6:30, 7:00 and I think we

6    were there until past midnight.

7        Q.    Was the meeting solely concerning the

8    investigation?

9        A.    Solely concerning the monitoring exercise.

10       Q.    Were meeting minutes kept?

11       A.    The agency had responsibility for that.    I

12   believe they did.

13       Q.    Did they record the meeting?

14       A.    Part was in open session.    They had a

15   period where they asked me and my staff to leave

16   and went to closed session.    I don't know the

17   policy.

18       Q.    Was the session where you were there tape

19   recorded?

20       A.    I don't know.    I know there is a

21   designated person that takes notes, a staff person

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

91

1          We convened together, it was announced

2     that Mr. Jennings was being suspended effective

3     immediately.

4          Q.    How did he react to that?

5          A.    I wasn't very focused on him, on trying to

6     read what his reaction was.

7          Q.    Was it fair to say your report indicated

8     Mr. Jennings may have committed serious wrongdoing?

9          A.    To the extent we could determine there was

10    at the very least mismanagement of CSBG funds, yes.

11         Q.    Misappropriations of those funds as well?

12         A.    I would surmise so, yes.

13         Q.    At that time, is it fair to say, at that

14    time, based on your conversations with the board,

15    Mr. Jennings, Ms. Mack, and Ms. Shears, that they

16    understood that the source of your information, in

17    part, at least, was Mr. Kakeh?

18         A.    I think it--everything pointed to him.  I

19    know, at some point later, I disclosed the fact he

20    was cooperating and being helpful to us.

21              I think I may have done that months later

95

1        Do you mean it was clear to you in March

2    or April that members of management knew that Mr.

3    Kakeh had been the source of your information?

4        A.    That is my belief.  The majority of the

5    documents we were looking at came from the finance

6    unit.  Ms. Shears was not the author of many of

7    those documents.

8            Mrs. Amin, by responsibility, had produced

9    those documents and we had a number of those

10    documents.

11        Q.    What documents, in particular, are we

12    talking about?

13        A.    Financial statements, balance sheets,

14    other financial-related documents, bank statements,

15    reconciliation documents.

16        Q.    Those documents, did any of those

17    documents show, to any degree that money, non

18    program funds were being charged to the CSBG grant?

19        A.    As far as the CSBG budget originally

20    submitted by UPO was concerned, yes, there was a

21    number of items out of line, not included in the

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

99

1    Q.    Did you disclose to him Mr. Kakeh had

2  cooperated with you in early February by providing

3  you information?

4    A.    Nothing specific other than he was

5  somebody we talked to and I encouraged him to talk

6  to Mr. Kakeh.

7         I believe he set up meetings.  I know I

8  was part of at least one meeting Mr. Kakeh was at,

9  was in with Mr. Jones.

10        Whether they had other meetings outside of

11  the one I participated in, I don't know, but I did

12  encourage Mr. Jones, I identified Mr. Kakeh as

13  someone I believed was knowledgeable about

14  financial operations of this agency and he could

15  also be useful to him.

16    Q.    Did you tell Mr. Jones you had

17  communications--oral, in person or in writing with

18  Mr. Kakeh before February 18?

19    A.    I don't know if I did specifically.  I

20  don't recall, but I don't think, at that point,

21  that I was terribly cagey, so if I didn't, it was

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

102

1     A.    Yes, yes, because as part of the entrance

2   exercise we conducted I felt that we identified

3   Mr. Jones for the board of UPO, so I felt obligated

4   to assist him to succeed in every possible way.

5     Q.    You recommended to the board Mr. Jones be

6   hired as interim executive director?

7     A.    I recommended that he be considered, yes.

8         The discretion to hire him was that of the

9   board.  They interviewed him.  Yes, I came up with

10  his name and suggested his name to the board on the

11  board's request to me to help, to recommend for

12  them what they can do, and I had tests and reasons

13  I applied to come up with Mr. Jones.

14    Q.    As time went by after Mr. Jones, you made

15  this recommendation that Mr. Jones deal with Mr.

16  Kakeh, did you sense that his welcoming of the

17  recommendation, the feelings he had about it

18  changed?

19    A.    He, in fact, told me that he no longer

20  believed that Mr. Kakeh can produce for him the

21  kind of assistance that he needed in the financial

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

103

1    office.

2        Q.    When did he tell you that?

3        A.    When he was talking about his decision to

4    use another group that he was familiar with, that

5    had done some work for him, right around the first,

6    maybe second or third week.

7        Q.    Are we talking late April of 2004?

8        A.    Mid to late April, correct.

9        Q.    What was your response when he said that

10   to you?

11       A.    Well, the group he identified I recall

12   that my office objected to the involvement of that

13   group primarily because they had also been involved

14   in old management that in our eyes had been become

15   discredited, so I raised an objection to it.

16       Q.    What was the name of the group?

17       A.    I don't recall.

18       Q.    Walker?

19       A.    No, this was before Walker.

20       Q.    F.S. Taylor?

21       A.    Correct.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

109

1   fired for poor performance based on what Jones told

2   you?

3       A.   Correct, I know he made specific reference

4   to, I don't remember now what financial statements

5   or financial documents that Mr. Kakeh produced for

6   him and he said that the report was either no good

7   or something to that effect.

8       Q.   This was financial reports that were then

9   current as opposed to ones you had relied on?

10      A.   I believe in the employee employer thing,

11  management and staff thing, at that time, I never

12  got involved with the details of what he was

13  getting on a day-to-day basis in order for him to

14  do his job as interim executive director.

