# EXHIBIT 2

COPY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------x

MOHAMMED AMIN KAKEH,                 x

       Plaintiff,              x Civil Case No.

       v.                      x 1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC., x

       Defendant.              x

------------------------------------ x

                  Monday, April 10, 2006

                  Silver Spring, Maryland

The deposition of GLADYS W. MACK called for

examination by counsel for Plaintiff in the

above-titled matter, pursuant to notice, in the

Offices of Zipin & Melehy, 8403 Colesville Road,

Silver Spring, Maryland, before Jonell Easton,

notary public, at 10:26 a.m., when were present on

behalf of respective parties:



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

7

1  functions?

2  A. Yes, different functions really.

3  Q. What is your current salary?

4  A. My current salary is $110,000, I believe.

5  Q. What was your salary in May of 2004?

6  A. The same as it is now.

7  Q. You have essentially, for the most part,

8  if you look at the two positions you have held as

9  being similar or the same, you have essentially

10 held the same position since 1993?

11 A. Yes.

12 Q. Going back to January of 2004, what were

13 your job duties, at that time?

14 A. I am not clear.

15    What were my job duties?

16 Q. Yeah, your principal job duties.

17 A. My principal responsibilities were to

18 coordinate the programs that were funded by the

19 Community Service Block Grant funds that come from

20 the department, D.C. Department of Human Services.

21    I was responsible for developing the

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

8

1   agency's overall budget and I was responsible for a
2   number of special activities, the strategic plan
3   and I can't think of anything else, in particular,
4   but generally and throughout all this time, I have
5   served on the Washington, D.C. Metro, WMATA,
6   Washington Metropolitan Area Transit Authority,
7   board of directors, so I spend a significant amount
8   of time in that responsibility, as well.
9        Q.   That is totally separate from your UPO
10  employment?
11       A.   Right, an appointment by the mayor of D.C.
12       Q.   What is your educational background?
13       A.   I have bachelor of science degree in
14  business administration from Morgan State
15  University.
16            I have done a little graduate work, some
17  continuing education type of work.
18       Q.   Do you have any graduate degrees?
19       A.   No.
20       Q.   What kind of graduate work did you do?
21       A.   In accounting in the late 1950s and that

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

21

1  not done properly?

2    A.   Yeah.

3    Q.   In other words, the reporting was not
4  accurate, in your opinion?

5    A.   In my opinion and since my major
6  responsibility was the budget area, it was an area
7  that I focussed on in particular, but there were
8  also just the general concerns about the
9  performance of the office and the fact that the
10 other operations that would normally be expected of
11 the office were not being done.

12   Q.   Who was Mr. Kakeh's supervisor--you or Ms.
13 Shears?

14   A.   Ms. Shears was Mr. Kakeh's supervisor.

15   Q.   Was she reporting this to you or was it
16 your own observations of Mr. Kakeh's performance?

17   A.   Ms. Shears had only been for there for a
18 short time. Most of my observations or the
19 observations I am giving you were ones from my own
20 personal knowledge.

21   Q.   Was Odu Thomas responsible for bank

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

48

1  He may or may not have been in the room
2  when I was having discussions, I can't say.
3  I can say I don't recall he and I had any
4  discussion one on one.
5  Q. I didn't assume that. I'm sorry if I gave
6  you that impression.
7  Going back to my earlier question, you
8  indicated the fact Mr. Kakeh was not giving certain
9  schedules and reports to Ms. Shears that really had
10 nothing to do with you possibly going to Mr. Eboda
11 and saying go to Mr. Shears?
12 A. I knew Ms. Shears was complaining, I heard
13 her say that sometimes I didn't know why that he
14 had created his own secret statement.
15 Let me address the concern I raised about
16 the way the statements were presented and my
17 request they be changed.
18 Q. Okay.
19 A. When Mr. Kakeh presented the statement
20 that had the $3.4 million deficit, whatever, it was
21 the first time I had a statement with a deficit

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

49

1  that size and it turned out that it was because Mr.
2  Kakeh had decided he was going to treat the CSBG
3  revenue in a different way than it had ever been
4  treated the whole six years he had been at UPO, in
5  a way there had been no discussion within the
6  agency, with me or anybody else.
7        And I asked him to change it and treat it
8  the way he had always done it for the previous five
9  years and the way the agency had always done.
10       It wasn't I was asking him to do something
11 different.
12       I was asking him to do the same thing he
13 had always done.
14   Q.   Did Mr. Eboda's group raise any concerns
15 about the boat or cell phone charges or the parking
16 fines or anything else that were allegedly improper
17 at UPO?
18   A.   Well, the report from the reviewers did
19 indeed raise concerns about all those things, the
20 preliminary report that was left, that was left
21 with the agency that the board got the opportunity

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

71

1    Q.   Did--to your knowledge, did Mr. Jennings
2    or Mr. Jones express, at any time, to anybody that
3    they were contemplating terminating Mr. Kakeh for
4    performance-related reasons?
5    A.   I can't cannot speak to that.
6    Q.   I am asking if someone said to
7    you--Mr. Jones said X or Mr. Jennings said they
8    don't want Mr. Kakeh around, they wanted to
9    terminate him for performance reasons.
10   A.   I can tell you what I told you
11   before--that there were problems in that office, it
12   was not performing satisfactorily.
13        Now, attempts to find the solution to the
14   problems that some of the efforts that were being
15   considered would have resulted in Mr. Kakeh not
16   being employed by UPO.
17   Q.   Along with other people?
18   A.   Yeah, exactly.
19   Q.   Basically a reorganization or RIF?
20   A.   Yes, not specific termination of his
21   employment due to alleged poor performance.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

