# EXHIBIT 6

COPY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------x

MOHAMMED AMIN KAKEH,                 x

              Plaintiff,         x Civil Case No.

              v.                 x 1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC.,x

              Defendant.         x

------------------------------------ x

                     Monday, February 27, 2006

                     Silver Spring, Maryland

The deposition of DANA JONES called for examination by counsel for Plaintiff in the above-titled matter, pursuant to notice, in the Offices of Zipin & Melehy, 8403 Colesville Road, Silver Spring, Maryland, before Jonell Easton, Notary public, at 10 a.m., when were present on behalf of respective parties:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

7

1    Q.    Are you currently employed there?

2    A.    Yes.

3    Q.    What is your position?

4    A.    Chief executive officer.

5    Q.    Have you held that position since April 5,

6    2004?

7    A.    I held it on interim basis, first, as

8    executive director, then when the bylaws were

9    changed, as chief executive officer.

10         And I officially started my tenure there

11    on August, in August of 2005.

12    Q.    Is it your understanding that the chief

13    executive officer and executive director positions

14    are one and the same with different names?

15    A.    Yes.

16    Q.    What is your current address?

17    A.    I reside at 142 Michigan Avenue, Apartment

18    U 14, Washington, D.C.

19    Q.    What is the ZIP code?

20    A.    20017.

21    Q.    What is your salary at UPO?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

8

1    A.    125.

2    Q.    Any bonuses?

3    A.    No.

4    Q.    What positions did you hold prior to

5  coming into UPO?

6    A.    President, chief executive officer

7  Southern Maryland Tri-county Community Action

8  Committee.

9    Q.    Tri-county?

10   A.    Community Action Committee.

11   Q.    How long did you hold that?

12   A.    Twenty-four years and about six months.

13   Q.    What was your salary at completion of that

14  tenure?

15   A.    $105,000.

16   Q.    Where was that position located in

17  Maryland?

18   A.    Charles County.

19   Q.    Before that, where were you?

20   A.    I was the special assistant to the

21  executive director of Shore Up, Inc. in Salisbury,

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

10

1      A.   I don't know, sometime after the third

2    Wednesday of March, I don't know the date.

3      Q.   Late March?

4      A.   Yes.

5      Q.   Who interviewed you?

6      A.   The ad hoc management committee.

7      Q.   Who was on that?

8      A.   Alexis Robertson.

9           Judge Annise Waggoner.

10          Judge Raphael Diez.

11          Brenda Kelley.

12          Judge Henry Green.

13          Mr. Nathaniel Howard.

14     Q.   Did they offer you the job in the

15   interview?

16     A.   No.

17     Q.   How did you hear about the job?

18     A.   I got a phone call on the third Wednesday

19   of March from Dr. Tunde Eboda asking if I would

20   consider coming to Washington, D.C. to help them

21   with their problem.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

11

1    Q.    Did you know Mr. Eboda?

2    A.    I had met him the month before at the

3  conference, but I did not know him.

4    Q.    He suggested to you that you apply and you

5  did?

6    A.    He suggested I meet with the board.

7    Q.    Did you meet with the board?

8    A.    I met with the management ad hoc

9  committee.

10    Q.    When were you offered the job?

11    A.    Sometime in late March.

12    Q.    2004?

13    A.    Yes.

14    Q.    And you started your duties on April 5,

15  2004?

16    A.    Yes.

17    Q.    Before you took the job, what were you

18  told about UPO?

19    A.    Before I took the job, I was told there

20  had been alleged improprieties on behalf of the

21  executive management and there were articles in The

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

27

1       Q.    When, in May, did you come to that final

2   decision?

3       A.    Late May.

4       Q.    What was the final decision?

5       A.    Final decision was to outsource the

6   management of the finance office.

7       Q.    At that time, the time you made the

8   decision, who was in the finance office, starting

9   from the top and working your way down?

10      A.    Sheila Shears was CFO.

11            Amin Kakeh was controller.

12            David Quashie was deputy controller.

13            Bill Issacs was senior auditor.

14            Nona McLean was the facilities person.

15            And I think, at the time I made the

16  decision, the payroll clerk had resigned.

17      Q.    Who was that?

18      A.    Sylvia Hogue, H-O-G-U-E.

19            Ododu-Thomas was there.  He was budget

20  chief, I guess that was what he was called.

