# EXHIBIT 7

COPY

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,                    )

               Plaintiff,                    ) No. 1:05-cv-1271

               vs.                           )

UNITED PLANNING ORGANIZATION, INC.,    )

                               )

               Defendant.                    )

————————————————————————)

               Silver Spring, Maryland

               Wednesday, May 10, 2006

Deposition of:

         ROY LAYNE,

called for examination by counsel for the Plaintiff,

pursuant to Notice, taken at the law offices of

Melehy & Associates, 8403 Colesville Road, Suite 610,

Silver Spring, Maryland, before Debbie Razavi, CSR,

Registered Professional Reporter, Notary Public in and

for the State of Maryland, commencing at 2:00 p.m., when

were present on behalf of the respective parties:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

5

1    Q.    How long have you been with Walker & Company?

2    A.    March was six years.

3    Q.    Have you been a partner for six years?

4    A.    About that now, yes.  Effective 2001,

5  January.

6    Q.    What's your educational background?

7    A.    Bachelor's degree in accounting, University

8  of District of Columbia, and a Master's degree in

9  administration with concentration in finance, University

10  of Maryland, University College.

11    Also a CPA, certified public accountant, and

12  CMA, which is a certified management accountant.

13    Q.    Had Walker & Company done any work with UPO

14  prior to the spring of 2004?

15    A.    No.

16    Q.    Had any partner or employee of Walker &

17  Company done any work with UPO prior to the spring of

18  2004?

19    A.    Not since I have been working.  I have no

20  recollection of them doing that work.

21    Q.    Was Walker & Company contacted at any time

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

10

1    Exhibit 1, for the record, is the Request for Proposal;

2    correct?

3            A.    Uh-huh.

4            Q.    You need to say "yes" or "no."

5            A.    Yes.

6            Q.    And if I understand you correctly, your

7    interpretation of Walker & Company's interpretation of

8    the proposal is UPO was requesting a company to do the

9    work of the entire finance department?  UPO was

10   outsourcing or seeking to outsource to a private

11   accounting firm the functions of the finance department?

12           A.    Yes.

13           Q.    When you received that document, that Request

14   for Proposal, and you had a chance to read it and

15   interpret it, did you think that that meant that every

16   single employee in the finance department was going to

17   be, or UPO was proposing to let go of everyone in the

18   finance department and replace each and every employee in

19   the finance department with a Walker & Company employee?

20           A.    No.  That's not how we interpret it.

21           Q.    How did you interpret it?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

11

1      A.     That the functions would be outsourced, that

2    the employees working there if we agreed to hire them

3    could be our employees.

4      Q.     I see.  So let me see if I understand.  I

5    think I know where you are going with this.

6             Basically, Walker & Company potentially under

7    this proposal as it was originally submitted would come

8    in to UPO, every employee in the finance department

9    ultimately would be an employee of Walker & Company, not

10   UPO, and that Walker & Company could choose to hire as

11   its own employees some of the existing UPO employees of

12   the finance department?

13     A.     Right.

14     Q.     Now, that's not stated anywhere in this

15   proposal; correct?

16     A.     No.  What was stated -- our interpretation of

17   the proposal is that we had the opportunity to run UPO's

18   finance department.  We could design the finance

19   department, the structure of the finance department

20   however we choose that would make it most efficient.

21     Q.     Where does it say that in this proposal?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

20

1  now go to different people.  In fact, that's why things

2  that we are currently working on is to put a proposal

3  process in place.  Proposals go to different people.  We

4  write the proposal and the actual RFP could then be

5  discarded.

6      Q.    When you wrote the proposal had the RFP

7  changed at all?

8      A.    At a point where we wrote the proposal?

9      Q.    Yes.

10     A.    No.

11     MR. MELEHY:  Excuse me for one second.

12                (Recess taken.)

13     Q.    BY MR. MELEHY:  I have shown you Layne

14  Exhibit 3, and that is the proposal that Walker & Company

15  submitted to UPO in response to the Request for Proposal

16  which is labeled Exhibit 1; is that correct?

17     A.    Yes.

18            (Plaintiff's Exhibit No. 3 was marked

19                for identification.)

20     Q.    In a nutshell, does the proposal include a

21  proposal for providing all staff in the finance

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

34

1    chart as we laid it out --

2         Q.    You are now looking at your proposal which is

3    Exhibit 3?

4         A.    Proposal Exhibit 3.

5         Q.    What page?

6         A.    That would be Page 6.

7               As we were preparing the proposal it was our

8    intention that definitely CFO is going to come from

9    Walker and that Walker employees could also be within the

10   Accounting Director, Financial Operations Director,

11   Grants Management Director.  At that point we had no idea

12   who the employees were at UPO, who the employees who

13   would be remaining at UPO.

14        Q.    The only position you knew on May 19, 2004

15   that Walker & Company was going to occupy with a non UPO

16   employee was the CFO position?

17        A.    We know clearly, yes.  That's the head.

18        Q.    You didn't know about any of the other

19   positions?

20        A.    The other portions when we were preparing our

21   proposals we had guys slated to go into those three

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

35

1    positions.

2         Q.    Into the employee positions, Accounting

3    Director, Financial Operations Director and Grants

4    Management Director?

5         A.    Yes.

6         Q.    You didn't know if you were going to use

7    existing staff for those positions?

8         A.    That was our plan.

9         Q.    You were going to use existing staff?

10        A.    Our plan was we were going to have existing

11   staff occupy those positions at the beginning of the

12   contract until we determine what we need to do going

13   forward.

14        Q.    Which position is analogous to the controller

15   position?

16        A.    In this schedule there isn't any.

17        Q.    What's the highest level position besides the

18   CFO?

19        A.    In this particular schedule?

20        Q.    Yes.

21        A.    It's these three.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

36

1    Q.    What's the highest level position?  Is there

2    one or are all three equal?

3    A.    When we designed it all three were equal.

4    Q.    Did that change?

5    A.    When we went in?

6    Q.    Yes.

7    A.    Not really.

8    Q.    Not really or did David Walker occupy the

9    Accounting Director position?

10    A.    Yes, he did.

11    Q.    That was previously the controller position;

12    correct?

13    A.    No, it wasn't.

14    Q.    You sure?

15    A.    We didn't have a controller position in our

16    schedule.

17    Q.    I understand you had an Accounting Director

18    position?

19    A.    We created this without any knowledge of UPO

20    structure and we said based on what they are asking we

21    said this is the best structure that will work.  If you

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

37

1    look at the RFP, I don't think they have these positions,

2    Accounting Director, Financial Operations Director and

3    Grants Management Director.  We created those.

4         Q.    Look at Page 4 of the RFP.  It says

5    "Staffing.  The proposal should include costs in the

6    personnel structure which incorporate the following

7    functions:  Chief Financial Officer, Financial Reporting,

8    Grants Manager, General Ledger Accountant, Budget

9    Accountant, Billing Accountant, Administrative Support,

10   Payroll, Accounts Payable."

11              Most of those are positions?

12        A.    No, they are not.

13        Q.    General Ledger Accountant is not a position?

14        A.    It's a position.

15        Q.    Grants Manager is a position; right?

16        A.    Yes.

17        Q.    Chief Financial Officer is a position?

18        A.    Yes.

19        Q.    Budget Accountant is a position?

20        A.    Yes.

21        Q.    Billing Accountant is a position?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

41

1    handwritten -- well, your chart of positions which is in

2    your proposal dated May 19, 2004.  There is no position

3    that's analogous to a controller position?

4        A.    The CFO.

5        Q.    But there was already a CFO at UPO and that's

6    identified in the Request for Proposal; correct?

7        A.    Yes.  Except UPO is outsourcing the work and

8    UPO is going to -- and we now have the opportunity to

9    bring the most efficient team and structure.

10       Q.    You determined that adding a controller

11   position to that would not be efficient?

12       A.    When you have a CFO with that size of

13   organization with these three levels with these three

14   persons under the CFO, no, a controller is not necessary.

15       Q.    So you made the decision when you presented

16   your proposal not to include a separate position for

17   controller?

18       A.    Yes.

19       Q.    And you did that after receiving the RFP and

20   after discussions with Gladys Mack?

21       A.    Not concerning the structure.  We had

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

56

1      Q.    In that May meeting was that your intention

2  or was it your intention to use a Walker & Company

3  employee who had never been a UPO employee to occupy

4  those positions?

5      A.    When we prepared the proposal it was our

6  intention initially to have Walker employees slated for

7  the Accounting Director, Financial Operations Director

8  and the Grants Management Director because we did not

9  have an idea who the employees were at UPO.

10     Q.    And I understand that.  You have said that

11 before.

12         But when you say "Walker & Company

13 employees," you mean people who were never employed by

14 UPO?

15     A.    At that point in time, yes.

16     Q.    And people who were then current employees of

17 Walker & Company?

18     A.    Yes.

19     Q.    That was your intention before you went into

20 this May meeting with Dana Jones and Gladys Mack?

21     A.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

73

1    A.    I don't know.  Could have been.

2    Q.    Do you know why -- I'll show you the

3 Agreement and you can see for yourself.

4         Let's have this marked as the next exhibit.

5         I'm showing you what's been marked as Layne

6 Exhibit 4.  That's a Memorandum enclosing a copy of the

7 Fully Executed Agreement between Walker & Company and

8 UPO, is it not?

9    A.    It appears to be, yes.

10        (Plaintiff's Exhibit No. 4 was marked

11              for identification.)

12   Q.    That Agreement was signed June 30?

13   A.    Yes.  By Walker & Company, yes.

14   Q.    UPO signed it on the 29th of June '04;

15 correct?

16   A.    Yes.

17   Q.    Why was it signed so late?

18   A.    My understanding is that there were certain

19 corrections that they were making within the Agreement.

