# EXHIBIT 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - X

MOHAMMED AMIN KAKEH,                    :

              Plaintiff,      :

    v.                                  :

UNITED PLANNING ORGANIZATION, :

INC.,                                   :

            Defendant.      :

- - - - - - - - - - X

Silver Spring, Maryland

Monday, June 19, 2006

Deposition of:

MONICA BECKHAM, ESQUIRE,

a witness herein, called for examination by Counsel

for the Plaintiff in the above-entitled matter,

pursuant to notice, taken at Melehy & Associates, 8403

Colesville Road, Suite 610, Silver Spring, Maryland,

beginning at 10:10 a.m., before Joan D. Carino, a court

reporter and notary public in and for the State of

Maryland.



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

40

1      A.   (Examines documents.)

2      Q.   What is Deposition Exhibit 1?

3      A.   It is a specific notice of

4   Reduction-In-Force to Mr. William Isaacs.

5      Q.   And that letter was cc'd to you, correct?

6      A.   Yes, it was.

7      Q.   Okay.  Mr. Jones indicated in his deposition

8   that you drafted that letter.  Did you?

9      A.   The letter would come to my office and if

10   there were corrections and things that needed to be

11   done to the letter as a result of coming out of HR, if

12   you call that drafting, yes.

13      Q.   So someone else drafted this letter?

14      A.   The letter is a standard form letter of the

15   agency.

16      Q.   Who devised the form?

17      A.   It was devised prior to my tenure.  And so

18   when a Reduction-In-Force is effectuated, this is the

19   format that is used with regards to it.  That is why

20   earlier I was saying that the policy might have been

21   revised with regards to Reduction-In-Force because it

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

41

1    shows you the different things that need to go in the

2    letter.  So one of the revisions is that it's office

3    by office, grant by grant, those types of things, and

4    so it is a form.  Now, the letters come from HR, Human

5    Resources, and they put together the letters as well

6    as the job family groupings, retentions and things,

7    because they have all of that information related to

8    that particular individual.

9        Q.    Who did that?

10       A.    That would have been done by Human

11   Resources, Mr. Robert Richardson and maybe, I can't

12   say, he would have to speak to who assisted him with

13   that.

14       Q.    Who in Human Resources?

15       A.    But his assistant.  And they would send it

16   to me and I would mark it up.  Say, for instance, for

17   an example, the references to the various provisions

18   might be incorrect.  You would have some staff persons

19   who are union and some are non-union so the references

20   to the memorandums and different things would have to

21   be different in the notices.  Sometimes despite the

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

64

1    eligible to be considered for the newly created

2    position of Accounting Director director."

3            Do you remember verifying that those facts

4    were in fact correct?

5        A.   I would think so but I also think in looking

6    at this document and without having the other document

7    that I recall Mr. Kakeh being a controller.

8        Q.   Correct.  Are you making a correction to

9    something here?  I see you're making a correction to

10   his position as Deputy Controller?

11       A.   Yes.

12       Q.   Wouldn't you say that was a typo?

13       A.   Yes, I think so and I think, yes, because I

14   remember him as a controller.

15       Q.   So do you agree that Mr. Kakeh was fully

16   terminated partly because he did not have as much

17   seniority as David Quashie?

18       A.   That's correct.

19       Q.   And had he had more seniority than Mr.

20   Quashie he would have been retained in the position of

21   accounting director, is that your recollection?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

65

1    A.    In his job family grouping if you have two

2  employees in the same competitive area, then they

3  would compete for the existing position that was

4  available, they could compete for that position.

5    Q.    So you are saying that if Mr. Kakeh had more

6  seniority than David Quashie he would be competing for

7  the same position with who?

8    A.    You compete in your job family grouping.

9    Q.    With the people that are in it?

10    A.    That's correct.

11    Q.    So Mr. Quashie and Mr. Kakeh were the only

12  people in that group?

13    A.    That's correct, so you can only compete

14  within your group based on seniority so you cannot

15  move from one group to another.

16    Q.    So Mr. Kakeh would have been placed in the

17  accounting director position, correct?

18    A.    That's correct.

19    Q.    If Mr. Kakeh had more seniority than Mr.

20  Quashiae.

21    Q.    In the next paragraph on page 6 it says,

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

66

1    "Due to having more seniority than Charging Party Mr.

2    Quashie was offered the newly created job of

3    Accounting Director consistent with UPO's established

4    Reduction-In-Force policies and procedures."

5        A.    That's correct.

6        Q.    "This action therefore is being taken based

7    on the number of jobs available in the Office of

8    Finance to be filled in the Office of Finance grouping

9    VI and your relative standing among other United

10   Planning Organization Office of Finance employees in

11   the job family grouping, based on the allowable length

12   of credible service."  Correct?

13       A.    Correct.

14       Q.    Okay.  So you agree that the facts as stated

15   in this memorandum, the ones that we just read, are

16   correct?

17       A.    Yes, except for the one.

18       Q.    Except for the fact that he is not deputy

19   controller?

20       A.    Yes.

21       Q.    Okay.  All right.

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

69

1    retaining those who are more senior within a grouping?

2        A.   If you look at part 4, "Scope of

3    Competition", it talks about the competitive area at

4    4.2 and at 4.3 it speaks to the competitive level and

5    then it also speaks to persons who the competing

6    employees are in 4.4.  And it describes -- so that is

7    the grouping, we use the word "grouping" for that but

8    that is what it speaks to.

9        Q.   Okay.

10       A.   A competitive level consists of the grouping

11   of positions by funding source, which is so familiar

12   in all important aspects that an employee can move

13   from one position to another without significant

14   training and without undue interruption of the work

15   program.

16       Q.   If you look at page 6 it says "Employee

17   Coverage", do you see that?

18       A.   Yes.

19       Q.   "B" says, "This memorandum does not cover

20   the General Counsel, Office Directors or Division

21   Heads inasmuch as the persons in these positions serve

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

70

1    at the pleasure of the Executive Director and have no

2    tenure rights."

3           Do you agree that this Reduction-In-Force

4    covered Mr. Kakeh or did not cover Mr. Kakeh?

5           A.    It did, he was not an office director.

6           Q.    Or a division head?

7           A.    Or a division head.

8           Q.    Did these rules cover Ms. Shears?

9           A.    No.

10          Q.    When was this -- strike the question.

11                Is there a provision here that requires

12   notice of the RIF to take place?

13          A.    In different notices there is what is called

14   a General Notice that can be provided and that is

15   under 5.3, and then there is what you call a specific

16   notice, which is under 5.4.  And then I think I'm

17   sorry I skipped because part 5 is "Notice to

18   Employees" and then it explains the general, which is

19   5.1 and 5.2, general and specific.  General is 30

20   days.

21          Q.    When does the general notice apply?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

117

1      A.    I met with DHS and the Feds came for the

2   head start review.   That was maybe like two weeks

3   after the CSBG review.

4      Q.    When was that?

5      A.    The latter part of March of '04.   And they

6   did an entrance conference with their team and then

7   the Head Start management team and United Planning

8   Organization management team.

9      Q.    Okay.   What was discussed during that

10  meeting?

11     A.    Pretty much what they were going to follow

12  using the Prism system.   You get a book in the summer,

13  the previous summer in '03, prior to that a new

14  monitoring system had come out with regards to Head

15  Start with regard to how that program would be

16  monitored, and they conducted that monitoring every

17  three years, so they were already scheduled for that.

18  It's like we will be coming up for another review

19  pretty soon.

20     Q.    Okay.

21     A.    And then later the IG's from DHHS,DHS, HUD

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

118

1    and the FBI, an FBI agent named Hans Martin, and they

2    came in one day together.  And then the office of the

3    Corporation for Community National, the full name you

4    will have to get, but they came in at another time.

5    They didn't come in together on that date that the

6    IG's and Shelley Elliott came in.

7        Q.    And how long did that meeting last?

8        A.    I'd say an hour and a half, two hours.  They

9    were interviewing an employee.  That is why I was

10   called into the meeting.

11       Q.    We are talking about the meeting with DHS,

12   DHHS and the FBI?

13       A.    That's correct.  First I was meeting with

14   Shelley Elliott, she had come into my office.  While I

15   was meeting with her executing the Hamilton matter I

16   get a call indicating that an employee was being

17   questioned by the FBI and --

18       Q.    Who was that employee?

19       A.    Darlene Booker.  -- and that she wasn't

20   going to answer any questions unless I was present.

21       Q.    Okay.  So that meeting, when did it occur,

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

119

1    what month?

2        A.    I'd say probably in May.  Maybe it was May.

3    Might have been later than that, I'm not sure.  It

4    might have been the latter part of May.

5        Q.    Do you have a calendar that would tell you

6    that information?

7        A.    No.  I would have, what we would have would

8    be the Consent to Search form, but I didn't have a

9    calendar.

10            MS. DAVIS:  We produced a copy of that.

11            THE WITNESS:  And that would show the date

12    that they came in.

13            BY MR. MELEHY:

14        Q.    Was Mr. Kakeh in that meeting?

15        A.    The meeting with me, no.

16        Q.    With the IG from DHHS?

17        A.    Not in the meeting with me.

18        Q.    So who was in that meeting?

19        A.    Those agents from the various federal and

20    district departments, the FBI, Dana Jones, Darlene

21    Booker initially was there and then she left after

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

120

1    they questioned her, and then it was just Mr. Jones

2    and me and the agents.

