# EXHIBIT 11

Page 1

1            UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

3    - - - - - - - - - - - - - - - - - x
                                       :
4    MOHAMMED AMIN KAKEH,              :
                                       :
5                        Plaintiff,    :
                                       :
6      - vs -                          :   Civil Action
                                       :   1:05-CV-1271
7    UNITED PLANNING ORGANIZATION, INC. :
                                       :
8                        Defendant.    :
                                       :
9    - - - - - - - - - - - - - - - - - x

10

11                            Washington, D.C.

12                            September 20, 2006

13   Videotaped Deposition of:

14              MOHAMMED AMIN KAKEH

15   the plaintiff, was called for oral examination by

16   counsel for the Defendant, in the offices of Ford &

17   Harrison, 1300 19th Street, Suite 700, Washington,

18   D.C. 20036, commencing at approximately 10:15 a.m., on

19   Wednesday, September 20, 2006, before Deborah L.

20   Spear, a Notary Public in and for the District of

21   Columbia, when were present on behalf of the

22   respective parties:

Page 60

1    around.  It's not what I can -- I wasn't there to ask

2    them I mean what should I do, what I cannot do.  It's

3    not -- it's -- it wasn't the ability to be able to be

4    in that position, or for them to be convinced that I

5    mean this person can run the operation for so many

6    millions and big organization.

7         Q    What is the budget or what was the budget at

8    that time for UPO?

9         A    I believe at that time it was about 22, 23,

10   and when I left it was about 37, 38 million dollars I

11   believe, something like this.

12        Q    And I'm going to refer to United Planning

13   Organization as UPO.

14        A    Okay.

15        Q    It's just a little easier.

16        A    Uh-huh.  Yes.

17        Q    Did UPO at the time you were hired have a

18   Chief Financial Officer?

19        A    No.

20        Q    Who was your supervisor when you were hired?

21        A    Well, on the papers it was the Deputy

22   Executive Director.  In reality it was the Executive

Page 62

1        Q      And when you started working for UPO what

2    were your job responsibilities as the Controller?

3        A      It was managing the finance -- the

4    Controller's Office for all the financial operations

5    and accounting transactions, reporting, the annual

6    audit, training the staff, implementing the new

7    software system, new computers accounting system,

8    supervising the Office of Billing and Revenue, the

9    accounts receivables, the accounts payable, the

10   payroll, the Budget Office, the Senior Accountant in

11   the Accounting Department, and the Financial Operation

12   Managers, and also in a way the external auditor, even

13   though I mean he reported to -- but he was in my

14   office also working with us.

15       Q      But who did he report to?

16       A      Ben Jennings directly.

17       Q      How many employees did you supervise when

18   you started working there?

19       A      Fourteen I believe.  Fourteen in the

20   Controller's Office.  There was another office under

21   my -- under my title, under the title, Institutional

22   Services.

Page 69

1    slipped my mind her name now.  Alice.  Alice.  Alice,

2    she was the Financial Operation Manager or Director.

3    I can't remember exactly the title.

4        Q    And when you terminated employment from UPO

5    were these individuals still performing these roles?

6        A    No, still two more people, still Sharon

7    Smith, who was my secretary, and -- and God bless her

8    soul, Christine Lattimore.  All of -- no, except Alice

9    left before me.  When I was there, all of them they

10   were there.

11       Q    Except for Alice who left?

12       A    Alice left, yes, and I believe most of them

13   are still there to this day.

14       Q    During your tenure at UPO did your job

15   responsibilities change?

16       A    Not really.

17       Q    Did you continue to have on paper Gladys

18   Mack as your supervisor and report to Ben Jennings?

19       A    Well, I guess one year before I left I

20   believe they abruptly appointed the consultant who was

21   working for me, Ms. Sheila Shears, as a Chief

22   Financial Officer, and I was supposed to report to

Deposition of M. AMIN KAKEH - 09/20/06
Kakeh vs. UPO

Page 124

1    this extra money as a indirect cost into -- as a

2    direct cost into the CSBG.

