# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,

       Plaintiff,

   v.

UNITED PLANNING ORGANIZATION,

       Defendant.

CIVIL ACTION NO. 1:05-CV-1271
(GK/JF)

## DECLARATION OF GLADYS MACK

I, Gladys Mack, make the following declaration under penalty of perjury pursuant to 28 U.S.C §1746 and declare that the following is true and correct:

1.    I am over the age of 18, am under no legal disability, and make this declaration based upon my personal knowledge.

2.    I am employed with the United Planning Organization, Inc. ("UPO") as the Chief Operating Officer.  I was the acting Executive Director during the period that UPO's Board of Trustees searched for an Interim Executive Director after Benjamin Jennings was suspended on March 11, 2004 and then terminated as Executive Director.

3.    One of my major areas of responsibilities is overseeing the budget and programs for the Community Services Block Grant ("CSBG") program.  As a service delivery organization for CSBG, UPO must have an independent auditor conduct an audit of its finances annually.  On January 17, 2004, the independent auditor, Thompson Cobb Bazilio & Associates, suspended the audit because the UPO Finance Office was unable to provide all of the necessary information. *See* Exhibit A.  Among the information which was missing were: (1) bank reconciliations, (2)

completed journal entries, (3) supporting documentation for the purchase of a boat, (4) support

for travel advances, and (5) a contract for Watkins Security.

4.     I attended the March 11, 2004 Board of Trustees meeting during which Tunde

Eboda, CSBG Program Manager, and Ricardo Lyles, Administrator, Family Services

Administration, delivered the preliminary findings from the CSBG monitoring review which was

completed on March 10, 2004.  The draft preliminary report to the Board of Trustees identified

issues in the areas of financial management, governance, planning and communications,

personnel and programs.  *See* Exhibit B.

5.     Sheila Shears, then the Chief Financial Officer, with the assistance of Rachel

Locus from F.S. Taylor, an independent accounting firm that had been working with UPO for a

couple of years to address issues arising out of the financial management of the Head Start

program and to complete bank reconciliations, completed the financial reports which our funding

sources, including our bank, required when Mohammed Amin Kakeh would not comply with my

direction.

6.     When UPO decided to outsource the management of the Finance Office in the

Spring of 2004,  I recommended to Dana Jones, then Interim Executive Director, that he send a

request for proposal ("RFP") to Walker & Company, LLP ("Walker").

7.     On May 27, 2004, Walker submitted to UPO its final budget for its proposal to

take over the management of the Finance Office with UPO employees filling all of the positions,

except Chief Financial Officer, Financial Operations Director and Grants Management Director.

*See* Exhibit C (Bates No. MAK 7986).

I declare under the penalty of perjury that the contents of the foregoing Declaration are true and correct.

Executed this 27th day of November, 2006.

_____
Gladys Mack

DC:63291 1

# EXHIBIT A

# THOMPSON, COBB, BAZILIO & ASSOCIATES, PC
*Certified Public Accountants and Management, Systems and Financial Consultants*

■ Main Office:
1101 15th Street, N.W.
Suite 400
Washington, DC 20005
(202) 737-3300
(202) 737-2684  Fax

□ Regional Office:
100 Pearl Street
14th Floor
Hartford, CT 06103
(860) 249-7246
(860) 275-6504  Fax

□ Regional Office:
21250 Hawthorne Boulevard
5th Floor
Torrance, CA 90503
(310) 792-7001
(310) 792-7004  Fax

January 17, 200

Mr. Benjamin Jennings
Executive Director
United Planning Organization
301 Rhode Island Avenue, NW
Washington, DC 20001

Dear Mr. Jennings:

The following is the status of the audit of United Planning Organization and Delegate
Agencies for the year ended September 30, 2003 as of January 17, 2004.

## UPO Financial Statements

We started the audit fieldwork on December 17, 2003 and have received significant
information requested for the audit. To date we have audited the following areas:

Completed our audit planning procedures

Payroll testing- complete

Cash Disbursements -80 % complete

Cash Receipts-90 % complete

Cash- 90% complete

Investments – 90 % complete

Accounts Receivable – 60% complete

Prepaids and Other Assets – 90% complete

Advances to Delegate Agencies – 70% complete

Fixed Assets – 80 % complete

MAK 7924

Mr. Benjamin Jennings
January 17, 200
Page 2


Search for Unrecorded liabilities- 90% complete

Revenue/ Receivable and Deferred Revenue – 50%


**Issues Pending**


Board approval of new bank accounts opened during the year

Operating and payroll accounts were not properly reconciled.

