# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Mohammed Amin Kakeh,

     *Plaintiff*,

  v.

United Planning Organization, Inc.,

     *Defendant*.

Civil Case No. 1:05-cv-1271 (GK/JMF)

Next Scheduled Event:
Pretrial Conference
April 11, 2007, 4:15 P.M.

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORTIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mohammed Amin Kakeh (hereinafter "Plaintiff" or "Kakeh"), by and through his undersigned counsel, and pursuant to Local Civil Rules 7(b), 7(h) and 56.1, hereby respectfully submits the following memorandum of points and authorities in opposition to the Motion for Summary Judgment filed by Defendant United Planning Organization, Inc. (hereinafter "Defendant" or "UPO") in the above-captioned matter.

## I.  GENERAL LAW OF SUMMARY JUDGMENT

"Summary judgment is appropriate when the pleadings and the record demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Williams v. Washington Convention Center Auth.*, 407 F.Supp.2d 4, 6 (D.D.C. 2005).  "Whether a fact is "material" is determined in light of the applicable substantive law invoked by the action. In light of the applicable substantive law, a 'genuine issue of material fact' is a fact that is determinative of a claim or defense, and therefore, affects the outcome of the case. The moving party bears the initial burden of demonstrating that no genuine issues of material fact are in dispute. Upon such a showing, the burden then shifts to the non-moving party to demonstrate that genuine issues of material fact are in dispute. The Court is precluded from

weighing evidence or finding disputed facts and must draw all inferences and resolve all doubts in favor of the non-moving party." *Price v. Greenspan*, 374 F.Supp.2d 177, 180 (D.D.C. 2005) (internal citations omitted).

## II. SUMMARY JUDGMENT IS PREMATURE BECAUSE DISCOVERY IS PRESENTLY INCOMPLETE

Defendant's Motion for Summary Judgment should be denied because discovery is incomplete.  As Federal Rule of Civil Procedure 56(f) directs, "should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

"'[T]he purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery.' Whether the circumstances warrant a continuance to permit discovery is a decision that falls within the discretion of the district court." *Bancoult v. McNamara*, 217 F.R.D. 280, 282-28 (D.D.C. 2003) (internal citations omitted).  "A party making a Rule 56(f) request must 'state[ ] concretely' why additional discovery is needed to oppose a motion for summary judgment." *Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006).  In order to prevail on a Rule 56(f) request, a "party must show a reasonable basis to suggest that discovery would reveal triable issues of fact" and must indicate why he cannot yet produce those facts.  *Bancoult*, 217 F.R.D. at 283; *see Williams v. Fed. Nat. Mortgage Assn.*, Civil Action No. 05-1483(JDB), 2006 WL 1774252 (D.D.C. June 26, 2006) at *11.  "It is well settled that [c]onclusory allegations unsupported by factual data will not create a triable issue of fact."  *Byrd v. Environmental Protection Agency*, 174 F.3d 239, 248 fn.8 (D.C. Cir. 1999) (internal citations omitted).

However, "Rule 56(f) motions should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Berkeley v. Home Ins. Co.,* 68 F.3d 1409, 1414 (D.C. Cir. 1995).

### A. Plaintiff Cannot Present By Affidavit Facts Essential to his Opposition Concerning the Testimony of Robert Richardson.

Plaintiff cannot present by affidavit the substance of the testimony of Robert Richardson, an individual whose testimony Plaintiff believes likely to prove highly dispositive in the instant matter.  Robert Richardson was Defendant's Human Resources Director for the entirety of the relevant period of January 2003 to July 2004, and is an individual Plaintiff intended to call as a witness at trial in the instant matter.  As evidence available to Plaintiff indicates, Defendant has alleged that Richardson, either solely or with the assistance of his staff, produced the Retention Register and the Job Family Groupings chart which Defendant has asserted governed the termination of Plaintiff and other of Defendant's Finance Office personnel in June 2004, in the form of a reduction-in-force ("RIF").  (*See, e.g.* Def. Mem. of Points and Authorities in Support of its Motion for Summary Judgment ("Def. Mem.") at 10-12; Defendant's Statement of Material Facts as to Which There is No Genuine Issue ("DSOF") ¶¶54, 59-61; Defendant Statement at Exhibit 13A; Plaintiff's Statement of Material Facts and Genuine Issues ("PSOF") ¶128.)    Further, as Defendant's Director of Human Resources, Richardson is the primary individual with direct knowledge of whether or not Defendant deviated from the provisions of its RIF policy though denial of mandated outplacement services to Plaintiff.  (*Id.* ¶¶98, 120.)

Plaintiff needs the evidence found only in the testimony of Richardson in order to be able to oppose Defendant's summary judgment motion, in that Defendant's motion makes numerous assertions as to the legitimacy of the process it claims it utilized to terminate Plaintiff, assertions with respect to which Plaintiff carries the burden of proof of showing pretext under certain of

Plaintiff's causes of action, as described in greater detail *infra*.  (Def. Mem. at 18-19, 21-22, 25, 27.) Plaintiff believes that, absent incorporation of the evidence of Richardson, this Court will be deprived of a sufficiently complete factual record as necessary to legitimately decide the merits of Defendant's motion for summary judgment to the material prejudice of Plaintiff.  Based on the indicia of pretext discussed in greater detail *infra*, Plaintiff believes that these are likely to further identify and to impact previously identified triable issues of fact.  *See infra, e.g.,* discussion at part III.C.3.  Plaintiff has been unable to produce these facts to date to procure by affidavit the testimony of Richardson, and has been unable to seek leave of this Court to depose Richardson outside of the context of a Rule 56(f) due to Defendant's refusal on February 12, 2007 to participate in a joint motion to reopen discovery so as to permit Richardson's deposition.

### B.  Plaintiff Cannot Present by Affidavit Facts Essential to his Opposition Which Defendant Has Unlawfully Refused to Produce.

Furthermore, Plaintiff cannot present by affidavit those facts which Defendant has improperly refused to divulge on the basis of purported privilege, to be described in greater particularly in Plaintiff's impending Second Motion to Compel Discovery in the instant matter.  Specifically, Defendant, in its responses to Plaintiff's discovery requests, produced documentation which in many instances contained excisions of text which were not labeled as "Redacted"—instead appearing merely as gaps in the text.  Indeed, Defendant used some of these modified documents as exhibits in support of its instant Motion for Summary Judgment *See, e.g.,* Defendant Statement, Ex. 14B at pages MAK 5898-5900, 5904, 5906-07; *id.,* Ex. 14C at 5908-09.  Defendant attempted to obfuscate as to the location of these excisions by producing initial privilege logs which failed to identify with particularity where Defendant was seeking to assert privilege.  (*See* Defendant's First and 1st Amended Privilege Logs, attached hereto as Exhibits 1 and 2.)  When pressed by Plaintiff, Defendant issued updated privilege logs

specifically identifying pages containing excisions, most recently on or about February 19, 2007. (*See* Defendant's 2nd and 3rd Amended Privilege Logs—attached hereto as Exhibits 3 and 4.)

"The party that asserts the existence of the attorney-client privilege possesses the burden of demonstrating its applicability. Not only the privileged relationship but all essential elements of the privilege must be shown 'by competent evidence and cannot be 'discharged by mere conclusory or *ipse dixit* assertions.'" *Cobell v. Norton,* 213 F.R.D. 69, 72 (D.D.C. 2003) (internal citations omitted). Similarly, the party asserting attorney work product privilege bears the burden of establishing that the privilege is applicable. *E.g., U.S. ex rel. Purcell v. MWI Corp.,* 209 F.R.D. 21, 24 (D.D.C. 2002). Defendant, as the party asserting privilege in this instance, fails to meet its burden in the manner discussed below.

This privilege log demonstrated that Defendant was withholding relevant discovery material—specifically transcripts of meetings of Defendant's Board of Directors and/or Ad Hoc Management Committee—on the basis of defective privilege claims. Defendant claimed that some of the excised portions were privileged attorney-client communications, notwithstanding that non-attorney third party individuals were present during those noted communications, destroying the privilege. *See U.S. v. Simpson,* 475 F.2d 934, 936 (D.C. Cir. 1973); Exh. 4; Minutes of Defendant Board of Trustees Meeting on April 1, 2004, attached hereto as Exhibit 5 (redactions on page 5 despite presence of personnel from D.C. Department of Human and Thompson, Cobb, Bazilio & Associates), Minutes of Defendant Ad Hoc Management Committee Meeting on May 26, 2004, attached hereto as Exhibit 6 (redactions on pages 4-5 despite presence of personnel from Thompson, Cobb, Bazilio & Associates).

Defendant alleged that other documents were privileged attorney work product "regarding pending litigation" without specifying *which* litigation was implicated, an assertion of

privilege which this Court has previously held facially defective. *Animal Legal Defense Fund, Inc. v. Dept. of the* Air Force, 44 F.Supp.2d 295, 302 (D.D.C. 1999) ("This Circuit has previously found inadequate an agency's conclusory assertion that a withheld document was prepared by attorneys 'in anticipation of litigation.' By failing to describe even in the most general of details the document's subject matter or identifying the litigation that the agency anticipated-that is to say, by failing to provide a single fact-the Air Force may not obtain judgment as a matter of law on this claim."); (*see* Exhibit 4).

In still other instances, Defendant has asserted privilege over where it had previously waived privilege through adduction of testimony concerning the subject matter of protected communications and/or through the identification of the attorney over whom such privilege has been previously asserted as a witness concerning the same subject matter. Specifically, in previous instances, Defendant asserted privilege with respect to the collaboration and/or interactions between UPO General Counsel Monica Beckham and UPO HR Director Robert Richardson as pertaining to the development of the job family groupings and retention register for its purported RIF. (*See e.g.*Deposition of Monica Beckham, Esq. at 128-133—attached hereto as Exhibit 7.) However, Defendant has adduced evidence in support of its Motion for Summary Judgment which either makes characterizations about the nature of those interactions or outright divulges portions of those communications, the effect of which is that Defendant voluntarily has presented Beckham as a witness, at least with respect to its Motion for Summary Judgment. (DSOF ¶54; *id.* at Ex. 13, ¶¶7-9, *id.* at Ex. 13A, page 1) ("Per your request today…")). In doing so, Defendant has waived any privilege applicable to the noted collaboration and/or interaction. *C.f. Rockwell Intern. Corp. v. U.S. Dept. of Justice*, 235 F.3d 598, 605-06 (D.C. Cir. 2001); *U.S. v. Nobles,* 422 U.S. 225, 239-40, 239 fn.14 (1975).

