# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Mohammed Amin Kakeh,

*Plaintiff,*

v.

United Planning Organization, Inc.,

*Defendant.*

Civil Case No. 1:05-cv-1271 (GK/JMF)

Next Scheduled Event:
Pretrial Conference
April 11, 2007, 4:15 P.M.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AND GENUINE ISSUES

Plaintiff Mohammed Amin Kakeh (hereinafter "Plaintiff"), by and through his undersigned counsel, and pursuant to Local Civil Rules 7(h) and 56.1, hereby respectfully submits the following statement of factual matters and issues in this case. To the extent that the contents of the so-called "Statement of Material Facts as to Which There is No Genuine Issue" (hereinafter "Statement") filed by Defendant United Planning Organization, Inc. (hereinafter "Defendant" or "UPO") comport with the matters appearing herein, then those matters of agreement represent material facts agreed to by both parties for purposes of disposition of Defendant's Motion for Summary Judgment. To the extent that the factual assertions contained in Defendant's Statement are different from the following statement, Plaintiff is expressly, emphatically and unequivocally controverting such alleged facts as propounded by Defendant and asserting therefore that genuine issues of material fact exist which must be resolved by the finder of fact as per Local Civil Rules 7(h) and 56.1.[1]

---

[1]    Please note that for formatting reasons Exhibits 28, 29, 30, and 31 have been intentionally omitted.

## DEFENDANT'S OPERATIONS

1.      Defendant is a non-profit corporate entity incorporated in the District of Columbia in 1962 which purports to be a social welfare organization tasked with provision of anti-poverty services to the residents of the District of Columbia. (UPO Corporate Status Record, Exh. 1; UPO Main Webpage, *available at* http://www.upo.org/index.html, Exh. 2; UPO Mission Statement (1995), *available at* http://www.upo.org/upocorporate.html, Exh. 3).

2.      Defendant's operations are primarily funded by grants provided by the federal government and the government of the District of Columbia. (UPO Information Booklet (January 2007 ed.) at 6-8, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4.) Private funding represents less than 1% of Defendant's entire budget; Defendant therefore effectively has no income except from grants. (*See id.*; Kakeh Dep. at 111, Exh. 5).

3.      At all times relevant to this lawsuit, Defendant has contracted with the District of Columbia to operate the Head Start program, a program providing educational services to pre-school children from low income families, for most periods from the early 1960s to the present. ("UPO Preschool and Day Care", *available at* http://www.upo.org/headstart.html, Exh. 6.) This program is funded in majority part (but no more than 80%) by federal funds which are disbursed directly from the federal government to the Defendant through a grant, and in minority part by District of Columbia funds which are disbursed directly to the Defendant from the District of Columbia in the form of a grant. (*Id.*); 42 U.S.C. § 9835(b); 45 C.F.R. § 1301.20; (UPO Information Booklet (January 2007 ed.) at 8, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4; UPO SJ Ex. 14 ¶ 6). Defendant is a service provider under its Head Start contract with the District of Columbia, as it directly provides Head Start services to D.C. residents. (UPO Information Booklet (January 2007 ed.) at 11, *available at* http://www.upo.org/Profile-

master.pdf, Exh. 4.) In the last few years, Defendant has received roughly $15.2 Million per year in Head Start monies from the federal and District governments, comprising approximately 39% of Defendant's overall budget in Fiscal Year 2006. (UPO Information Booklet (January 2007 ed.) at 7, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4.)

      4.    At all times relevant to this lawsuit and since 1981, Defendant has contracted with the District of Columbia to administer the Community Service Block Grant ("CSBG") program. (UPO Information Booklet (January 2007 ed.) at 11, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4; Eboda Dep. at 6, Exh. 7 ). This program is funded by federal funds which are funneled through grants from the federal Department of Health and Human Services to the District government, and then from the D.C. Department of Human Services to the Defendant. 42 U.S.C. §9907; (UPO Information Booklet (January 2007 ed.) at 6, 8, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4; Eboda Dep. at 15, Exh. 7; UPO SJ Ex. 14 ¶ 4). As a Community Action Agency under applicable statute, Defendant's role is to provide administrative and oversight services with respect to allocation and disbursement of CSBG monies to D.C. service providers, and to monitor services funded thereby. (Eboda Dep. at 10, Exh. 7; UPO SJ Ex. 14 ¶ 4). In Fiscal Year 2006, Defendant received $9.9 Million in CSBG monies, comprising approximately 28% of Defendant's overall budget in FY 2006. (UPO Information Booklet (January 2007 ed.) at 6-7, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4.)

      5.    At all times relevant to this lawsuit, Defendant has contracted with the District of Columbia to directly provide services to D.C. senior citizens. (UPO's Information Booklet, January 2007 edition at 6, 8, available at:  http://www.upo.org/Profile-master.pdf, Exh. 4.) These service programs are funded by the D.C. Office on Aging, as supplemented by federal

CSBG monies. (*Id.*; *UPO Reporter* (March 2006 ed.) at 6, available at: http://www.upo.org/RPT.3-06b.pdf, Exh. 8). In Fiscal Year 2006, Defendant received $5 Million from the District and federal government to fund Defendant's service-provision activities, comprising approximately 13% of Defendant's overall budget in Fiscal Year 2006. (UPO Information Booklet (January 2007 ed.) at 7, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4.)

6.    Defendant also had or has other contracts with the District of Columbia and/or federal governments to provide other services within the District of Columbia, which are funded in whole or in part by agencies of the District of Columbia (in particular, the D.C. Department of Human Services, the D.C. Department of Employment Services, the D.C. Department of Environment, the D.C. Department of Health, D.C. Public Schools and the D.C. Community Partnership for Prevention of Homelessness) and/or of the federal government (in particular, the U.S. Department of Housing and Urban Development, the Corporation for National & Community Services and the U.S. Department of Agriculture). (UPO Information Booklet (January 2007 ed.) at 6-8, *available at* http://www.upo.org/Profile-master.pdf, Exh. 4.)

7.    As a recipient of federal and District grant monies, Defendant is required by law to (A) implement and maintain stringent standards for financial operations, accounting practices and audit procedures, pursuant to the Single Audit Act Amendments of 1996 (31 U.S.C. 7501-7507) and revised OMB Circular A-133, "Audits of State, Local Governments, and Non-Profit Organizations" and other relevant authorities, and (B) certify compliance with the same under pain of severe civil and criminal penalties. 31 U.S.C. § 7502; 42 U.S.C. § 9917; 45 C.F.R. §§ 74.21, 74.26, 74.52, 96.31(a), 1301.10, 1301.12, 1301.13, 1304.51; (Eboda Dep. 15-16, Exh. 7; UPO SJ Ex. 15 ¶ 3); *see* ("CSBG Terms and Conditions: States, Territories, and Tribal Grantees

FY 2005", *available at* http://www.acf.hhs.gov/programs/ocs/csbg/documents/csbgtc2005.html, Exh. 9; DHHS ACF Grants, dated Feb. 2003, Exh. 10; DHHS ACF Grants, dated Feb. 2003, Exh. 11; DHHS ACF Grants, dated Feb. 2003, Exh. 12; DHHS ACF Grants, dated Feb. 2003, Exh. 13; DHHS ACF Grants, dated Feb. 2003, Exh. 14; DHHS ACF Grants, dated Feb. 2003, Exh. 15).

## FACTS CONCERNING PLAINTIFF

8.    At all times relevant to this lawsuit, Plaintiff has been a member of the following categories of persons protected by the D.C. Human Rights Act, D.C. CODE ANN.§ 2-1402(a)(1): race (Caucasian), color (light-skinned), religion (Muslim), national origin (Syrian) and sex (male). (Kakeh's Charge of Discrimination, dated Mar. 31, 2004, Exh. 6; Fisher Dep. at 70-71, Exh. 17; Kakeh Dep. at 21, 22, 24-25, Exh. 5; *see* Kakeh's Resume, Exh. 18; Fisher Dep. at 62, Exh. 17; UPO SJ Ex. 13 ¶5).

9.    Plaintiff began his employment with Defendant on June 29, 1998 as the Controller. (Personnel Action No. 51633, Exh. 19.)

10.    As Controller, Plaintiff's job functions included: establishing and maintaining the Organization's accounting principles, practices, and procedures; preparing financial reports and presenting subsequent findings and recommendations to top management; overseeing the computer accounting system; management of the cash flow and the revenue activities; preparing the overall financial statements annually and otherwise; preparing the audit schedule and oversight of the audit preparation; managing the Organization's budget including all related disbursements and reporting requirements; acting as chief financial adviser to the Organization's managers and executives; developing and training of staff; designing and operating the computerized accounting system; and supervising the Office of Billing and Revenue, accounts

receivable and payable, payroll, the Budget Office, the Senior Accountant in the Accounting Department, the Financial Operation managers, and to an extent the external auditor. (Controller's Job Description, undated, Exh. 20; Kakeh Dep. at 62, Exh. 5). As Controller, Plaintiff was present at management team meetings and gave input regarding financial systems and further, he was given copies of important memoranda concerning financial matters. (*See* Hughey Dep. at 25-26, Exh. 21; Kakeh Dep. at 71-74, Exh. 5).

## PLAINTIFF'S WHISTLE-BLOWING ACTIVITIES

11.    In 2003, Plaintiff learned facts which caused him to reasonably believe that Defendant had engaged in the following: gross mismanagement in connection with the administration of a public program or the execution of a public contract; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of a public program or the execution of a public contract; and violations of contractual terms and state, local and federal laws within the meaning of D.C. CODE ANN.§ 2-223.01. (Kakeh Dep. at 127, 132-33, Exh. 5.) Additionally, in 2003, Plaintiff learned facts which caused him to reasonably believe that Defendant was engaged in knowingly presenting a false claim for payment or approval to the District of Columbia and United States governments; conspiring to defraud the District of Columbia and United States governments; and knowingly making and using a false record to make a claim to the United States government (hereinafter "fraud, waste and abuse.") (*Id.*)

12.    Plaintiff's belief was reasonable in that it was the product of Plaintiff's diligent and thorough investigations. Plaintiff became increasingly suspicious, prompted in part by reports from UPO staff of financial irregularities such as managers claiming reimbursement for trips which they had not taken or claiming expense advances which were never repaid and for

which the actual expenses incurred were never properly documented. (*Id*. at 128, 129-130, Exh. 5.) By precluding his access to needed financial documentation, Defendant initially hindered Plaintiff's investigation of fraud, waste and abuse. (*Id*. at 130, Exh. 5.) For example, Defendant had blockaded Plaintiff's access to financial information from about June 2003 onward. (*Id*. at 72-73, 128, 131, Exh. 5; Roberson Dep. at 28, Exh. 22). Plaintiff suspected that this denial of access to financial records possibly indicated an attempt to cover up financial transactions which he would not have permitted. (Kakeh Dep. at 128, Exh. 5.) However, to the extent that Plaintiff learned of suspicious transactions, it was only in the form of signed payment directives from then-UPO Executive Director Benjamin Jennings, which Plaintiff lacked the authority to countermand. (*Id*. at 116, 130, Exh. 5; Roberson Dep. at 30, Exh. 22). As financial information began to be compiled for the end-of-year reconciliation in Fiscal Year 2003, Plaintiff identified fiscal discrepancies which demanded extra investigatory effort in order to rectify. (Kakeh Dep. at 115, 129, 131, Exh. 5.)

13.    However, in November and December 2003 many relevant wrongdoers in UPO management were absent from Defendant's nearly vacant headquarters due to vacations and work related trips to Hawaii and Puerto Rico, permitting Plaintiff the opportunity to investigate, locate and elicit needed information concerning the fraud, waste and abuse. (*Id*. at 127-128, 131, Exh. 5.) As a product of these diligent investigations, by January 2004, Plaintiff was able to identify a list of UPO financial transactions which constituted fraud, waste and abuse. (*Id*. at 127, 131-32, Exh. 5; *see* Shears Dep. at 40, 43-44, Exh. 23). These investigations were hindered by steps that UPO managers such as Jennings had taken to hide illegal financial transactions, such as directing illegal transactions through the corporate credit card account, and paying out balances on that account through direct wire transfers which sidestepped internal control, and

then storing the credit card records in private residences to avoid discovery. (Kakeh Dep. at 115-116, 129, 213-214, Exh. 5.)  Plaintiff's investigations in particular also continued to be impeded by continuing efforts to block his access to financial information, such that Plaintiff often had to use subterfuge to access financial records being withheld by Defendant's then-CFO Sheila Shears. (*Id.* at 131, 196, Exh. 5; *see* Shears Dep. at 40, 42-43, 44, Exh. 23).

14.     As a result, by January 2004 Plaintiff reasonably believed that Defendant was engaged in fraud, waste and abuse, and that blowing the whistle was necessary to bring in outside individuals with the power to locate the missing financial documentation and to stymie Defendant's fraud, waste and abuse before Plaintiff was forced to either issue an illegal fraudulent financial statement or to resign. (Kakeh Dep. at 133-34, Exh. 5.)

