# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                :
MOHAMMED AMIN KAKEH,            :
                                :
              Plaintiff,         :
                                :
   - vs -                        :    Civil Action
                                :    1:05-CV-1271
UNITED PLANNING ORGANIZATION, INC.  :
                                :
              Defendant.         :
                                :
- - - - - - - - - - - - - - - - x

COPY

                            Washington, D.C.

                            September 20, 2006

Videotaped Deposition of:

              MOHAMMED AMIN KAKEH

the plaintiff, was called for oral examination by

counsel for the Defendant, in the offices of Ford &

Harrison, 1300 19th Street, Suite 700, Washington,

D.C. 20036, commencing at approximately 10:15 a.m., on

Wednesday, September 20, 2006, before Deborah L.

Spear, a Notary Public in and for the District of

Columbia, when were present on behalf of the

respective parties:

DEBORAH L. SPEAR
(301) 843-9370

1    registration about $300.  So it -- I believe it's

2    about 15, 16 hundred dollars a year.

3        Q    Do you have any other children in private

4    school?

5        A    No.

6        Q    And has Nabeelah attended private school

7    throughout her years in school?

8        A    No.

9        Q    She was in public school first?

10       A    She was in public school.

11       Q    Okay.  We have spoken a little bit about

12   your children's education.

13       A    Uh-huh.

14       Q    Why don't we talk a little bit about your

15   education.

16       A    Okay.

17       Q    Did you graduate from high school?

18       A    Yes, I did.

19       Q    Where did you attend high school?

20       A    Damascus, Syria.

21       Q    And when did you graduate?

22       A    1964.

---

DEBORAH L. SPEAR
(301) 843-9370

1      Q      And after you graduated what did you do?

2      A      I went to the University of Damascus.

3      Q      How long did you attend the University of

4   Damascus?

5      A      I attended for four years and graduated with

6   a BS in Accounting.

7      Q      And after you graduated from the University

8   of Damascus did you continue your schooling?

9      A      No.  After I graduated we were -- I was one

10  of the top 10 in the class.  So we picked up by the

11  government to work as a -- like the General Accounting

12  Office here, similar to that position, as an auditors,

13  and we trained during that period of time to practice

14  that kind of profession.

15     Q      And what were your responsibilities as an

16  auditor?

17     A      I was in the branch which usually audit

18  banks and financial institutions all the way until I

19  left and I came back here, when I came here.

20     Q      And when you were auditing banks what did

21  you do?

22     A      Well, we go for the -- for their financial

1    operations for compliances with the regulations and

2    the policies, with the bank policies, with the

3    government policies.  We look for fraud.  We look for

4    a mishandling of the money.  We look for the safeguard

5    of the gold.  And most important thing is the -- when

6    we change the circulation, the currency in the

7    circulation, to replace it with the other one, to be

8    sure that the entire amount would be burned,

9    safeguarded, because usually they have it with the

10   tons, and it can be in circulation for a long period

11   of time, so that very important.  So that's the kind

12   of thing, yeah, kind of audit we do.

13       Q    And you said you worked there for four

14   years?

15       A    I worked there -- I graduated 1968.  I

16   worked about four years there.

17       Q    And what did you do after you left the

18   government position?

19       A    In 1975, in April of 1975 I arrived at New

20   York Airport I guess, all the way to Louisiana to

21   Baton Rouge, where I started my preparation for my

22   graduate school.

DEBORAH L. SPEAR
(301) 843-9370

1      Q    And what did you do from 1972 to '75?

2      A    I was in the service.

3      Q    You were in the service where?

4      A    In the Syrian Army.

5      Q    Did you do accounting when you were in the

6    Army?

7      A    No.  I was anti-aircraft officer.

8      Q    And why did you leave the Army in 1975?

9      A    It's a mandatory service.  I finished my

10   service.

11     Q    The mandatory service is three years?

12     A    Close to three years, yeah.

13     Q    Do you know what the mandatory service is?

14     A    Was what?

15     Q    Do you know what it is?

16     A    It's like a draft.  I mean it's -- it's --

17   when you graduate from university you have to go serve

18   in the Army for about two and a half years, and after

19   that it is about six months in the reserve between the

20   rest of the period.  So it can be four months, it can

21   be five months, it depends, and that's -- it is not

22   like I mean a profession.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    So you served two and a half months and you

2    fulfilled your duties?

3    A    No, two and a half years, two and a half

4    years.  And after that few months I was in the reserve

5    and that -- the service is finished.

6    Q    And were you an anti-aircraft officer in the

7    reserve as well?

8    A    Uh-huh.

9    Q    So in 1975 you ended up in Baton Rouge?

10    A    Uh-huh.

11    Q    What were you doing in Baton Rouge?

12    A    I went to three months course of English

13    language, and orientation, and just to know the rules

14    and the way to go for the university for the graduate

15    school.  It's a program will make you prepare to

16    understand the system, how to go to the university,

17    how to apply, and at the same time is to raise your

18    level of English language to know it will make you

19    able to be in the -- in the -- in the -- in the higher

20    education.

21    Q    And how long was this program?

22    A    I believe it was about -- well, the program

---

1   can go for two years, but I was able to finish my

2   requirements in about four months.

3       Q    And after those four months what did you do?

4       A    I applied for a few universities, and I was

5   accepted in University of Detroit in Detroit,

6   Michigan.

7       Q    And you attended the University of Detroit?

8       A    I attended the University for two years.

9       Q    When did you start studying at the

10  University of Detroit?

11      A    Um, I guess it was -- I believe it was

12  September '75.

13      Q    And what did you study at the University of

14  Detroit?

15      A    I studied economics and finance.

16      Q    Did you take any accounting courses while

17  you were at the University of Detroit?

18      A    Oh, yeah.  Oh, yeah.  Oh, yeah.  Sure, yeah.

19      Q    What accounting courses did you take?

20      A    I don't really -- I mean I don't remember

21  all of them, but I remember managerial accounting, I

22  took financial accounting, I took cost accounting, I

---

DEBORAH L. SPEAR
(301) 843-9370

1    took intermediate accounting I believe also, because

2    that was my field, so I mean it was helping me a lot

3    into -- into the field.

4         Q    Did you take any accounting courses that

5    focused on nonprofit organizations?

6         A    There is really -- until this day there is

7    no courses, quote/unquote, for nonprofit organization.

8    There is no -- nothing like that.  There is a

9    governmental accounting, and that's part of the

10   general education when you are -- when you are an

11   accountant, but the courses per se, like when you say

12   cost accounting, you say managerial accounting, other

13   things, there is nothing called nonprofit accounting

14   courses.

15        Q    And you said there is governmental

16   accounting?

17        A    Uh-huh.

18        Q    What is -- what is -- what is com -- what is

19   governmental accounting comprised of?

20        A    Really it's -- it's how the government

21   operate for their accounting system, which is

22   appropriation and allocation and other things.  There

---

DEBORAH L. SPEAR
(301) 843-9370

1    is no profit.  In the bottom line everything has to

2    equal out.  It's -- it's a different kind of

3    accounting between the nonprofit -- with

4    governmental -- I mean nonprofit coming very similar

5    to governmental accounting in nature.  And I learned

6    the nonprofit accounting really through experience,

7    and that where I gained all this knowledge and those

8    experience about -- because I almost -- 75 percent of

9    my professional life is in nonprofit organization.

10        Q    What is the difference in your opinion

11   between nonprofit accounting and governmental

12   accounting?

13        A    The difference is in the bottom line.  In

14   the government accounting usually expenditures equal

15   revenue, and if there is any difference, will be

16   financed by deficit.  For the nonprofit organization

17   they have what they call a de -- fund balance, like a

18   pool.  Things will go in and out in that one.  It's

19   like similar to the capital in the for profit

20   organization.

21        Q    A defined pool, is that what you said?

22        A    Fund.  Fund.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    Defined fund?

2    A    Uh-huh.  It's got so many kinds of funds in

3  it itself, but the whole thing called fund balances I

4  mean.  So there is nothing at the end of the year like

5  a returned earning to give to anybody.  It will stay

6  there.  If there is a deficit, that fund will be

7  automatically decreased.  If there is a surplus, it

8  will go there.  And they are not supposed to have any

9  surplus, especially from -- from the grants from the

10 outside agencies.

11    Q    And what happens if a nonprofit has a

12 deficit?

13    A    If a nonprofit has a deficit, it means that

14 they spending their own fund balances.  And that will

15 be their assets really if they have investments, if

16 they have bank accounts.  Or it will be on the papers

17 as a deficit, but they are financing the deficit with

18 the money coming for the next year, or from money for

19 the grants is available for them, because usually they

20 put all of these things in one pool.  In the papers

21 you can see it, but in reality there is nothing to --

22 to really -- to -- I mean they don't come to the point

DEBORAH L. SPEAR
(301) 843-9370

1    tell you I don't have money, so I am bankrupt or

2    something, because all the time it is sitting in that

3    fund balances.

4        Q    Now, let's go back to your education again.

5    You were at the University of Detroit for two years?

6        A    Uh-huh.

7        Q    And you studied economics and finance there.

8    Did you get a degree from the University of Detroit?

9        A    Yes, I did.

10       Q    And what degree?

11       A    It's an MA.

12       Q    An MA in any specialized field?

13       A    Well, they call it there -- that college

14   they really call it Liberal Arts and Science.  And you

15   can pick up your field in the combination the way you

16   want to, and I picked up between the economics,

17   finance, and accounting because of my background.

18       Q    And what did you do after you got your

19   Master's degree at the University of Detroit?

20       A    Well, really I did a lot of things.  I mean

21   I worked for sometime at the University of Detroit

22   itself.  After that I started working for a higher

DEBORAH L. SPEAR
(301) 843-9370

1    education.

2         Q      How long did you work at the University of

3    Detroit?

4         A      Months really, I mean it's nothing major.

5         Q      Were you working there while you were

6    studying?

7         A      When I was studying and after I finished.  I

8    mean it's in the administration area and the finance

9    area.  Just helping, I mean it's not a permanent

10   position or anything.

11        Q      And you say you started working higher

12   education.  When did that begin?

13        A      I believe in the 1980s, in the beginning of

14   1980s.

15        Q      And what did you do between the University

16   of Detroit and the time that you started working in

17   higher education?

18        A      Well, a few months I was in the University

19   of Detroit, and after that I became a credit --

20   accepted the position as a credit manager, accounting

21   manager, credit and accounting manager in a technical

22   school in Detroit.

1    Q    And how long were you in that position?

2    A    Couple years.

3    Q    Why did you leave that position?

4    A    We moved to Virginia at that time.

5    Q    So you moved to Virginia about 1980?

6    A    No, 1982 I believe.

7    Q    Could you -- could you -- you have to raise

8  your voice.

9    A    1982.  1982, yes.

10    Q    What were you doing from 1980 to 1982?

11    A    I was with the technical school.

12    Q    And then when you moved to Virginia in 1982

13  did you start working there?

14    A    Sure, yeah.  I worked in Vienna, Virginia,

15  in a place they call it the People Committee -- in

16  reality it was, what you call it, the Libyan Embassy

17  at that time, they closed the Libyan Embassy.  So they

18  have a lot of students in American at that time.  So

19  they give them a nonprofit organization to manage

20  these students until they finish and go back home,

21  because at that time it was a political problems and

22  they stop the relationship.  So friend of mines they

1    were here, and they called me in Detroit when I was

2    there and to come and be the controller for the

3    organization.  So I came there for three years until

4    we completely got all these students finishing

5    schooling and finish everything.  They close the --

6    they closed the office after that one, and that when I

7    went into St. Mary's College in 1985.

8         Q    What were your job responsibilities as the

9    Controller for the People's Committee?

10        A    All the financial operations for them,

11   receivables, payables, salaries, payment for the

12   students, tuition for the universities, doctors,

13   travels.

14        Q    Do you recall how many employees the

15   People's Committee had?

16        A    Most of them they were -- I believe it's

17   less than 30.

18        Q    Did you have any employees reporting to you

19   at that time?

20        A    Oh, yeah, I have four.

21        Q    And what were their job responsibilities?

22        A    Three, three, three of them.  Accountants.

---

DEBORAH L. SPEAR
(301) 843-9370

1      Q      What were their responsibilities as the

2  accountants?

3      A      Well, one was for the revenue, the other one

4  for the expenditures, and the other one was for the

5  payroll, and banking, I believe banking operations,

6  yeah.

7      Q      Do you recall what the size of the budget

8  was for the People's Committee?

9      A      It was few millions at that time.

10     Q      And where did the People's Committee get its

11  funding from?

12     A      From -- from the Libyan government, because

13  they are Libyan nationals.

14     Q      So the Libyan government would have been

15  responsible for overseeing the spending of that money?

16     A      No.  We have a CPA company here, and we have

17  a law firm here was representing them, but all the

18  documentation will go back into Libya, because the

19  people who running the committee they are Libyans.  So

20  they are in Libya when they take all these

21  documentation, they make all the audit and make the

22  other things.  But we were subject to also to the

1    American requirement for the IRS, and the withholding,

2    the FICA, the taxes, and all the other things.

3         Q    And after the People's Committee closed what

4    did you do next?

5         A    I went to St. Mary's College.

6         Q    Were you attending as a student or were you

7    working there?

8         A    No, no.  I hired as a Director, Director of

9    Accounting.

10        Q    Did you have a supervisor there?

11        A    The Vice President, yeah.

12        Q    The Vice President of the College?

13        A    No, Vice President of Finance and

14    Administration.

15        Q    As the Director of Accounting what were your

16    job responsibilities?

17        A    I was responsible for the college financing,

18    the accounting, the student accounts, the accounts

19    payable, the grants, the accounts receivables, budget

20    reporting, closing the book, the financial statements,

21    and preparing for the auditors, both kind of auditors,

22    independent auditors and governmental auditors.

---

DEBORAH L. SPEAR
(301) 843-9370

1        Q      And how long were you the Director of

2    Accounting?

3        A      About six years I believe, five and a half,

4    six years.

5        Q      And did your job responsibilities stay the

6    same for those six years?

7        A      Job what?

8        Q      Job responsibilities stay the same for those

9    six years?

10       A      No.   It's increased from the beginning

11   when -- when I -- because when I -- when I been hired

12   at the time I was an Associate Director.   In less than

13   a year I became the Director.   And as when I was going

14   up we been reorganizing the -- the -- the -- the --

15   the finance -- the Administration and Finance

16   Department, and the responsibility increased until at

17   the end I was -- really all the financial operations

18   was under my supervision.

19       Q      Was there still a Vice President of

20   Accounting at that time?

21       A      It's not the -- it's Vice President of

22   Administration and Finance.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    And did that position still exist when you

2    left?

3    A    I believe at that time the Executive Vice

4    President became the one who was responsible for the

5    Finance and the -- there was reorganization in the

6    college, and the Executive Vice President became the

7    head of that Department also.

8    Q    And who was responsible for establishing

9    policy for that Department?

10    A    Well, this -- this is a -- St. Mary's

11    College is a part of the Maryland Colleges and

12    University system.  So you have government rules they

13    have to abide by, and they have the university's

14    rules, and they have their own rules.  The government,

15    that's offhand, I mean nobody can touch that one.  In

16    the university it's come from top, from the Board and

17    the other things.  In the department it was between me

18    and the Vice President to decide about the policies

19    and procedures within our area.

20    Q    And throughout your tenure at the -- at

21    St. Mary's College did you and the Vice President

22    continue to split the re --

---

DEBORAH L. SPEAR
(301) 843-9370

1        A      Split.

2        Q      -- to split the responsibilities for setting

3   policies and procedures?

4        A      No, we didn't -- we didn't split it.  I mean

5   we -- we -- we will talk about it, I will write it,

6   give him feedback, look at it, approve it, agree it,

7   and we put it in execution.

8        Q      And that was the way it was from when you

9   started working there?

10       A      No, after, after maybe one year.

11       Q      And after you left St. Mary's College what

12  did you do?

13       A      Well, after I left St. Mary's College really

14  I did a few things at the same time.

15              MR. MELEHY:  After he answers this question,

16  or when you finish it, at a convenient time could we

17  have a five minute break so I can use the restroom?

18              MS. DAVIS:  Yes, no problem.

19              MR. MELEHY:  Go ahead, I'm sorry.

20              THE WITNESS:  By the way, I forget also to

21  tell you, when I came to Washington, D.C., even before

22  Washington, D.C., when I have a job, main job, I'll

1    still do other things relate to my area, with friends,

2    with -- for money, sometimes volunteer, and the other

3    things, and -- but I focus all the time on the job

4    where I get money, and that's my -- relate to my area.

5              So after I left St. Mary's College I did

6    three things.  I contracted for one year to go to

7    Bowie State University as a Grant Manager.  I start

8    establishing working with the family, friends in

9    American Middle East Services, helping them, that's

10   volunteer.  And at the same time I was in contact with

11   Saudi in the overseas to look for the -- to have a job

12   there, okay.  I keep my address, I keep my

13   relationship, I keep everything in this country here

14   during that period of time.

15             I got an offer to go to Saudi Arabia, I

16   believe it was in 1993, 1992, because at that time I

17   was working for Bowie State University, and I was -- I

18   met with them couple times in Bethesda, Maryland for

19   negotiations, and finally I accept the job.  I believe

20   I went in '93, in the beginning of 1993.  And I was

21   Regional Director for Finance for one of these tycoon

22   in Saudi Arabia, his name is Jeraisy Group Investment.

DEBORAH L. SPEAR
(301) 843-9370

1          COURT REPORTER:  Could you repeat the name?

2          THE WITNESS:  Jeraisy, J-E-R-S-I-Y, I

3    believe, yeah, Jeraisy Group, yeah.  And I was the

4    Regional Director for the -- for that organization

5    until I -- close to 1996 I believe.

6    BY MS. DAVIS:

7          Q    And why did you leave St. Mary's College?

8          A    I resigned.

9          Q    Why did you choose to resign at that point

10   in time?

11         A    Well, the Vice President really who was with

12   me, and we were working very close together, I mean he

13   resigned, went back to Annapolis in the -- to work for

14   the government also as a -- in the budget I believe

15   department or something.  And the new person who came,

16   the Executive Vice President, wasn't knowledgeable --

17   I mean his background is not in finance.  His

18   background is in human -- human manage -- resources or

19   something, and so -- and I been there for -- for a

20   long time at that time, and I felt it is time for me

21   to change.

22         MS. DAVIS:  Let's take a short break now.

DEBORAH L. SPEAR
(301) 843-9370

1          VIDEO OPERATOR:   Time is 11:12 a.m.   We are

2   going off the record.

3          (Whereupon, there was a brief recess.)

4          VIDEO OPERATOR:   Time is 11:18 a.m.   We are

5   back on the record.

6   BY MS. DAVIS:

7      Q    Before we broke, Mr. Kakeh, we were

8   discussing your work with Jeraisy Group in Saudi

9   Arabia?

10     A    Uh-huh, uh-huh.

11     Q    And you said you were the Regional Director?

12     A    Of Finance.

13     Q    Of Finance.   What were your responsibilities

14  as the Regional Director of Finance?

15     A    Really is the standard policies for a

16  Finance Director.   I mean it's the accounts payable,

17  the accounts receivables, the contract with the

18  governments, the stores where they have the sales, and

19  the vendors in the United States because their product

20  is from here.   So also the budgeting, and the

21  financial statements, and government reports, and the

22  annual audit.

---

DEBORAH L. SPEAR
(301) 843-9370

1     Q    Was the Jeraisy Group a private corporation?

2     A    It is a private corporation, yeah.

3     Q    Is it an American owned corporation?

4     A    No.  It is -- it is a Saudi owned

5  corporation, but they have a lot of partnership with

6  the Steelcase, Apple Macintosh, and a few other

7  American companies, credit card factories and other

8  things, and furniture I believe, office furnitures.

9     Q    Were you the highest level person in your

10  department?