15      Q.   When Mr. Jones told you Mr. Kakeh had been

16  RIFed, was that after June 4, 2004, after Mr. Kakeh

17  was let go?

18      A.   I remember him telling me before Mr. Kakeh

19  was let go.  I don't recall whether it was one

20  conversation or two conversations.  I don't know or

21  I don't remember if he identified for me a date.  I

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

156

1     Q.   Had you not learned those things, that

2   would not have happened?

3     A.   It would not have required the drilling

4   down that required specific skills that an

5   accountant brought to the table and specific skills

6   the management of the community action agency

7   brought to the table.

8          A member of the team was also an executive

9   director of a similarly structured community action

10  as UPO to give us that balance and benefit.

11    Q.   I want to point out one thing in your

12  letter, Exhibit 2, this on-site monitoring visit

13  should be regarded as a routine customary exercise

14  in Section 678 of the Community Services Block

15  Grant Act of 1978 as amended.

16         Did you write that so UPO wouldn't be

17  alarmed?

18    A.   I am sure somewhere before I would have

19  said I was coming with a team and a team

20  constituted specifically for that purpose.

21         It is--we start out using our staff, if

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

157

1    there are issues of a technical nature we don't

2    have expertise in, yes, customarily we will find

3    that expertise and make that part of this team.

4        At the time I was developing this, we were

5    not on the ground pealing the layers and, to an

6    extent, it still hadn't hit us.  We started the

7    exercise, yes, I know we have to drill deep.

8        It is still customary.  It is not unheard

9    of.

10   Q.   When you had met at Howard University, why

11   did you invite Amin Kakeh to meet with Head Start?

12   A.   I revealed to Head Start the extent he was

13   cooperating.  Whether I initiated it or they did

14   it, it was clear to me that they knew him and the

15   meeting was brief.

16       As I recall, Head Start had a structure

17   and training they go to before they send folks out

18   and it is very specific, and they were going to do

19   their thing, so them asking to meet with me or me

20   asking Amin to join us for that meeting was simply

21   to make it firsthand some of the things Amin had

161

1    minimum of 90 percent of community-based

2    organization--UPO has to be designated as a

3    recipient of CSBG, found as the eligible agency and

4    that process has nothing to with my office.

5             As I said, UPO was on the ground carrying

6    out some of the functions of CSBG under a different

7    act, so they were grandfathered into their role, so

8    they did not need to be a separate designation.

9        Q.    As a recipient of CSBG funds, how does UPO

10   get access to this money to run programs?

11       A.    UPO makes awards of them, to portions of

12   funds passing through, they, then, get paid either

13   on a monthly basis or quarterly basis, which

14   is--commonly it is on a monthly basis through a

15   period of a 12-month calendar.

16       Q.    How did they make the request to be paid?

17       A.    Through an invoice, UPO was submitting

18   invoices to us for one twelfth of the amount of the

19   grant on a monthly basis.

20       Q.    Would financial statements be used to

21   obtain funds?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

164

1    certain tests so money can be used to fund the

2    positions?

3        A.    That is a prerogative of the agency that

4    employees dedicate performance to a CSBG function

5    and they can pay them 100 percent or split time

6    between programs and pay portions from CSBG for the

7    portion of CSBG work they do.

8            They can establish and budget CSBG funds

9    that they wish to use to co-fund other program

10   activities.

11       Q.    Do you know, in 2003, which positions were

12   budgeted for CSBG?

13       A.    They would have had to submit that at

14   least to us in some of their program plan documents

15   that would detail what employees were being paid

16   100 percent by CSBG and what employees were paid a

17   fraction of CSBG.  Usually, we got a program plan

18   budget and outcome report.

19       Q.    To your knowledge, was Mr. Kakeh paid for

20   with CSBG funds?

21       A.    I would have to review documents.  I

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

173

1    that we had reviewed coming from UPO, certain

2    charges belong with certain cost centers

3    appropriate for that charge and that the structure

4    they set up, a cost center for Head Start, cost

5    center for CSBG and operations within CSBG is my

6    understanding of how the cost centers structure

7    was.

8        Q.    During the monitoring and review process,

9    did you look solely at the cost center for CSBG?

10       A.    We looked at CSBG.

11            And where information that we were

12   gathering suggested that we take a look elsewhere,

13   we did that, also, but not in as much detail as

14   CSBG.

15            For example, if UPO submits to us they use

16   CSBG funds to co fund other cost centers, other

17   program areas, we looked at those and some of the

18   questions that were raised was to find if, was to

19   find out why those cost centers could not

20   sufficiently fund whatever activities they were and

21   simply accepted the fact what they needed to do in

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

174

1    those areas exceeded the funds available and CSBG

2    is appropriating funds to use to co fund some of

3    these other programs, simply we would take a look

4    at that.

5              And if the program activities exceeded

6    what was available under those programs, we wanted

7    to be assured it was properly budgeted for in the

8    CSBG budget.

9         Q.   Were you aware UPO had a line of credit?

10        A.   Yes.

11        Q.   Did you find, during your review, some of

12   the credit card charges were paid for from the line

13   of credit?

14        A.   Correct.

15        Q.   And with the boat, which I believe was My

16   Fine Lady, was some of the money paid towards that

17   paid through their line of credit?

18        A.   I don't recall offhand I made that link,

19   but documents made the link for us.  I stand

20   corrected.

21        Q.   Do you recall if you examined the cost