72

1   Well, let me say this, when the
2   reorganization occurred that brought Ms. Shears in,
3   basically it was because the leadership of the
4   office was not accomplishing the goals of the
5   office and the reorganization was to attempt to
6   bring in other resources that would improve the
7   performance of the office.
8   So, you know, had Mr. Kakeh been, had the
9   office been succeeding under the leadership of Mr.
10  Kakeh, the reorganization may not have taken place.
11  The fact he was retained suggested it was
12  felt he could make a contribution to a reorganized
13  office.
14  Q.   At the time Mr. Jennings left, did he have
15  any plans to outsource the accounting department or
16  the finance department or had those plans been
17  scraped?
18  A.   That had been in the planning off and on
19  for five years, four years, for four or five years,
20  right.
21  Q.   It had never been followed through on?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

73

1  A.   It hadn't been followed through on to some
2  extent because there was not consensus on the board
3  that that should be done.
4       There was consensus that there were
5  problems in the financial office, if you look at
6  our audit, there were clearly problems in the
7  finance office.
8  Q.   Did Mr. Jones, at some point, decide to
9  propose and carry out a reduction in force of the
10 finance office?
11 A.   Well, the board voted, I believe this is
12 correct, to outsource the leadership of the
13 finance--the leadership of the finance office
14 because of the serious concerns that were in the
15 audit and also had been cited in the report.
16 Q.   Did Mr. Jones decide to recommend that
17 before the board voted on that?
18 A.   I am not sure.  I don't know.
19 Q.   The UPO board did it on its own?
20 A.   Well, let me say I don't know where that
21 discussion started, whether it started with

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

103

1  A.  No.

2  Q.  So Mr. Eboda never talked about any of the

3  financial statements Mr. Kakeh prepared?

4  A.  At the March 11 board meeting?

5  Q.  Yes.

6  A.  No.

7  Q.  You are sure?

8  A.  Not that I recall.

9  Q.  Did Mr. Eboda tell the board there was

10  fraud, waste and abuse going on at UPO?

11  Talking about March 11.

12  A.  Those words--I don't believe so.

13  At that board meeting, Dr. Eboda presented

14  the report, the preliminary report that had been

15  prepared. He didn't speak outside of that report.

16  He didn't present details, no, that were not

17  included in that report, to my recollection.

18  Q.  Did Mr. Eboda discuss with you, at any

19  time, that Mr. Kakeh was cooperating and being

20  helpful in his investigation?

21  A.  No.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

104

1   Q.   Are you sure?

2   A.   Yes. Well, let me ask you this, when you
3   mean--I am assuming that if the office was being
4   reviewed, Mr. Kakeh, as part of his responsibility
5   in the office, was cooperating.

6   Q.   I am not asking about assumptions.

7        I am asking whether Mr. Eboda specifically
8   said to you, at any time in 2004, that Mr. Kakeh
9   had been cooperative and helpful in the
10  investigation.

11  A.   Not to my recollection.

12  Q.   In any meeting which you attended which
13  Mr. Eboda was present, did he ever indicate to you
14  that Mr. Kakeh had provided certain documents to
15  him?

16  A.   I was present I think, but I was present
17  in a meeting with Mr. Kakeh and Ms. Robinson and
18  Mr. Kakeh brought a tremendous number of documents
19  with him to that meeting and so I was aware he was
20  sharing documents with the board. I think Mr.
21  Eboda was there also.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

106

1  with me. He told me he would not share them with
2  me only with the board, so that was a meeting that
3  was set up so he could share the documents with the
4  board, and Dr. Eboda was there.
5      Q.  Was he authorized to share those documents
6  with Mr. Eboda at the time you just described?
7          MS. DAVIS:  Objection.  Form.
8          You can answer.
9          THE WITNESS:  I did not authorize him. He
10  took it upon himself to present these documents and
11  he said that there were problems.
12         And I asked him both in email and later
13  personally to explain what the problems were.
14         And, as I said, he indicated he would not
15  explain it to me.
16         BY MR. MELEHY:
17     Q.  Explain them to you privately outside the
18  presence of Mr. Eboda, is that what you were asking
19  him to do?
20     A.  Not in that meeting, I am talking about
21  there was another meeting where we had some other

107

1   staff available, Ms. Shears and I believe the
2   accounting firm, and I asked him to share
3   information and he refused to share it with me.
4            And I explained to him I was in charge and
5   entitled to know anything he knew about what needed
6   to be shared, but--
7       Q.   About what needed to be shared?
8       A.   He said there were things that needed to
9   be shared.
10           I said, I am in charge, so share them with
11  me.
12           And he said, No, I will not share them
13  with you.
14      Q.   By virtue of his position, did he have
15  authority to disclose the documents to Mr. Eboda?
16           MS. DAVIS:  Objection.  Form.
17           You can answer.
18           THE WITNESS:  Well, by virtue of his
19  position, you know I don't know how to answer that
20  question.
21           Let me say that by virtue of his position