21            There was Jean Gray, Arthur Gray was a

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

28

1    payroll clerk or voucher auditor, just as Daisy.

2          Christine Lattimore more was like an

3    office clerk.

4          Aaron Smith was in sometimes, an admin

5    assistant position.

6          Henry Kanaghbou was either general

7    accountant or something.

8          And the revenue chief--who was that?

9          There was a lady who worked there named

10   Nona McLean, and Marco Reed, and I think that he

11   was on the line, as well, in that organization

12   chart.

13   Q.    Who did you consider to be management in

14   the finance department?

15   A.    CFO, controller, and deputy controller,

16   facilities person.

17   Q.    Nona McLean?

18   A.    Yes, and the senior auditor.

19   Q.    That was Bill Issacs?

20   A.    Yes.

21   Q.    You indicated you wanted to get rid of,

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

29

1    well, that you wanted to eliminate management in

2    the finance office that was your plan, as well,

3    rephrase.

4              I think that you said you made a decision

5    in late May to outsource the management of the

6    finance office?

7        A.    Correct.

8        Q.    So basically, your decision was you were

9    going to replace services of management with an

10   independent contractor who would perform those

11   functions.  Is that right?

12       A.    Correct.

13       Q.    And in late May, how did you decide you

14   were going to accomplish that?

15       A.    Through a reduction of force of the

16   management personnel.

17       Q.    Did you decide, at some point, who you

18   were going to eliminate or who you were going to

19   RIF, I should say?

20       A.    Yes.

21       Q.    When did you decide who you were going to

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

34

1     Q.    What was the effective date of her

2   resignation?

3     A.    I don't recall.

4     Q.    Did you ask her to stay on extra time past

5   her proposed resignation date?

6     A.    Yes.

7     Q.    Why?

8     A.    So we could have someone to make some type

9   of hand off or transition to the new firm and

10  because she indicated a willingness to do so.

11    Q.    Is she a consultant of UPO presently?

12    A.    No.

13    Q.    Her last day of work was June 30?

14    A.    Correct.

15          MR. MELEHY:  Have this marked as the next

16  exhibit, Exhibit 2.

17          (Jones Deposition Exhibit No. 2 was marked

18  for identification.)

19          BY MR. MELEHY:

20    Q.    I am showing you Jones Exhibit 2.

21          I ask if you have ever seen that document

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

45

1    performance problems?

2        A.    I had no way of evaluating the employees'

3    performance.

4        Q.    You drew no conclusion of what positions

5    were eliminated?

6        A.    I drew conclusions based upon reports and

7    the audit, which reflected the declining quality of

8    the accounting department starting in 2001,

9    repeated in 2002 and disastrous by 2003.

10       Q.    Did you offer any of the RIFed employees

11   outplacement programs?

12       A.    I don't recall.

13       Q.    Did you ever offer Mr. Kakeh any

14   outplacement services?

15       A.    I don't recall.

16             I would take it when you say--do you mean

17   UPO?

18       Q.    I mean externally.

19       A.    No.

20       Q.    Or UPO?

21       A.    I don't recall what UPO did.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

47

1          MR. MELEHY:  I need a quick break.

2          (Discussion off the record.)

3          BY MR. MELEHY:

4     Q.   Mr. Jones, I want to make sure I

5    understand your testimony.

6          You indicated, a little while ago, that

7    Walker & Company told you it wanted to eliminate

8    the top two management positions in the finance

9    department and replace those positions with its own

10   people.  Correct?

11    A.   No, I didn't.

12    Q.   You didn't say that?

13    A.   No, what I said to you was that Walker &

14   Company indicated to me that it wanted to have the

15   decision over management positions and, at a

16   minimum, bring in the two top people.

17    Q.   It wanted to be able to decide what

18   management positions to eliminate?

19    A.   They didn't necessarily--the number one

20   and two positions they wanted to bring in their own

21   top two people, yes.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

48

1        And aside from that, they wanted to have

2   the decision over who held the management positions

3   in those organizational structures those

4   positions--UPO financial operations officer,

5   accounting director and the grants management.

6        Q.   Who was in the grants management position?

7        A.   Nobody, we had to hire someone.

8        Q.   You are talking about more than two

9   positions, talking about the controller and--the

10  UPO controller and deputy controller that needed to

11  be eliminated?