20 It had nothing to do with what I would call the meat of

21 the Agreement as far as the dollars, the people, the

# PROPOSAL

## TO

## MANAGE THE ACCOUNTING AND FINANCE FUNCTIONS

### OF

### UNITED PLANNING ORGANIZATION





Walker & Company, LLP
*Assurance, Business and Advisory Services*

**May 19, 2004**

LAYNE
EXHIBIT 3

# Proposal to Manage the Accounting and Finance Functions

of

## UNITED PLANNING ORGANIZATION

*Submitted by:*
**Walker & Company, LLP**
**4200 Wisconsin Avenue, NW**
**Suite 300**
**Washington, DC 20016**

**May 19, 2004**

Walker & Company, LLP
*Assurance, Business and Advisory Services*

May 19, 2004

Mr. Dana M. Jones
Interim Executive Director
United Planning Organization
301 Rhode Island Avenue, NW
Washington DC 20001

Dear Mr. Jones:

Walker & Company, LLP appreciates the opportunity to present this proposal to perform and manage the accounting and finance functions of United Planning Organization (UPO) beginning June 1, 2004 for one year. We are particularly pleased to be considered for these services to UPO because our firm's mission, in part, is to develop and analyze information that users rely on to make decisions and to serve as a catalyst for the betterment of the communities we serve.

Our proposal addresses the size and experience of our firm, the size of our non-profit accounting staff and a select team of managers and staff who will be made available to UPO. We have also included our proposed approach, management plan and cost to meet your requirements on this assignment.

We are confident that we are the best choice to serve United Planning Organization for the following reasons:

- We have proven expertise as accountants, advisors and outsourced contractors to various non-profit clients and understand the nature of the transactions in UPO as well as the methodology required to produce internal and external reports and assist in the completion of year-end audits on time and achieve the results to meet funding source expectations.
- We have, over the years, recognized that superior performance on engagements with government funded non-profit organizations is essential to our practice and have dedicated our most talented personnel to specialize in government reporting and regulatory compliance requirements and U.S. GAAP financial reporting and other government standards.
- We are prepared to focus on areas that require attention and to provide management meaningful recommendations for improvement in other areas identified during the course of the contract. We have served some of the most prominent nonprofit organizations in America successfully on similar engagements.

We view this as a critical assignment for our firm and the continuity of the United Planning Organization. We want to assure you that its financial needs during the next year or beyond will be met by Walker & Company's team. If you have any questions, please let us know.

Yours truly,

Ronald P. Walker
Walker & Company, LLP

4200 Wisconsin Avenue, N.W., Suite 300, Washington, DC 20016 | T. 202.363.9300  F. 202.363.0531

UNITED PLANNING ORGANIZATION

ACCOUNTING AND FINANCE FUNCTION PROPOSAL

**Table of Contents**

Executive Summary ..................................................................................................... 1

Our Approach and Position Descriptions ................................................................ 3

Plan for Accounting and Finance Function ............................................................. 7

Relevant Firm Experience .......................................................................................... 10

Firm References .......................................................................................................... 12

Staffing Plan and Key Personnel Biographies ........................................................ 14

Cost Proposal .............................................................................................................. 19

Appendices .................................................................................................................. 20

# EXECUTIVE SUMMARY

Walker & Company, LLP is committed to rapidly improving an accounting and finance function that serves the immediate needs of the United Planning Organization (UPO). During the critical period of the next sixty days, we will utilize our experience and resources acquired in servicing not-for-profit organizations in Washington DC and throughout the United States over the last twenty years. The United Planning Organization has complex financial and grants management needs that require financial organizational leadership supported by accounting personnel that will proactively address the expectations and concerns of funding sources and governmental audit agencies over the next several months.

We will, in consultation with UPO's senior management, assess the existing accounting and finance functions, and assemble a team from existing UPO personnel and Walker & Company senior managers and professional staff that will assure accurate and timely reporting of financial and management information. Our approach to the solution of immediate problems and management of these functions over a one-year period is to focus upon UPO's strengths and eliminate weaknesses in information processing and production of accurate internal and external financial reporting. Our key personnel will transition UPO's in-house accounting and financial management to an effective contract team employing former UPO and current Walker & Company personnel to meet the specific deliverable and performance expectations of management and funding sources.

Our organization of the accounting and finance function relies upon a Chief Financial Officer with proven experience in major not-for-profit organizations supported by Directors of three separate functions to form a four person management team responsible for the overall financial organization. A Financial Operations Director, with significant grants and cost accounting experience will manage the cash flows of UPO and process receipts and disbursement transactions. A Grants Management Director with strong technical knowledge of grants monitoring, documentation and compliance within an intensive program environment will coordinate program managers tracking of grant financial and compliance activity. They will team with an Accounting Director with strong report writing skills and who will be expected to master the sub-functions of general ledger, its report writer module and grants management such that management and external funding sources receive timely and reliable information. Personnel within these functions will be expected to meet the standards set for each process and task within the outsourced financial organization. This financial organization will obtain concurrence from the Executive Director of UPO on each of its planned actions prior to their execution.

Our plan to manage UPO's accounting and finance function focuses on five critical accounting and financial management functions. Our financial organization chart in Table 1 displays how our structuring of UPO's contracted financial organization will manage the following accounting and finance functions:

- Financial Organization Leadership
- Budget Development and Monitoring
- Internal Financial Reporting
- Cash Flow Management
- External Reporting

By necessity UPO has had complex accounting, reporting and information requirements that should be met timely and reliably within the regulatory and compliance frameworks of its funding sources. Our firm has more than sixty professional personnel and prior experience with major not-for-profit and government organizations such as the Ford Foundation, Fannie Mae Foundation, the Corporation for National and Community Service, the U.S. Department of Housing and Urban Development and others and can be rapidly configured to provide the necessary consultative services that have produced accurate, quality results as documented in our references and prior relevant experience.

UNITED PLANNING ORGANIZATION
Accounting and Finance Function
Proposal – June 1, 2004 to May 31, 2005

## OUR APPROACH AND POSITION DESCRIPTIONS

We will manage the accounting and finance functions with a staff of ten professionals led by the Chief Financial Officer with heavy reliance on the Financial Operations Director, a Grants Management Director and an Accounting Director. We will segregate the Accounting Director's responsibilities and reporting lines from those of the Grants Management Director's to emphasize the need for internal and external financial reporting and control to be complementary to the equally important task of grants compliance, monitoring and reporting. Continuous communication and interface with program managers is expected from the Grants Management Director. The Accounting Director will be expected to interface with UPO management on financial reporting matters and related financial information and together with the Financial Operations Director, keep the CFO and Executive Director abreast of cash flow and key organization wide budget developments.

These positions are shown within our proposed financial organization Chart shown in Table 1. Brief descriptions of these and other supporting positions follow:

### Chief Financial Officer

The Chief Financial Officer (CFO) will lead UPO's financial organization supported by the Financial Operations Director, a Grants Management Director and an Accounting Director, with a structure designed to deliver monthly executive management reports to the Executive and Deputy Directors. He/she will make funds decisions and possess strong management and leadership qualities. He/she will be responsible for ensuring that a sound financial structure is operating effectively. The CFO will be the first point of contact between legal counsel, independent accountants and government officials responsible for fiscal oversight of grant awards. He/she will, through the Grants Management Director oversee compliance with federal and District of Columbia grant financial requirements. The CFO will coordinate with the Deputy and Executive Directors, the preparation and use of UPO's budget and oversee revisions and communication of needed management action die to significant variances.

### Financial Operations Director

The UPO Financial Operations Director will report directly to the CFO and manage the accounts payable, payroll and billing accounting staff.   He/she will manage payroll, accounts payable, billing and accounts receivable accounts in the processing of routine transactions and preparation of reports. He/she will devise and implement a system of cash flow reporting and monitoring on a weekly basis and prepare cash forecasts necessary to ensure cash stability. He/she will review the cash needs of UPO base our cash forecasts and advise the CFO of excess or shortages of cash on a weekly and monthly basis.

### Grants Management Director

The Grants Management Director will be in charge of all grant funds and programs and will provide managers and department heads with the information required to monitor and achieve program targets and ensure that program budgets are developed and monitored. The Grants Management Director will be responsible for control of all UPO sub-grantees/recipients financial reporting and will ensure that they comply with grant provisions in accordance with UPO established policies and procedures. The Grants Management Director will monitor sub-recipients using action plans and checklist tools and supervisory approval of expenses or payment requests prior to disbursement of funds.

### Accounting Director

The Accounting Director will prepare recurring and special financial and other information reports as required. He/she will provide relevant and timely information to managers to enable them to make informed decisions. He/she will ensure that accurate and timely information is generated and made available to the CFO to be used in

3

UNITED PLANNING ORGANIZATION
Accounting and Finance Function
Proposal – June 1, 2004 to May 31, 2005

preparing reports for the Executive Directors. The Accounting Director will also perform all general ledger accounting activities and prepare monthly financial statements for the organization as well as the program and grant activities. He/she will prepare bank reconciliations for all bank accounts and will periodically review the chart of accounts structure and make code changes as directed by the CFO. Together with the Financial Operations Director and the Grants Director, he/she will assist with the preparation of cash, grants and federal and DC government reports and assist in reconciling balances to the general ledger in a timely manner.

**Accounts Payable Accountant**

The two accounts payable accountants will report to the Financial Operations Director and be responsible for coding and recording transactions of all inventory, supplies, program and other expenses and purchases of equipment for UPO. The accounts payable staff will evaluate vendors and assist in determining the best value for UPO. Accounts payable staff will work closely with the grants management team to ensure that proper control procedures are followed and only valid and authorized payment requests are recorded and payments are made only in accordance with grant provisions or when services are delivered. Accounts payable staff will provide an aged report from the Solomon IV software and submit a "bills to pay" report to the Financial Operations Director weekly.