3        Q.    So Shears and Mack were not there?

4        A.    No.

5        Q.    Was Mr. Kakeh interviewed by any of those

6    agents?

7        A.    I can't recall, I would have to look at the

8    document, I can't recall.

9        Q.    What documents are you talking about?

10       A.    They interviewed various employees of the

11   agency.

12       Q.    What documents are you talking about?

13       A.    So it would show a list that would show

14   where they were to come for interviews.

15       Q.    The list would show where they were?

16       A.    Just an internal document.  I don't think I

17   can speak to that on grounds of attorney-client

18   privilege.  It was something I developed within my

19   office.

20       Q.    Did you hear any rumors that Mr. Kakeh had

21   met with the FBI or any of the Inspector General's?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

121

1      A.   No, I didn't hear rumors.  I would think

2   that, no, I did not hear rumors. I know that they were

3   in the finance department.  In fact I put them across

4   from the finance office so they could get any

5   information that they needed and everyone in finance

6   was instructed to assist them in their investigation.

7   Initially when they came in the office they were in an

8   office they shared with our auditors so they were able

9   to converse not only with our auditors on a daily

10  basis but with different staff members of the finance

11  department.

12      Q.   What was discussed in that meeting, any

13  specific allegations?

14      A.   That they were there because of the

15  newspaper articles, that they had read the newspaper

16  and they had seen what was in the newspapers. And they

17  wanted to know who Mr. Jones was, what his background

18  was, the process how he got to UPO.

19      Q.   So they knew about the boat?

20      A.   Oh, yes, the boat was in the newspaper.

21      Q.   Sure, as well as the telephone charges?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

122

1        A.    The telephone, credit charges.

2        Q.    Weren't those subjects discussed at the

3    meeting?

4        A.    I was in a lot of meetings, I'm sorry.

5        Q.    You don't remember?

6        A.    I will tell you what I can remember from

7    that meeting, the agents wanted to do a Consent to

8    Search form.  They gave us that.  I reviewed that.  We

9    executed it, Mr. Jones executed it.  We had a

10    handshake.  I saw that there were mistakes in the

11    Consent to Search form, being the requirement of how

12    long we had to keep documents and things and it went

13    back beyond the time period which we were required,

14    and I indicated to them that and they understood that

15    and so we had a handshake and they said they would

16    revise it, but I told them I wanted them to get

17    started immediately and we would sign that, it was

18    executed.  And they wanted to know, I explained to

19    them that the locks had been changed to the executive

20    office on the night of the 11th or the morning of the

21    12th of March, '04, and all the files were there and

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

123

1    available for them to review, that everyone would

2    cooperate with them.  And then I asked them why didn't

3    they call me.

4         Q.    Did they tell you?

5         A.    Well, they said they didn't have to call

6    me.  And I said, "Well", I said, "didn't you get the

7    letter?"  And they said, "What letter?"  I said, "You

8    didn't get the letter from my Board?  They wanted you

9    to come into this agency."  We have found that it was

10   extremely costly to get our own outside investigator

11   into all the matters that had come about as a result

12   of the report and we couldn't obtain pro bono services

13   and so we knew we needed to get a very in-depth look

14   at the agency, disclosure, transparency, all those

15   things were needed, and we knew that the persons

16   capable of doing that were those persons that were

17   associated with the various IG offices.  And so I was,

18   when I met them I was under the impression that they

19   were coming in because they had gotten the letter that

20   we had sent.  So I told the agent to wait right there

21   and I would provide him with a copy of that letter and

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

124

1    at that point he started laughing and indicated that,

2    he had indicated to the assistant attorney-general

3    that we were extremely cooperative and that he was

4    surprised about it because I guess he indicated to me

5    that he had been told that he would meet with great

6    resistance coming into our agency.

7         Q.    Did the Board approve Mr. Kakeh's

8    termination?

9         A.    The Board approved the reorganization.

10        Q.    Did the Board know when it approved the

11   reorganization that it would be effectively approving

12   Mr. Kakeh's termination?

13        A.    I couldn't say that, no.  They knew that

14   positions were being abolished.  They knew that they

15   were outsourcing the top management of the office, but

16   I'm not sure if the Board was aware of exactly who was

17   being impacted.  They are not given names and things

18   like that.

19        Q.    Did any more meetings occur with any IG's or

20   the FBI where you were present?

21        A.    Oh, they were ongoing, yes, I met with them

Beck Law

Deposition Exhibit No. 2

6-19-06

June 2, 2004

Ms. Nona McLean
4608 Holmehurst Way
Bowie, MD  20720

RE:  Specific Notice of Reduction-In-Force

Dear Ms. McLean:

In accordance with the provisions of UPO Administrative Memorandum No. E-107 dated July 22, 1985, (Part 5, Notice to Employees, 5.2. General and Specific Notice); UPO Administrative Memorandum NO. E-119 dated November 8, 1989; UPO Administrative Memorandum NO. E-124 dated July 11, 1990 and UPO Administrative Memorandum No. E-125 dated August 2, 1990; I am herewith notifying you that your current employment in the position Facilities/IS nager with the Office of Finance, United Planning Organization ll be adversely affected effective the close of business on June ᵕ0, 2004. This means that as of that date, you will be released from your current competitive level by separation from employment. The reason for this action is that the United Planning Organization is forced to declare a Reduction-In-Force affecting, four employees in Office of Finance which is made necessary due to the reorganization and the abolishment of positions in the Office of Finance.

Further, you are advised that effective immediately you are placed on paid administrative leave from June 2, 2004 through close of business on June 30, 2004. You are to immediately turn in all keys, cell phones or other equipment issued to you by UPO and remove your personal affects. Any personal items not immediately removed will be packed for you and arrangements for pick-up will be made for a later date.

The competitive area affected is the Office of Finance.

The competitive levels which control the agreed upon scope of competition in this Reduction-In-Force are those grouping of positions by funding source, which are so similar in all important aspects that an employee can move from one position to another in that funding source without significant training and without interruption of the work program. All positions in the same

CONF
MA

competitive level are characterized by a similarity of duties, functions, responsibilities and pay schedules. Job titles and job descriptions are indicative, but not conclusive, in determining the composition of competitive levels. A competitive level may consist of only one job when that job is so nearly unique that it is not interchangeable with similar jobs. The principal guide to determining competitive levels in each office shall be the job classification grouping.

Thus, for purposes of the Reduction-In-Force, your competitive level is that group of jobs which fall within the job family grouping in Group V of UPO's Office of Finance Job Family Grouping List (See Attachment A). For purposes of this Reduction-In-Force, your entrance on duty date (EOD) January 5, 1999, a date which was established by your Job Family Grouping by reason of (see reason checked below):

      __X___      Your initial dates of employment by the United
                  Planning Organization;

      _____     Your length of creditable service as an employee
                  based on your current employment service, plus
                  allowance for your prior years of service resulting
                  from your previous employment with UPO, minus any
                  time disallowed for lose of seniority or minus any
                  periods of temporary employment.

This action therefore is being taken based on the number of jobs available in the Office of Finance to be filled in the Office of Finance Grouping V and your relative standing among other UPO Office of Finance employees in the Job Family Grouping, based on your allowable length of creditable service.

The Official UPO Retention Register, which is available for your inspection in the UPO Office of Human Resources during normal duty hours, documents a listing of all competing employees within your Job Family Grouping (your competitive level) in the order of their seniority as indicated by their length of allowable UPO creditable service. You are urged to examine this Retention Register so that you can ascertain the correctness of your retention standing relative to all other competing UPO Office of Executive Director employees in the order of their seniority within your Job Family Grouping.

UPO Administrative Memorandum NO. E-107, Part 6, Subsection 6.1 thru 6.6 (see Attachment B) governs all appeals from this action. You are encouraged to examine the attached appeal provisions and fully utilize same should you determine that any one or more of the enumerated grounds for appeals is applicable to you. Should you decide to appeal this reduction-in-force action taken against you, it is emphasized that your notice of appeal must set specific reasons for believing the action is improper. The

CONFIDENTIAL
MAK 0164

UPO Office of Human Resources is available to assist you in perfecting your appeal or to answer any questions you may have concerning these appeal provisions.

You are requested to complete a UPO Resignation/Termination Form and process it through the respective UPO components designated on the form.

Attached (see Attachment C) is information regarding your rights and obligations for group health continuation coverage under COBRA. The UPO Office of Human Resources will notify you as to your continuation and conversion privileges under the UPO medical expense/health care/life insurance plans in which you are a participant and with respect to your retirement income plan benefits.

Your final paycheck will be available for you by close of business on the next UPO workday following your date of termination. You must report to Cash and Reports Branch, UPO Office of Finance to sign for and receive your final paycheck or it will be subsequently mailed to your last forwarding address. The Cash and Reports Branch is located at the UPO Headquarters Building, 301 Rhode Island Avenue, N.W., WASHINGTON, D.C. 20001.

Please accept our appreciation for the services you rendered as an employee of the United Planning Organization.