3         Q    Do you know a gentleman by the name of Tunde

4    Eboda?

5         A    Very good.

6         Q    How do you know Mr. Eboda?

7         A    I know him really closely.  At the end of

8    January 2004, that when started the relationship

9    face-to-face between me and him.  Before I met him

10   twice, one time when I came they introduce me --

11   introduce him to me as the Program Manager for the

12   CSBG.  The second time after two years maybe or after

13   one year, I cannot remember, we had a little chat with

14   other staff, that all what I know about him.  But I

15   know that he is the person -- oh, no, no.  And I

16   attended two conferences for the poor and other things

17   for CSBG, and he was presenting the information about

18   the grant and everything.  But as a know him by name,

19   know me by name, it happened after January 2004.

20        Q    So you didn't have any one-on-one meetings

21   with him prior to January 2004?

22        A    No.  As I said, I mean the only time we

Page 125

1    had -- we had I mean -- it's not one-on-one.  I mean

2    he came to the office as CSBG person or something, and

3    he was shaking hands, I mean introducing him, that

4    what happened, but for me to sit one-on-one with him

5    and discuss business, it was after January.

6        Q    Prior to January 2004 what did you

7    understand was Mr. Eboda's role as the program

8    administrator?

9        A    I did not really know much about it because

10   that was a progmat -- prog -- program --

11   progmatic (sic) things is was between him it was, and

12   Ms. Mack, and Mr. Jennings, and the lady, the other

13   lady in -- the Director of the CSBG program.  I mean

14   he wasn't the financial person, and the financial area

15   was from Simlot going into the Chief Financial Officer

16   in Washington, D.C.  My role in the whole things

17   really is I'm looking at the outcome, the output.

18       Q    So Mr. Simlot communicated with the finance

19   contact person --

20       A    Yeah.

21       Q    -- for CSBG?

22       A    Uh-huh, uh-huh.  And Tunde was communicating

Deposition of M. AMIN KAKEH - 09/20/06
Kakeh vs. UPO

Page 126

1    directly with Ben Jennings, and Gladys Mack, and I

2    believe with the lady who was the director of the

3    program.  And, oh, also, and the lady -- the -- Doris

4    Stashenko, who was the Director of Training and

5    Evaluation, that was -- yeah.  He has a relation --

6    these are the people who he work with them.

7         Q    To your knowledge did Mr. Eboda have

8    meetings at UPO prior to January 2004?

9         A    Meetings, I mean I assume he will have

10   meetings.  I mean as a program director, I mean but

11   really there is nothing visible about his presence.

12   See, the Head Start people, I mean the whole

13   organization get ready for them every two years, and

14   especially me, we have to prepare a lot of things for

15   them.  They are very well known.  They announce they

16   are coming and everything.  But for Tunde and the CSBG

17   program really it was very private and quiet.  I mean

18   there is nothing special about it I mean.  And the

19   first time I met his assistant really it was in 2004

20   after January 2004.  I mean I didn't have much to do

21   with him because he was in the program area, and as I

22   said, I mean Simlot is -- Ben was involved with him

Page 137

1    you were referring to?

2         A    No.   There are two memos before this one.

3    The first one was on October 3rd.

4                        (Deposition Exhibits Number 3-5

5                         were marked for identification.)

6    BY MS. DAVIS:

7         Q    I show you what's been marked as M. Kakeh

8    Exhibit Number 5.  Is this the memo that you were

9    referring to?

10        A    That was the first memo, yes.

11        Q    And in this memo you pointed out to

12   Mr. Jennings that there was a deficit; is that what

13   you just testified to?

14        A    Oh, no, that was, as I said, this is -- I

15   was alerting him in October.

16        Q    What were you alerting him to?

17        A    It says here completely what I said, that

18   what I -- because I wrote this one, make him aware of

19   the facts, alerting him about the situation.  And as a

20   matter of fact, this was a documentation from me, the

21   first documentation to make it in the open that there

22   are a lot of wrong things going on here and I wanted

Page 138

1    answers.  And I mentioned all the facts for that.