Client need to pass journal entries and provide us with a new trial balance

Explanation for Headstart receivable of $364,141

Explanation for FY 2002 receivables still not collected -UDC $106,939, DCPS $68,777

Supporting documentation for purchase of Boat has not been provided to us (title,
purchase agreement, loan documents, etc.).

Agreement and payment terms for loan issued to DC Prevention Partnership

A reconciliation of occupancy costs from the statement of functional expenses to the
allocation plan prepared by FS Taylor.

Support for travel advances (invoices to support expenses)

CSBG and Headstart budget, grant agreement and/or proposal

Detail and explanation for suspense account

Contract agreements for the following contractors:

       Watkins Security (security services)
       Unlimited Janitorial (Janitorial services)
       Total Management (Management services)
       Coviello and Associated (Consultants for proposal development)


**Single Audit**

Two programs tested this year, Headstart and CSBG. We have completed 80% of the
testing for both programs.


MAK 7925

Mr. Benjamin J. Jennings
January 17, 2006
Page 23

**Issues Pending**

SF 272's and 269's reports do not agree to trial balance expenditures for Headstart (same issue as prior year).

SF 269's have not been filed for CSBG as required per the grant agreement.

**Delegate Agencies**

We started the audit of the following delegates as scheduled

**Bureau of Rehabilitation**
- Completed

**Friendship House Association**

- The following outstanding issues/requests are still pending:

    1. UPO cash reconciliation not provided
    2. Need invoices/backups for four disbursements tested
    3. No information received for compliance test work

**Preventive Child Abuse**

- Fieldwork completed
- Preparing draft financial statements

**Peoples Involvement Corporation**

- Fieldwork completed except for compliance testwork.  Waiting on client to provide information

**Marshall Heights**

- Fieldwork completed except for compliance testing.  Waiting on client to provide information

**DC Public Schools**

- Cash disbursement and compliance testwork to be completed

MAK 7926

Mr. Benjamin Jennings
January 17, 2004
Page 2 4

**Rosemont Center**

- Audit started on 2/13/04

**EUFOLA**

- Audit starts on 2/17/04

**Council of Latin Agencies**

- Audit starts on 2/20/04

**Center City Community Corporation**

- Audit starts on 2/23/04

**Edward Maziq ...Parent Child Center and National and Capital & Family Development**

- Unable to schedule the audit start date

The pending issues need to be resolved as soon as possible in order for us to complete the field work and the draft financial statement and OMB Circular report by February 28, 2004.

If you have any questions please call me at 202-778-3416.

Sincerely,

Dennis D. Represtad

Dennis D. Ramp had, CPA
Principal

MAK 7927

# EXHIBIT B

DC Department of Human Services
Family Services Administration
Community Services Block Grant Program

# Confidential

# Do Not Copy

FY 2004 CSBG On-site Monitoring Review
Draft Preliminary Report
(To be released only by DC CSBG Office)

United Planning Organization
301 Rhode Island Avenue, NW
Washington, D.C. 20001

March 2004

1

EXHIBIT
Eboda #3
2/23/2006

# AGENCY OVERVIEW

United Planning Organization (UPO) is the Community Action Agency for the District of Columbia. UPO is a 41-year old organization and was founded as a result of a number of small community-based organizations binding together to serve low-income families in the District.

The Agency has 364 employees and eight program areas, including CSBG, Head Start and programs for the Elderly, among others. The Agency programs served approximately 50,000 families and individuals during 2003 using $9.5 million in CSBG funds and a combination of other federal and local dollars. The total agency annual budget for FY 2004 is approximately $36 million dollars.