Plaintiff needs the excised materials in order to be able to oppose Defendant's summary judgment motion for several reasons. First and foremost, Defendant's improper excisions preclude Plaintiff from being able to even properly challenge and rebut the very exhibits Defendant has adduced in support of its summary judgment motion. Second, based on the unredacted materials surrounding these improper excisions, some of the redactions plausibly relate to discussions of the central alleged legitimate reason asserted by Defendant to justify its termination of Plaintiff—namely, Defendant's decision to outsource portions of the Finance Office and to terminate UPO personnel to do so. Based on the indicia of pretext discussed in greater detail *infra*, Plaintiff believes that these are likely to further identify and to impact previously identified triable issues of fact. *See, e.g. infra* at part III.C.3. Plaintiff has been unable to produce these facts to date based on Defendant's withholding of production of the relevant discovery matter on the basis of faulty assertions of privilege.

### III. DEFENDANT RETALIATED AGAINST PLAINTIFF IN VIOLATION OF D.C. CODE §2-223.01 *et seq.*

As a preliminary matter, Plaintiff respectfully advises the Court that counsel has been wholly unable to identify any prior reported opinions directly construing the Employees of District Contractors and Instrumentality Whistleblower Protection Act of 1998 ("WPA") anywhere in Westlaw database—either under its present codification (D.C. Code §223.01 *et seq.*) or under its prior codification (former D.C. Code §1177.1 *et seq.*).

#### A. Summary of Argument

Defendant makes three legal arguments concerning the WPA. First, Defendant argues that Plaintiff is not protected by the WPA since Plaintiff's role regarding the relevant government contracts was not constrained to "provid[ing] direct services to the program participants." (Def. Mem at 16.) Second, Defendant argues that no connection exists as a matter

of law between Plaintiff's protected disclosures and Defendant's decision to terminate Plaintiff. Defendant's primary basis for this contention is that Defendant had no knowledge that Plaintiff made protected disclosues. (*Id.* at 16-18.)  Finally, Defendant asserts that it had an allegedly legitimate reason to remove Plaintiff— a purportedly legitimate RIF caused by a decision to outsource the management of the Finance Department. (*Id.* at 18-19.)  Defendant's arguments consist of factual error, legal error, or both.

### B.  General Law of WPA Reprisal

Although this is first impression for the WPA, the Court is not without authoritative guidance as to construing the WPA's terms.  Specifically, the D.C. Council suggests that the WPA should interpreted in concert with D.C. Code §1-615.51 *et seq.*  The Council states that the purpose of the WPA is "to afford the same whistleblower protections to employees of District instrumentalities and employees of contractors who perform work on District contracts" as those available to D.C. employees under the D.C. Whistleblowers Act, D.C. Code §1-615.51 *et seq. See* 45 D.C. Reg. 7578 (1998).  As an aid to construction of D.C. Code §1-615.51 *et seq*, the D.C. Court of Appeals has relied upon Merit Systems Protection Board ("MSPB") and interpretation of 5 U.S.C. §2302(b)(8). *See Zirkle v. District of Columbia,* 830 A.2d 1250, 1260, 1260 fn.13 (D.C. 2003).[1]

Also, the Federal Circuit/MSPB case law is only of partial assistance in the context of the WPA; while the WPA has two different theories—'protected disclosure' reprisal and 'illegal order' reprisal—only one of those two ('protected disclosure') is incorporated into 5 U.S.C.

---

[1] That body of case law is an imperfect reference in the instant context, however, since the MSPB—the trial-level adjudicator of competent jurisdiction—has no authority to entertain motions for summary judgment for whistleblower protection claims under 5 U.S.C. §2302(b)(8). *See Crawford v. U.S. Postal Service*, 70 M.S.P.R. 416, 423 (1996); *Wagner v. Environmental Protection Agency,* 53 M.S.P.R. 300, 304, 304 fn.2 (1992); *Brommer v. Dept. of the Navy,* 34 M.S.P.R. 543, 546-51 (1987).

§2302(b)(8).   *Compare* 5 U.S.C. §2302(b)(8) *to* D.C. Code §§2-223.01(4,7), 2-223.02; *see Lerner v. District of Columbia,* 362 F.Supp.2d 149, 165-66 (D.D.C. 2005) (noting two separate species of claim under D.C. Code §1-615.51 *et seq.*)

Because the WPA has two different theories, the *prima facie* case necessarily has two different iterations.   A plaintiff establishes a *prima facie* case of retaliatory termination for protected disclosures by showing that: (1) he engaged in whistleblowing by making a 'protected disclosure', and (2) the disclosure was a contributing factor in the employer's decision to take or fail to take a personnel action.   *See Woodworth v. Dept. of the Navy,* 101 M.S.P.R. 560, 563 (Apr. 20, 2006); *Anderson v. Ramsey,* 2006 WL 1030155 (D.D.C. April 19, 2006) at *12-*13. For the case of 'illegal order' reprisal, the *prima facie* is similar and requires Plaintiff to show: (1) actual refusal to obey an illegal order; and (2) that the disclosure was a contributing factor in the employer's decision to take or fail to take a personnel action.   *C.f.* D.C. Code §§2-223.02, 2-2230.03; *Ramsey,* 2006 WL 1030155 at *13.

"[O]nce it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 2-223.02 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the employing District [...] contractor to prove *by clear and convincing evidence* that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section." D.C. Code §2-223.03(b) (emphasis added).

**C.  Plaintiff Has Established A *Prima Facie* Case Under Both Theories**

### 1. 'Protected Disclosure'

Under the WPA, a 'protected disclosure' is "any disclosure of information, not specifically prohibited by statute, by an employer to a supervisor or a public body, that the employee *reasonably believes* evidences, *inter alia,* gross mismanagement; gross misuse or waste; violation of a federal, state, or local law, rule or regulation, or of a term of a contract. *See* D.C. Code §2-223.01(7)(emphasis added). The test for 'reasonable belief' under this standard is "[C]ould a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the action of the [employer] evidences [illegality]?" *See Zirkle*, 830 A.2d at 1259-60; *Applewhite v. Equal Employment Opportunity Commission,* 94 M.S.P.R. 300 (2003) ¶12. While a purely subjective opinion of the employee is insufficient to constitute a 'reasonable belief,' evidence of reasonable belief of the whistleblower is bolstered where the whistleblower himself has expertise in the subject matter of the disclosure. C.f. *Zirkle*, 830 A.2d at 1260; *Paul v. Dept. of Agriculture*, 66 M.S.P.R. 643, 648 (1995).

Plaintiff clearly made protected disclosures within the meaning of D.C. Code §2-223.01(7) through his various disclosures to Eboda, Gawad, Marty and Duncan—all agents of public bodies under the meaning of §2-223.01(8)—as well as disclosures to his various supervisors (including Jones, Mack, Shears, Jennings, Beckham, Roberson, and several other members of Defendant's Board and senior staff). (PSOF ¶¶ 27, 40, 45-56, 59-60, 62, 67-70, 73-77, 79-81, 85-86.) The reasonableness of Plaintiff's disclosures is bolstered by Defendant's decades of expertise in matters of non-profit accounting. (*Id.* ¶ 15.) Indeed, the existence of 'protected disclosures' in this case is a fact which Defendant in its instant motion has declined to contest. (Def. Mem. at 16.)

### 2. 'Illegal Order'

Plaintiff has also met his *prima facie* burden with respect under the 'illegal order' theory. To meet the standard for 'illegal order', the order must in fact be illegal—an actual violation of law, rule or regulation (as orders which the employee reasonably believes to be violations of law but which in fact are not fall under the 'protected disclosures' prong of the WPA). *See Zirkle,* 830 A.2d at 1258-60. In the instant case, the record shows that Plaintiff in fact did refuse to obey several such illegal orders issued by Mack and Shears to falsify financial statements in derogation of numerous federal and state laws. (PSOF ¶¶ 19, 61-62, 67, 70.)

### 3.  Contributing Factor

Under the WPA, a "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." D.C. Code §2-223.01(2). Whether or not the protected activity was a "contributing factor" with respect to a particular personnel decision is a question of fact for the jury to decide. *C.f. Ramsey*, 2006 WL 1030155 at *11, *12-*13 (D.C. Code §1-615.51 *et seq.* causation analysis indistinguishable from causation analysis under 1st Amendment claim formulation where causation element was question of fact for the jury). Contributing factor status can be shown circumstantially, by showing evidence that: (A) the official taking the personnel action knew of the disclosure; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *C.f.* 5 U.S.C. §1221(e)(1); *Ramsey,* 2006 WL 1030155 at *11-*13 (contributing factor impossible where relevant official only gained knowledge after date of decision on personnel action). The MSPB has held that knowledge for purposes of this provision can be either actual knowledge or constructive knowledge, the latter being shown "by demonstrating that an individual with actual knowledge of the disclosure influenced the official accused of taking the retaliatory action." *See*

*Easterbrook v. Dept. of Justice,* 85 M.S.P.R. 60 (2000) ¶11.

Plaintiff has met his *prima facie* burden of showing that his protected disclosures were a contributing cause of his termination. As discussed *infra*, Defendant made the decision to terminate Plaintiff within a matter of weeks of learning of his protected disclosures. (PSOF ¶¶ 56-58, 72-73, 75, 76, 78, 80, 100.) This is sufficient temporal proximity exists to infer contributing element. *C.f. McIntyre v. Peters*, 460 F.Supp.2d 125, 133 (D.D.C. 2006) (3 month standard for temporal proximity for causal connection analysis under Title VII retaliation cases); *Cosgrove v. Dept. of the Navy*, 59 M.S.P.R. 618, 623 fn. 5 (1993) (1 year is reasonable period under MSBP case law for 5 U.S.C. §2302(b)(8)).

Plaintiff made protected disclosures within the meaning of D.C. Code §2-223.01(7) through his various disclosures to Eboda, Gawad, Marty and Duncan—all agents of public bodies under the meaning of §2-223.01(8)—as well as disclosures to his various supervisors (including Jones, Mack, Shears, Jennings, Beckham, Roberson, and several other members of Defendant's Board and senior staff). (PSOF ¶¶ 27, 40, 45-56, 59-60, 62, 67-70, 75-76, 79-80, 85-86, 90-91.)

There is an abundance of evidence in the record from which a trier of fact may infer that Defendant knew of the Plaintiff's protected disclosures and that they were contributing factors in his termination. On or about February 19, 2004, Eboda met with Shears, Mack and Jennings and discussed the Plaintiff's allegations that Defendant committed fraud, waste and abuse. (PSOF ¶ 56.) Shears, Mack and Jennings knew that Plaintiff shared financial statements with Eboda that showed a sizable deficit and a desire on the part of Defendant to improperly charge non-program related expenses to the CSBG contract. Plaintiff's sharing of these financial statements with Eboda was an action which -- based on Shears's directive -- Plaintiff was not authorized to take.

In fact, subsequent actions take by Shears, Mack and Jennings indicate clearly that they knew Plaintiff had shared such financial statements with Eboda, that they opposed it and that they sought to punish Plaintiff for it.  On February 25, 2004, Eboda reported to Plaintiff that Mack had discussed certain financial statements with Eboda which were facially identifiable as authored by Plaintiff; she stated that they were incorrect and directed Eboda not to contact Plaintiff, but instead to direct all of questions to her, a fact which demonstrates that Shears knew Plaintiff had made protected disclosures to Eboda and that Shears wanted them to stop.  (*Id.* ¶ 57, 58.)