15.     Plaintiff's belief was also reasonable as being informed by Plaintiff's extensive experience and training in accounting matters. (*See* Mack Dep. at 17, Exh. 24.)  As of 2003, Plaintiff has been an accountant for 35 years, with relevant degrees from the University of Damascus and the University of Detroit, and varied and progressively higher-level experience in accounting in the Syrian government audit agency, several non-profits, a Saudi investment firm and three universities. (Kakeh Dep. at 22-57, Exh. 5.)  While no special academic training exists for nonprofit accounting *per se*, Plaintiff is an accomplished non-profit accountant, which 75% of his accounting career spent with non-profit organizations of various stripes. (*Id.* at 27-28.)

16.     Plaintiff reasonably believed that Defendant had engaged in two varieties of fraud, waste and abuse with respect to the CSBG grant funds.  The first variety was the fraudulent mischaracterization of monies expended by UPO as CSBG-related expenses, when these monies were expended on programs other than CSBG.  The second variety of fraud, waste

and abuse was fraudulent mischaracterization of misappropriated funds as CSBG related expenses.

17.    CSBG is a block grant, portions of which are pre-designated when the grant is issued for spending on other specifically enumerated programs such as Head Start and Office on Aging programs. (*Id.* at 111, Exh. 5.)   Only the amounts pre-designated may be lawfully transferred into other legitimate grant programs—the rest is to be used for CSBG purposes only. (*Id.*)   Under no circumstances may UPO draw down CSBG grant funds for expenses that have no relationship to any legitimate program.   Due to Defendant's misappropriation of funds -- largely caused by the actions of Ben Jennings, the former Executive Director (*See id.* at 106, 109-110, 113-115, Exh. 5) -- Defendant was faced with a deficit in that it had insufficient funding to cover the expenses it had incurred.   In other words, all other grant moneys had been drawn down and Defendant's line of credit was maxed out. (*Id.* at 109-10, 212, Exh. 5.)

18.    Defendant, like every corporation, spends its own cash reserves whenever faced with a deficit. (*Id.* at 29, Exh. 5.)   As a non-profit corporation, Defendant is not supposed to be retaining accrued profits from operations as cash reserves, but instead is supposed to run at a break-even level on a long-term basis. (*Id.* at 27-28, Exh. 5.)   Since Defendant had no income except from grants — which had already been spent — and no cash reserves, it had no money to pay the large deficits that had accrued. (*See Id.* at 111, Exh. 5.)   In short, if Defendant had observed the legal restrictions governing use of CSBG funds, it would be bankrupt absent special permission from DHS to reallocate unallocated CSBG funds to cover those deficits.   Defendant had not received such permission as of the date of Plaintiff's unlawful removal from Defendant's employ; in fact, such permission was denied the day before Defendant terminated Plaintiff. (*See* Letter from Eboda to Roberson, dated Jun. 1, 2004, Exh. 25; Jones Dep. at 111-12, Exh. 26).

19.    To cover these deficits, Defendant committed fraud, waste and abuse and made false claims by attempting to charge expenditures to the CSBG grant, when the expenditures were for other programs or for illicit purposes.  Defendant, in preparing its annual budget request for the forthcoming year to be submitted to the CSBG office of DHS, would submit a budget request for an amount far larger than what Defendant actually expected to spend on proper CSBG activities.  (Kakeh Aff.  ¶ 14, Exh. 27.)   DHS would then forward UPO's fraudulent budget request on to HHS.  (*Id.* ¶ 14, Exh. 27.)  HHS then disbursed CSBG moneys to DHS based on Defendant's fraudulently inflated budget request.  (*Id.* ¶ 14, Exh. 27.)  Every year, per DHS requirements, Defendant would submit its audited financial statement to DHS, which DHS would the rely upon both as confirmation of the accuracy of Defendant's prior year CSBG budget request and as confirmation of the figures Defendant was requesting for its proposed CSBG budget request for the forthcoming year.  (*Id.* ¶ 14, Exh. 27.)  Defendant's agents, including Jennings and Mack, would order Defendant to prepare Defendant's end-of-year financial statement in an inaccurate fashion in conformance with their falsely inflated CSBG budget claims, and thus in derogation of applicable accounting practice (as well as applicable law and regulation associated with the governmental grants funding Defendant's activities).  (*Id.* ¶ 14, Exh. 27.) Although the financial statements produced by Plaintiff were putatively submitted for audit by an outside auditor prior to submission to DHS, Plaintiff understood that in practice the outside auditor in question would ultimately produce no meaningful corrections to any financial statements so submitted with respect to this particular issue.  (*Id.* ¶ 14, Exh. 27.)

20.    DHS paid CSBG money to Defendant on a reimbursement basis, to be paid based on written invoices for actual expenses incurred by Defendant for CSBG programs.  (*Id.* ¶ 15, Exh. 27.)  To get the maximum amount of money from DHS, UPO would file false invoices each

month which stated the not the real amounts expended for real CSBG purposes, but instead $1/12^{th}$ of the budgeted amount for each line item in the CSBG budget. (*Id.* ¶ 15, Exh. 27.) In effect, Defendant would submit the exact same invoice for each month of a given fiscal year — they would only change the date. (*Id.* ¶ 15, Exh. 27.) Because Defendant's initial budget request to DHS was falsely inflated, UPO would disburse far less than their available maximum CSBG allocation to CSBG programs than was budgeted. (Kakeh Dep. at 51, 251-52, Exh. 5.) Defendant would thus be left at the end of the year with a large pool of CSBG funds procured from DHS and HHS through false pretenses. (Kakeh Aff. ¶ 15, Exh. 27.)

21.    Defendant would further violate federal grant regulations by loaning money from one stream of grant money to pay pressing expenses allocable to a second stream of grant money. (Kakeh Dep. at 112-13, Exh. 5)

22.    Plaintiff reasonably believed that Defendant committed the first type of fraud, waste and abuse by using CSBG money to cover cost overruns in programs that had no relationship to the CSBG program in derogation of federal law. (*Id.* at 105, 112-113, Exh. 5.) Defendant (specifically, UPO Chief Operating Office Gladys Mack) engaged in the practice of hiding this misappropriation by filing fraudulent financial paperwork with the government which mischaracterized the pool of improper CSBG reimbursements not as an advance, but as revenue earned. She did this by mischaracterizing expenditures for non-CSBG matters as CSBG expenses which were legitimately owed to UPO. (*See id.* at 50-57, 112-113, 252, Exh. 5.) The net effect was that money being taken from the government on pretense of spending on CSBG programs was instead being diverted into to pay expenses that had no relationship to the CSBG program.

23.    Plaintiff reasonably believed that Defendant had engaged in a second variety of fraud, waste and abuse with respect to CSBG, specifically, through fraudulently mischaracterizing monies misappropriated by UPO management and board members as legitimate CSBG expenses.    Defendant did this by charging the misappropriated expenses to three principal cost centers.  (Kakeh Dep. at 113, Exh. 5.)  They included the following: CSBG Program Support (*Id.* at 113-114, 121-22, Exh. 5); G&A, which is the budget for the immediate office of the Executive Director (*Id.* at 114, 123-24, Exh. 5); and UPO Special (*Id.* at 114-16, Exh. 5).

24.    Plaintiff reasonably believed that Defendant had engaged in fraud, waste and abuse with respect to Head Start and other grants through fraudulent consultant contracts.  As a particular example, Jennings ordered William Hughey (operations head for Head Start at UPO) to hire A. Sue Brown Associates, at a rate of $10,000 per two-week period, for alleged consultant services which were never in fact provided, and then attempted to bill the charges to Head Start as a program expense.  (*Id.* at 123, 252, Exh. 5.)  A. Sue Brown was a personal friend of Jennings.  (Kakeh Aff. ¶ 5, Exh. 27.)  These costs were not properly reimbursable by Head Start as direct costs, and as such, when Head Start refused to pay the entirety of these improper consultancy expenses, Hughey requested that Plaintiff reallocate money to other budgets to cover the consultant bills.  (*See* Hughey Dep. at 12-17, Exh. 21.)

25.    Plaintiff further reasonably believed that Defendant had engaged in fraud, waste and abuse with respect to the District of Columbia Office on Aging, as Defendant (specifically, Jennings) had purchased a luxury sport utility vehicle for the personal use of UPO Board of Directors Chairman Russell Simmons, and then attempted to bill the cost as a direct expense to

the Office on Aging in 2002. (Kakeh Dep. at 117-18, 252, Exh. 5.) When Simmons destroyed the vehicle in 2003, Jennings used UPO money to buy him another. (*Id.* at 117, Exh. 5.)

26.    Plaintiff's discovery of fraud, waste and abuse, included but was not limited to, the following, by way of example:

(a) that employees or company officials were incurring exorbitant cellular telephone bills; (Eboda Dep. at 50, 54-55, Exh. 7; Shears Dep. at 42, Exh. 23; Kakeh Dep. at 162, Exh. 5; *compare* UPO audit, dated Jan. 17, 2004, Exh. 32 *to* Mack Dep. at 50, Exh. 24 (actual text of auditors' letter disproves claim by Mack that TCBA auditors had discovered cell phone issues); *see also* Letter from Catania to Jones, dated Apr. 27, 2004, Ex. 33; Mack Dep. at 49-50, Exh. 24);

(b) that money was paid to consultants of the Defendant, but the funds paid were not properly accounted for (Eboda Dep. at 50, Exh. 7; Kakeh Dep. at 123, 194-95, 196, 199, Exh. 5; Hughey Dep. at 12-17, Exh. 21; Memo from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; Jones Dep. at 103, Exh. 26; Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33, Head Start Review Report, dated Mar. 15, 2004, Exh. 35; Memo from Hughey to Kakeh, dated Mar. 3, 2004, Exh. 36; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37; UPO Bd. of Trustees Mtg., dated Mar. 18, 2004, Exh. 38);

(c) that the Defendant incurred $50,000 in questionable expenses including expenditures for parking tickets, vehicle fines, consulting services and travel (Kakeh Dep. at 128, 129-130, 131, Exh. 5; Fisher Dep. at 23, 27-29, Exh. 17; Stashenko Dep. at 26, Exh. 39; Mack Dep. at 49-50, Exh. 24; Memo from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; *see also* Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; UPO Bd. of Trustees Mtg., dated Mar. 18, 2004, Exh. 38);

(d) that Defendant provided luxury vehicles to the Board Chairman and Jennings, paid for with CSBG and D.C. Office on Aging money (Kakeh Dep. at 116-19; 194-95, Ex. 5; Memo from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34, Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37; UPO Bd. of Trustees Mtg., dated Mar. 18, 2004, Exh. 38);

(e) that Jennings purchased or leased a 46-foot fishing boat for his own personal use with Defendant's funds; (Eboda Dep. at 50, 52, 53-54, 57, Exh. 7; Stashenko Dep. at 16, 26, 37-38, Exh. 39; Fisher Dep. at 22-25, Exh. 17; Beckman Dep. at 22, 24, 27-32, 34, Exh. 40; Kakeh Dep. at 199-200, Exh. 5; Mack Dep. at 13, 15, Exh. 24; Stashenko Dep. at 40-4, Exh. 39; Letter from Catania to Jones, dated Apr. 27, 2004, Exh. 33);

(f) that Jennings incurred $556,000 in inappropriate charges on Defendant's credit cards; (Eboda Dep. at 50, 55-57, Exh. 7; Kakeh Dep. at 115, 194-95, 199, Exh. 5; Stashenko Dep. at 26, 39, 40-41, Exh. 39; Fisher Dep. at 18-20, Exh. 17; Shears Dep. at 38, 43, Exh. 23; Memo from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; UPO Bd. of Trustees Mtg., dated Mar. 18, 2004, Exh. 38);

(h) a large deficit had been incurred by the Defendant generally, which Defendant intended to cover by defrauding CSBG (Kakeh Dep. at 105, 110-114, 122, Exh. 5; Eboda Dep. at 50, 165, Exh. 7; Memo from Kakeh to Roberson, dated Apr.1, 2004, Exh. 34; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37);

(i) Defendant had used grant monies to make a roughly $100,000 loan for the benefit of UPO Treasurer and Board Member Therman Walker, per Jennings' direct order (Kakeh Dep. at 116, 199, Exh. 5; Eboda Dep. at 59, Exh. 7; Fisher Dep. at 34, 74, Exh. 17; Letter

from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37);

(k) Defendant had expended grant money to cover credit card charges related to one of Jennings' assistants having procured cash advances from certain pawn shops. (Kakeh Dep. at 194-196, Exh. 5; Kakeh Aff. ¶ 3, Exh. 27).