11    A    Yes.

12    Q    And what department did you oversee?

13    A    The Finance Department.

14    Q    How many employees were in the Finance

15  Department?

16    A    It's not only in the Finance Department.  I

17  mean the Finance Department and in the -- like the

18  Maintenance Department for the copier machines and for

19  the computer, they were also part of the Finance

20  Office.  I believe it's -- I mean as -- as a

21  accountant in the regional and in the main office it

22  was about 40 people.

1     Q    Was your office also responsible for

2  purchasing?

3     A    No.

4     Q    But you were responsible for paying any

5  invoices relating to purchases?

6     A    Oh, yeah, and the accounts payable

7  completely.

8     Q    And how long were you with the Jeraisy

9  Group?

10     A    I guess it's about -- being there is about

11  three years I believe.

12     Q    Was there a time when you were working for

13  them not in Saudi Arabia?

14     A    Not working directly, I mean I have friends

15  working for them.  So sometime I was a contact, and a

16  commission or something.

17     Q    After the three years that you were in Saudi

18  Arabia?

19     A    After and before.

20     Q    And why did you leave Saudi Arabia after

21  three years?

22     A    Aminah and Mohammed, they get older and they

---

DEBORAH L. SPEAR
(301) 843-9370

1    have to go to another -- they don't have school to

2    accommodate them there.

3         Q    So did you return to the United States at

4    that point?

5         A    Uh-huh.

6         Q    So you re --

7         MR. MELEHY:  You need to say yes or no.

8         THE WITNESS:  Yes.

9         MR. MELEHY:  Just so you understand.  Okay.

10   BY MS. DAVIS:

11        Q    You returned to the U.S. about 1996?

12        A    Around that time.

13        Q    And what did you do when you came back to

14   the U.S.?

15        A    Well, I start looking for a job, and I start

16   working with Manna Corporation.

17        Q    When did you start working for Manna?

18        A    I believe it was March of nineteen-ninety --

19   '96.  You have all the documentation.  I mean I

20   believe around that time.

21        Q    And what was your position at Manna?

22        A    Controller, Financial Controller.

1      Q      And who did you report to as the Controller?

2      A      The Vice President of Finance and

3  Administration.

4      Q      Did you supervise any employees when you

5  were at Manna?

6      A      Uh-huh, uh-huh.

7      Q      How many employees?

8      A      One time there were three, one time there --

9  yeah, three, three.

10     Q      What positions did those three employees

11  hold?

12     A      One was accounts payable, the other one was

13  for the revenue part and the payroll, and the other

14  one was for I believe is an accounting assistant or

15  something.

16     Q      And how long were you the Controller for

17  Manna?

18     A      Two years.

19     Q      Were you promoted after two years?

20     A      No, my -- my salary increased within the two

21  years, but my employment terminated with -- with --

22  with the -- with Manna.

---

DEBORAH L. SPEAR
(301) 843-9370

1       Q      And why did your employment terminate?

2       A      Well, it looks like my style of management

3    was too demanding for the staff I had.

4       Q      How would you describe your style of

5    management?

6       A      Well, I'm the kind of person who liked to

7    meet a deadlines, have an accurate information, take

8    the job seriously, learn and train people, and get

9    ready for the -- for the annual audit.

10      Q      Do you know how that differed from what

11   Manna was expecting?

12      A      It's not really -- it's not really different

13   I mean in reality.  When I came to Manna the agreement

14   was between me and the Vice President.  He said --

15   because the salary was very low for my caliber, and he

16   said if you give us only two years, just give me two

17   years to put everything together, and -- and I did

18   that, because I mean the goal was for two years to

19   accomplish exactly what I was supposed to do.  So at

20   that time I mean I wasn't looking for a long term

21   employment with them.  So I was very demanding to

22   accomplish these goals into these two years, and that

1    was maybe for them, for the staff I guess too much, I

2    don't know, looks like it.

3         Q    Did you have a contract with Manna?

4         A    No, I have -- I mean I have a gentleman

5    agreement with the Vice President, I mean that I will

6    commit to be in that position for two years, and I did

7    that.  I did that two years and maybe a couple days

8    after that.

9         Q    And is Manna a for profit corporation?

10        A    No, not for profit.

11        Q    Do you know how Manna is funded?

12        A    Grants, charities, grants from federal

13   government, and from D.C., and from private donations

14   also.

15        Q    Do you know which federal government

16   agencies --

17        A    HUD.

18        Q    -- provided grants to --

19        A    HUD, and Department of Housing also, DHHS.

20        Q    Did you say DHHS, is that what you said?

21        A    DHS.

22        Q    DH?

DEBORAH L. SPEAR
(301) 843-9370

1   A    HHS is that the Human and Health Services.

2  Department of Housing also there because I mean they

3  are a -- they build houses for low income families.

4        Q    Any other federal agencies provided grants?

5        A    The Energy Department I guess for the energy

6  conservation, also for the poor people, that mainly

7  the two sources for the income, yeah.

8        Q    What about from the D.C. Government, which

9  agency provided grants?

10       A    Department of Housing, D.C. Department of

11 Housing.

12       Q    Any other D.C. agency?

13       A    There are other agencies they used to have a

14 grant from them, I'm trying to remember, let's see,

15 the -- it's for social -- for social activities, and

16 because they were also a community -- within Manna

17 there was another branch for community services also,

18 so...

19       Q    Did the Department of Housing ever conduct a

20 review of Manna while you were employed there?

21       A    We were reporting to them and the -- you

22 have to distinguish here between two things.  There

DEBORAH L. SPEAR
(301) 843-9370

1   are a requirement for a government agencies to audit

2   subgranting, that happen every two years.  Like when I

3   was in St. Mary's College, every two years they call

4   it a legislative auditors.  They will come, stay for a

5   few months, looking at everything.  And they have the

6   independent auditors which comes every year.

7   Depending on the amount of the grant, some agencies

8   consider the regular reporting to them when you

9   sending them information about -- all the time about

10  what you are doing, and the independent auditor will

11  be sufficient for them.  They look at these things and

12  they continue.  So they don't have to come for an

13  audit.

14          And there are these -- there are regular

15  auditors and there are the GI auditors, Inspector

16  General Office, the IG auditors.  When I was in Manna

17  we were reporting to the D.C. Government about the

18  progress, the withdrawal of the money, on all the

19  related subject, and they have the independent

20  auditors coming, but I don't believe anybody came

21  for -- to audit them when I was there.  I don't

22  believe so.  They are not a big agency anyhow.

DEBORAH L. SPEAR
(301) 843-9370

1    Q    Do you know what their budget is?

2    A    Maybe three million dollars I believe.

3    Q    Was an independent audit conducted of Manna

4    while you were there?

5    A    Uh-huh.  Uh-huh.  Uh-huh.  Yes.  I forgot.

6    Q    During the two years that you were with

7    Manna did Manna use every year all of the monies that

8    was granted to them?

9    A    Oh, no.  They will have deferred revenue,

10   and they will have advances, and they will have

11   account receivables with the -- with the -- with the

12   agency.  So it's all kind of financial terms you can

13   say.

14   Q    Do you have to account -- did Manna have to

15   account to the D.C. agency for deferred revenues?

16   A    Yes.

17   Q    And how did they do that?

18   A    Well, every really -- the deferred revenue

19   -- deferred revenue, the advances, the prepay, the

20   refundables, the liability of cash, each one of them

21   is completely different origin.  Deferred revenue is a

22   revenue you earned, but you didn't spend.  Okay.  Now,

1  many people they have difficulties in that area, and

2  they consider any money they receive from the

3  government as a deferred revenue, i.e., because we are

4  going to come to that point I know, so I will explain

5  it from now.

6          When you billing the government on regular

7  basis, on a monthly basis, and you base for these

8  expenses as assumption or budget, you end up at the

9  end of the year with a lot of money you didn't spend

10  and you didn't earn.  Some people will put that as a

11  deferred revenue, and this is wrong.  These are

12  advances because as I said, the government when you

13  give the grant, the max of the amount is that one, if

14  you spend that amount of money in the fiscal year, you

15  will earn that much.  If you don't re -- if you don't

16  spend it, the money will be left with you.  It's not a

17  deferred revenue.  That will be part of the grant for

18  the next year.  So the next year payments, let's say

19  they give you nine million dollars, the next year when

20  you have say two million dollars you didn't spend,

21  next year will be seven million dollars cash, and the

22  grant will be nine million dollars.  Okay.

---

DEBORAH L. SPEAR
(301) 843-9370

1      And this is very important point I want to

2  emphasize because I mean that's an essential point we

3  are going to be talking about, I know that, I mean in

4  the later stages.  So deferred revenue is a very wide

5  concept for a lot of people.  Okay.  And the only way

6  we can identify it when you really come to the grant

7  conditions and the terms for how are you going to

8  spend the grant.

9      Q    So deferred revenue varies from grant to

10  grant?

11      A    No.  Deferred revenue, what I said, people

12  can miss -- um -- they can miss the name, the title,

13  the goal for it.

14      Q    And I just want to make sure I understand

15  what it is.

16      A    Well, I mean I told you what -- deferred

17  revenue, if in this fiscal year, whatever the

18  situation is, I spend five million dollars, okay, but

19  I bill the government for four million dollars, okay,

20  they still owe me for one million dollars, at the end

21  of the year that will be deferred revenue.  Okay,

22  that's one thing.

DEBORAH L. SPEAR
(301) 843-9370

1        The other thing, this is one term of

2   deferred revenue, the other thing, you have a grant

3   for five million dollars, okay, it's not on

4   reimbursable basis.  That's for a project for that

5   year.  For whatever reason you couldn't finish the

6   project, but they give you the five million dollars,

7   and you spend only three million dollars.  The two

8   million dollars would be for that project to earn it

9   in the next year, and it doesn't come from the next

10  year grant, it's the previous one.  So the criteria

11  here, there is a lot of place for interpretation and

12  maneuvering, and the only one who knew that one is the

13  one who is inside, Controller, the Director, the Vice

14  President, who leading the operation and knows two

15  things, knows the budget and knows the billing, from

16  three angles will decide if this is a deferred

17  revenue, or this is a prepayment, or this is a

18  refundable amount of money going into the government.

19       Q    And then you said there is also a category

20  advances.  What are advances?

21       A    Advances like I mean we let's say -- we do

22  it now on Equal Justice, we did it before in UPO.  We

---

DEBORAH L. SPEAR
(301) 843-9370

1   are the grantee, we have subgrantee.  The subgrantee,

2   they don't have much money like we have.  So at the

3   end of the year they need the payment -- let's say the

4   year end in June 30th, they need the payment for July

5   because they don't have money.  We give them the money

6   from that, that money to them, that considered

7   advances.  They didn't earn it, and it doesn't belong

8   to the same year.  It will be earned and dealt with in

9   the second fiscal year.  And at the end these advances

10  can equal or be less or more the amount you give them.

11          So the advance is really is an estimate.

12  They said give me $5,000, but their expenses will be

13  for that month $7,000.  So you send them $2,000, but

14  you consider that you giving them seven because you

15  give them five and the two for that period.

16          Or it will be this, if it's this, the

17  differences will be also advances for months after

18  that.  So it's on continuous basis.  And that has

19  nothing to do with the earning.  It's just a

20  transaction going in and out.

21      Q    And at the end of the year if the advances

22  exceed the amount that they are given, what happens to

1    that money?

2        A    It's -- this is considered for on them

3    account receivable, it's a debt.  So in that case when

4    you billing the government, you cannot bill the

5    government for that advances, because this is the cash

6    advances, there is no substantiation for it for any

7    expenses.  If you bill the government, you are taking

8    money from the government which you did not earn.

9        Q    So where does that money come from if it

10   can't come from the government?

11       A    It comes from the government.  It comes from

12   the government, but the government doesn't sit there

13   and count these.  I mean because we have the PMA

14   system they call it.  The PMA system you have a

15   maximum amount.  You can draw that money in any time

16   because it is -- this is what the practice is.  So you

17   can go any time and draw the money as long as you have

18   the right code, the right, you know, transaction,

19   so -- and they will ask you, you supposed to tell them

20   that you taking advances or not taking advances or you

21   earned it, okay.  The only time the government

22   interfere if you show them as an advances more than

DEBORAH L. SPEAR
(301) 843-9370

1    what you spend already, that will trigger them to pick

2    up the phone and say why you asking for all that

3    money.  And if you asking for all that money, it is

4    supposed to be spent in three days from that time.  So

5    you are getting the cash from them, but all the

6    transaction it would take months after that to show in

7    the system either with them or in the report we submit

8    to them, because the report for cash is quarterly,

9    every three months.  And they assume I believe -- it's

10   not they assume.  I mean the people supposed to adhere

11   to the terms of this -- of the grant that they will

12   take the money when they need it to spend it.

13        Q    So if you exceed the amount of money that's

14   been given, if you substantiate it, you can keep that

15   money?

16        A    No, it's not you can keep that money.  The

17   issue for the draw-down is to help you pay for your

18   expenses.  And the terms of the grant, it's two kind

19   of terms, either advances or reimbursement basis.

20   Reimbursement basis, I mean you have to spend the

21   money first before you ask for it.  The advances you

22   can ask for it if you are going to expend this expense

1    the money within three days.  Any amount more than

2    three days shouldn't be drawn down, or if you find out

3    that you don't need it, you bring it back to

4    government, or if you keep it, you pay interest on it.

5    And the advances you draw down, it has to be

6    reasonable.  You know that you going to be spending

7    $20,000, you don't ask for $200,000.  So it has to be

8    also in the range of your -- I mean actual and routine

9    operations, expense trend.

10       Q    You said after two years you left Manna.

11   What did you do after you left Manna?

12       A    I accepted the job with United Planning

13   Organization as the Financial Controller.

14       Q    How did you learn about the job at United

15   Planning Organization?

16       A    The auditors who were auditing Manna, they

17   were the same auditors for United Planning

18   Organization, and the relationship between the

19   independent auditors and United Planning Organization

20   administration, it was very close.  So they ask their

21   help in finding a controller, and I worked with them

22   for two years with Manna, they know me.  So they

DEBORAH L. SPEAR
(301) 843-9370

1    Q    And when you started working for UPO what

2    were your job responsibilities as the Controller?

3    A    It was managing the finance -- the

4    Controller's Office for all the financial operations

5    and accounting transactions, reporting, the annual

6    audit, training the staff, implementing the new

7    software system, new computers accounting system,

8    supervising the Office of Billing and Revenue, the

9    accounts receivables, the accounts payable, the

10   payroll, the Budget Office, the Senior Accountant in

11   the Accounting Department, and the Financial Operation

12   Managers, and also in a way the external auditor, even

13   though I mean he reported to -- but he was in my

14   office also working with us.

15   Q    But who did he report to?

16   A    Ben Jennings directly.

17   Q    How many employees did you supervise when

18   you started working there?

19   A    Fourteen I believe.  Fourteen in the

20   Controller's Office.  There was another office under

21   my -- under my title, under the title, Institutional

22   Services.

---

DEBORAH L. SPEAR
(301) 843-9370

1      Q      And how many employees were in Institutional

2  Services?

3      A      Five maybe, five, yeah, five I will say.

4  But I didn't supervise them directly I mean, because

5  they were really having completely different task and

6  different goals, but in the structure of organization

7  and structure it's under my Department.

8      Q      And who was responsible for supervising

9  Institutional Services?

10     A      Ms. Nona McLean at that time.

11     Q      Is she included in the five employees who

12 were in that department?

13     A      Yes.

14     Q      Or were there five plus her?

15     A      No, no.  She and -- she -- including her.

16     Q      Were you responsible for the budget for the

17 Controller and Institutional Services?

18     A      No.  I was for the Controller's Office.

19     Q      Who was responsible for the budget for the

20 Institutional Services group?

21     A      She was working very closely with Ben

22 Jennings I believe.  It's between -- between Nona and

DEBORAH L. SPEAR
(301) 843-9370

1    between Ben Jennings I believe, because that area

2    include the purchasing, and the inventory, and the

3    building, and the security, and the mail room, and the

4    phone system.  So in reality, as I said, I mean in the

5    organizational chart was under my Department, but in

6    reality she was working directly, I believe directly

7    was working with the Executive Director, because I

8    mean for the volume of the operation they have, I mean

9    the importance of the operation that they have, yes.

10       Q    Now, you said Ms. McLean worked directly

11   with Mr. Jennings and the external auditor.  Who was

12   the external auditor at that time when you started?

13       A    Bill Isaac.

14       Q    Did anybody else that on the org. chart was

15   underneath your office work directly with

16   Mr. Jennings?

17       A    All of them.

18       Q    All of the employees worked for --

19       A    All of them with no exception.  I mean he

20   will even call my own secretary, give her assignment

21   to do something.  I mean this is his style.  So if he

22   wants something, he doesn't go through channels.  He

DEBORAH L. SPEAR
(301) 843-9370

1    her.

2         Q    Did you start to report to her?

3         A    Well, I have to.

4         Q    Was Mr. Jennings still the Executive

5    Director at the time that she became the CFO?

6         A    Yeah.  Yes.  But the difference now is the

7    following.  Mr. Jennings and Ms. Mack -- well, first

8    of all, Mr. Jennings himself stopped any

9    correspondence with me at that time.  He was not

10   contact me directly for anything.  Ms. Gladys Mack,

11   after they hired the Chief Financial Officer maybe one

12   or two month, and in meeting for all the managers and

13   the directors she made it clear to all of them that

14   from now on you deal directly with the Chief Financial

15   Officer, no more with the Controller.  I was in the

16   meeting, and that was recorded I mean the -- no, no,

17   that wasn't recorded because it is for managers'

18   meeting, but I documented that statement, I mean -- so

19   since then they made it clear that I mean the only way

20   to go to them is through the Chief Financial Officer.

21   And I tried couple times, not tried, I mean as a habit

22   I believe to go to Ben or to go to Gladys Mack, and

1    they made it clear, Amin, you have to go and -- to

2    Sheila, Ms. Sheila Shears.

3         Q    Do you remember when Ms. Shears became the

4    CFO?

5         A    It's April or May, I mean something like

6    this.  I cannot remember exactly.

7         Q    Of what year?

8         A    Two thousand -- 2002, because I left in two

9    thousand -- no, 2003.  2003, yeah, because I left in

10   2004.

11        Q    And you said --

12        A    And that was about almost a year by that

13   time.

14        Q    You said there was a managers' meeting where

15   Ms. Mack said that the managers were to deal directly

16   with the CFO.  Was this a managers' meeting for the

17   Finance Office --

18        A    No.

19        Q    -- or for the UPO as a whole?

20        A    For the whole organization.  She -- she made

21   it very, very bluntly clear for everybody, and as a

22   matter of fact after that -- well, she make it clear

---

DEBORAH L. SPEAR
(301) 843-9370

1    for everybody that -- I mean and immediately they took

2    my name from the circulation of the reports to

3    receive.  Before that one my name was in the

4    circulation, because we have a circulation for, you

5    know, we are a big organization, and who going to --

6    who going to receive what and who going to get what,

7    they took my name immediately after that meeting from

8    the circulation.  So I don't receive anything directly

9    after that.

10        Q    What types of reports were circulated that

11   you stopped getting?

12        A    Everything.  Everything.

13        Q    You say everything.  What is everything?

14        A    Everything financial used to come to me,

15   stopped.

16        Q    Well, what types of reports stopped coming

17   to you?

18        A    Well, really I -- when I say every --

19   every -- everything that belong to the Controller's

20   Office, anything, banking statements, credit cards,

21   contracts -- not contracts, I mean -- yeah, the

22   execution of the contracts, payroll issues, billing

---

DEBORAH L. SPEAR
(301) 843-9370

1   issues, the contact, any new you -- new news,

2   meetings, it was an absolutely black out I mean from

3   every angle.

4        Q    Prior to Ms. Shears being hired what

5   meetings did you attend that you were no longer

6   invited to?