12       A.   No, we RIFed the management positions in

13  the old structure, which excluded external auditor,

14  the facilities manager, which included assistant

15  controller and controller and CFO.

16       And the reorganization involved a CFO, a

17  financial operations officer and accounting

18  director, and grants management position.

19       Q.   UPO financial operations officer,

20  accounting director and what was the fourth one?

21       A.   Grants manager.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

69

1       A.    I don't recall.

2       Q.    The second meeting, who was present?

3       A.    Mr. Kakeh, myself.

4       Q.    The first meeting was early April?

5       A.    Yes.

6       Q.    The second meeting was mid April?

7       A.    Mid to late April, those are the two I

8    recall, I am sure we had other discussions.

9       Q.    Regarding the first meeting, do you recall

10    what you talked about with Mr. Kakeh or what you

11    talked about period?

12       A.    Yes, the level of the deficit at UPO,

13    trying to get through the audit and understand

14    exactly what the deficit number was.

15       Q.    What audit?

16       A.    The 2003 audit had not been completed and

17    the audit firm was, 2003--agency funding sources

18    were demanding an audit and one, in particular,

19    stopped paying us because we did not meet standards

20    agreed upon in the contract.

21            We were trying to find out--every number

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

97

1    Q.    Ms. Locus of F.S. Taylor along with

2    Ms. Shears disagreed and presented a position that

3    was contrary to Mr. Kakeh on what portion of the

4    deficit should be allocated to grant monies.

5           Is that correct?

6    A.    Yes.

7    Q.    Mr. Kakeh believed that little, if any, of

8    the deficit could be allocated to grant funds.

9           Ms. Locus' and Ms. Shears' position

10   indicated that a large portion of it could be

11   allocated to the grant.  Correct?

12   A.    No.

13   Q.    Did Ms. Locus and Ms. Shears, in their

14   written statement, indicate that a portion of the

15   deficit could be allocated to the grant?

16   A.    There was no written statement.

17   Q.    You referred to a presentation made by Ms.

18   Locus, what was that?

19   A.    It was a presentation regarding our

20   revenue and adjustments made, to be made to the

21   revenue schedule for 2003 audit and it recognized

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

98

1    expenditures that exceeded, in Head Start, the

2    amount of revenue we had claimed.  It was a

3    difference of approximately $300,000.  She said,

4    because they are allowable expenditures under Head

5    Start you should claim revenue and they will reduce

6    your deficit.

7        Q.    The third paragraph concerns the Head

8    Start program?

9        A.    Yes.

10       Q.    Did Mr. Kakeh disagree with that, that

11   those $300,000 were legitimately billed to the

12   grant?

13       A.    I think in previous documents you have

14   shared with us, we will see his comment was he

15   didn't disagree, he needed to look at that point in

16   the meeting, he was not certain.

17       Q.    The April 7 meeting?

18       A.    I don't know if there was an April 7

19   meeting.  It referred to an April 7 memo, I don't

20   know.

21       Q.    Going to the fourth paragraph.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

101

1      A.    Yes.

2      Q.    It is true Mr. Kakeh wanted you to tell

3  Head Start that a deficit had been run or had

4  accumulated in the amount of 300,000 or whatever

5  the deficit was with the Head Start grant and you

6  were applying those as costs to address the

7  deficit?

8            MS. DAVIS:  Objection.  Form.

9            If you understand you can answer.

10           THE WITNESS:  No.

11           BY MR. MELEHY:

12     Q.    No?

13     A.    No.

14     Q.    No what?

15     A.    No.  You asked me a question.  The answer

16  to it is no.

17           You will have to ask him what he meant.

18     Q.    You wrote, Why would I tell them by

19  applying those costs as allowed we are addressing

20  our financial condition.

21           You were saying that he was telling you

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

102

1    that you had to tell them that UPO was running a

2    deficit and the deficit was motivating this claim?

3       A.    I would have to see his letter to me to be

4    able to answer that question, but my recollection

5    of it, no, the question was would I tell them we

6    were addressing the deficit.

7            My perspective was we had earned income,

8    poor accounting had resulted in us not claiming it,

9    it needed to be claimed.