**Billing and Receivables Accountant**

The Billing and Receivables accountant will bill and process all grant receipts from federal and DC government agencies and other contributors in accordance with UPO's billing and cash receipts procedures. He/she will generate an aged listing as determined by the Financial Operations Director and follow up on outstanding grants receivable in a timely manner. He/she will prepare a report of all grants received and together with the Accounting and Grants Management Directors, reconcile and report program fund balances to the Financial Operations Director on a regular basis for input into cash forecasts.

**Payroll Accountant**

The Payroll Accountant will be responsible for all payroll records of UPO and process all checks and provide the Financial Operations Director with payroll reports each pay period for review and approval. The Payroll Accountant will inform the Financial Operations Director of cash requirements for payroll in a timely manner to ensure that employee salaries are met on due dates. The Payroll Accountant will interface with the human resources department and ensure that all fringe benefits are paid on time.

**Staff Accountant**

The Staff Accountant will support the reporting function and report directly to the Accounting Director. He/she will be responsible for performing accounts reconciliation functions and will assist the Accounting Director with monthly and other financial closing and reporting.

**Budget Monitoring Accountant**

The Budget Monitoring Accountant will assist the Grants Management Director with the planning of current and future grant revenues and expenditures for UPO. He/she will monitor actual grant costs versus budgeted grant costs and will support the Grants Management Director, Financial Operations Director and Chief Financial Officer in preparing the annual budget and revisions thereto and support the review of cost/benefit information for specific programs.

We plan to have this approach and the positions noted above cover the preparation of the nineteen (19) Statements, Schedules, and Other Pertinent Information listed under Background Information in the request to

4

contract in addition to the other duties and responsibilities of UPO's accounting and finance functions. From our experience with large and small nonprofit organizations and our knowledge of UPO's operations structure and its immediate needs, we have developed a Plan for Accounting and Finance Function. This Plan forms the framework for rapid improvement of UPO's ability to generate required external and internal reports, reconcile grant financial information to ledger accounts, more proactively and closely monitor grants financial activity and manage cash flow. Our plan focuses on the five most important specific functions that we consider critical to effective operation of a financial organization to perform the overall accounting and finance functions of UPO.

United Planning Organization
Financial Organization Chart

Chief Financial Officer

Accounting Director
Mark Quashie
Reporting

Financial Operations Director
Cash Management

Grants Management Director
Grants

Staff Accountant

Accounts Payable (2)
Can do
Tracey
Suzy Bellamy
Arthur Grey (Chars)

Payroll Accountant

Billing Accountant

Budget Monitoring Accountant

Henry Kaunga   Sherri Simlote

Procurement Mgr
Procurement Asst   — Manya

Sherion Christine
Accounting Support 6

Thomas
Beke Thomas

I/A 6
(1) CSBG, Progressive Hsg
       DOEs
(2) All other billings

Walk/Kofi

Ellice Moslani

UPO

UPO

Bill Hughy 202 438 9707 (c)
George West

## PLAN FOR ACCOUNTING AND FINANCE FUNCTION

### Financial Organization Leadership

United Planning Organization's program activities require the support of a financial organization that complements program managers' operational oversight and allow management to make informed decisions on the commitment and use of fiscal resources. The accounting function of UPO is a foundation of its financial organization that, with effective leadership, will produce timely financial reporting and management information in a suitable control environment. We will operate UPO's accounting and finance functions under a Chief Financial Officer who uses proven organizational and financial management expertise and experience to provide direction and guidance to financial organization personnel.

Our Chief Financial Officer's team will include a Financial Operations Director, an Accounting Director and a Grants Management Director to manage separate functions within UPO's financial organization. The accounting, cash management and grants management functions will be three separate lines of responsibility reporting to the CFO. As depicted in Table 1 this financial organization structure will have all accounting and cash management reporting activities performed by the Financial Operations Director's staff, while all internal and external reporting will be placed under the control of the Accounting Director. Grants management, monitoring, and interface with program management on grant matters will be performed by the Grants Management Director and his/her staff. Financial reporting, cash management and grant compliance are key financial controls needed to meet the expectations of UPO's management and the external funding sources. Interim financial reports, budget monitoring and cash projections will be used by our CFO to improve internal financial management.

Our Grants Management Director will be responsible for oversight of all grants and their modification and closeout. A Budget Monitoring Accountant will assist the Grants Management Director in keeping program managers focused on financial compliance and budgets variations for each UPO grant award. This will enable UPO to take corrective action in a timely manner to avoid grant overruns or deviation from planned program outcomes.

In the sixty days beginning June 1, our senior personnel, working with UPO, will expand the organization's capacity to assure continuance of existing federal funding by bringing all grants reporting up to date as a first priority.

We believe that the success of this outsourcing contract will be assured through recruitment of a highly qualified and experienced Chief Financial Officer who is an effective communicator, sensitive to the complexities and realities of UPO's programs, operations and personnel and who will in turn manage a strong Financial Operations Director, an experienced Grants Management Director and an Accounting Director who together will build effective teams to manage UPO's finances. Ronald P. Walker, CPA and Roy G. Layne, CPA, managing partner and partner in charge of audits respectively at Walker & Company, will jointly fill the CFO's position at contract commencement until, in consultation with UPO's management, we assign a permanent CFO. Messrs. Walker and Layne will address the needs and concerns of funding sources and will immediately form the teams needed to effectively operate the accounting and finance functions.

### Budget Development and Monitoring

A UPO control environment that will make management confident with its decision-making and clear about its direction will include a flexible annual budget that program and financial managers endorse and use to track variances from projections. We will improve the budget format to make it clear and useful to the broadest group of managers at UPO. We have significant experience with budget formats that encourage conformity to relevant program and overhead cost categories. Our Accounting Director will enter the adopted budget into the Solomon

7

IV system for use in comparing monthly grant, functional and natural expenses classifications to budgeted amounts.

The Grants Management Director, with support from the Budget Monitoring Accountant, will continually assess by grant and UPO program function, the extent to which program managers are meeting or deviating from budget. The Budget Monitoring Accountant will track and assure the accuracy of current budget vs. actual information and be responsible for execution of budget revisions and modifications. We will encourage constant interaction between the Grants Management Director, the Budget Monitoring Accountant and program/project directors to promote program accountability and adherence to grant budgets. Significant emphasis will be placed upon the Budget Monitoring Accountant's monitoring of sub-grantees/sub-recipients financial reporting and compliance with grant provisions.

Development of UPO's annual budget for the year ending September 30, 2005 will be a cooperative effort between program managers and the Chief Financial Officer with support from the Financial Operations Director, the Accounting Director and the Grants Management Director. This shared responsibility will further encourage program managers to take responsibility for their portion of annual budget objectives.

**Internal Financial Reporting**

We will analyze needs and assemble reliable and consistent internal financial reports that will facilitate better decisions by program and financial managers. Timely, relevant financial reports generated monthly or quarterly from the Solomon system enhanced by Excel spreadsheet templates will provide UPO officials with management information that strengthens cost controls. Our experience in the use of Solomon IV reports for management information will allow us to rapidly determine how the general ledger account structure of UPO and Solomon IV's report writer module will produce interim financial reports for activities within Head Start, Special Emphasis, Senior Citizens and other grant programs that are important to program and financial managers.

Our goal will be to improve UPO's critical financial decision-making processes through development and use of internal financial reports in condensed formats and presentations that are easily understood and accepted by users. We plan to design these reports with input and approval from the Executive Director. We will test their acceptability with program managers and develop procedures for their use by UPO managers and decision makers. Our objective will be to develop a limited number of useful, concise, relied-upon reports to assist management in tracking budgets, cash flow and financial performance at various program and organizational levels.

**Cash Flow Management**

Consolidated cash flow at UPO is affected by many controllable and uncontrollable factors such as billing and collections and timing of disbursements. Since UPO has multiple bank accounts, restrictions on use of certain cash and high volumes of transactions, accurate production of weekly cash position and projected cash flow depends upon reconciliation of bank to book information consolidating banking and accounting information. Cash flow management is a time and expertise intensive effort that will require the CFO and Financial Operations Director to concur on preparation methods and procedures for the production of accurate weekly cash reports. We have produced weekly and monthly cash position and projection reports in a number of complex organizations and will quickly analyze UPO's cash position and flows. We will then produce for the Executive and Deputy Executive Directors a single, simple weekly cash position report and a thirty-day cash projection. This report will alert the CFO and senior management to impending cash flow problems. The Financial Operations Director will have primary responsibility for cash flow management.

**External Reporting**

We will analyze and document the existing process of preparing GAAP compliant financial statements at UPO and establish an improved process to produce such statements. In preparation for the year ending September 30, 2004, we will produce March 31 and June 30 interim financial statements to test and perfect our production process. We will target August 31, 2004, subject to mutual agreement with the Executive Director, as a deadline for June 30, 2004 financial statements to be produced. Our objective is to assure ability to produce financial statements for audit by independent accountants for the year ending September 30, 2004 no later than December 31, 2004. We will encourage the independent accountants to perform "preliminary" work prior to the end of the calendar year to improve on delivery dates for UPO's annual audit, OMB Circular A-133 report and IRS Form 990.

We will direct our Grants Management Director and Accounting Director in how to reconcile Standard Forms 269 and 272 to UPO's general ledger accounts. Based on our experience in performing this process, we will assign permanent responsibility for Forms 269 and 272 to either the Accounting Director or the Grants Management Director (or their designees) for these important reports. We consider the preparation and acceptability of Forms 269 and 272 to be critical tasks in need of resolution within sixty days of our appointment as contractor to manage the accounting and finance functions of UPO.

Preparation of all grants related external reports other than Forms 272 and 269, such as interim and final financial reports to federal and District of Columbia government entities, will be the responsibility of the Grants Management Director.