Sincerely,


Dana M. Jones
Interim Executive Director

Attachment(s)
    A - Job Family Grouping List
    B - UPO Administrative Memorandum Nos. E-107, E-119, E-124 & E-125
    C - Group Health Continuation Coverage Under Cobra

DMJ/dlb

cc:  Office of Executive Director
     General Counsel
     Office of Finance
     Office of Human Resources
     File

CONFIDENTIAL
MAK 0165

# UNITED PLANNING ORGANIZATION
## DC COMMUNITY ACTION
### 301 Rhode Island Avenue, NW ▪ Washington, DC 20001-1826

June 2, 2004

```
Beckham
Deposition Exhibit No. 3
6-19-06
```

Mr. Davidson Quashie
12418 Littleten St
Silver Spring, MD 20906

RE:   Specific Notice of Reduction-In-Force

Dear Mr. Quashie:

In accordance with the provisions of UPO Administrative Memorandum No. E-107 dated July 22, 1985, (Part 5, Notice to Employees, 5.2. General and Specific Notice); UPO Administrative Memorandum NO. E-119 dated November 8, 1989; UPO Administrative Memorandum NO. E-124 dated July 11, 1990 and UPO Administrative Memorandum No. E-125 dated August 2, 1990; I am herewith notifying you that your current employment in the position Acting Deputy Controller with the Office of Finance, United Planning Organization will be adversely affected effective the close of business on June 30, 2004. This means that as of that date, you will be released from your current competitive level by separation from employment. The reason for this action is that the United Planning Organization is forced to declare a Reduction-In-Force affecting, four employees in Office of Finance which is made necessary due to the reorganization and the abolishment of positions in the Office of Finance.

Further, you are advised that effective June 2, 2004 you are hereby reassigned to the position Accounting Director, Office of Finance. You will be acting in this position until filled.

The competitive area affected is the Office of Finance.

The competitive levels which control the agreed upon scope of competition in this Reduction-In-Force are those grouping of positions by funding source, which are so similar in all important apects that an employee can move from one position to another within that funding source without significant training and without undue interruption of the work program. All positions in the same competitive level are characterized by a similarity of duties, functions, responsibilities and pay schedules. Job titles and job descriptions are indicative, but not conclusive in determining the composition of competitive levels. A competitive level may consist of only one job when that job is so nearly unique that it is not interchangeable with similar jobs. The principal guide to

CONFID
MAK

HELPING PEOPLE—CHANGING LIVES
Telephone: (202) 238-4600 ▪ FAX (202) 588-0270 ▪ E-Mail: info@upo.org ▪ UPO Webs

determining competitive levels in each office shall be the job classification grouping.

Thus, for purposes of the Reduction-In-Force, your competitive level is that group of jobs which fall within the job family grouping in Group VI of UPO's Office of Finance Job Family Grouping List (See Attachment A). For purposes of this Reduction-In-Force, your entrance on duty date (EOD) September 23, 1974, a date which was established by your Job Family Grouping by reason of (see reason checked below):

__X__     Your initial dates of employment by the United Planning Organization;

_____   Your length of creditable service as an employee based on your current employment service, plus allowance for your prior years of service resulting from your previous employment with UPO, minus any time disallowed for lose of seniority or minus any periods of temporary employment.

This action therefore is being taken based on the number of jobs available in the Office of Finance to be filled in the Office of Finance Grouping VI and your relative standing among other UPO Office of Finance employees in the Job Family Grouping, based on your allowable length of creditable service.

The Official UPO Retention Register, which is available for your inspection in the UPO Office of Human Resources during normal duty hours, documents a listing of all competing employees within your Job Family Grouping (your competitive level) in the order of their seniority as indicated by their length of allowable UPO creditable service. You are urged to examine this Retention Register so that you can ascertain the correctness of your retention standing relative to all other competing UPO Office of Executive Director employees in the order of their seniority within your Job Family Grouping.

UPO Administrative Memorandum NO. E-107, Part 6, Subsection 6.1 thru 6.6 (see Attachment B) governs all appeals from this action. You are encouraged to examine the attached appeal provisions and fully utilize same should you determine that any one or more of the enumerated grounds for appeals is applicable to you. Should you decide to appeal this reduction-in-force action taken against you, it is emphasized that your notice of appeal must set forth specific reasons for believing the action is improper. The UPO Office of Human Resources is available to assist you in perfecting your appeal or to answer any questions you may have concerning these appeal provisions.

CONFIDENTIAL
MAK 0170

You are requested to complete a UPO Resignation/Termination Form and process it through the respective UPO components designated on the form.

Attached (see Attachment C) is information regarding your rights and obligations for group health continuation coverage under COBRA. The UPO Office of Human Resources will notify you as to your continuation and conversion privileges under the UPO medical expense/health care/life insurance plans in which you are a participant and with respect to your retirement income plan benefits.

Your final paycheck will be available for you by close of business on the next UPO workday following your date of termination. You must report to Cash and Reports Branch, UPO Office of Finance to sign for and receive your final paycheck or it will be subsequently mailed to your last forwarding address. The Cash and Reports Branch is located at the UPO Headquarters Building, 301 Rhode Island Avenue, N.W., WASHINGTON, D.C. 20001.

Please accept our appreciation for the services you rendered as an employee of the United Planning Organization.

Sincerely,

Dana M. Jones
Interim Executive Director

Attachment(s)
    A - Job Family Grouping List
    B - UPO Administrative Memorandum Nos. E-107, E-119, E-124 & E-125
    C - Group Health Continuation Coverage Under Cobra

DMJ/dlb

cc:  Office of Executive Director
     General Counsel
     Office of Finance
     Office of Human Resources
     File

CONFIDENTIAL
MAK 0171

# UNITE PLANNING ORGANIZATION
### DC COMMUNITY ACTION
301 Rhode Island Avenue, NW ▪ Washington, DC 20001-1826

Beckham

Deposition Exhibit No. 4

6 - 19 - 06

RECEIVED
GENERAL COUNSEL
2004 JUN -2 P 3:

June 2, 2004

Mr. M. Amin Kakeh
7050 Lee Stone Dr
Springfield, VA 22151

RE:   Specific Notice of Reduction-In-Force

Dear Mr. Kakeh:

In accordance with the provisions of UPO Administrative Memorandum No. E-107 dated July 22, 1985, (Part 5, Notice to Employees, 5.2. General and Specific Notice); UPO Administrative Memorandum NO. E-119 dated November 8, 1989; UPO Administrative Memorandum No. E-124 dated July 11, 1990 and UPO Administrative Memorandum No. E-125 dated August 2, 1990; I am herewith notifying you that your current employment in the position Controller with the Office of Finance, United Planning Organization will be adversely affected effective the close of business on June 30, 2004. This means that as of that date, you will be released from your current competitive level by separation from employment. The reason for this action is that the United Planning Organization is forced to declare a Reduction-In-Force affecting, four employees in Office of Finance which is made necessary due to the reorganization and the abolishment of positions in the Office of Finance.

Further, you are advised that effective immediately you are placed on paid administrative leave from June 2, 2004 through close of business on June 30, 2004. You are to immediately turn in all keys, cell phones or other equipment issued to you by UPO and remove your personal affects. Any personal items not immediately removed will be packed for you and arrangements for pick-up will be made for a later date.

The competitive area affected is the Office of Finance.

The competitive levels which control the agreed upon scope of competition in this Reduction-In-Force are those grouping of positions by funding source, which are so similar in all important aspects that an employee can move from one position to another within that funding source without significant training and without

**CONFIDENTIAL**
**MAK 0017**

HELPING PEOPLE—CHANGING LIVES
Telephone: (202) 238-4600 ▪ FAX (202) 588-0270 ▪ E-Mail: info@upo.org ▪ UPO Website: www.upo.org

undue interruption of the work program. All positions in the same competitive level are characterized by a similarity of duties, functions, responsibilities and pay schedules. Job titles and job descriptions are indicative, but not conclusive, in determining the composition of competitive levels. A competitive level may consist of only one job when that job is so nearly unique that it is not interchangeable with similar jobs. The principal guide to determining competitive levels in each office shall be the job classification grouping.

Thus, for purposes of the Reduction-In-Force, your competitive level is that group of jobs which fall within the job family grouping in Group VI of UPO's Office of Finance Job Family Grouping List (See Attachment A). For purposes of this Reduction-In-Force, your entrance on duty date (EOD) June 29, 1998, a date which was established by your Job Family Grouping by reason of (see reason checked below):

    __X__     Your initial dates of employment by the United Planning Organization;

    _____    Your length of creditable service as an employee based on your current employment service, plus allowance for your prior years of service resulting from your previous employment with UPO, minus any time disallowed for lose of seniority or minus any periods of temporary employment.

This action therefore is being taken based on the number of jobs available in the Office of Finance to be filled in the Office of Finance Grouping VI and your relative standing among other UPO Office of Finance employees in the Job Family Grouping, based on your allowable length of creditable service.

The Official UPO Retention Register, which is available for your inspection in the UPO Office of Human Resources during normal duty hours, documents a listing of all competing employees within your Job Family Grouping (your competitive level) in the order of their seniority as indicated by their length of allowable UPO creditable service. You are urged to examine this Retention Register so that you can ascertain the correctness of your retention standing relative to all other competing UPO Office of Executive Director employees in the order of their seniority within your Job Family Grouping.