2    When he did not respond in writing to me, I wrote the

3    second one.

4         Q    And when did you write the second one?

5         A    I gave him two weeks, on the 20th.  But the

6    second one, I directed it to the person who is

7    supposed to be responsible for the budget, and giving

8    him a copy, and the other -- and to Monica and to

9    Sheila, that this is the second notice, loudly I'm

10   saying there are problems here, and I don't have

11   answers for them.

12        Q    And who was the person responsible for the

13   budget that you directed it to?

14        A    It says there Gladys Mack.

15        Q    And you are referring to M. Kakeh Exhibit

16   Number 2?

17        A    Exactly.

18        Q    Now, direct your attention again to Exhibit

19   Number 5.  In this memo to Mr. Jennings does it advise

20   him that he is not supposed to be using CSBG funds for

21   these purposes?

22        A    No.  What I am saying here -- we didn't come

Deposition of M. AMIN KAKEH - 09/20/06
Kakeh vs. UPO

Page 147

1      Q    Mr. Kakeh, I'm showing you what has been

2  marked M. Kakeh Exhibit Number 6.  Do you recognize

3  this document?

4      A    Now, hold on.  You asked me the question

5  before February do I know about him monitoring, I

6  didn't know.  Now this is February 25, that after I

7  been meeting with him and discussing what are we going

8  to do.  So this is -- I'm want to make that very

9  clear.  Before February I didn't know.  The only time

10  I know about it when they mentioned it in the

11  deposition.

12      Q    And my question was did you know that

13  Mr. Eboda was conducting a monitoring review from

14  February of 2004, are you now changing your testimony

15  to say you didn't know?

16      A    I'm not changing my testimony.  What I am

17  saying, before February I didn't know about it, and I

18  wouldn't know about it because the mail and the CC

19  stop coming to me.  In February 5 I met with Tunde

20  Eboda face to face and we discussed everything, but he

21  never mentioned to me routine.  My impression was all

22  the time that what we are really doing here that he

Deposition of M. AMIN KAKEH - 09/20/06
Kakeh vs. UPO

Page 149

1        A      I know.  I know.  I know.

2        Q      I am asking you about your knowledge of

3    whether or not there was a monitoring review being

4    conducted at UPO by Mr. Eboda?

5             MR. MELEHY:  Okay.

6             MS. DAVIS:  Yes or no.

7             MR. MELEHY:  Let me just object to the form.

8    You just said whether there was.  You didn't say when

9    he knew.

10             MS. DAVIS:  I'm not asking --

11             MR. MELEHY:  Are you intending to ask when

12    he knew?

13             MS. DAVIS:  No.

14             MR. MELEHY:  Okay.

15             MS. DAVIS:  No, I'm not asking -- I'm just

16    asking if he knew that there was a monitoring review

17    in February of 2004 going on at UPO.

18             THE WITNESS:  If I knew before February that

19    he -- there is a monitor review in February?

20    BY MS. DAVIS:

21        Q      No.  I'm asking if in February of 2004 were

22    you aware that there was a monitoring review being

Deborah L. Spear, Court Reporter
301-843-9370/301-641-0556

Page 150

1    conducted at UPO?

2        A     From whom?

3        Q     From anybody.   Did you have this knowledge?

4        A     No.

5        Q     Did you ever learn that there was a

6    monitoring review being conducted in February of 2004

7    at UPO?

8        A     I know what you are referring to the

9    monitoring, and I have to clarify that one.   In

10   February when I was talking to him we never -- he

11   never told me and I never knew about anything called

12   monitoring, okay.   Yet if there is a monitoring, I

13   wouldn't know about it because I don't really have any

14   information to come to me, and I never -- I didn't

15   have any contact with Tunde before February.

16       Q     Did you meet with Mr. Eboda in February of

17   2004?