# FINANCIAL MANAGEMENT SYSTEM

We reviewed the financial management system of United Planning Organization, which includes internal control systems within the organization for processing accounting data. We found that there are enough employees within the fiscal department for a proper segregation of duties for processing financial information; however, any internal control system in place can fail if these processes are circumvented, or if management overrides these controls. We have noted the following items that indicate that the financial management system of United Planning Organization does not meet Federal grant standards.

### Bank Reconciliations

We found that bank reconciliations were not completed timely or accurately. The Agency has an employee on staff whose responsibility is to perform this function; however, the Agency hired a former employee on a consulting basis to complete bank reconciliations for a number of months through September 30, 2003. This consultant was contracted to perform bank reconciliations for the Agency for $34.79 per hour not to exceed $6,000. Incomplete bank reconciliations indicate that financial statements generated could not have been verified as being accurate prior to that time. Bank reconciliations since that date have not been properly reconciled to the general ledger. Bank reconciliations should be reconciled timely each month, initialed, and dated by the person performing the bank reconciliation work. In addition, the bank reconciliations should be initialed and dated by a supervisor as evidence of review for accuracy and timely preparation. Staff indicated that there is difficulty in reconciling the bank account timely due to charges appearing on the bank statement that have not been entered into the accounting system through the normal data processing procedures for cash disbursements. Lack of or improper reconciliation of the bank accounts to the general ledger is a material weakness in internal control that can lead to inaccurate and misleading financial information being prepared upon which management and financial decisions are being based.

2

## Cash Disbursements

We found instances where cash disbursement procedures were circumvented by management. Disbursements have cleared bank accounts, some via wire transfers that did not go through the normal accounting approval process that the majority of other program expenses follow. Every disbursement of the Agency should be approved by more than one person, and must be reviewed for budget authority and availability, as well as allowability. The Agency has these systems in place, but they have not been followed for some charges that are appearing on bank statements. We have found a number of questioned costs charged to Federal grants, either directly, or indirectly through the Indirect Cost Pool, that we believe are disallowed under Federal grant regulations. In addition, we have noted a material amount of disbursements clearing the Agency's bank accounts that we have been unable to obtain supporting documentation. We have requested the documentation numerous times and have not been provided such supporting documentation. We are enclosing list of costs we have questioned that appear to be charged to the CSBG Federal grant, summarized as follows:

| | |
|---|---|
| Vehicle Fines | $ 3,463.92 |
| Vehicle Parking Violations | 310.00 |
| Professional Services - Consultants | 22,325.00 |
| Professional Services - Contractors | 7,852.50 |
| Conferences & Seminars - Admin. | 1,340.00 |
| Miscellaneous - Direct Expenses | 4,589.09 |
| Fines | 645.00 |

These costs appear to be for parking fines and for fundraising consultants, or should be charged to another program other than CSBG.

In addition, there is $ 7,576.50 in questioned costs presently charged to the Indirect Cost Pool for various items (see list attached).

We have found a large volume of unsupported disbursements clearing various bank accounts that appear to be paying for credit card balances. We have found transfers out of the bank account, authorized by memo from the Executive Director to the bank, totally $61,380.89. One of these for $13,473 appears to go to T/S Christine Charter Fishing, and the others do not have enough support for us to determine exactly what the expenditures were for. On one of the transactions for $9,392.96, we were provided supporting documentation on the last day we were at the Agency, however, the backup amount of supporting documentation did not agree with the amount of money transferred. These amounts have not been charged out properly in the general ledger to this date. In addition, the Agency's general ledger reflects expenditures for credit card payments on account number 60-01-02-6055-03-060 totaling $211,231.03 for the period January to December 2003. At this point we have not been provided any supporting documentation for these expenditures and it is difficult for the fiscal department to charge these to any programs at this point if the programs are closed and grant funds already spent. We have requested supporting documentation on numerous occasions and this has not been

provided. It appears that Agency funds have been used to pay these bills, and the funds used could be from Federal grant sources if the Agency has insufficient unrestricted funds to cover such disbursements. These expenditures appear to be paid by wire transfers from the banks, many at the direction of the Executive Director, circumventing normal approval for purchase and payment internal controls. The accounting department does not know how to code or charge these disbursements in the general ledger as timely sufficient supporting documentation has not been provided. We believe that no one at the Agency should have the authority to purchase and pay bills before proper supporting documentation has been provided and approved by another responsible person in the disbursement process. We recommend that these bills be paid via the Agency's normal process for paying all other Agency program costs so there is a segregation of duties and proper documentation and approval before a bill is paid. We suggest the Agency establish a policy requiring two persons to authorize wire transfers to reduce the potential risk of unauthorized use of funds. We also suggest that further investigation into these types of transactions be pursued for periods prior to 2003 and after 2003, as these types of transactions may have occurred during time periods that we did not examine and there is a risk that Federal funds may have paid for such items.