Plaintiff also made protected disclosures directly to Defendant's management, of which Defendant was aware.   These disclosures were made to the following persons: to Roberson on April 1, 2004; (*id.* ¶ 73); to Roberson and Jones on April 5, 2004 (*id.* ¶ 75); to Jones, Mack, Beckham and Shears on April 6, 2004 (*id.* ¶ 76); to Jones on April 11, 2004 (*id.* ¶ 80). Defendant cannot possibly disclaim knowledge of these disclosures since he made them directly to Defendant's management.

Further, Eboda, testified that he reported to Jones and Alexus Roberson, that Plaintiff had made protected disclosures to him.  (*Id.* ¶ 72, 73.)  In fact, in Eboda's mind, the fact that the Plaintiff had made protected disclosures was common knowledge at Defendant by March, 2004. (*Id.* ¶ 73.)   On April 5, 2004, Plaintiff met with Jones, Roberson, and Eboda and during the meeting, Eboda openly identified Plaintiff as having assisted his investigation through protected disclosures.  Eboda made no secret of the fact that Kakeh and Eboda had been clandestinely meeting.  (*Id.* ¶ 78.)  Additionally, on June 1, 2004, during normal business hours, the day before Plaintiff's termination, Plaintiff made protected disclosures to federal investigators who met with Plaintiff at Defendant's offices.  (*Id.* ¶ 91.)

It is not only evident from the record that Defendant knew about the Plaintiff's disclosures of fraud, waste and abuse, but that Defendant harassed him and took other actions against him based on those disclosures, creating the inference that Plaintiff's termination was likely caused directly by such disclosures.   Plaintiff's protected activity continued, and as it did, the animus of Defendant's management grew as did its harassment of Plaintiff which eventually turned into a plan to terminate him.  On March 3, 2004, Mack demanded that Plaintiff alter one of Defendant's financial statements to conceal the Defendant's fraud, waste and abuse through the issuance and authentication of a revised financial statement.  (*Id.*¶ 61.)   This demonstrates that Mack knew that Plaintiff was making protected disclosures to Eboda, that she opposed it and that she was angry and that she intended to take a personnel action against him as a result.  Mack in fact threatened Plaintiff with potential reprisal from Jennings if Plaintiff refused to make the changes.  (*Id.*)

Shears also harbored the same animus toward Plaintiff as Mack and she and Mack continued to advocate and threaten the termination of Plaintiff.  On March 11, 2004, Shears submitted a letter of resignation to Jennings in which she catalogued her many requests to have the Plaintiff terminated based in part at least on his issuance of financial statements – statements which she did not approve and which showed an inordinate deficit -- yet another fact indicating that she wished to have him terminated based on his disclosures.  (*Id.* ¶ 63.)  On March 25, 2004, Mack formally became Acting Executive Director, and that same day demanded that Plaintiff alter the financial statement he had prepared to conceal Defendant's deficit.  (*Id.* ¶¶ 67, 70.)  On or about March 25, 2004, Mack and Shears accused Plaintiff of insubordination – a terminable offense – for failing to alter the financial statements in the manner that they wished.  (*Id.* ¶ 70.)

As late as April 6, 2004, during a meeting with Jones, Mack, Beckham, Shears, Roberson demanded that Plaintiff explain why he was refusing to alter the financial statements. (*Id.* ¶ 79.)

Obviously influenced by Shears and Mack, Jones also harbored the same animus toward Plaintiff as Mack and Shears and began to make plans to terminate the Plaintiff. Eboda testified that Jones conveyed a pre-existing intent to terminate the Plaintiff in late April or early May, 2004. In April or May, 2004, Jones informed Eboda that he would rely on Walker & Company for financial information and intended to terminate Kakeh's employment. (*Id.* ¶ 112.) Eboda sought clarification on whether Jones was intended to abolish Kakeh's position through a RIF or terminate him for poor performance. Jones told Eboda that Kakeh was producing bad reports or something to that effect and Eboda assumed Jones was intending to terminate Plaintiff for poor performance; later Eboda learned that Jones intended to terminate Plaintiff through a RIF. (*Id.*) Eboda told Jones that if Kakeh's work is not good, Kakeh needs to be fired not RIF'd. (*Id.*) During this conversation which took place in May, 2004, Jones did not mention Walker and Company or link Walker to Kakeh's intended dismissal (*Id.*)

Jones did terminate Kakeh on June 2, 2004 and the temporal proximity between the action Jones took and the protected disclosures is very close.   In fact, Jones took the action on June 2, 2004, the day after Kakeh met with federal investigators in plain view at Defendant's offices. (*Id.* ¶ 89.) Indeed, much of the Plaintiff's protected disclosure activity and oppositional activity – refusal to obey the orders to alter financial statements – occurred in April, 2004 – and Defendant was fully aware that Plaintiff had provided financial statements to Eboda showing a deficit by March, 2004.   Thus, Jones decision to terminate the Plaintiff was made at most, roughly one month after Jones learned of Plaintiff provided financial information to Eboda that led to Eboda's investigation of fraud, waste and abuse.   Under these circumstances, a reasonable

trier of fact could and is likely to conclude that Plaintiff's protected disclosures were a contributing factor in his termination.

The legitimate inference that Plaintiff's termination was the result of his protected activity is further strengthened by the manner and justification for Plaintiff's removal. As is dicussed in more detail in Part III,D,3 of this Memorandum, *infra,* Jones purportedly terminated Kakeh through a RIF that was ill conceived, unjustified, riddled with procedural irregularities and on its face a pretext for the retaliatory termination of the Plaintiff.

More fundamentally, Plaintiff's whistle blowing activities focused attention on UPO's fraud waste and abuse and the fact that it was improperly charging its funding sources. At least in part, this brought about the Defendant's reevaluation of the Finance Department, and gave support to Jones who argued that the Finance Department (or its management) should be outsourced to an auditing firm. Had plaintiff not made the disclosures, most likely, Defendant would not have taken steps to outsource the Finance Department, the RIF would never have taken place and Plaintiff would never have been terminated. Based on these facts, a reasonable juror could determine that Plaintiff's protected disclosures were at a very minimum a factor which contributed to his termination.

### D. Rebuttal of Defendant's Arguments

### 1. Plaintiff is Protected by the WPA

Defendant's attempt to deny that Plaintiff is an "employee" within the meaning of the WPA is faulty, as it goes against the text of the WPA. The specific text of the relevant statute shows the WPA extending its protection to, among others, "Any person who is a former or current employee of any entity that has a contract with the District government to supply goods or services *and who is engaged in performing such contract.*" D.C. Code §2-

223.01(3)(B)(emphasis added). Defendant contests the emphasized portion, asserting without any cited authority that Plaintiff was not performing any relevant contract. (Def. Mem. at 16.) The text of the WPA, on the other hand, indicates that 'performance of the contract' is the operative standard here; as such, the best authority for the scope of the 'performance of the contract' would logically be what the contract itself requires by performance, rather than a-contextual assertions which do not even examine the terms of the contracts in question.

Under its pertinent contracts with the federal and District governments, Defendant was required as part of its performance to utilize accounting practices sufficient to meet specified governmental standards and to submit financial statements and other financial status certifications verifying its financial status generally and/or its disposition of moneys received from the government, in order to ensure that the moneys were being used for the performance of the contract. *See generally* 31 U.S.C. §7502; 42 U.S.C. §§1301.13(a,b), 9916, 9917; 45 C.F.R. §§74.21, 74.26, 74.52, 1301.12, 1301.13, 1304.51(d)(3), 1304.51(h) 1304.51(i); D.C. Mun. Regs tit. 1, §§5004.2(a), 5004.2(d)(2, 4); D.C. Mun. Regs tit. 27, §§3207.1, 3207.2(g). Because Defendant tasked Plaintiff with performing the accounting and financial portions of the relevant contacts, Plaintiff was assisting Defendant in performance of its obligations under those contracts, and thus qualifies as an "employee" within the meaning of D.C. Code §2-223.01(3)(B).

Further, for the Court to adopt the strained reading proposed by Defendant would represent a perverse result not in keeping with the intent of the WPA. Through incorporation of the 'performance of the contract' clause, the WPA explicitly recognizes both that many contractors who work for the District government also have non-District customers, and that a line needs to be drawn such that the WPA does not extend whistle blower protection to activities

concerning non-District contracts. *See* D.C. Code §2-223.01(3)(B). However, Defendant proposes to draw the line in an illogical fashion—namely making the distinction based on whether or not Plaintiff was "provid[ing] direct services to the program participants." (Def. Mem. at 16.) Defendant's characterization fails to comport with the familiar rule that statutes are to be interpreted an absurd result. *See generally Nixon v. Missouri Municipal League,* 541 U.S. 125, 134-38,144 (2004); *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1068 (D.C. Cir. 1998).

Specifically, at least some portion of the service contractors hired by the District are large contractors like Defendant who have a general back-office staff providing programmatic and financial support to the service providers in the field. Defendant's proposed interpretation of the WPA would artificially limit whistle blower protection solely to the programmatic staff—many of whom are deployed in the field and therefore not in a position to identify the species of back-office fraud and illegality which the WPA was in part intended to help stymie. *See* D.C. Code §2-223.01(7) (defining "protected disclosure" to include disclosures of "gross mis*management* in connection with the *administration of a public program* or the execution of a public contract" and "abuse of authority in connection with the *administration of a public program* or the execution of a public contract" (emphasis added)). This interpretation should not be accepted by the court as it runs contrary to both the language and statutory intent of the WPA.

### 2. Defendant Knew About Plaintiff's Protected Activities

Defendant's position that it was not aware of Plaintiff's protected activity is quickly put to rest by a cursory examination of the record. Defendant, Defendant's Board, and Defendant's agents Jones and Mack were all aware of Plaintiff's protected disclosures to Eboda on or before April 5, 2004. *See* Argument, *supra* Part III.C.3; *see also* (PSOF ¶¶ 19, 61-62, 67, 70.) Further,

Defendant—or at least Defendant's agents Mack, Shears, Beckham and Roberson—were also well aware of Mack and Shears issuing Plaintiff with illegal orders to falsify financial statements, which Plaintiff opposed. (*Id.*)

Defendant's argument that it lacked knowledge of the protected character of Plaintiff's disclosures since he was merely performing his Controller duties (Def. Mem. at 17-18) is without merit. The MSPB and the Federal Circuit have provided a highly fact-specific standard for disclosures made within the general scope of an employee's duties. Summarizing the tripartite reasoning of the Federal Circuit on remand, the MSPB noted that the court:

> distinguished three different situations. The first is when an employee has been assigned the task of investigating and reporting wrongdoing by government employees as part of his normal duties, and, in fact, reports that wrongdoing through normal channels. The court held that the "core purposes of the WPA are simply not implicated by such reporting." The second situation is when an employee with assigned investigatory responsibilities reports the wrongdoing outside of normal channels. The court concluded that such a disclosure is protected by the Act. The third situation is one in which the employee is obligated to report the wrongdoing, but such a report is not part of the employee's normal duties or the employee has not been assigned those duties. The court found that such disclosures are covered by the Act.