27.    Plaintiff began objecting to Defendant's misappropriations associated with the CSBG grant on or about the middle of 2001. (*See* Kakeh Dep. at 112-113, Exh 5.) As a result of these objections, by mid-2002, Jennings had stopped all correspondence with Plaintiff, and would never contact Plaintiff directly. (*Id.* at 70, Exh 5.) To further impede Plaintiff, Jennings purported to hire a consultant, Sheila Shears, allegedly to "make organization perform more efficiently"—to observe Defendant's operations and make recommendations for improvements. (Shears Dep. at 9, Exh 23.) In reality, Defendant brought in Shears to take over job functions stripped from Plaintiff in order to facilitate Defendant's illegal activities. (*See* Kakeh Dep. at 89, Exh 5.) Even at that level, Shears' professional performance proved deficient. (*Id.* at 86, Exh 5.) Shears failed to complete any assignment which Plaintiff gave to her while Shears was a consultant. (*Id.* at 87, Exh 5.) Shears was further unqualified even to act in her purported consulting role as she lacked basic knowledge in many areas of non-profit accounting, at times requiring Plaintiff to explain to her how to perform basic accounting tasks. (*Id.* at 85, 86, 89,. Exh. 5.) Indeed, Shears was not selected as a consultant because of her knowledge of non-profit accounting or her qualifications as she had little prior professional experience in non-profit accounting; she was merely a prior acquaintance of Jennings. (Shears Dep. at 19-20, Exh. 23 (prior acquaintance); Kakeh Dep. at 89, Exh. 5; Shears' Resume, Exh. 41).

28.    On or about April 1, 2003, Jennings, with the support of Mack, created the position of UPO Chief Financial Officer ("CFO") over top of Plaintiff, and personally hired Shears to fill the role. (Shears Dep. at 19-22, 28, 29, Exh. 23; Mack Dep. at 69-70, Exh. 24; Kakeh's Charge of Discrimination, dated Mar. 31, 2004, Exh. 16).

29.    Defendant's hiring of Shears as CFO was done by Jennings to facilitate continued fraudulent activity.  At the time Shears was hired as CFO, Defendant had borrowed up to the maximum available under its credit lines, and had no money available to repay those loans in the event that the lines of credit were reduced by the banks.  (Kakeh Dep. at 109-10, 212, Exh. 5.) Shears testified that Jennings objected that Plaintiff was not providing Jennings with financial analyses containing the "explanations" which Jennings deemed necessary for purposes of filing reports to the banks extending the lines of credit.  (*See* Shears Dep. at 26-27, Exh. 23.)  But Kakeh said Jennings wanted misrepresentations; within 3 months of being hired as CFO, Shears took over this task from Plaintiff, and Shears started sending fraudulent UPO financial statements to the banks so that those banks would continue to extend UPO its multimillion-dollar line of credit undiminished.  (Kakeh Dep. at 92, 212, Exh. 5; *see* Shears Dep. at 29-30, Exh. 23).

30.    Shears was wholly unqualified for the CFO position of CFO.  (Kakeh Dep. at 85, Exh. 5.)  The role of the CFO is to have experienced knowledge of the details of the workings of the organization, to be able to generate financial statements, write procedures and policies, and to practice internal financial control. (*Id.* at 91, Exh. 5.)  Normally, one would expect that the CFO would be more knowledgeable and experienced than the Controller to be qualified for the position. (*Id.* at 88, Exh. 5.)  This level of experience is crucial at the end of the fiscal year.

31.    While Defendant runs financial statements on a monthly basis, the monthly statements do not include all information and so do not present an accurate financial picture, and

thus are only approximate. (*Id.* at 95, Exh. 5.)  Near the end of the year the financial statement changes by the day due to large amounts of new information being entered into the system; the statement is checked for accuracy at least daily, and then by the end 3-4 times a day.  (*Id.* at 95, 97-99, Exh. 5.)  The role of the CFO and/or Controller in this context is to examine the reports to determine where discrepancies in the financial statements are coming from, and what caused them.  (*Id.* at 96, Exh. 5)  Although anybody can run a financial statement from the Solomons system, the duty of the Controller and/or the CFO is to ensure that the financial statements are accurate and reflect the true fiscal status of the organization.  (*Id.* at 97, 98-99, Exh. 5.)  With experience and a thoroughgoing knowledge of how the system parameters are set up, one can judge immediately from where discrepancies arise (the importance of the latter knowledge being part of why access to changing the system parameters is highly restricted).  (*Id.* at 96, 100-104, 222, Exh. 5.)

32.    Based on extended observation of Shears' job performance, Shears was not equal to the task of being CFO and her professional performance was deficient.  (*Id.* at 86, 88.)  Even as a consultant, Shears' professional performance was deficient.  (*Id.* at 86.)  Shears' theoretical knowledge was not much better, in that Shears lacked basic knowledge and prior practical experience in many areas of non-profit accounting, at times requiring Plaintiff to explain to her how to perform basic accounting tasks.  (*Id.* at 85, 86, 89, Exh. 5; Kakeh's Charge of Discrimination, dated Mar. 31, 2004, Exh. 16; Shears' Resume, Exh. 41).

33.    Defendant's selection of Shears was simply for the purposes of placing a person loyal to Jennings over Plaintiff.  Indeed, the process itself was not designed to obtain the best candidate, only a candidate that was loyal to Jennings and would facilitate the wrongdoing he was committing.  Jennings prevented Plaintiff from competing for the position by informing

Plaintiff that even if he applied for the position, his application would not be considered. (Kakeh Dep. at 77-78, Exh. 5; Kakeh's Charge of Discrimination, Exh. 16). The selection process was further defective, in that it was not well publicized as at least one UPO employee believed Shears to have only been a consultant — even the better part of two years after Shears' departure from UPO. (*C.f.* Roberson Dep. at 20, Exh. 22.)

34.    Additionally, Defendant's creation of the CFO position was not part of any legitimate reorganization of UPO, in that no *ex ante* delineation of respective duties was envisaged for the CFO and Controller. No member of senior management had any idea of how the Controller and CFO were to interact to perform their respective roles. After Shears became CFO, Plaintiff was told to split his work with Shears—effectively making Shears' position (or Plaintiff's) redundant. (Kakeh Dep. at 89, Exh. 5.) When Plaintiff complained to Mack that the work done by him and Shears was redundant, Mack responded by asking Plaintiff to "give her [Shears] something to do." (*Id.* at 90, Exh. 5.) At a meeting with Jennings, Mack and Beckham, Plaintiff asked how the work in the Office of Finance was to be apportioned between him and Shears. (*Id.* at 90, Exh. 5.) Jennings responded by instructing Plaintiff to write a job description for the CFO—the absurd situation of a subordinate writing the job description for his supervisor. (*Id.* at 90, Exh. 5.) Plaintiff's responsibilities, however, were in no way decreased—Plaintiff still held ultimate responsibility for the Controller's office: responsibility for supervising staff, for meeting deadlines, for issuing reports, for closing the year and for preparing for the audit. (*Id.* at 73-74, Exh. 5.)

35.    Finally, Defendant by its actions demonstrated that it wished to use Shears to conceal and facilitate Jennings's wrongdoing, rather than perform the traditional functions of a CFO. Pursuant to accounting industry standard, the role of a CFO in a nonprofit organization is

to oversee the financial management of the organization. (*Id.* at 91, Exh. 5.) Typically, the CFO position is a senior-level executive position whose role is to set accounting policy; the Controller in contrast serves to supervise day-to-day financial operations of the organization. (*Id.* at 91-92, Exh. 5.) In contrast, the portions of Plaintiff's former duties which Shears took over—such as Accounts Payable—had two important characteristics: (a) they pertained to functions which were relevant to the financial misconduct of some of UPO's senior officers; and (b) they were the easier tasks. (*See Id.* at 92-93, Exh. 5.) However, they were not traditional CFO functions.

36.    In June 2003, Defendant's Deputy Director, Gladys Mack ("Mack") officially stripped Plaintiff of his duties during a manager's meeting. (*Id.* at 70, Exh. 5; Kakeh's Charge of Discrimination, Exh. 16; Memo from Kakeh to Jennings, dated Oct. 3, 2003, Exh. 42). Specifically, Plaintiff was no longer invited to financial meetings where financial policy matters were discussed and/or was not an active participant when he was permitted to attend. He was taken off the distribution list for financial information inside UPO, was barred from communicating with anyone at UPO save Shears, was barred from accessing most financial information relevant to the Controller's position (banking statements, credit cards, executed contracts, payroll issues, billings issues) and was otherwise stripped of his authority and duties as Controller. (Kakeh Dep. at 70-73, 131, 146, Exh. 5.) Although Plaintiff still retained the title of Controller, his position was reduced to work in a more clerical capacity. (*E.g.* Memo from Kakeh to Jennings, dated Oct. 3, 2003, Exh. 42.)

37.    Plaintiff was also required to check with Shears before issuing any financial statement, and could only share financial statements with others when they had been pre-approved by Shears. (Shears Dep. at 30-31, 51, Exh. 23.) Mack and/or Jennings further stripped Plaintiff of his duties with respect to Defendant's outside auditors on or about March 30, 2004,

and Shears (in association with Jennings) stripped Plaintiff of authority over accounts payable on October 29, 2003. (Shears Dep. at 16, 149-50, 164, Exh. 23; Kakeh Dep. at 93, Exh. 5).

38.    On October 3, 2003, Plaintiff wrote a memorandum to the Executive Director entitled "Controller's Status Alert". (Kakeh Dep. at 136-38, Exh. 5; Kakeh's Charge of Discrimination, dated Mar. 31, 2004, Exh. 16; Memo from Kakeh to Jennings, dated Oct. 3, 2003, Exh. 42). This memorandum alerted the Executive Director about the seriousness of the Defendant's financial operations and solvency. (*See* Memo from Kakeh to Jennings, dated Oct. 3, 2003, Exh. 42.) The Plaintiff also complained that he was being deprived of financial information necessary for him to carry out his job duties. (*See id.*) Specifically, Plaintiff complained that: he was not assisted by Shears; he was no longer involved in meetings where Defendant's finances were discussed; he was being denied information that was essential to the performance of his job; his position had been reduced to a clerical position; and he had been stripped of his authority. (*See Id.*; Kakeh Dep. at 72-73, 146, Exh. 5).

39.    On October 16, 2003, Plaintiff sent a follow-up memorandum to Jennings complaining of discriminatory harassment perpetrated against Plaintiff by Shears. (Memo from Kakeh to Jennings, dated Oct. 16, 2003, Exh. 43.) Shears was aware of this complaint. (*See* Shears Dep. at 55-56, Exh. 23.)

40.    On October 20, 2003, after failing to receive any response to his October 3 memorandum, Plaintiff drafted a memorandum entitled "Urgent Request for Budget and Financial Information." He sent it to Mack and carbon copied Jennings and Defendant's General Counsel Monica Beckham. (Kakeh's Charge of Discrimination, dated Mar. 31, 2004, Exh. 16; Kakeh Dep. at 138-39, 140, Exh. 5). In this memorandum, Plaintiff complained about the fact that Defendant was depriving him of information necessary to perform the duties of his position

as Controller and reducing him to the status of a clerical employee. (*Id.*)  In the memorandum, Plaintiff also disclosed that Defendant was then running a $748,000 deficit.  (Memo from Kakeh to Mack, dated Oct. 20, 2003, Exh. 44.)

      41.    On October 20, 2003, Plaintiff sent another memorandum (addressed to Mack, Jennings, Beckham and UPO Human Resources Director Robert Richardson) entitled "Denying My Rights" regarding continuing discriminatory harassment against Plaintiff by Mack, Shears and Jennings.  (Memo from Kakeh to Mack, dated Oct. 20, 2003, Exh. 44.)  Jennings, Shears, Beckham and Mack received the memorandum shortly after it was sent and were thus aware of Plaintiff's complaints about discrimination.  (Mack Dep. at 122-23, Exh. 24; Shears Dep. at 55, 87, Exh. 23; UPO SJ Ex. 13 ¶ 4).

      42.    On or about October 21 and 22, 2003, Plaintiff met with Beckham, Jennings, Mack and Shears to discuss the fiscal matters disclosed in his October 3, 2003 and October 20, 2003 memoranda line for line.  (Kakeh Dep. at 140-41, Exh. 5.)  In that meeting, Plaintiff again disclosed that Defendant was then running a $748,000 deficit and that, since the $748,000 was paid out with no income to offset it, CSBG money was necessarily being spent to cover it.  For that reason, Plaintiff demanded to know exactly how that money was being spent.  (*Id.* at 141, Exh. 5.)  Those present appeared to hear Plaintiff's disclosures, and Beckham further took notes on Plaintiff's disclosures.  (*Id.* at 141-42, Exh. 5.)

      43.    In response to Plaintiff's questions and assertions at the meetings on October 21 and 22, 2003, Shears issued a memorandum on October 29, 2003 stripping Kakeh of all cash management and budget authority, including his authority to approve accounts payable checks to be cut and released, his authority to coordinate accounts receivables and cash draw downs and his authority to coordinate with the Executive Director regarding cash transfers and invoicing.