7        A    Well, I don't -- we used to meet all the

8   time with Ben Jennings.  I will be there in the

9   meetings for some major -- I mean for things relate to

10  a company-wide issues, that stopped.  I used to have

11  meetings with the -- attending meetings where the

12  General Counsel will be, that stopped.  Meetings with

13  the outside agencies stopped, insurance companies,

14  committees, even in the managers' meeting really I was

15  put aside -- not put aside, I mean I wouldn't be

16  questioned any more, even in the managers' meeting I

17  mean so --

18       Q    So you continued to attend managers'

19  meetings, but questions weren't directed to you?

20       A    Yeah.  Yeah.  I mean I was the -- I was the

21  contact, the source, the to be questioned and

22  everything, that stopped also.  However, my

DEBORAH L. SPEAR
(301) 843-9370

1    responsibilities did not diminish one bit.

2         Q    So what responsibilities did you continue to

3    have?

4         A    The same thing, the ultimate responsibility

5    in the Controller's Office was mine, and everything

6    else stopped.

7         Q    So what do you mean that the ultimate

8    responsibility remained yours?

9         A    I'm still responsible for supervising the

10   staff, for meeting the deadline, for issuing the

11   reports, for closing the year, for preparing for the

12   audit, everything still the same.

13        Q    Was there a change in your salary when

14   Ms. Shears came on board?

15        A    No.  Well, she didn't come on board.  She

16   was consultant there before, so...

17        Q    Did this change occur while she was a

18   consultant or when she became an employee of UPO?

19        A    What change?

20        Q    Your responsibilities.

21        A    No.  She was consultant helping me.  They

22   appointed -- they hired her as a consultant to help me

DEBORAH L. SPEAR
(301) 843-9370

1    in the office.  I didn't ask for help.  They hired her

2    to help me, so -- and after that they appointed her as

3    the Chief Financial Officer.

4         Q    And I asked you if your salary changed --

5         A    I don't believe --

6         Q    -- at the time that she was hired.

7         A    I don't believe so.  My salary changed

8    before that, not when she been appointed.  When they

9    hired a Deputy Controller for me, that when my salary

10   change I believe.

11        Q    When did they hire a Deputy Controller?

12        A    When -- when Sheila was there, yeah.  He

13   didn't last for more than maybe six months or

14   something.

15        Q    And who was that?

16        A    I cannot remember his name at this point,

17   but it will come to me.

18        Q    And who hired the Deputy Controller?

19        A    Ben Jennings and Gladys Mack.

20        Q    But so he was hired before Sheila Shears

21   became the CFO?

22        A    Well, she was there.

---

DEBORAH L. SPEAR
(301) 843-9370

1        Q     But was she the CFO or consultant?

2        A     No, she was consultant.

3        Q     And what happened to your salary when the

4    Deputy Controller retired?

5        A     I guess they gave her a higher salary and

6    they added couple thousand dollars to my salary I

7    believe at that time.

8        Q     So your salary increased?

9        A     Uh-huh, because of his salary, otherwise the

10   increase in the salary in UPO, the trend was is for

11   the COLA every year, that's it.  Whatever the

12   government agree for the COLA they will increase the

13   salary.  So that was an adjustment in the salary

14   because of the hiring of the Deputy.

15       Q     And after the Deputy Controller left did

16   they hire another Deputy Controller?

17       A     No.

18       Q     Do you know if UPO --

19       A     They nominated my Senior Accountant to be

20   the Deputy.

21       Q     And who is the Senior Accountant?

22       A     David Quashi.

DEBORAH L. SPEAR
(301) 843-9370

1      Q    What do mean he was nominated, did he fill

2  that role?

3      A    No, they put him as an Acting.

4      Q    Did he ever become the Deputy Controller?

5      A    Really it didn't -- it was in a short period

6  of time when every time -- when everything happened.

7  So I don't know what happened after that.  I know he

8  is still working there, I mean they are calling him

9  director or something now, I don't know, but I mean as

10  a title to come from the Human Resources by appointing

11  him as a Deputy Controller didn't happen at that time

12  because he was to be tested and find out if he can fit

13  that position.

14      Q    So they were testing him when he was Acting?

15      A    I believe so.  I believe so.

16      Q    Do you know if UPO advertised for the CFO

17  position that Sheila Shears was appointed to?

18      A    Officially, officially I didn't receive

19  anything, but I know that -- I guess they -- I

20  guess -- I guess they did.  I guess they did.

21      Q    Did you apply for the position?

22      A    Yeah.

1        Q    Were you interviewed for the position?

2        A    They won't accept my application.

3        Q    Who would not accept it?

4        A    Mr. Benjamin Jennings.

5        Q    Did he tell you why he would not accept it?

6        A    Well, that was the base for my suit, lawsuit

7   against them in the beginning for discrimination.   So

8   simply he doesn't want me to apply for the position.

9        Q    He told you he didn't want you to apply?

10       My question was do you know why he would not

11  accept your application?

12       A    Well, that's a different story, but I mean

13  in reality I mean it was very -- in a very secretive

14  and very closed doors way it happened, and as I said,

15  officially I didn't have anything, but when I heard

16  about it I expressed my interest, and he told me from

17  the beginning that he is not going to consider the

18  application.   So I don't believe I submitted a request

19  or something, but I believe -- yeah, it was verbally I

20  guess I told him, and -- yeah, and he said he won't

21  consider my application.   So that's the reason I went

22  for a lawsuit at that time for discrimination.   And

---

DEBORAH L. SPEAR
(301) 843-9370

1          Q      Did you talk to him about the audits?

2          A      What do you mean about the audits?

3          Q      You earlier testified that annually audits

4    are done of these organizations --

5          A      No.   This happened in the -- when -- when

6    the auditor is there, Gladys Mack will be there, he

7    will be there, I will be there, and sometime maybe

8    Isaac will be there, and it will be a general

9    discussion about the findings from the auditors.   But

10   for me and him to sit privately or with Gladys Mack to

11   discuss about the auditor, that never happened.

12   Because as a matter of fact, there is another fact

13   also here, the auditors, they used to report to him

14   directly, and it happened after him continued the

15   trend even to report to Dana Jones about the status of

16   the things, they submit the report to him.   I work

17   with them in the things inside the office, but all the

18   decisions, all the findings, the status, will be

19   discussed between them and the auditors.   Now, if

20   there is a disagreement between me and the auditors,

21   it will be in the open with all of us sitting there.

22         Q      And during the time that you were employed

DEBORAH L. SPEAR
(301) 843-9370

1    at UPO who were the auditors?

2         A    They never changed, Thompson, Cobb, and

3    Bazilio.  Bazilio is B-A-Z-I-L-I-O.  Thompson, Cobb,

4    C-O-B-B.

5         Q    And were these the same auditors that you

6    had worked with at Manna?

7         A    Yes.

8              MS. DAVIS:  I think this is a good time to

9    break.

10             THE WITNESS:  Great.

11             VIDEO OPERATOR:  The time is 12:23 p.m.  We

12   are going off the record.

13             (Whereupon, there was a luncheon recess.)

14             (Kevin Kraham not present.)

15             VIDEO OPERATOR:  The time is 1:33 p.m.  We

16   are back on the record.

17                    (Deposition Exhibit Number 1

18                     was marked for identification.)

19   BY MS. DAVIS:

20        Q    Mr. Kakeh, I'm showing you what has been

21   marked as M. Kakeh Number 1.

22        A    Uh-huh.

1    BY MS. DAVIS:

2        Q    Before the break we were talking about the

3    appointment of Sheila Shears to the CFO position?

4        A    Uh-huh.

5        Q    And in paragraph 11 it states that Shears

6    did not meet the qualifications for the position.  Is

7    that your opinion, that Sheila Shears was not

8    qualified?

9        A    To fit that position in the organization

10   itself, in the organization itself, that's my feeling,

11   yes.

12       Q    Your feeling that she was not qualified?

13       A    Uh-huh.

14       Q    And why do you believe that she was not

15   qualified for the position?

16       A    Well, it's for the simple fact that I mean

17   she doesn't have a background in nonprofit.  That's

18   number one.  Number two, when she worked with me as a

19   consultant, really I have to teach her the basic

20   things about our operation.

21       Q    What did you have to teach her?

22       A    I have to do -- I mean because she -- she

1    been asked to provide some specific project, financial

2    project, and I have to explain to her how -- how to

3    get it, what that supposed to mean.  And I mean it

4    will sound I mean rude, but talking professionally I

5    wasn't really impressed I mean with the -- with the --

6    with the knowledge she has.  And if they at that time

7    -- if they asked me to hire her as my assistant, I

8    wouldn't do.  So I feel from this situation here to

9    put her over me to tell me what to do for things I

10   already been trying to teach her the basic things

11   about it I feel this is absolutely I mean

12   unacceptable.

13        Q    What types --

14        A    Maybe she is excellent in some other areas

15   of some other organization, but here I have -- at that

16   time when she came I have five solid years I built

17   everything, and I know the core of every operation,

18   and then somebody come whose -- so that's the reason I

19   felt I mean she is not -- because I mean it was a --

20   in a daily -- not a daily.  I mean when she was

21   working with me as a consultant I wasn't impressed to

22   the degree to hire her as my assistant, rather to put

---

DEBORAH L. SPEAR
(301) 843-9370

1    her Chief Financial Officer.

2         Q      What types of financial projects did she

3    have questions about?

4         A      Really I mean she never finished any project

5    we give her.  I mean we give her a project to try to

6    go to the subgrantees, the agencies, establish a sound

7    accounting practice there, how to report to the main

8    office, if they need any help in training or

9    something, she really never finished that one.

10        The other project we give her it was to

11   write a procedures and policies.  And I remember at

12   that time I bought a CD, generic, generic procedure

13   and policy for nonprofit organization, give it to her

14   just to match it -- to add here and there and just

15   change things to match UPO.  She didn't finish that

16   project either.

17        We gave her another project to write the

18   notes for the financial statements, just to change

19   numbers and do things, because I mean this is

20   straightforward in the financial statements.  She

21   wasn't able to do that either, and -- and she really

22   was more interested in running her boutique business

---

DEBORAH L. SPEAR
(301) 843-9370

1    from the office than concentrating on learning

2    accounting, or learning the finance, or learning about

3    our business.  And I have to teach her about the -- in

4    the accounting system on the computer system because

5    she never had experience, previous experience into the

6    software.

7         Q    What software was that?

8         A    Solomon.

9         Q    Do you know if she had any experience with

10   another type of financial management system?

11        A    I didn't really read his -- her resumé, but

12   I mean the way she presented herself that she was with

13   Verizon I believe or something, and it's not for me to

14   judge her, I didn't know her there.  I made my

15   judgment exactly in the relationship between me and

16   her in that position, and I felt if somebody going to

17   come to the CFO position, has to teach me, be more

18   qualified than me, have more knowledge, more

19   experience than me, to be in that position.  It's not

20   the other way around.  That -- that -- that's my

21   judgment on her.  I'm -- it's not personally for her,

22   it's not what she was.  Maybe she is the best in her

DEBORAH L. SPEAR
(301) 843-9370

1    field where she was, I don't know, but I'm talking

2    specifically at that point of the relationship there.

3            And when she came really she didn't come as

4    a -- she came for about she said for one year, because

5    she had financial difficulty -- behind the lines,

6    behind the closed doors, and they told me that.  I

7    mean she had financial difficulty, had deficits in her

8    business.  So she wanted to come do some consulting

9    work so she can build it up and everything.  So really

10   it wasn't a career path for her, so -- and that, all

11   of these things they put it together.  And after that

12   I mean they kept telling me teach her, give her some

13   of your tasks to work on, that's when she was

14   consultant.  And after she became Chief Financial

15   Officer, the same thing, they say split your work

16   between you and her.  I said she should have other

17   tasks besides splitting my work.  I mean if -- if I'm

18   the work I am doing here, why do we need -- I need

19   another person to work half of the things?  It doesn't

20   work out that way.  She has to be doing on other

21   things.  So that was really the reason for that

22   judgment.

---

DEBORAH L. SPEAR
(301) 843-9370

1       Q       And who told you to split your work with

2    Ms. Shears?

3       A       Gladys Mack.  As a matter of fact she said

4    that emotionally, she said, well, give her something

5    to do.

6       Q       When did she tell you this?

7       A       When she became Chief Financial Officer she

8    said you holding everything, give her something to do.

9    I said I am not holding anything, this is my job, this

10   is my responsibility.  That's what I did all the time.

11   How am I going to give her half of my things?  I mean

12   how -- who going to be responsible for what?

13          So they told me when I said that one, Ben

14   Jennings was in the meeting, Gladys Mack was in the

15   meeting, Monica Beckham was in the meeting.  So Ben

16   Jennings suggested to me, he said why don't you write

17   a job description for her.  I have to write a job

18   description for the CFO?  They said, well, we want you

19   to do something, I mean just put it on the table, she

20   will find out and we will go from there.

21          MS. DAVIS:  For the record David Rosenberg

22   has just walked into the room.

---

DEBORAH L. SPEAR
(301) 843-9370

1   BY MS. DAVIS:

2        Q    What is your understanding of the role of a

3   Chief Financial Officer in a nonprofit organization?

4        A    My understanding or the standard of the

5   industry?

6        Q    Your understanding.

7        A    Well, my understanding is really the

8   standard of the industry, which is to overlook the

9   financial management of the organization, in a

10  nutshell.

11       Q    And what do you mean by overlook the

12  financial management?

13       A    The person will have an experienced

14  knowledge about the operation of the organization, the

15  details, the scope of the operation, grant management,

16  managing the budget of the organization, the

17  expendi -- I mean the investment, and being able to

18  generate financial statements, write procedures and

19  policies, practice in an internal contro -- internal

20  financial control.  It's a senior level operations

21  really, and mainly to make decisions, to make

22  financial decisions.

DEBORAH L. SPEAR
(301) 843-9370

1    Q    Is there a distinction between the role of a

2  Controller and a CFO?

3    A    Completely.

4    Q    What's the difference?

5    A    The difference is the finan -- the financial

6  controller is the man who run the operation in

7  day-to-day operations for all aspects of financial

8  accounting and finance.  It's an exec -- executor --

9  executor, how you say it, an executor, I mean that's

10  the man who does the decision making.

11    Q    And after Sheila Shears became the CFO did

12  you run the day-to-day operation of the Finance

13  Office?

14    A    Not really.  She -- she -- she start to

15  taking some of the task I have.

16    Q    What tasks did she start to take?

17    A    Well, she took the easy -- the easy part,

18  which is relate -- related to the whole problem after

19  that one, the accounts payable area, where all the

20  expenditures come out.

21    Q    Do you know why she took over the accounts

22  payable?

---

DEBORAH L. SPEAR
(301) 843-9370

1    A    Why?  Because that was the vital part of the

2    operation.

3    Q    Why was it the vital part of the operation?

4    A    Because you -- 36 million dollars coming out

5    of that channel.

6    Q    And how did she take over the accounts

7    payable function?

8    A    She issued the -- through Ben Jennings, I

9    believe there is a memo from -- in that case is

10   that -- I mean she will take full responsibilities for

11   the accounts payable area while I am closing the

12   fiscal year, under my objection.

13   Q    And what were you doing to close the fiscal

14   year?

15   A    All the other daily operation related to

16   closing the fiscal year.

17   Q    And what is entailed in closing the fiscal

18   year?

19   A    Well, reconcile, to be sure that

20   reconciliation is there, the posting is there,

21   everything relate to the fiscal year documents is

22   there.

DEBORAH L. SPEAR
(301) 843-9370

1    for the auditors, there are special requirements for

2    the auditor, from schedules, and documentation, and

3    all the other things, related to every financial

4    action been taken during the -- for that fiscal year.

5         Q    In the first part when you are closing out

6    the fiscal year do you prepare financial statements?

7         A    Well, as the result we will -- we will --

8    we -- in the system it's already the designs for the

9    financial statements there because we can issue it in

10   a monthly basis also, so -- but running the financial

11   statements in a monthly basis really that does not

12   reflect the real financial status of the organization

13   because there are so many things outside the system it

14   does not put it in.  So most of these financial

15   statement within the year is approximate, this is the

16   way it looks now.  At the end of the year the

17   financial statements change by the day.  When you run

18   it every day, it change by the day.  It depend on the

19   information posted into the system.

20        Give you an example.  Let's say the Head

21   Start program, when we close it September 30th, they

22   have $12,000 in expenditures.  There are purchase

---

DEBORAH L. SPEAR
(301) 843-9370

1  orders, and there are reports from the agencies from

2  the outside, they didn't send it, for another three

3  million dollars.  So if I run the financial statement

4  today, it will show surplus in the Head Start for

5  three million dollars.  If I get tomorrow $500,000, it

6  will show less by $500,000.  If they made the mistake

7  in the posting, instead posting to this program, to

8  this program, it will show negative in that program.

9  Okay.

10       And my role is to sit there and find out

11  about where are these differences coming from, what

12  impacted all of these.  This is the process of the

13  closing on a daily basis.  And when you are

14  experienced with all these things, I mean you can make

15  a -- you can make a judgment immediately what's going

16  on.  You can find out exactly when you looking at the

17  programs and all the details.

18       So that what you talking about from the

19  financial statement, the financial statements is

20  there.  Any minute you can click on it, it will give

21  you the report, but now the information inside the

22  financial statements, that's completely different.  It

1    depend on the timing and all the relevant information

2    of the audit in the system or not.

3        Q    And who generates the -- who was responsible

4    for generating the financial statements for fiscal

5    year 2003?

6        A    Anybody can run the financial statement,

7    they are in the system, but the one who really --

8    anybody can run the report, but the one who is

9    responsible to see that the financial statements are

10   accurate and reflecting the real situation in the

11   organization is me as the Controller.

12       Q    And how frequently do you check the

13   financial statements for accuracy?

14       A    At the end of the year, because the -- when

15   you close the fiscal year, you have to take a picture

16   of the situation on that day.  So that will give you

17   an indication where you are going to go, how long you

18   are going to take, and what problems inside.  So

19   through the experience I mean you can tell from that

20   one, also be a lot of things missing.  You will have

21   $800,000 in expense account, they don't show in the

22   bottom line even if you run the financial statement,

---

DEBORAH L. SPEAR
(301) 843-9370

1    but all of these things are expenses, when you add it

2    to it the bottom line, going to change the whole

3    picture.

4              So I look at these things usually according

5    to the schedules I have for the people what to finish.

6    Like I give you an example.  Our revenue at the end of

7    the year would be increased in a daily basis.  Every

8    time we issue a billing to the government, that would

9    be recorded.  When we recorded that one, our revenue

10   would go higher.  So one day I will have the revenue

11   low, the second day I will have the revenue high.  The

12   expenses coming from the agencies outside our

13   agencies, or from the department, or we are having

14   from the vendors, especially at the end of the year,

15   at the end of the year, fis -- our fiscal year, every

16   day there is a -- a new amount would be added.  Every

17   day a new amount would be added.  So it will change

18   also the picture.

19             Until when I see that everything is coming

20   very close to the budgeted amount and the awarded

21   amount, that when I start making -- will make me close

22   to make a decision to issue the final draft for the

---

DEBORAH L. SPEAR
(301) 843-9370

1    auditors.   That's -- that's the final step I do.   So I

2    have to keep watching these things.   And that, I can

3    run the financial statement sometime three, four times

4    a day.   Every time when they tell me something, they

5    will say, well, we bill today CSBG for $1,200,000, I

6    run to find out the impact on how much is still left

7    and how much it will affecting the bottom line.   Until

8    I see that we get to the point when my guideline is

9    the budget amount which we will receive the award for

10   that fiscal year, the bottom line and the individuals

11   will be very close to each other.

12       Q    And where do you get the information to

13   determine the accuracy of the financial statements at

14   the end of the year?

15       A    I don't understand.   Maybe you can -- you

16   mean the question a different way, what -- what you

17   really saying?

18       Q    You say your responsibility is to ensure the

19   accuracy of the financial statements.