10           Would you not bill a client for $300,000

11   worth of work?  It was my position, still is, we

12   had not billed the customer for the work.

13           Whether or not it was applied to the

14   deficit or not is irrelevant.  We had not

15   appropriately accounted for earned income.

16           MR. MELEHY:  Could we take a five-minute

17   break.

18           (Discussion off the record.)

19           BY MR. MELEHY:

20      Q.    I want to refer you back to Exhibit 11,

21   Page 2.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

104

1    Q.    What did this $300,000 that you were

2    seeking from Head Start include, to your knowledge?

3    A.    Teaching children to read, count their

4    numbers.

5    Q.    I'm talking about what particular

6    expenditures by UPO were within that amount.

7    A.    Just that, salaries in the normal course

8    of allowable business.

9    Q.    So you don't know specifically what they

10   were for?

11   A.    No.

12        MR. MELEHY:  Let's mark this as Exhibit

13   13, please.

14        (Jones Deposition Exhibit No. 13 was

15   marked for identification.)

16        BY MR. MELEHY:

17   Q.    For the record, Exhibit 13 is letter dated

18   April 20, 2004 to Russell Simmons, board of UPO,

19   from Kenyetta Penn, the federal team leader,

20   Department of Human Resources.

21        Am I correct on that?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

105

1       A.    Yes.

2       Q.    You were cc'd on this.  Correct?

3       A.    Yes.

4       Q.    Do you recall receiving it?

5       A.    Yes.

6             MS. DAVIS:  Clarify, she is not with human

7   resources.

8             BY MR. MELEHY:

9       Q.    Health and Human Services.

10            Now, she was identifying certain

11  deficiencies.  Correct?

12      A.    Correct.

13      Q.    What were those deficiencies?

14      A.    According to page 2, A, program

15  governance, record keeping and reporting and

16  additional items with fiscal management, basically

17  referencing several internal control deficiencies.

18      Q.    Now, did you, were you informed of why

19  Head Start had decided to audit UPO?

20      A.    Yes.

21      Q.    Why was that?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

106

1    A.    Head Start--every three years--it does not

2    audit, Head Start had never audited UPO.

3          Head Start conducts, every three years, a

4    planned review.  This review, conducted from

5    March 15 to March 19, was planned and announced in

6    the spring of 2003.

7    Q.    Were you aware of the reason why CSBG

8    decided to conduct a review in March using the Iowa

9    group?

10   A.    Yes.

11   Q.    Why was that?

12   A.    According to Dr. Eboda, in July of 2003,

13   he announced at a regular quarterly meeting he

14   wanted to conduct his review of the program, he had

15   been stalled and had not been able to agree upon a

16   date because of scheduling conflicts.

17         And subsequently, he came in February of

18   2004 and found issues he felt he did not have the

19   expertise to deal with and sought the help of

20   people who were in town to help him.

21   Q.    February of 2004?

107

1    A.    That is what he shared with me.  My only

2  knowledge of why UPO was reviewed came from him.

3    Q.    Did he tell you that UPO was being

4  reviewed because Mr. Kakeh had made disclosures to

5  him?

6    A.    Never in my entire tenure of knowing him.

7    Q.    Did he tell you he had private meetings

8  with Mr. Kakeh?

9    A.    Never in my entire tenure.

10    Q.    Did you know Mr. Kakeh provided him with

11  financial statements?

12    A.    Never beyond the meeting April 5, in which

13  he provided financial information in the meeting

14  with Ms. Robertson, myself and Mr. Eboda.

15    Q.    He who?

16    A.    Mr. Kakeh provided.

17    Q.    You knew, April 5, Mr. Kakeh provided the

18  financial statements people were looking at that

19  day?

20    A.    Yes.

21    Q.    Did you authorize him to provide that

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

111

1    Q.    Is it a letter sent to Alexis Robertson

2    from Mr. Eboda?

3    A.    Yes.

4    Q.    Dated June 1, 2004.

5    A.    Yes.

6    Q.    Are you cc'd on this?

7    A.    Yes.

8    Q.    Did you receive it?

9    A.    Yes.

10   Q.    Do you know when you received it?

11   A.    On or about June 1.

12   Q.    In this letter, Mr. Eboda is denying UPO's

13   fiscal year 2003 CSBG budget deficit in the amount

14   of about a million dollars.  Correct?