Case 1:05-cv-02123-GK    Document 73-11    Filed 11/27/2006    Page 26 of 53

## RELEVANT FIRM EXPERIENCE

### History of our Firm

Founded in 1985 in Washington, DC, Walker & Company, LLP is a multi-service accounting and consulting firm, with 65 professional personnel serving clientele throughout the United States. The firm provides quality professional services in assurance, accounting, tax and information systems consulting and emphasizes the use of information technology in the improvement of client operations and management control.

We serve on significant engagements across America and we have an excellent reputation for our work in serving the public and private sectors within a variety of nonprofit, governmental and for-profit business organizations. Amongst our clients are the Corporation for National and Community Service, the National Congress for Community Economic Development and the Federal Transit Administration. Other clients served range from small to medium sized businesses and include federal and local government agencies, health care providers, venture capitalists, churches and professional associations.

The selected client experience below represents engagements relevant to the proposed outsourcing contract. Our three references, which include two current outsourcing contracts, follow in the section headed "References."

### National Congress for Community Economic Development (NCCED)

NCCED's program services are designed to support the field of community economic development and Community Development Corporations (CDCs) through the use of policy research, information, technical assistance and training to advance professional and local leadership development and the capacity of its member CDCs. Funding for these services are provided by grants from major foundations; the Department of Health and Human Services; Department of Justice; and the Department of Housing and Urban Development (HUD); and contributions from its members and the general public. During our eight years of service to NCCED, we first developed financial policies and procedures manual and assisted in building in-house capacity to run a Financial Operations Directors operation. We subsequently became its independent auditor and have provided financial management support to senior executives of NCCED, trained staff in accounting systems and program monitoring and reporting. With an annual budget ranging from $4 to $7 million in recent years, NCCED's programs involve reporting grant expenditures under Community Capacity Building and Leadership Development Programs and Family Strengthening Awards Programs. These programs together with HUD technical assistance contracts and Community Development Block Grants require continuing indirect cost rate development and analysis from Walker & Company. We ensure proper expense classification through correct coding of its general ledger as well as timely reporting to grantors under federal reporting regulations.

### Wheeler Creek Estates Community Development Corporation

Wheeler Creek Estates Community Development Corporation (Wheeler Creek) is a District of Columbia 501(c)(3) not-for-profit entity. It was incorporated in 1997 to redevelop the SkyTower and Valley Green housing developments in Southeast, Washington, DC and has expanded from a less than $1 million annual budget to more than $2 million per annum presently. Recently Wheeler Creek was awarded a $5 million Hope VI grant by HUD. Wheeler Creek provides construction apprenticeship training, home ownership and mortgage financing training. Walker & Company has advised Wheeler Creek since its inception on its accounting and management structures. Our involvement with the organization includes

10

Accounting and Finance Function
Proposal – June 1, 2004 to May 31, 2005

providing them with technical support and as auditors, ensuring timely reporting of grant funds for their new and future developments.

## A Prominent D.C. Litigation Law Firm

Walker & Company was engaged by a DC law firm to provide litigation support in a large bankruptcy case. In determining whether deterioration of the financial condition of the company was caused by management of the defendant law firm, we reconstructed the accounting records and statements from basic source documents for five years, which included canceled checks, banking records and other numerous company records. We gathered, reviewed and analyzed documents, eventually piecing together the financial position, operating results and cash flows of the company. This assignment lasted twelve months, during which time we created financial models using Excel spreadsheets to develop income statements and balance sheets for the company that formed the basis for economic loss assumptions. In deposition, Walker & Company's testimony proved that the company's present and future market value had been lost by its management's business and financial acts rather than a breach of fiduciary duty by a defendant law firm, thus winning the case for our clients and saving millions of dollars in the settlement agreement.

## Rural School and Community Trust

Rural School and Community Trust (the Trust) is a 501(c)3 nonprofit educational organization dedicated to enlarging student learning and improving community life by strengthening relationships between rural schools and communities and engaging students in community-based public work. Founded as the Annenberg Rural Challenge in 1995, the Trust today works with more than 700 rural elementary and secondary schools in 35 states. The Trust was formed with the encouragement and financial assistance of the Annenberg Foundation, which awarded a grant to the Trust of up to $46,750,000. In 2001 the Trust made a decision to move its accounting functions from Colorado, at the same time replacing its Peachtree accounting software with BlackBaud. Walker & Company assisted the Trust in transitioning its accounting services from Colorado and provided technical support to ensure the smooth transition to the more complex but flexible software. Our work on this assignment involved checking the integrity of the transactions, assisting to map the chart of accounts migration from one software to the other, reconciling subsidiary ledgers to the general ledger and agreeing opening and closing balances. Our work was important for annual grant reporting purposes, due mainly to the size of the Annenberg award and the importance of the community service provided by the Trust. We are also independent auditors of the Trust.

## FIRM REFERENCES

### Corporation for National and Community Service

Walker & Company, LLP has since 1995 been contracted by the Corporation for National and Community Service (CNCS) to provide accounting and management consulting services. The firm has primary responsibility for financial management training and technical assistance for the more than 600 AmeriCorps State Commissions and National Direct Grantees located throughout the country. Assistance has been provided in the areas of: accounting system installation; financial report preparation; audit firm selection; sub grantee financial reporting; organizational problem identification; compliance with grant conditions; business management and other areas as needed. Assistance is also provided to CNCS in grantee oversight and monitoring by evaluating the grant making environment within CNCS; developing a profile of grantees; and developing a model of financial risk and vulnerability.

Walker & Company has developed a wide spectrum of comprehensive financial management services that include training and technical assistance activities and materials tailored to the needs of the Corporation. We provide custom training workshops, telephone and Internet technical assistance, on-site technical assistance, self-directed E-courses, materials development and networking opportunities to National Service programs. We understand the grant requirements of the Corporation and the compliance needs of its grantees and we use this knowledge and experience to continually customize our services to meet their needs. We present workshops to diverse groups of participants across many streams of National Service; each workshop presentation is customized based upon the needs of the participants obtained through a needs assessment. We adapt our training techniques to meet the needs of the participants and are responsive to the various learning principles of adults. Our workshops integrate a variety of adult learning techniques, including case studies, role- playing and small group interactions. We offer a variety of workshop curriculum and technical assistance options to the National Service network.

Contact Person:    Ms. Gina Fulbright Powell, Senior Training Officer
Corporation for National and Community Service
Ph: (202) 606-5000 ext. 182

### Community Academy Public Charter School, Inc.

Community Academy Public Charter School, Inc. (CAPCS) was incorporated in 1998 as a District of Columbia 501(c)(3) not-for-profit entity. It was created to facilitate a group of public charter schools according to subtitle B of the 1995 School Reform Act.

Walker & Company serves as outsourced contractor to Community Academy Public Charter School (CAPCS) to manage it's accounting and finance functions. CAPCS serves approximately 600 students presently and will grow to 1,000 students in August 2004. Its budget will increase form $6 million to $9 million annually during this period. CAPCS can grow up to 4,000 students and intends to grow to 2,000 students by 2005. We have developed the accounting system and budget formats for this fast growing educational institution. We resigned as independent auditors in 2003 to take on the larger task of managing CAPCS's accounting and finance function. We act as Chief Financial Officer and Comptroller and have developed financial feasibility projections for a tax-exempt bond proposal for the school. We are presently developing a cost model for expansion of CAPCS to three (3) new campuses in 2004 and

12

2005.  The School must comply with Charter provisions and GAO auditing standards in addition to the provisions of several federal grant awards.

We have established a control environment that has normalized timely, reliable internal and external financial reporting and financial management practices to sustain rapid growth.

| | |
|---|---|
| Contact Person | Mr. Kent Amos, President |
| | Community Academy Public Charter School |
| | (202) 723-7236 |

---

## National Organization of Black Law Enforcement Executives

The National Organization of Black Law Enforcement Executives (NOBLE) was established in 1976 by a group of 60 black police officials concerned about crime levels and community policing services. NOBLE has since developed into one of the leading law enforcement groups in the country, leading research on bias-based policing, domestic violence, police accountability and seat belt safety in minority communities.  NOBLE is a nationwide organization with 57 state chapters and 4,300 active and a total of 8,000 members worldwide governed by an 18 member Executive Board.  Working with a consortium of Chiefs of Police and the National Sheriffs Association, NOBLE manages $2 million of federal funds awarded through the U.S. Department of Community Oriented Policing Services (COPS) office.

Walker & Company manages the Comptroller's function at NOBLE.  Our firm was initially engaged by the Board of Directors of NOBLE to perform a forensic audit and report on the loss of cash to NOBLE in prior years.  We corrected and implemented lapses in internal control and developed procedures for its finance and accounting department.  We were engaged by NOBLE to take over the day to day running of its finance and accounting department, which involves structuring the chart of accounts to meet federal reporting as well as other quasi government funding institutions, presenting management reports to the Board and managing the day to day running of the affairs of the organization.  As Comptroller, we monitor and review all transactions and prepare required schedules for monthly, quarterly and annual reporting.  We also ensure the timely completion of the financial audit under OMB Circular A-133 guidelines.

During this engagement we negotiated settlement with prime grantees for NOBLE as a sub-grantee on the COPS national grant award and developed acceptable indirect cost reimbursement rates with the U.S. Department of Justice funding source.  We also successfully assisted in completion of a special engagement conducted by a CPA firm retained by the Justice Department to perform due diligence and agreed upon procedures in connection with an embezzlement.

| | |
|---|---|
| Contact Person: | Mr. Jesse Lee |
| | National Organization of Black Law Enforcement Executives |
| | 4609 Pinecrest Office Park Drive |
| | Suite F |
| | Alexandria, VA 22312 |
| | (703) 658-1529 |

## STAFFING PLAN AND KEY PERSONNEL BIOGRAPHIES

On each engagement, we assign a team of professionals to execute necessary planning, fieldwork and quality control procedures to assure adherence to all quality control standards. With this in mind, we intend to assign the following individuals to perform the audit of UPO.