UPO Administrative Memorandum NO. E-107, Part 6, Subsection 6.1 thru 6.6 (see Attachment B) governs all appeals from this action. You are encouraged to examine the attached appeal provisions and fully utilize same should you determine that any one or more of the enumerated grounds for appeals is applicable to you.

CONFIDENTIAL
MAK 0018

Should you decide to appeal this reduction-in-force action taken against you, it is emphasized that your notice of appeal must set forth specific reasons for believing the action is improper. The UPO Office of Human Resources is available to assist you in perfecting your appeal or to answer any questions you may have concerning these appeal provisions.

You are requested to complete a UPO Resignation/Termination Form and process it through the respective UPO components designated on the form.

Attached (see Attachment C) is information regarding your rights and obligations for group health continuation coverage under COBRA. The UPO Office of Human Resources will notify you as to your continuation and conversion privileges under the UPO medical expense/health care/life insurance plans in which you are a participant and with respect to your retirement income plan benefits.

Your final paycheck will be available for you by close of business on the next UPO workday following your date of termination. You must report to Cash and Reports Branch, UPO Office of Finance to sign for and receive your final paycheck or it will be subsequently mailed to your last forwarding address. The Cash and Reports Branch is located at the UPO Headquarters Building, 301 Rhode Island Avenue, N.W., WASHINGTON, D.C. 20001.

Please accept our appreciation for the services you rendered as an employee of the United Planning Organization.

Sincerely,

Dana M. Jones
Interim Executive Director

Attachment(s)
    A - Job Family Grouping List
    B - UPO Administrative Memorandum Nos. E-107, E-119, E-124 & E-125
    C - Group Health Continuation Coverage Under Cobra

DMJ/dlb

cc:  Office of Executive Director
     General Counsel
     Office of Finance
     Office of Human Resources
     File

CONFIDENTIAL
MAK 0019

ATTACHMENT A

## Non-Bargaining Unit Employees Family Grouping List

### Office of Controller

Number of Positions in each group

**Group I**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Office Coordinator | $41,617 | 07/29/71 |

**Group II**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Revenue Acct | $52,000 | 02/20/01 |

**Group III**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Sr. External Auditor | $55,194 | 08/01/67 |

**Group IV**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Chief, Budget | $52,494 | 05/22/68 |
| 1 | Chief, Cash Reports | $53,168 | 07/20/81 |

**Group V**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Facilities/IS Manager | $56,844 | 01/05/99 |

**Group VI**

| No. | Title | Salary | EOD |
|---|---|---|---|
| 1 | Atg Deputy Controller | $78,232 | 09/23/74 |
| 1 | Controller | $87,550 | 06/29/98 |

Dated: 5/27/04

CONFIDENTIAL
MAK 0020

# UPO ADMINISTRATIVE
# Memorandum

No. E-107

**to:** ALL UPO EMPLOYEES

**from:** _Ernest Pete Ward, Executive Director_

**subject:** Reduction In Force

Date of
Issuance: July 22, 1985

---

Effective immediately, this Administrative Memorandum supersedes UPO Administrative Memorandum No. E-81, dated November 19, 1976, and repeals all other UPO policies and procedures inconsistent herewith.

## CONTENTS

PART 1.   GENERAL

1.1.   Purpose of Administrative Memorandum
1.2.   Causes of Reduction In Force
1.3.   Definitions

PART 2.   MANAGEMENT ASPECTS OF REDUCTION IN FORCE

2.1.   Management Obligations Beyond Requirements
2.2.   Guides for Keeping Demotions and Displacements to a Minimum
2.3.   Improper Use of Reduction In Force
2.4.   Keeping Employees Informed
2.5.   Outplacement Programs

PART 3.   USE OF REDUCTION IN FORCE

3.1.   Administrative Use of Reduction In Force
3.2.   Employee Coverage
       a.   Employees Covered
       b.   Employees Not Covered

PART 4.   SCOPE OF COMPETITION

4.1.   Determining Factors
4.2.   Competitive Area
4.3.   Competitive Level
4.4.   Competing Employees
4.5.   Retention Register
4.6.   Retention Standing

CONFIDENTIAL
MAK 0021

3

## PART 1.   GENERAL

### 1.1.   PURPOSE OF ADMINISTRATIVE MEMORANDUM

The instructions in this Memorandum shall govern all reduction in force actions affecting UPO employees.

### 1.2.   CAUSES OF REDUCTION IN FORCE

A reduction in force may be necessary due to circumstances existing inside or outside the Agency. The following are some conditions which may warrant a reduction in force:

.   Significant reduction in funds or a cut off of funds entirely

.   Deobligation of existing funds

.   Excessive delay in awarding funds

.   Program changes

.   Workload changes

.   Reorganization

The determination of whether any of these conditions or other factors occuring singly or in combination will necessitate a reduction in force, which and how many jobs are abolished, and when the reduction is made shall be in the sole discretion of the Executive Director. UPO shall therefore have a reduction in force when such has been determined by the Executive Director and an employee is released from his competitive level by separation, demotion, furlough for more than 30 days, or reassignment requiring displacement by any of the actions or for any of the reasons mentioned in this paragraph. The Executive Director may delegate to the Directors of the Offices of UPO any of his functions, powers and duties under this Memorandum, as he may deem appropriate.

### 1.3.   DEFINITIONS.   As used in this Memorandum--

Agency: means the United Planning Organization.

DAYS: means work days.

Creditable Service: means period(s) of employment with the United Planning Organization, excluding (1) any period(s) of temporary employment and/or (2) service subtracted due to less than satisfactory employee performance evaluations or disciplinary actions, which would result or have resulted in the denial of an In-Step Increase.

CONFIDENTIAL
MAK 0022

5

- placing employees who desire it on leave with pay or without pay until conditions giving rise to the reduction in force have abated;

- making maximum use of the permissable waiver of qualifications in job descriptions;

- freezing vacancies;

- training employees facing possible reduction who have potential for reassignment;

- accepting voluntary retirements;

- maintaining strict control over leave, to keep a minimum work force;

- using extensive overtime rather than hiring additional people; and

- shifting personnel from one Office or Division to another.

Employees for whom no positions are located should be counselled on any benefits that may be available to them as an unemployed person.

### 2.3.   IMPROPER USE OF REDUCTION IN FORCE

The need for a reduction in force does not suspend management's authority and responsibility to terminate, demote, reassign or take any other appropriate administrative action against an employee. Management must in every case, however, make certain that the action is appropriate to the circumstances of the individual case and that the proper Administrative Memorandum is followed. It would not be appropriate to accomplish a reduction in force by actual or implied threats or transfers or of forced resignations or the like. It also would not be appropriate to use a reduction in force to eliminate inadequate employees.

### 2.4.   KEEPING EMPLOYEES INFORMED

Management shall take care to keep all affected employees informed about the entire reduction in force process to the extent of providing them with the information they need to understand clearly what is going on and why they were affected.

### 2.5.   OUTPLACEMENT PROGRAMS

To help relieve the economic insecurity of an affected employee, management should utilize the full extent of UPO's resources to develop and establish outplacement programs to locate jobs for those persons who cannot be placed within the Agency. This program should not be limited to those employees not yet released but should also include released employees as well.

CONFIDENTIAL
MAK 0023

7

Employees whose work station is in one Office but whose funding source is the responsibility of one or more Offices are in the competitive area of the work Office.

### 4.3. COMPETITIVE LEVEL

A "competitive level" consists of the grouping of positions by funding source, which are so similar in all important aspects that an employee can move from one position to another within that funding source without significant training and without undue interruption of the work program. In no case shall "undue interruption" mean mere inconvenience. All positions in the same competitive level are characterized by a similarity of duties, functions, responsibilities and pay schedules. Job titles and job descriptions are indicative but not conclusive in determining the composition of competitive levels. The principal guide to determining competitive levels in each Office shall be the job classification groupings as set forth in the Agency's Wage and Salary Program. These job classification groupings establish responsibility levels of positions, but not necessarily a functional relationship. A competitive level may consist of only one job when that job is so nearly unique that it is not interchangeable with similar jobs. Before taking any reduction in force action, each reduction in force plan shall assign every position in the affected competitive area to a competitive level. The retention register at each competitive level must show clearly all positions in the level. If old records of competitive levels have not been kept current, they should be carefully reviewed and updated when a reduction in force is expected.

### 4.4. COMPETING EMPLOYEES

"Competing employees" mean permanent employees listed on the retention register in the order of their retention standing. Competing employees compete for retention within the designated competitive level. Temporary and term employees are not competing employees. Temporary and term employees must be released by appropriate means other than reduction in force before any competing employee in the same competitive level is affected by the reduction in force. This rule shall apply except where such is precluded by the nature and special conditions of the grant/contract under which an employee is employed (e.g., Special grant or contract limited to only temporary employees).

### 4.5. RETENTION REGISTER

The Agency shall establish for each competitive level a retention register utilizing one document before it releases a competing employee from his competitive level. The register documents the competitive levels, the basis for release or retention of any competing employee and such documentation is required in every reduction in force plan even when the employee occupies the only position in the competitive level and competes with no one else. The retention register shall list all competing employees within a competitive level in order of their retention standing to each other as indicated by their length of creditable service. The

CONFIDENTIAL
MAK 0024

tion in force.  However, in no event may an employee be affected until at least ten (10) days after he receives a specific notice.  Therefore, if the specific notice is issued too late for the employee to have ten days notice, the effective date must be postponed to allow at least the required ten days.