18       A     In the 5th, Thursday.

19       Q     And where did you meet Mr. Eboda?

20       A     I met with him, that was I believe my second

21   meeting, we met at the Jefferson Memorial.   That day

22   was an election day in Virginia, and we met at ten

Page 224

```
1    floor at that time.  There was no courtesy to sit

2    down, talk about things, make an introduction, have

3    some human communication, prepare the person for this

4    is a bomb, this is a bomb.  Immediately with all this

5    arrogance and inhumane approach he said the Board

6    decided to terminate your employment.

7         Q     My question is did Mr. Jones tell you --

8         A     I said give me the papers.

9         Q     -- tell you why?

10        A     No, I didn't ask him.  I didn't ask him.  I

11   said give me the papers.

12        Q     Did anybody ever tell you why the Board had

13   decided to terminate your position?

14        A     I have the documentation they gave me,

15   that's what I know.

16        Q     After you met with Mr. Jones what did you

17   do?

18        A     That wasn't a meeting really.  That was

19   summoning.  He summoned me, and he gave me the

20   termination, and I left, and he said go collect your

21   things, and I don't need to send the security with

22   you.
```

Deposition of M. AMIN KAKEH - 09/20/06
Kakeh vs. UPO

Page 232

1      Q    Did you go with her to Monica's office?

2      A    No.  When we went upstairs I showed her

3 where is Monica's office, and I continue with Ken and

4 Duncan into the Executive Office.

5      Q    Did you have any discussions with Monica

6 about your termination?

7      A    No.

8      Q    Did she ever tell you that you were

9 terminated because she saw you coming into the

10 building with the FBI and the Assistant Attorney

11 General?

12     A    Told me that because of that one you been

13 terminated?

14     Q    Yeah.

15     A    They didn't say termination.  They said

16 reduction in force.

17     Q    Well, did Monica ever tell you that you were

18 selected for the reduction in force because you

19 brought the FBI into the building?

20     A    She didn't tell me personally.

21     Q    Who did she tell?

22     A    But I mean she was the witness when they

Page 233

1   came inside the building, and immediately she went and

2   she called them.  So that is at that time they went

3   out and they brought them to their office and I went

4   downstairs.

5        Q    Did she ever tell anybody that the reason

6   why you were selected for the Reduction In Force was

7   because you brought the FBI into the building?

8        A    If she tell some other party?

9        Q    Yes.  To your knowledge did she tell anybody

10  else that that's the reason why you were selected for

11  Reduction In Force?

12       A    Well, as I said, that wasn't -- that was the

13  immediate reason.  These things been building for a

14  while, but that was the immediate reason I believe.

15  This is my belief.  I mean it's not the decision been

16  made because I had them inside.  These things been

17  prepared.  Until they saw them in their faces and all

18  these people I guess at that time they made the

19  decision.  But Monica was part of the decision because

20  she has to read about these things, legal things.

21       Q    Earlier we had a discussion about your

22  diaries.

MEMORANDUM

TO:         Benjamin Jennings
            Executive Director

FROM:       M. Amin Kakeh
            Controller

RE:         Harassment and Discrimination

DATE:       October 16, 2003


This memorandum is a follow up to the problems outlined in my memorandum dated 10/3/03. My major concern is the discrimination and harassment I am suffering from Ms. Sheila Shears, CFO. The additional incidents which have occurred are as follows:

➢ On Tuesday, October 14, 2003, at the Managers' Meeting, Ms. Shears asked me about the financial statements. I told her that I had not finished them yet. After the meeting, I went to my office and finished the financial statements. I gave two copies to you. After an hour, Ms. Shears came to my office, uncomfortably close to me behind my desk, and called me a "liar". She said that I told her I had not finished the financial statements and that I had. She asked me why I didn't give them to her first in a threatening tone. She then said we would deal with that later. She then asked me to explain the financial statement to her.