## Financial Status of the Agency

Per our review of the Agency's past three years' audited financial statements, it appears that the liquidity of the Agency is declining to the point that cash flow will soon be, if not already, a serious problem for the Agency. We were provided a September 30, 2003, trial balance for the Agency approximately two days after our request. If these numbers are reasonably accurate, then there appears to be a significant decrease during the last fiscal year to the Agency's liquidity. We understand that these numbers have not been audited, but if they end up materially different after audit adjustments are made, then we question the Agency's accounting system and internal controls and its ability to generate reliable financial statements in a timely manner. As stated above, we could not get a September 30, 2003, financial statement upon our arrival as adjustments were still being made; therefore, the timeliness of generating financial data from the present system is questioned. With the bank account not being reconciled since September 30, 2003, it is doubtful that financial statements being produce today are accurate. In addition, the unsupported transfers from bank accounts discussed most likely have not been posted properly yet. We believe that based upon our limited review of the September 30, 2003, financial statements, that there still could be material audit adjustments to those financial statements. However, whatever the adjustments are, it does not alter the fact that the liquidity of the Agency has deteriorated over the past year. The Agency appears to have overspent in its Indirect Cost Pool and spent significant amounts for fixed assets, thus reducing cash balances, which has required additional line of credit borrowings.

## Indirect Cost Pool

The Agency's preliminary un-audited trial balance reflects an over expenditure in the Indirect Cost Pool of $1,280,511 that could not be allocated to grant programs that must be covered by Agency unrestricted funds. It appears that there are not sufficient

4

unrestricted Agency funds to cover such a deficit. If the Agency extends their line of credit balances with the bank, they are also incurring additional interest expense that is not allowed to be charged to Federal grant programs. For the fiscal year ended September 30, 2003, the Agency's records reflect interest expense charged to Fund 60 in the amount of $74,720.73.

**Fixed Assets**

Our review of the preliminary un-audited trial balance and our analysis of fixed assets purchased shows that fixed assets increased by $2,471,586 from September 30, 2002, to September 30, 2003, and was financed by cash from the bond proceeds bank account of $1,271,352, indicating that the Agency has used $1,200,234 of its own cash, either through existing cash on hand or additional line of credit borrowings. This has had an impact on the Agency's cash flow also.

During our review of fixed assets, we noted the apparent purchase of a boat. Upon further inquiry, we found a Purchase Agreement dated January 16, 2003, to purchase a 46' Dead Rise Boat as is for $226,000, for $69,315 down and the assumption of debt through the Bank of America which requires payments of $1,815.42 per month. The Agency's legal counsel stated that she was not aware of such a purchase, nor has the fiscal department recorded the debt obligation on the Agency's trial balance. Attached to the Purchase Agreement is a Due Diligence Agreement stating that UPO is in process of submitting a grant proposal to the federal government to fund such a purchase. This document discusses making a $10,000 refundable deposit until a grant proposal is submitted and a grant award is received, and 'upon receipt of a grant award to purchase My Fine Lady, UPO will negotiate a Purchase Agreement with My Fine Lady LLC, MRL Charter Boat, Inc'. The Purchase Agreement appears to be negotiated before any grant was submitted or awarded, and is further supported by evidence in the Agency's financial records payments totaling $70,761.68 for this purchase, which includes monthly payments being made. In addition, we found no indication in the Board minutes of any discussion of this purchase or grant application. We have also been unable to obtain evidence of title to this asset, even though UPO funds appear to be used. If the Agency no longer has unrestricted funds, then these payments could possibly be made using Federal funds and should be investigated further.