*Huffman v. Office of Personnel Management*, 92 M.S.P.R. 429 (September 23, 2002) ¶5. The MSPB will construe the definition of what constitutes investigation and reporting within normal duties with reference to the position description of the whistleblower. *See Grimes v. Dept. of the Navy*, 96 M.S.P.R. 595 (August 4, 2004). The whistleblower whose disclosure is closely aligned with his duties is not subject to the same burden in proving his prima facie case as other whistleblowers, however. *Connolly v. Nuclear Regulatory Commission*, 64 M.S.P.R. 28, 34 (August 3, 1994) (quoting *Marano v. Dept. of Justice*, 2 F.3d 1137 (Fed. Cir. 1993)).

Plaintiff's disclosures are protected disclosures. Plaintiff's disclosures were not within normal channels as they were disclosures to persons outside his supervisory chain made in derogation of instructions from Plaintiff's superiors. (PSOF ¶¶ 47-56, 59-60, 68, 79-80-81, 85-

86.)  In particular, beginning in 2003, Defendant had barred Plaintiff from issuing financial statements to Eboda or other outside persons without those statements having been vetted and approved for release first by Shears.   Thus, Plaintiff's disclosure of the financial statements to Eboda -- which had not been approved first by Mack – was not only a protected disclosure – but one about which Mack, Shears, Roberson and Jennings were fully aware.   *See* Argument, *supra,* Part III.C.3; *see also* (PSOF ¶¶ 19, 61-62, 67, 70.)  Additionally, Plaintiff's disclosures directly to Shears, Mack and Jennings were undoubtedly protected disclosures about which these persons cannot possibly disclaim knowledge.   (PSOF ¶¶ 73, 74, 76, 77.)

Therefore, a reasonable trier of fact could infer that all of the Plaintiff's disclosures were in fact protected disclosures.

### 3.    Defendant Has Failed to Meet Its Burden of Demonstrating Independent Legitimate Reasons For its Retaliatory Termination of Plaintiff

Defendant's final argument – that it had a legitimate reason for terminating the Plaintiff apart from his protected disclosures -- is the product of both factual error and legal error.

The legal error is evident, as Defendant relies on the wrong standard for "independent legitimate reasons."   Specifically, Defendant relies upon discrimination cases which apply a much lower standard.   *See Goss*, 942 F.Supp. 659, 664 (D.D.C. 1996); *Fain*, 568 F.Supp. 799, 804 (D.D.C. 1983); *Newton*, 841 F.Supp 19, 23 (D.D.C. 1994).  In a discrimination case, "[t]he employer 'need not persuade the court that it was actually motivated by the proffered reasons.' Rather, '[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'"   *Mitchell v. National R.R. Passenger Corp.*, 407 F.Supp.2d 213, 226 (D.D.C. 2005) (internal citations omitted).

In stark contrast, the WPA mandates that Defendant "prove *by clear and convincing evidence* that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section." D.C. Code §2-223.03(b) (emphasis added); *See Crawford,* 891 A.2d at 218-19. Whether or not the protected activity was a "contributing factor" with respect to a particular personnel decision is a question of fact for the jury to decide. *C.f. Ramsey*, 2006 WL 1030155 at *11, *12-*13 (construing D.C. Code §1-615.51 *et seq.*).

The familiar pretext issues ordinarily implicated in Title VII-type cases are incorporated under the WPA as factual issues which the trier of fact considers in making this factual determination, as indicated by a multifactor test developed by the MSPB:

> When determining whether the agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board considers the following factors: the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated.

*Grubb v. Dept. of Interior¸* 96 M.S.P.R. 377 (June 22, 2004) ¶15.

When considered under the correct standard, Defendant has failed to show as a matter of law that it has met its burden of proof to the requisite standard of clear and convincing evidence with respect to showing legitimate independent reasons actually motivating its termination of Plaintiff. The ringing pretext in Defendant's alleged RIF is heard most strongly under the first *Grubb* factor—Defendant's purported evidence in support of its alleged RIF is weak and contradictory, if not blatantly pretextual.

Defendant's alleged non-retaliatory reason for terminating Plaintiff is as follows. Defendant decided to outsource the management of the Finance Department to Walker &

Company in May, 2004 to rectify long-term deficiencies in financial operations and to address concerns raised in recent adverse audit findings from outside funding institutions. Allegedly, this created the need to eliminate certain positions through a RIF, including the position of CFO occupied by Shears, the Controller position occupied by Plaintiff, the Acting Chief Accountant position occupied by David Quashie, the Senior Auditor position occupied by William Isaac and the position of Facilities/IS Manager occupied by Nona McLean. Allegedly a neutral application of the RIF policy placed Kakeh and Quashie in the same job family grouping for the position which was to succeed the Chief Accountant position – Accounting Director; since Quashie had far more seniority, and since only one managerial level position was available, Quashie was retained and Plaintiff was not. (Def. Mem. at 8-12; 18-19, 21-22, 25, 27.)

The RIF was riddled with procedural irregularities and seemed to have no other purpose than to facilitate the termination of Plaintiff. In fact, the effect of the RIF was that Plaintiff was the only member of the Finance Department management who was terminated. Nona McLean, the only other terminated employee was not a member of Finance Office management.

Jones apparently first considered eliminating the entire finance department and outsourcing its functions, but then in late May, 2004, decided to eliminate only the management of the Finance Office. (PSOF ¶ 106.) Jones's initial steps and contradictory statements suggest an ulterior motive other than addressing the concerns of the agencies who employed UPO and cleaning up the Department. Jones attempted to disavow responsibility for his own decisions and place responsibility for them on others and failed to acknowledge or take responsibility for actions he took. Jones testified that the decision to outsource the Finance Department was initiated by the Ad Hoc Management Committee, when the minutes of the meeting show that Jones initiated the proposal. (*Id.* ¶ 108.) Also, Jones originally intended to "outsource" financial

operations F.S. Taylor, a company closely tied to Jennings and others involved in Defendant's fraud, waste and abuse, an action which would not restore integrity to UPO nor address concerns of the agencies from which UPO received grant funds. (*Id.* ¶ 106.) Suspiciously, Jones denied recommending or advocating the use of F.S. Taylor, when both the minutes of Defendant's Ad Hoc Management Committee and corroborating testimony of Eboda show that he did. (*Id.*)

Jones's later actions along with his self-serving and contradictory testimony, which was at odds with other managers, suggest an approach deliberately designed to target Plaintiff's position. In late May, 2004, just prior to Plaintiff's termination, when the outsourcing plan became infeasible, Jones scaled back his plan to include outsourcing of the management of the Finance Office. He chose Walker & Company ("W&C") to staff the outsourced positions. (*Id.* ¶¶ 105, 107, 110.) Ironically, but consistent with Jones's objectives, Plaintiff was the only member of the Finance Office management that was terminated. (*Id.*) The other members of Finance Office management – Quashie and Isaac – remained; Nona McLean, Jennings' live-in girlfriend, although terminated, was not a member of management. (*Id.* ¶ 108, 109, 114.)

Additionally, the reasons given by Jones for retaining Quashie and Isaac are inconsistent and lack credibility, suggesting that the reason was pretextual and that the true reason was Plaintiff's protected disclosures. Jones testified that it was not his decision to retain Quashie and not Plaintiff in the newly created Accounting Director position. In his capacity as corporate designee, he testified that the decision was made by W&C and that W&C had requested Quashie by name and insisted that he stay. (*Id.* ¶ 105.) Significantly, in his capacity as corporate designee, Jones also testified that the reason terminated Plaintiff and retained Quashie – as UPO states in its motion, because the RIF policy mandated it due to Quashie's greater seniority – was simply not true; according to Jones, the RIF policy had nothing to do with the reason why

Quashie and not Plaintiff was retained in the Accounting Director position; the sole reason was W&C's insistence that UPO retain Quashie. (*Id.*) W&C principal Roy Layne gave completely contrary testimony. He testified that when he arrived at UPO in June, 2004, UPO officials old him that UPO had decided to place Quashie in the Accounting Director position and that it had already terminated Plaintiff. (*Id.* ¶ 111.)

Not only is Jones's credibility and stated reasons for terminating Plaintiff seriously in question, Eboda's testimony suggests that Jones had planned on firing Plaintiff one way or another since April or May, 2004, he just did not know precisely how he was going to do it until late May, 2004. According to Eboda, in April or May, 2004, Jones indicated that he was going to terminate Plaintiff. Initially, Jones had told Eboda that he was going to terminate Plaintiff for performance reasons and then later indicated that it would be through a RIF. (*Id.* ¶ 112.) Indeed, these statements by Jones along with other unusual events at UPO, caused Eboda to conclude that Kakeh had been terminated in retaliation for his cooperation in Eboda's investigation. Eboda was so convinced of this that he wrote it a report that he prepared on December 1, 2004. (*Id.* ¶ 123.)

In short, Defendant has not demonstrated as a matter of law that Plaintiff's protected disclosures were not a contributing factor in the decision to terminate him. This is normally a question of fact and Defendant's proof and arguments fail to lift it from that realm. Given inconsistencies in Defendant's explanation of why it terminated Plaintiff, this issue is undoubtedly and clearly a question of fact for the jury.

## IV.    DEFENDANT RETALIATED AGAINST PLAINTIFF IN VIOLATION OF THE FEDERAL AND D.C. FALSE CLAIMS ACTS

### A.  Summary of Argument

Defendant essentially makes three arguments with respect to Plaintiff's claims under the

two False Claims Acts.  The first argument is that Defendant never made a false or fraudulent claim to either the Federal or District governments.  The basis for this claim is that because it obtained  payments from CSBG based on monthly invoices, not by submission of a financial statement – hence, since no financial statement was submitted, no false claim could be made. (Def. Mem. at 23.)  The second argument is that Plaintiff has no claims because he made no proffer that Defendant knew that Plaintiff had engaged in protected activity or he never put Defendant on notice that he was furthering a False Claims Act claim rather than merely acting as the Controller.  (*Id.* at 23-25.)  Defendant's third claim is that causal connection cannot be established because Defendant supposedly had begun its alleged RIF prior to when it became aware of Plaintiff's protected activities.  (*Id.* at 25.)  Each of these contentions is error.

### B.  General Law of False Claims Act Reprisal

"The District of Columbia Circuit has stated that to make out a successful claim of retaliation under [31 U.S.C.] Section 3730(h), a plaintiff must demonstrate: (1) he engaged in protected activity, that is, 'acts done ⋯ in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity. To establish the second element, the employee must in turn make two further showings. The employee must show that: (a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'"  *Shekoyan v. Sibley Intern. Corp*, 309 F.Supp.2d 9, 13 (D.D.C. 2004).