Shears conveyed this authority upon herself, presumably at Jennings behest. (*See* Memo from Shears to Finance Staff Members, dated October 29, 2003, Exh. 45.) The memorandum further stated that Kakeh and Quashie will continue to handle general ledger activity, financial statement production, tax issues, audit coordination and the day to day operations of the Finance Office. (*Id.*)

44.    In November 2003, Plaintiff again met with Beckham, Mack and Defendant's auditors from F.S. Taylor to discuss the fiscal matters disclosed in his October 20, 2003 memorandum. (Kakeh Dep. at 142-44, Exh. 5.) While the alleged goal of the meeting was to identify a funding source for the deficit identified in the Plaintiff's October 20, 2003 memorandum, no conclusion was reached as to a funding source. (*Id.* at 143, Exh. 5.) Instead, the participants agreed to investigate the source of the deficit expenses. (*Id.* at 143, Exh. 5.) Plaintiff disclosed to Beckham, Mack and the auditors that he would seek assistance from sources outside of Defendant if no satisfactory answer was forthcoming regarding a funding source for the expenses. (*Id.* at 143, Exh. 5.) Plaintiff further disclosed that he would not be able to compile financial statements showing this deficit, as he knew that the expenses could not be justified and that there was no income source to cover those expenses. (*Id.* at 144, Exh. 5.) Beckham took notes on Plaintiff's disclosures in writing. (*Id.* at 144, Exh. 5.)

## PLAINTIFF'S PROTECTED DISCLOSURES TO PUBLIC BODIES

45.    Beginning in January 2004, Plaintiff began making protected disclosures to supervisors and public bodies by reporting Defendant's fraud, waste and abuse to public bodies and/or agencies of both the District of Columbia and the federal government. (*Id.* at 199, Exh. 5.)

46.    Plaintiff made protected disclosures to supervisors and public bodies by reporting Defendant's fraud, waste and abuse to the Office on Aging.  (*Id.* at 119, Exh. 5.)  Plaintiff's disclosure was made to then-Deputy Director Sam Gawad somewhere between November 2003 and January 2004. (*See id.* at 119, 121, Exh. 5.)  The Office on Aging hired private auditor Thompson, Cobb, Bazilio & Associates ("TCBA") to audit Defendant based on Plaintiff's disclosures, but that audit was impeded by Jennings' flat refusal to release requested financial records to TCBA auditor Nulhaylta Idrsue.  (*Id.* at 119-120, Exh. 5.)  Idrsue requested that Plaintiff assist her in attempting to procure these records.  Pursuant to that request, Plaintiff and Idrsue met with Jennings to again request the noted financial documents.  (*Id.* at 120, Exh. 5.) This meeting occurred in January 2004.  (*Id.* at 120-21, Exh. 5.)

47.    On February 5, 2004, Plaintiff—through intermediary Doris Stashenko— contacted Mr. Tunde Eboda ("Eboda"), a Program Manager for the District of Columbia Department of Human Services, a public body within the meaning of D.C. Code § 2-223.01, and requested that Eboda meet with him to discuss his allegations that Defendant committed fraud, waste and abuse. (Kakeh Dep. at 134-36, Exh. 5; Note from Kakeh, dated Feb. 5, 2004, Exh. 46; Stashenko Dep. at 19-20, 23-25, 45, Exh. 39).  Eboda was a member, agent, servant, or otherwise employed by a public body, and thus Plaintiff's protected disclosures to him were disclosures to a public body that provided assistance in an investigation of false claims. (*See* Eboda Dep. at 7- 8, Exh. 7; Stashenko Dep. at 16-17, Exh. 39).

48.    Prior to meeting with Plaintiff on February 10, 2004, Eboda had been planning to perform a fairly perfunctory monitoring review of Defendant.  CSBG regulations required the District of Columbia Department of Human Services ("DHS") to perform a monitoring review of some sort every three years.  *See* 42 U.S.C. §9914(a)(1); (Eboda Dep. at 11-12, 16, Exh. 7).

However, Eboda's customary and consistent practice in conducting these monitoring reviews was to conduct a fairly basic, low-key, superficial review: Eboda would personally visit with some other DHS employees and interview a few senior staff members such as Mack and Jennings. (Kakeh Dep. at 145, 146, Exh. 5; Eboda Dep. at 13, 24, Exh. 7). This customary practice contrasted markedly with the highly invasive audits conducted by Head Start, such that an observer could reasonably assume that Eboda was not in fact conducting a formal monitoring review. (*See* Kakeh Dep. at 145-46, Exh. 5). No experts (such as auditors) would be brought in initially—and would only be drawn in if cause to do so was identified in the initial visit. (Eboda Dep. at 13, 16, 17, Exh. 7.) Prior to meeting with Plaintiff on February 10, 2004, Eboda planned on performing a routine monitoring exercise on February 18, 2004 and had neither sought nor arranged for the assistance of any outside auditors for that review. (*Id.* at 18, 24, 63, Exh. 7.)

49.    On February 10, 2004, Plaintiff met with Eboda at the Jefferson Memorial, a location remote from Defendant's office. (Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Note from Kakeh, dated Feb. 10, 2004, Exh. 48; Eboda Dep. at 27, Exh. 7). This meeting occurred at Plaintiff's request, and lasted no less than 30 minutes. (Eboda Dep. at 27, 34-35, Exh. 7.) During this meeting, Plaintiff informed Eboda of Defendant's fraud, waste and abuse in many respects. Plaintiff informed Eboda of: (a) Defendant's intent to charge its $2 Million deficit to CSBG grant funds, showing him documents to demonstrate the facts in his oral disclosure, (b) Defendant's use of CSBG funds to purchase a boat for which there was no program purpose, (c) Defendant's use of CSBG funds for payment of parking tickets, excessive cell phone charges and fraudulent travel expense advances, (d) Defendant's use of CSBG funds to make a loan to UPO's Treasurer, and (e) Defendant's use of CSBG funds for payment of personal charges on Defendant's corporate credit card. (*Id.* at 33-34, 48-50, 53, 54-55, 59, Exh.

7; Kakeh Dep. at 151, 160, Exh. 5). Plaintiff's disclosures in part prompted Eboda's decision to conduct a thorough review of Defendant's finances. (Eboda Dep. at 38-39, Exh. 7; Kakeh Dep. at 151, 159, Exh. 5).

50.    Plaintiff again met with Eboda at a location away from Defendant's office at some point between February 10 and February 16, 2004. (Eboda Dep. at 29, 31-32, 33, Exh. 7; Kakeh Dep. at 159, 160, Exh. 5). During this meeting, Plaintiff again discussed Defendant's fraud, waste and abuse. (Eboda Dep. at 50, 52-53, 55, Exh. 7; Kakeh Dep. at 160-61, 162, Exh. 5).

51.    At one of their two meetings, Plaintiff informed Eboda that he was concerned about potential retaliation for having made these protected disclosures. (Eboda Dep. at 35-36, Exh. 7.)

52.    Defendant had hired Thompson, Cobb, Bazilio and Associates, P.C. to audit its financial records, a task which it performed for the entire period that Plaintiff was employed by Defendant. (Kakeh Dep. at 82-83, Exh. 5).

53.    On February 12, 2004, Plaintiff met with Dennis Ramprashad ("Ramprashad") and Nuhaylatta Idrisu ("Idrisu"), two auditors employed by Thompson, Cobb, Brazilio, and Associates, P.C., at a Moroccan restaurant in Arlington, VA. (Kakeh Dep. at 154-55, 158-59;, Exh. 5; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Note from Kakeh, dated Feb. 2, 2004, Exh. 49).

54.    Ramprashad and Idrisu were agents of a public body or supervisors within the meaning of D.C. ST § 2-223.01, as they were performing outside audit functions for Defendant as required by the CSBG and Head Start grants. (UPO SJ Ex. 15 at 1; Letter from Ramprashad to Jennings, dated Jan. 17, 2004, Exh. 32; UPO SJ Ex. 15A). At this meeting, Plaintiff made

public disclosures of his allegations that Defendant engaged in fraud, waste and abuse. (Kakeh Dep. at 154-55; Exh. 5.)

55.     On February 16, 2004, Plaintiff spoke with Junius Nottingham of the District of Columbia Inspector General's ("IG's") office while Eboda was deciding whether to act. (*Id.* at 155, Exh. 5; Note from Kakeh, dated Feb. 16, 2004, Exh. 50).   Nottingham contacted Eboda; Eboda then called Plaintiff back and arranged to meet him at Plaintiff's office on February 19, 2004 concerning Plaintiff's allegations that Defendant had committed fraud, waste and abuse. (Kakeh Dep. at 155, Exh. 5; Eboda Dep. at 66, Exh. 7; Note from Kakeh, dated Feb. 16, 2004, Exh. 50; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47).

56.     On February 19, 2004, Plaintiff met with Eboda and Eboda's assistant at Plaintiff's office to discuss and review the evidence Plaintiff possessed which related to Defendant's fraud, waste and abuse. (Eboda Dep. at 68, Exh. 7; Note from Kakeh, dated Feb. 19, 2004, Exh. 51; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47).   Eboda's assistant was a member, agent or servant of a public body or was otherwise employed by a public body. (*See id.*)   During this meeting, Plaintiff made protected disclosures of his allegations that Defendant had committed fraud, waste and abuse. (*See id.*)

57.     On or about February 19, 2004, Eboda met with Shears, Mack and Jennings, at different times together and/or separately, and discussed the Plaintiff's allegations that Defendant committed fraud, waste and abuse. (Kakeh Dep. at 163-64, Exh. 5; Eboda Dep. at 67-68, 74-79, 91, 94-95, Exh. 7; Shears Dep. at 53-54, 56-57, Exh. 23; Mack Dep. at 27-28, 29-32, Exh. 24; Note from Kakeh, dated Feb. 19, 2004, Exh. 51; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47).   Defendant became aware of Plaintiff's protected disclosures to a public body on or

prior to February, 2004. (*See e.g.* Eboda Dep. at 79, 91, 94-95, Exh. 7; Shears Dep. at 133, Exh. 23; *also see* Eboda Dep. at 78, Exh. 7).

58.     On February 25, 2004 Eboda reported to Plaintiff the contents of a conversation he had with Mack on February 18, 2004 specifically that Mack instructed Eboda not to contact Plaintiff, but instead to direct all of his questions to Shears. (Kakeh Dep. at 154, Exh. 5; Eboda Dep. at 79-80, Exh. 7; Note from Kakeh, dated Feb. 25, 2004, Exh. 52; Mack Dep. at 54-55, Exh. 24; *see* Mack Dep. at 42, 46, Exh. 24).  Specifically, Mack directed Eboda to financial records facially identifiable as produced by Plaintiff, and stated that they were inaccurate. (*See* Eboda Dep. at 81-83, Exh. 7; Shears Dep. at 133, Exh. 23).  Eboda informed Plaintiff at that time that he decided to procure outside auditors to assist in auditing Defendant. (Eboda Dep. at 40-44, 46-48, 63, 65, Exh. 7; Kakeh Dep. at 155-156, Exh. 5; *see* Mack Dep. at 53, Exh. 24).  Plaintiff further disclosed to Eboda that Defendant's managers — especially Mack — were pressuring him to issue fraudulent financial statements and threatening to terminate him if he refused to issue the statements as directed. (Kakeh Dep. at 155-156, Exh. 5.)

59.     On March 1, 2004, Plaintiff met with Eboda, Eboda's assistant, and several auditors who were employed or commissioned by the District of Columbia Department of Human Services. (Eboda Dep. at 51, 86, Exh. 7; Kakeh Dep. at 157, Exh. 5; Note from Kakeh, dated Mar. 1, 2004, Exh. 53; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47).  The meeting took place at Plaintiff's office. (*Id.*)  During this meeting, Plaintiff made protected disclosures to Eboda, Eboda's assistant and the auditors that Defendant had engaged in fraud, waste and abuse. (*Id.*)

60.     On March 3, 2004, Plaintiff met with Ramprashad, Eboda, and several auditors. (Note from Kakeh, dated Mar. 3, 2004, Exh. 49; Kakeh's Log of Contacts, dated May 27, 2005,

Exh. 47; *see* Kakeh Dep. at 157, Exh. 5).  The independent auditors accompanying them were members or agents of a public body.  (*See, e.g.,* Eboda Dep. at 43-48, Exh. 7.)  At this meeting, Plaintiff made protected disclosures to Ramprashad, Eboda and the auditors regarding Defendant's fraud, waste and abuse.  (Note from Kakeh, dated Mar. 3, 2004, Exh. 49; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; *see* Kakeh Dep. at 157, Exh. 5).

61.    The same day, March 3, 2004, Mack demanded that Plaintiff alter one of Defendant's financial statements to conceal the Defendant's fraud, waste and abuse through the issuance and authentication of a revised financial statement.  Specifically Mack wanted Plaintiff to recharacterize CSBG fund advances – which could not be charged to the CSBG grant -- and certain other grant monies as UPO revenues so as to reduce Defendant's FY 2003 deficit by $3 Million, an act which Plaintiff reasonably believed to be unlawful.  (Kakeh Dep. at 166, 167, 174, Exh. 5; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Note from Kakeh, dated Mar. 3, 2004, Exh. 49; Mack Dep. at 40, 89, 92-93, 94-95, Exh. 24).  Mack stated that the purpose of these adulterations was to cover Defendant's deficit, but failed to provide any legitimate accounting rationale to justify the ordered modifications.  (Kakeh Dep. at 166, 167, Exh. 5.)  Mack further threatened Plaintiff with potential reprisal from Jennings if Plaintiff refused to make the changes.  (*See id.* at 167, Exh. 5.)