20       A    Oh, it's from -- from -- from the award

21   letters.   I mean they give me nine and a half million

22   dollars award for that fiscal year, and I see that I

---

DEBORAH L. SPEAR
(301) 843-9370

1    am either so far I spend eight million or I collected

2    six million or ten million, that where I draw the line

3    because that's the criteria, for every program, and at

4    the same time in the other hand is the same thing for

5    every department, every program have how much to

6    spend.  Because I mean if they supposed to spend 12

7    million dollars, and I see 14 million dollars, then

8    there is something wrong there.  The other people,

9    they cannot see it because they are doing the action.

10   When I look at the big pictures, I can usually tell

11   because I have the other accounting and the pieces of

12   the information.

13        Q    Who has access to the Solomon's?

14        A    Everybody.

15        Q    Everybody in the organization?

16        A    No.  Everybody in the Finance Office, and

17   any consultant, if they been hired by the

18   organization, and the auditors, will have access to

19   the system, but this access is limited and specific.

20   Anybody can look at the system inside or outside for

21   reporting -- for viewing purposes.  That's no problem

22   there.

1        The people who work in the organization, if

2   they are in account receivable area, they will have

3   access to the account receivable area.  If they are in

4   the accounts payable area, the same.  If they are in

5   the budget area, the same.  If -- the general ledger

6   people usually have access to everything else.  Okay.

7   I have access to everything.  So if somebody is not

8   there, there is a problem in the system, I can put my

9   account there, or for other people, they can access

10  it.  So when the auditors comes we will do that.

11       Also the consultants, they are in a range.

12  Some of them they will have a view, some of them they

13  will have access into the system when they will become

14  as not consultant, become working for you, and some of

15  them they will be -- that was the only time in my life

16  I mean, and I am 63 years old, I mean I been 40 years

17  in the financial area, the first time in my life I saw

18  consultant have an access to the design of the system

19  it was in UPO.

20       Q    Which consultant had access to the design?

21       A    F.S. Taylor.

22            COURT REPORTER:  What's the name?

DEBORAH L. SPEAR
(301) 843-9370

1          THE WITNESS:  F.S. Taylor, CPA company,

2    firm.

3    BY MS. DAVIS:

4          Q     And did they have access to the design from

5    when you started working at UPO?

6          A     No.  They ask me to give them access to the

7    design.

8          Q     And when did they ask for access?

9          A     When they came to work, to work in the --

10   that was I mean -- we had -- I had a big problem with

11   that one, and in the beginning I refused to give them

12   any access to the system -- to the design, because if

13   I give access to that, to the design, I lose control

14   over the system, and I don't know what people are

15   doing, and I would not be able to trust to trace

16   everything.

17          So what I did, to save you another question,

18   I gave them a limited -- I gave them an account for

19   access to the system, but I have my own other account

20   with the system.  So if they messed up with the

21   system, they are generating the report, I don't care

22   about it.  The one I have access to, the same

---

DEBORAH L. SPEAR
(301) 843-9370

1  database, but mine is restricted, they don't have

2  access to it.

3       Q    So do they have like a shadow account?

4       A    No.  No, no.  To give you an example, the

5  design can be -- when you give -- when I give you

6  access to the design, you can go to the rows, change

7  what's in it, you go to columns, change what's in it,

8  change the year, change the date, so the report will

9  be completely different coming out.

10          They were working for Head Start, and the

11  fiscal year -- the grant year for the fis -- the Head

12  Start is different from our fiscal year.  So they told

13  me that, Amin, they really need to have an access

14  because they want to pick it in a different time, pick

15  it in different things.  From my previous dealing with

16  F.S. Taylor I don't trust them.  I dealt with them,

17  and I know how they operate.  So I don't -- I didn't

18  trust them.  But it's imposed on me to give them

19  access to the design.  So what I did at that time, I

20  give them an access to the design exactly what I have,

21  what I have, and I blocked mine for myself with that

22  special account, and I give them access to them in

---

1    the -- everything the same.  So both of us we have the

2    same access to the data system, but mine is the one

3    designed with the auditors with the organization.

4    They are the one who is changing this to fit their

5    operation and their reporting what they want to do.

6            The reason for that one because we been

7    double-dipping, taking money from the government, and

8    they were trying to find out how much we owe the

9    government, how much we supposed to take, how much we

10   paying from CSBG to Head Start that they are not

11   supposed to, for this kind of reason they wanted to

12   find out.

13       Q    Did Ben Jennings have access to the

14   financial management system?

15       A    Yeah.  He has access to everything, but he

16   does -- I mean he doesn't touch it, he doesn't know.

17   As the head of the organization for him, for Ms. Mack,

18   for the Director of the IT, these people they have

19   access to everything, in, out, from A to Z, but that

20   doesn't mean that they work with the system, the --

21   no, they don't, they don't do that.

22            The IT person can, can I mean go into the

DEBORAH L. SPEAR
(301) 843-9370

1    system according to our request if they want to find

2    out if there is a problem or something, but for

3    Mr. Jennings and Ms. Mack, they have the ability, but

4    I don't think they ever -- I don't know.  I don't --

5    but I mean I don't think it was a practice for them to

6    go into system because they used to ask for reports

7    from me.

8         Q    And you made a statement that we were

9    double-dipping.  What did you mean by double-dipping?

10        A    Well, this is -- this is really a long

11   story, but we take money from one grant and spend it

12   for the other grant, supposed to be on temporary basis

13   until we get the money from that one and put it back.

14   So after a while I made a decree that we are taking

15   for the same expenses from two sources.  So the first

16   time they hired Thompson, and Cobb, and Bazilio, and

17   they made a study for a few months, and they decided

18   that they had to pay the federal government Department

19   of Health and Human Services about 600 and -- 600 and

20   some amount, I remember when I left -- the year before

21   we left we paid them the final payment, we paid them

22   342,000, that's the second payment.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Ben Jennings was, his hand was in everything

2    inside the Controller's Office, and especially,

3    especially when it comes to CSBG and Head Start,

4    especially these two. The decision come from him how

5    much to draw down, how much to bill, how much due on

6    all of these things. So one time I was looking at

7    the -- making the reconciliations between the cash and

8    everything, and I find out that I mean we really

9    overdrafting, and when I saw that one I presented to

10   them. So what they did at that time they hired Alice

11   Williams, who was working with F.S. Taylor, hired her

12   to be Financial Director for main -- Financial

13   Operation Director, and she start working on that

14   subject, and she said that I mean the government owe

15   us, we don't owe them. And she made the calculation,

16   everything, and finally Ben decided that we have to

17   take the money from the government, they owe us,

18   despite my objection and Badri Simlot objection at

19   that time.

20           So what he did on all the documentation he

21   put in the top, and he asked me to sign it, to take

22   the money from the -- for the -- from -- from -- from

---

DEBORAH L. SPEAR
(301) 843-9370

1    the -- from the PMA system.  So at that -- and the man

2    was powerful, everybody knows that.  I mean he was

3    running the company.  He is one the first and the

4    final decision of the company.  And he -- they brought

5    it to me in the middle of one million things, and they

6    said you -- Ben said you have to sign this one so we

7    can get the money today.  I said I'm not signing this

8    one, but I tell you one thing, I called around, and I

9    asked, and they said -- they advised me to say in

10   order to be compliance with him as the mana -- as

11   executive, so you don't I mean, what you call it,

12   the -- sub -- insubordination and the other things.

13   So I wrote on it -- I looked at the documents, period.

14   I didn't say authorize it to give -- to go there and

15   pick up the -- to draw the money.  So when that

16   happened, that after that they get the Thompson, Cobb,

17   and Bazilio, and my insistence, and they looked at it,

18   and they found out that we really owed them the money

19   back, and we paid them the money.

20        Q    So let me make sure I have this straight.

21   First there was movement of money back and forth, and

22   Ben Jennings thought that the government owed you

DEBORAH L. SPEAR
(301) 843-9370

1    insistent all the time, he said, well, we will bring

2    Thompson, and Cobb, and Bazilio to look at that one.

3    When they looked at it they said on the bottom, yes,

4    you overdrafted, and you have to pay the money back to

5    the government.

6        Q    So when was Thompson, Cobb and Bazilio

7    hired?

8        A    He was there all the time.

9        Q    When was he brought in to look at the

10   situation that you have just described to us?

11       A    If we said -- that was in 2002 I believe.

12       Q    Do you know why Mr. Jennings wanted to draw

13   down this additional money that wasn't UPO's?

14       A    We didn't have money in the bank to pay the

15   payroll.  We were building at that time the buildings

16   and paying a lot of money.

17       Q    So he needed the extra money for payroll?

18       A    He wanted ca -- he wanted cash.  I mean he

19   wanted cash to cause him to run the operation,

20   especially for the payroll.  So in reality he didn't

21   really care how the money come, come there, because

22   that was the only avenue for him at that time, because

DEBORAH L. SPEAR
(301) 843-9370

1    at that time we reach the maximum of the line of

2    credit, we have all the payments from the grants and

3    everything.  So there was no money to keep things

4    going except that one.  So he was willing to do that.

5    And when we stopped as a matter of fact he cussed

6    Simlot in the open, and he threatened him by firing

7    him and everything, and it end up that way.  And after

8    that when he failed that, I mean spread all over the

9    places, and we been upset about it, when he said we

10   bring Thompson, Cobb, and Bazilio to take a look at

11   it.

12       Q    And when was it determined that UPO had

13   overdrawn $600,000?

14       A    Well, after she spent couple months,

15   Ms. Logan I guess her name, she had decided that, and

16   so they put a clause in the financial statement that

17   UPO owed the Department of Health and Human Services

18   that amount of money, and by talking to the -- the

19   people in the Department of Health and Human Services

20   they suggested to them that to apply for the next

21   payments, they refused, they said no, you refund this

22   and you take your money as usual.  So the second

1    payment made in 2002 for $243,000 I believe, even.  In

2    2003 we didn't pay anything.  We supposed to -- we

3    were supposed to pay 292,780 I guess, something like

4    this, to -- kind of a program, but we didn't.  When I

5    left they didn't pay it.

6         Q    Now, you have described the situation

7    involving Head Start and double-dipping.  You also

8    mentioned CSBG.  What's CSBG?

9         A    CSBG, there is a budget for the CSBG, a

10   community block grant.  There are portions of it

11   already decided when they submit the budget that,

12   let's see, $200,000 will go to this program, $400,000

13   will go to for this program.  And I remember exactly

14   it was between 150 to 156 thousand dollars supposed to

15   go into the Head Start.  Okay.  This is what the

16   government approved and agreed on, and you only spend

17   that amount of money on it from the CSBG grant.  Now,

18   you want to spend from your own money ten million

19   dollars, that's up to you.  However, UPO doesn't have

20   any source of income except from the grants, none.  So

21   UPO doesn't have $10, not one million dollars, $10 to

22   pay any deficit for any program.  At the end of the

---

DEBORAH L. SPEAR
(301) 843-9370

1    year all these deficits they will shift it into the

2    CSBG for everything we didn't spend of the CSBG and

3    cover the deficit and cover these programs, and that's

4    when the problems started between me and between them.

5        Q    And when did that start?

6        A    Really started couple years before that one,

7    but I been overridden all the time.  As I told you, I

8    mean the other auditors, they don't report to me, and

9    Mr. Gladys Mack was the only one responsible for the

10   budget.  So she used to juggle the information into

11   the -- into the organiz -- to the D.C. Government in a

12   way that it will show that I mean we spend all the

13   money.

14       Q    And how did she do that?

15       A    Very simple, I mean it's just saying I mean

16   the amount we spend that we spend all of it.

17       Q    But how would she -- you said she juggled

18   it.  How would she juggle it?

19       A    She knows, she knows that all the deficits

20   from the other program paid out of CSBG money, okay.

21   So in this case here we pay from the CSBG money.  I

22   want to concentrate only on one program.  We take

1    money from the CSBG to cover the deficit in the Head

2    Start program.  We supposed when we get the money from

3    the Head Start program is to pay the money back into

4    the CSBG money, okay.  We never did that.  So we take

5    for the same expenses we paid for it from the CSBG,

6    and we take the money for it from the Head Start.

7        Q    And you said that this occurred a couple

8    years prior, a couple years prior to when?

9        A    It happened in 2001, it happened in 2002, it

10   happened in 2003, but the difference was it was a

11   small amounts in these years that looks like it was

12   immaterial for the auditors or for the agency to dwell

13   about it.  Okay.  In 2003 the money was for not for

14   the programs.  In 2003 the plot was like this, the

15   plot was like this, we are qualified by the government

16   to charge them for $2,392,000 as an indirect cost

17   recovery.  They put three outlets to spend money from

18   the CSBG, which is not really has to do anything with

19   the CSBG.  The first one there is an account in the

20   CSBG it's called program support.  In 2003 it came to

21   $758,000 in that, in that account, and I know, I know

22   for that program there is no program.  It is just a

---

DEBORAH L. SPEAR
(301) 843-9370

1    name. It's just a name. Only expenses going there.

2    Everything else it has going to an agency, going to

3    subsidiary, except this one here it's really for all

4    the money which Ben want to spend or the UPO going to

5    spend is in that account.

6         The other account is his own account. His

7    own account when we make the pool in the beginning of

8    the year and make a budget, we will give him a

9    specific amount. Let's say $300,000. He charged

10   $700,000 there, that's number two.

11        Number three, I have an account called UPO

12   Special. Okay, UPO Special really is accommodation

13   for a limited operation for the organization outside

14   the allowable costs which will go into that area. You

15   are talking about few thousand dollars.

16        They wanted to cover all of these, as I

17   said, we are -- what we are approved for $2,300,000

18   for the whole organization as an indirect cost pool.

19   That's what the government is going to pay for it.

20   Then one day it came to $3,440,000. So I said,

21   listen, we can only claim two million and three from

22   the government. The money left over in G & A, what

1   you spend for 3,440,000, that is not qualified to be

2   covered by anybody.  Okay.  And the other amount which

3   was for the credit cards, which was coming directly to

4   Ben, which came to about $556,000 for about maybe six

5   months, we never saw the credit card, and he was

6   making the payment directly, wire transfer to the same

7   bank.  The Vice President of the bank M & T was his

8   friend, and he was maybe spending more time in our

9   organization than in his office in the bank.  But

10  anyhow, so the relationship is very close, all what he

11  has to do, and we have the Visa from them.  He will

12  send the bill, he will take a look at it, tell him to

13  go and wire the money from our account to pay for the

14  credit card.  None of these things was in the system.

15          So when we came at the end for the

16  reconciliation and everything and we found out about

17  that one, that when we start looking for where is

18  coming from, who is that wire, who is this, and that

19  was also the other amount they wanted to cover by the

20  CSBG money.

21      Q   So let me make sure I understand that.

22  There was 1.1 million dollars that they wanted to

---

DEBORAH L. SPEAR
(301) 843-9370

1   cover through CSBG money, and then an additional

2   $556,000 that was for credit cards?

3       A    Uh-huh.  And there was hundred and -- I

4   believe $108,000, the loan was given to the Treasurer,

5   they wanted to cover it from CSBG.  The payment for

6   the SUVs for the Chairman of the Board of Director

7   also been charged to CSBG.  We find out all of these

8   things when we discovered the credit card that the

9   payment in the -- in the -- for these things it was on

10  the credit card.

11      Q    The payment for the loan to the Treasurer

12  was on the credit card?

13      A    No.  The payment for the Treasurer was

14  issued in a check from our -- from our offices with

15  Ben signatures on it and his order.  The payment for

16  this SUVs and the other cars, it was in the credit

17  card, some of the payments were in the credit card.

18  So that's the reason we didn't know about the SUV to

19  put it into the assets or anything else because we

20  didn't have any access to that one.

21      Q    You said payments for the SUV.  What SUV?

22      A    A Mercury Mountaineer I guess.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q  Was this Ben Jennings' SUV?

2    A  No.  That was Russell Simmons.  I guess he

3 bought him two.  The first one he crashed it

4 completely, and he bought him another one.  Two or

5 three, I cannot remember.  Plus he has two Lincoln

6 Continentals, he was paying on it also on the credit

7 card.  He was parking them in his house.

8    Q  Russell Simmons was?

9    A  No, Ben Jennings.

10    Q  And the SUVs were bought in fiscal year

11 2003?

12    A  The new one, I believe so, yeah.

13    Q  And the first one, do you recall when it was

14 purchased?

15    A  If it's in the same year, it would be 2002,

16 but I don't believe in 2002 because I mean we had -- I

17 mean the report for the credit card doesn't come to

18 me, but if he was paying on it, the staff would have

19 told me there is something I mean there.  So I am not

20 sure for the first one how he was paying for it.  No,

21 the first one paid for it and charged the -- the

22 Office on Aging for it.  Yeah, he give it to him and

---

DEBORAH L. SPEAR
(301) 843-9370

1   charged the Office on Aging for it.

2        Q    And when did that happen?

3        A    I believe in 2002.  And when they came to

4   audit the information, they found out, and they

5   discounted from them also.

6        Q    It was discovered in the audit for fiscal

7   year 2002?

8        A    No.  They didn't discover -- when the audit

9   came on, everything came in the open.  The Office on

10  Aging came to check on their program, see what's been

11  charged to their program.  So they found out about

12  them.  So they make it disqualified payments.

13       Q    But when did they discover this?

14       A    Af -- af -- after the fiscal --

15       Q    In fiscal year 2003 or fiscal year two

16  thousand --

17       A    After 2003.

18       Q    After 2003?

19       A    Uh-huh.

20       Q    So after the annual audit for fiscal year

21  2003?

22       A    No.  The annual audit for 2003 took more

---

DEBORAH L. SPEAR
(301) 843-9370

1    than a year and a half, and the final report was after

2    I left three months.  They came sometime in November

3    2003 and finalized it close to October 2004.

4            So during that time I contacted the Office

5    on Aging, and I know a guy there, Jiwad, and I said,

6    listen, you have to send your auditors, take a look at

7    your accounts.  So they send them there.  They hired a

8    CPA, CPA company agency, they came, and I was working

9    very closely with the lady.  That's before anything

10   else.  I mean that when I start -- when I start

11   hearing about these things, so they came.  So they

12   left that one and presented an independent audit.  I

13   mean they start getting information from everyone else

14   about the situation inside.  So the independent

15   auditors really, they couldn't figure out anything

16   because Ben was refusing to give them access to a lot

17   of information.  One of the information he refused to

18   give them is the old bank trans -- wire transfers and

19   old construction accounts, and I was with the auditor

20   when he refused to give it to her.

21       Q    Who was the auditor that he refused to give

22   the information to?

---

DEBORAH L. SPEAR
(301) 843-9370

1    A    She -- her name is Nulhaylatta,

2    N-U-L-H-A-Y-L-T-A, and the last name is Idrisu,

3    I-D-R-S-U-E, I believe.

4    Q    Does she work for UPO?

5    A    No.  She worked for Thompson, Cobb, and

6    Bazilio.  She really asked for the information on her

7    own and he refused.  Finally she told me and she said

8    I want you to come with me to explain to him, and I

9    went there explained to him, and he said you really

10   don't need this information, this is between the

11   contractor, the construction, and the bank, and

12   everything, so -- but we can give you what the bank

13   saying what -- how much we spend and how much we got,

14   but she wanted to take a look at the, what they call

15   it, when they finish a portion of the building there

16   is some kind of report they submit, they had to

17   testify for it and sign it, and then after that the

18   bank -- because it is a bond money they have to pay

19   it.  She wanted to see that the completion of the

20   work, the value of the completion of the work is equal

21   the amount of the money the contractor was receiving,

22   and she never got that one.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    Do you remember when this meeting took

2  place?

3    A    That meeting took place before Ben had his

4  accident in his -- in his leg.  It must be in Janu --

5  I -- I -- it should be in January.

6    Q    Of what year?

7    A    2004.

8    Q    Now, you mentioned three accounts that UPO

9  was trying to get paid through, the indirect cost

10  recovery program support?