15   A.    Yes.

16   Q.    What, as a result of that denial, how did

17   UPO obtain payment for the $1 million deficit, how

18   did it cover the $1 million deficit?

19   A.    I think it needs to be put in the

20   appropriate process.

21   Q.    Okay.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

112

1    A.   UPO had money, it was an issue of

2  recognition of its use of money as allowable.

3        UPO filed an appeal to this decision and

4  an approval was granted for this amount and more,

5  once it was determined that all expenditures were

6  allowable and acceptable.

7    Q.   When was that appeal finalized?

8    A.   September 29, 2004.

9    Q.   When the denial was received by you, was

10  that before or after you made the decision to RIF

11  the employees from the Office of Finance?

12    A.   After.

13    Q.   Is the decision to RIF them documented

14  anywhere other than the letters themselves?

15    A.   Not to my knowledge.

16    Q.   There were two articles in The Washington

17  Post, correct, about UPO?

18    A.   At least.

19    Q.   One was April 19 and one was March 23,

20  2004?

21    A.   I don't know the dates.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

113

1      Q.    Did you have any idea about the source of

2    their information?

3      A.    No.

4      Q.    Did you speculate who it might be?

5      A.    Yes.

6      Q.    Who did you think it was?

7      A.    Someone with insight on what the report

8    said.

9      Q.    Did you think it might have been Mr.

10   Kakeh?

11     A.    No.

12     Q.    Why not?

13     A.    My understanding was the report had only

14   been shared with the board and those who did the

15   review.

16     Q.    Who did the review?

17     A.    Mid Iowa.

18     Q.    You thought it was someone on the Mid Iowa

19   team?

20     A.    Or someone on the board, yes, someone in

21   the state office, someone on the board, someone on

114

1    the Mid Iowa team, those were my obvious thoughts

2    because, to my knowledge, they were the only people

3    who had the report.

4        Q.   Did you consult with Ms. Mack or Ms.

5    Shears about your decision to RIF employees?

6        A.   I consulted with Ms. Mack.

7        Q.   Did she recommend it?

8        A.   She shared with me that Mr. Jennings had

9    sought and received bids a year, 14 months prior to

10   do the same thing and she shared with me that

11   information.

12       Q.   Bids to do what?

13            I was talking about the RIF.

14       A.   To turn the finance operation over to an

15   outside firm.

16       Q.   That is not what happened.  Is it?

17       A.   They didn't do it then.  Evidently, they

18   made a decision to, as I understand it, create a

19   CFO position and bring Sheila Shears in as opposed

20   to turning over the whole operation, they made the

21   decision to bring in a new person to be CFO.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

122

1    that I could afford to pay for external management

2    of activities.  I wanted firms that--

3        Q.   At the time you made the RIF decision when

4    you issued the letters, you didn't know whether

5    either of those firms was going to staff Mr.

6    Kakeh's position.  Correct?

7        A.   Wrong, I testified that each of those

8    firms submitted proposals to staff the entire

9    organization, so at a minimum the functions that he

10   held they had demonstrated a capacity and

11   willingness to provide people to do it.

12       Q.   You said earlier you didn't know what

13   position either firm was going to staff?

14       A.   I didn't know which positions at the end

15   they would staff, but in the proposals, each bid

16   indicated they had the capacity to do it all.

17       Q.   Correct.

18       A.   So if  someone can do it all, you can

19   assume they have the capacity to do one.

20       Q.   You didn't know for sure whether UPO was

21   going to hire them to do that.  Correct?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

132

1    Q.   Do you know why Mr. Marty came in?

2    A.   Yeah.

3    Q.   Why?

4    A.   He was part of a team that investigated

5    UPO.

6    Q.   Do you know why he was investigating?

7    A.   Basically, the newspaper articles and we

8    had had several indications of hits by IRS and FBI

9    and all the rest on our web sits and on about the

10   ninth of May, I recommended to the board that they

11   write Dr. Eboda, request an IG investigation

12   because we didn't have the capacity to deal with

13   it.

14        So that letter was sent and evidently

15   never transmitted because when they got there, they

16   were surprised to learn we had written requesting

17   that they come in.