**Ronald P. Walker, CPA, MBA**

| | |
|---|---|
| Managing Partner | Walker & Company, LLP |
| Position on Team | Acting CFO |

Ronald P. Walker, founder and managing partner of Washington, DC-based Walker & Company, LLP, established the firm in 1985, and has since dedicated his career to setting new standards of excellence in every arena of the accounting profession. Walker & Company, a 70-person financial and management service consulting firm, specializes in developing proactive assurance and consultative services in accounting, auditing, and financial and business management to corporations, government agencies and non-profit organizations. Its clients have included healthcare facilities, foundations, professional service firms, and venture capitalists.

Prior to starting his own firm, Mr. Walker spent seven years serving as Partner-in-Charge of the Washington, DC office of Mitchell and Titus, the largest African American CPA firm in the United States. He also served as the Ford Foundation's international financial advisor. In this role, Mr. Walker was instrumental in developing and implementing the Foundation's worldwide field office accounting and grantee information systems. He also developed internal audit procedures and reporting mechanisms for Foundation management and its independent auditors. Prior to joining Mitchell and Titus, he worked, for four years, as a senior accountant at Arthur Andersen in New York City.

With more than 30 years of practical experience, Mr. Walker is considered a significant and well-respected presence in the Washington, DC auditing and accounting community. His professional contributions are evident in many federal and local government auditing success stories. From leading a 20-person team in the audit of major oil refiners for compliance with the U.S. Department of Energy's pricing regulations, to serving as Partner-in-Charge of streamlining financial and compliance audits performed to satisfy OMB regulations for U.S. Departments of Health and Human Service, Agriculture, Housing and Urban Development, and the National Endowment for the Arts, Mr. Walker has dedicated his career to finding practical solutions to financial challenges.

His professional memberships include the American Institute of Certified Public Accountants, the Greater Washington Society of Certified Public Accountants where he served as President, the New York State Society of Certified Public Accountants and the National Association of Black Accountants. He serves on the boards of several nonprofit organizations including St. John's Community Services, Calvary Bilingual Multicultural Learning Center and Nexus Health, Inc. (Ft. Washington Hospital). He has also served as Chairman of the Board of the Family Savings Bank, [currently known as One United Bank], which is now the second largest African-American owned bank in the United States. He holds a B.S. in Accounting from New York University and the M.B.A. from the Stanford Graduate School of Business and is a CPA in the District of Columbia and State of New York.

Roy G. Layne. CPA, CMA
Audit Partner                    Walker & Company, LLP
Position on Team                 Acting CFO

Mr. Layne, a Partner with Walker & Company since 2000, has over 18 years cumulative experience performing auditing and management consulting engagements for nonprofit, governmental and commercial enterprises in the accounting profession. As Chief Financial Officer of Pepsi-Cola of Washington, DC, LP, Mr. Layne was able to improve the financial projection and forecasting process of the company and achieve cost reductions in support functions. Prior to becoming Chief Financial Officer, Mr. Layne was the Financial Operations Director for Pepsi-Cola of Washington, DC, LP. In this position, he was instrumental in improving the efficiency of both the internal reporting and the external audit function through better preparation and management of the data collection, recording and reporting process.

Prior to his position as Financial Operations Director at Pepsi-Cola, Mr. Layne was an Audit Manager with Coopers & Lybrand in its Audit Services Division. His responsibilities included providing financial audit and consulting services to a variety of nonprofit organizations in the Washington, DC office including, state and local government, colleges and universities, health care institutions, national associations and certain for-profit businesses. He consulted and interacted closely with senior management on issues affecting the organization, and coordinated the involvement of various other firm disciplines in addressing client issues to ensure efficient resolution. He presented significant audit, financial and operational findings to various audit and finance committees. In his current position at Walker & Company, LLP he is responsible for our audit and business services division. Mr. Layne has a B.B.A. in Accounting form the University of the District of Columbia and a Master of Science in Administration with concentration in financial management from The University of Maryland University College. He is a Certified Public Accountant and Certified Management Accountant.

Dominic Owusu. CPA, MSc
Audit Manager                    Walker & Company, LLP
Position on Team                 Accounting Director

Mr. Owusu is a certified public accountant with over fifteen years of relevant industry experience in the field of accounting, auditing, business advisory services, taxation, and management system reviews for both private and government agencies. Mr. Owusu provides expertise in the area of auditing and investigation, and internal control system development and application. He has assisted clients in the review and installation of management processes and internal controls, including financial accounting controls and reporting standards under U.S. GAAP and OMB

Mr. Owusu was a lead member for a team that identified and measured risks in various management processes of the Metropolitan Washington Airports Authority, and assisted in developing efficient remedial controls to address the identified process risks. Areas of review included the Authority's materials management, airline revenue and construction management processes. He was also a Team Supervisor with KPMG for a consulting services engagement for the verification and valuation of Union Trading Company's fixed assets, which was used in a prospectus for reporting to potential investors. During his tenure with Ernst & Young, LLP, Mr. Owusu led the audit team for more than ten years as the engagement manager, and subsequently as engagement partner, in the audit of various government agencies and private companies. He also led a team that reviewed and recommended more effective

15

internal control systems to the business arm of the West New Britain Provincial Government in Papua New Guinea and its subsidiaries. During his ten years of employment with Ernst & Young, Mr. Owusu provided consultancy services as a Senior/Branch Manager to the North Solomons Provincial Government. As the lead partner in the succeeding firm, he led a team on an investment advisory consultancy assignment for the West New Britain Provincial Government.

Mr. Owusu holds a Master of Science degree in Management Studies with finance option from Brunel University of Uxbridge, England. He is also a Fellow of the UK-based Association of Chartered Certified Accountants (ACCA). Mr. Owusu is a Certified Public Accountant in the Commonwealth of Virginia.

**Hugh Romney, CPA**
**Walker & Company, LLP**
**Position on Team**        **Financial Operations Director**

Mr. Romney is a certified public accountant with over fifteen years of relevant industry experience in the field of accounting, and consulting, with particular interest in financial management and corporate accounting. His in -depth experience and extensive exposure to senior management responsibilities as Corporate/Financial Financial Operations Director, and a Financial Management Consultant enables him to provide an effective solution-based, and successful hands-on professional service to his clients.

Mr. Romney managed all aspects of the financial management of the $33Million budget of Anguilla Electricity Company Limited. Among his major accomplishments includes his initiative and drive in converting a manual accounting system to a computerized system, including the development of relevant policies and guidelines. In addition, he introduced an inventory control system, which resulted in not only strengthening the internal control system and costing methods of the organization; it increased profits by 13 per cent. Mr. Romney was promoted to the position of Acting General Manager of Anguilla Electricity Company Limited (ANGLEC) for over two years. He directed the activities of up to 100 engineers, technicians, and administrative personnel while having the responsibilities for overseeing all operations of this utility that provides electricity to over 20,000 residents of the Island of Anguilla.

As the Corporate Financial Operations Director/Chief Financial Officer, of Urban Service Healthcare Systems, Inc. (USHCSI), Washington, D.C. Mr. Romney managed the financial affairs of the company and its seven subsidiaries. He reorganized the accounting department to strengthen the financial management reporting capabilities through expanded computer applications and improved internal control and data processing methodologies. He successfully established corporate goals for return on investment and reporting systems to maximize capital.

As the Director of Accounting, of the Greater South East Community Hospital Management Company Mr. Romney had full responsibilities for directing and overseeing the activities of six accountants in the financial management of this community hospital in Washington DC Metro area.

He also served as a Management Consultant and directed the financial and accounting activities of client companies for the Howard University Small Business Development Center, Washington D.C. Mr. Romney is highly skilled in the use of various computer software including Oracle, People Soft, AccPac, Solomom III, MS Office Suites, QuattroPro, and Excel.

Mr. Romney was a Senior Accountant with Ernst & Young. He holds a B.S. in Accounting from Howard University and is a Certified Public Accountant.

**Kristina Tecce. B.S, MBA**
**Manager**                          Walker & Company, LLP
**Position on Team**                 **Grants Management Director**

As a manage at Walker & Company Ms. Tecce is responsible for providing financial management training and technical assistance to the Corporation for National Service (CNS) where she develops training materials on accounting principles and policies, financial reporting and grants compliance for state commissions as well as commission sub-grantees. Ms. Tecce was recruited due to her specific hands-on experience with the Corporation for National Service at the grantee and sub-grantee levels.

Prior to working with Ms. Tecce was the Chief Financial Officer for the Alliance, which is the State Commission for National and Community Service. She had oversight of all financial and administration functions of statewide non-profit organization that distributes $13 Million dollars in grant funds. She was a senior member of the management team. She led the financial department in the successful completion of the State Administrative Standards and a visit from the Inspector General. Areas of responsibility include Financial, Grants Management, Human Resources and Administration.

- Fiscal responsibilities include budgeting, cash management, contract management, grantee/grantor relations, oversight of all accounting activities, financial reporting and annual audit.
- Grants Management responsibilities include working with both grantee and sub-grantee level. Specific duties include: annual review process for selection of sub-grantees, contracting with over 200 individual organizations, oversight of grants officer, risk management policies, financial and compliance site visits
- Human Resources responsibilities include annual review of personnel policies, annual compensation review, job description design and review, hiring and termination policies as well as oversight for staff benefits plan.
- Administrative duties include supervision of Office Manager, oversight of computer system, purchasing and contracting with a multitude of vendors and contractors.