### 5.3.  INFORMATION IN GENERAL NOTICE

While a general notice will lack some of the information an employee must have before he is released from his competitive level, it must contain the following minimum information:

    a.  a statement that the Agency finds a reduction in force necessary and that the employee may be separated as a result;

    b.  a statement that the general notice will be supplemented by a specific notice as soon as the individual actions are finally determined;

    c.  a statement that the employee will receive at least ten (10) days notice of the specific action to be taken before any action takes place;

    d.  a statement that no appeal can be taken until he receives a specific notice; and

    e.  expiration date of the general notice.

### 5.4.  INFORMATION IN SPECIFIC NOTICE

The information that must be given in a specific reduction in force notice is as follows:

    a.  the action to be taken and the effective date of the action;

    b.  the competitive areas described organizationally;

    c.  the employee's competitive level such that the retention register for the competitive level can be readily identified by the employee;

    d.  length of creditable service and the reason(s) for any adjustments;

    e.  where and when the employee may inspect the retention register and other records pertinent to his case; and

CONFIDENTIAL
MAK 0025

    d.  error in establishing length of creditable service;

    e.  inadequate reasons, or failure to give reasons, for exceptions to the provisions contained in the Agency's memorandum on reduction in force; and/or

    f.  Agency's failure to comply with its own administrative memorandum on reduction in force.

### 6.4.  DECISION BY OFFICE DIRECTOR

The Office Director shall promptly issue a written decision sustaining the specific notice or indicating the corrective action required. If the reconsideration is denied, the employee may appeal to the Executive Director for an additional review.

### 6.5.  APPEAL TO THE EXECUTIVE DIRECTOR

The appeal to the Executive Director must be in writing and shall set forth the employee's reasons why the Office Director's action should not be carried out with such offers of proof and pertinent documents as he is able to submit.

    a.  <u>Time Limit</u>

        If an employee decides to appeal, the appeal must be submitted within five (5) days after issuance of the decision by the Office Director. The effective date of the release action shall not be tolled or held in abeyance for the purpose of completing the appeal process.

    b.  <u>Appeal File</u>

        When an employee files an appeal under these procedures, the Executive Director shall establish an Employee Appeal File separate from the official Personnel File. The file will contain all documents pertinent to the appeal, such as copies of the reduction in force notice releasing the employee, the employee's appeal notice, all testimony and documentation developed during the appeal process, and the decision of the Office Director. Upon completion of the appeal process, the file should be forwarded to the General Counsel's Office for filing.

    c.  <u>Action by Executive Director</u>

        (1)  Upon receipt of an appeal, the Executive Director shall immediately forward a copy of the appeal to the General Counsel with a directive that the General Counsel promptly furnish an opinion to him regarding the legal sufficiency of the release action taken.

CONFIDENTIAL
MAK 0026

# MEMORANDUM

**to:**   ALL UPO EMPLOYEES                      No. E-119

**from:**   ~Benjamin Jennings~ Benjamin Jennings, Executive Director

**subject:**   AMENDMENT of UPO'S POLICY AND PROCEDURES GOVERNING
REDUCTION-IN-FORCE

**RE:**   UPO Administrative Memorandum No. E-107

**DATE of
ISSUANCE:**   November 8, 1989

---

Effective immediately, UPO's policy and procedures
governing Reduction-In-Force, pursuant to UPO Administrative
Memorandum No. E-107, dated July 22, 1985, are hereby amended by the
revisions of the following paragraphs and/or definition as set forth
below:

Part I. GENERAL

1.2. Causes of Reduction-In-Force

...The Executive Director may delegate to the Directors
of the Offices of UPO and the Executive Assistant any of his
functions, powers and duties under this Memorandum, as he may deem
appropriate.

Part 1. GENERAL

1.3. DEFINITIONS.  As used in this Memorandum--

<u>Office</u>: means one of the four major organizational
elements of UPO.

Part 4. SCOPE OF COMPETITION

4.2. COMPETITIVE AREA

The major organizational components listed below comprise
the UPO competitive areas:

        Executive Office
        Office of Administrative and Management
        Office of Field Services Operations
        Office of Program Development

CONFIDENTIAL
MAK 0027

# MEMORANDUM

**to:** ALL UPO EMPLOYEES       **No. E-124**

**from:** Benjamin Jennings, Executive Director

**subject:** AMENDMENT OF UPO'S POLICY AND PROCEDURES GOVERNING REDUCTION-IN-FORCE

**RE:** UPO Administrative Memoranda No. E-107 and No. E-119

**DATE of ISSUANCE:** July 11, 1990

---

Effective immediately, UPO's policy and procedures governing Reduction-In-Force, pursuant to UPO Administrative Memorandum No. E-107, dated July 22, 1985, and UPO Administrative Memorandum No. E-119, dated November 8, 1989, are hereby amended by the additions and/or revisions of the following paragraphs and/or definitions as set forth below:

## PART 1. GENERAL

1.3. DEFINITIONS.  As used in this Memorandum--

_Furlough_: means the temporary involuntary placement of an employee in a non-duty, non-pay status for reasons requiring reduction-in-force procedures as set forth in 1.2.

_Office_: means one of the seven major organizational elements of UPO.

## PART 2.  MANAGEMENT ASPECTS OF REDUCTION IN FORCE

2.2    GUIDES FOR KEEPING DEMOTIONS AND DISPLACEMENTS TO A MINIMUM

. releasing a competing employee from his or her competitive level by furlough in accordance with Part 3., Part 4., Part 5., Part 6., and Part 7., herein;

## Part 3.  USE OF REDUCTION IN FORCE AND FURLOUGH

3.2.    ADMINISTRATIVE USE OF FURLOUGH

a.  A competing employee may not be furloughed for more than thirty (30) days.

CONFIDENTIAL
MAK 0028

b. A competing employee may be furloughed only when recall of the employee within thirty (30) days to duty in the position from which furloughed is intended.

c. A competing employee may not be separated under this part while an employee with lower retention standing in the same competitive level is on furlough.

d. When an employee is recalled to duty in the competitive level from which furloughed, he or she shall be recalled in the order of retention standing, beginning with the employee with the highest retention standing;

3.3    EMPLOYEE COVERAGE

b. Employees not covered .....Nor does this Memorandum cover persons in positions required by District or Federal regulations to be present in order to be in compliance with program guidelines or persons in positions responsible for providing educational, health or life saving services. For example, Teachers, Teacher Aides, Drivers, EASE Workers, Day Care Center Custodians or Cooks; and

Part 4. SCOPE OF COMPETITION

4.2. COMPETITIVE AREA

The major organizational components listed below comprise the UPO competitive areas:

Office of the President, Board of Trustees
Executive Office
Office of Administration & Management
Office of General Counsel
Office of Field Services Operations
Office of Preschool and Day Care
Office of Program Development.
Special Operations Unit/Transportation

CONFIDENTIAL
MAK 0029

# UPO ADMINISTRATIVE
# memorandum

| | | |
|---|---|---|
| **to:** | ALL UPO EMPLOYEES | No. E-125 |
| **from:** | *Benjamin Jennings* | |
| | Benjamin Jennings, Executive Director | |
| **subject:** | AMENDMENT Of UPO'S POLICY AND PROCEDURES GOVERNING REDUCTION-IN-FORCE | |
| **RE:** | UPO Administrative Memoranda Nos. E-107, 119, 124 | |

DATE of
ISSUANCE:        August 2, 1990

Effective immediately, UPO's policy and procedures governing Reduction-In-Force, pursuant to UPO Administrative Memorandum No. E-107, dated July 22, 1985, UPO Administrative Memorandum No. E 119, dated November 8, 1989, and UPO Administrative Memorandum No. E-124, dated July 11, 1990 are hereby amended by the additions and/or revisions of the following paragraph as set forth below:

PART 1. GENERAL

Part 3.  USE OF REDUCTION IN FORCE AND FURLOUGH

3.3    EMPLOYEE COVERAGE

b. Employees not covered .....Nor does this Memorandum cover persons in positions required by District or Federal regulations to be present in order to be in compliance with program guidelines or persons in positions responsible for providing educational, health or life saving services. For example, Teachers, Teacher Aides, Drivers, Dispatchers, Switchboard Operators, Food Service Handlers, EASE Workers, Day Care Center Custodians, Cooks, Food Service Aides, or Office on Aging Workers.

CONFIDENTIAL
MAK 0030

# GROUP HEALTH CONTINUATION COVERAGE UNDER COBRA

On April 7, 1986, a federal law was enacted (Public Law 99272, Title X) requiring that most employers sponsoring group health plans offer employees and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform you, in a summary fashion, of your rights and obligations under the continuation coverage provisions of the law. Both you and your spouse, should take the time to read this notice carefully. If you are an employee covered by the Washington Council of Agencies (WCA) Group Health Plan, you have a right to choose this continuation coverage if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).