➢ On Wednesday, October 15, 2003, I was in my office meeting with Gene and Henry when Ms. Shears came and asked me about a health insurance payment. I told her that I was investigating the payment. She left my office. A few minutes later she returned to my office with a note for me to call the vendor, make the payment, and report back to her by the end of the day. I read the note and went to Ms. Shear's office. I put the note on her desk and asked her to call and ask you to transfer money for the payment. She followed me back to my office and came uncomfortably close again and in a threatening tone said, "Never come to my office and throw a piece of paper on my desk!" She then went to the door using a very loud voice and said, "You have a problem....You should close the door and say some prayers for yourself." I responded that you should pray, too. She said that she prays every Sunday for God to give her guidance on how to deal with me.

Calling me a liar is verbal abuse. Asking me to pray is an insult to my religion and is harassment. Using a loud voice for all to hear is a public "put-down" and is degrading. Interacting with me in this way is unjustifiable and should stop immediately.


DEPOSITION
EXHIBIT
M. Kakeh #4
9-20-06 DLS
PENGAD-Bayonne, N.J.

00118

Your inaction on this matter is making it worse. I had one incident with Mary in which I did nothing wrong. However, you gave me a final warning with this first incident and warned me that another incident would result in my termination of employment. To date, Ms. Shears has yet to be counseled. Does UPO have a double policy? This is discrimination.

You said at the Managers' Meeting that Gladys, Sheila, you and I were going to meet. This meeting has yet to take place.

On Wednesday, October 15, 2003, at 4:45 p.m. Ms. Gladys Mack called me and said that she wanted to talk to me. I told her I had to pray and then I would see her. She called me again at 5:30 p.m. to ask about our meeting. I asked her the reason for the meeting. Ms. Mack said that it was about the memorandum I gave to you which caught me by surprise. I asked her if a third party, the General Council of UPO, could be present. Ms. Mack then asked me why she should attend. I told her that this is a sensitive subject and I have to protect myself. Ms. Mack said that I am not a union member and that I have no rights. She then said that I was refusing to meet with my employer. I said that I need a third party to be present for this sensitive subject. Ms. Mack then threatened that she would put a letter in my employee file stating that I refused to meet with her. Again, all I was asking for was a third party to be present since Ms. Mack is the executive who instructed all financial information to go to the CFO and not the controller.

This impossible situation of being harassed and discriminated against is causing me mental and physical anguish. This ordeal is an unnecessary distraction causing disruption in the operation of the controller's office. This situation warrants immediate resolution and I am asking for your assistance.

cc:    Monica Scott Beckham, General Counsel
       Robert Richardson, Director, Office of Human Resources

## MEMORANDUM

TO:      Benjamin Jennings
           Executive Director

FROM:    M. Amin Kakeh
           Controller

SUBJECT:  Controller's Office Status Alert

DATE:      October 03, 2003

Since the newly created position of the Chief Financial Officer was established and the sudden appointment of the ex-consultant, Ms. Sheila Shears, you did not ask me how the office is functioning nor had any meeting with me as you did previously for the last six years. All the communications have stopped....for these reasons I felt it is my responsibility to let you know about the current status in the controller's office. The situation is serious and needs immediate attention before it is too late to resolve these issues. I am going to start with the current situation and then I am going to list recommendations which I believe can help to remedy some of these problems.

### FACTS

**ONE:**
ON JUNE 23, 2003, DURING THE MANAGERS' MEETING, MS. GLADYS MACK, THE DEPUTY EXECUTIVE DIRECTOR RESIDED OVER THE MEETING WITH MS. SHEARS AT HER SIDE. MS. MACK TOLD THE MANAGERS "FROM THIS DAY ON ALL YOUR CONTACT AND CORRESPONDENCE MUST BE WITH THE CHIEF FINANCIAL OFFICER AND NOT WITH THE CONTROLLER, DO NOT SEND ANY THING TO THE CONTROLLER, EVERYTHING SHOULD BE SENT TO THE CHIEF FINANCIAL OFFICER." NOW, SOME MANAGERS ARE HAVING DIFFICULTIES EVEN TALKING TO ME BECAUSE OF THIS INSTRUCTION. THIS IS UNHEARD OF IN ANY LEGITIMATE BUSINESS IN THIS COUNTRY.