**Construction Projects**

Per our review of construction project files and expenditures to date, we have noted expenditures exceeding original budget projections. The projects consist of the administrative headquarter facilities, the 'Anacostia' project, and the 'Petey Green' project with an original budget totaling $13,448,277. The headquarters facility is completed and our analysis reflects cost overruns totaling $604,990.18 (see UPO Fixed Asset Analysis at the bottom of the page). Our analysis of the Anacostia project reflects

cost overruns of $427,168.57 to date and the project is not completed. There is a retainage due of $106,998.91 that is not included in the above cost overrun amount. The third project on Petey Green is anticipated to be completed in August 2004 and is early in the project, with no overruns at this date.

**Vehicle Leases**

During our review of vehicle lease charges to the CSBG program, either directly to the program, or through the Indirect Cost Pool and allocated back to the CSBG program, we noted several concerns. The fiscal department did not have copies of vehicles leases even though disbursements were being processed for such items. Upon further inquiry, we found one vehicle, a 2003 Mercury Mountaineer, that is on the Agency's insurance policy for which we could not locate any payments being made. We were told that this vehicle was purchased and paid off with Aging grant funds, however, we could not find such evidence, and if it in fact was purchased with grant funds, it needs to be added to the Fixed Asset account. We also noted two vehicles assigned to the Executive Director, one a 1997 Lincoln Town Car and one a 1999 Lincoln Town Car. We requested mileage logs for these vehicles and were not provided with such documentation. We question why two vehicles are necessary and why supporting mileage logs are not required. In addition, there has been no personal use of these vehicles added to W-2's in accordance with IRS rules and regulations; therefore, we question the entire vehicle lease expense charged to Federal grant programs in the amount of $408.67 per month for the 1997 Lincoln Town Car and $452.13 per month for the 1999 Lincoln Town Car.

There is also a 2000 Mercury 4x4 Mountaineer being provided to the UPO board president at a cost of $452.13 per month. Again, we could not locate mileage logs or evidence that personal use was charged to the individual. We are questioning this cost and believe that a review should be made to determine the necessity of such expenditure for the administration of grant programs.

There were a couple of other leased vehicles in the parking lot that did contain mileage manifests, which logged mileage whenever the vehicle was used for a program purpose, but contained no mileage log for any other uses. We believe the whole area of leased vehicles, documentation of use, and necessity should be reviewed by the Agency and a policy developed that conforms to grant guidelines.

**Cell Phones**

We reviewed the Agency's usage and charges for cell phones and have the following concerns. The fiscal department does not know what cell phones are being used and by whom until a bill arrives each month at the fiscal office. The Agency is paying approximately $14,500 per month for cell phone use and our review of some cell phone bills does not indicate any controls over personal use or review for such use of cell phone bills prior to payment. We have noted one cell phone issued to the Board Treasurer and

have included a summary of these charges for the year ended September 30, 2003, that total $13,752.22. We are questioning these costs and further review needs to be made of the usage, reasonableness, and necessity of such a cost.

**Transactions With Related Parties**

In the audit report for the year ended September 30, 2000, footnote 11 discusses an accounts receivable from North Capitol Area Business Association, Inc. (NCABA) in the amount of $108,000, of which $20,000 was repaid. The Executive Director of UPO was a non-paid volunteer member of NCABA and the Treasurer of UPO was a member of NCABA. The remaining balance of $88,000 due to UPO was to be repaid from a pending DHCD grant for $175,000. The detailed general ledger records of UPO indicate that these advance made to NCABA were charged to the CSBG grant at the time. The auditor responded that he thought the CSBG grant expenditures were credited for these advances when the receivable was set up and we asked for documentation or evidence to support this statement. He indicated that he needed to look in his work papers for this evidence, and to this date, has not provided such evidence. It appears that the remaining accounts receivable balance of $88,000 from this related party was written off in a subsequent year with no disclosure in the audit report of the write off. We have been unable to determine for certain if Federal funds have been used to pay for this amount and therefore, question the cost for further review by the grantor.

The Office of Inspector General has been involved with a possible related party transaction involving the company providing security for UPO's facilities. The issue relates to the possibility that the security company is owned by a board member and facilities provided to that security company by UPO. We have summarized costs to this company paid from CSBG funds in the amount of $43,192.95 and we have questioned this cost for further review by the grantor.