"Determining whether an employee has engaged in protected conduct under the FCA is a 'fact specific inquiry.'"  *Shekoyan v. Sibley Intern. Corp.*, 409 F.3d 414, 423 (D.C. Cir. 2005). "[A] plaintiff need not inform his employer that he is contemplating filing a qui tam action to come within the protection of section 3730."  *Id.* at 15.  Instead, "the language of the FCA

'manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." Thus, while the employee 'must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action,' it is not necessary for a plaintiff 'to 'know' that the investigation ⋯ could lead to a False Claims Act suit.'" *Id.* at 423 (emphasis in original, internal citations omitted). The question of whether or not the retaliation was motivated, at least in part, by the employee's engaging in protected activity, is a question of fact generally left for the jury to decide.[2] Instructive to the factual determination of whether or not the retaliation was motivated, at least in part, by the employee's engaging in protected activity is a causal factor analysis. *C.f. Ramsey*, 2006 WL 1030155 at *11, *13 (interpreting the *Mt. Healthy/O'Donnell* test (*see infra* footnote 2 for discussion)).

Once the plaintiff has made his prima facie showing by a preponderance of the evidence, "the burden then shifts to the employer "to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity," another matter considered to be a question of fact left to the jury. *U.S. ex rel. Long v. SCS Business & Technical Institute*, 999 F.Supp. 78, 95 (D.D.C. 1998), *rev'd on other grounds U.S. ex rel. Long v. SCS Business & Technical Institute, Inc.*, 173 F.3d 870 (D.C.Cir. 1999); *c.f. Ramsey*, 2006 WL 1030155 at *11, *13 (applying the *Mt. Healthy/O'Donnell* test (*see infra* footnote 2 for

---

[2]    This Court looks to the legislative history of 31 U.S.C. §3730(h) to construe the elements of the *prima facie* case, in particular Senate Report 99-345 (1986). *See Long,* 999 F.Supp. at 95. Senate Report 99-345, in turn, instructs that Congress drew from prior case law in implementing the "motivating factor" test, specifically citing among its sources *Mackwiak v. University Nuclear Systems, Inc.*, 735 F.2d 1159, 1162-1164 (9th Cir. 1984); and *Consolidated Edison of N.Y. Inc. v. Donovan*, 673 F.2d 61, 62 (2nd Cir. 1982). *See* Senate Report 99-345 (1986) at *35. *Mackwiak* and *Donovan,* in turn, both draw their interpretation of the "motivating factor" test from the Supreme Court's decision in *Mt. Healthy City School District v. Doyle*, 429 U.S. 274 (1977). *See Mackowiak,* 673 F.2d at 1164; *Donovan*, 673 F.2d at 62. Among the cases in this Circuit which apply the *Mt. Healthy* test is *O'Donnell v. Barry*, which applied the test to the 1st Amendment. *See O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998). The D.C. Circuit in *O'Donnell* instructs that the "motivating factor" test is interpreted as a question of fact. *Id.; accord Mikes v. Strauss,* 889 F.Supp. 746, 754 (S.D.N.Y. 1995) (applying the "motivating factor" test in a federal False Claims Act reprisal case as a question of fact).

discussion)).

The D.C. Court of Appeals has not extensively interpreted the D.C. False Claims Act statute. In the absence of such separate analysis, the federal courts look to the case law interpreting the federal False Claims Act to construe the analogous state-level statute where the language of the state-law statute closely tracks the provisions of the federal statute. *See U.S. ex. rel. Bogart v. King Pharmaceuticals*¸ 414 F.Supp.2d 540, 543 (E.D.PA 2006). The whistleblower reprisal protection provisions of the D.C. False Claims Act track those of its federal cousin. *Compare* 31 U.S.C. §3730(h) *to* D.C. Code §2-308.16(b). As such, under *Bogart*, the Court should look to the federal False Claims Act to construe the D.C. False Claims Act.

### C. Plaintiff Has Demonstrated His *Prima Facie* Case

Plaintiff has met his burden of presenting his *prima facie* case of showing that Defendant retaliated against him in violation of the False Claims Acts. As the record shows, Plaintiff has clearly engaged in conduct protected under the False Claims Acts. Specifically, Plaintiff as far back as 2003 was engaged in active attempts to investigate indicia of financial misconduct on the part of Defendant. (PSOF ¶¶ 40, 42, 44.) Based on diligent investigations, Plaintiff was able to determine by the end of 2003 that Defendant and its agents had made numerous false statements, certifications, and other filings to agencies of the Federal and District of Columbia Governments in order to procure financial benefit. (*Id.* ¶¶ 44-49.) Beginning in January 2004, Plaintiff made numerous and detailed disclosures of Defendant's myriad false statements to agents of both the District of Columbia and Federal Governments. (*Id.* ¶¶ 44-50, 53-56, 59-60, 68, 78, 84-86, 90-91.)

Defendant became aware of Plaintiff's protected investigatory and disclosure activities on

or before March 2004. (*Id.* ¶¶ 73.)  The facts in the record strongly indicate that reprisal was a motivating factor for Defendant's termination of Plaintiff as they show indicia of causal connection, in that soon after gaining knowledge of Plaintiff's protected activity Defendant terminated Plaintiff.  *See* Argument, *supra*, Part III,C,3.  This temporal proximity, when coupled with the other indicia of pretext found in Defendant's conduct with respect to removal of Plaintiff (*see id.*), a genuine issue if material fact exists as to whether reprisal was a motivating factor, meeting Plaintiff's *prima facie* burden.  Defendant simply cannot meet its burden of showing by a preponderance of evidence that Plaintiff's protected disclosures were not a motivating factor in its decision to terminate him.  Defendant's reasons for terminating Plaintiff are pretextual.  *See* Argument, *supra,* Part III,D,3.  At most, a genuine issue of material fact exists as to whether Defendant has met its burden of showing that it is not liable under the False Claims Acts.

### D.  Rebuttal of Defendant's Arguments

#### 1.  Defendant Made False and/or Fraudulent Statements Actionable Under the False Claims Acts

Defendant's first argument – that it made no false claim because it submitted no financial statement as a prerequisite to obtaining its monthly draw – is without basis.  Defendant is simply wrong as the twin False Claims Acts utilize a very broad definition of the term "claim".  Even on the face of the relevant statutes, the definition of "claim" is written broadly.  *See* 31 U.S.C. §3729(c); D.C. Code § 2-308.13(1).[3]  Interpreting this broad directive, the federal courts have

---

[3]  31 U.S.C. §3729(c) states that "For purposes of this section, 'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  D.C. Code § 2-308.13(1) states that "'Claim' means any request or demand for money, property, or services made to any employee, officer, or agent of the District, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or

used the 'certification' theory to find actionable violations of the False Claims Act simply from a

party making phony certification of material facts in order to procure a government benefit.

> "A number of courts in a variety of contexts have found violations of the False Claims
> Act when a government contract or program required compliance with certain conditions
> as a prerequisite to a government benefit, payment, or program; the defendant failed to
> comply with those conditions; and the defendant falsely certified that it had complied
> with the conditions in order to induce the government benefit."

*U.S. ex rel. Barrett v. Columbia/HCA Health Care Corp.,* 251 F.Supp.2d 28, 32 (D.D.C. 2003),

(quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786 (4th Cir. 1999).)

This requirement is not necessarily limited to express certifications, as this Court and

D.C. Circuit--recognize implied false certifications as sufficient to produce an actionable

violation of the False Claims Act. *Id.* at 33-34; *U.S. ex rel. Pogue v. Diabetes Treatment

Centers of America, Inc.*, 238 F.Supp.2d 258, 263-66 (D.D.C. 2002).

> The theory of implied certification [...] is that where the government pays funds to a
> party, and would not have paid those funds had it known of a violation of a law or
> regulation, the claim submitted for those funds contained an implied certification of
> compliance with the law or regulation and was fraudulent. The implied certification
> theory essentially requires a materiality analysis. Certification of compliance with the
> statute or regulation alleged to be violated must be so important to the contract that the
> government would not have honored the claim presented to it if it were aware of the
> violation.

*Id.* at 264 (internal citation omitted).

Thus, under the case law, an individual document filed with the government to procure

payment—even if not a succinct payment demand—can constitute an actionable false statement

if it incorporates (expressly or impliedly) compliance with regulation that is not factual. *See,

e.g.*, *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531-33 (10th Cir. 2000) (False

Claims Act claim for invoices filed on increments in fixed price contract where payment was

predicated on separate false certification of compliance with statutory requirements concerning

---

services requested or demanded issued from, or was provided by, the District, or if the District will reimburse such
contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

silver recovery in chemical process).

Notably, in *U.S. v. Board of Educ. of City of Union City*, various of the defendants, in applying for federal education grants, had "signed […] applications […]certifying that the funds would be used according to regulations, and that the [federal grant making agency] would be provided with reports on the project's progress and the disbursement of funds" and/or "signed to accept the grants, reaffirming that the funds would only be used for genuine costs incurred in the high school projects." 697 F.Supp. 167, 170 (D.N.J. 1988).  Defendants then filed falsely certified financial reports in order to obtain funding. *Id.*  The court held that "the five false quarterly reports and one false interim report may properly be penalized under 31 U.S.C. § 3729(a)(3). *Although each individual report did not trigger separate payments, the release of funds was predicated upon the grant agreement which required the periodic submission of accurate reports. It was a condition upon which the funds were granted. The reports were all essential elements in causing the United States to part with its money*." *Id.* at 176 (emphasis added).

The instant record is rife with examples of how Defendant, as a prerequisite in order to receive payment of federal moneys from the CSBG program, was required by law to file financial statements of various sorts which were certified—implicitly if not expressly—as accurate and in compliance with proper accounting and audit standards.  To participate at all in CSBG, Defendant obligated itself to meet federal regulations requiring use of proper accounting methodologies and the submission of certified accurate financial statements and audit reports.  *See e.g.* 31 U.S.C. §7502; 45 C.F.R. §§74.21, 74.26, 74.52; *c.f.*. 42 U.S.C. §§ 9916, 9917.  Further, in order to purloin the greatest amount of CSBG money, Defendant submitted to DHS for forwarding to HHS Defendant's falsified year-end financial statement in

order to bolster its falsely inflated budget request. (*See* PSOF ¶¶19-20.) Indeed, Defendant's claim of merely filing invoices to DHS for 1/12 of the amount of that year's CSBG grant is actually double fraud—filing of a falsely inflated reimbursement request for a 1/12 portion of grant made based on a falsely inflated budget request from Defendant. (*See* PSOF ¶¶19-20.) This sort of certification was naturally not limited to CSBG, as other federal programs such as Head Start and the District programs required certification of accurate accounting procedures and/or accurate financial statements as well, to participate and/or to receive advance payments. *See* 42 U.S.C. §1301.13(a,b); 45 C.F.R. §§1301.12,1301.13, 1304.51(d)(3); 1304.51(h); 1304.51(i); D.C. Mun. Regs tit. 1, §§5004.2(a), 5004.2(d)(2, 4); D.C. Mun. Regs tit. 27, §§3207.1, 3207.2(g).