62.    Plaintiff refused to obey Mack's illegal order, and communicated to Mack that he would not alter the financial statement.  (Kakeh Dep. at 166, Exh. 5; Beckham Dep. at 108, Exh. 40; Note from, Kakeh, dated Mar. 3, 2004, Exh. 49).  In his view, making the change would have made him complicit in the misappropriation of funds, in that the CSBG moneys which Mack wanted allocated had never been earned by Defendant — they merely were monetary advances

effectively loaned by the government — and they needed to be returned to the grant source. (Kakeh Dep. at 166, 167, Exh. 5.)

63.    Shears wrote and delivered a letter of resignation to Jennings on March 11, 2004. (Shears' Letter to Jennings, undated, Exh. 54; Shears Dep. at 84, 126, Exh. 23; Mack Dep. at 120, Exh. 24).  This resignation letter referred to several requests by Shears for Jennings to terminate Plaintiff, including several conversations occurring in the midst of the CSBG review within the 7 days prior to the issuance of the letter.  (Shears' Letter to Jennings, undated, Exh. 54; Shears Dep. at 86-87, Exh. 23, 151; Mack Dep. at 124, Exh. 24).  These discussions included charges that Plaintiff was insubordinate for issuing financial statements which Plaintiff provided to Eboda showing Defendant's deficits.  (Shears Dep. at 85, 96, 140-41, 174, Exh. 23; Kakeh Dep. at 165-67, Exh. 5; Mack Dep. at 39-42, 48-49, 110-12, Exh. 24; Eboda Dep. at 80-81, Exh. 7).

64.    Shears generally desired Plaintiff's termination, and continued to do so through the end of her tenure with Defendant, which was June 30, 2004.  (Shears Dep. at 96, Exh. 23.) Jennings had denied Shears's previous requests to terminate Plaintiff, citing Plaintiff's October 2003 discrimination and harassment complaints against Shears and Mack (presumably from concern that terminating Plaintiff by request of Shears or Mack would constitute actionable retaliation).  (Shears' Letter to Jennings, undated, Exh. 54; Shears Dep. at 87, Exh. 23; Mack Dep. at 122-23, 127-28, Exh. 24).  Shears admitted that she would not have resigned if she thought that it was possible terminate Plaintiff without her resignation.  (Shears Dep. at 89, Exh. 23.)  Although unclear from her deposition, Shears apparently feared that her animus toward Plaintiff was well known and any efforts to terminate Plaintiff during the course of her employment might be attributed to her.  Shears also stated that her interraction with Plaintiff

constituted a "major roadblock" to Defendant making "the changes needed" in the finance department, and that her departure would "allow [Defendant] to move forward with the changes needed in the finance department.'" (Shears' Letter to Jennings, undated, Exh. 54; Shears Dep. at 87-88, 90, Exh. 23).

65.    Later in the day on March 11, 2004, the same day that Shears submitted her resignation letter to Jennings, Defendant placed Jennings on administrative leave pending an investigation. On March 11, 2004, Eboda attended a meeting of Defendant's Board of Directors. Also present were Jennings, Shears and Mack. (UPO Bd. of Trustees Mtg, dated Mar. 11, 2003, Exh. 37; Note from Kakeh, dated Mar. 11, 2004, Exh. 55; Eboda Dep. at 86-88, Exh. 7). At that meeting, Eboda presented the report of the CSBG audit team and informed the Board in detail of the magnitude and scope of Defendant's fraud, waste and abuse with respect to the CSBG funds. (Roberson Dep. at 18, Exh. 22; Eboda Dep. at 89-90, Exh. 7; UPO SJ Ex. 15 ¶ 4; UPO SJ Ex. 15B; Letter from Roberson to Eboda, dated Jun. 1, 2004, Exh. 25; Mack Dep. at 51, Exh. 24). These investigative results were the direct product of Plaintiff's protected disclosures of Defendant's fraud, waste and abuse, as Eboda was prompted to investigate these matters primarily by Plaintiff's disclosures. (Eboda Dep. at 38, 39, 50, 53, 55-56, 57, 59, Exh. 7.)

66.    Indeed, the information disclosed by Plaintiff proved very powerful in Eboda's investigations of Defendant's fraud, waste and abuse. (*Id.* at 52-53, Exh. 7.)  In presenting his investigative findings to the Board, Eboda discussed the financial statement prepared by Plaintiff showing Defendant's deficit status.  (*Id.* at 89, Exh. 7.)  As a direct result of Plaintiff's disclosures to Eboda, as reflected in Eboda's audit results, Defendant's Board immediately suspended Jennings, and suspended Board Member Thurmond Walker.  (*Id.* at 91, Exh. 7; Roberson Dep. at 18, Exh. 22; Fisher Dep. at 15, Exh. 17; Stashenko Dep. at 25-26, Exh. 39;

Kakeh Dep. at 169, Exh. 5; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37). Prior to this meeting, Plaintiff had suggested to Eboda that Eboda propose Defendant's removal of four individuals — Jennings, Mack, Beckham and UPO public relations director Cheryl Christmas. (Kakeh Dep. at 168, 169, 183, Exh. 5.) The Board, upon the suggestion of Board Member (and later Chair) Alexis Roberson, retained Mack and Beckham, however, with Mack to serve as Acting Executive Director. Additionally, Roberson had Shears stay on for a time to facilitate the transition to new management. (*Id.* at 168-69, 171-173, Exh. 5; Shears Dep. at 127-28, Exh. 23).

67.    Within 12 hours of becoming Acting Executive Director, Mack contacted Plaintiff and again demanded that Plaintiff improperly alter Defendant's financial statements to conceal the Defendant's deficit status, an act which Plaintiff reasonably believed to be unlawful. (Kakeh Dep. at 174, 176-77, Exh. 5; Note from Kakeh, dated Mar. 12, 2004, Exh. 56). When Plaintiff refused, Mack threatened to have Roberson force his compliance. (*See* Kakeh Dep. at 174-77, Exh. 5.)

68.    On March 17, 2004, Plaintiff met with Eboda and two auditors from the Head Start program on the campus of Howard University to discuss Plaintiff's allegations that Defendant had committed fraud, waste and abuse with regard to the Head Start program. (Eboda Dep. at 147-48, 154, 157, Ex. 7; Note from Kakeh, dated Mar. 17, 2004, Exh. 57; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47). On March 17, 2004, Plaintiff met with the auditors from the Head Start program to discuss his allegations that Defendant engaged in fraud, waste and abuse, as it related to the Head Start program. (Kakeh Dep. at 199, Exh. 5; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Note from Kakeh, dated Mar. 17, 2004, Exh. 57).

69.     On March 24, 2004, Defendant's Board terminated Jennings from Defendant's employ, effective April 2, 2004. (Letter from Simmons to Jennings, dated Mar. 24, 2004, Exh. 58; Roberson Dep. at 35-36, Exh. 22; Fisher Dep. at 14, Exh. 17).

70.     On March 25, 2004, at a meeting attended by Plaintiff, Mack, Shears and Beckham, Mack once again ordered Plaintiff to fraudulently alter one of Defendant's financial statements in order to conceal Defendant's fraud, waste, and abuse, an act which Plaintiff reasonably believed to be unlawful. (Email from Mack to Kakeh, dated Mar. 25, 2004, Exh. 59; Note from Kakeh, dated Mar. 25, 2004, Exh. 60; Beckham Dep. at 106, 111-12. Exh. 40) Plaintiff again refused to obey Mack's illegal order, and communicated to Mack that he would not "cook the books" at Mack's behest. (Beckham Dep. at 108, 110, Exh. 40.) Mack and Shears then accused Plaintiff of insubordination for refusing to obey Mack's illegal order. (*Id.* at 111-14, Exh. 40.)

71.     Eboda provided Jones with a copy of DHS' audit report on March 25, 2004. (Email from Mack to Eboda, dated Apr. 5, 2004, Exh. 61.)

72.     In late March 2004, at the suggestion of Eboda, Defendant offered Dana Jones ("Jones") the post of Interim Executive Director. (Jones Dep. at 10-11, Exh. 26; UPO Comm. Report, dated Apr. 1, 2004, Exh. 62). Eboda notified Jones of the fraud, waste and abuse which Plaintiff had disclosed to Eboda prior to Jones being offered the position. (Jones Dep. at 11-12, Exh. 26.) On April 1, 2004, Defendant formally appointed Jones to the position of Acting Executive Director, effective April 5, 2004. (UPO Bd. of Trustees Mtg., dated Apr. 1, 2004, Exh. 63; Roberson Dep. at 32, Exh. 22).

73.     Eboda had disclosed the existence of Plaintiff's protected disclosures to Defendant's senior management — in particular Jones and Roberson; Eboda's disclosure was

then relayed to Mack. (Kakeh Dep. at 177-78, 181-82, Exh. 5; Edoda Dep. at 91-94, 98, Exh. 7; Roberson Dep. at 30, Exh. 22). As a result, knowledge of Plaintiff's protected disclosures was widely disbursed among Defendant's Board and senior staff by March 2004. (Eboda Dep. at 93, Exh. 7.)

74.    It only became evident in March 2004 that Defendant was even seriously considering outsourcing its finance office. (Defendant Statement, Ex. 13, Exh. 64 at ¶ 8.) Defendant's management had idly discussed outsourcing off and on for some years, but had not taken any real action prior to March 2004. (*C.f.* Stashenko Dep. at 27, 34, Exh. 39; Mack Dep. at 70, 72, 112, Exh. 24). Jennings would use the prospect of potential outsourcing as a threat against staff in the Finance Office. (*See* Isaac Dep. at 8, Exh. 65.)

75.    On April 1, 2004, Plaintiff sent a memorandum to Eboda and Robertson regarding his concerns that Defendant was engaging in fraud, waste and abuse. Plaintiff's memorandum was a protected disclosure to supervisors under DC ST § 2-223.01. (Letter from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; Memo from Kakeh to Jones, dated Apr. 11, 2004, Exh. 66; Letter from Jones to McLean, dated Jun. 2, 2004, Exh. 67; Note from Kakeh, dated Mar. 31, 2004, Exh. 68).

76.    On April 5, 2004, Plaintiff sent a memorandum to Roberson, Eboda and Jones decrying attempts to blame improprieties on the financial department — and instead again disclosing concerns that Defendant's management had engaged in fraud, waste and abuse. (Memo from Kakeh to Roberson, dated Apr. 5, 2004, Exh. 69; Jones Dep. at 88, Exh. 26).

77.    Eboda provided Mack with a copy of DHS' audit report on April 5, 2004. (Email from Mack to Eboda, dated Apr. 5, 2004, Exh. 59.)

78.     On April 5, 2004, Plaintiff met with Jones, Roberson, and Eboda.   During the meeting, Eboda openly identified Plaintiff as having assisted in instigating the CSBG audit through protected disclosures, stating that Kakeh had been extremely helpful in bringing about the CSBG audit and making no secret of the fact that Kakeh and Eboda had been clandestinely meeting. (Kakeh Dep. at 177-78, 181-82, Exh. 5; Eboda Dep. at 91-94, 98, Exh. 7).   After Eboda disclosed Plaintiff's role in the CSBG audit, Plaintiff presented Eboda, Jones and Roberson with copies of his April 1, 2004 memorandum regarding his concerns that Defendant was engaging in fraud, waste and abuse.  (Kakeh Dep. at 178-81, Exh. 5; Letter from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34).   Roberson, however, interfered by seizing the copy presented to Eboda. (Kakeh Dep. at 179, Exh. 5.)   Roberson reported the contents of the April 5, 2004 meeting to Mack after the meeting ended.  (Roberson Dep. at 30, Exh. 22.)

79.     On April 6, 2004, Plaintiff met with Jones, Mack, Beckham, Shears and others. (Note from Kakeh, dated Apr. 5-6, 2004, Exh. 70, Exh. 71; Kakeh Dep. at 174, 175, Exh. 5; Mack Dep. at 104, 106, 109-10, Exh. 24; Roberson Dep. at 32-33, Exh. 22).   In this meeting and/or the April 5, 2004 meeting, Roberson demanded that Plaintiff justify his refusal to issue financial statements in the fraudulently modified, deficit-concealing manner desired by Mack. (Kakeh Dep. at 175, Exh. 5.)  Plaintiff replied by spending several hours explaining the fraud, waste and abuse in detail and producing voluminous amounts of documentation to support his explanation.  (*Id.* at 175-76, Exh. 5; Mack Dep. at 104, 109-10, Exh. 24; Eboda Dep. at 95, Exh. 7).

80.     On April 11, 2004, Plaintiff sent another memorandum to Dana Jones.  (Memo from Kakeh to Jones, Apr. 11, 2004, Exh. 66; Jones Dep. at 89, Exh. 26).  The memorandum addressed Defendant's unauthorized expenditures of Head Start funds, in particular Defendant's

attempt to improperly claim $300,000 (the maximum amount available) in unearned Head Start grant funds from the government in order to fund improper expenses. These improper expenses included, for example, $186,000 associated with the A. Sue Brown consultant contract for which no services were actually provided. (Memo from Kakeh to Jones, Apr. 11, 2004, Exh. 66; Jones Dep. at 89-90, 93-95, 99, 103, Exh. 26).