11    A    No, no, no, no, no.  Indirect cost recovery

12  is by itself.  A program support is a title within the

13  CSBG program for a slush fund.  Any money, any money

14  Ben wanted to spend cannot be charged to the other

15  programs.  For the other programs they have director

16  and they have -- and I issue them budget to actual

17  report.  So they will see it there.

18         That program was for him directly.  So the

19  budget for him, the expenses goes to him.  So any kind

20  of money he cannot charge it there, he will put it

21  there.  Some of them salaries, bonuses, car payments,

22  rental, you name it.  And that come to $758,000 in

DEBORAH L. SPEAR
(301) 843-9370

1    2003.

2        Q    Was that account, though, part of the CSBG

3    budget or was it created by Ben Jennings?

4        A    No.  It's part of the CSBG, when they submit

5    it to them, they will see program support, and they

6    put an amount for it.  The CSBG people, they assume

7    that that program is for a specific project.  Okay.

8    But one of the things they used to do, hiring people,

9    there is no budget for them, there is no money for

10   them, so they will be working let's say in the Human

11   Resources Department, which is supposed to be indirect

12   cost pool, and they will be paid from that account, an

13   arm length to do the things legally and where to

14   charge it.

15       Q    And did that account program support exist

16   prior to 2003?

17       A    It existed all the time, but the amount in

18   it was very small.  In 2003 it jumped to almost

19   752,000.  So when I was looking at the things and I

20   saw the jump, because I mean I really have nothing to

21   do with the CSBG in the pragmatic way.  It's between

22   Ben, between Gladys, and between the lady who was the

1  Director for the CSBG program.  So they are the one

2  who decide what's going there.  So I didn't -- I

3  don't -- don't really know, because to me it's the

4  figures.  The activities is their own decide.  And he

5  decide in that program what will go there, but Gladys

6  knows, and the Director for the CSBG program also

7  knows, and he cannot do that into the Head Start

8  program.  In the Head Start program there is no slush

9  fund for him directly to go, yet he pressured Bill

10 Hughey to hire consultant, pay her about $10,000 every

11 two weeks cash for services she never provided.

12       Q    And you said there was a second account, Ben

13 Jennings' account?

14       A    That the G & A, in the G & A all the

15 itemizations, in my office, the Human Resources, the

16 IT, everybody has a budget.

17       Q    Is this the Department budget?

18       A    Department budget.  So his Department budget

19 supposed to be from the beginning for his salary and

20 the other stuff come to a specific amount.  That one

21 it will be doubled.  The double the extra money there

22 is no source for it, and they wanted to charge all

DEBORAH L. SPEAR
(301) 843-9370

1    this extra money as a indirect cost into -- as a

2    direct cost into the CSBG.

3        Q    Do you know a gentleman by the name of Tunde

4    Eboda?

5        A    Very good.

6        Q    How do you know Mr. Eboda?

7        A    I know him really closely.  At the end of

8    January 2004, that when started the relationship

9    face-to-face between me and him.  Before I met him

10   twice, one time when I came they introduce me --

11   introduce him to me as the Program Manager for the

12   CSBG.  The second time after two years maybe or after

13   one year, I cannot remember, we had a little chat with

14   other staff, that all what I know about him.  But I

15   know that he is the person -- oh, no, no.  And I

16   attended two conferences for the poor and other things

17   for CSBG, and he was presenting the information about

18   the grant and everything.  But as a know him by name,

19   know me by name, it happened after January 2004.

20       Q    So you didn't have any one-on-one meetings

21   with him prior to January 2004?

22       A    No.  As I said, I mean the only time we

DEBORAH L. SPEAR
(301) 843-9370

1   all the time to send the check, and get the check, and

2   would send him the billing through Simlot, so that...

3        Q    In January of 2004 how did you come to meet

4   with Mr. Eboda?

5        A    By January 2004 at that time I have a very

6   clear picture about the misfortune of UPO.

7             MS. DAVIS:  I don't mean to interrupt you,

8   but he needs to change the tape again.

9             THE WITNESS:  Okay.

10             MR. MELEHY:  Why don't we take a break.

11             VIDEO OPERATOR:  We are going off the

12   record.  This completes tape number two.

13             The time is 2:37 p.m.  This begins tape

14   number three.

15   BY MS. DAVIS:

16        Q    Mr. Kakeh, I apologize, I interrupted you.

17        A    No problem.

18        Q    You can continue.

19        A    In the period from November through December

20   most of the UPO people they were on vacations, and the

21   Board, portion of the Board, and the executives, and

22   Ben Jennings, they were -- they were in Hawaii.  And

---

DEBORAH L. SPEAR
(301) 843-9370

1    it was a quiet time, which I was able to focus on the

2    financial statements and the situation.  I was very --

3    started in June when they blocked me from -- started

4    blocking me from the circulation, from going to the

5    meetings, from having financial information.  That was

6    absolutely in my mind came to two things, either these

7    people they preparing to finish my employment, or

8    there is something else they couldn't do when I am in

9    charge, they want to do it now.  That my own personal

10   analysis.

11         And every day I start leaning toward the

12   other option, that there is something -- I know before

13   there were a lot of mismanagement, I knew that.  As a

14   matter of fact, the first day I -- not the first day.

15   The first couple days when I came my secretary came to

16   me and she said, listen, I want to tell you one thing,

17   I'm not going to repeat it again, the Controller

18   before you who was here resigned, and he said I want

19   to go every day back to my house, I don't want to go

20   to jail, and this place here is crazy, so he left.

21   She told me this is the only time I am going to tell

22   you this one and forget I told you about it.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Through working like everyone else, I mean
2    that's expected for people to come and start getting
3    close to you by making statements and everything.  So
4    I didn't really pay much attention to that one.  But
5    after that I mean I start every time there is
6    something questionable, every time there is something
7    questionable, but the problem was I don't have the
8    handle on it because of the way he operate, because he
9    go directly to the source.  He hire somebody, go to
10   the payroll, telling them how much, pay them how much,
11   do this.  They want to make a payment, he go directly
12   to that accounts payable.  He want to have some
13   information, he go directly to the Senior Accountant.
14   He want the billing, go to Simlot.  If there is any
15   problem, he will send his auditor.  So in reality I
16   mean I looking at the figures as a shape, but the
17   substance of it I didn't have a handle on it.  Okay.
18        So I was -- the suspicion was building,
19   building, building, building, okay.  And I heard it
20   from so many people in the organization about his, I
21   mean the way they deal financially, how they pay.
22   Managers go on trips, they get advances, they -- that

1    they are going on a trip, they never pay the advances

2    back, and after that they will say we lost the

3    receipts, and Ben will write on it I know that that

4    person went to this, and there you go, that's

5    sufficient enough documentation.

6         And the problem is, I mean the one strike me

7    all the time, he will put his handwriting, is not

8    initial, complete signature on it.  So they come to me

9    and said listen to this one, I know that she didn't go

10   to as she said to San Diego because I saw her.  So

11   it's not my job.  I'm not private investigator.  And

12   at the same time I mean I have his signature here,

13   it's his hand signature, not initial, I have to pay

14   it.  I mean it has to go through.  I have -- I mean I

15   cannot stop it.

16        So a lot of people were benefitting from

17   these things, but I don't have the ability to prove

18   it, okay.  So I am seeing these things, I am -- I know

19   there are a lot of things going, but it never come to

20   the point to be blunt in the open like what happened

21   in 2000 -- 2003.

22        So it wasn't -- I mean it was -- it was a

---

DEBORAH L. SPEAR
(301) 843-9370

1    saint operation in the beginning?  No.  But the

2    problem is I mean, as I said, I mean I didn't have the

3    capability, I didn't have the ability, I didn't have

4    the opportunity or the authority to come to grab these

5    things.

6              So in November and December most of them

7    because he went and -- they went to Hawaii, and from

8    Hawaii they went after that to Puerto Rico, so the

9    organization was almost vacant, not many things.  It's

10   everybody in a Christmas mood and everything.  So I

11   was able to concentrate and simply because at that

12   time I was, quote/unquote, soliciting the information

13   because I didn't have the information.  Since June

14   starts up completely dry out in my faces.  All what I

15   am seeing is really when I run the statements, the

16   report, I take a look at things, that doesn't sound

17   right, there is something wrong, but I do -- nothing

18   come to me, there is no mail coming to me, there is no

19   documentation come to me.  I know if I ask, he will

20   say see Sheila, and if I ask Sheila, she will say,

21   well, I don't know, I have to ask Ben.  So I said

22   there is -- that when I start to lean toward there is

1    really something is going on here, it's not

2    mismanagement, it's an intended, I mean there is

3    something planned, something putting into place, start

4    to be very clear, very blunt, because at the end he

5    became very blunt.  I mean he didn't care about

6    anything, if you...

7        Q    Now, you said earlier he went directly to

8    the source --

9            MR. MELEHY:  Are we going to take a break

10   soon?

11           MS. DAVIS:  Just one.

12   BY MS. DAVIS:

13       Q    He went directly to the source.  Were you

14   referring to Benjamin Jennings when you said that?

15       A    Yes.  Yes.

16           MS. DAVIS:  We can take a break now.

17           THE WITNESS:  Okay.

18           VIDEO OPERATOR:  The time is 2:44 p.m.  We

19   are going off the record.

20           (Whereupon, there was a brief recess.)

21           VIDEO OPERATOR:  The time is 2:53 p.m.  We

22   are back on the record.

---

DEBORAH L. SPEAR
(301) 843-9370

1    BY MS. DAVIS:

2        Q    Mr. Kakeh, if I can direct you again to

3    M. Kakeh Exhibit Number 1, to page 5 of the Second

4    Amended Complaint, specifically to paragraph 17.  In

5    that paragraph it states that prior to February 10th,

6    2004 you requested that Tunde Eboda meet with you to

7    discuss your allegations.

8        A    Uh-huh.

9        Q    Why did you feel that a meeting with

10   Mr. Eboda was necessary at that time?

11       A    Well, as I said, I mean I been since

12   November I was looking at things, and after three

13   months trying to put the financial statements

14   together, and blocking me from all this information.

15   In one hand they are pushing me to issue the financial

16   statement, in the other hand I don't have the

17   financial documentations.

18            And when I saw, start looking at all these

19   deficits, and how the charges going on, and made

20   analysis, start talking to the staff, start

21   investigate, I was really 100 percent sure that there

22   is something wrong that's going on, and it's time to

DEBORAH L. SPEAR
(301) 843-9370

1  have somebody from the outside to come and start get

2  -- because I mean the pressure was so tremendous on me

3  to issue the financial statements, yet I can see all

4  the problems and no help to get the information.  So

5  really -- and the auditors, they have to stop.  The

6  independent auditors have to stop because I mean also

7  for the same thing, for the -- the availability of the

8  information, the financial information.

9       So -- and I been thinking about it before.

10  So I decided I have to go to -- it wasn't Tunde.  I

11  mean I was looking for somebody outside the agency who

12  can have an authority, and have a responsibility, and

13  have an interest to come into the organization, and

14  been talking to few people, and say they suggested to

15  me that, that Tunde is really the man to see because

16  he is the Director of the program.  I mean I thought

17  in the beginning to see the Chief Financial Officer

18  because this is financial matters, but they say,

19  suggested to me.  So that when I -- and I don't know

20  his phone number or anything.  So that at the time

21  when I ask the third party to contact him and tell him

22  that I want to see him privately.

---

DEBORAH L. SPEAR
(301) 843-9370

1      Q      Who did you talk to before contacting

2  Mr. Eboda?

3      A      Doris Stashenco.

4      Q      Did you explain to Ms. Stashenco --

5      A      Oh, yeah.

6      Q      -- why you wanted to meet with Mr. Eboda?

7      A      Well, she was my first outlet really because

8  she is the program -- she is the Manager for Training

9  and Evaluation.  So she is anyway responsible for the

10  integrity of the program.  So she suggested to me that

11  this is really beyond, and I saw so many times, and

12  every time I mean it's getting more urgent to me.

13  Finally I said if I can get any way, when we talking

14  about him, to him, because I don't know his phone

15  number, and he doesn't know -- and I don't want to

16  talk to him on the phone, and I don't know what will

17  be his reaction.  So I wanted third party really to be

18  so I can meet with him, explain to him, and see where

19  we can go from there.  And also I wanted to test him

20  personally to find out, because I mean I know he has

21  close relationship with Ben Jennings.  So it was a

22  Russian roulette.  I mean I didn't know the impact,

1    but it came to the point I said, well, let me test

2    him, find out, I mean -- and that was the reason for

3    contacting him.

4        Q    Other than Ms. Stashenko, who else did you

5    speak to about your concerns about Mr. Jennings at

6    this time?

7        A    Oh, I was all the time with a lot of people.

8    I mean I didn't hide my concern about the things we

9    operate, and I used to put it that way.

10       Q    So who did you talk to about it?

11       A    Everybody knows about it.  I mean from my

12   staff, to the directors, I mean I told them in their

13   faces.  I told them all the way back in October I mean

14   that what you doing -- that what we doing, there is a

15   deficit, and all the, you know, memos I wrote about

16   the subject.  So there is nothing new really.

17                        (Deposition Exhibit Number 2

18                        was marked for identification.)

19   BY MS. DAVIS:

20       Q    I'm showing you what's been marked as

21   M. Kakeh Exhibit Number 2, and a few minutes ago you

22   just referred to an October 2003 memo.  Is this what

---

DEBORAH L. SPEAR
(301) 843-9370

1    you were referring to?

2         A    No.   There are two memos before this one.

3    The first one was on October 3rd.

4                            (Deposition Exhibits Number 3-5

5                            were marked for identification.)

6    BY MS. DAVIS:

7         Q    I show you what's been marked as M. Kakeh

8    Exhibit Number 5.   Is this the memo that you were

9    referring to?

10        A    That was the first memo, yes.

11        Q    And in this memo you pointed out to

12   Mr. Jennings that there was a deficit; is that what

13   you just testified to?

14        A    Oh, no, that was, as I said, this is -- I

15   was alerting him in October.

16        Q    What were you alerting him to?

17        A    It says here completely what I said, that

18   what I -- because I wrote this one, make him aware of

19   the facts, alerting him about the situation.   And as a

20   matter of fact, this was a documentation from me, the

21   first documentation to make it in the open that there

22   are a lot of wrong things going on here and I wanted

---

DEBORAH L. SPEAR
(301) 843-9370

1    answers.  And I mentioned all the facts for that.

2    When he did not respond in writing to me, I wrote the

3    second one.

4         Q    And when did you write the second one?

5         A    I gave him two weeks, on the 20th.  But the

6    second one, I directed it to the person who is

7    supposed to be responsible for the budget, and giving

8    him a copy, and the other -- and to Monica and to

9    Sheila, that this is the second notice, loudly I'm

10   saying there are problems here, and I don't have

11   answers for them.

12        Q    And who was the person responsible for the

13   budget that you directed it to?

14        A    It says there Gladys Mack.

15        Q    And you are referring to M. Kakeh Exhibit

16   Number 2?

17        A    Exactly.

18        Q    Now, direct your attention again to Exhibit

19   Number 5.  In this memo to Mr. Jennings does it advise

20   him that he is not supposed to be using CSBG funds for

21   these purposes?

22        A    No.  What I am saying here -- we didn't come

---

DEBORAH L. SPEAR
(301) 843-9370

1    to that point.  This is the second -- the second

2    request, telling them that so far as of October I see

3    a deficit close to $748,000.  This is Exhibit Number

4    2.  In the second page I'm detailing to them, to her,

5    that this the money I have deficit, and I do not have

6    a revenue, or source, or income to offset it, yet we

7    spend it.  So I'm asking you where, where do you have

8    the money, where did you put this money, where the

9    income is coming from to cover these things, that was

10   all the way in October.  So what I'm saying in

11   October, my first look at the financial statements

12   showing me, despite about the other programs, showing

13   me there are expenses, there is no budget for it,

14   exceeded $700,000.

15           And if you realize in this one, I put to Ben

16   Jennings, and I put it to General Counsel, and I put

17   it to also to Sheila Shears.

18       Q    And you are referring to Exhibit Number 2?

19       A    Exhibit Number 2, yeah.

20       Q    Did you talk to Sheila Shears about Exhibit

21   Number 2?

22       A    She has a copy of it.  I gave them copy to

DEBORAH L. SPEAR
(301) 843-9370

1    each one of them.

2         Q     But did you speak to Ms. Shears about your

3    concerns raised in Exhibit Number 2?

4         A     This is -- this is more than anything else.

5    I mean I gave her a copy of this one.  I gave them a

6    copy to each one of them.  So what I wanted to say

7    verbally, I have it in writing.

8         Q     So you had no follow-up discussions with her

9    regarding the information --

10        A     No, no, I -- I --

11        Q     -- that is in Number 2?

12        A     I didn't forward the memo to her.  I forward

13   the memo to Gladys Mack, and I am informing her about

14   what is going on with what I saw.  So the meeting was

15   after that to discuss the whole -- to discuss the

16   whole thing, it was between me, Ben Jennings, Gladys

17   Mack, Sheila Shears, and Monica Beckham.

18        Q     And when did this meeting take place?

19        A     Maybe one or two days after that.  See, the

20   first one I gave it to him, I didn't have any

21   response.  When I be --

22             MR. MELEHY:  Can you clarify what timeframe

---

DEBORAH L. SPEAR
(301) 843-9370

1    he is talking about?

2    BY MS. DAVIS:

3        Q    You said there was a follow-up meeting to

4    the October 20th memo?

5        A    Yes.

6        Q    And Ben Jennings, Gladys Mack, Sheila

7    Shears, yourself, and Monica Scott Beckham were

8    present?

9        A    All of them, yes.

10       Q    And what was discussed at this meeting?

11       A    We discussed this memo.

12       Q    Do you remember specifically what was

13   discussed about the memo?

14       A    Everything, line by line.

15       Q    Was there any discussion about the use of

16   CSBG funds?

17       A    It's not a discussion, it's a fact.  So when

18   they asked me, I said this 748,108 has already been

19   paid out, yet there is no income for it, how did you

20   spend it; I said you spend it from CSBG money.

21       Q    Did anybody respond to that comment?

22       A    Monica Beckham, the General Counsel was

---

DEBORAH L. SPEAR
(301) 843-9370

1    there, and she was writing everything, and I guess you

2    have a copy of that.  So I cannot remember exactly the

3    details for this one, but I remember we was sat there,

4    and I was on one side and all of them on the other

5    side on the table, and I was explaining all of these

6    things, and the only comment I -- two comments, first

7    of all, Ben Jennings said why you asking for Monica

8    Beckham to be here; I said I wanted somebody with

9    legal status to be here.  He said, but I have to warn

10   you about something, she is here as my attorney to

11   protect me, not you.  I said I don't need any

12   protection, I need somebody neutral to write what I am

13   saying.  That's number one.

14          When he heard this one from me he said -- he

15   responded the other one comment he said, he said, he

16   said, well, this is, Amin, a budget, financial

17   matters, really you should discuss it with Gladys

18   Mack.  After they listened to everything I said, that

19   was the end of it.

20       Q    And did you have a discussion with Gladys

21   Mack after this meeting?

22       A    I have discussion with Gladys Mack at this

DEBORAH L. SPEAR
(301) 843-9370

1    meeting, and I requested also Monica Beckham to be in

2    the meeting.  So Gladys Mack, she brought also F.S.

3    Taylor into the table.

4           Q     And what was this meeting about?

5           A     About this memo.

6           Q     And what was discussed at this meeting about

7    the memo?

8           A     Exactly the memo, where we going to get the

9    sources to cover for these, for these expenses.

10          Q     And was there a conclusion regarding for

11   where the source of the funds would be coming from?

12          A     Well, really they didn't have any answer for

13   it.  They said we have to go ahead and find -- find

14   out how was with -- how these things happened and how

15   -- and the meeting ended that way.