18   Q.   What did you talk to Ken Marty about?

19   A.   I offered him access to all files and

20   records and said I would advise the staff to be

21   fully cooperative with him, offered him full access

# DEPARTMENT OF HEALTH & HUMAN SERVICES

ADMINISTRATION FOR CHILDREN AND FAMILIES
Suite 864
150 S. Independence Mall West
Philadelphia, PA 19106-3499

April 20, 2004

Reference:                  Head Start/Early Head Start
Grant Number:           03CH0380

Russell Simmons, Board President
United Planning Organization
Preschool and Day Care Division
301 Rhode Island Avenue, NW
Washington, DC 20001

Dear Mr. Simmons:

From March 15, 2004 to March 19, 2004 the Administration for Children and Families (ACF) conducted an on-site monitoring review of the United Planning Organization Head Start/Early Head Start program. We wish to thank the Board, Policy Council, staff, and parents of your program for their cooperation and assistance during the review.

Your program was reviewed using the Program Review Instrument for Systems Monitoring (PRISM). On-site program reviews allow ACF, as the responsible funding agency for Head Start and Early Head Start programs, to assure that Head Start and Early Head Start grantees deliver the type and scope of services required by the Head Start Program Performance Standards and all other relevant legislative, regulatory and policy requirements governing the administration of Head Start and Early Head Start programs. Through monitoring, ACF determines the degree to which programs are meeting requirements and, as necessary, directs technical assistance resources to those programs.

This letter and the attached Head Start/Early Head Start Review Report are our notice to your agency of the results of the on-site program review. The report provides you with detailed information on all areas of your program's performance in meeting Head Start Performance Standards.

A determination has been made that United Planning Organization Head Start/Early Head Start is a <u>Grantee with Deficiencies</u>.

## DEFICIENCY DEFINITION

According to 45 CFR 1304.3(a)(6), *Deficiency means:*

(i)  An area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more regulations under parts 1301, 1304, 1305, 1306, and 1308 of this title which involves:

JONES
EXHIBIT 13

(A) A threat to the health, safety, or civil rights of children or staff;

(B) A denial to parents of the exercise of their full roles and responsibilities related to program governance;

(C) A failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management; or

(D) The misuse of Head Start grant funds.

(ii)    The loss of legal status of financial viability, as defined in part 1302 of this title, loss of permits, debarment from receiving Federal grants or contracts or the improper use of Federal funds; or

(iii)   Any other violation of Federal or State requirements including, but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this title, and which the grantee has shown an unwillingness or inability to correct within the period specified by the responsible HHS official, of which the responsible HHS official has given the grantee written notice of pursuant to section 1304.61.

## DEFICIENCY DETERMINATION

This letter, in conjunction with the attached Head Start/Early Head Start Review Report, serves as the legal notification that United Planning Organization has been designated a <u>Grantee with Deficiencies</u> as defined under 45 CFR 1304.3(a)(6)(i)(A) and 45 CFR 1304.3(a)(6)(i)(C), with a failure to perform substantially the requirements related to:

Program Design and Management.

The following area(s) of noncompliance constitute deficiencies in the operation of the United Planning Organization Head Start/Early Head Start program.  Refer to the enclosed Head Start/Early Head Start Review Report for a detailed listing and summary of the specific area(s) of noncompliance related to the deficiency(ies).

A.  The following areas of noncompliance constituting a deficiency must be corrected within *one year* from the date you receive this letter.

- Core Question 1: Program Governance
  1)  45 CFR § 1304.50(g)(2)

- Core Question 4: Recordkeeping and Reporting
  1)  45 CFR § 1304.51(h)(1)

- Core Question 8: Fiscal Management
  1)  45 CFR § 1304.50(g)(2)
  2)  45 CFR § 1304.51(h)(1)
  3)  Part 74 § 74.21(b)(1)
  4)  Part 74 § 74.21(b)(3)
  5)  Part 74 § 74.26(a)
  6)  Part 74 § 74.27(a)
  7)  Part 74 § 74.51(b)
  8)  Part 74 § 74.52(a)(1)(iv)