Ms. Tecce was an also an Adjunct Professor at Northeastern University where she was involved in the creation and design of the Non-Profit Graduate Certificate program targeted at a variety of leaders in the Non-profit field. She also taught the course in Non-Profit Financial Management. She was responsible for the development of the curriculum and identification of learning objectives for the course. Learning objectives for the course included:

- Introduction to finance, for the non-financial manager including accounting principles and practices.
- Introduction to budgeting at both the organizational and programmatic levels.
- Understanding financial statements including Statement of Financial Position, Statement of Activities and Cash Flow Statement. These were presented with the focus of gaining understanding as well as the ability to utilize them as a management tool.
- Creation and importance of internal controls for both large and small organizations.
- Review of the various types of Audits and why they are important, as well as how an organization can get the most from their annual audit

Ms. Tecce also served as Director of Administration and Finance of a community-based non-profit corporation where she had the responsibility for all fiscal activities. She implemented all internal controls and procedures as well as designed accounting system. This organization was funding over twenty different sources and had over seven major activities, one of the programs was a National Service program called AmeriCorps. Her duties included managing grant compliance and review of all contracts

17

and provisions, Financial reporting for State and Federal Contracts and Oversight of Accounting department responsible for payroll, AP and AR

Ms. Tecce was an Account Administrator and Contract Manager for a community college where she was responsible to track State, federal and private contracts, budgets & revenue for corporate educational programming. She was responsible for developing & monitoring budgets, reporting, billing and accounts receivable. She holds the M.B.A in Financial Management from University of Massachusetts Lowell and B.B.A. in Business Administration Salem State College.

**Joshua Agbebakun, CPA, MBA**
**Accountant**              **Walker & Company, LLP**
**Position on Team**        **Alternate Accounting Director**

---

Mr. Agbebakun is a certified public accountant with seven years of relevant industry experience in the field of accounting, auditing, and consultancy. He has proven experience in assisting clients in critical analytical reviews, and a history of success for assisting them in the implementation of remedial and effective measures for improvement in the area of financial reporting.

At the Department of Corrections of the District of Columbia as Financial Operations Director Mr. Agbebakun managed the budgets and assisted the agency's Chief Financial Officer and Executive Director on financial, budgetary, and information technology. He performed studies and reviews, designed and implemented changes in techniques, controls and standards for the department's budgetary system. Mr. Agbebakun's responsibilities included reviewing and certifying the department's financial reports and documents, and preparing department's quarterly and end-of-year closing packages.

While at the District of Columbia Metropolitan Police Department (MPD) Mr. Agbebakun developed, reviewed, formulated, and reprogrammed the MPD budget. He performed detailed analyses to assist the agency's Chief Financial Officer, and the Chief of Police. He reviewed, designed, and implemented changes in the techniques, controls, procedures and standards in the department's accounting systems.

Mr. Agbebakun is a graduate of Alabama A&M University with a B.S. in Accounting and holds the M.B.A. from Morgan State University. He is a Certified Public Accountant.

18

## COST PROPOSAL

| Position | Responsibilities | Fee |
|---|---|---|
| Chief Financial Officer | Manages the Financial Operations Director the Accounting Director and a Grants Management Director and makes funds management decisions. | $125,000 |
| Financial Operations Director | Responsible for cash management functions and directs the functions of payroll, accounts payable, billing and accounts receivable. | 85,000 |
| Grants Management Director | Oversees grant funds and programs and coordinates the preparation of reports to federal and DC government agencies. | 75,000 |
| Accounting Director | Prepares detailed monthly schedules of revenues and expenditures for review by the Financial Operations Director and periodically reviews the chart of accounts structure. Implements accounting policies and reports grant expenditures. | 75,000 |
| Accounts Payable (2) | Works closely with the grants management team to ensure that proper control procedures are followed and only valid and authorized invoices are recorded and paid. | 45,000 35,000 |
| Billing Accountant | Processes all grant payments from federal and DC government agencies and other contributors in accordance with UPO's cash receipts procedure. | 55,000 |
| Payroll Accountant | Processes checks ready for signature and distribution and processes payroll journals showing activity for each employee | 55,000 |
| Staff Accountant | Supports the accounting and reporting function and reports directly to the Accounting Director. | 40,000 |
| Budget Monitoring Accountant | Assists the Grants and Management Director with the planning of current and future grant revenues and expenditures for UPO. | 55,000 |
| | Fee before fringe benefits, overhead and profit | 645,000 |
| | Fringe benefits allowance @ 25% | 161,250 |
| | Profit and overhead allowance | 88,750 |
| | Total Annual Flat Fee | $895,000 |

**APPENDICES**

## STATEMENTS AND REPRESENTATIONS

Walker & Company, LLP is licensed to practice as a CPA firm with the Department of Consumer and Regulatory Affairs Occupational and Professional Licensing Administration Board of Accountancy in the Government of the District of Columbia. License No. CPC162.

We have included a copy of our license to practice certificate in the proposal.

---

Walker & Company, LLP has 65 staff members, 25 of who are accountants, auditors and consultants in the non-profit practice. The work on this engagement will be monitored and supported where necessary from our offices at 4200 Wisconsin Avenue, NW, Suite 300, Washington DC 20016. Accounting transactions and recording will be performed on site at the offices of UPO at 301 Rhode Island Avenue, NW, Washington DC 20001.

---

Walker & Company, LLP is independent of the United Planning Organization as defined by generally accepted auditing standards and the U.S. Financial Operations Director General's Government Auditing Standards.

---

Five of the six supervisory members of our team available to UPO on this assignment are Certified Public Accountants and all have a minimum of two years of experience with not-for-profit organizations in the District of Columbia.

---

Walker & Company, LLP has had no disciplinary action taken against it in the past three years, neither is there any pending disciplinary action against the firm with state regulatory bodies or professional organizations.

---

Walker & Company, LLP



GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
OCCUPATIONAL AND PROFESSIONAL LICENSING ADMINISTRATION
BOARD OF ACCOUNTANCY
*certifies that*

WALKER & COMPANY
4200 WISCONSIN AVE NW
SUITE 300
WASHINGTON DC 20016

*has met all requirements prescribed by law and regulations and is hereby licensed as a(n):*

C.P.A. Corp/Partnership
License Number: CPC162

ISSUE DATE: 01/01/2003          EXPIRATION DATE: 12/31/2004

_____
Director
Department of Consumer and Regulatory Affairs

Sequence Number: 1

# M E M O R A N D U M

**TO:**      Dana M. Jones
            Gladys Mack
            Roy Lane
            Daisy Bellamy

**FROM:**    Monica L. Scott Beckham    *MLSB*
            General Counsel

**DATE:**    July 2, 2004

**RE:**      UPO Consulting Agreement No.130604 – Walker & Company LLP –
            Public Accountants

       Attached for each of you is a fully executed copy of the referenced agreement.

MLSB/gp
Attachment

LAYNE
EXHIBIT 4

UPO No. 130604

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is entered into this 30th day of June 2004 and effective June 1, 2004 (hereinafter referred to as the effective date of the agreement) by and between United Planning Organization (UPO), with offices at 301 Rhode Island Avenue, NE, Washington, DC 20011 and Walker & Company LLP, with offices at 4200 Wisconsin Avenue, Suite 300, Washington, D.C. 20016 ("Consultant").

### W I T N E S S :

WHEREAS, Consultant has substantial skill and experience in public accountancy; and

WHEREAS, UPO desires to hire Consultant and Consultant desires to provide services to UPO.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to the terms and conditions set forth herein.

ARTICLE 1. STATEMENT OF WORK.

Consultant shall provide the following public accounting services:

➤ Perform and manage all of UPO's accounting and financial functions for the period June 1, 2004 to May 31, 2005 including source document analysis for purposes of creating entries into subsidiary accounting systems and general ledger, the automated maintenance of UPO's chart of accounts, general ledger, cash accounts, accounts receivable, accounts payable, fixed assets, payroll, taxes, bank reconciliations and other accounting cycles that are critical to the successfully financial record keeping of UPO.

➤ Assist with the development of specific operating and capital budgets, tracking of cash flow, monitoring and the provision of feedback in the critical financial decision-making processes of UPO including management of the daily cash flow.

Consultant will initially perform these public accountancy services by managing the accounting and finance functions of the UPO using the following three management level personnel in UPO's financial organization to provide guidance and oversight of UPO's existing accounting and finance personnel:

• Chief Financial Officer

The Chief Financial Officer (CFO) will lead UPO's financial organization supported by the Financial Operations Director, a Grants Management Director and an Accounting Director, with a structure designed to deliver monthly executive management reports to the Executive and Deputy Directors. He/she will make funds decisions and possess strong management and leadership qualities. He/she will be responsible for ensuring that a sound financial structure is operating effectively. The CFO will be the first point of

contact between legal counsel, independent accountants and government officials responsible for fiscal oversight of grant awards. He/she will, through the Grants Management Director oversee compliance with federal and District of Columbia grant financial requirements. The CFO will coordinate with the Deputy and Executive Directors, the preparation and use of UPO's budget and oversee revisions and communication of needed management action due to significant variances.

- Financial Operations Director

The UPO Financial Operations Director will report directly to the CFO and manage the accounts payable, payroll and billing accounting staff. He/she will manage payroll, accounts payable, billing and accounts receivable accounts in the processing of routine transactions and preparation of reports. He/she will devise and implement a system of cash flow reporting and monitoring on a weekly basis and prepare cash forecasts necessary to ensure cash stability. He/she will review the cash needs of UPO base our cash forecasts and advise the CFO of excess or shortages of cash on a weekly and monthly basis.

- Grants Management Director

The Grants Management Director will be in charge of all grant funds and programs and will provide managers and department heads with the information required to monitor and achieve program targets and ensure that program budgets are developed and monitored. The Grants Management Director will be responsible for control of all UPO sub-grantees/recipients financial reporting and will ensure that they comply with grant provisions in accordance with UPO established policies and procedures. The Grants Management Director will monitor sub-recipients using action plans and checklist tools and supervisory approval of expenses or payment requests prior to disbursement of funds.