If you are the spouse of an employee covered by the WCA's Group Health Plan, you have the right to choose continuation coverage for yourself if you lose group health covered under the WCA's Group Health Plan for any of the following four reasons:

1)  The death of your spouse;
2)  A termination of your spouse's employment (for reasons other than gross misconduct) or reduction in your spouse's hours of employment;
3)  Divorce or legal separation from your spouse; or
4)  Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by WCA's Group health Plan, he or she has the right to continuation coverage if group health coverage under WCA's Group Health Plan is lost for any of the following reasons:

1)  The death of the employee;
2)  A termination of the employee's employment (for reasons other than gross misconduct) or reduction in the employee's hours of employment;
3)  The employee's divorce or legal separation;
4)  The employee becomes entitled to Medicare; or
5)  The dependent child ceases to be a "dependent child" under the WCA's Group Health Plan.

Under the law, the employee or a family member has the responsibility to inform the Plan Administrator of a divorce, legal separation, or a child losing dependent status under WCA's Group Health Plan within 60 days of the date of the event. Your employer has the responsibility to notify the Plan Administrator of the employee's death, termination, reduction in hours of employment or Medicare entitlement.

Similar rights may apply to certain retirees, spouses, and dependent children if your employer commences a bankruptcy proceeding and these individuals lose coverage.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law you have at least 60 days from the date you would lose coverage because of one of the events described above to inform the Plan Administrator that you want continuation of coverage.

If you do not choose continuation of coverage on a timely basis, your group health insurance coverage will end. Not choosing continuation of coverage may cause a break in your continued coverage and, any such break of more than sixty-three days, may cause loss of coverage portability.

CONFIDENTIAL
MAK 0031

If you choose continuation coverage, WCA is required to give you coverage which, as of the time coverage is being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. The law requires that you be afforded the opportunity to maintain continuation coverage for 36 months unless you lost group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months. This 18 months may be extended for affected individuals to 36 months from termination of employment if other events (such as death, divorce, legal separation, or Medicare entitlement) occur during that 18 month period. Also, if you or your spouse gives birth to or adopts a child while on continuation coverage, you will be allowed to change your coverage status to include the child.

In no event will continuation coverage last beyond 36 months from the date of the event that originally made a qualified beneficiary eligible to elect coverage. The 18 months may be extended to 29 months if an individual is determined by the Social Security Administration to be disabled (for Social Security disability purposes) as of the termination or reduction in hours of employment, or within sixty days thereafter. To benefit from this extension, a qualified beneficiary must notify the Plan Administrator of that determination within 60 days and before the end of the original 18 month period. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled.

However, the law also provides that continuation coverage may be cut short for any of the following five reasons:

1) Your employer no longer provides group health coverage to any of its employees;
2) The premium for continuation coverage is not paid on time;
3) The qualified beneficiary becomes covered under another group health plan after electing to participate in a continuation coverage plan;
4) The qualified beneficiary becomes entitled to Medicare after electing to participate in a continuation coverage plan;.
5) The qualified beneficiary extends coverage for up to 29 months due to disability and there has been a final determination that the individual is no longer disabled.

You do not have to show that you are insurable to choose continuation coverage. However, continuation coverage under COBRA is provided subject to your eligibility for coverage; the Group Health Plan Administrator reserves the right to terminate your COBRA coverage retroactively if you are determined to be ineligible.

Under the law, you may have to pay all or part of the premium for your continuation coverage. There is a grace period of at least 30 days for payment of the regularly scheduled premium. (At the end of the 18 month, 29 month or 36 months continuation coverage period, qualified beneficiaries may be allowed to enroll in an individual conversion health plan provided under WCA's Group Health Plan).

If you have any questions about COBRA, please contact Helen Watkins at Benefits Plus, Inc., the COBRA Plan Administrator for the Washington Council of Agencies Health Plan. The telephone number is: 301-840-6624.

CONFIDENTIAL
MAK 0032

# UPO ADMINISTRATIVE
# memorandum

**to:**  ALL UPO EMPLOYEES                                    No. E-107

**from:**  *[signature]*
Ernest Pete Ward, Executive Director

**subject:**  Reduction In Force

Date of
Issuance:   July 22, 1985

Effective immediately, this Administrative Memorandum
supersedes UPO Administrative Memorandum No. E-81, dated November 19, 1976,
and repeals all other UPO policies and procedures inconsistent herewith.

## CONTENTS

PART 1.    GENERAL

1.1.    Purpose of Administrative Memorandum
1.2.    Causes of Reduction In Force
1.3.    Definitions

PART 2.    MANAGEMENT ASPECTS OF REDUCTION IN FORCE

2.1.    Management Obligations Beyond Requirements
2.2.    Guides for Keeping Demotions and Displacements to a Minimum
2.3.    Improper Use of Reduction In Force
2.4.    Keeping Employees Informed
2.5.    Outplacement Programs

PART 3.    USE OF REDUCTION IN FORCE

3.1.    Administrative Use of Reduction In Force
3.2.    Employee Coverage
        a.   Employees Covered
        b.   Employees Not Covered

PART 4.    SCOPE OF COMPETITION

4.1.    Determining Factors
4.2.    Competitive Area
4.3.    Competitive Level
4.4.    Competing Employees
4.5.    Retention Register
4.6.    Retention Standing

BECKHAM
EXHIBIT 7

CONTENTS CONTINUED

2

PART 5.   NOTICE TO EMPLOYEES

    5.1.   General
    5.2.   General and Specific Notice
    5.3.   Information in General Notice
    5.4.   Information in Specific Notice

PART 6.   APPEALS AND CORRECTIVE ACTION

    6.1.   Procedure for Appeal
    6.2.   Contents of Appeal
    6.3.   What May be Appealed
    6.4.   Decision by Office Director
    6.5.   Appeal to the Executive Director
    6.6.   Corrective Action

PART 7.   COMPUTATION OF TIME PERIODS

3

# PART 1.   GENERAL

## 1.1.   PURPOSE OF ADMINISTRATIVE MEMORANDUM

The instructions in this Memorandum shall govern all reduction in force actions affecting UPO employees.

## 1.2.   CAUSES OF REDUCTION IN FORCE

A reduction in force may be necessary due to circumstances existing inside or outside the Agency.  The following are some conditions which may warrant a reduction in force:

- Significant reduction in funds or a cut off of funds entirely

- Deobligation of existing funds

- Excessive delay in awarding funds

- Program changes

- Workload changes

- Reorganization

The determination of whether any of these conditions or other factors occuring singly or in combination will necessitate a reduction in force, which and how many jobs are abolished, and when the reduction is made shall be in the sole discretion of the Executive Director.  UPO shall therefore have a reduction in force when such has been determined by the Executive Director and an employee is released from his competitive level by separation, demotion, furlough for more than 30 days, or reassignment requiring displacement by any of the actions or for any of the reasons mentioned in this paragraph.  The Executive Director may delegate to the Directors of the Offices of UPO any of his functions, powers and duties under this Memorandum, as he may deem appropriate.

## 1.3.   DEFINITIONS.  As used in this Memorandum--

Agency:  means the United Planning Organization.

DAYS:  means work days.

Creditable Service:  means period(s) of employment with the United Planning Organization, excluding (1) any period(s) of temporary employment and/or (2) service subtracted due to less than satisfactory employee performance evaluations or disciplinary actions, which would result or have resulted in the denial of an In-Step Increase.

4.

**Funding Source:** means indirect cost, grant or contract received from a Federal or D.C. Government Agency or Private Foundation, which provides funding for a UPO staff position.

**Functions:** means all or a clearly identifiable segment of an Office's mission.

**Office:** means one of the five major organizational elements of UPO.

**Performance:** means the performance of an employee as documented under the UPO In-Step Increase and Employee Performance Evaluation Programs as set forth under UPO Administrative Memoranda Numbers E-98 and E-103.

**Disciplinary Actions:** means suspensions and/or Probations as referenced under UPO Administrative Memoranda Numbers E-49, E-98, and E-103.

**Permanent Employee:** includes all employees serving under an appointment without a predetermined terminal point of employment.

**Temporary Employee:** includes all employees serving under an appointment with a predetermined terminal point of employment.

**Term Employee:** includes all employees serving under a six month term appointment, who may be offered a permanent appointment with UPO upon satisfactorily completing the term appointment.

**Reorganization:** means the planned elimination, addition or redistribution of functions or duties in a Office or Division.

PART 2.  MANAGEMENT ASPECTS OF REDUCTION IN FORCE

2.1.  MANAGEMENT OBLIGATIONS BEYOND REQUIREMENTS.

Because this is a highly sensitive area of employee-management relations several important considerations should be taken into account where a reduction in force is concerned.  Once the need for a reduction in force has been announced all management personnel involved in the planning and implementation of the reduction in force shall give the matter their utmost attention.  While the instructions and procedures set forth in this Memorandum are to be adhered to, management should nonetheless carryout its responsibilities with a true appreciation and concern for the problems and interest of those employees facing a possible reduction in force.

2.2.  GUIDES FOR KEEPING DEMOTIONS AND DISPLACEMENTS TO A MINIMUM

Maximum effort is to be made to keep the number of reduction in force demotions and displacements to a minimum.  Some solutions which may be utilized for this purpose are:

5

- placing employees who desire it on leave with pay or with-
  out pay until conditions giving rise to the reduction
  in force have abated;

- making maximum use of the permissable waiver of qualifications
  in job descriptions;.