**TWO:**
BEFORE FILLING THAT POSITION YOU ASSURED ME THAT THE CFO WAS GOING TO HELP ME, UNFORTUNATELY, THAT HELP NEVER MATERIALIZED. IN FACT, I AM OVERWHELMED WITH THE AMOUNT OF WORK I HAVE TO DO, NOW MORE THAN EVER BEFORE. WE WERE SUPPOSED TO BE PARTNERS AND WORK TOGETHER. THIS HAS NOT HAPPENED. AS A MATTER OF FACT, I AM TREATED NOW AS A FINANCIAL SECRETARY TO DO ALL THE WORK.


DEPOSITION
EXHIBIT #5
M. Kakeh 5
9-20-06 DLS

00149

**THREE:**
I WAS NOT INVITED TO ANY FINANCIAL MEETINGS SINCE SHE BECAME THE CFO EARLY THIS YEAR. NOR HAVE I RECEIVED ANY INFORMATION ABOUT THESE MEETINGS. I RECEIVE WORK ORDERS ONLY, NOT THE NECESSARY FINANCIAL INFORMATION TO COMPLETE THE REQUEST.  I HAVE TO HUNT FOR THIS INFORMATION IN ORDER FOR ME TO DO MY WORK. THE IMPACT OF THIS PRACTICE WILL SHOW DURING THE CLOSING OF THIS YEAR AND ITS AUDIT:  AS AN EXAMPLE, THE MEETING OF THE UPO BOARD OF TRUSTEES RETREAT, WHICH ALL THE MANAGERS AND SUB-MANAGERS WERE INVITED DID NOT INCLUDE ME, THE CONTROLLER.  THIS OCCURRED EVEN THOUGH THE SUBJECT OF THE MEETING IS "TO REVIEW AND DISCUSS UPO'S DRAFT STRATEGIC PLAN".

**FOUR:**
MY NAME HAS BEEN TAKEN OFF THE DISTRIBUTION LIST....NOW I RECEIVE ONLY GENERAL INFORMATION THAT ALL GENERAL STAFF OF UPO RECEIVE.  AS A RESULT I HAVE TO GO AND HUNT FOR THE MEMORANDUMS AND THE DOCUMENTS NEEDED FOR MY WORK AS CONTROLLER.

**FIVE:**
I AM LOOKING FOR ESSENTIAL SUPPORTING DOCUMENTS WHICH NO ONE KNOWS WHERE THESE DOCUMENTS ARE.... THIS HAS NEVER HAPPENED TO ME BEFORE.

**SIX:**
THE NEW CFO POSITION HAS TURNED INTO A "SUPERVISOR POSITION" AND MY POSITION HAS TURNED INTO A "CLERICAL POSITION".  I DO NOT KNOW HOW UPO IS GOING TO BENEFIT UNDER THESE CONDITIONS.

**SEVEN:**
I HAVE BEEN STRIPPED OF MY AUTHORITY AS CONTROLLER AND ADDITIONAL TASKS HAVE BEEN ADDED TO MY RESPONSIBILITIES.

**EIGHT:**

I HAVE BEEN TREATED LATELY WITH DISRESPECT, HUMILIATED IN
FRONT OF MY STAFF, AND HAVE BEEN YELLED AT MANY TIMES IN
FRONT OF STAFF AND OTHERS BY MS SHEILA SHEARS, THE CHIEF
FINANCIAL OFFICER. THE INCIDENTS OF THIS UNPROFESSIONAL
BEHAVIOR ARE AS FOLLOWS:

- ON 5/7/03, DURING THE CONTROLLER'S OFFICE STAFF MEETING,
  MS. SHEARS SCREAMED AT ME IN FRONT OF ALL THE STAFF
  BECAUSE I DID NOT RESPOND TO AN EMAIL SHE HAD SENT.
- ON 7/22/03, IN MY OFFICE, NONA, CHRISTINE, AND I WERE WAITING
  TO MEET WITH MS. SHEARS WHO WAS ON THE TELEPHONE. SHE
  CAME TO MY OFFICE AND STARTED YELLING AT ME BECAUSE WE
  WERE LATE FOR THE MEETING.
- ON 7/22/03, IN MS. SHEARS OFFICE, SHE AGAIN SCREAMED AT ME
  IN FRONT OF NONA, ALICE, AND SYLVIA AND HER SCREAMING
  WAS SO LOUD THE ENTIRE STAFF HEARD HER.
- ON 9/11/03, IN MS. SHEARS' OFFICE SHE YELLED AT ME
  REGARDING THE JULY, 2003, FINANCIAL STATEMENT.

**NINE:**

A PAYMENT FOR $7,897.44 WAS SIGNED BY MS. SHEARS TO PAY A
PENALTY TO THE INSURANCE COMPANY IN MY ABSENCE. I HAD TO
ARGUE FIERCELY WITH THE INSURANCE COMPANY TO RECOVER THIS
PAYMENT. SINCE UPO RECEIVES GOVERNMENT FUNDING, WE ARE NOT
AUTHORIZED TO PAY FINES. PAYING THE PENALTY WAS A MISTAKE.

**TEN:**

SINCE MS. MACK INSTRUCTED THAT ALL CORRESPONDENCE BE SENT
TO THE CHIEF FINANCIAL OFFICER AND NOT THE CONTROLLER,
FINANCIAL AND OTHER DOCUMENTS ARE MISSING, UNAVAILABLE, LOST,
OR NO ONE KNOWS ABOUT THEM.

**ELEVEN:**

MS. SHEARS VOLUNTARILY OBLIGATES THE CONTROLLER'S OFFICE TO
NON-REQUESTED TASKS WHICH PUTS TREMENDOUS PRESSURE ON ME
RESULTING IN THE ABANDONMENT OF MAJOR TASKS WE ARE
REQUIRED TO DO. I ASKED MS. SHEARS MANY TIMES TO DISCUSS
THESE MATTTERS WITH ME PRIOR TO MAKING THESE COMMITTMENTS.
SHE HAS YET TO DO SO.

## CLARIFICATIONS OF THE FOLLOWING CONCERNS ARE REQUESTED:

- WHAT IS MY POSITION NOW?
- WHAT ARE MY RESPONSIBILITIES NOW?
- WHAT IS MY JOB DESCRIPTION NOW?
- WHO IS REPORTING TO WHOM?
- WHAT IS THE JOB DESCRIPTION FOR THE CHIEF FINANCIAL OFFICER?
- WHO IS RESPONSIBLE FOR THE LEGALITY OF THE FINANCIAL OPERATIONS IN THIS OFFICE?
- HOW CAN I DO MY JOB SINCE I HAVE BEEN DISCONNECTED FROM ALL THE MAJOR DEPARTMENTS AND MANAGERS?
- HOW CAN I DETERMINE WHAT IS MISSING IF I AM NOT INFORMED ABOUT THE BUSINESS OF THE ORGANIZATION?
- HOW COME STAFF UNDER ME IN MY OFFICE ARE STILL ON THE DISTRIBUTION LISTS AND I HAVE BEEN TAKEN OFF?
- HOW CAN I FUNCTION IF I AM NOT INFORMED OF THE ACTIONS OF THE ORGANIZATION AND THESE ACTIONS NEED TO BE ENTERED INTO THE FINANCIAL SYSTEM AND THE RELATED DOCUMENTS OF THESE ACTIONS NEED TO BE FILED AS SUPPORT DOCUMENTS?
- HOW CAN I ISSUE FINANCIAL STATEMENTS ON A MONTHLY BASIS UNDER THESE IMPOSSIBLE CONDITIONS?
- THIS OFFICE IS FULL OF "CHIEFS" AND THAT MAY HAVE WORKED WHEN WE PRODUCED ONLY ONE FINANCIAL STATEMENT A YEAR. NOW, I CAN'T GUARANTEE THE MONTHLY FINANCIAL STATEMENTS WITHOUT HAVING TWO MORE NEW ACCOUNTANTS TO HELP US TO MEET THE MONTHLY DEADLINES.