**Reporting**

We have reviewed the process and preparation of CSBG reporting and offer the following observations. We reviewed the November 2003 through April 2004 CSBG invoice requests and expense line item detail reports. The Agency was unable to substantiate reports submitted and reconcile them to the Agency's accounting general ledger. Interviews with accounting staff indicated that reports are submitted based upon estimated expenditures and cannot be reconciled to the general ledger. A further review and test of the month January 2004 reflects year to date reported expenses of $3,188,686 compared to year to date general ledger expenses of $1,927,724, for an excess of cash on hand of Federal funds of $1,260,959, which is in violation of Federal regulations.

**Management Oversight**

Because of the deficiencies noted above, we believe that there has not been proper overview of monthly financial data by management on a timely basis. There are a number of disallowed costs charged to CSBG each month that should be caught and

corrected in a proper review process. Disbursements clearing the banks without proper supporting documentation should be noted and resolved timely and not over a year later. Under the present system and procedures being followed, there exists a material weakness in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements in amounts that would be material in relation to the financial statements may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.

**Consultants**

The Agency has utilized a high number and volume of consulting services contracts, some of which could be deemed by the IRS as employer-employee relationships. For the year ended December 31, 2003, the Agency issued Form 1099's in the total amount of $2,853,420.01. We suggest that all consulting contracts be reviewed in light of IRS rules and regulations for employees. Some individuals appear to be devoting full-time to the Agency and utilizing Agency offices and equipment, which could jeopardize a contractual relationship. If a consultant was deemed by the IRS to be an Agency employee, then additional payroll taxes and possibly retirement plan benefits could be due from the Agency. If the applicable grant program year is closed where the consultant was charged, the Agency would be responsible for these additional costs.

We also have a concern about the longevity and the total contracted amounts paid to some consultants and believe a review should be undertaken of the cost/benefit relationship for the product/benefit received. The Agency's document history detail reflects that A. Sue Brown has been paid $580,859.78 to date for development of a Medicaid billing system that has not been implemented yet. We believe the cost of the development of this system should be compared to the future benefits of the system and whether this was the least cost alternative of developing a Medicaid billing system. Another consultant, Lillian Jones, is being paid for managing program compliance of the aging programs and has been paid a total of $188,922.50. She is being paid every two weeks, and based upon the longevity of the arrangement and the full-time nature of her services, she appears to be an Agency employee and not a consultant.

## GOVERNANCE

UPO, Inc is governed by a 30 members Board of Trustees, composed of ten seats in each of the private, public, and low-income sector. As of March 4, 2004, there were 25 members of the Board of Trustees. There were five vacancies as noted below:

| Sector of the Board | Date of the Vacancy |
| --- | --- |
| Public Sector | 2000 |
| Representative of the Poor | 2003 |
| Representative of the Poor | 2001 |
| Representatives of Major Groups and Interest | 2001 |
| Representatives of Major Groups and Interest | 1990 |

8

In addition, one Board member (M. Bailey) has not attended a Board or Executive Committee meeting since January 30, 2003.

Both the Board Chair and Executive Director acknowledged the vacancies, and attribute the delay in replacing the Board members to the process in the Mayor's Office regarding public sector appointments to the Board, and the need to select the individuals representing other sectors that can bring resources to the Agency.

A review of board members appointments indicates that the majority of the Board has served for more than 20 years, while the Bylaws state that members serve for three years and until they are replaced. There is no indication that there are attempts to replace Board members after a three year term, or that a term limit process exists.

The Board has a set of Bylaws that were last amended in January of 1995. The Board has recently adopted a conflict of interest policy, but that policy has not been made an integral part of the Bylaws.

A review of Board and Executive Committee minutes for calendar year 2003, and draft minutes for January 2004 indicate that the Board of Directors received only one Financial Statement during this time period (at the January, 2004 Board meeting).