Defendant, by falsely certifying the accuracy of their financial statements and other reports, violated these regulations through provision of false certifications which were prerequisite to Defendant's receipt of CSBG and other government moneys in order to gain access to those moneys in desired quantity. Defendant, based on its decades of experience providing accounting services to non-profit entities, was aware of the stringent requirements for accuracy in these statements, and thus had a reasonable and good faith belief that submission of false or inaccurate information on these statements would constitute a violation of these regulations in a manner such as to render Defendant liable under the False Claims Act.

Defendant also misstates the substantive scope of Plaintiff's protected disclosures as merely pertaining to fraud and falsification with respect to CSBG. (*Id.* at 23.) Additionally, Plaintiff disclosures of fraud, waste and abuse were not limited to Defendant's misconduct pertaining to CSBG, but instead from the beginning expansively covered disclosures of fraud, waste and abuse under completely separate grant programs operated by the federal government

(*e.g.* Head Start) and by the District government (*e.g.* programs under the D.C. Office on Aging). (PSOF ¶¶ 46, 48.) Any characterization by Defendant concerning CSBG thus has little or no bearing on the methods Defendant used to appropriate moneys from these other programs.

## 2. Defendant Knew About Plaintiff's Protected Activities

Defendant's second argument – that Defendant did not have notice that Plaintiff had engaged in protected activity -- misstates the legal notice requirements associated with the False Claims Act. Defendant incorrectly asserts that Plaintiff must first have taken "steps to put UPO on notice that he was furthering or intending to further an action under the False Claims Acts." (Def. Mem. at 23.)

First, UPO's reliance on the case law of another circuit is grossly misplaced. The D.C. Circuit provides instruction on the correct standard for notice under the False Claims Act—that is, the standard which is binding authority in the instant proceedings:

> [T]here is also no requirement that a plaintiff tell, or threaten, his employer that he will report his allegations to the government—or to tell anyone outside of the employing institution. As the statute does not require the employee to make an outside complaint in order to render his conduct protected, he cannot be required to advise of or threaten such a complaint. Moreover, as with a requirement that an employee tell his employer he is contemplating filing a qui tam suit, a requirement that an employee announce that he has gone outside the institution would undercut the statutory purpose of encouraging employees to expose fraud.

*U.S. ex rel. Yesudian v. Howard University,* 153 F.3d 731, 743 (D.C. Cir. 1998). The test for a plaintiff in a False Claims Act reprisal is not proof some sort of talismanic, 'magic words' notice recitation of intent to look into False Claims Act issues; Plaintiff instead merely must show that his employer was aware of Plaintiff engaging in activities such as would fall under the definition of protected activities. *Id.* at 742-43.

In the instant case, the record shows Defendant clearly being on notice of Plaintiff's protected activity. "Threatening […] to make a report to the government […] clearly is one way

to make an employer aware.  But it is not the only way."  *Id.* at 743.  In the instant case, Defendant was well aware of Plaintiff's protected activity:  Plaintiff had disclosed to Beckham, Mack and Defendant's auditors his intent to potentially seek assistance outside UPO as part of his protected investigations of Defendant's financial improprieties as far back as November 2003, and Defendant was well aware of Plaintiff's disclosures of CSBG improprieties to Eboda by March 2004.  Eboda directly disclosed Plaintiff's protected activities to Defendant's Board and senior management.  (PSOF ¶ 44.)  In addition to these express disclosures, Defendant also was aware of Plaintiff's protected activities based on its observations of Plaintiff's conduct as well.  (*Id.* ¶92.)

Notwithstanding groundless assertions to the contrary, Defendant was well aware that Plaintiff was engaged in protected activity and not merely acting in his role as Controller. Defendant was aware of Plaintiff's disclosures of CSBG improprieties to Eboda by March 2004—indeed, Eboda directly disclosed Plaintiff's protected activities to Defendant's Board and senior management.  (*Id.* ¶¶ 73, 92.)  Eboda is an agent of an outside government agency, and not in Plaintiff's usual chain of command at UPO.  (*Id.* ¶47.)  Indeed, the record shows that Defendant found Plaintiff's disclosures of unedited financial statements to Eboda to be specifically objectionable and in violation of what they believed were the proper parameters of Plaintiff's position.  (*See id.* ¶¶ 37, 58, 92.)  Such disclosures are clearly *not* within the ordinary scope of the Controller's position, and thus can constitute protected activity under the False Claims Acts, even where the subject matter could under other circumstances fall within the scope of Plaintiff's position.  *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,* 389 F.3d 1251, 1260-62 (D.C. Cir. 2004) ("when an employee acts outside his normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the

employer that the employee is engaging in protected activity").

Wholly lacking merit is Defendant's attempt to misconstrue a small portion of Plaintiff's deposition. Even the text highlighted by Defendant is taken out of context, as Plaintiff clearly states that Defendant and its agents had been preparing to unlawfully terminate Plaintiff prior to June 2004—as he states, "I mean it's not the decision been made because I had them inside. These things been prepared." (Def. Mem. at 24.) Plaintiff's speculation about why he was terminated and whether it was one or more of his protected disclosures should not and cannot be the basis of summary judgment.

### 3. Defendant Knew About Plaintiff's Protected Activities Prior to Retaliating Against Plaintiff

Defendant's third argument – that the causal connection between Plaintiff's protected disclosures and his termination cannot be established as a matter of law because Defendant had already taken steps to conduct the RIF before learning of the protected activity – is baseless and certainly not grounds for summary judgment. The facial inaccuracy of Defendant's third claim is readily apparent from the facts in the record. Defendant's essential claim is that Plaintiff could not have been retaliated against because Defendant's agents began planning the RIF in April 2004, some two months before the Inspectors General began their on-site investigation of Defendant. (Def. Mem. at 25.) The clear flaw in Defendant's argument is that it relies on the presumption that Defendant only learned of Plaintiff's protected activity from Inspector General personnel physically present at UPO headquarters. This presumption relies on two erroneous assertions: (1) the only portion of Plaintiff's conduct which constitutes protected activity is Plaintiff's dealings with the Inspectors General, and (2) Defendant only learned of Plaintiff's protected activity in June 2004.

Defendant cites no authority whatsoever for its assumption that dealing with an Inspector

General is the *sine qua non* of protected activity under the False Claims Act—nor can it, as that assumption is legal error. A plaintiff, in order to raise a viable False Claims Act reprisal claim, need not have spoken to any particular government office, or indeed to anyone outside his organization, as internal reporting can constitute protected activity under the False Claims Acts. *See Yesudian,* 153 F.3d at 743. The test, instead, is merely whether or not Defendant was aware of Plaintiff's protected activity. *Id.*

Defendant was well aware of Plaintiff's protected activity prior to its April 2004 asserted start time for implementation of the purported RIF: Plaintiff had disclosed to Beckham, Mack and Defendant's auditors his intent to potentially seek assistance outside UPO as part of his protected investigations of Defendant's financial improprieties as far back as November 2003, and Defendant was well aware of Plaintiff's disclosures of CSBG improprieties to Eboda by March 2004—indeed, Eboda directly disclosed Plaintiff's protected activities to Defendant's Board and senior management. (*Compare* Def. Mem. at 25 *to* (PSOF ¶¶ 73, 92.) Since Defendant in fact had notice prior to April 2004—the date it asserts as the start of the process for the RIF—its argument is meritless.

More fundamentally, the Defendant had not decided exactly how it was going to implement the RIF and who would be impacted by it until May, 2004. Thus, even if Defendant began the RIF process as early as it has stated, that is completely irrelevant. (PSOF ¶ 106.) A reasonable trier of fact is free to infer that the termination of Plaintiff was motivated by his protected disclosures.

## V.    DEFENDANT RETALIATED AGAINST PLAINTIFF IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT ("DCHRA")

### A.  Summary of Argument

Defendant first challenges Plaintiff's ability to show a causal connection between

Plaintiff's prior protected activity and Defendant's termination of Plaintiff, based on alleged temporal attenuation and on alleged intervening cause. (Def. Mem. at 20-21.) Defendant then asserts that it had a legitimate reason for terminating Plaintiff -- the ordinary operation of its RIF policy. (*Id.* at 21-22.) Defendant finally proffers as supposed disproof of Plaintiff's ability to prove pretext the similarly situated comparator of Nona McLean, who was also terminated under operation of the same RIF policy. (*Id.* at 22.) Upon closer examination, each of these assertions proves groundless.

### B. General Law of DCHRA Reprisal

> To prove a prima facie case for retaliation [under the D.C. Human Rights Act], the plaintiff must demonstrate that: (1) he engaged in protected activity, (2) the employer subjected him to adverse action or conduct that had an adverse impact on him, and (3) there is a causal link between the protected activity and the adverse action. The plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."

*Williams v. Washington Convention Center Authority*, 407 F.Supp.2d 4, 7-8 (D.D.C. 2005) (internal citations omitted). The burden on a plaintiff for making a *prima facie* showing is not onerous. *See id.*; *Bowie v. Gonzalez*, 433 F.Supp.2d 24, 35 (D.D.C. 2006).

"[T]he defendant is still entitled to judgment as a matter of law if it articulates legitimate, nondiscriminatory reasons for its actions." *Williams,* 407 F.Supp.2d at 8. However, "'the plaintiff is entitled to an opportunity [...] to prove by a preponderance of the evidence that the proffered reason was but a pretext for retaliation.'" *Carter-Obayuwana v. Howard University,* 764 A.2d 779, 793 fn.23 (D.C. 2001). The D.C. Human Rights Act is construed in concert with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 869 fn.3 (D.C. 1997).

"This Court recognizes that it must approach summary judgment in a discrimination case

with special caution. Discriminatory intent and proof of disparate treatment are notoriously difficult to establish so the court must be extra-careful to view all evidence in the light most favorable to [Plaintiff]." *Johnson v. Digital Equipment Corp.*, 836 F.Supp. 14, 18 (D.D.C. 1993) (internal citation omitted) *accord Batson v. Powell,* 912 F.Supp. 565, 571 (D.D.C. 1996), *aff'd Batson v. Powell*, 203 F.3d 51 (D.C.Cir. Dec 17, 1999), *rehearing en banc denied* (Feb 15, 2000), *rehearing denied* (Feb 23, 2000). Further, "there is no requirement that a discrimination plaintiff offer some evidence other than h[is] own subjective belief, as reflected in h[is] affidavit or deposition, in order to survive summary judgment: 'There is simply no rule of law that provides that a discrimination plaintiff may not testify in his or her own behalf, or that such testimony, standing alone, can never make out a case of discrimination that will survive a motion for summary judgment.'" *Jackson v. American Chemical Soc..* 812 F.Supp. 239, 241-42 (D.D.C. 1993) (internal citation omitted).