81.     On April 20, 2004, Head Start issued a report to Defendant identifying improper payments being made to consultant A. Sue Brown. (UPO Financial Program Management Report, undated, Exh. 72.) The cover letter for the report finding Defendant to be a "Grantee with Deficiencies." (*Id.*) A finding of being a "Grantee with Deficiencies" is a major problem for a Head Start program participant, and would normally require prompt attention at the highest levels. (Kakeh Aff. ¶ 11, Exh. 27.)

82.     On April 26, 2004, Head Start issued a letter to Defendant formally declaring Defendant to be a "high risk" grantee. (Letter from the Dept. of Health to Simmons, dated Apr. 26, 2004, Exh. 73.)

83.     On April 30, 2004, M&T Bank declared Defendant in default on its line of credit, and moved to foreclose on Defendant's collateral. (UPO Financial Statements for 2003 ("Note 9", deletions to "Note 11"), Exh. 74.)

84.     On May 3, 2004, as a result of Plaintiff's protected disclosure that Defendant had engaged in fraud, waste and abuse, Special Agent Kenneth L. Marty ("Marty") contacted Plaintiff. (Kakeh Dep. at 187-88, Exh. 5; Note from Kakeh, dated May 3, 2004, Exh. 75; Memo from Finance Dept. Staff to Simmons, dated Apr. 29, 2004, Exh. 76; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47). Marty was a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations. (Marty's

Business Card, undated, Exh. 77).  Marty informed Plaintiff that he had been assigned to investigate Plaintiff's allegations that Defendant had engaged in fraud, waste and abuse.  (Kakeh Dep. at 187-88, Exh. 5; Note from Kakeh, dated May 3, 2004, Exh. 75).  During the meeting, Plaintiff made protected disclosures to Marty that Defendant engaged in fraud, waste and abuse. (*Id.*)

85.    On May 4, 2004, at the request of Marty, Plaintiff met with Federal Bureau of Investigation Agent Duncan ("Duncan") at the offices of the FBI, during which meeting he made protected disclosures to a public body that Defendant had engaged in fraud, waste and abuse. (Note from Kakeh, dated May 4, 2004, Exh. 78; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Kakeh Aff. ¶ 6, Exh. 27).  Marty and Duncan were agents or members of public bodies. (*See id.*)

86.    On May 7, 2004, May 10, 2004, May 12, 2004, May 19, 2004, and May 25, 2004, Plaintiff provided Marty with documents related to Defendant's fraud, waste and abuse.  (Fax Transmittal Sheets, dated May, 7, 2004, May 10, 2004, May 12, 2004, May 19, 2004, and May 25, 2004, Exh. 79; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47; Note from Kakeh, dated May 19, 2004, Exh. 80).

87.    On or about May 18, 2004, Roberson sent a letter to Eboda by facsimile requesting that DHS authorize reallocation of $1 million in CSBG funds to cover UPO's deficit, which would have permitted Defendant to cover some or all of the deficit with CSBG funds. (Letter from Eboda to Roberson, dated June 1, 2004, Exh. 25.)

88.    On or about May 26, 2004, Russell D. Simmons, President of Defendant's Board of Directors, resigned as a result of an investigation surrounding his inappropriate use of a Mercury Mountaineer SUV provided to him by the Defendant.  (Kakeh Dep. at 116-119; 194-95,

Exh. 5; Note from Kakeh, dated May 28, 2004, Exh. 81; UPO Minutes, dated May 26, 2004, Exh. 82; Letter from Kakeh to Roberson, dated Apr. 1, 2004, Exh. 34; *see also* Letter from Cantania to Jones, dated Apr. 27, 2004, Exh. 33; Roberson Dep. at 18-19, Exh. 22; UPO Bd. of Trustees Mtg., dated Mar. 11, 2004, Exh. 37; UPO Bd. of Trustees Mtg., dated Mar. 18, 2004, Exh. 38). This investigation was a direct and proximate result of Plaintiff's protected disclosures to public bodies regarding Defendant's fraud, waste and abuse. (*See id.*) Before departing, however, Simmons specifically appointed Roberson as his successor. (Roberson Dep. at 15, Exh. 22.)

89.    On May 27, 2004, Jones and two unspecified members of Defendant's Board traveled to the DHS offices to restate orally Roberson's request that DHS to authorize reallocation of $1 million in CSBG funds to cover Defendant's deficit. (Letter from Eboda to Roberson, dated June 1, 2004, Exh. 25.)

90.    On May 28, 2004, Plaintiff met with Marty and Hans for approximately three hours to discuss their investigation of Plaintiff's allegations that Defendant committed fraud, waste and abuse and other information. (Note from Kakeh, dated May 28, 2004, Exh. 81; Kakeh's Log of Contacts, dated May 27, 2005, Exh. 47). At this meeting, Plaintiff made public disclosures by providing to Marty and Hans the names of persons who had knowledge of Defendant's fraud, waste and abuse. (*Id.*)

91.    On June 1, 2004 Marty, Hans and a government attorney visited Defendant's office for the express purpose of investigating Plaintiff's allegations that Defendant engaged in fraud, waste and abuse. (Note from Kakeh, dated Jun. 1, 2004, Exh. 83; Kakeh's Log of Contacts, dated May 27, 2004, Exh. 47). This visit was a direct and proximate result of the Plaintiff's protected disclosure to supervisors and public bodies of information related to

37

Defendant's fraud, waste and abuse. (*See id.*) In plain view and during regular working hours, Plaintiff escorted these persons into Defendant's building and took them directly to his office. (Kakeh Dep. at 231, Exh. 5.) Beckham witnessed Plaintiff escorting the investigators into the building, and followed them to Plaintiff's office. (*Id.* at 230-31, 232-33, Exh. 5.) Plaintiff then took Marty, Hans and the attorney to meet Beckham and Darlene Booker, the Executive Assistant of Defendant. (*Id.* at 231-32, Exh. 5.) During the meeting with Beckham and Booker, Marty, Hans and the attorney discussed Defendant's fraud, waste and abuse. (*Id.* at 231, Exh. 5.) Later that day, Marty, Hans and the attorney met with Mack and Jones, during which they discussed the Plaintiff's allegations of fraud, waste and abuse. (Note from Kakeh, dated June 1, 2004, Exh. 83.)

92.    Defendant was aware of Plaintiff's protected disclosures and other protected activities by virtue of the following:

(a)    through observation of Plaintiff's abnormally heavy and otherwise unexplained use of UPO facsimile machines and photocopiers located in public areas of Defendant's offices during the relevant period (Isaac Dep. at 17, 21, Exh. 65; Fisher Dep. at 72-73, Exh. 17);

(b) Plaintiff's protected activities had become sufficiently observed at Defendant to make them the subject of common knowledge and rumor (Isaac Dep. at 17-19, 20, Exh 65; Quashie Dep. at 30-31, Exh. 84; Eboda Dep. at 93, Exh. 7; Kakeh Dep. at 136, Exh. 5);

(c) Defendant's upper level management was able to identify documents utilized by agents of public bodies as produced and provided by Plaintiff by their substantive content or formatting (Shears Dep. at 130, 140-41, Exh. 23; Jones Dep. at 107-08, Exh. 26; Shears Dep. at 174, Exh. 23; Mack Dep. at 106, 109-10, Exh. 24; Eboda Dep. at 79-81, Exh. 7);

(d)  Eboda would expressly identify Plaintiff as the source of a particular document during discussions with Defendant and its agents  (Eboda Dep. at 93-94, Exh. 7);

(e)  Defendant's management physically observed Plaintiff interacting with and/or otherwise accompanying agents of public bodies in confidential conversations with investigators as early as the February 18-25, 2004 and continued through June 2, 2004 (Mack Dep. at 38, Exh. 24; Kakeh Dep. at 230-33, Exh. 5); and

(f)  Shears occupied the office adjacent to Plaintiff's office at UPO, and thus could observe the comings and goings of persons present in that office (Kakeh Dep. at 158, Exh. 5; Shears Dep. at 163, Exh. 23).

(g)  In a letter dated August 31, 2004 prepared by one of Defendant's agents for submission to Yvonne Gilchrist, Director of DHS, under the signature of Jones, Defendant's agents indicated their awareness that Plaintiff produced financial statements to the CSBG auditors during their March 2004 visit which contained financial information that Defendant's agents did not agree with.  (Letter from Jones to Gilchrist, dated Aug. 31, 2004 at 2, Exh. 85.)

93.    On June 1, 2004, Eboda formally denied Defendant's request to authorize reallocation of $1 million in CSBG funds to cover UPO's deficit.  This denial was stated in a letter to Roberson, which was carbon copied to Jones, Mack, Shears, Beckham, Ramprhashad, and Plaintiff.  (Letter from Eboda to Roberson, dated Jun. 1, 2004, Exh. 25; Jones Dep. at 111-12, Exh. 26).

94.    On June 2, 2004, Marty, Hans and several other government officials came to Defendant's office.  (Note from Kakeh, dated June 2, 2004, Exh. 86; Kakeh's Log of Contracts, dated May 27, 2005, Exh. 47; *see* Mack Dep. at 155, 158-59, Exh. 24; Kakeh Dep. at 230-33, Exh. 5).  This visit was a direct and proximate result of the Plaintiff's protected disclosures to

supervisors and public bodies of information about the Defendant's fraud, waste and abuse. (*Id.*) Plaintiff escorted them into the building in plain view and during regular working hours. (*Id.*)

### PLAINTIFF'S CHARGES OF DISCRIMINATION

95.     On March 31, 2004, Plaintiff filed a charge of discrimination against Defendant for discrimination on the basis of his race, color, gender, national origin and religion with the District of Columbia Office of Human Rights.    He alleged a pattern of harassment and discriminatory treatment. (Kakeh's Charge of Discrimination, Exh. 16; Note from Kakeh, dated Mar. 31, 2004, Exh. 68).

96.     Shortly thereafter, Defendant and its agents Shears, Mack, Beckham and Jones became aware of Plaintiff's protected activity. (Shears Dep. at 55, Exh. 23; Beckham Dep. at 57-58, Exh. 40; Mack Dep. at 113-14, 127-28, Exh. 24; Jones Dep. at 13, Exh. 26; UPO SJ Ex. 13 ¶ 5).    Defendant and its agents Shears, Mack, Beckham and Jones further became aware of Plaintiff's protected activity in contacting OHR soon after that complaint was filed. (Shears Dep. at 55, Exh. 23; Beckham Dep. at 57-58, Exh. 40; Mack Dep. at 113-14, 127-28, Exh. 24; Jones Dep. at 13, Exh. 26; UPO SJ Ex. 13 ¶ 5).

97.     Plaintiff's complaint of discrimination at OHR was further discussed by the UPO Board's Ad Hoc Management Committee at a meeting occurring on April 20, 2004. (UPO Comm. Report, dated Apr. 1, 2004, Exh. 62; UPO Comm. Minutes, dated Apr. 20, 2004, Exh. 87). Jones, Roberson, and Mack were in attendance at this meeting. (UPO Comm. Report, dated Apr. 1, 2004, Exh. 87.) Later in the same meeting, Jones proposed outsourcing Defendant's Finance Office to F.S. Taylor for the period of one year. (*Id.*) The minutes of the Ad Hoc Committee cite no rationale whatsoever to justify outsourcing the Finance Department; instead, the minutes contain the notation "INCLUDE THE RATIONALE FOR OUTSOURCING

SERVICES", suggesting that the rationale was to be devised later and subsequently inserted into the record. (*Id.*)

## PLAINTIFF'S TERMINATION AND THE
## ALLEGED REDUCTION IN FORCE

98.    The UPO RIF Policy permits Defendant to conduct a RIF if the organization undergoes *inter alia,* program changes, workload changes or reorganization. (Letter from Jones to Kakeh, dated Jun. 2, 2004, Exh. 88.)   The decision as to whether a RIF is conducted is left to the discretion of the Executive Director. (*Id.*)   The policy cautions that a RIF should be undertaken with sensitivity to the affected employees and requires that: "management . . . carryout its responsibilities with a true appreciation and concern for the problems and interest of those employees facing a possible reduction in force" *(Id.* ¶ 2.1, Exh. 88); that management keep affected employees informed about the RIF process and provide them "with the information they need to understand clearly what is going on and why they are affected" (*Id.* ¶ 2.4, Exh. 88); and that it develop and establish an outplacement program to "locate jobs for those persons who cannot be placed within the Agency (*Id.* ¶ 2.5, Exh. 88).    The policy requires "maximum effort" to "keep the number of reduction in force demotions and displacements to a minimum" (*Id.* ¶ 2.2) and does not permit the use of a RIF "to eliminate inadequate employees" (*Id.* ¶ 2.3, Exh. 88).    Additionally, the policy allows only "permanent employees" to compete for retention. (*Id.* ¶ 4.4., Exh. 88)   This outplacement policy was allegedly in force during the May-June 2004 period. (*See* Beckham Dep. at 80, Ex. 40).