16          Q     Did you tell Gladys Mack or Monica Scott

17   Beckham at this meeting that if you weren't satisfied

18   with the answer, you would have to go outside the

19   agency?

20          A     Yes, I did.

21          Q     What did you tell them?

22          A     When the meeting end almost and without

1    having an answer, I said I cannot present the

2    financial statements draft and this deficit on it, and

3    I know at the onset what the answer, and I know this

4    can't be justified, and I know there is income -- no

5    income for it, and if you don't give me an answer, I

6    will go to outside sources to confirm this one.

7        Q    And this meeting took place in November of

8    2003?

9        A    It must be in the early November or maybe a

10   week or few days after, after the 20th.  Also

11   documented by Monica, I mean the meeting.

12       Q    In February of 2004 did Tunde Eboda conduct

13   a monitored review at UPO?

14       A    The only time I heard about the monitoring

15   review in the deposition in Mr. Melehy's office when

16   Dana Jones who asked him the question -- he asked it

17   and -- Mr. Melehy asked him the question, and he said

18   about it, that's the first time I know there is

19   monitoring about it.

20       Q    So you weren't --

21       A    I was surprised and shocked to hear it, and

22   at the beginning to be honest with you I thought this

---

DEBORAH L. SPEAR
(301) 843-9370

1    is a some kind of statement made by UPO just to

2    minimize or undermine the investigation.

3         Q    So you weren't aware that Mr. Eboda was

4    going to be conducting a monitoring review in February

5    of 2004?

6         A    There is no monitoring review.  This --

7    this -- he comes for a visit to talk.

8         Q    So when Mr. Eboda --

9         A    And when he comes to talk, he comes and meet

10   with Gladys, he meet with Ben Jennings.  And as I told

11   you before, I mean and the only time we see him maybe

12   because Odu-Tho -- Odu-Thomas in my office is his from

13   native country, so come to say hi to him, and by the

14   way, shake hands and everything.  But there is nothing

15   I have documentation saying there is a monitoring

16   process like as I told you with the Simlot -- with the

17   every other year annual monitoring by the Head Start

18   program.  That is in the open, preparation for it,

19   everything.  For him, as I said before, suggests -- he

20   comes quietly.  I mean they sit with each other and

21   everything.  But I heard that during that time that

22   the CSBG ask a different format to report the expenses

1    to them.

2        Q    So when Mr. Eboda testified that he

3    conducted a monitoring review starting February, he

4    was making it up too like UPO?

5        A    I won't speak in his behalf.  What I am

6    saying, his monitoring is very low key, very personal

7    with Gladys Mack most of the time, and as a courtesy

8    call they go to Ben I guess, and meet with Doris, and

9    meet, what's her name, the Director for the CSBG

10   program, Vanes -- Vanessa Rose.

11           Let me add to that one another thing.  Even

12   if he coming for monitoring at that time, I won't know

13   about it because as I told you since June 2003 they

14   stop sending me any -- any -- any -- any e-mail,

15   any -- any -- any CC, or any copies of anything

16   happen.  So even if he came, I wouldn't even know

17   about it.

18                        (Deposition Exhibit Number 6

19                         was marked for identification.)

20           MR. MELEHY:  Six?

21           MS. DAVIS:  Six.

22   BY MS. DAVIS:

DEBORAH L. SPEAR
(301) 843-9370

1    o'clock all the way until about one o'clock.

2        Q    And what did you discuss with Mr. Eboda at

3    this meeting?

4        A    I discussed with him that there is a deficit

5    with UPO, at that time deficit came to close to two

6    million dollars, and I told him that they are

7    pressuring me in UPO to apply these deficits to the

8    CSBG, and take the deferred revenue from the year

9    before and apply for this year also to cover the

10   deficit.  And I told him I refused to do that, and I

11   was looking for some help and support from the outside

12   agency for somebody to come and confirm what I am

13   saying, don't take my word for it, I need somebody to

14   come there.

15       Q    And how did Mr. Eboda respond?

16       A    Mr. Eboda is a very careful person, very

17   careful.  He think about things before he answer, but

18   we came to consensus me and him that he has a

19   suspicion about Ben Jennings for a long time, but

20   never had anybody from the inside to cooperate with

21   them in order for them to come in an official manner

22   to expose all these action in the open.  You came now

1          At that time Gladys Mack told him don't deal

2     with him, deal with Sheila Shears.  He told me that

3     when we met.  So he went to talk to the Chief

4     Financial Officer, and they said they are busy in

5     other things, they have to put it off for a while.  I

6     cannot wait for a while.  They are pressuring me to

7     issue the financial statements.  The auditor is

8     waiting, the Board is waiting, everybody waiting, you

9     have to finish.  And I said why don't you have the

10    Chief Financial Officer finish it; they said no, she

11    doesn't know, you are the one.

12          When that happened I looked for other

13    sources.  So I met with the -- with our auditors.  I

14    called the partner and we met in the -- during that

15    period of time when Tunde still thinking about what he

16    going to do, in a restaurant.  The auditor who was in

17    my office and the partner, we met there, and I told

18    him about my concerns completely.  And I said if you

19    going to be pushing for the drafted financial

20    statements, you are going to go nowhere because I am

21    not going to issue one with this kind of deficit on

22    it.  He said, well, you have to do something.  And I

1    said what do you think if I contact CSBG.  I already

2    contacted them.  He said I guess it's a good idea.

3              When Tunde was still thinking about the

4    subject and these auditors they weren't there to come

5    forward, I called the Inspector General Office.

6    Junius called me back.  He said I will take care of it

7    and call you.  At that time he called Tunde, and he

8    said, listen, the Controller of UPO called me for

9    bla-bla-bla.  So Tunde called me back, and he said we

10   have to meet.  So we went and met, and he said I am

11   going for a conference for the community action

12   agencies, and there I have colleagues, they went

13   through the same problem like you, like your

14   organization, and I want to find out what they did,

15   how they approach it, and when I come back immediately

16   I will call you, so -- and I said do you want me to

17   call Junius.  He said, no, I will call him because I

18   ask him now officially if they can come and conduct

19   that one.

20             The Inspector General Office in Washington,

21   D.C., they said they don't have time for it now.  At

22   that time Tunde went into the conference in Minnesota.

---

DEBORAH L. SPEAR
(301) 843-9370

1    He met with the people and they told him the way out

2    for -- or what the way to do it, not the way out, by

3    hiring these professionals in Iowa who are

4    experienced, they are auditors experienced in

5    community action agencies, to come and do the work for

6    them.  So he has at that time three tasks to do.  He

7    has to convince his bosses in the Department that he

8    need these people.  The second thing he has to

9    convince the federal office to give him money for them

10   because it is not in the budget, and the third thing

11   is to have these people as soon as possible come to

12   the agency, because the last time I refuse to do I was

13   in the open like this, and I was shouting.  I said I'm

14   not cooking the books for you, Gladys Mack, Sheila

15   Shears, both of them in front of my office, and all

16   the staff listening, I am not going to cook the books

17   for you.  So Gladys Mack told me if you don't do it,

18   we will have somebody from the office hire him to do.

19   So I called Tunde, and I said, listen, these people

20   can put me aside and issue their own financial

21   statements, and that will be too late.

22           So he told these people in Iowa that I mean

1    what -- because they have at that time assignment

2    somewhere else. He said if you come only for couple

3    days, establish the investigation and go, you come

4    back again and you finish it. So they agreed. He

5    came to UPO, he met with Gladys Mack, he met with

6    Sheila, and he told them that he bring a few from --

7    people from the outside for to run an investigation

8    because he saw a lot of things he is not comfortable

9    with.

10         And he met with me in my office officially

11   that day, with the closed doors he and his assistant,

12   and he made it clear to me. He said, listen, I cannot

13   guarantee your job, I cannot help you, you doing this

14   in your own for the reasons you are doing it, but we

15   appreciate your help and your assistance, and they are

16   going to start on Thursday, so get all the information

17   ready for them. So Thursday 12 auditors with Tunde,

18   they came to UPO to start the investigation.

19         Q    Now, the meeting that you had with the

20   auditors while Mr. Eboda was thinking about what you

21   had told him on February 5th, --

22         A    Uh-huh.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    -- was anybody else present other than

2    yourself and the auditors?

3    A    No.  But I guess he met some colleague for

4    him, but my -- it wasn't in -- the meeting was between

5    me, Nuhaylatta, and Dennis.

6    Q    And it was at a restaurant, not at UPO?

7    A    No.  It's in a Moroccan restaurant in

8    Arlington, Virginia.

9    Q    Did you tell anybody that you were going to

10   meet with them?

11   A    No.  As a matter of fact, they were working

12   there, they were working there, but I said we have to

13   meet outside because I don't want anybody to see me

14   with you behind closed doors about things.  Because

15   what at that time -- Sheila's office is next to me,

16   and if they are going to come inside, they made it

17   clear for me in the meeting that even though you

18   preparing everything, but the auditors' contact is

19   Sheila.  So if they going to sit in my office for a

20   long time, it will draw suspicion.  So I said we will

21   meet in that restaurant.  And we left from the office

22   separately, and we met outside behind the building.

---

DEBORAH L. SPEAR
(301) 843-9370

1    They took me in their car and we went there.

2         Q    And when did Mr. Eboda tell you that he had

3    decided that he was going to follow up on what you had

4    told him on February 5th?

5         A    Oh, immediately the first time we met, I

6    mean --

7         Q    So he told you on February 5th he was going

8    to follow up?

9         A    Oh, yeah, I mean he -- and that when the

10   time decided that he going to come as soon as

11   possible, he wanted to find his calendar, I mean the

12   time, and he going to come with bringing his -- his

13   assistant.  And that happened after that in couple

14   days I mean.

15        Q    And when did he come with his assistant?

16        A    He came -- we -- we met another two more

17   times, because he asked for -- yeah, he asked for --

18   for -- for more documents.  See, I went -- met with

19   him on the 10th.  That was Tuesday or so.

20        Q    The 10th of what month?

21        A    10 February, first time on the 5th.

22        Q    2004?

DEBORAH L. SPEAR
(301) 843-9370

1          A      Yes.  First time on the 5th, the second time

2     the 10th, and I took a lot of documentation with me.

3          Q      Did you take any documents with you when you

4     met with them the first time?

5          A      Yes, I did.

6          Q      What did you take with you?

7          A      I took the financial statements and the

8     statement of activities showing the deficit, but the

9     second time I brought more documentation, and I

10    brought -- I was able to have a copy of the credit

11    card disbursements to show him about the SUV, and the

12    pawn shop, and all the other things, and --

13         Q      In addition to the credit card disbursements

14    and the financial statements, did you take any other

15    documents with you on that --

16         A      The first time?

17         Q      No, the second time.  You said the second

18    time you took more financial statements and credit

19    card disbursements.

20         A      Oh, I took documents about the wire

21    transfer, about the credit cards, I took with me his

22    handwriting about the payment for the boat which he

---

DEBORAH L. SPEAR
(301) 843-9370

1    was sending from the bank, all of these things.

2            Q    Did you give those documents to Mr. Eboda?

3            A    He looked at them.  He get the financial

4    statement, but the rest of them I couldn't give it to

5    him because I have to have them.  It's original

6    documents.

7            Q    Do you still have those original documents?

8            A    With FBI.

9            Q    The FBI has the original documents?

10           A    Uh-huh.  Uh-huh.  They have two boxes of

11   them with originals.

12           Q    In addition to the financial --

13           A    I might have copies, and I give it to -- to

14   you guys I guess.  It's in the documentation I gave it

15   to you.

16               MR. MELEHY:  We don't need to have

17   conversations here.  Just, you know, just answer the

18   questions.

19               THE WITNESS:  Oh.

20   BY MS. DAVIS:

21           Q    In addition to these financial statements

22   and the credit card disbursements, information

---

DEBORAH L. SPEAR
(301) 843-9370

1    relating to wire transfers, the SUV, and the pawn

2    shop, what else was in the two boxes that you gave to

3    the FBI?

4        A    Oh, the FBI, that was -- I mean that was

5    reports, transmittals, phone records, statements,

6    invoices, checks, voided checks, memos, contracts with

7    no signatures on it.  I cannot recall exactly I mean

8    every document, but I mean all of these things

9    supporting documents to what I was presenting to them.

10       Q    And when did you give these documents to the

11   FBI?

12       A    Well, you asking me when I show it to Tunde,

13   I show it to Tunde in --

14       Q    My question was when did you provide these

15   documents to the FBI?

16       A    Um, sometime in March.

17       Q    Was it in early March or late March?

18       A    I cannot remember.

19       Q    Was it before Ben Jennings was suspended or

20   after?

21       A    After.

22       Q    Were you involved in the conversation

1   between Junius Nottingham and Tunde Eboda?

2        A    Not directly.

3        Q    Were you present for the conversation?

4        A    No.

5        Q    How do you know what was discussed between

6   Mr. Nottingham and Mr. Eboda?

7        A    From Junius when he called me back to tell

8   me about...

9        Q    And you said Mr. Eboda met with Sheila

10  Shears and Gladys Mack.  Did he meet with them

11  together?

12       A    I don't know.

13       Q    You weren't present for the meeting?

14       A    No.  They didn't invite me for the meeting.

15       Q    Do you recall when this meeting took place?

16       A    February 19.

17       Q    Was that the only time that Mr. Eboda met

18  with Ms. Shears prior to June of 2004?

19       A    I don't know.

20       Q    Looking again at Exhibit Number 1.

21       A    Number 1?  Yes.

22       Q    That's the Second Amended Complaint.

---

1          A      Uh-huh.

2          Q      If you look at page 6, paragraph 19.

3          A      Uh-huh.

4          Q      Four lines from the bottom it states that on

5    or about February 19th Mr. Eboda met with Shears and

6    Mack, at different times, and discussed the

7    Plaintiff's allegations that Defendant committed

8    fraud, waste and abuse.  When you say at different

9    times, do you mean he met with them separately or met

10   with them multiple times that day?

11         A      I wasn't in the meetings, but my

12   recollection that in the beginning he met with the

13   Gladys, and he met also with Sheila, with Sheila

14   Shears, and after that he met with both of them and

15   Ben Jennings was on the phone.  I wasn't in any of

16   these things, but I mean my recollection about the

17   sequences of the day, and from the deposition we been

18   sitting here.

19         Q      To your knowledge were these meetings

20   recorded?

21         A      Nothing in UPO recorded.  Let me take that

22   one back is nothing, but the Board of Trustees -- the

---

DEBORAH L. SPEAR
(301) 843-9370

1   Board of Directors is recorded, and I guess when

2   Monica, the General Counsel there, she write things,

3   but I don't know, but beyond that one I mean we never

4   sat down and --

5        Q    Took notes from that meeting?

6        A    No.  No.  It's not a habit.

7        Q    Turning to page 7 of the Second Amended

8   Complaint.

9        A    Uh-huh.

10       Q    Paragraph 21.

11       A    Uh-huh.

12       Q    It describes a meeting between you and

13  Gladys Mack on March 3rd, 2004.  Do you remember that

14  meeting?

15       A    On March 3rd?

16       Q    Yes.

17       A    2004, yes.

18       Q    Do you remember the meeting with Ms. Mack?

19       A    Uh-huh.

20       Q    And it states:  The same day, Mack requested

21  that Plaintiff alter one of Defendant's financial

22  statements to conceal the Defendant's fraud, waste and

DEBORAH L. SPEAR
(301) 843-9370

1    abuse.   What did Ms. Mack request that you do?

2         A    She wanted to apply the money we owe to

3    TANF, $292,000, and the other money for the CSBG which

4    we did not spend in the year before, to apply into the

5    revenue, and for me to bring back all the funds which

6    we did not expend in 2003, I put it away.   She said

7    you have to bring all of these things back into the

8    revenue.

9         Q    Did she explain to you why she wanted it

10   brought back?

11        A    No.   She said to cover the deficit.

12        Q    And did you follow her instructions?

13        A    No.

14        Q    Why not?

15        A    Because that was a cover up.   That was

16   misuse of the funds.   That was a conspiracy as a

17   matter of fact to do it.

18        Q    Why was it misuse of funds?

19        A    Because we are not entitled to -- to that --

20   to that -- to that fund.   It's not for expenses been

21   generated directly for the grants, that's for

22   something else.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    Did she discuss with you why she wanted the

2    change made other than to --

3    A    She said --

4    Q    -- cover the deficit?

5    A    She said you want to bring back in the

6    company or you want Ben Jennings to go through the

7    roof; I said this is not the issue, this is not the

8    issue.  The issue we didn't earn this money.

9    Q    Did she disagree with you that the money was

10   earned?

11   A    She really was ordering me to do it.

12   Q    And you didn't ask her why she thought that

13   you could apply it?

14   A    What mean why?  She ordered to tell me you

15   have to apply to cover the deficit.

16   Q    And did you ask her why she thought you

17   could apply it to cover the deficit?

18   A    She didn't explain why.  She just telling me

19   put the money back so you can cover the deficit.

20   Q    In the next paragraph, paragraph 22, it says

21   on or about March 11th, 2004, as a result of

22   Plaintiff's protected disclosure of fraud, waste and

1    abuse, Defendant placed Jennings on administrative

2    leave pending investigation.

3         A    Uh-huh.

4         Q    Were you involved in the decision to put

5    Mr. Jennings on administrative leave?

6         A    Before that meeting took place --

7         Q    When you say that meeting, what meeting are

8    you referring to?

9         A    Before the 11th, before when the -- the --

10   the -- the -- the -- the meeting of the Board when

11   they suspended Ben Jennings.  I suggested to Tunde to

12   get four people out of the organization, Ben Jennings,

13   Gladys Mack, Monica Beckham, and what's her name.  I

14   will remember her name.  She is the -- she was the

15   Public Relation Director I believe.  I will remember

16   her name.

17            And I suggested for him to put Bill Hughey

18   in charge, so Bill Hughey would be -- would be running

19   the Head Start program, it won't be affected, he will

20   run the CSBG, and the other managers for the Office on

21   Aging will continue to be there.  And I believe that

22   was the suggestion to the Board.  And I heard after

1    that in a private closed doors after that when they

2    went inside the meeting that letting Gladys Mack go

3    and letting Monica go, in addition to Ben Jennings,

4    and that was Alexis Roberson suggestion, that we will

5    destroy the company, who -- there is nobody there to

6    run the company.

7             So they came to a settlement that Ben

8    Jennings, Thurmon Walker, and Sheila Shears she said,

9    she told them he used me and I'm going to be leaving,

10   so they didn't have to bother with that one. And they

11   said they will put Gladys Mack temporarily as an

12   Acting until they bring the other -- another person,

13   at that time she will be leaving.

14            So Ben Jennings left. I wasn't in there

15   making a decision. I wasn't lobbying for it, but that

16   was my suggestion to Tunde when we discussing about

17   what going to happen after that one, I mean who going

18   to be running the organization. So I was giving him

19   my opinion how the organization can be run without

20   affecting the services to the people in that way.

21     Q    How did you learn about the decision that

22   the Board made regarding Mr. Jennings and to appoint

DEBORAH L. SPEAR
(301) 843-9370

1          A     I know what's going on inside.

2          Q     Did you have any conversations with

3    Ms. Roberson as to what went on at the March 11th,

4    2004 meeting?

5          A     After the meetings.

6          Q     When did you have a discussion with her?

7          A     I didn't have discussion with her per se

8    about what going on in the meeting.  I didn't have

9    this relationship with her about that one.  I have a

10   first-hand information, the copy of the meeting

11   inside, for one of the Board members, I have a

12   complete copy, and you have a copy of it.

13         Q     Are you talking about the Board minutes?

14         A     Uh-huh.  Plus --

15         Q     And who provided that to you?

16         A     Huh?

17         Q     Who provided to you a copy of the Board

18   minutes?