## CORRECTIVE ACTION REQUIRED TO REMEDY DEFICIENCIES

In accordance with Sec. 641A(d)(2)(A) of the Head Start Act the United Planning Organization Head Start/Early Head Start program must develop a Quality Improvement Plan (QIP) to correct the deficiencies, (with the exception of deficiency(ies) that must be corrected immediately or within 90 days), that are identified in the enclosed Head Start Review Report and submit this QIP to the Regional Office. Pursuant to Sec. 641A(d)(2)(A) of the Head Start Act, the Grantee shall:

(i) develop in a timely manner…and implement a quality improvement plan that specifies—
   (I) the deficiencies to be corrected,
   (II) the actions to be taken to correct such deficiencies; and
   (III) the timetable for accomplishment of the corrective actions specified; and
(ii) eliminate each deficiency identified, not later than the date for elimination of such deficiency specified in such plan (which shall not be later than 1 year after the date the agency received notice of the determination and of the specific deficiency to be corrected).

We request that the Grantee submit the QIP to the Regional Office within thirty (30) days of receipt of this report. We are willing to assist you in the preparation of your QIP. The Regional Office must advise you within thirty (30) days from the date that the Regional Office receives the QIP if it is approved, and if not, the reasons for denial. **The period for correction of deficiencies under a QIP cannot exceed a year from the date of notification of the grantee of the deficiency(ies) under any circumstances.** To minimize the likelihood of having your plan not judged satisfactorily, we urge you to call your Regional Office contact person (noted below) immediately so you can jointly work on developing an approvable QIP.

We will continue to make assistance available to you throughout the coming months. We will determine, in partnership with you, a reasonable schedule of follow-up activities, which pursuant to Sec. 641A(c)(1)(C) of the Head Start Act, will include a site visit to monitor your progress and validate your full compliance.

If your program continues to have uncorrected deficiencies beyond the specified timeframe(s), you will be issued, pursuant to 45 CFR 1304.60(f), a letter stating our intent to terminate your Head Start grant.

## AREAS OF NONCOMPLIANCE NOT RELATED TO A DEFICIENCY

In addition, United Planning Organization Head Start/Early Head Start has five (5) areas of noncompliance not related to the designation of deficiency(ies). These are found in:

| | |
|---|---|
| Core Question 11: | Disabilities |
| Core Question 13: | Family Partnership Building |
| Core Question 9a: | Prevention and Early Intervention |
| Core Question 16: | ERSEA |
| Core Question 17: | Facilities, Materials, Equipment, and Transportation. |

Refer to the enclosed Head Start Review Report for a detailed listing and summary of the specific area(s) of noncompliance not related to a deficiency.

## ACTION REQUIRED TO REMEDY AREAS OF NONCOMPLIANCE

The area(s) of noncompliance not related to a deficiency that are cited in the enclosed report must be corrected within **ninety (90) days** from the date of receiving this letter unless an extension is approved by the Regional Office. Once you have corrected the identified areas of noncompliance, a letter to this office certifying full compliance is required. This certification of compliance letter is considered separate from the QIP. The certification should describe the noncompliance situations, explain action(s) taken, clearly state that the problems have been remedied, specify the date(s) of such correction, and be signed by the Board and the Policy Council Chairpersons. Pursuant to 45 CFR 1304.61(b), a grantee that is unable or unwilling to correct the specified areas of noncompliance within the prescribed time period will be judged to have a deficiency that must be corrected, either immediately or pursuant to a Quality Improvement Plan. Further, if your program continues to have uncorrected deficiencies beyond the timeframes stated for correction, you will be issued, consistent with the requirements of the Head Start Act, a letter stating our intent to terminate your Head Start grant.

The goal of ACF is to ensure that all Head Start and Early Head Start programs provide quality services to young children and their families. We look forward to supporting your efforts to reach this goal.

Please feel free to contact Burma Paige-Stokes at (215) 861-4042 regarding any questions or concerns you may have.

Sincerely,

Quinetta Penn
Federal Team Leader

Enclosure:  PRISM Head Start Review Report

cc:     Iweoqu Okechukwu, Policy Council Chairperson
        Dana Jones, Interim Executive Director
        William Hughey, Head Start Director
        Edward Vreeswyk, Head Start Branch Chief
        Paul Blatt, Head Start Bureau Monitoring Lead
        Steve Martin, Monitoring Support Project Director, DANYA International
        Tom Tregear, Regional Office T/TA Coordinator
        Burma Paige-Stokes, Program Specialist