These positions may be added to, deleted or changed only by written amendment between the parties of this Agreement.

Consultant's professional services shall be completed on May 31, 2005.

### ARTICLE 2.  COMPENSATION.

For the complete, satisfactory, and timely performance of services hereunder, Consultant will be paid a professional fee. Consultant's professional fee will be the fixed amount of Four Hundred Nine Thousand Six Hundred Eight Seven Dollars ($409,687).

### ARTICLE 3.  PROGRESS REPORTING AND PAYMENT.

Consultant shall submit invoices to UPO on a monthly basis for services rendered to the date thereof. Such invoices shall be supported by appropriate documentation which shall include, at a minimum, a description of the task performed and the individuals working on such task. Upon receipt of a satisfactory invoice and documentation, UPO, within a reasonable period of time, shall pay such invoice.

ARTICLE 4.  TERM AND TERMINATION.

In the event either party desires to terminate this Agreement for any reason (inclusive of convenience or reduction of funds, etc.) other than for breach of any of the covenants, agreements or stipulations of this Agreement by the other (in which case notice of termination shall be effective immediately) such party shall give at least thirty (30) working days written notice to the other. Unless earlier terminated, this Agreement shall be in effect for a period of one year from the date it is signed by both Parties. The provisions of Articles 6, 7, 9, 10, 12 and 13 shall survive termination or expiration hereof.

ARTICLE 5.  PLACE OF PERFORMANCE.

Consultant shall be responsible for maintaining its own office facilities and will be provided with either office facilities or secretarial support as deemed necessary by UPO.

ARTICLE 6.  CONFIDENTIAL INFORMATION.

Consultant acknowledges and agrees that in the course of the performance of the services pursuant to this Agreement, Consultant may be given access to, or come into possession of, confidential information of UPO and/or UPO's Grantee or other third party to which UPO owes an obligation of confidentiality (collectively, "Third Parties"), which information contains trade secrets, proprietary data or other confidential information of UPO or Third Parties. Consultant acknowledges and agrees that it will not use, duplicate, or divulge to others any confidential information, including without limitation, trade secrets belonging to or disclosed to Consultant by UPO without first obtaining written permission from UPO. "Confidential information" as used herein, includes information, materials, products and deliverables developed during, and discoveries and contributions made by Consultant in the performance of this Agreement. All tangible embodiments of such information shall be delivered to UPO by Consultant upon termination hereof, or upon request by UPO, whichever first occurs. Without limiting the foregoing, Consultant agrees to comply with any confidentiality obligation or use restrictions pertaining to the information of Third Parties (including UPO Grantees) which UPO is obligated to follow.

ARTICLE 7.  INTELLECTUAL PROPERTY.

Consultant hereby assigns any and all rights, title and interest, including, but not limited to, copyrights, trade secrets and proprietary rights to the information, materials, products and deliverables developed during the performance of this Agreement to UPO. All work performed under this Agreement and all information, materials, products and deliverables developed pursuant to this Agreement shall be the exclusive property of UPO and all title and interest therein shall vest in UPO. All such information, materials, products and deliverables shall be deemed to be "works made for hire" under the Federal Copyright Laws. Pursuant to its exclusive proprietary rights, UPO shall have the sole and exclusive right *inter alia* to use, modify or adapt the information, materials, products or deliverables that Consultant have developed during the performance of this Agreement or, at UPO's discretion, to assign all or any portion of such rights to its Grantees. Consultant agrees to give UPO all necessary assistance required to perfect such assignment of rights defined in this Article 7.

## ARTICLE 8.  INDEPENDENT CONSULTANT STATUS.

A.    It is understood and agreed that Consultant will provide the services under this Agreement on a professional basis and as an independent Consultant and that during the performance of the services under this Agreement, Consultant's employees or Consultants will not hold themselves out nor claim to be officers or employees of UPO within the meaning or the applications of any federal, state or local laws or regulations including, but not limited to, laws or regulations covering unemployment insurance, old age benefits, worker's compensation, industrial accident, labor or taxes of any kind.  Consultant's employees shall not be entitled to benefits that may be afforded from time to time to UPO employees, including without limitation, vacation, holidays, sick leave, worker's compensation and unemployment insurance.  Further, UPO shall not be responsible for withholding or paying any taxes or social security on behalf of Consultant's employees or Consultants.  Consultant shall be fully responsible for any such withholding or paying of taxes or social security.

B.    Consultant will obtain from each individual assigned to perform services for UPO an executed confidentiality agreement in the form attached as Exhibit A to this Agreement and will deliver the original confidentiality agreement to UPO.

## ARTICLE 9.  WARRANTIES AND REPRESENTATIONS.

A.    Consultant warrants and represents that neither the execution, delivery nor performance of this Agreement constitutes a breach or violation of any contract or agreement to which it is a party or by which it is in any manner bound.  Consultant further warrants and represents that it has no interests or obligations, nor during the term hereof will it acquire any interests or obligations, which conflict with or hamper its ability to perform as required hereby.

B.    Consultant warrants and represents that it will perform any and all services hereunder in a professional and workmanlike manner and that all such work shall be free of errors and defects. Consultant shall immediately correct such error or defect at no additional cost to UPO. This remedy is in addition to any and all other remedies which UPO may have pursuant to this Agreement or otherwise. This warranty is in addition to any warranty which may be implied or imposed by operation of law.

C.    Consultant also warrants and represents that all services provided hereunder are original and shall not infringe any other party's proprietary property rights or interests and that Consultant has the authority to transfer ownership of work product in accordance with this Agreement.

## ARTICLE 10.  RESTRICTIVE COVENANT.

A. During the term of this Agreement and for a period of one year thereafter, Consultant agrees that it will not provide consulting services of any kind to Grantees of UPO for which Consultant provided services under, or as a result of, this Agreement.

B. Consultant further agrees that without UPO's prior written approval, Consultant shall not publish or use any advertising, sales promotion or publicity matter relating to services, materials, information, products and reports furnished by Consultant wherein the name "United

-4-

Planning Organization" or "UPO" and/or any of UPO's Grantee's names are mentioned or their identity implied. Consultant acknowledges and agrees that it acquires no rights to use or refer to, or interest in, such name or names.

## ARTICLE 11. INSURANCE.

Consultant shall provide statutory worker's compensation insurance and general comprehensive and contractual liability insurance in sufficient amounts to cover liability of Consultant that may arise hereunder. Certificates of Insurance shall be furnished to UPO from time to time upon reasonable request.

## ARTICLE 12. TRADEMARK AND TRADE NAME.

This Agreement does not give either party any ownership rights or interest in the other party's trade name or trademarks.

## ARTICLE 13. INDEMNIFICATION.

A.      Consultant, at its own expense, shall indemnify, defend and hold UPO, its partners, employees, agents, affiliates, designees and assignees harmless from and against any and all suits, causes of action, proceedings, loss, damage, liability or expense, including defense costs and legal fees, and claims of any nature, including but not limited to, damage to property and personal injuries, including death, arising out of or resulting from any negligent act or omission of Consultant relating to the performance of this Agreement. Consultant, at its expense, shall defend any suit or dispose of any claim or other proceeding brought against said indemnitees on account of such damage or injury, and shall pay all expenses, including attorney's fees, and satisfy all judgments which may be incurred by or rendered against said indemnitees.

B.      Consultant, at its own expense, shall indemnify, defend and hold UPO, its partners, employees, agents, affiliates, designees and assignees harmless from and against any claim of infringement of any patent or copyright with respect to any software, program, service and/or other materials developed by the Consultant under this Agreement. Should any software, program, service and/or other materials developed by the Consultant under this Agreement become, or in the Consultant's opinion be likely to become, the subject of a claim of infringement of a copyright or patent, Consultant shall at its option use its best efforts to either procure for UPO the right to continue using the software, program, service and/or other materials developed by the Consultant under this Agreement, or shall replace or modify the software, program, service and/or other materials developed by the Consultant under this Agreement to make it non-infringing.

## ARTICLE. 14 COVENANT AGAINST CONTINGENT FEES

The Consultant warrants that no person or selling agency or other organization has been employed or retained to solicit or secure this Agreement upon an agreement or understanding or a commission, percentage, brokerage, or contingent fee. For breach or violation of this warrant, UPO shall have the right to annul this Agreement without liability, or in its discretion, to deduct from the compensation, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

## ARTICLE 15. <u>DISCRIMINATION IN EMPLOYMENT PROHIBITED</u>

The Consultant will not discriminate against any employee or applicant for employment because of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, political affiliation and Vietnam Era Veteran status. The Consultant will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, political affiliation and Vietnam Era Veteran status. Such action shall include, but not be limited to the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Consultant agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

The Consultant will, in all solicitations or advertisements for employees placed by or on behalf of the Consultant, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, political affiliation and Vietnam Era Veteran status.

The Consultant will send to each labor union or representative of workers with which he/she has a collective bargaining agreement or other agreement or understanding, a notice to be provided by the agency contracting officer, advising the labor union or worker's representative of the Consultant's commitments under ARTICLE. 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

The Consultant will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor. The Consultant will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his/her books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders, upon reasonable prior notice.