- freezing vacancies;

- training employees facing possible reduction who have
  potential for reassignment;

- accepting voluntary retirements;

- maintaining strict control over leave, to keep a minimum
  work force;

- using extensive overtime rather than hiring additional people;
  and

- shifting personnel from one Office or Division to another.

Employees for whom no positions are located should be counselled on any
benefits that may be available to them as an unemployed person.

### 2.3.   IMPROPER USE OF REDUCTION IN FORCE

The need for a reduction in force does not suspend management's
authority and responsibility to terminate, demote, reassign or take
any other appropriate administrative action against an employee.
Management must in every case, however, make certain that the action
is appropriate to the circumstances of the individual case and that
the proper Administrative Memorandum is followed.  It would not be
appropriate to accomplish a reduction in force by actual or implied
threats or transfers or of forced resignations or the like.  It also
would not be appropriate to use a reduction in force to eliminate in-
adequate employees.

### 2.4.   KEEPING EMPLOYEES INFORMED

Management shall take care to keep all affected employees informed
about the entire reduction in force process to the extent of providing
them with the information they need to understand clearly what is going
on and why they were affected.

### 2.5.   OUTPLACEMENT PROGRAMS

To help relieve the economic insecurity of an affected employee,
management should utilize the full extent of UPO's resources to develop
and establish outplacement programs to locate jobs for those persons who
cannot be placed within the Agency.  This program should not be limited
to those employees not yet released but should also include released em-
ployees as well.

6

## PART 3.   USE OF REDUCTION IN FORCE

### 3.1.   ADMINISTRATIVE USE OF REDUCTION IN FORCE

The term "administrative use" refers to those personnel actions UPO may take at its own discretion that are consistent with the provisions of this Memorandum but go beyond it.  For example, a reduction in force will not require UPO to fill a vacant position although UPO may, at its discretion, offer a vacant position to an employee affected by a reduction in force action.  In other words, an employee does not have a right to be assigned to any vacant position existing at the time of his release from his competitive level due to a reduction in force.  If, however, the affected employee is placed in the vacant position, the placement may be accomplished as a reduction in force action.  If it is accomplished as a reduction in force action, it must comply with the procedures established in this Memorandum.

### 3.2.   EMPLOYEE COVERAGE

a.  Employees covered.  Except as in paragraph b. below, this Memorandum covers all employees, who have received a permanent appointment.

b.  Employees not covered.  This Memorandum does not cover the General Counsel, Office Directors or Division Heads inasmuch as the persons in these positions serve at the pleasure of the Executive Director and have no tenure rights.

## PART 4.   SCOPE OF COMPETITION

### 4.1.   DETERMINING FACTORS

The scope of competition in any reduction in force depends on several factors which, taken together, determine which employees compete for retention and under what circumstances.  The two principal factors explained in these subparts are "competitive area" and "competitive level."

### 4.2.   COMPETITIVE AREA

The major organizational components listed below comprise the UPO competitive areas:

- Executive Office

- Office of Administration and Management

- Office of Field Services Operations

- Office of Program Development

- Office of Manpower Programs

Employees whose work station is in one Office but whose funding source is the responsibility of one or more Offices are in the competitive area of the work Office.

### 4.3. COMPETITIVE LEVEL

A "competitive level" consists of the grouping of positions by funding source, which are so similar in all important aspects that an employee can move from one position to another within that funding source without significant training and without undue interruption of the work program. In no case shall "undue interruption" mean mere inconvenience. All positions in the same competitive level are characterized by a similarity of duties, functions, responsibilities and pay schedules. Job titles and job descriptions are indicative but not conclusive in determining the composition of competitive levels. The principal guide to determining competitive levels in each Office shall be the job classification groupings as set forth in the Agency's Wage and Salary Program. These job classification groupings establish responsibility levels of positions, but not necessarily a functional relationship. A competitive level may consist of only one job when that job is so nearly unique that it is not interchangeable with similar jobs. Before taking any reduction in force action, each reduction in force plan shall assign every position in the affected competitive area to a competitive level. The retention register at each competitive level must show clearly all positions in the level. If old records of competitive levels have not been kept current, they should be carefully reviewed and updated when a reduction in force is expected.

### 4.4. COMPETING EMPLOYEES

"Competing employees" mean permanent employees listed on the retention register in the order of their retention standing. Competing employees compete for retention within the designated competitive level. Temporary and term employees are not competing employees. Temporary and term employees must be released by appropriate means other than reduction in force before any competing employee in the same competitive level is affected by the reduction in force. This rule shall apply except where such is precluded by the nature and special conditions of the grant/contract under which an employee is employed (e.g., Special grant or contract limited to only temporary employees).

### 4.5. RETENTION REGISTER

The Agency shall establish for each competitive level a retention register utilizing one document before it releases a competing employee from his competitive level. The register documents the competitive levels, the basis for release or retention of any competing employee and such documentation is required in every reduction in force plan even when the employee occupies the only position in the competitive level and competes with no one else. The retention register shall list all competing employees within a competitive level in order of their retention standing to each other as indicated by their length of creditable service. The

8

employee with the highest retention standing based on length of credit-
able service shall be listed at the top of his competitive level. The
retention records should be kept open to those employees who have
received reduction in force notices to an extent sufficient to settle,
as far as possible, all of their questions about retention standings.

### 4.6.  RETENTION STANDING

An employee's retention standing within his competitive level is
determined by his length of creditable service with the United Planning
Organization.  Creditable service shall exclude any period(s) of temporary
employment.  Also, in each case where an employee would be or has been
denied an In-Step Increase due to less than satisfactory employee perfor-
mance evaluations or disciplinary actions, his length of service shall be
reduced by one year for the purpose of establishing his retention standing.
For example, two (2) denials of In-Step Increases shall result in a reduc-
tion of two (2) years of service.  A tie occurs when two or more employees
in the same competitive level have the same length of creditable service.
When one or more, but not all, must be released, the Office Director may
break the tie by using management judgment as to which employee(s) has/have
the best work record.  In each such instance, he must document the basis for
his judgement.  The Agency must establish a single date of issuance of all
specific notices in each reduction in force in each separate competitive
area.  The date must be the same for all competing employees even when
circumstances require the Agency to issue some individual notices after
the uniform date.  When an error is discovered in an employee's retention
standing, the Agency shall be required to correct it and make all reduc-
tion in force actions consistent with the employee's true retention
standing.

## PART 5.  NOTICE TO EMPLOYEES

### 5.1.  GENERAL

The Office Director must give written notice to an employee selected
for release from his competitive level under this Memorandum.  The reduc-
tion in force notice should be an official, personal communication addressed
to the employee and issued by the Office Director.

### 5.2.  GENERAL AND SPECIFIC NOTICES

When it cannot be determined specifically what all the individual
actions at the start of the notice will be, general notices, which must
be supplemented by specific notices may be used.  As soon as the individual
actions have been determined, the general notice, if used, is to be promptly
supplemented by a specific notice.  The agency may cancel an unexpired
general notice, it may renew it for additional periods or, if it is
appropriately supplemented by a specific notice, let it stand for as long
as the maximum notice period.  Every effort should be made to give the
employee at least thirty (30) days advanced notice of an impending reduc-

9

tion in force.  However, in no event may an employee be affected until at
least ten (10) days after he receives a specific notice.  Therefore, if
the specific notice is issued too late for the employee to have ten days
notice, the effective date must be postponed to allow at least the required
ten days.

### 5.3.  INFORMATION IN GENERAL NOTICE

While a general notice will lack some of the information an employee
must have before he is released from his competitive level, it must contain
the following minimum information:

   a.   a statement that the Agency finds a reduction in force
        necessary and that the employee may be separated as a
        result;

   b.   a statement that the general notice will be supplemented
        by a specific notice as soon as the individual actions
        are finally determined;

   c.   a statement that the employee will receive at least ten
        (10) days notice of the specific action to be taken before
        any action takes place;

   d.   a statement that no appeal can be taken until he receives
        a specific notice; and

   e.   expiration date of the general notice.

### 5.4.  INFORMATION IN SPECIFIC NOTICE

The information that must be given in a specific reduction in force
notice is as follows:

   a.   the action to be taken and the effective date of the
        action;

   b.   the competitive areas described organizationally;

   c.   the employee's competitive level such that the retention
        register for the competitive level can be readily identi-
        fied by the employee;

   d.   length of creditable service and the reason(s) for any
        adjustments;

   e.   where and when the employee may inspect the retention
        register and other records pertinent to his case; and

f.  appeal rights, i.e., how and where to appeal the release
action, the time limits for appeal; the notice should
emphasize the need for the employee to give specific
reasons for appealing the release action.

PART 6.   APPEALS AND CORRECTIVE ACTION

6.1.  PROCEDURE FOR APPEAL

An employee who has received a specific notice (not a general notice)
of reduction in force and who believes his Office has incorrectly applied
the provisions of this Memorandum may request reconsideration of the action
affecting him from the Office Director taking the action.  The request must
be in writing and filed within five (5) work days following the issuance of
the notice.  The employee must state explicitly why he believes the release
action to be improper.  The filing of a request by an employee will not serve
to delay the effective date of the action affecting him.  For purposes of
this section, the notice shall be deemed sufficient if the notice has been
sent to the employee's last known address, as reflected in UPO's Personnel
Division files, by certified return receipt mail, in the event he cannot be
served at his normal work station at UPO.