# UPO
# HUMAN RESOURCES

<u>UPO Main</u> - <u>What is UPO?</u> - <u>Corporate</u> - <u>Communications</u> - <u>UPO Programs</u> - <u>UPO Network</u> - <u>Special Activities</u>

The United Planning Organization maintains a comprehensive Office of Human Resources, staffed with a highly qualified team of employees who go the "extra mile" for staff members, future employees, and the community at large. The agency offers some of the finest employee benefits in the Washington region. Consider the challenge of working for UPO, the greatest community action agency in the nation. Below is a listing of our current employment opportunities. NOTE: Some positions may be filled. To inquire about a career with UPO, contact the Office of Human Resources (202) 238-4600 or send an e-mail to: <u>upojobs@upo.org</u>

**SENIOR JOB/WORKSITE DEVELOPER $33,500 - $37,148**
BASIC FUNCTION: Promotes employer and community interest in the program. Develops jobs and worksites for program participants. Refers participants to job and worksite openings. Maintains records of employers, supervisors, job openings.
QUALIFICATION CRITERIA: BS or BA in human resources, sociology, business, or related fields, or five years of experience in employment, human services, training for work, or community empowerment. Demonstrate track record in placing persons into entry-level positions. Able to create documents using MS Word, Corel WordPerfect, and/or Power Point. Marketing or sales experience a plus.

**TECHNICAL ASSISTANT $27,500 - $31,500**
BASIC FUNCTIONS: Promotes employer and community interest in the program. Maintain records of employment and job openings. Support the overall work of the TANF Project and assist staff in meeting deadlines and pay points.
QUALIFICATION CRITERIA: B.S. or B.A. in human resources, business, or related fields, or five years experience in employment, human services, training for work, or community empowerment. Able to create documents using MS Word, Corel WordPerfect, and/or PowerPoint.

**DEPUTY CONTROLLER $75,954 - $80,000**
BASIC FUNCTIONS: To manage the day-to-day operations in the Finance Division, and to supervise the Division Staff.
QUALIFICATION CRITERIA: A Bachelor's degree in accounting, 10 years of financial operations in automated accounting environment & 5 years in a upervisory position.

**CHIEF ACCOUNTANT $45,954 - $50,811**
BASIC FUNCTIONS: Responsible for the maintenance of UPO's accounting operations and for ensuring accurate reporting.
QUALIFICATION CRITERIA: A Bachelor's degree in accounting and five years of supervisory experience in Accounting Department.

**DRIVER/part-time position $13.00 per hour**
BASIC FUNCTION: To transport the UPO In-School YO Program's staff and student/Associates to the UPO In-School Laboratory and to special events and scheduled program sites.
QUALIFICATION CRITERIA: Must have a valid District of Columbia Drivers Permit, CDL license, previous driving experience and through knowledge of the Washington, DC area streets and neighborhoods. Evening and weekend availability is required

UPO is an equal opportunity employer

For information on these and other UPO employment opportunities, please call UPO at (202) 238-4600, ext. 618 or 622. You may also send e-mail to the UPO Office of Human Services at: <u>upojobs@upo.org</u>.

UPO is an equal opportunity employer.

<u>UPO Main</u> - <u>What is UPO?</u> - <u>Corporate</u> - <u>Communications</u> - <u>UPO Programs</u> - <u>UPO Network</u> - <u>Special Activities</u>

**UNITED PLANNING ORGANIZATION**
301 Rhode Island Avenue, NW

00153