Although the Audit and Finance Committee generally meets on a monthly basis, we could not find evidence that the Committee routinely reviewed a Financial Statement detailing the overall status of the agency, or reviewed program-by-program financial data. Audit and Finance Committee reports to the Executive Committee did address construction issues, the agency audit, the agency line of credit and other specific finance 'issues,' but did not provide the Executive Committee or the full Board with a comprehensive Financial Statement on a regular and timely basis.

The By-laws establish 11 Standing Committees in addition to the Executive Committee. We could only find evidence that the Nominating, Planning Research and Evaluation, Audit and Finance, and Executive Committees met during the past year.

The Board has received ROMA Training in 2001 and basic board training in 2003, both sponsored by the District CSBG Office.

## Findings and Recommendations

**By-laws Revision -** The By-laws have not been revised since 1995. The By-laws do not address issues such as meeting by conference call, clearly defined term limits for Board members, duties and responsibilities of Standing Committees, and a clear description of the role and responsibilities of the Board of Directors and the Executive Director.

*Recommendation* – The Board should review and update its By-laws. The By-laws need to describe if and how Board members can participate by electronic means,

describe the roles and responsibilities of Standing Committees, and outline the specific responsibilities of the Board and the agency Executive Director. The Board should furthermore establish a process for the regular review and update of the By-laws to ensure that the Board is acting in full compliance with the By-laws, and that the By-laws accurately describe the operation of the Board.

Issues such as lack of attendance at Board meetings, methods of removing Board members, potential term limits for Board members etc., should be addressed in a review of the by-laws.

In addition, the recently adopted conflict of interest policy should be adopted as part of the by-laws as soon as possible.

**Board Vacancies** – One-sixth (5) of the seats on the Board of Directors are currently vacant, with most of these vacancies lasting for three or more years.

   *Recommendation* - The Board should take immediate steps to fill these vacancies as quickly as possible. The Board should also seriously consider establishing a policy to fill vacant Board seats in a reasonable and defined time period (90 days?).

**Financial Reports** – The Board has asked for, and has just begun to receive, financial statements in addition to the routine financial reports provided by the Executive Director.

   *Recommendation* – Financial Statements including: a current balance sheet; a cash flow analysis including use of the agency line of credit; program-specific revenue and expense reports comparing actual to planned expenditures; and an overall agency budget should be provided to the Board on a monthly basis. The Finance and Audit Committee should review such statements on a monthly basis, and provide the full Board with these reports on a timely basis.

**Board Tenure & Membership** – Agency Bylaws state that members serve for a three-year term and until replaced. Many of the board members have served for well over a decade.

   *Recommendation* – As part of its Bylaws revision, the Board should seriously consider the issue of term limits for Board members. Although longevity and stability among Board members can be desirable, the infusion of new members with new ideas and new ways of thinking is also vital to a vibrant and vigilant Board.

**Board Oversight and ROMA** – The Board has received general Board of Directors Training in 2003 and ROMA Training in 2001 through the District CSBG Office. Follow-up to either of these training sessions has not been planned.

   *Recommendation* – The Board needs to become well versed in ROMA in order to exercise skilled oversight of the organization. Further Board training on ROMA, as well

as the development of a Board Orientation and Training Plan, should be a priority for Board action.

## PLANNING AND COMMUNICATIONS

The agency is currently engaged in a strategic planning process that is being conducted by an outside consulting firm. The Board has been an active force behind the strategic plan, which includes strategies and goals for enhancing planning and management systems.

The draft of the strategic plan also includes objectives regarding the Agency's capability to support strategic functions such as policy analysis, resource development, and advocacy.

*Recommendation* – The Agency should continue with its strategic planning process, paying particular attention to the area of Organizational Development. The strategic plan calls for the needed enhancement of agency planning, management, and operational systems. The strategic plan, once finalized and adopted, must be accompanied by an implementation plan, a timeline and action steps. We recommend that the plan serve as a working document -a blueprint for action for the Board and the Agency.

The Strategic plan should be used to focus attention on the integration of agency programs and services, and support the evolution of the agency to one that is fully compliant with ROMA standards and practices.