### C.  Plaintiff Has Proven His *Prima Facie* Case

Defendant cannot dispute that Plaintiff meets the first two prongs of the *prima facie* case: Defendant in its summary judgment motion expressly concedes that Plaintiff engaged in protected activity in October 2003 by making an internal written complaint of discrimination against Shears and Mack, and does not attempt to deny that Plaintiff's termination would constitute an adverse employment action under the DCHRA.  (Def. Mem. at 19-20.)

Where Defendant errs, however, is in attempting to characterize Defendant as having only engaged in protected activity in October 2003.  (*Id.*)  This is error, because Plaintiff also filed a complaint with the D.C. Office of Human Rights ("DCOHR") on March 31, 2004—an act which Defendant's counsel Beckham became aware of by April 7, 2004.  (PSOF ¶¶ 95-96; DSOF ¶47; DSOF, Ex. 13 at §5.)  The act of filing a complaint with DCOHR in and of itself

constitutes protected activity under DCHRA. *See Forkkio v. Powell,* 306 F.3d 1127, 1131-32, (D.C. Cir. 2002) (filing of complaints with EEOC is protected activity for Title VII retaliation purposes); *Nurriddin v. Goldin,* 382 F.Supp.2d 79, 104-05 (D.D.C. 2005) (contacting EEOC about discrimination complaints constitutes protected activity).

This error is especially glaring, in that Plaintiff's Complaint specifically identified Plaintiff's protected activity on March 31, 2004 as being the pertinent protected activity for purposes of the instant DCHRA reprisal. (Plaintiff's Second Amended Complaint ¶54.) This is not to say that Defendant and its agents did not engage in reprisal for the October 2003 protected activity, of course. For example, the record documents that Shears stripped Plaintiff of his duties with respect to cash flow management a mere 13 days after Plaintiff engaged in what Defendant concedes is protected activity by filing a complaint against Shears for discrimination which Shears was aware. (PSOF ¶ 39, 41, 43; Def. Mem. at 20.) Stripping such duties constitutes an adverse personnel action for purposes of DCHRA, and given the temporal proximity the action would meet the *prima facie* standard for actionable reprisal. *See Edwards v. U.S. Environmental Protection Agency,* 456 F.Supp.2d 72, 87 (D.D.C. 2006) (stripping duties constitutes adverse employment action); *c.f Mansfield v. Billington,* 432 F.Supp.2d 64, 72 (D.D.C. 2006) (loss of supervisory duties constitutes adverse employment action).

Defendant's temporal attenuation argument fails wholly, as Defendant's alleged decision to begin the process of removing Plaintiff occurred less than 2 weeks after Defendant became aware of Plaintiff's charge of discrimination filed with the D.C. Office of Human Rights. "This Court has often followed a three-month rule to establish causation on the basis of temporal proximity alone." *McIntyre,* 460 F.Supp.2d at 133. Here, Defendant avers that it learned of Plaintiff's March 31, 2004 filing with DCOHR on April 7, 2004, when Beckham received notice

of the same. (Defendant Statement, Ex. 13 at §5.) On April 20—a mere 13 days later—Defendant's Ad Hoc Management Committee, at a meeting attended by Jones and Mack, discussed Plaintiff's March 31, 2004 complaint with DCHRA (and the complaint of another Finance Office staffer)—and then a matter of minutes later voted to approve Jones' suggestion to terminate the Finance Office. (PSOF ¶ 97.) Defendant cannot dispute that 13 days is sufficient temporal proximity to show a causal connection sufficient to meet Plaintiff's burden for his *prima facie* case. *See Mansfield*, 432 F.Supp.2d at 73 (16 days sufficiently close temporal proximity to establish causal connection).

Defendant's alternate argument of intervening cause falls apart on close factual inspection. Defendant alleges two intervening causes—the CSBG audit report and the Head Start audit report. (Def. Mem. at 20-21.) Neither of these constitute intervening cause with respect to Plaintiff's March 31, 2004 protected activity. To constitute intervening cause under the reasoning of *Tenkku* (the 8th Circuit case cited by Defendant) the intervening matter must be intervening—it must occur temporally between the date where knowledge arose of the protected activity and the date where the adverse action decision was decided upon. *See Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir. 2003). Defendant's senior management received the CSBG audit report prior to learning of Defendant's discrimination charge; the CSBG audit report—the contents of which were discussed at Defendant's Board meeting on March 11—were sent by Eboda to Jones on March 25 and by Eboda to Mack on April 5. (PSOF ¶¶ 71, 77.) In contrast, Defendant's general counsel received notice of Plaintiff's March 31 protected activity only on April 7, 2004, preventing the CSBG report from intervening between discovery of Plaintiff's protected activity and the apparent decision to terminate Plaintiff. (Defendant Statement, Ex. 13 ¶5.)

For the opposite reason, the Head Start report also cannot constitute such intervening cause--Defendant received the Head Start audit report results *after* its Ad Hoc Management Committee's had approved Jones' proposal. Specifically, while the relevant meeting of the Ad Hoc Management Committee was on April 20, 2004, Head Start only issued its adverse audit report on April 26. (DSOF ¶¶ 56, 64.) Further, Defendant has adduced no evidence that it received the April 20 Head Start deficiency letter prior to the meeting of the Ad Hoc Management Committee occurring that evening – April 20, 2004 -- nor is such evidence likely— a deficiency finding from Head Start is an important matter requiring prompt attention, and yet the matter is completely omitted from the unredacted portions of the Ad Hoc Management Committee's minutes. (PSOF ¶ 81.) To the contrary, Defendant's preparations to terminate Plaintiff were already in the works, as Defendant's general counsel Beckham was already requesting the issuance of a retention register and family grouping list on April 15, 2004—a mere 8 days after she received notice of Plaintiff's protected filing with DCHRA. (DSOF Ex. 13 ¶5.)

Further, casual connection for purposes of the *prima facie* case can be shown by more than mere temporal proximity and knowledge. Other indicia can also suffice, including disparate treatment, deviation from standard procedures, contradictions between present explanations and contemporaneous explanations indicative of 'shifting reasons,' as well as vocalized continuing concern with prior protected activity coupled with temporal proximity. *See Gipson v. Wells Fargo N.A.,* 460 F.Supp.2d 15, 25, 28-31 (D.D.C. 2006). All of these indicia are present here. Plaintiff was treated disparately from another individual also within UPO Finance Office management lacking prior protected DCHRA activity whom Defendant did not terminate at the time of the RIF--namely Isaac. (*See* PSOF ¶103.) With respect to the other *Gipson* rationale,

*see* Part V,D, *infra*.

### D. Defendant's Alleged Legitimate Reasons are Pretext for Reprisal

The record readily puts the lie to Defendant's alleged legitimate reason of following its own RIF policy with respect to Plaintiff and Quashie. First, Defendant's Memorandum asserts that Plaintiff was released because he was second in seniority to Quashie—in other words, bumped—and yet Defendant's corporate designee testified under oath that the RIF bumping policy was not used with respect to Plaintiff and Quashie. (PSOF ¶105; Def. Mem. at 21.) And yet, Defendant has claimed in other testimony that the reason for retaining Quashie was not the RIF policy, but instead that outsourcing contractor Walker & Company requested him by name. (PSOF ¶105.) And yet still, the record also shows Defendant ordering the outsourcing contractor to retain Quashie by name, and then informing that contractor that Plaintiff had been discharged due to position abolition prior to the contractor's arrival. (*See id.* ¶111.) Such "shifting reasons" and deviations from standard procedure provide strong evidence of retaliatory intent. *C.f. Gipson,* 460 F.Supp.2d at 29, 30. Further, the record also shows Defendant's CEO stating that he wanted to fire Plaintiff for performance reasons without reference to any RIF. (*Id.* ¶112.)

"Plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision […] Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination." *Gipson,* 460 F.Supp.2d at 27. Second, the legitimacy of treating Quashie as comparable to Plaintiff under the RIF policy is in doubt given that Quashie was not properly appointed to the Acting Deputy Controller position under Defendant's own internal personnel policies. (*Id.* ¶117.) Third, Defendant has adduced no evidence showing the propriety of processing an employee in acting status for RIF

purposes based on his or her acting post instead of their true post.  (*See* PSOF ¶128; *see generally* DSOF.)

Fourth, independent evidence exists of possible retaliatory intent, based on the conduct of Shears.  Shears, in her abortive resignation letter on March 11, 2004, stated that her resignation was motivated in part by Plaintiff's October 2003 protected activity, and that she would be resigning if it were possible to terminate the Plaintiff while she was still employed with UPO.[4] (*Id.* ¶¶63-64.)    Given the role that Shears would need to have taken any RIF decision, her making such a statement just over one month before Jones proposed outsourcing and RIFing the Finance Department is highly indicative of pretext.  *See Gipson,* 460 F.Supp.2d at 25, 30-31.

Defendant's reference to McLean is similarly fraught.  In the first instance, citing a comparator is not *apropos* in the context of summary judgment.  As this Court has instructed, "'[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury.'  Where disparate treatment is at issue, courts in this circuit have been cautious in granting summary judgment, since questions of disparate treatment are difficult questions of fact often left to a jury."  *Gipson,* 460 F.Supp.2d at 30.  Second, McLean is indeed a good comparator for Plaintiff, in that both were terminated for pretextual reasons in a manner inconsistent with the proper functioning of Defendant's purported RIF policy.  First, Defendant had a strong pretextual reason to terminate McLean—she was the girlfriend of Defendant's disgraced former Executive Director Jennings, and both she and her coworkers understood that she was being terminated on that basis.  (*Id.* ¶¶101, 113.)  Second, McLean's termination deviated markedly from the RIF policy in several respects:  McLean was bumped in favor of Isaac, even though they were classified in separate job family groupings (*Id.* ¶116); McLean was bumped in favor of

---

[4]        Plaintiff notes that this Court has held that "the possibility of a statement to convey more than one interpretation in itself suggests that there is a genuine issue of material fact as to its meaning."  *Gipson,* 460 F.Supp.2d at 27.

Isaac, despite Defendant's denial that it used the RIF bumping policy with respect to the Finance Office in 2004 (*Id.* ¶¶105, 116); McLean was never restored to status despite the fact that Isaac—the person who took over her position—resigned prior to her full termination (*Id.* ¶116); and McLean—like Plaintiff—apparently never received the outplacement assistance from Defendant which the RIF policy required (*Id.* ¶120.)

Finally, the text cited by Defendant from Plaintiff's deposition in no way disproves the pretextual nature of Defendant's removal of Plaintiff. To the contrary, the question asked was whether Plaintiff had ever been told of the Board's stated reasons for termination. (Def. Mem. at 21-22.) If the facial text of statements by the Board or the documentation provided were determinative of the issue of reprisal, then the pretext analysis noted in *Carter-Obayuwana* and elsewhere would be redundant. Since such facial representations carry little weight when pretext is evident, the Agency's argument is of no moment.