99.    One of the lynchpins of the RIF policy is that it provides for the reassignment of persons whose positions are eliminated.    It does so through a grouping process that gives preference to the employees with the greatest number of years of service.    Displaced employees are grouped by competitive level, which is defined as "the grouping of positions by funding

source, which are so familiar in all important aspects that an employee can move from one position to another within the funding source without significant training and without undue interruption of the work program. (*Id.* ¶ 4.3, Exh. 88.) Positions in the same competitive level are characterized by "a similarity of duties, functions, responsibilities and pay schedules. (*Id.*) Permanent displaced employees are placed on a retention register in order of their years of service (*Id.* ¶¶ 1.2, 4.5, 4.6, Exh. 88) and each is permitted to compete for retention, but only within their competitive level (*Id.* ¶ 4.4, Exh. 88).

100.    On June 2, 2004, Jones presented Plaintiff with a letter notifying Plaintiff that he would be terminated from his position as Controller effective the close of business on June 30, 2004, and also informing him that he was immediately placed on administrative leave for the interim period. (Letter from Jones to Kakeh, date Jun. 2, 2004, Exh. 88; Note from Kakeh, dated Jun. 2, 2004, Exh. 86; Kakeh Dep. at 223-24, Exh. 5). Jones orally instructed Plaintiff to clean out his desk that day. (Kakeh Dep. at 224-25, Exh. 5). The purported reason for Plaintiff's termination was a reduction-in-force ("RIF"), allegedly necessitated by a decision to outsource the management of the Office of Finance. (Kakeh Dep. at 227-28, 232-33, Exh. 5; Letter from Jones to Kakeh, dated Jun. 2, 2004, Exh. 88). The letter stated that Plaintiff had been placed in Office of Finance Grouping VI along with David Quashie and that his retention would be awarded to the person with the greatest seniority. (Letter from Jones to Kakeh, dated Jun. 2, 2004, Exh. 88.) According to Attachment A, Quashie had the most seniority. (*Id.*)

101.    On the same day, June 2, 2004, Jones issued reduction in force letters to Nona McLean, the acting Facilities/IS Manager, and the live-in girlfriend of Jennings (Stashenko Dep. at 30-31, Exh. 39; Jones Dep. at 26, Exh. 39) terminating her. (Letter from Jones to McLean, dated Jun. 2, 2004, Exh. 67).

42

102.    On the same day, June 2, 2004, Jones issued a reduction in force letter to David Quashie, the Accounting Director and Acting Deputy Comptroller, terminating him from the position of Acting Deputy Comptroller and simultaneously reassigning him to the position of Accounting Director and had no break in service and no change in salary. (Letter from Jones to Quashie, dated Jun. 2, 2004, Exh. 89; Jones Dep. at 37, Exh. 26).

103.    On June 9, 2004, Jones issued a reduction in force letter to William Isaac, the Senior External Auditor, removing him from his position and simultaneously reassigned him to the position of Procurement Manager without break in service or reduction in salary. (Letter from Jones to Isaac, dated Jun. 9, 2004, Exh. 90; Jones Dep. at 37, Exh. 26). As far as Plaintiff is aware, Isaac did not have any prior involvement in any discrimination complaints during Plaintiff's tenure at UPO. (Kakeh Aff. At ¶ 10, Exh. 27.)

104.    The reasons given by the Defendant terminating Plaintiff varied, depending on who gave them and when they were given. When Defendant submitted a Position Statement to the District of Columbia Office of Human Rights ("DCOHR") on August 31, 2004, prior to the filing of this lawsuit, it represented to the DCOHR that Kakeh was terminated because his position was eliminated, that he was placed in Group VI with the Acting Controller David Quashie and since Quashie had more years of service, Quashie was retainer and Kakeh was not. (Position Statement at 1, 5, 2130, 2134, Exh. 64.)   Notably, Defendant makes the same claim in its summary judgment motion. (*Compare* Statement ¶ 61, Exh. 64 to UPO SJ Ex. 13 ¶ 5.)

105.    Significantly, Jones testimony was exactly the reverse. He testified that it was not his decision to retain Quashie and terminate Kakeh, but that of Walker and company and that he (Jones) did not retain Quashie over Kakeh due to their placement in Group VI and Quashie's

greater years of service.    The deposition testimony of Jones in his capacity as corporate designee

is as follows:

> Q:    So are you telling me that the decision to retain Mr. Quashie was not
> based on his seniority, his superior seniority within the Group VI
> category?
>
> A:    What I am telling you is what I have maintained from the very beginning.
> And that is that when we had discussions with Walker about how they
> would proceed in taking over this responsibility, they presented to us Mr.
> Quashie's name.  We did not present his name, Mr. Kakeh's name, Mr.
> Isaac's name or anyone else.  They said based upon their references, that
> was it.
>
> Q:    So you made the decision on whether or not to reassign Mr. Quashie.
> Correct?
>
> A:    Yes.
>
> Q:    And you're telling me, are you not, that you made that decision, solely on
> Walker & Company's indication that they wanted to place Mr. Quashie in
> the general ledger accountant position.
>
> A:    Yes.
>
> Q:    And you did not make that decision, that is, the decision to retain Mr.
> Quashie, because of Mr. Quashie's superior seniority over Mr. Kakeh.
>
> A:    We gave Walker the authority and the right to select these positions.  And
> we acted based upon Walker's desire to give Mr. Quashie an opportunity.
> Had UPO filled those positions, UPO would have had to use this policy
> and the net result would have been the same.
>
> Q:    So, in essence, you are telling me Walker & Company made the decision
> to retain Mr. Quashie, or the recommendation and you approved it.
>
> A:    I did.
>
> Q:    Okay.  And you are telling me that UPO did not use the policy that says
> that out of however many people in a particular group, the one with
> greater seniority has the bumping rights.
>
> A:    No, I didn't.

(Corp. Designee Dep. at 18-20, Exh. 91.)

106.    Jones testified that he first considered eliminating the entire finance department and outsourcing its functions, but then in late May, 2004, decided to scale down the plan to eliminate only the management of the Finance Office. (Jones Dep. at 23-27, Exh. 26.)  He originally intended to "outsource" financial operations not to a truly independent outside auditor, but instead to a company closely and intimately tied to Jennings and others involved in Defendant's fraud, waste and abuse, F.S. Taylor. (Eboda Dep. at 103-04, Exh. 7.)  Jones denied recommending or advocating for F.S. Taylor to receive the outsourcing contract, when both the minutes of Defendant's Ad Hoc Management Committee and corroborating testimony show Jones as an advocate for F.S. Taylor for the contract.  (Jones Dep. at 91, Exh. 26 *to* Outsourcing Services, Apr. 20, 2004, Exh. 87; Eboda Dep. at 103-04, Exh. 7).  Jones only relented from the choice of F.S. Taylor after Eboda advised Jones directly that he vehemently opposed hiring F.S. Taylor. (Eboda Dep. at 103-05, Exh. 7; Corporate Designee Dep. at 22-23, Exh. 91.)

107.    Jones also testified that sometime after June 1, 2004, W&C identified Quashie and Isaac as the members of Finance Office management who should be retained after the RIF. (*Id.* at 37-38, Exh. 91.)  However, Jones did not remember whether W&C requested retention of Quashie and Isaac before or after the RIF letters were issued.  (*Id.* at 38-39, Exh. 91.)  Jones later changed his testimony and indicated W&C informed him that Quashie and Isaac should be retained, but not until after the RIF letters were issued.  (*Id.* at 39, Exh. 91.)  However, in his RIF letter to Quashie, Jones removed him from his position and simultaneously reassigned him to the position of Accounting Director, indicating that Jones made the decision to retain Quashie before receiving the recommendation from W&C.  (Letter from Jones to Quashie, dated Jun. 2, 2004, Exh. 89.)  Jones also testified that Kakeh was not among those identified by W&C as someone they wanted to work with and that Walker wanted to use its own people to staff the

number one and number two positions in the reorganized Office of Finance. (Jones Dep. at 46, Exh. 26.)

108.    Jones also testified that RIF was initiated by Defendant's Ad Hoc Management Committee, when the minutes of the same Ad Hoc Management Committee clearly demonstrate that Jones himself initiated the proposal. (*Compare* Jones Dep. at 37, Exh. 26 *to* Outsourcing Services, Apr. 20, 2004, Exh. 87).

109.    The top two tiers of the new management structure included the CFO position in tier one and in tier two, three co-equal positions of Financial Operations Officer, Accounting Director and Grants Management position. (Jones Dep. at 48, Exh. 26; Proposal to Manage Accounting and Finance Functions, dated May 19, 2004, Exh. 92).

110.    Other persons testified, as did Jones, that W&C decided which of Defendant's employees would remain in the Finance Office and which would not. (*See e.g.* Beckham Dep. at 82, Exh. 40 (Kakeh was not reassigned to another position at Defendant because W&C "decided it had to have, at a minimum, its own people in the number one and number two positions; Mack Dep. at 135, Exh. 24 (When asked "[y]ou agree that through the RIF, Walker & Company did not replace the entire leadership, just some portion", Mack replied: "They had authority to replace the entire leadership.  The decision was not up to UPO, it was up to them, and they made the decision.").

In his capacity as Corporate Designee, Jones emphatically stated that: the reason that Kakeh was not retained was that "the management tier he was in, which was Controller, was to be occupied by the independent contracting firm of Walker & Company" and that the reason he was not reassigned to another position with Defendant was the same.   (Corp. Design. Dep. at 6-7, Exh. 91); and that W&C made no recommendation on whether to retain Plaintiff prior to June 2, 2004

(*Id.* at 34-35, Exh. 91). Beckham and Jones in fact testified that W&C specifically requested the retention of Quashie by name, based on his general reputation in the industry. (*Id.* at 17-20, 34, Exh. 91; Beckham Dep. at 85-86, Exh. 40.)

111. Roy Layne, a partner of W&C gave testimony that was different from that of Jones. Lane contradicted Jones, Mack and Beckham on the following key points: that Layne had intended to staff the Accounting Director, Financial Operations Director and Grants Management Director positions with W&C employees (Layne Dep. at 56, Exh. 93); that Jones and Mack told Layne that the wanted Quashie to fill the position of Accounting Director and that they wanted Layne to fill the CFO, Financial Operations Director and the Grants Management Director positions with W&C employees (*Id.* at 53-55, Exh. 93); that Mack and Jones informed Layne that Plaintiff was leaving and Quashie was staying (*Id.* at 59, Exh. 93); after coming to UPO to perform work, Layne made a list employees who he believed should be terminated but UPO never acted on his recommendation (*Id.* at 94-96, Exh. 93); that after coming to UPO, Layne learned that Kakeh had been terminated (*Id.* at 46, Exh. 93).

112. Eboda's testified that Jones conveyed a pre-existing intent to terminate the Plaintiff. In April or May, 2004, Jones informed Eboda that he would rely on W&C for financial information and intended to terminate Kakeh's employment. (Eboda Dep. at 107, 111, Exh. 7.) Eboda sought clarification on whether Jones was intended to abolish Kakeh's position through a RIF or terminate him for poor performance. Jones told Eboda that Kakeh was producing bad reports or something to that effect and Eboda assumed Jones was intending to terminate Plaintiff for poor performance but later he learned that Jones intended to RIF him. (*Id.* at 108, 110, 111, Exh. 7.) Eboda told Jones that if Kakeh's work is not good, Kakeh needs to be fired not

"RIF'd." (*Id.* at 112, Exh. 7.) During this conversation which took place in May, 2004, Jones did not mention Walker and Co. or link Walker to Kakeh's dismissal (*Id.* at 117, Exh. 7.)

113. The effect of the RIF was suspicious as the only two people removed by the RIF were (1) Plaintiff, who had been widely know to have engaged in protected activity against Defendant, and (2) Nona McLean, Jennings' girlfriend. (Fisher Dep. at 67, Exh. 17; Corporate Designee Dep. at 27-29, Exh. 91; Letter Jones to Kakeh, dated Jun. 2, 2004, Exh. 88; Letter from Jones to McLean, dated Jun. 2, 2004, Exh. 67; Letter from Jones to Isaac, dated Jun. 9, 2004, Exh. 90; Letter from Jones to Quashie, dated Jun. 2, 2004, Exh. 89). McLean was romantically involved with Jennings and lived with him. (Jones Dep. at 36, Exh. 26; Mack Dep. at 80, Exh. 24; Isaac Dep. at 12, Exh. 65; Fisher Dep. at 48, Exh. 17; Eboda Dep. at 150, Exh. 7; Stashenko Dep. at 30-31, Exh. 39; Kakeh Dep. at 63-64, Exh. 5.) As a result, both McLean herself and others at UPO understood that the reason she was removed was because of her relationship with Jennings — indeed, McLean stated that she effectively had been expecting the RIF notice. (Isaac Dep. at 12-13, Exh. 65; Fisher Dep. at 48, Exh. 17.)