19         A     One of the Board members.

20         Q     And who was that?

21         A     I cannot remember the name.

22         Q     Was it a male or female Board member?

1        A    I cannot remember.

2        Q    You can't remember the gender?

3        A    No.  I remember that it was -- I didn't get

4   it directly.  I got it through a third party.  So that

5   Board member really it's -- but I mean I know a few

6   Board members I mean at that time, and I was coming

7   forward to them to tell them about things in the open,

8   so what the -- what's going on, especially at that

9   period of time, but I didn't have any Board member

10  directly face-on-face and one-to-one to get it.

11  This -- this is the way we got it.

12       Q    It was through a third party who is not on

13  the Board?

14       A    The person I took it from, it wasn't on the

15  Board.

16       Q    Who did you take it from?

17       A    Well, that -- that is a privilege I guess.

18            MS. DAVIS:  Could you instruct your client

19  please to answer?

20            MR. MELEHY:  We are going to have to talk

21  about this outside.  It's a privilege, so let's go

22  outside.

---

DEBORAH L. SPEAR
(301) 843-9370

1          VIDEO OPERATOR:  The time is 3:54 p.m.  We

2    are going off the record.

3               (Brief recess.)

4          MR. MELEHY:  There is no privilege.  He is

5    going to answer the question.  You can just ask him.

6          VIDEO OPERATOR:  Time is 3:55 p.m.  This

7    begins tape number four.

8    BY MS. DAVIS:

9        Q    Mr. Kakeh, before we broke I asked you who

10   you received a copy of the March 11, 2000 minutes

11   from, and you said that it was privileged, and I

12   understand from your counsel that it is not a

13   privileged communication.

14       A    Well, with regret I'm going to say this.  I

15   mean it's -- I don't know that I have to answer the

16   question, but it's Doris Stashenko, and I hope there

17   is no harm because she is still employed for the

18   organization.

19       Q    Now, you also mentioned that you had a

20   conversation with Alexis Roberson, but it didn't

21   relate to the decision to appoint Gladys Mack as the

22   Acting Executive Director.  What was your conversation

---

DEBORAH L. SPEAR
(301) 843-9370

1    with Ms. Roberson about?

2        A    Well, I have several -- couple conversation,

3    but that happened after the 11th, and that was

4    relating to the job really.

5        Q    When was your first conversation with

6    Ms. Roberson?

7        A    It took place I believe the second day or

8    third day after they turned -- they put Mr. Jennings

9    in leave.  No, no, no, hold on.  I was supposed to see

10    her after the Board meeting after they suspended Ben

11    Jennings, and Gladys Mask -- Gladys Mack told me, she

12    said, okay, now I am -- they appointed in the night.

13    Early in the morning, eight o'clock, she called me.

14        Q    Alexis Roberson called you?

15        A    No, Gladys Mack.  And she said now I am in

16    charge, and I want you to present to me the financial

17    statements.  There is an e-mail on that fact.  You

18    have a copy of it.  When I refused, and I said I'm

19    still telling you I'm not going to cook the books for

20    you, I'm not issuing any finan -- she said all that,

21    she said the Board, the Chairman -- because Alexis

22    Roberson been appointed at that time I guess Chairman

DEBORAH L. SPEAR
(301) 843-9370

1    of the Special Committee that -- something like this

2    is the title, that she is the big person I mean, and

3    she said she want to meet -- she said I want you to

4    meet with her, we are going to meet with her.

5              That meeting never took place or -- no, hold

6    on.  Yeah.  The meeting took place I don't know how

7    many days after that.  I was there in the -- in the

8    room, the conference room meeting next to Ms. Gladys

9    Mack office and Mr. Jennings' office, both of them

10   they were in -- there is a conference room in the

11   middle.  I met with Alexis Roberson the first time,

12   and I believe Monica was there, and couple people they

13   were there.  She wanted to know from me first hand why

14   am I refusing to issue the financial statements and

15   apply -- cover the deficit the way they been asking me

16   to do.  When I start this -- when I sat there I came

17   with pile of file like this, and I remember her

18   comment about that one, and I told her the reasons why

19   and all these things.

20        Q    What was Ms. Roberson's comments about the

21   pile of files?

22        A    She said that a lot of documentations.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Because I said I mean when I am telling you anything,

2    I am backing up these things with documentation.  It's

3    not I'm telling you stories or anything, and this the

4    reason for it.  And we spent couple hours at this.  It

5    took couple hours to explain to her everything, but

6    there no is decision made at that one.  She was

7    sitting there and listening and the other things

8    and --

9        Q    What did you tell her as to why you wouldn't

10   change the financial statements?

11       A    Because we didn't -- we didn't earn this

12   money.  This is money not covered by grant, especially

13   not by CSBG.  This money been wasted by UPO, they have

14   to pay for it.

15       Q    And this meeting took place after Mr. Eboda

16   had come in to do his visit?

17       A    That's after the 11th of March, couple days

18   after the 11th of March.  When Ms. Mack became the

19   Acting Executive Director, the second day in the

20   morning she called me, you have to issue the financial

21   statements, and she said I'm in charge now.  Because

22   before that I refuse to do it because I said you are

---

DEBORAH L. SPEAR
(301) 843-9370

1    not in charge, Ben Jennings still in charge, that

2    before the 11th.  When she been appointed at that

3    time, she said, okay, now I am in charge, you do the

4    financial statements.  When I refused, she said you

5    have to see Alexis Roberson, and that was the first

6    time I met her with explaining of these things.

7        Q    Was Mr. Eboda still at UPO at the time of

8    his meeting with Ms. Roberson?

9        A    I am not sure from the first meeting, but I

10   am sure from the second meeting took place when me,

11   and Dana, and Alexis, and Tunde met together.

12       Q    And when did this second meeting take place?

13       A    After -- after they hired Dana Jones, couple

14   days maybe, or the second night or something like

15   this.

16       Q    And what was the purpose of this meeting?

17       A    The purpose for that meeting really was it's

18   for Tunde to let Dana Jones know, and Dana Jones know

19   from before because when he hired him and he was

20   concerned about Dana, how he going to start operating

21   inside the big organization that doesn't know anybody

22   there and everything.  He said our man is there, it's

---

DEBORAH L. SPEAR
(301) 843-9370

1    Amin, the Controller.  So when he came -- they

2    appointed him either the same night or the second

3    night.  I was sitting here, and Dana Jones was sitting

4    next to me, and Tunde was sitting there, and Alexis

5    Roberson was sitting next to Tunde.  And Tunde said,

6    I'm quoting him, he said after he made the

7    presentation everything, we going forward and we have

8    -- he said for you to go to Dana, Alexis and you, me,

9    to work together so we can pull this organization up

10   and go forward.  That my second meeting I guess with

11   her, second meeting.

12        Q    And Tunde Eboda hired Dana Jones?

13        A    Yeah, because he --

14        Q    That was your understanding?

15        A    He is -- he is the one who has to hire him

16   because I mean everything was really his

17   responsibility.  So he asked around, and they it looks

18   like suggested that to him.  So when I talking to him

19   and he said don't worry about it, we are getting

20   somebody experienced in community action agencies.  So

21   Tunde is the one who interviewed him and hired him.

22             So that day he told them in the open, and I

---

DEBORAH L. SPEAR
(301) 843-9370

1    presented some letters about what's my -- I presented

2    a memo about my vision, how to cope with the problem,

3    and how to override it, and how to make the

4    adjustments, and how to approach the deficit.  And I

5    gave copy to Tunde.  Alexis took it from him, she said

6    give it to me, it's not official now.  I don't want

7    you to have it as an official, leave it here.  So

8    really beside that after that he said I have big hope

9    for you, three of you to get things together.

10                       (Deposition Exhibit Number 7

11                       was marked for identification.)

12   BY MS. DAVIS:

13        Q    I'm showing you what's been marked as

14   M. Kakeh Exhibit Number 7.  Do you recognize that

15   memo?

16        A    Uh-huh.

17        Q    Was this memo sent around the time of your

18   meeting with Mr. Eboda, Dana Jones, and Alexis

19   Roberson?

20        A    Uh-huh.  Uh-huh.

21        Q    Was it sent before or after the meeting?

22        A    No, I give it to her in that time.

---

DEBORAH L. SPEAR
(301) 843-9370

1    Q    So you gave it to her at the meeting?

2    A    Uh-huh.

3    Q    Is there anywhere in this memo where you

4    state that you believe that UPO was engaging in fraud?

5    A    This is a judgment I couldn't make at that

6    time, before I don't have it, we do before I have the

7    proof for the fraud.  But I was very clear in saying

8    that you are asking me to cover the deficit in that

9    way, you are asking me to cook the books, and that's

10    illegal.  Now, that will mean implicitly fraud, that

11    mean implicitly what illegal mean, but to come to the

12    word fraud, in this memo I didn't have it.  Because in

13    reality that was building bridges, it's not accusing

14    the organization, because already know that Thurmon

15    been fired, Ben Jennings been fired, Gladys Mack on

16    her way out.  So we are looking -- well, when my --

17    what I am saying here, I am saying this is the way

18    out, how everything happened, and this is the way out.

19    So it wasn't saying -- the subject of it wasn't the

20    fraud, it was that kind of things.

21    Q    Did you tell Ms. Roberson that you had gone

22    to Mr. Eboda and brought him into UPO?

---

DEBORAH L. SPEAR

(301) 843-9370

1          A    In the meeting he told them.

2          Q    In the meeting Mr. Eboda told Ms. Roberson

3    that he was there because of you?

4          A    What he told them that Amin was very, very

5    helpful in getting us to this point, and I want you to

6    work together.  He didn't sit there and tell we met

7    here and there and everything.  But I didn't make it a

8    secret in front of them that we were seeing each

9    other.

10         Q    What did you tell them?

11         A    He was mentioning something, and I said

12   remember that one, that wasn't clear at that point

13   when we talked about it.

14              MR. MELEHY:  Alison, when you find another

15   convenient stopping point, I have to step out and make

16   a phone call to my office.  So whenever you think it's

17   convenient.

18              MS. DAVIS:  Okay.

19   BY MS. DAVIS:

20         Q    Going back, you said that he told them that

21   he had been meeting with you?

22         A    No.

DEBORAH L. SPEAR
(301) 843-9370

1      Q    And he said something, remember --

2      A    No.  He said Amin was instrumental as a

3  matter of fact and very helpful in getting us to this

4  point.

5      Q    And in this conversation you said you

6  tried -- you reminded him of something?

7      A    So we been talking about something else, and

8  I reminded him about that he knows about it or

9  something, I said you know I told you about it before,

10  because when I told -- when I was -- we were talking

11  about I mean the problems and what happened,

12  everything, and I said remember I told you about it,

13  about this point, I cannot remember what the point,

14  but I mean it's related to the situation.

15         Plus before dinner came Tunde told him,

16  because I mean he was worried, I mean the man is -- he

17  never been in any big organization before, he doesn't

18  know anybody inside, and it's all over the news media

19  and everything, and big I mean show.  So he wanted to

20  know who can he trust inside who can deal with.  So he

21  told him.

22         MS. DAVIS:  Let's take a break now.

---

DEBORAH L. SPEAR
(301) 843-9370

1          THE WITNESS:  Okay.

2          VIDEO OPERATOR:  The time is 4:10 p.m.  We

3  are going off the record.

4          (Whereupon, there was a brief recess.)

5          THE WITNESS:  The other lady's name I

6  remember.

7          VIDEO OPERATOR:  The time is 4:24 p.m.  We

8  are back on the record.

9  BY MS. DAVIS:

10     Q    Mr. Kakeh, you said you just remembered a

11  woman's name.

12     A    The other lady's, yes, her name is Cheryl

13  Christmas.

14     Q    That was the Public Relations --

15     A    Uh-huh.  Uh-huh.

16         MR. MELEHY:  What was her name again?

17         THE WITNESS:  Cheryl Christmas.

18         COURT REPORTER:  First name Cheryl?

19         THE WITNESS:  Cheryl.

20         MR. MELEHY:  Christmas?

21         THE WITNESS:  Christmas, as Christmas.

22  BY MS. DAVIS:

---

DEBORAH L. SPEAR
(301) 843-9370

1       A       Me and Tunde.

2       Q       Did you have any conversations with

3  councilmember David Catania?

4       A       Not directly.

5       Q       What do you mean by not directly?

6       A       I sent him copies.

7       Q       Sent copies of what?

8       A       Of the letters I was -- I sent to the Board,

9  with other officials.

10      Q       What letters did you send to him?

11      A       That letter I send it to the Board of

12  Directors, to Russell Simmons, and I mentioned on it

13  all the people in the outside -- of the outside of the

14  agency that I sent it to, CC under -- under his name

15  all the way down.  You have a copy of it.

16      Q       Do you know who Kenneth Marty is?

17      A       Very well.

18      Q       How do you know Mr. Marty?

19      A       Well, I was working with him.

20      Q       How were you working with him?

21      A       He was my second contact from the Inspector

22  General Office of the Federal Government, Department

---

DEBORAH L. SPEAR
(301) 843-9370

1    of Health and Human Services.

2         Q    How did you come to know Mr. Marty?

3         A    I contacted the FBI first, and I met -- I

4    cannot remember his name.  I am good at names, I will

5    remember it.  I met with the -- that gentleman in the

6    FBI, in the FBI building next to D.C. Government

7    building.  Ken at that time was in Virginia Beach.

8    They have conferences.  So he told that gentleman to

9    meet with me, find out things, and if it is -- and if

10   the gentleman would see that it's really worth going

11   any further, the information that I mean clear,

12   available, legitimate, and everything, so he told him

13   to call him.  So he called him in the conference call

14   when we were there, and we made an appointment at that

15   time in the same session between me and between Ken

16   Marty.

17        Q    And when did you first talk to Mr. Marty?

18        A    In March, late March I believe.

19        Q    After Mr. Jennings was suspended?

20        A    Oh, yeah.  Oh, yeah.

21        Q    Did you ever talk to the media about the

22   situation at UPO?

---

DEBORAH L. SPEAR
(301) 843-9370

1      A    I did.

2      Q    Who did you talk to?

3      A    I talked to -- why did this happen? I lose

4   the name.  I know the name, but I lose it.  It's

5   the -- Moreno.

6      Q    When did you speak to Moreno?

7      A    In March.

8      Q    Do you remember when in March?

9      A    I guess you have it in my diary, I mean

10  exact date.

11     Q    How long have you kept a diary?

12     A    On a daily basis?

13     Q    Have you recently started keeping a diary?

14     A    No.  At that time and I gave you copies of

15  all the diaries.

16     Q    How long have you been keeping a diary?

17     A    Since I was maybe -- from early ages.  I

18  like writing.

19     Q    When did you start writing down in your

20  diary about events that were occurring at UPO?

21     A    From -- from October I believe.

22     Q    October of what year?

---

DEBORAH L. SPEAR
(301) 843-9370

1    connection with the administration of a public program

2    or the execution of a public contract, gross misuse or

3    waste of public resources or funds, abuse of authority

4    in connection with the administration of a public

5    program or the execution of a public contract, and

6    violations of contractual terms and state, local and

7    federal laws within the meaning of D.C. Statute

8    Section 2-223.01, and then it itemizes various things

9    that you can read through.  I will give you a moment

10   to read that.

11        A    Uh-huh.

12        Q    Are there any other facts that you recall

13   today that are not included in paragraph 15 of the

14   Second Amended Complaint that relate to your discovery

15   of fraud, waste and abuse at UPO?

16        A    At what time?

17        Q    That you recall today that are not included

18   in paragraph 15.

19        A    Yes.

20        Q    What other facts do you recall today?

21        A    Well, at that time I didn't have the

22   documentation for the pawn stores, cashing checks and

---

DEBORAH L. SPEAR
(301) 843-9370

1    charging it to the credit card.  I didn't know at that

2    time that he has four cars, luxury cars.  I didn't

3    know at that time that the credit card would go up to

4    $556,000.  I didn't know at that time that there were

5    payments to the consultant in the Head Start Program.

6        Q    How did you learn about the pawn shops?

7        A    Credit cards, from the -- from the

8    statement.

9        Q    And how did you learn about the four luxury

10    cars?

11        A    They brought it to the -- they start

12    bringing -- because when they wrote -- when they asked

13    Ben Jennings to put him in suspension, they asked him

14    to bring back all the things, that was among them the

15    four cars.

16        Q    And how did you learn about the credit

17    cards?

18        A    I got a copy.

19        Q    How did you learn about the payments to the

20    consultant?

21        A    Mr. Bill Hughey talked to me about it, and I

22    asked him to make it in writing to me, and you have a

---

DEBORAH L. SPEAR
(301) 843-9370

1    copy of it.

2         Q    And did you learn about the pawn shops after

3    Mr. Jennings was suspended as well?

4         A    Uh-huh.  Uh-huh.  Because before that he has

5    all the credit cards coming to him.  I didn't have

6    access to it.  Even at that time I didn't have access

7    to it because they already gave it to Sheila.  She is

8    so -- keep everything outside of my hands, but I got a

9    copy from the secretary.

10        Q    And you learned from Mr. Hughey about the

11   payments to the consultant afterwards as well?

12        A    Uh-huh.

13        Q    Now, I would like you to look at M. Kakeh

14   Exhibit Number 9 on page 4, and keep Exhibit Number 1

15   out as well.

16        A    9?  Oh, this one here.  Keep 1 open?

17        Q    Keep Exhibit 1 open.

18        A    What page?

19        Q    Exhibit 1 I would like you to look at page

20   5, and Exhibit 9 at page 4.

21        A    Page 1, number 5.

22        Q    Correct and --

---

DEBORAH L. SPEAR
(301) 843-9370

1    A    Number 9 is page --

2    Q    Page 4.

3    A    -- 4?

4    Q    Which is interrogatory number 2 at the top.

5    A    Okay.

6    Q    Okay.  And the last sentence says, Plaintiff

7    intends to uncover more supporting facts as discovery

8    progresses.

9    A    Uh-huh.

10   Q    Today are there any additional facts that

11   support the allegations in paragraph 16 of the Second

12   Amended Complaint that you have discovered?

13   A    Generally speaking every time I discovered

14   something, I gave it to my counsel, he gave you a copy

15   of it.  It's been a long time, and I don't really

16   remember every documents I give him, and they give it

17   to you, but he made it clear to me anything you

18   discover, you find out, you have to give it to me to

19   give them a copy of it.

20   Q    So all of the documents which I have

21   received and the written responses from your counsel

22   represent the extent of your knowledge of facts

DEBORAH L. SPEAR
(301) 843-9370

```
 1    that when we get the information, that top it off

 2    completely.

 3         Q    And when did you get this information?

 4         A    I believe I got it in January.

 5         Q    Of '04?

 6         A    Uh-huh.

 7              MS. DAVIS:  Can you mark this as 11, and

 8    then I am going to give you another for 11A.

 9              THE WITNESS:  Keep this open or close it?

10              MS. DAVIS:  You can close it.

11              This will be 11.

12              THE WITNESS:  11?

13                        (Deposition Exhibits 11 & 11A were

14                         marked for identification.)

15    BY MS. DAVIS:

16         Q    11A -- one is -- one is going to be marked

17    as M. Kakeh Exhibit 11.

18         A    Uh-huh.

19         Q    And that will be the first document that was

20    handed to you.

21         A    Uh-huh.

22         Q    Do you recognize what has been marked as
```

DEBORAH L. SPEAR
(301) 843-9370

1      M. Kakeh Exhibit 11?

2          A    Uh-huh.

3          Q    And what is it?

4          A    These the Arabic text of my diary.

5          Q    And you also have before you what has been

6      marked as M. Kakeh Exhibit Number 12, and I will

7      represent to you that that is a -- 11 -- sorry, 11A,

8      which is a certified translation of M. Kakeh 11, and I

9      will be referring to M. Kakeh Exhibit 11A.

10         A    Well, I want to say something.  I have -- I

11     reserve the right to correct the translation if it

12     really doesn't mean what I meant.

13         Q    And feel free to correct it because we want

14     to make sure we understand what you meant.