In the event of the Consultant's noncompliance with the nondiscrimination clauses of this Agreement or with any of such rules, regulations, or orders, this Agreement may be canceled, terminated or suspended in whole or in part and the Consultant may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

The Consultant agrees that all suitable employment openings of the Consultant which exist at the time of the execution of this Agreement, including those not generated by this Agreement and including those occurring at an establishment of the Consultant other than the one wherein the agreement is being performed but excluding those of independently operated corporate affiliates, shall be listed at an appropriate local office of the State employment service system wherein the opening occurs. All suitable employment openings, as used in this clause, includes, but is not limited to, openings which occur in the following job categories: production and no production, plant and office; laborers and mechanics; supervisory and no supervisory; technical; and executive, administrative, and professional openings as are compensated on a salary basis of less than $25,000 per year. This term includes full-time employment, temporary employment of more than 3 days duration, and part-time employment. It does not include openings which the Consultant proposes to fill from within his/her own organization or to fill pursuant to a customary and traditional employer-union hiring arrangement nor openings in an educational institution which are restricted to students of that institution. The Consultant further agrees to provide such reports to such local office of the State employment service system wherein the opening occurs regarding employment openings and hires as may be required pursuant to Title 41, U.S.C. Chapter 60, Part 250. 4. In the event that the Consultant signs any agreement which would be covered by Executive Order 10925 (March 6, 1961) or Executive Order 11114 (June 22, 1963), the Consultant shall include the equal-employment opportunity clause specified in ARTICLE. 301 of Executive Order 10925, as amended.

In the event of the Consultant's non-compliance with the nondiscrimination clauses of this agreement, this agreement may be canceled in whole or in part and the Consultant may be declared ineligible for further District contracts in accordance with procedures established in accordance with Commissioners' Administrative Instruction 2621.

The Consultant will permit access to all books, records, and accounts pertaining to his/her employment practices by the Office of Human Rights, its representatives, the Contracting Officer, or his/her agents for purposes of investigation to ascertain compliance with this provision, upon reasonable prior notice.

## ARTICLE. 16 DISCRIMINATION PROHIBITED

No person in the United States shall, on the ground of race, creed, color, sex, handicap or national origin, be excluded from participation in, be denied the proceeds of, or be subject to discrimination in the performance of this Agreement. The Consultant shall comply with any applicable regulations promulgated by the funding agency with the approval of the President, pursuant to the Civil Rights Act of 1964.

## ARTICLE. 17 POLITICAL ACTIVITY PROHIBITED

None of the funds, materials, property or services contributed by UPO to the Consultant under this agreement shall be used in the performance of this Agreement for any partisan political activity, or to further the election or defeat of any candidate for public office.

## ARTICLE. 18 <u>RELIGIOUS ACTIVITY PROHIBITED</u>

There shall be no religious worship, instruction or proselytization as part of or in connection with the performance of this Agreement.

## ARTICLE. 19 <u>GENERAL PROVISIONS.</u>

A.     <u>Entire Agreement</u>:  This Agreement represents the entire and sole agreement between the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, understandings, representations or consulting agreements whether written or oral. This Agreement cannot be modified, changed or amended, except for in writing signed by the parties.

B.     <u>Waiver</u>:  The failure of either party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.  All remedies afforded in this Agreement shall be taken and construed as cumulative; that is, in addition to every other remedy available at law or in equity.

C.  <u>Relationship</u>:  Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent relationship between Consultant and UPO, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever, except as otherwise agreed to in writing.

D.  <u>Assignment and Delegation</u>:  Neither party shall assign or delegate this Agreement or any rights, duties or obligations hereunder without the express written consent of the other. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the Parties hereto.

E.  <u>Severability</u>:  If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable.  In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

F.  <u>Governing Law</u>: The provisions of this Agreement shall be governed by, and construed in accordance with, the laws of the District of Columbia except for its conflict of laws principles.

G. <u>Paragraph Headings</u>:  The paragraph headings set forth in this Agreement are for the convenience of the parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

H. <u>Mediation/Arbitration</u>:  Any controversy or claim arising out of or relating to services covered by this letter or hereafter provided by the Consultant for UPO or at its request (including

any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of United Planning Organization, or involving any person or entity for whose benefit the services in question are or were provided), shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the attachment to this letter. Judgment on any arbitration award may be entered in any court having jurisdiction.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized representatives.

WALKER & COMPANY LLP                    UNITED PLANNING ORGANIZATION

By: _____            By: _____
(Signature)                             (Signature)

_PARTNER_____                 _____
(Title)                                 (Title)

_6/30/04_____                 _6/29/04_____
(Date)                                  (Date)

-9-

# EXHIBIT A

[DATE]

[INDIVIDUAL CONSULTANT'S NAME]
c/o    Walker & Company, LLP
        4200 Wisconsin Avenue, NW, Suite 300
        Washington, DC  20016

Dear [INDIVIDUAL CONSULTANT'S NAME]:

In connection with your assignment by Walker & Company LLP ("Consultant") to United Planning Organization (the "Organization"), for the purpose of executing assigned projects for the Organization or its Grantee (hereinafter the "Services"), the Organization may find it necessary to disclose to you, or you may have access to, the Organization's methodologies, systems and tools and other confidential or proprietary information of the Organization, including Grantee lists, pricing and other confidential business information and/or confidential or proprietary information of its Grantees (hereinafter referred to as the "Proprietary Property"). You recognize that the Proprietary Property is the proprietary, confidential and trade-secret property of the Organization and/or its Grantees; that it was compiled for the use of the Organization and/or its Grantees and represents the culmination of a substantial investment of time and money.  The Proprietary Property is made available only to Grantees or other non-Organization personnel who agree to maintain its confidential and trade-secret nature, to make no disclosure of any portion of the Proprietary Property to others except under an appropriate nondisclosure agreement and as authorized in writing by the Organization, and to protect adequately its usage.

Accordingly, in consideration of the disclosure of the Proprietary Property and any accompanying materials, you agree to the following specific requirements:

1.    You will preserve the confidential and trade-secret nature of the Proprietary Property and its contents in whole or part and not to disclose the Proprietary Property or its contents in whole or part to any third party or entity (including Consultant) nor use it for any purpose except to provide the Services to the Organization.

2.    You will preserve said confidential and trade-secret interests, safeguard the Proprietary Property from theft, access by unauthorized personnel, and assure that such materials or the contents thereof are not used in an unauthorized manner.  You will not copy, reproduce, translate into another language or format, or with respect to any software disclosed hereunder, transmit, (including without limitation, electronic transmission over any network) reverse engineer, disassemble or decompile, any of the Proprietary Property without the express permission of the Organization.

3.    On completion of the Services or at the request of the Organization, you will immediately return to the Organization all copies of the Proprietary Property made available to you and erase any software components from your computers.  You agree that the duties of nondisclosure and confidentiality concerning the subject matter and contents of the Proprietary Property will survive the return of the Proprietary Property.

4.    The restrictions herein shall not apply to information: in the public domain through no fault or breach of this Agreement by you; previously and lawfully known by you prior to disclosure by the Organization; and rightfully learned from a third party not under restriction of disclosure.

5.    The title and full ownership to the Proprietary Property are agreed to be and will remain the proprietary, confidential and trade-secret property of the Organization and/or its Grantees, whether or not any portions of the Proprietary Property are or may be protected by copyright law.    Your right to the use of the Proprietary Property as a result of this Agreement is not be assigned, subleased, or otherwise transferred (voluntarily, by operation of law, or otherwise) without the Organization's prior written consent.

6.    Proprietary Property disclosed hereunder may include third party software.  You agree that you will treat any such third party software under the same terms and condition as you are obligated to treat the Proprietary Property hereunder.   Any such third party software remains the property of such third party software vendor.

7.    The Proprietary Property shall also include information, materials, products and deliverables developed, and discoveries and contributions made by you in the performance of the Services, including any trade secrets or other data or information.  All Works (as defined below) compiled, developed, created or performed by you while assigned to projects for the Organization or in connection with performing Services shall be deemed "work made for hire" under the Federal Copyright Laws.  In addition, you hereby assign any and all rights, title and interest, including, but not limited to, copyrights, trade secrets and proprietary rights to any such information, materials, products, deliverables, discoveries and contributions ("Works") to the Organization.  Pursuant to its exclusive proprietary rights, the Organization shall have the sole and exclusive right *inter alia* to use, modify or adopt the Works that you may compile, create, perform or develop during the performance of the Services.  You agree to give the Organization all necessary assistance required to perfect such assignment of rights.

8.    You agree to comply with all Grantee and Organization policies and rules applying to the Organization's personnel.

We appreciate your cooperation in this matter.

Very truly yours,

United Planning Organization

Accepted and agreed by UPO: _____ 6/29/04

Accepted and agreed by Individual Consultant: _____

Printed Name of Individual Consultant: _RONALD P. WALKER_

Date: __6/30/04__

## EXHIBIT B

## <u>Dispute Resolution Procedures</u>

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our Consulting Agreement of June 1, 2004. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### *Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. The mediator shall be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the CPR Institute for Dispute Resolution at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation shall be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and therefore shall be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party shall bear its own costs in the mediation. The fees and expenses of the mediator shall be shared equally by the parties.

### *Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("Rules") as in effect on the date of the engagement letter, or such other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom are to be designated by the parties from the CPR Panels of Distinguished Neutrals using the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. It shall also have no power to award (a) damages inconsistent with any applicable agreement between the parties or (b) punitive damages or any other damages not measured by the prevailing

party's actual damages; and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. The result of the arbitration will be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

 DC COMMUNITY ACTION

Case 1:05-cv-01271-GK   Document 73-11   Filed 10/07/2006   Page 53 of 53
5?? Rhode Island Avenue, NW ■ Washington, DC 20001-8026

September 1, 2005

Mr. Roy Layne
Walker & Company LLP
4200 Wisconsin Avenue, N.W.
Washington, DC 20016

RE:     Amendment No. 1 to UPO Agmt. No. 130604

Dear Mr. Layne:

            Enclosed for your records is a fully executed copy of the referenced amendment.

Sincerely,

Monica L. Scott Beckham
General Counsel

MLSB/gp
Enclosure

cc:     Erik Boas