6.2.   CONTENTS OF APPEAL

The request for reconsideration must contain the following information:

a.  the employee's full name, home address, home telephone
number and signature;

b.  the employee's official job title and grade;

c.  the nature and date of the action;

d.  the date of the notice (or enclose a copy of the notice);
and

e.  the employee's specific reason(s) for believing the action
is improper (see Subpart 6.3. below).

6.3.  WHAT MAY BE APPEALED

Appeals may be based on grounds such as the following:

a.  retention of a competing employee in the competitive level
with a lower listing on the retention register;

b.  insufficient notice;

c.  denial of right to examine the UPO Reduction In Force
Policy or to inspect the retention register and related
records;

d. error in establishing length of creditable service;

e. inadequate reasons, or failure to give reasons, for exceptions to the provisions contained in the Agency's memorandum on reduction in force; and/or

f. Agency's failure to comply with its own administrative memorandum on reduction in force.

6.4. DECISION BY OFFICE DIRECTOR

The Office Director shall promptly issue a written decision sustaining the specific notice or indicating the corrective action required. If the reconsideration is denied, the employee may appeal to the Executive Director for an additional review.

6.5. APPEAL TO THE EXECUTIVE DIRECTOR

The appeal to the Executive Director must be in writing and shall set forth the employee's reasons why the Office Director's action should not be carried out with such offers of proof and pertinent documents as he is able to submit.

a. Time Limit

If an employee decides to appeal, the appeal must be submitted within five (5) days after issuance of the decision by the Office Director. The effective date of the release action shall not be tolled or held in abeyance for the purpose of completing the appeal process.

b. Appeal File

When an employee files an appeal under these procedures, the Executive Director shall establish an Employee Appeal File separate from the official Personnel File. The file will contain all documents pertinent to the appeal, such as copies of the reduction in force notice releasing the employee, the employee's appeal notice, all testimony and documentation developed during the appeal process, and the decision of the Office Director. Upon completion of the appeal process, the file should be forwarded to the General Counsel's Office for filing.

c. Action by Executive Director

(1) Upon receipt of an appeal, the Executive Director shall immediately forward a copy of the appeal to the General Counsel with a directive that the General Counsel promptly furnish an opinion to him regarding the legal sufficiency of the release action taken.

12

against the employee

(2) Upon receipt of the General Counsel's opinion, the Executive Director shall promptly issue a final decision with a specific statement of the basis of his determination and shall communicate in writing said decision to the employee. Copies shall also be sent to the employee's Office Director, Director, Office of Administrative and Management, Head, Personnel Division and the General Counsel. A decision made under this subpart shall legally exhaust the employee's administrative remedies.

d. Extension of Time Limits

Any person having authority to review an employee's appeal under this part may extend the appeal time limit when the employee shows on clear justification that circumstances beyond his control prevented him from appealing within the time limit. An extension of any appeal time will therefore be based on the circumstances of an individual case.

6.6. CORRECTIVE ACTION

When an Office restores an employee to duty, as a result of the Office Director's decision on reconsideration or pursuant to the Executive Director's decision on appeal because the action was unjustified or unwarranted, the restoration is effective retroactively to the date of the improper action. Adjustment of pay and fringe benefits is required. The restoration gives to the employee all the rights to which he could otherwise been entitled on the same basis as if the improper action had never been accomplished. When corrective action is required by the Executive Director, the Office Director must report promptly to whomever requested the action that the action has been taken.

PART 7. COMPUTATION OF TIME PERIODS

In computing any period of time stated or allowed by this Memorandum (or any extension of such times), the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is Saturday, Sunday or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday or legal holiday.

# MEMORANDUM

**to:**   ALL UPO EMPLOYEES          No. E-119

**from:**   _Benjamin Jennings_
Benjamin Jennings, Executive Director

**subject:**   AMENDMENT OF UPO'S POLICY AND PROCEDURES GOVERNING
REDUCTION-IN-FORCE

**RE:**   UPO Administrative Memorandum No. E-107

**DATE of
ISSUANCE:**   November 8, 1989

---

Effective immediately, UPO's policy and procedures governing Reduction-In-Force, pursuant to UPO Administrative Memorandum No. E-107, dated July 22, 1985, are hereby amended by the revisions of the following paragraphs and/or definition as set forth below:

Part I. GENERAL

1.2. Causes of Reduction-In-Force

...The Executive Director may delegate to the Directors of the Offices of UPO and the Executive Assistant any of his functions, powers and duties under this Memorandum, as he may deem appropriate.

Part 1. GENERAL

1.3. DEFINITIONS. As used in this Memorandum--

Office: means one of the four major organizational elements of UPO.

Part 4. SCOPE OF COMPETITION

4.2. COMPETITIVE AREA

The major organizational components listed below comprise the UPO competitive areas:

Executive Office
Office of Administrative and Management
Office of Field Services Operations
Office of Program Development

# UPO ADMINISTRATIVE
# memoranDum

| | | |
|---|---|---|
| **to:** | ALL UPO EMPLOYEES | No. E-124 |
| **from:** | Benjamin Jennings, Executive Director | |
| **subject:** | AMENDMENT Of UPO'S POLICY AND PROCEDURES GOVERNING REDUCTION-IN-FORCE | |
| **RE:** | UPO Administrative Memoranda No. E-107 and No. E-119 | |
| **DATE of ISSUANCE:** | July 11, 1990 | |

Effective immediately, UPO's policy and procedures governing Reduction-In-Force, pursuant to UPO Administrative Memorandum No. E-107, dated July 22, 1985, and UPO Administrative Memorandum No. E 119, dated November 8, 1989, are hereby amended by the additions and/or revisions of the following paragraphs and/or definitions as set forth below:

PART 1. GENERAL

1.3. DEFINITIONS. As used in this Memorandum--

Furlough: means the temporary involuntary placement of an employee in a non-duty, non-pay status for reasons requiring reduction-in-force procedures as set forth in 1.2.

Office: means one of the seven major organizational elements of UPO.

PART 2. MANAGEMENT ASPECTS OF REDUCTION IN FORCE

2.2 GUIDES FOR KEEPING DEMOTIONS AND DISPLACEMENTS TO A MINIMUM

. releasing a competing employee from his or her competitive level by furlough in accordance with Part 3., Part 4., Part 5., Part 6., and Part 7., herein;

Part 3. USE OF REDUCTION IN FORCE AND FURLOUGH

3.2. ADMINISTRATIVE USE OF FURLOUGH

a. A competing employee may not be furloughed for more than thirty (30) days.

2

b.   A competing employee may be furloughed only when recall of the employee within thirty (30) days to duty in the position from which furloughed is intended.

c.   A competing employee may not be separated under this part while an employee with lower retention standing in the same competitive level is on furlough.

d.   When an employee is recalled to duty in the competitive level from which furloughed, he or she shall be recalled in the order of retention standing, beginning with the employee with the highest retention standing;

3.3    EMPLOYEE COVERAGE

b. Employees not covered .....Nor does this Memorandum cover persons in positions required by District or Federal regulations to be present in order to be in compliance with program guidelines or persons in positions responsible for providing educational, health or life saving services. For example, Teachers, Teacher Aides, Drivers, EASE Workers, Day Care Center Custodians or Cooks; and

Part 4. SCOPE OF COMPETITION

4.2. COMPETITIVE AREA

The major organizational components listed below comprise the UPO competitive areas:

Office of the President, Board of Trustees
Executive Office
Office of Administration & Management
Office of General Counsel
Office of Field Services Operations
Office of Preschool and Day Care
Office of Program Development.
Special Operations Unit/Transportation

# UPO ADMINISTRATIVE
# memorandum

| | |
|---|---|
| **to:** | ALL UPO EMPLOYEES                           No. E-125 |
| **from:** | Benjamin Jennings, Executive Director |
| **subject:** | AMENDMENT Of UPO'S POLICY AND PROCEDURES GOVERNING REDUCTION-IN-FORCE |
| **RE:** | UPO Administrative Memoranda Nos. E-107, 119, 124 |

DATE of
ISSUANCE:     August 2, 1990

      Effective immediately, UPO's policy and procedures governing Reduction-In-Force, pursuant to UPO Administrative Memorandum No. E-107, dated July 22, 1985, UPO Administrative Memorandum No. E 119, dated November 8, 1989, and UPO Administrative Memorandum No. E-124, dated July 11, 1990 are hereby amended by the additions and/or revisions of the following paragraph as set forth below:

## PART 1. GENERAL

## Part 3.   USE OF REDUCTION IN FORCE AND FURLOUGH

### 3.3     EMPLOYEE COVERAGE

      b. Employees not covered .....Nor does this Memorandum cover persons in positions required by District or Federal regulations to be present in order to be in compliance with program guidelines or persons in positions responsible for providing educational, health or life saving services. For example, Teachers, Teacher Aides, Drivers, Dispatchers, Switchboard Operators, Food Service Handlers, EASE Workers, Day Care Center Custodians, Cooks, Food Service Aides, or Office on Aging Workers.