## PERSONNEL

The Agency has 364 employees. A review of job descriptions of the staff paid from CSBG indicated that a majority of the job descriptions have not been updated in the past five years. Interview with staff indicated that there are a variety of job descriptions for the same general category of staff, i.e. drivers. A review of the files indicated a lack of verification of credentials and performance evaluations consistent with the Agency's policy. There is no wage comparability study or wage range for positions. Staff members who work in certain grant-funded positions get pay increases and those who don't do without.

*Recommendation-* The Agency should review all the job descriptions in the Agency and update to reflect current job duties and responsibilities. In addition, the Agency should complete a wage comparability study and salary schedule to ensure that they are competitive with the job market. Finally that the Agency revise it's practice of hiring consultants for long periods of time and then hiring them without an open recruitment for those positions.

11

# PROGRAMS

The Agency delivers services through: 7 Delegate Agencies; 3 self-administered community centers; self-administered sub-grantees; and a set of special initiative grants to other agencies, including competitive grants to local non-profits.

Each grant recipient (as well as several self-administered programs) is required to submit monthly reports into the Community Action Statistical Assess (CASA) data collection system. This system is designed to gather demographic information on clients served, as well as outcome data regarding the impact of services delivered.

Grantee-specific and agency-wide reports are reviewed on a monthly basis. In addition, monitoring and evaluation staff conducts regular on-site reviews of grantee operations and service delivery. Internal audit staff reviews grantee financial reports on a monthly basis.

Grantees who are not meeting their performance targets must submit a corrective action plan to the agency. Grantees who are not meeting financial targets must request a budget revision for approval by the agency.

## Findings and Recommendations

The CASA system has the capacity to provide up-to-the-minute, comprehensive data regarding service delivery and outcome achievement. However, the CASA system is not used by all agency programs, nor can data from other programs be integrated into the CASA database.

   *Recommendation* -- The agency should continue to update and refine CASA, including exploration of ways to integrate data from other programs (such as Head Start and aging programs) into the CASA system. The District CSBG office should have access to CASA to view records and reports, and for receiving reports.

# EXHIBIT C

**Alison Davis**

| | |
|---|---|
| **From:** | Sonia Smith |
| **Sent:** | Thursday, May 27, 2004 5:10 PM |
| **To:** | Gladys Mack |
| **Subject:** | Financial Sheet |
| **Importance:** | High |

Here is the final.

**MAK 7985**

4/4/2006

# Financial Management Expenses

| Position | Responsibilities | Fee |
|---|---|---|
| **Walker & Company** | | |
| Chief Financial Officer | Manages the Financial Operations Director the Accounting Director and a Grants Management Director and makes funds management decisions. | $125,000 |
| Financial Operations Director | Responsible for cash management functions and directs the functions of payroll, accounts payable, billing and accounts receivable. | 85,000 |
| Grants Management Director | Oversees grant funds and programs and coordinates the preparation of reports to federal and DC government agencies. | 75,000 |
| | **Fee before fringe benefits, overhead and profit** | 285,000 |
| | **Fringe benefits @ 25%** | 71,250 |
| | **Profit and overhead allowance** | 53,437 |
| Total Walker & Company | | 409,687 |
| **UPO** | | |
| Accounting Director | Prepares detailed monthly schedules of revenues and expenditures for review by the Financial Operations Director and periodically reviews the chart of accounts structure. Implements accounting policies and reports grant expenditures. | 78,232 |
| Accounts Payable (2) | Works closely with the grants management team to ensure that proper control procedures are followed and only valid and authorized invoices are recorded and paid. | 36,635 41,616 |
| Billing Accountant | Processes all grant payments from federal and DC Government agencies and other contributors in accordance with UPO's cash receipts procedure. | 53,165 |
| Payroll Accountant | Processes checks ready for signature and distribution and processes payroll journals showing activity for each employee. | 35,872 |
| Staff Accountant | Supports the accounting and reporting function and reports directly to the Accounting Director. | 35,120 |
| Budget Monitoring Accountant | Assists the Grants and Management Director with the planning of current and future grant revenues and expenditures for UPO. | 52,495 |
| Accounting Support | | 32,638 23,781 |
| | **Total Salaries** | 389,554 |
| | **Fringe benefits allowance @ 26%** | 101,284 |
| **Total UPO** | | 490,838 |
| **Total UPO Grand Total** | | 900,525 |

MAK 7986