## VI.    DEFENDANT WRONGFULLY DISCHARGED PLAINTIFF

### A.  Summary of Argument

Just as Plaintiff raised two separate bases for wrongful discharge, namely wrongful discharge for making protected whistleblowing disclosures and wrongful discharge for refusal to issue fraudulent financial statements, Defendant has raised two separate lines of argument to Plaintiff's case.

With respect to its wrongful discharge of Plaintiff for making protected whistleblowing disclosures, Defendant's sole argument is that Plaintiff should not be entitled to a common law remedy because the statutes which prohibit whistleblower reprisal (namely, the D.C. Whistleblower Protection statute and the two False Claims Acts) create exclusive statutory remedies. (Def. Mem. at 25-26.)

With respect to its wrongful discharge for refusal to issue fraudulent financial statements, Defendant asserts three arguments:  (a) Plaintiff did not identify a specific statute enunciating a policy which Plaintiff was asked to violate by issuing fraudulent financial statements, (b) if Plaintiff was referring to the False Claims Act, then the False Claims Act provides an exclusive statutory remedy, and (c) Plaintiff has failed to show a causal connection between his refusal to issue the fraudulent financial statement and his termination.  (Def. Mem. at 26-27.)

The fatal defects in Defendant's arguments are detailed below, organized by basis for convenience.

### B.  Wrongful Discharge in Retaliation for Whistleblowing

### 1.  General Law

In a recent unpublished opinion, this Court took the opportunity to provide an excellent explanation of the proper analysis for summary judgment determinations for common-law wrongful discharge claims predicated upon whistleblower reprisal in the District of Columbia:

> As a general rule, the District of Columbia has long recognized the at-will employment doctrine, which holds that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." […T]he District of Columbia Court of Appeals first recognized a "very narrow exception" to the at-will doctrine, creating an intentional tort for wrongful discharge where a plaintiff can prove that the "sole reason for the discharge is the employee's refusal to violate law, as expressed in a statute or municipal regulation." The D.C. Court of Appeals later clarified, however, that "the 'very narrow exception' […] should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition."

> […T]he analysis is as follows:  Th[e] court should consider seriously only those arguments that reflect a clear mandate of public policy- *i.e.,* those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination. […]The tort has been held to encompass claims of discharge in retaliation for whistleblowing. [...]

> To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in

a protected activity; (2) the employer took an adverse personnel action; and (3) there was a causal connection between the two. Further, the causal connection between the protected activity and the adverse personnel action must be tight. In order for Plaintiff's wrongful discharge claim to succeed, Plaintiff must have been terminated solely, or at least substantially, for engaging in the alleged whistleblowing activity.

*Mastrangelo v. Natnl. Passenger R.R. Corp.,* Civil Case No. 01-0582(TFH), 2006 WL 416181 (D.D.C. Feb. 22, 2006) at *3-*5 (internal citations omitted).  For purposes of summary judgment, however, the Plaintiff is not held to making his ultimate showing for causal connection; instead, his burden is merely to present evidence sufficient to create a genuine issue of material fact as to the existence of a causal link between the protected activity and the adverse personnel action. *See id.* at *5.

### 2.  Plaintiff Has Demonstrated His *Prima Facie* Case

Plaintiff has plainly met his *prima facie* case for this species of wrongful discharge. Plaintiff had made numerous protected disclosures to officials of the Federal and District governments, including Eboda, Marty and Duncan.  (PSOF ¶¶ 45-51, 55-56, 58-60, 68, 75-76, 78, 84-86, 90-91, 94.)  Defendant cannot dispute that it took an adverse personnel action against Plaintiff, specifically by terminating Plaintiff's employment.  (*Id.* ¶100.)  Finally, as the record reflects, Plaintiff has met his burden of presenting evidence showing at a minimum the existence of a genuine issue of material fact as to the existence of a causal link between the protected activity and the adverse personnel action, especially in light of the pretext inherent in Defendant's alleged rationale for removing Plaintiff.  (*See id.* ¶¶104-120.)

### 3.  Rebuttal of Defendant's Arguments

Defendant's sole argument as to this basis for wrongful discharge is that the statutory remedies of the False Claims Acts and the Whistleblower Protection statute preempt the creation of a common-law wrongful discharge remedy, citing the rule of *Nolting v. National Capital*

*Group.* (Def. Mem. at 25-26.)  This argument is error, at least with respect to the D.C. False Claims Act, under the reasoning of the *Nolting* court.

In *Nolting,* the court inferred that the relevant statute (protecting employees from reprisal for filing workers' compensation claims) created a comprehensive regulatory scheme, and therefore that the D.C. Council did not intend any remedial mechanism outside the one provided in statute.  *Nolting v. National Capital Group, Inc.,* 621 A.2d 1387, 1388-89 (D.C. 1993).  In contrast to the workers' compensation scheme discussed in *Nolting*, the plain text of the D.C. False Claims Act suggests that the Council's intent was that the remedies under the False Claims Act *not* be the exclusive remedy for the wrongs discussed therein.  *Compare* D.C. Code § 2-308.18 ("The provisions of this chapter are not exclusive, and the remedies provided for shall be in addition to any other remedies provided for in any other law or available pursuant to common law.") *to* D.C. Code § 32-1504 (primary worker's compensation remedy intended to be exclusive remedy).

## C.  Wrongful Discharge for Refusal to Violate Law

### 1.  General Law

With respect to the wrongful discharge of Plaintiff for refusal to issue fraudulent financial statements, the relevant case law governing Plaintiff's circumstance is that of *Adams,* the seminal case in the District of Columbia which first recognized wrongful discharge, and its progeny.  As the *Adams* court teaches, "there is a very narrow exception to the at-will doctrine under which a discharged at-will employee may use his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation."  *Adams v. George W. Cochran & Company, Inc.,* 597 A.2d 28, 34 (D.C. 1991).  To invoke the *Adams* wrongful discharge claim, the employee must be directly

presented with "the 'Hobson' choice of either doing an illegal act […] or being fired if []he did not elect the former course"—in other words, there must be an "express direction given to the employee to do an act that would violate the law." *Mandsager v. Jaquith,* 706 A.2d 39, 42 (D.C. 1998). The employee must also make an "outright refusal". *Id.*; *Thigpen v. Greenpeace, Inc.,* 657 A.2d 770, 771 (D.C. 1995).

## 2. Plaintiff Has Demonstrated His *Prima Facie* Case

Plaintiff's circumstances also evince the *prima facie* case for wrongful discharge under the rule of *Adams.* Plaintiff was directly ordered by his employer to issue the false financial statements. (PSOF ¶¶ 19, 61-62, 67, 70.). For Plaintiff to do so would necessarily require Plaintiff to break a number of laws, all of which codify the clear public policy of prohibition of fraud—in this case, fraud through the means of falsified financial statements. This policy finds its most stringent statutory form in the various statutes criminalizing fraud. Of particular note in this context is 18 U.S.C. §1344, the Bank Fraud statute, which creates especially strict penalties for attempts to defraud banks as part of public policy of not only deterring crime but also protecting the integrity of the banking system. *See U.S. v. Leahy,* 445 F.3d 634, 646-47 (3rd Cir. 2006). In addition, Plaintiff's assistance in falsifying the financial records of Defendant would represent his participation in his official capacity as an agent of UPO in a violation of D.C. Code § 29-301.26, which mandates that all D.C. non-profit corporations "keep correct and complete books and records of account". D.C. Code § 29-301.26. Defendant's agents—specifically Mack and Shears—expressly directed Plaintiff to violate these statutes through issuance of fraudulent financial statements on several occasions, and each time Plaintiff responded with an outright and unequivocal refusal to engage in acts that violate the law. (PSOF ¶¶ 62, 67.) Defendant—even by its own assertion—began preparing to terminate Plaintiff soon after these refusals. (*Id.* ¶¶ 74,

112; Def. Mem. at 25.)  Finally, at a minimum a genuine issue of material fact exists as to the true motivation for Defendant to discharge Plaintiff, especially in light of the pretext apparent in Defendant's alleged rationale for removing Plaintiff.  (PSOF ¶¶104-120.)

### 3.  Rebuttal of Defendant's Arguments

Defendant's three arguments are easily disposed of.  First, contrary to Defendant's allegations, Plaintiff has identified a clear and unambiguous public policy enshrined in statute which provides the basis for a wrongful discharge claim:  the public policy of fighting fraud in its multifarious forms.  *See* 18 U.S.C. §§ 1001, 1003, 1031, 1344; D.C. Code §22-3221.

Defendant's second argument is of no moment, as the False Claims Acts' reprisal provisions do not provide a civil remedy for all aspects of the fraudulent activities engaged in by Defendant and its agents.  Specifically, the False Claims Acts are the civil analogue to those criminal statutes which criminalize fraud against *the government*.  *Compare* 31 U.S.C. §3729 *to* 18 U.S.C. §§ 1001, 1003, 1031 (federal civil and criminal statutes for frauds against the United States).  However, the federal and District governments were not the only victims of Defendant's agents—their fraudulent activities also extended to at least one *private* entity—namely, the bank which provided Defendant with its line of credit.  Under the Bank Fraud statute, criminal violations of the law occur not only where the bank actually suffers financial loss (for example, due to provision of false information overstating creditworthiness and financial status in order to procure a lesser interest rate); the federal courts have also found a Bank Fraud violation to occur from filing of false financial statements regarding a borrower's financial status in order to sustain a line of credit.  *See U.S. v. Goldsmith*, 109 F.3d 714 (11th Cir. 1997); *c.f. U.S. v. Molinaro*, 11 F.3d 853 (9th Cir. 1993).

The record clearly shows such false filings here, with Plaintiff being stripped of duties to

facilitate submission of false financial statements to the bank to sustain the line of credit—a line of credit which the bank almost revoked when it received corrected financial statements after the governmental audits began. (PSOF ¶ 83.) Unlike the False Claims Acts, the Bank Fraud statute incorporates no civil remedy for wrongful discharge to protect individuals such as Plaintiff in the same fashion as the False Claims Acts or the workers' compensation system in *Nolting*. Similarly, no such civil remedy is apparent with regard to persons protesting falsification of the books of Defendant as a non-profit corporation under the District's corporations statutes. *See generally* D.C. Code §29-301.01 *et seq.*

Finally, Defendant's third argument fails, as Defendant's proffered rationale for disproving the causal connection between Plaintiff's refusal to violate the law through issuance of false financial statements and Defendant's termination of Plaintiff—the alleged legitimacy of the outsourcing and/or RIF of Defendant's financial department—are riddled with inconsistencies which demonstrate clear indicia of pretext. (PSOF ¶¶104-120.)

## CONCLUSION

For the reasons stated above, the Court should DENY Defendant's Motion for Summary Judgment.

Respectfully Submitted,

_/s/_____
Omar Vincent Melehy, Esq.
D.C. Bar No. 415849
Melehy & Associates, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Phone: (301) 587-6364
Fax:    (301) 587-6308
Email: ovmelehy@zmdlaw.com

*Attorney for Plaintiff*