114. Further evidence that the application of Defendant's RIF policy was slipshod and designed to accomplish specific terminations rather than an overall reorganization lies in the manner in which the Defendant treated McLean. Defendant's managers gave contradictory statements on whether McLean was even part of the Finance Office reduction in force or whether her position was simply eliminated. In his capacity as corporate designee, Jones testified that the termination of McLean was part of the Finance Office RIF and that McLean was a member of the management of that office. (Corp. Design. Dep. at 27, 31, 34-35, 37, 134, Exh. 91; Letter from Jones to McLean, dated Jun. 2, 2004, Exh. 67.) However, Mack testified that McLean was

not part of the Finance Office management and she was not part of the RIF; her position was simply abolished. (Mack Dep. at 76-79, Exh. 24.)

115.    Mack's testimony about McLean is more consistent with the actual facts than Jones's. At the beginning of June 2004, McLean was in charge of Institutional Services. (Kakeh Dep. at 63, Exh. 5.) Although the Institutional Services office appeared to fall under the Finance Department, Plaintiff exercised neither budgetary nor supervisory control over Institutional Services, and in practice the office was directly under the authority of the Executive Director. (*Id.* at 63-64, Exh. 5.) Further, Institutional Services' functions were very different than the financial matters ordinarily falling into the Finance Department. (Kakeh Dep. at 63, Exh. 5.) Institutional Services in general—and McLean in particular—was not in the Finance Department. (Isaac Dep. at 9, Exh. 65.) McLean was not even physically located in the Finance Department. (*Id.* at 9, Exh. 65.)    Furthermore, the institutional services tasks performed by McLean were not part of the outsourcing contract with W&C, and thus McLean's removal was not only not properly part of the RIF but not properly part of the outsourcing either. (Mack Dep. at 76, Exh. 24; Layne Dep. at 50, Exh. 93). Instead, those tasks were transferred to another UPO office after June 2004. (Jones Dep. at 135, Exh. 26.)

116.    Defendant's application of the RIF procedures regarding Isaac and McLean made no sense. According to Mack, Isaac was also not part of the Finance Office management (Mack Dep. at 78, Exh. 24.) Prior to the purported RIF, Isaac was the External Auditor and McLean was in charge of Facilities and Institutional Services. (Kakeh Dep. at 63, Exh. 5; Beckham Dep. at 48, Exh. 40; Jones Dep. at 27, Exh. 26.) Pursuant to the Isaac RIF notice, Isaac was pursuant to the RIF process being transferred into the position of Procurement Manager—essentially, Isaac was being transferred into McLean's former position. (Letter from Jones to McLean, dated

49

Jun. 9, 2004, Exh. 67; Isaac Dep. at 11, Exh. 65.)    In essence, since Isaac was placed in

McLean's position, McLean's position was not eliminated.  Since it was not eliminated, McLean

qualified for reassignment to it under the RIF policy unless someone in her grouping had greater

seniority.    In this case, Isaac and McLean were in completely different groupings.  Isaac was

alone in Group III and McLean was alone in Group V, making the displacement of McLean by

Isaac completely improper under the paragraphs 4.3 and 4.4 of the RIF policy.  (Letter from

Jones to Kakeh, dated Jun. 2, 2004, Exh. 88.)  Further, Isaac resigned prior to June 30, 2004, the

effective date of McLean's removal.  (*Compare* Isaac Dep. at 23-29, Exh. 65 *to* Letter from

Jones to McLean, dated Jun. 2, 2004, Exh. 67; *see also* Defendant Statement at ¶ 86, Exh. 64).

Nonetheless, to Plaintiff's knowledge McLean was not reinstated to her position after Isaac's

retirement, and to Plaintiff's knowledge was terminated as scheduled on June 30, 2004.  (Kakeh

Aff. ¶ 12, Exh. 27.)

117.    Defendant's alleged placement of Plaintiff and Quashie in the same Group VI

category, was inconsistent with its own personnel policies.  First, Quashie was not formally the

Deputy Controller.  At the time of the alleged RIF, Quashie formally held the position of Chief

Accountant and he served informally in the position of Acting Deputy Controller.  (Quashie Dep.

at 6, Exh. 84.)  However, Defendant never properly placed Quashie in the position of Acting

Deputy Controller.  (Kakeh Aff. ¶¶ 7-8, Exh. 27.)    Under Defendant's standard policy, whenever

a personnel action occurred which changed the status of a UPO employee for any duration—

including naming an employee to an acting position—Defendant's HR office issued a "Personnel

Action" form for the change in status which was circulated to the employee's supervisors and

other persons.  (Kakeh Aff. ¶ 7, Exh. 27.)    When Quashie was named to the Acting Deputy

Controller position, this requirement was not satisfied, as Plaintiff (Quashie's supervisor) never

received a Personnel Action form for the acting posting and never made the position permanent. (Kakeh Dep. at 76-77, Exh. 5.)   As such, Quashie was not a permanent Acting Deputy Controller, but a permanent Chief Accountant and could not compete for retention in the Group VI category.

118.   As a Chief Accountant, Quashie's duties were not the sufficiently similar to Plaintiff's as to justify placement in the same competitive level under paragraph 4.3 of the RIF policy.   Thus, even if UPO had followed its RIF policy (which Jones denied), Kakeh, not Quashie should have been placed in the same grouping.   Additionally, as Acting Deputy Controller, Quashie did not have close to the same level of responsibility as Plaintiff to justify placement in the same grouping.  (Kakeh Aff. ¶ 9, Exh. 27.)

119.   The outsourcing of the Finance Office was not consistent with sound fiscal policy as the Defendant contends.   One of the cited rationale for the RIF was to cut costs in order to finance outsourcing the department.  (Jones Dep. at 121-22, Exh. 26.)  Indeed, outsourcing the Controller's position was supposed to save Defendant approximately $20,000/year.  (Id. at 124, Exh. 26.)  These claims, however, do not comport with actual figures.  The partially-outsourced Finance Department under the W&C contract proposal actually cost Defendant $5,000-$10,000/year more than merely using the existing staff.  (*Compare* Outsourcing Services, Apr. 20, 2004, Exh. 87 to UPO Account. and Finance Function Proposal, for Jun. 1, 2004 to May 31, 2005, Exh. 92; UPO Minutes, dated May 26, 2004, Exh. 82; and *see* UPO SJ Ex. 15 ¶ 7). Further, the total cost to Defendant for any of the outsourced positions potentially comparable to the former Controller position under the W&C outsourcing contract were either comparable or higher.  (*Compare* Personnel Action No. 55530, Exh. 94 *to* UPO Minutes, dated May 26, 2004,

Exh. 82; *and see* Layne Dep. at 77-78, Exh. 93). These cost problems were apparent early on, attracting comment from Defendant's auditors. (Eboda Dep. at 104-05, Exh. 7).

120.    The Defendant deviated from its stated RIF policy with respect to the persons actually removed in terms of outplacement services. (Fisher Dep. at 67, Exh. 17.) Under what Defendant claims were the operative policies governing RIFs in June 2004, Defendant is supposed to assist terminated employees in finding work outside UPO. (Letter from Jones to Kakeh, dated Jun. 2, 2004, Exh. 88; Beckham Dep. at 80, Exh. 40.) However, Plaintiff never received any such outplacement assistance, and Defendant has offered no clear evidence as to whether or not either Plaintiff or McLean received outplacement services — and indeed affirmatively indicated that Jones did not expend effort to place Plaintiff in any alternate position. (Beckham Dep. at 81, Exh. 40; Jones Dep. at 44, 45, Exh. 26; Kakeh Dep. at ¶13, Exh. 27).

## OTHER POST-TERMINATION EVENTS

121.    On or about June 18, 2004, Plaintiff amended his Charge of Discrimination filed with the District of Columbia Office of Human Rights to allege that Defendant retaliated against him, for the exercise of protected activity, by terminating his employment on June 2, 2004. (UPO SJ Ex. 18).

122.    On August 6, 2004, DHS first issued its Final Report of the CSBG monitoring review. (CSBG Program Final Report, dated Aug. 6, 2004, Exh. 95.) In that report, Eboda stated that the audit team wished "to commend the UPO Controller, M. Amin Kakeh for his forthrightness and commitment to do the right thing during the on-site review and thereafter, even at the peril of losing his job. The on-site monitoring team found him both knowledgeable

and credible and regrets that he appeared to be the unfair target of a 'reduction in force' action by" Defendant. (*Id.* at 4, Exh. 95; Eboda Dep. at 126-29, Exh. 7.)

123.    On December 1, 2004, DHS again issued its Final Report of the CSBG monitoring review. (CSBG Final Report, dated Dec. 1, 2004, Exh. 96; Mack Dep. at 51, Exh. 24). In that report, Eboda stated that the audit team wished "to commend the former UPO Controller, M. Amin Kakeh for his forthrightness, high ethical convictions, professionalism, and commitment to his duties during the 2004 on-site monitoring exercise. The state CSBG office found him both knowledgeable and credible and regrets the manner of his separation from the agency in what appeared to be a retaliatory action by UPO management for his cooperation with the state CSBG review team." (*Id.* at 4, Exh. 24; Eboda Dep. at 132-33, Exh. 7; Beckham Dep. at 100, Exh. 40.)

124.    On or about December 16, 2004, Defendant sent a letter to Yvonne Gilchrist, DHS Director, concerning its responses to the December 1 Final Report. (Letter from Jones to Gilchrist, dated Dec. 12, 2004, Exh. 85.) In that letter, which Defendant sent to DHS in draft form, Defendant requested changes to the text of the December 1 Final Report, specifically demanded that DHS strike the discussion concerning the retaliatory termination of Plaintiff from the report. (*Id.* Attachment 1 at I, Exh. 97; Beckham Dep. at 91-92, 97, Exh. 40). The specific text complaining of DHS' discussion concerning the retaliatory termination of Plaintiff was written by Beckham at the instruction of Jones. (Beckham Dep. at 94-95, Exh. 40; Jones Dep. at 130, Exh. 26.) Jones further orally requested Eboda to remove this discussion concerning the retaliatory termination of Plaintiff. (Eboda Dep. at 137-38, Exh. 7.)

125.    Pursuant to UPO's instructions, DHS issued a Revised Final Report on March 4, 2005 striking the text in which Eboda accused Defendant of terminated Kakeh in retaliation for

his protected disclosures. (Revised Final Report, dated Mar. 4, 2005, Exh. 97; Beckham Dep. at 100-101, Exh. 40; Mack Dep. at 52, Exh. 24). Eboda, however, continued to stand by his observation that Defendant terminated Plaintiff in reprisal for Plaintiff's protected disclosures and other assistance in connection with the CSBG audit. (Eboda Dep. at 129, 132, 137-38, 139, 143, Exh. 7.)

126.    On March 30, 2005, Plaintiff withdrew his Charge of Discrimination with the District of Columbia Office of Human Rights. (Letter from the D.C. Off. of Human Rights to Zipin & Melehy LLC, dated Apr. 4, 2005, Exh. 98.)

127.    The job duties of Plaintiff and of Quashie (when Quashie was acting *qua* Acting Deputy Controller) were markedly different, due to the wider scope of supervisory authority and far greater level of personal responsibility for accuracy exercised by the Controller. (*See* Kakeh Aff. ¶ 9, Exh. 27; *c.f.* Quashie Dep. at 9-11, Exh. 84). The difference in position was such that the Acting Deputy Controller would not be in a position to evaluate the quality of performance of the Controller. (*See* Quashie Dep. at 42, Exh. 84.) As such, one would not expect the two positions to be in the same job family grouping for RIF purposes. (*See* Kakeh Aff. ¶ 9, Exh. 27).

128.    No direct testimony has been adduced concerning the activities of Robert Richardson, Defendant's former HR Director, in classifying individuals in Defendant's Finance Department on the Retention Register and the Job Family Groupings from persons directly involved in the initial compilation of those two documents for Defendant's alleged June 2004 RIF of its Finance Department. (*C.f.* Beckham Dep. at 81, 139, Exh. 40; Jones Dep. at 79; Exh. 26; Defendant Statement Ex. 13 at ¶¶ 7-9, Exh. 64.)

129.    Plaintiff's only knowledge with respect to what Defendant's Board's putative and facial reasons for terminating his employment came from what was stated in the RIF notice.

(*See, e.g.* Kakeh Dep. at 230, 232-33, Exh. 5)  Plaintiff has knowledge from other sources with respect to Defendant's true reasons for terminating his employment.  (*See e.g..* Letter from D.C. Off. of Human Rights to Zipin & Melehy LLC, dated Apr. 4, 2005, Exh. 98.)  Plaintiff believes that his escorting the Inspector General personnel into Defendant's offices in June 2004 may not have been the ultimate reason behind Defendant terminating him, but he does believe that it was the immediate impetus.  (*See id.*)

Respectfully Submitted,

<u>  /s/</u>
Omar Vincent Melehy, Esq.
D.C. Bar No. 415849
Melehy & Associates, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Phone: (301) 587-6364
Fax:    (301) 587-6308
Email: ovmelehy@zmdlaw.com

*Attorney for Plaintiff*