15         A    Okay.

16         Q    Now, you testified earlier that you began

17     recording in your diary events relating to UPO

18     starting in October of 2003.  And we, looking at your

19     diary, do not have anything prior to January 5th,

20     2004.

21         A    You didn't ask for it.  You asked for the

22     diary from the time I start contacting the outside

1  31st, 2003?

2      A    March 31st, 2003?  It doesn't say March.  It

3  doesn't say anything about March here.

4      Q    At the bottom.

5      MR. MELEHY:  Yeah, it does at the bottom.

6      MS. DAVIS:  You might barely be able to read

7  it.  I'm just -- what's the significance of net assets

8  as of March 31st, 2003.

9      MR. MELEHY:  Not this one.  4664.

10      THE WITNESS:  Oh, that's March 31st I mean.

11  Oh, these are the statements which Sheila Shears was

12  sending to the bank.

13      MR. MELEHY:  March 31st, 2003.

14      THE WITNESS:  Uh, because starting in July

15  she start sending a made up financial statements into

16  the bank to show them that everything is okay so they

17  will continue giving us the line of credit couple

18  million dollars.  And that carries their signatures

19  and Ben Jennings' signatures when they send it to the

20  bank, but can be generated from the system, okay, and

21  she can generate any way she want it.

22  BY MS. DAVIS:

DEBORAH L. SPEAR
(301) 843-9370

1      Q    And still looking at the same group of

2  documents, the fourth page in, which is Bates stamped

3  on -- it's on the side, MAK 4666.  It's the fourth

4  page in.

5      A    Uh-huh.

6      Q    And at the top it shows a vari --

7      A    Yes.

8      Q    -- variance --

9      A    Yes.

10     Q    -- and then percentage?

11     A    Uh-huh.

12     Q    Would this be something that Ms. Shears

13 would have generated?

14     A    No.

15     Q    Who would have generated that?

16     A    I generated that one at that time.

17     Q    And what was the purpose of this?

18     A    Just running to find out where we stand.

19 Because after, after Ben Jennings left we discovered a

20 lot of things that wasn't in the system.  It was

21 either in his house or in his office.  And whatever

22 they put in the system I don't -- they tell me that we

---

DEBORAH L. SPEAR
(301) 843-9370

1    posted this, we posted that, we did some other

2    changes, and I run it when -- that was 7:36 p.m.,

3    yeah, just trying to take a look where we stand.

4         Q    Was that showing that UPO was running a

5    deficit?

6         A    Of $775,000.

7         Q    And was that the $775,000 that's shown under

8    variance in the line entry total assets, that's what

9    you are looking at?

10        A    Uh-huh.  Uh-huh.  The difference between

11   the -- between the two years there was a reduction for

12   $775,000.

13        Q    And then on the next page it shows at the

14   bottom Net Assets as of September 30th, 2003, just so

15   we make sure we are all on the same page, MAK 4667?

16        A    Uh-huh.

17        Q    Net assets as of September, 30, 2003 is

18   showing as 328,407.  Is that a deficit?

19        A    Uh-huh.

20        Q    Why --

21        A    At that point.

22        Q    Why is that number different from the number

---

DEBORAH L. SPEAR
(301) 843-9370

1    statements been run for I guess to know, just have

2    information what's in the system, no more, no less,

3    but I mean that is not something you -- you can swear

4    by them, no.

5        Q    And the document marked MAK 4702, which has

6    a time of 1:45 p.m., 5/7/02, other than yourself,

7    would there be someone else in the Finance Office who

8    would have generated this report?

9        A    Uh-huh.

10       Q    Who would have generated --

11       A    Quashi can issue this one, Odu can print

12   this one.  I mean anybody can do it.  It's in the

13   system.  See, these reports are available in the

14   system.  Even somebody from the outside, they cannot

15   change the ingredients of it, but they can print it.

16       Q    So the auditors would have access to this

17   report?

18       A    They can print them.  Anybody can print

19   them.

20            MR. MELEHY:  Here, I will take that.

21            Are you done, Alison, with this?

22            MS. DAVIS:  Yes, I'm finished with those.

---

DEBORAH L. SPEAR
(301) 843-9370

1          MR. MELEHY:  Okay.  Why don't you just give

2   me the stack and I will clip it.  Thank you.

3   BY MS. DAVIS:

4          Q    Mr. Kakeh, when did you learn that you would

5   no longer be employed at UPO?

6          A    The minute -- few minutes after I -- not few

7   minutes, I mean as in the first minute when Dana

8   called me in June the 2nd or the 3rd, one of the two.

9          Q    He called you on the telephone?

10         A    No.  I was -- I was either in the bathroom,

11  in a meeting, or something.  When I came back they

12  said Mr. Jones wants to see you upstairs in his

13  office.  So I went there to his office I mean to find

14  out what he need, because I mean usually he doesn't

15  call me, he doesn't meet with me.  I wanted to go to

16  find out.  And immediately with the door open and

17  everything he said the Board decided to terminate your

18  employment.

19         Q    Did you ask him why they were terminating

20  you?

21         A    In reality I mean the way he presented was

22  sufficient for somebody with heart problem to fall in

---

DEBORAH L. SPEAR
(301) 843-9370

1  floor at that time.  There was no courtesy to sit

2  down, talk about things, make an introduction, have

3  some human communication, prepare the person for this

4  is a bomb, this is a bomb.  Immediately with all this

5  arrogance and inhumane approach he said the Board

6  decided to terminate your employment.

7      Q    My question is did Mr. Jones tell you --

8      A    I said give me the papers.

9      Q    -- tell you why?

10     A    No, I didn't ask him.  I didn't ask him.  I

11 said give me the papers.

12     Q    Did anybody ever tell you why the Board had

13 decided to terminate your position?

14     A    I have the documentation they gave me,

15 that's what I know.

16     Q    After you met with Mr. Jones what did you

17 do?

18     A    That wasn't a meeting really.  That was

19 summoning.  He summoned me, and he gave me the

20 termination, and I left, and he said go collect your

21 things, and I don't need to send the security with

22 you.

1   Q To your knowledge was anybody else summoned

2 to Mr. Jones's office?

3   A That day, yes.

4   Q Who else?

5   A Nona McLean.

6   Q Were you present when she was --

7   A No.  But when she -- when she finished from

8 him and she came back with the letter, she came to me

9 and she told me.

10   Q Did she tell you about her conversation or

11 what was discussed with Mr. Jones?

12   A I -- I -- I don't remember I mean really

13 something special I mean more than that I get my

14 termination or something.

15   Q And did you return to UPO after that meeting

16 with -- or after you left Mr. Jones's office?

17   A I collected my stuff, and Nona and another

18 gentleman, the auditor, junior auditor was there, they

19 help me, because I cannot carry with my back, carrying

20 the boxes to my van I believe, and that was the last

21 time I went to UPO, inside UPO.

22   Q Did Ms. McLean tell you if she was given a

---

DEBORAH L. SPEAR
(301) 843-9370

1   BY MS. DAVIS:

2       Q    Earlier when we were discussing when you

3   were summoned to Mr. Jones's office on June 2nd or

4   June 3rd --

5       A    This is not -- this is not the statement I

6   received.

7       Q    What did you receive?

8       A    Title wasn't like this.

9       Q    What do you mean the title wasn't like this?

10      A    This here, I believe the address I mean it

11  was written differently, before I look at anything

12  else.

13      Q    I will represent to you that this document

14  is marked 00165, and this is a document that we

15  received from your attorney.

16      A    From my attorney?  So who draw the lines I

17  mean?

18          MR. MELEHY:  The copier probably.

19          THE WITNESS:  Oh, okay.

20  BY MS. DAVIS:

21      Q    Other than the line underneath your name

22  that we are not quite sure where it came from, does

---

DEBORAH L. SPEAR
(301) 843-9370

1    that look like the letter that you received?

2         A    It looks like it, yes, the Notice of

3    Reduction In Force, yes.

4         Q    This is all the information that you

5    received --

6         A    That was what --

7         Q    -- at that time about your reduction --

8         A    No.  They gave me with that one some kind of

9    policy, some document.

10         Q    The RIF policy, did you receive that too?

11         A    Not -- I don't re -- I don't recall exactly

12    if it was the RIF policy.  I guess it's for the health

13    insurance, and I guess -- I guess something in the --

14    yes, I believe there was some pages about the RIF

15    policy because I remember now I had to read it to

16    respond to it, yes, but there was other documentation

17    also, I cannot remember what's the name.

18              MS. DAVIS:  Have this marked as Exhibit

19    Number 14.

20                        (Deposition Exhibit Number 14 & 15

21                        were marked for identification.)

22    BY MS. DAVIS:

1    Q    Do you recognize either Exhibit 14 or 15 as

2  what came with your letter?

3    A    I believe, I believe so.

4    Q    Did one or both of them come --

5    A    Something to that fact.

6    Q    Did one or both of these come with your

7  letter?

8    A    If -- if we gave it to you, if I gave it to

9  my attorney, yes, but if I mean it came from other

10  source, I don't know, but I mean I know this one

11  because I mean that was a joke when I looked at it

12  1985 in 2004, so -- but I know that it's been updated

13  by Ben Jennings.  I -- maybe, maybe.

14    Q    Again I will represent to you by the numbers

15  on them 00298 and 0286 that these are documents that

16  we received from your attorney.

17    A    Yeah, I mean -- well, I mean I didn't

18  really -- my concern wasn't about the letter, the RIF

19  letter, justification I know, so I didn't have to

20  bother with reading this.

21    Q    And what was the justification that you

22  knew?

---

DEBORAH L. SPEAR
(301) 843-9370

1    A    What the justification?

2    Q    (Nodded head affirmatively.)

3    A    The justification for this letter?

4    Q    Yes.  You just said you knew the

5 justification for the decision.

6    A    I knew the -- I knew the reasons, but this

7 has to be covered by the legal documents.  I mean they

8 cannot say just you go ahead and leave.  That was part

9 of the whole game.

10    Q    And there is nothing in writing, but you

11 said you know the reasons.  What were the reasons?

12    A    Because I was doing all the things I was

13 explaining and writing.  And what triggered the whole

14 thing here, triggered it, the day before I had the

15 FBI, the Inspector General, the Assistant Attorney

16 General, and I let them into the UPO organization.

17 And it happened, it happened, that Monica was in

18 the -- was in the -- around the entrance next to the

19 security, because they cannot come inside the building

20 without somebody from the inside.  So they called me

21 from the cell phone, we been preparing for all of

22 these things, they called me from outside, they said

DEBORAH L. SPEAR
(301) 843-9370

1    we are outside, so I came out and I let them in. And

2    when I let them in Monica was there. It happened that

3    the lady from the Assistant Attorney General's Office,

4    she knows Monica by profession. Okay. So I took them

5    to my office, explained to them everything, and so

6    they appointed the lady because she knows Monica to go

7    and tell her about the reason why they are there. And

8    I took Ken and Duncan upstairs and introduce him to

9    Darlene Booker, because we wanted her to cooperate, to

10   cooperate with us. At that time Monica came and she

11   said tell them I want to see my attorney, don't say

12   anything. So she said I'm going to call my attorney,

13   and so Ken told me, he said tell her that we are

14   friends, Amin, there is nothing on her. And I told

15   them, because I know her very well, I said really

16   there is nothing on you, I mean they just wanted to

17   know the facts about Ben and all the other things.

18   Gladys I guess and Dana were in a meeting. So Monica

19   went right away and she called them.

20        Q    Now, you said the lady went to Monica's

21   office?

22        A    Uh-huh.

DEBORAH L. SPEAR
(301) 843-9370

1      Q    Did you go with her to Monica's office?

2      A    No.  When we went upstairs I showed her

3  where is Monica's office, and I continue with Ken and

4  Duncan into the Executive Office.

5      Q    Did you have any discussions with Monica

6  about your termination?

7      A    No.

8      Q    Did she ever tell you that you were

9  terminated because she saw you coming into the

10  building with the FBI and the Assistant Attorney

11  General?

12      A    Told me that because of that one you been

13  terminated?

14      Q    Yeah.

15      A    They didn't say termination.  They said

16  reduction in force.

17      Q    Well, did Monica ever tell you that you were

18  selected for the reduction in force because you

19  brought the FBI into the building?

20      A    She didn't tell me personally.

21      Q    Who did she tell?

22      A    But I mean she was the witness when they

---

DEBORAH L. SPEAR

(301) 843-9370

1    came inside the building, and immediately she went and

2    she called them.  So that is at that time they went

3    out and they brought them to their office and I went

4    downstairs.

5        Q    Did she ever tell anybody that the reason

6    why you were selected for the Reduction In Force was

7    because you brought the FBI into the building?

8        A    If she tell some other party?

9        Q    Yes.  To your knowledge did she tell anybody

10   else that that's the reason why you were selected for

11   Reduction In Force?

12       A    Well, as I said, that wasn't -- that was the

13   immediate reason.  These things been building for a

14   while, but that was the immediate reason I believe.

15   This is my belief.  I mean it's not the decision been

16   made because I had them inside.  These things been

17   prepared.  Until they saw them in their faces and all

18   these people I guess at that time they made the

19   decision.  But Monica was part of the decision because

20   she has to read about these things, legal things.

21       Q    Earlier we had a discussion about your

22   diaries.

DEBORAH L. SPEAR
(301) 843-9370

1    Women regarding why you weren't selected for the

2    position?

3        A    No.  But I -- we talked about UPO, and

4    because nobody really in any interview I had if we

5    come to the point they asking me why you left and I

6    said I been riffed, they said, excuse me, what's your

7    position, Financial Controller riffed, it's like a

8    joke.  Yes, was riffed.  So I had to tell the people

9    when I am going for interview when they come -- when

10   it come to serious point, because that's the first

11   thing they ask you, why you left your final job, the

12   last job, and that wasn't few months, it was six

13   years, I mean I have to say something.  So many of the

14   prospective employers when I mentioned that one, it

15   didn't take them long after that for a few minutes to

16   close the interview.  So but for Women -- Women for

17   Women I met the Controller the first time, and it

18   looks like I mean we would -- he liked me I guess to

19   work with him.  I mean he -- so the next time when we

20   have the second meeting they have a consultant and

21   they have the Chief Operation Officer, and they asked

22   me why you left UPO, and I had to tell them the truth,

1    what happened.

2        Q    What did you tell them?

3        A    I told them, well, I blow the whistle on

4    them, and I was contacting the agencies outside the

5    organization, for what, for fraud and mishandling and

6    everything.  And I remember until this day she said

7    why are you still there if you saying all of these

8    things, why you still there, and I said I still there

9    because I mean I wanted to finish the mission and let

10   everybody knows what they are doing.  I mean I cannot

11   just leave like this because I mean they will put

12   everything on my back.  They will say the Controller,

13   he did all of these things.  So I have to see it

14   through it.

15        When she knows about all these problems and

16   everything, I mean I can tell immediately that that

17   was a major obstacle.  So it wasn't easy to explain.

18   You cannot lie, and you cannot make it any -- in any

19   terms to fit the new employer, 61 years old man,

20   financial controller, the company all over the country

21   in the news medias, and after that hire him for

22   another position or controller, I wouldn't do it if I

DEBORAH L. SPEAR
(301) 843-9370

1    back on the record.

2    BY MS. DAVIS:

3        Q    Mr. Kakeh, I just have a few more questions

4    before we wrap up for today.  Earlier you mentioned

5    that Nona McLean also was summoned to Mr. Jones's

6    office on or about June 2nd or June 3rd, the day that

7    you were summoned and received your RIF notice?

8        A    Uh-huh.

9        Q    Did Ms. McClain assist you in providing

10   information to Mr. Eboda about --

11       A    No.

12       Q    -- the fraud, waste and abuse?

13       A    No.

14       Q    To your knowledge has Ms. McLean filed a

15   discrimination charge against UPO?

16       A    I don't know.

17       Q    Do you believe that UPO was submitting false

18   claims to the federal government?

19       A    Yes.

20       Q    And how was it doing that?

21       A    Very simple.  Every month automatically they

22   used to bill the CSBG for 1/12th of the total grant

DEBORAH L. SPEAR
(301) 843-9370

1    for money we didn't spend, and that way we end up at

2    the end of the year with all this money in UPO left

3    over to cover all these deficits because we didn't

4    have expenses for it from CSBG.  And that been signed

5    by Ben Jennings, and at the end of the year when they

6    submit a report to CSBG Gladys Mack knows about it and

7    justify it.

8        Q    Was UPO doing anything else that you

9    considered to be the submission of false claims to

10   either the Federal Government or the D.C. Government?

11       A    The Office on Aging the same thing, for the

12   Head Start it's the same thing.  And after that

13   documented both from Department of Health and Human

14   Services for the Head Start, we pay them back, and for

15   the CSBG, they asked them for the money back.  All of

16   these things build on the ground that they been

17   billing the government agencies for money they didn't

18   earn.

19       Q    Have you had any discussions with any

20   employees of UPO since you left?

21       A    Discussion about what?

22       Q    About UPO and how it is operated.

---

DEBORAH L. SPEAR
(301) 843-9370

1      A    I don't call it discussion.  I used to hear

2    the news really from -- directly from -- from Tunde.

3    So I didn't have to fish for it from other places.

4      Q    Have you spoken to any employees of UPO

5    about this case?

6      A    Oh, yeah, all of them.

7      Q    When did you -- which employees have you

8    spoken to about this case?

9      A    All of them.  All of them.  We had a meeting

10   in my office so many times, and I have their

11   signatures all of them.

12     Q    No.  My question is have you spoken to any

13   UPO employees about your case, your lawsuit against

14   UPO?

15     A    No.  No.  No, I -- not that, not that one.

16          MS. DAVIS:  This is the final exhibit.

17               (Deposition Exhibit Number 18

18                was marked for identification.)

19          COURT REPORTER:  18.

20          MR. MELEHY:  Which number?

21          COURT REPORTER:  18.

22          MS. DAVIS:  Number 18.

---

DEBORAH L. SPEAR
(301) 843-9370

1    BY MS. DAVIS:

2        Q    You mentioned earlier when I asked you if

3    you had had any discussions with Councilman David

4    Catania that you had sent him copies of a memo that

5    you had sent to Russell Simmons.

6        A    Uh-huh.

7        Q    Is Exhibit Number 18 the memo that you were

8    referring to?

9        A    Okay.  This memo I wrote it in the house the

10   night before, and I sitting early in the morning, me

11   and my wife we writing that one.  So what I did I

12   e-mailed it to Sharon to take a look at it with the

13   guys, because before that, as I said, we been meeting

14   in my office, and I have the consent for everybody to

15   sign papers, that we going to be sending this letters

16   to all everyone so they will know.  And some of them

17   they give me something in their handwriting about what

18   they wanted to say, and the other one -- I looked at

19   all of them, and I said -- I wrote this letter here.

20   So I sent it to Sharon, and Sharon there, there was I

21   remember two copies of this one went one after the

22   other, but there at that time from inside UPO they

1   gave me names I didn't know about them.  The first

2   time we sent it to Schwartz, I remember this one here,

3   and this councilmember, she is the one who sent it to

4   David Catania because she is no longer was watching

5   for over CSBG.

6       Q    So this is the memo that you were referring

7   to that eventually got to Mr. Catania?

8       A    She -- she -- she sent to it him.

9       Q    But this is the memo?  Just yes or no.

10      A    This is the memo, yes.  Uh-huh.

11          MS. DAVIS:  I have no more questions at this

12  time, but I would like to leave the record open until

13  we receive the other documents to see if I have any

14  additional questions.

15          COURT REPORTER:  Signature?

16          MR. MELEHY:  Yes, read and sign.

17          VIDEO OPERATOR:  The time is 6:16 p.m.  This

18  is going to close today's videotape deposition of

19  Mr. Mohammed Amin Kakeh.

20          (Whereupon, the deposition of M. AMIN KAKEH

21  was concluded at approximately 6:16 p.m.)

22

---

DEBORAH L. SPEAR
(301) 843-9370