# EXHIBIT 7

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------x

MOHAMMED AMIN KAKEH,                x

             Plaintiff,           x Civil Case No.

             v.                   x 1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC.,x

             Defendant.           x

------------------------------------ x

                     Thursday, February 23, 2006

                     Silver Spring, Maryland

The deposition of TUNDE EBODA called for

examination by counsel for Plaintiff in the

above-titled matter, pursuant to notice, in the

Offices of Zipin & Melehy, 8403 Colesville Road,

Silver Spring, Maryland, before Jonell Easton,

Notary public, at 10:00 a.m., when were present on

behalf of respective parties:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

Case 1:05-cv-01271-GK    Document 78-18    Filed 02/27/2007    Page 3 of 94
DEPOSITION OF GLADYS MACK
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

6

1      A.    Correct.

2      Q.    From now on, if it is okay, we can refer

3   to CSBG grant.   What is a CSBG grant for?

4      A.    CSBG is a federal antipoverty block grant

5   administered by the state and program services

6   carried out through designated community services

7   organizations.

8            The purpose is to address poverty and

9   issues of poverty and seek to eliminate the causes

10  of poverty.

11           In the District, the program operates

12  through a network of service delivery organizations

13  that coordinate and deliver services on behalf of

14  the D.C. government.

15     Q.    One of those service delivery

16  organizations is United Planning Organization?

17     A.    Correct.

18     Q.    How long has UPO been a service delivery

19  organization?

20     A.    Under CSBG, since 1981, they have been

21  doing it.

DEPOSITION OF LINDA BRODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

7

1    Q.   Have you held the same position at DHS for

2  ten years?

3    A.   No, I was program analyst prior and I have

4  been, was program manager prior to being a program

5  officer, I was program analyst, so I have had

6  three, four different--I was a program assistant

7  back in the beginning of 1996.

8    Q.   Your precise title now is?

9    A.   Program officer.

10   Q.   Whom do you report to?

11   A.   Administrator of family services

12  administration, Mr. Ricardo Lyles.

13   Q.   How long have you been reporting to him?

14   A.   Since 1998.

15   Q.   You have been a program officer since

16  1998?

17   A.   I have been a program officer since 2005.

18       Prior to that, I was program manager since

19  2001.

20   Q.   What are your general job duties?

21   A.   Provide management and administration of

8

1    the community service block grant; provide

2    oversight; perform monitoring evaluation of

3    recipients; provide technical assistance, general

4    management and administrative duties.

5         Q.    Do you have an accounting degree?

6         A.    I do not.

7         Q.    Do you have any training in finance?

8         A.    I was a budget analyst before I was a

9    program manager.

10        Q.    What is your education?

11        A.    I hold a bachelor's degree in statistics,

12   a master's in management and a doctoral degree in

13   medical sociology.

14        Q.    You have a Ph.D.?

15        A.    Correct.

16        Q.    Did you take any accounting courses in

17   college or graduate school?

18        A.    Other than--yes, in college, an accounting

19   and commerce classes which are business-related

20   classes.

21        Q.    Did you take any accounting course in

10

1     was created, the UPO was grandfathered in.

2          UPO has a unique arrangement in they are a

3     district of, one of three jurisdictions that only

4     have one designated community action agency, and

5     UPO is that agency.

6     Q.   UPO does not deliver the services?

7     A.   They, in turn, have a service delivery

8     network that includes seven delegate agencies,

9     three community neighborhood service centers and a

10    number of contractual relationships with

11    organizations.

12         By extension, where CSBG dollars go, we

13    extend our oversight and responsibilities to.

14    Q.   Seven what?

15    A.   Seven delegate, UPO delegate agencies.

16    Q.   Three neighborhood centers?

17    A.   Neighborhood service centers.

18    Q.   A given number of contractual providers?

19    A.   Correct.

20    Q.   There are over ten different entities that

21    provide these services?

11

1        A.    Correct, ten is the minimum and the

2    contractual relationships vary from year to year.

3    Could be ten, 20, 30 and that is purely their

4    relationship with their service delivery centers.

5             In order for us to be assured that the

6    mission of community services block grant is being

7    carried out, DHS extends voluntarily interest and

8    oversight of what is being done at the direct

9    service levels.

10        Q.    You, basically DHS does oversight over

11    these entities?

12        A.    Our primary responsibility is UPO.

13             In order to do a sufficiently thorough

14    job, voluntarily, we extend interest and oversight

15    function to those other agencies when required.  We

16    understand that we cannot fully carry out the

17    community services themselves, so we extend

18    ourselves to where the services are being

19    delivered.

20        Q.    Does DHS have an obligation to safeguard

21    funds, to prevent fraud waste and abuse?

12

1    A.    Yes, we have responsibility for funds

2  being used.

3    Q.    Did you say fiduciary responsibility?

4    A.    Maybe, that is technical, yes, we do have

5  the responsibility to make sure they, regardless of

6  fiduciary or not, but yeah, we have responsibility

7  to make sure funds are being used.

8         It is the intent of Congress we perform

9  regular monitoring site visits not audits, but

10 monitoring program site visits.

11    Q.    That would be one of the purposes of your

12 position to make sure that gets carried out?

13    A.    Correct.

14         Statutorily, it is once every three years.

15 There no limit to our frequency, at a minimum,

16 there is a site visit once every three years.

17    Q.    What is a site visit?

18    A.    A site visit is a monitoring exercise that

19 takes you to the location where the agency that

20 receives funds maintains its operations.

21    Q.    So when you go in to do the monitoring

13

1    exercise, who goes?

2        A.    Typically, I will lead the exercise.  I

3    don't necessarily have to remain on location for

4    the duration.  I lead the exercise, also I have

5    program managers, analysts on staff that join in

6    performing those functions.

7            Where we require specific skills, we

8    reserve the option to have a contractual

9    arrangement to seek the expertise outside of

10   government.

11       Q.    What typically happens during a monitoring

12   exercise?

13           Is it the case typically during a

14   monitoring exercise that you and/or your staff from

15   DHS go to the site and conduct a review?

16       A.    Correct, we review records, conduct

17   interviews, we have monitoring tools we use to

18   gather information like questionnaires, monitoring

19   tools, use of questionnaires, use of interviews,

20   review of records on-site and further interviews.

21       Q.    That is all done by DHS staff?

15

1    independent accounting or auditing form?

2        A.    Yes.

3        Q.    The government would theoretically pay for

4    that, the federal government?

5        A.    Yes.

6        Q.    Advice and referral would come from

7    federal, employees of the federal agency you were

8    under?

9        A.    Yes.

10       Q.    Would that be in the form of auditors?

11       A.    Could be if the problem in question is

12   financial in nature, could be there is a

13   requirement for CSBG recipient to perform audits

14   annually and to submit the report of that to the

15   state office.

16       Q.    Who has to audit annually?

17       A.    Sub grantee.

18       Q.    Who would that be?

19       A.    Sub grantee would be UPO, the grantee is

20   the District of Columbia government and the sub

21   grantee is UPO.

1    Q.    UPO would be obligated to do annual

2    audits?

3    A.    Correct, CSBG is audited on a single audit

4    basis, which happens once every three years, if

5    there are no findings, and it can be more

6    frequently if there are findings.

7    Q.    Say, for example, DHS is going on a

8    monitoring exercise, strike.

9         When would you request either federal

10   assistance, when would you request federal

11   assistance during a monitoring exercise, what would

12   trigger that?

13   A.    If we get in the field and we begin our

14   work and we recognize that there will need to be a

15   more in-depth review other than what is customary,

16   we have a monitoring tool, it is completed, we

17   conduct interviews, the questions check out with

18   what we see on the ground, and that will be

19   satisfactory.

20        If it is anything beyond that, if we

21   suspect activities that appear to be beyond the

17

1    scope of what a program monitor normally deals

2    with, we cannot conduct interviews, cannot

3    do--conduct investigations, we cannot conduct

4    in-depth fiscal exercises that can be called an

5    audit.

6         We cannot compel third parties to share

7    records with us.  For instance, if UPO has a

8    relationship with another entity, we cannot compel

9    that entity to share records, we can encourage UPO

10   to secure those records, if it will help shed

11   light.

12        And if we get calls from significant

13   people in the organization alerting us to issues of

14   a serious nature, fraud, waste and abuse, criminal

15   intent and criminal fraud and such, our protocol is

16   thar DHS refers it to the office of investigation

17   and they comply, we have the option to invite the

18   District Inspector General to take a look at such

19   cases.

20        Those would be, by far, above what the

21   program manager is required to do.

1    Q.   As far as the history of doing the

2  monitoring exercises you did, started a monitoring

3  exercise with regard to UPO in February or March of

4  2004.  Correct?

5    A.   February of 2004 correct, February 18, 17,

6  19.

7    Q.   That is when you started the monitoring

8  exercise.  Correct?

9    A.   That is when we commenced the monitoring

10  exercise.

11    Q.   Prior to that monitoring exercise, when

12  was the previous monitoring exercise conducted?

13    A.   It was 2002, I believe, spring of 2002,

14  prior to 2004.

15    Q.   Prior to the spring of 2002 monitoring

16  exercise, when was the previous one done?

17    A.   I would like, I would have to check my

18  records, no more than a year or two focused on

19  different aspects, different agencies on any

20  particular year, there is something going on.

21    Q.   I want to make sure my questions are

DEPOSITION OF TYREE FORDA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

24

1    Q.   What had you planned to do, as of the

2    quarterly meeting, during that monitoring exercise?

3    A.   It was set up as a routine exercise where

4    we would go in, have an interview with the

5    executive, usually the executive director and

6    whatever the executive director includes in that

7    entrance interview, mostly, it would include the

8    deputy director and perhaps one or two other senior

9    management staff.

10        We would do the entrance interview and we

11   would have developed a list of significant program

12   managers that we would like--not only program

13   managers, but line staff we would like to interview

14   and in advance, documents of interest--we would

15   make that clear so they can have those documents

16   available for us.

17        So it was set out to be a routine program

18   monitoring exercise.

19   Q.   You had planned to do the monitoring

20   exercise with your own DHS staff?

21   A.   Correct.

Case 1:05-cv-01271-GK    Document 78-13    Filed 02/27/2007    Page 15 of 94
DEPOSITION OF ODP
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

27

1    outside his building?

2         A.    I met him on a number of occasions outside

3    of his work site.  I don't remember if it was prior

4    to February 18 or thereafter.

5         Q.    The first time you met him, do you

6    remember where, did you meet him at a memorial?

7         A.    Yes.

8         Q.    Which memorial was it?

9         A.    Around Jefferson Memorial.

10        Q.    How close was that to his building?

11        A.    It's southwest D.C.  His building is

12   northwest, I would say maybe 15 minutes' drive.

13        Q.    Is that the first time you met him in

14   2004?

15        A.    That is probably, yes.

16        Q.    When you met him at the Jefferson

17   Memorial, how did that meeting come about?

18        A.    I believe he called me and requested a

19   meeting.

20        Q.    Did he give you any indication, in any

21   way, shape or form, why he wanted a meeting with

29

1    A.    I am not sure prior to or immediately

2    thereafter.  I could look at, if I penciled that on

3    my calendar, I could look, I am not sure.

4    Q.    You said earlier that you assumed

5    knowledge of your impending site visit was out

6    there when you met with him.

7          Did you, do you think it occurred, the

8    meeting at Jefferson Memorial occurred before the

9    site visit on February 18?

10   A.    It could be, because we met a number of

11   times, couple, two, three times, at least.  It is

12   entirely possible that a meeting occurred before

13   February 18.

14   Q.    You said you met with him two or three

15   times?

16   A.    Correct.

17   Q.    Where did you meet him the next time?

18   A.    It was also somewhere on the Mall and

19   maybe that time around--

20         (Witness and counsel confer.)

21         THE WITNESS:  Hains Point, not precisely

31

1    A.    I don't, but I could check my calendar to

2  see if I penciled it in.  Ordinarily if I have an

3  informal meeting, I may not have penciled it in.

4         MR. MELEHY:  Could you produce your

5  calendar?  We asked for all documents related to

6  your investigation.  I don't think we got the

7  calendar.

8         THE WITNESS:  It's informal, I printed

9  Outlook.  I punch in the stuff, what I still have I

10  can provide.

11         MR. MELEHY:  Great.

12         MR. WARREN:  For the month of February of

13  2004?

14         MR. MELEHY:  I would say January,

15  February, March, probably April and anything on

16  there personal in nature that has nothing to with

17  this, redact it.  We have no interest in anything

18  personal on there, just things related to his

19  business and his job and any meeting with people at

20  UPO.

21         MR. WARREN:  January of 2004 to April of

DEPOSITION OF BODA

CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

1    2004.

2         MR. MELEHY:  Start in December, actually.

3         MR. WARREN:  Okay.

4         MR. MELEHY:  We will let you know if we

5    need to go beyond, I think our subpoena covers

6    beyond.

7         MR. WARREN:  Okay.

8         BY MR. MELEHY:

9    Q.    Do you know if the second meeting, the one

10   you referred to that started at the Tidal Basin and

11   ended at Jefferson Memorial was before or after

12   February 18?  Can you say that definitively one way

13   or the other?

14   A.    It could be after, I am really not sure

15   about that, whether one meeting occurred before the

16   18th or two.  I am not sure.

17        The reason I believe the first meeting, I

18   now believe the first meeting happened before

19   February 18 is because we had not begun the

20   monitoring exercise before I had my first

21   conversation with Mr. Amin.

DEPOSITION OF MOUSA BODAI
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

33

1    Q.   The second meeting, you are unclear

2    whether it was before or after February 18?

3    A.   Yeah, unsure.

4    Q.   The third meeting, when was that?

5    A.   I believe it was during the week of the

6    monitoring exercise itself I also met with him.

7    Q.   When you say week of the monitoring

8    exercise, you are talking about the week of

9    February 18?

10    A.   Correct.

11    Q.   The 18th?

12    A.   Correct.

13    Q.   So you know that meeting was in February

14    and you know it was during the seven-day period in

15    or around February 18?

16    A.   In or around there.

17    Q.   Going back to the first meeting, what did

18    you discuss?

19    Did you receive any documents from Mr.

20    Kakeh during the first meeting?

21    A.   I don't remember if I did, but I do know

34

1    he had documents and he showed me some documents,

2    whether he had copies he relinquished at that

3    meeting, I don't recall.

4        Q.    From your memory, at your first meeting at

5    Jefferson Memorial, Mr. Kakeh shows you UPO

6    financial documents?

7        A.    Correct.

8        Q.    Did he tell you there were financial

9    improprieties going on at UPO regarding the

10   Community Services grant?

11       A.    Yes, I believe to some extent he did state

12   that.

13       Q.    What did he tell you about improprieties

14   during the first meeting?

15       A.    Details of that I don't recall, but I know

16   it was something, what I got from that was that I

17   needed to pay a great deal more attention to,

18   during my visit, to documents I may be reviewing.

19       Q.    When you met with him at the Jefferson

20   Memorial, how long did the meeting last?

21             This is the first meeting.

35

1    A.   At least 30 minutes.

2    Q.   Could have been longer?

3    A.   Could have been longer, I don't recall.

4    Q.   Were you meeting outside at the Memorial

5  or inside?

6    A.   Yeah, outside, generally walking around

7  outside, yeah.

8    Q.   Why did you meet outside of the UPO

9  building?

10    A.   This was his, Mr. Kakeh's, at his request.

11    Q.   Did he give you a reason why he wanted to

12  meet outside of the UPO building?

13    A.   As an employee of the organization, I

14  think he would be concerned that things he had to

15  share with me could be overheard by maybe his

16  coworkers or superiors.

17    Q.   Did he express concern he might be

18  retaliated against for making these disclosures to

19  you?

20    A.   That did come up.  I don't know at the

21  first meeting or later, but it did occur to him at

DEPOSITION OF WILLIAM BODEN
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

36

1    some point that he might attract some negative

2    responses from the agency and I imagine my response

3    would be, would have been that he had to do the

4    right thing, something to that effect.

5        Q.    Did you encourage him to be forthright

6    with you and share the information?

7        A.    I most certainly did, as I did with other

8    people I interviewed, I always encouraged them to

9    be completely open and truthful and cooperative.

10       Q.    When he spoke to you and showed you

11   documents, did you conclude that potentially grant

12   monies from the CSBG grant were being improperly

13   spent?

14             In other words, the funds were not being

15   used for federally mandated purposes?

16       A.    That would be my assumption coming out of

17   such a dialogue and also I recognized I am not a

18   trained accountant, I started computing in my head

19   I was going to need help.

20       Q.    You determined, after your first meeting

21   with him, that you were going to need help?

38

1          One of the first things I asked to see

2     when I went out in 2004 was to ask to see the

3     policy and procedures manual that--this was being,

4     they said had they hired a consultant to help them

5     with its development.  I knew a consultant had

6     become full time staff with the agency and did not

7     produce the document in a timely manner.

8          That raised red flags in my eyes, so a

9     combination of that and perhaps interview responses

10    that I had gathered and Mr. Amin's alert led me to

11    conclude there may be things going on that are not

12    supposed to be going with on CSBG funds.

13         Q.   You said that meeting, the interview,

14    entrance interview, was done on February 17.

15    Correct?

16         A.   I could check, February 17 or February 18,

17    it may have been scheduled for the 17th, I probably

18    did note that on the 17th and my calendar clearly

19    will show that.

20         I can put my hands on my calendar for that

21    period.

39

1    Q.    Mr. Kakeh's disclosures to you were part

2    of the reasons for your concern and needing to

3    assess the financial situation?

4    A.    In part, yes.

5    Q.    When Mr. Kakeh made those disclosures to

6    you initially at Jefferson Memorial, you didn't

7    have any other information at that point?

8    A.    I don't believe so.

9    Q.    Do you remember what you discussed with

10   him at the second meeting you had with him?

11   A.    Along the same lines, maybe seeking

12   clarification about information we had gathered

13   either through him or through interviews we had

14   conducted, seeking direction about where we might

15   locate some documents that would tie into some of

16   the things that Mr. Kakeh was telling us.

17   Q.    Was the second meeting before or after the

18   entrance interviews were conducted?

19   A.    I think it was after the entrance

20   interviews were conducted.

21   Q.    Are you sure about that?

DEPOSITION OF ANTHONY BODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

40

1    A.    I am not positive.  We may have met more

2    than once before February 18, but in this general

3    timeframe, it is possible.

4    Q.    When did you meet with Mr. Kakeh the third

5    time?

6    A.    After a few days on the ground at the site

7    visit, the location, the headquarters of UPO, I,

8    after my first few days, I cut off my exercise.  I

9    had determined, at that time, this was no longer

10    going to be routine and customary.

11    I suspect I, right after I made the

12    determination that we are going to need more than

13    just me and my staff conducting this exercise, plus

14    I had a conference coming up in town the following

15    week.

16    I believe February 17, 18 would have been

17    Tuesday and Wednesday.  By that Friday, I had

18    concluded I would take time off the exercise,

19    attend the conference in town the following week

20    and come back and resume my monitoring exercise.

21    Q.    You apparently decided at one point you

41

1    needed help?

2        A.    Correct.

3        Q.    You indicated that was after the entrance

4    interviews were conducted?

5        A.    Correct.

6        Q.    At what date in February did you decide

7    you needed help?

8        A.    I imagine the end of the week of

9    February 18, so it would be that Friday.

10        Q.    February 18, to your knowledge, was

11    Monday?

12        A.    Could be Tuesday or Wednesday, not sure.

13        Q.    The end of the week of February 18?

14        A.    Yes.

15        Q.    That would be?

16        A.    That Friday.

17        Q.    Following February 18?

18        A.    Correct.

19        Q.    That would have been the date you

20    completed your monitoring exercise?

21        A.    No, that would have been the date I took a

42

1    break from the monitoring exercise to attend a

2    conference locally, beginning the next week.

3            And that afforded me the opportunity to

4    regroup, share with my superior that I believed I

5    would need to seek more specific expertise to

6    continue the monitoring exercise.

7            And I did tell UPO that also.

8    Q.    What expertise, on that Friday of the week

9    of February 18 that you decided you needed help,

10   what type of help did you think you needed?

11   A.    I knew I would have to focus a great deal

12   more on the financial operations of the agency.

13           They had not been able to produce the

14   policy and procedures manual.  That had been a

15   point we raised two years prior.

16           The document they finally provided for me

17   was not satisfactory and they said the work had not

18   been concluded, that they were still working on it.

19   That gave me concern that we may be lacking a code

20   of procedures for managing accounting functions at

21   the agency and so what was--

DEPOSITION OF CARL BURTON
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

43

1    Q.    My question was what kind of help.

2          Did you think you needed auditors?

3    A.    I knew I needed people with finance

4    expertise, accounting and finance expertise.

5    Q.    What steps did you take to procure those

6    people?

7    A.    During the conference, I met with the

8    agency sponsoring it, the National Association for

9    State Community Service Programs.  That is a

10   membership organization that CSBG administrators

11   belong to.  They were sponsors, it was what they

12   called a mid winter training conference.

13         I met with the director of programs for

14   that organization.  And in the past, they have been

15   used by the federal oversight agency to perform a

16   number of CSBG data gathering exercises by contract

17   with the feds.

18         And they have also served as advisors to

19   CSBG administrators in matters where we needed

20   clarity or referral, so it was them.

21   Q.    What is the name?

44

1      A.    National Association for State Community

2   Services Programs.

3      Q.    Did you hire that agency?

4      A.    Actually, I did.  I entered into an

5   arrangement with them to provide technical

6   assistance.

7            At the same time, I contacted my federal

8   oversight agency and talked to the program manager,

9   region three.  D.C. is region three.  I talked to

10   the region three manager that I was having,

11   potentially there may be a need for me to request

12   technical assistance from them.

13      Q.    What was the response?

14      A.    In the affirmative, if you need help, let

15   us know and we will get you some help.

16      Q.    When did you have this meeting with the

17   National Association for State Community Service

18   Programs?

19      A.    The week after February 18, the week of

20   the conference.

21      Q.    What was the week?

DEPOSITION OF IZUCHUKWU EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

45

1     A.   The conference started on Wednesday, so it

2   will be, at the latest, that Wednesday, could have

3   been--Monday or Tuesday were orientation, that is

4   for new administrators, typically Monday and

5   Tuesday, and the full conference starts.

6          MR. MELEHY:   Take a short break.

7          We need a calendar.

8          (Discussion off the record.).

9          MR. MELEHY:   Back on the record.

10          Mark this as Exhibit 1, please.

11          (Eboda Deposition Exhibit No. 1 was marked

12   for identification.)

13          BY MR. MELEHY:

14     Q.   Mr. Eboda, I am showing you Exhibit 1.

15          That is a calendar for January, February,

16   March, April and May of 2004.   Correct?

17     A.   Correct.

18     Q.   In February, you indicated you had a

19   meeting on the 17th or 18th, the entrance

20   interviews on the 17th, 18th of February with UPO?

21     A.   Correct.

46

1      Q.    February 17 was Tuesday?

2      A.    Correct.

3      Q.    You indicated the conference began the

4   following week, on the 25th?

5      A.    Correct, the orientation was the 23rd and

6   the 24th, which I normally would not be a part of

7   it.

8            My first day, the contact would have been

9   the 25th.  I may have been in conversation I would

10  like to meet with you and talk about some of this.

11     Q.    What was the day you decided to hire the

12  National Association, the day you had contact with

13  the National Association?

14     A.    The face-to-face would have been

15  February 25.  We drew up a document shortly after

16  agreeing what they will do and what I am prepared

17  to budget for this.

18           I don't remember the date of that

19  document.  That document would exist in their files

20  that we maintain.  We can put our hands on a

21  precise document.

DEPOSITION OF FUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

47

1    Q.    Did the National Association, in fact, go

2    and do an investigation of UPO?

3    A.    It turned out that they also entered into

4    an arrangement with another group, Mid Iowa

5    Community Action Agency, National Services unit or

6    something.

7         They were members of that organization,

8    members of that organization were present at the

9    conference I attended, I did have discussions with

10    members, but my relationship with NASCP, I have

11    used expertise of MICA, the people that actually

12    were on the ground with me were members that MICA

13    put together.  They don't necessarily work for

14    MICA, but there are professionals in their own

15    different pursuits in the areas of accounting,

16    management and board governance that MICA can put

17    together.

18    Q.    Who hired what?  MICA hired?

19    A.    MICA was an entity that NASCP hired.

20    Q.    Who paid for the services of MICA?

21    A.    NASCP, I paid NASCP and NASCP paid MICA.

DEPOSITION OF ANTHONY BODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

48

1    Q.    Did anybody pay DHS?

2    A.    The federal government, any technical

3    assistance awarded to us, a little shy of $50,000,

4    49,900 something.

5    Q.    What date was NASCP formerly engaged by

6    DHS?

7    A.    March 3, I believe the first week in

8    March, I am not sure, could be March 1, I believe

9    it was March 1.

10    Q.    I will return to this first meeting you

11    had with Mr. Kakeh.

12         Did Mr. Kakeh tell you, during that first

13    meeting at the Jefferson Memorial, that UPO had a

14    deficit of $2 million?

15    A.    Yes, I believe so.

16    Q.    Did he tell you, at that meeting, that UPO

17    intended to charge that $2 million deficit to the

18    CSBG grant?

19    A.    I recall he did, yes.

20    Q.    If those two things were true, that would

21    have been fraud, waste and abuse?

Case 1:05-cv-01271-GK    Document 78-18    Filed 02/27/2007    Page 34 of 94
DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

49

1    A.    In my opinion, it would have been.

2    Q.    Did he, at that meeting, show you that Ben

3  Jennings or any other UPO officials had been

4  basically using UPO or grant funds for personal

5  expenses?

6    A.    Maybe, maybe not in those terms, but

7  essentially that CSBG funds were being misspent not

8  so much for personal expenses, but they were being

9  misspent.

10    Q.    He was telling you they were being

11  misspent in ways that could constitute fraud,

12  waste, and abuse?

13    A.    In his opinion.

14    Q.    If these things he told you were true,

15  would that constitute fraud, waste and abuse?

16    A.    It would need to be verified, but yes.

17    Q.    I want to ask the question, if what he

18  told you was true that CSBG grant monies were being

19  misspent by UPO, in your opinion, that would have

20  constituted fraud, waste and abuse.  Correct?

21    A.    I would have considered it as such.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

50

1    Q.    He showed you some documents to back up

2    his statements.    Correct?

3    A.    I remember specifically the document about

4    the deficit, yes, a financial statement he produced

5    and there was a significant deficit at the agency.

6    Q.    In the second meeting, did he tell you the

7    same thing?    In other words, that UPO still

8    intended to apply the deficit to the CSBG grant?

9    A.    Correct.

10    Q.    He showed you additional information to

11    support that.    Correct?

12    A.    Correct.

13    Q.    The additional information you got led you

14    to believe there may be fraud, waste and abuse.

15    Correct?

16    A.    Correct.

17    Q.    Did he show you, during the first or

18    second meeting, any extensive personal expenditures

19    Ben Jennings had made for a boat, cell phone calls,

20    parking tickets, any such matters?

21    A.    He did raise those points, I believe.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

51

1          Documents relating to both we got from UPO

2     general counsel office, but we specifically asked

3     for it.

4          Q.   You asked for it based on what Mr. Kakeh

5     told you?

6          A.   Correct.

7          Q.   When did you get a document from the

8     general counsel office?

9          A.   It would be the week of March 1.

10          Q.   When did Mr. Kakeh first tell you about

11     the expenditure for the boat?

12          A.   It would have been one of the first one or

13     two meetings that he had with me.

14          Q.   What was your understanding of the boat

15     matter, based on, let me rephrase.

16          What understanding did you have of the

17     boat matter based on your first or second meeting

18     with Mr. Kakeh?

19          A.   That there is a boat somewhere did not

20     cause me great alarm.  I wanted to know the purpose

21     for which we, meaning CSBG or the CSBG sub grantee,

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

52

1    would have need to own the boat.

2           What alarmed me was when not too many

3    people confirmed that we have a boat, everybody we

4    talked to about it said, we charter a boat to do

5    various things, but that we do not own a boat.

6           That alarmed me because I, at the time, I

7    was verifying this, I had asked the general counsel

8    if there was a contract to purchase a boat.

9           And she had produced a document which

10   pictured, that showed we had made payments toward

11   the purchase of a boat.

12          And at some point, I don't recall, I know

13   it was the first week in March, I don't recall what

14   date, by telephone we had inquired of the executive

15   director, Mr. Jennings, if we owned a boat or

16   purchased a boat or was purchasing a boat.

17          And we had been told that we were wrong,

18   that a boat did not exist and we do not own a boat.

19          I asked other members of the organization

20   and they maintained we did not own a boat.

21          Mr. Kakeh's assertions became very

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

53

1    powerful in what continued to drive what we looked

2    for, who we talked to and where we looked.

3        Q.    This was information you got from Mr.

4    Kakeh during the first and/or second meetings?

5        A.    Yes.

6        Q.    Mr. Kakeh's assertions during the first

7    and/or second meeting was there was a purchase, it

8    was purchased by UPO turned out to be true?

9        A.    It was verified we had made consecutive

10   monthly payments toward the purchase that

11   totaled--I don't recall the amount.  We had made at

12   least 14 consecutive monthly payments including a

13   deposit.

14       Q.    We meaning DHS?

15       A.    No, that means UPO using CSBG funds, using

16   a combination of, I had every reason to believe

17   CSBG funds were used.

18       Q.    Did Mr. Kakeh tell you, during this first

19   meeting, that UPO was using CSBG funds to purchase

20   a boat?

21       A.    Yes.

DEPOSITION OF TONDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

54

1    Q.    That allegation, if true, would be fraud,

2    waste and abuse.  Correct?

3    A.    If there was no program purpose for the

4    boat, it would be fraud, waste and abuse.

5    Q.    He told you during the first meeting there

6    was no program purpose for the boat?

7    A.    He did.

8          And other people were not aware that the

9    boat existed.  If there was a boat for program, it

10   would be common knowledge.

11   Q.    During the first meeting Mr. Kakeh told

12   you UPO purchased a boat using CSBG funds and that

13   the boat had no program purpose.

14         And if those allegations were true, that

15   would constitute fraud, waste and abuse.  Correct?

16   A.    It would.

17   Q.    Did Mr. Kakeh tell you, during the first

18   meeting, that any other items were purchased by UPO

19   with CSBG funds that were not for program purposes?

20   A.    He had knowledge that travels that had

21   taken place and cell phone charges that were being

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

55

1    abused and that is the extent of my recollection on

2    details.

3         Q.    Did Mr. Kakeh tell you, during the first

4    meeting, that Ben Jennings had made credit card

5    charges that were paid for by CSBG funds for

6    personal use?

7         A.    Yes, he did, he did put us on the that,

8    yes.

9         Q.    During the first meeting?

10        A.    Correct, the first or second meeting.

11        Q.    And he did indicated, during the first or

12   second meeting, that there were cell phone charges

13   for Ben Jennings, for business and for personal

14   calls not program-related and they were paid for

15   with CSBG funds?

16        A.    The bills were exorbitant and it was his

17   assumption they could not be program-related.

18        Q.    You investigated the cell phone charges?

19        A.    Yes.

20        Q.    Based on what he told you during the first

21   and second meeting?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

56

1     A.    Correct.

2     Q.    You investigated the credit card charges

3    on what Mr. Kakeh told you during the first and

4    second meeting.  Correct?

5     A.    We investigated it based in part of what

6    he investigated.  Correct.

7     Q.    You found out credit charges were not

8    program-related?

9     A.    Or portions of the credit charges were not

10   for program services.

11    Q.    What portion?  A majority of credit card

12   payments?

13    A.    We required the UPO auditor to segregate

14   the charges that they would deem appropriate for,

15   to be charged to the program and that was my

16   contention, throw everything out and say there was

17   no program charges.

18          And we started from that and the agency

19   produced documents that led us to a new start to

20   work our way into a lot of things as allowable

21   charges.  It was later resolved.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

57

1       I don't remember the amounts.  There will

2   be records that would spell that out.

3       Q.  Credit card charges--a fairly significant

4   portion of credit card charges were deemed to be

5   non program related?

6       A.  It started out very large and I think it

7   dwindled down with UPO rebuttal and production of

8   documents, it still, in my opinion, was

9   significant.

10      Q.  Significant enough to constitute fraud,

11  waste and abuse?

12      A.  Correct.

13      Q.  The cell phone charges, were any of those

14  determined to be non program related?

15      A.  They were and they would be considered

16  fraud, waste and abuse.

17      Q.  You indicated that as far as the boat was

18  concerned, the boat purchase you investigated that

19  because of what Mr. Kakeh told you during the first

20  meeting?

21      A.  Correct.

59

1          During the first meeting with Mr. Kakeh,

2     he mentioned to you there was a $10,000 loan given

3     by UPO to the treasurer and that was charged to the

4     CSBG grant?

5          A.   Yes.

6          Q.   That disclosure by him caused you to

7     conduct an investigation of that.  Correct?

8          A.   Yes.

9          Q.   When you conducted the investigation, you

10    found that the loan was an improper expenditure of

11    CSBG grant funds?

12         A.   It was improper and not to the knowledge

13    of the board of trustees of UPO.

14         Q.   That loan, in and of itself, constituted

15    fraud, waste and abuse?

16         A.   Yes, in my opinion.

17         MR. MELEHY:  I suggest we take a lunch

18    break now.  Off the record to return at 12:45.

19         (Whereupon, a luncheon recess was taken at

20    12:00 to resume at 12:45 p.m.)

21         BY MR. MELEHY:

63

1      Q.    Was that meeting pre scheduled?

2      A.    Yes, that would be the entrance interview.

3      Q.    How much in advance of when it took place

4  was it scheduled?

5      A.    At least 30 days.

6      Q.    Was there any written correspondence to

7  that effect?

8      A.    I believe there would be, yes.

9      Q.    When you brought in the MICA people?

10     A.    MICA group.

11     Q.    The MICA group, was that part of the

12  monitoring process?

13     A.    Yes, it was.

14     Q.    Had that been pre scheduled?

15     A.    No, it was not.

16     Q.    Was that an audit?

17     A.    No, program management exercise.

18          MR. MELEHY:  Have this document marked as

19  the next exhibit.

20          (Eboda Deposition Exhibit No. 2 was marked

21  for identification.)

DEPOSITION OF GWENDOLYN BOYD
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

65

1      A.    Correct.

2      Q.    At the time you wrote this letter, you

3   knew you had retained MICA.   Correct?

4      A.    Correct.

5      Q.    You indicated, in the next sentence, As

6   discussed during recently concluded CSBG second

7   quarterly meeting on January 30, 2004, and

8   subsequently at the preliminary on February 18, the

9   exercise will be begin.

10          Does that sentence--you wrote the

11   sentence.   Correct?

12      A.    I believe, yes.

13      Q.    Does that refresh your memory, at all,

14   when the quarterly meeting was?

15      A.    It said, now--we had a quarterly meeting

16   at the end of January of 2004.

17      Q.    At that time, this letter seems to

18   indicate that the March 1 date for the monitoring

19   process was discussed on January 30, 2004?

20      A.    No, the February 18 date wasn't discussed

21   on January 30.

DEPOSITION OF CHRISTINE MIRZAYAN SOUDA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

66

1    Q.   All right, fine.

2         Now, you said you had two to three

3    meetings where Mr. Kakeh--did you have any phone

4    conversations with Mr. Kakeh either before or after

5    February 18, 2004?

6    A.   At a minimum, there would have had to have

7    been at least one phone conversation to set up my

8    face-to-face contact with him before February 18.

9    Q.   You are saying you had a phone

10   conversation with him prior to your first meeting

11   with him?

12   A.   Correct.

13   Q.   Did you have a conversation with him prior

14   to your second meeting with him?

15   A.   It is entirely possible we also set that

16   up by phone, yes.

17   Q.   Prior to February 17, did you meet with

18   any officials at UPO?

19   A.   There was frequent contact between my

20   office and their offices, yes, most definitely

21   after the quarterly meeting on January 30.

DEPOSITION OF FARUK BHODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

67

1     Q.    After meeting with Mr. Kakeh, after

2    speaking to him on the phone in February, did you

3    have any meeting with any UPO people prior to

4    February 17?

5     A.    I don't recall that there was.

6     Q.    When did you have your first meeting with

7    any officials or employees of UPO other than Mr.

8    Kakeh in February?

9     A.    During the entrance interview or the

10    January 30 meeting.

11     Q.    Based on this letter, what you wrote

12    February 18, 2004 as being the entrance interview

13    date, do you agree with that?

14     A.    Yes.

15     Q.    The entrance interview lasted one day.  Is

16    that right?

17     A.    A portion of the day, maybe an hour, we

18    went right after the entrance interview and started

19    conducting interviews of staff.

20     Q.    February 18, 2004, how long were you at

21    UPO?

68

1      A.    For the whole day, from the time we

2  conducted the entrance interview through later

3  afternoon, maybe 4:00.

4      Q.    You were there 9:00 to 4:00?

5      A.    Thereabouts.

6      Q.    During that time, who did you meet with?

7      A.    I met with Mr. Jennings, Gladys Mack,

8  talked with Ben Jennings.

9            He conducted, participated in the entrance

10  interview by a telephone call, by phone, speaker

11  phone.

12      Q.    You talked to Ben Jennings, you talked to

13  Gladys Mack?

14      A.    And Sheila Shears.

15      Q.    You talked to Sheila Shears, Gladys Mack

16  and who else?

17      A.    Mr. Amin.

18      Q.    Who else?

19      A.    I don't recall, but I may be able to

20  locate notes that might refresh my memory on that.

21            MR. MELEHY:  We got some notes, but I

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

74

1    contract related to a contract for purchase or

2    lease of a boat during February 18, 19 or 20?

3        A.    I don't believe so.  At some point, I know

4    we honed in specifically on the contract for the

5    boat.  We asked for that.

6        Q.    When was that?

7        A.    I don't recall.

8        Q.    Was it before March 1?

9        A.    I don't believe so.  It may have been the

10   week of March 1.

11       Q.    You asked the general counsel for that?

12       A.    Correct.

13       Q.    During February 18, 19 and 20, did you

14   talk with Ben Jennings, Ms. Mack or Ms. Shears

15   about credit card expenditures?

16       A.    I know specifically we talked to Ms.

17   Shears about credit card expenditures.

18            I remember what triggered that was there

19   were frequent amounts of wire transfers that were

20   being made by the agency and we wanted to see what

21   the purpose of that was, they were present and we

DEPOSITION OF FUNDE PEODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

75

1    asked Ms. Shears that question.

2            She produced for us memos authorizing her

3    to make those transfers.  They were authorization

4    memos.

5            I recall our reaction was that the memo

6    did not state in detail what was the purpose of the

7    wire transfers other than money was to be

8    transferred to this account, gave that account

9    number and to this account and gave that account

10   number.

11           To follow up on that, we were told this

12   money was being used to make credit card payments

13   the agency needed to make.

14           That is what triggered the questions about

15   credit cards and what are we paying for and buying.

16   Q.    When?  Did you ask about the wire

17   transfers February 18, 19 and 20?

18   A.    I believe so because I remember that was

19   my staff and I was there, initiated the line of

20   asking of Ms. Shears, my team did not get in place

21   until March 1.

DEPOSITION OF FUAD KUREODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

76

1    Q.    When you asked for the information, did

2    you have documentation regarding the wire transfers

3    at that time?

4    A.    I don't recall that we did.  I don't

5    recall.

6    Q.    Why did you ask for wire transfer

7    information at that time?

8    A.    We may have been alerted to that by Mr.

9    Kakeh.

10    Q.    You were told the wire transfers were used

11    to pay credit cards?

12    A.    Maybe, they were wire transfers, we don't

13    know what it was being used for or what it was

14    buying or paying for.

15    Q.    Did Ms. Shears ask you why you were asking

16    about wire transfers?

17    A.    No, she answered our questions.  She was

18    saying she was acting on instructions from Mr.

19    Jennings.

20    Q.    When you first did the interview of the

21    18th with Mr. Jennings and Ms. Mack, you brought up

77

1    the issue of the deficit.  Correct?

2        A.    I don't recall.  I may have.  I don't

3    recall.

4        Q.    Do you recall them asking you how you knew

5    about the deficit?

6        A.    I don't remember when they asked, but I

7    know the question came up at some point during our

8    exercise.  I don't know whether it was the initial

9    meeting in the middle of February or the team

10   exercise we conducted beginning March 1, 2004.

11       Q.    Who asked you how you knew about the

12   deficit?

13       A.    It was not so much who asked me--it was

14   more like, Who said we are running a deficit?

15             More like, We don't believe we are running

16   a deficit.

17             And I can assure you that Ms. Mack or Mr.

18   Jennings asked.

19       Q.    They asked you that?

20       A.    Correct.

21       Q.    When they asked you, how did you answer?

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

78

1      A.   I think I pointed to the financial

2  statement that was provided to us by the finance

3  office and may have come from Mr. Kakeh or Ms.

4  Shears.

5           Ms. Shears was the person officially that

6  was head of the finance office and we directed our

7  government requests to her.

8      Q.   Mr. Kakeh also gave you financial

9  statements?

10     A.   Yes.

11     Q.   He gave them to you first?

12     A.   At the entrance interview, gave them to me

13  or showed them to me, I know he produced the

14  documents.  He showed us.  It is entirely possible

15  I had copies, yes.

16     Q.   When you went into UPO on February 18, you

17  had a copy of the financial statement.  Correct?

18     A.   I don't recall if I did.

19           It is possible I did.

20     Q.   When you were asked, at some point, how

21  you knew about the deficit, you pointed them to the

79

1    financial statement?

2    A.    Correct.

3    Q.    Did you indicate Mr. Kakeh had given them

4    to you?

5    A.    I very well may have.  I could not have

6    gotten them other than from the comptroller's

7    office.

8    Q.    Did they say anything to you about Mr.

9    Kakeh or ask you any questions about him at any

10   time in February or March?

11   A.    Questions of what nature?

12   Q.    Did, at any time in February or March, did

13   any official of UPO or employee of UPO tell you not

14   to deal with Mr. Kakeh?

15   A.    Yes.

16   Q.    Who told you that?

17   A.    I believe it was Ms. Mack.  I was told to

18   only deal with Ms. Shears as the head of that unit.

19   Q.    When did Ms. Mack say that to you?

20   A.    I don't recall the precise date.

21   Q.    Was it March or February?

80

1    A.    I believe it was February.  I think she

2    identified for us who had responsibility for the

3    finance office because in the entrance interview,

4    in going next after her office to the finance

5    office, and she identified Ms. Shears as the person

6    we should deal with when we interviewed Mr. Amin.

7    That was after we interviewed Ms. Shears.

8    Q.    When you interviewed Mr. Amin, it was

9    against the directive of Ms. Mack?

10    A.    I don't think they would give us a

11    directive.

12          They identified for us who, in their

13    opinion, was responsible or acting on their behalf

14    in the finance office and they identified Ms.

15    Shears not Mr. Amin.

16    Q.    They told you--I want to make sure I

17    understand, but I don't want to put words in your

18    mouth.

19          Did Ms. Mack say, Don't deal with Mr.

20    Kakeh, go to Ms. Shears?

21    A.    That is what I recall, yes.

1    Q.   At that time, did you have any inkling

2    that Mr. Jennings was the one who was charging up

3    these personal expenses against the CSBG contract?

4    A.   We had not honed in on anybody.  We were

5    following where the paper trial led us.  There were

6    only a few credit cards we were told the agency

7    controlled and two of them, as I recall, one was in

8    the possession of Mr. Jennings.

9    Q.   When Mr. Ms. Mack said to you, Don't deal

10   with Mr. Kakeh, did she explain why?

11   A.   I think she pointed to the records I

12   got--the financial statements I got and said it was

13   inaccurate or wrong or something to that effect,

14   asserting she does not believe they are running a

15   deficit to that extent.

16   Q.   The financial statements you had, at that

17   time, did she indicate to you Mr. Kakeh had

18   prepared those financial statements?

19   A.   I don't think there was any question he

20   did, but she did not indicate.

21   Q.   She understood?

1      A.   She understood his function was to prepare

2  those statements for them and we had a copy.

3      Q.   She indicated to you he prepared the

4  financial statements in your possession

5  inaccurately?

6      A.   I think she said she doesn't believe the

7  numbers reflect what she believes to be the true

8  situation, that deficits were not that large.

9      Q.   She was basically saying to you, Don't go

10  to Mr. Kakeh, he does not possess accurate

11  information or had at least made some mistakes?

12      A.   Correct.

13      Q.   The financial statement you had in your

14  possession that was allegedly inaccurate, did that

15  come from Mr. Kakeh?

16      A.   I believe that it did, yes.

17      Q.   Ms. Shears understood that it came from

18  Mr. Kakeh?

19      A.   Yes, yes, I believe.

20      Q.   She understood, at the time she said don't

21  deal with Mr. Kakeh?

DEPOSITION OF TANGO ZBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

83

1     A.   I believe she did.

2     Q.   What did she say to you that made you

3   believe she understood that?

4     A.   The responsibility from prior contacts

5   with the agency was clear that Mr. Kakeh produced

6   such documents and had responsibility for producing

7   such documents.

8     Q.   Tell me about the prior communications

9   with the agency.  Who was it with and when was it?

10    A.   We had, in 2002, conducted a monitoring

11  exercise in which Mr. Kakeh was also a person that

12  we interviewed and reviewed records of.  During

13  that exercise, he had shared similar documents with

14  us for the period of that exercise.

15    Q.   Now, during February or March did you have

16  any other communications with any UPO people about

17  Mr. Kakeh--either things he produced, financial

18  statements, things he did, the nature of his

19  position, anything that to that effect?

20    A.   It is entirely possible.

21         I don't recall any specifics.

86

1    Q.    Was that done by February 25, the letter?

2    A.    Yes, we went in March 1 and stayed on the

3    ground for the most part of that week conducting

4    interviews of the board of trustees, members of

5    management, program managers with UPO and perhaps

6    staff; reviewed documents; set up appointments to

7    talk to independent auditors of UPO.  That occurred

8    during that exercise.

9    Q.    How many days did you spent there during

10    that period?

11    A.    Five days a week, by the end of that week

12    we had made a request to address the entire board.

13          And the rules say we have to give them

14    three days' notice to convene the full body of the

15    board outside of what is previously scheduled as a

16    regular meeting.

17          I believe we made that request on Monday

18    to give them three days.

19          And I asked, I addressed the entire board

20    March 11 sharing with them preliminary findings of

21    our exercise and insisting that they take seriously

87

1    some of these actions, some of those findings and

2    take some actions, and that was the evening of

3    March 11.

4        Q.   How long did that meeting last?

5        A.   We started about 6:30, 7:00 and I think we

6    were there until past midnight.

7        Q.   Was the meeting solely concerning the

8    investigation?

9        A.   Solely concerning the monitoring exercise.

10       Q.   Were meeting minutes kept?

11       A.   The agency had responsibility for that.  I

12   believe they did.

13       Q.   Did they record the meeting?

14       A.   Part was in open session.  They had a

15   period where they asked me and my staff to leave

16   and went to closed session.  I don't know the

17   policy.

18       Q.   Was the session where you were there tape

19   recorded?

20       A.   I don't know.  I know there is a

21   designated person that takes notes, a staff person

88

1    that is designated to take notes to later be

2    developed into a minutes of the meeting.

3         Q.   Who was that, do you know?

4         A.   Josephine Thompson, she is special

5    assistant to the board of UPO.

6         Q.   At that meeting, who was there other than

7    the board members, was Ben Jennings there?

8         A.   Yes.

9         Q.   Was Ms. Shears there?

10        A.   Ms. Shears was there, yes.

11        Q.   Was Gladys Mack there?

12        A.   Ms. Mack was there, yes.

13        Q.   Was anybody else there from UPO?

14             Was Mr. Kakeh there?

15        A.   I don't recall that he was.

16             He was not, as a matter of fact.

17        Q.   Who else from UPO, do you know?

18        A.   Other than management staff, I couldn't

19   name anybody else outside of that group.

20        Q.   Did Mr. Kakeh's name come up, at all, ever

21   during the board meeting that day?

DEPOSITION OF TEMO TCHEBOUA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

89

1     A.   I don't recall.

2     Q.   Did you discuss the financial statements

3  that he complied?

4     A.   Yes.

5     Q.   What did you say?

6     A.   I think I referred it to it as documents

7  produced by the finance office.

8     Q.   Did you say the document indicated a $2

9  million deficit?

10    A.   I imagine we would have highlighted that

11 because it was significant.

12    Q.   At that time, did you agree there could

13 have been or was a $2 million deficit?

14    A.   I had no reason to doubt it because the

15 document I had been looking at and I shared with

16 the team I had developed seemed to be reasonable so

17 that we believed it.

18    Q.   What else?  Did you tell the board there

19 had been fraud, waste and abuse?

20    A.   Yes, we made statements to that effect.  I

21 don't know whether we used those--we were careful

DEPOSITION OF TEMEJI EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

90

1    to not prejudice what we know, what an

2    investigation through the IG's office might uncover

3    not specific to matters.

4        Q.   Did you indicate to the board that you had

5    concluded or your team had concluded that UPO

6    misused or misspent CSBG grant monies?

7        A.   We did most definitely.

8             What I believe also came up at that time

9    was that we would be disallowing--I don't recall

10   what the number was we threw out, we would be

11   disallowing what UPO had spent on some of these

12   other activities, the cell phone, travel, credit

13   cards and that kind of stuff unless they could

14   legitimate it.

15       Q.   What was Ben Jennings' reaction to all of

16   this?

17       A.   He was quiet for the most part and when he

18   spoke, he spoke, I believe the president of the

19   board was sitting next to him and he was asked to

20   leave the room at the time the board went in a

21   private session.

DEPOSITION OF TEMBE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

91

1        We convened together, it was announced

2   that Mr. Jennings was being suspended effective

3   immediately.

4        Q.   How did he react to that?

5        A.   I wasn't very focused on him, on trying to

6   read what his reaction was.

7        Q.   Was it fair to say your report indicated

8   Mr. Jennings may have committed serious wrongdoing?

9        A.   To the extent we could determine there was

10  at the very least mismanagement of CSBG funds, yes.

11       Q.   Misappropriations of those funds as well?

12       A.   I would surmise so, yes.

13       Q.   At that time, is it fair to say, at that

14  time, based on your conversations with the board,

15  Mr. Jennings, Ms. Mack, and Ms. Shears, that they

16  understood that the source of your information, in

17  part, at least, was Mr. Kakeh?

18       A.   I think it--everything pointed to him.  I

19  know, at some point later, I disclosed the fact he

20  was cooperating and being helpful to us.

21       I think I may have done that months later

DEPOSITION OF FANDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

92

1    when the new management team was formed.

2        Q.    When did you indicate to new management,

3    what month or year, that Mr. Kakeh had been

4    cooperating with you?

5        A.    The new management team came in, the board

6    first created a management ad hoc management team.

7    This was composed of about five members of the

8    board that assumed from March 11, when they

9    suspended Mr. Jennings, they formed an ad hoc

10   management team that was managing the day-to-day

11   operations of the agency.

12       I believe I disclosed to at least one

13   member of that team, the co chair of the ad hoc

14   management team, Ms. Alexis Robertson, that Mr.

15   Kakeh had been a highly valuable resource to us and

16   I encouraged her to have a meeting with him and get

17   more cooperation or information from him.

18       Q.    Did she do that?

19       A.    I believe the meeting happened.  I don't

20   recall if it was one that I sat in on because there

21   was a meeting with Ms. Robertson, Mr. Kakeh and

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

93

1    myself that took place.

2              I don't know, outside of the one that I

3    recall, I don't know if any other meetings took

4    place outside of the one I recall.

5         Q.    When did you disclose this to Alexis

6    Robertson?

7         A.    Shortly after the budget.

8         Q.    That would be March?  April.

9         A.    It would be March.

10        Q.    March of 2004?

11        A.    Correct.

12        Q.    Did you indicate this to anybody else, at

13   any time, that Mr. Kakeh had been cooperating with

14   you?

15        A.    By the time we were substantially into the

16   exercise I no longer, it was clear to me it was out

17   there, I no longer took extra precautions to

18   conceal that it may have happened.

19              As a matter of routine, if any document we

20   were looking at came up, I think I would identify

21   it, if I got it from Mr. Kakeh, I would say I got

1    it from him.

2        Q.    Do you recall specifically saying to

3    anybody at UPO that you got particular documents,

4    financial documents, from Mr. Kakeh other than what

5    you indicated earlier?

6        A.    I don't recall specifically, but, again,

7    it is all flowing at this time and mostly I think

8    Mr. Kakeh himself, on occasion, referred us to,

9    directed our requests through Ms. Shears, who was

10    CFO.

11        And formally, I think we continued to deal

12    with Ms. Shears and it was only for cultural

13    reasons and almost very quickly we went to

14    Mr. Amin.

15        Q.    You indicated earlier, maybe a minute ago,

16    when I asked you about whether people at UPO not

17    about the board, but whether management knew Mr.

18    Kakeh was the source of a lot of information, and

19    you indicated that, at that time, I guess you were

20    referring to March or April, it was clear to you

21    this was out there.

95

1          Do you mean it was clear to you in March

2   or April that members of management knew that Mr.

3   Kakeh had been the source of your information?

4          A.    That is my belief.  The majority of the

5   documents we were looking at came from the finance

6   unit.  Ms. Shears was not the author of many of

7   those documents.

8          Mrs. Amin, by responsibility, had produced

9   those documents and we had a number of those

10  documents.

11         Q.    What documents, in particular, are we

12  talking about?

13         A.    Financial statements, balance sheets,

14  other financial-related documents, bank statements,

15  reconciliation documents.

16         Q.    Those documents, did any of those

17  documents show, to any degree that money, non

18  program funds were being charged to the CSBG grant?

19         A.    As far as the CSBG budget originally

20  submitted by UPO was concerned, yes, there was a

21  number of items out of line, not included in the

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

98

1    following protocol, which is to ask Ms. Shears

2    first, she would say, I can get it from Amin or you

3    can get it from Amin, something to that effect.

4        Q.    They were aware of the fact you had gotten

5    some documents from Mr. Amin?

6        A.    Prior to my visit?

7        Q.    Yes.

8        A.    I did not disclose that, but I did

9    disclose that I had talked to him, the initial

10   status, I think the time I may have been completely

11   open about Mr. Amin was first when the old

12   management was no longer at the helm of the

13   organization.  The ad hoc management was there and

14   when the interim executive director was hired at

15   the beginning of April, I also disclosed it.

16       Q.    You mean Dana Jones?

17       A.    Yes.

18       Q.    What did you say to Dana Jones about Mr.

19   Kakeh's cooperation with you?

20       A.    I said that we appreciated it and that it

21   was--we found it highly relevant.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

102

1    A.    Yes, yes, because as part of the entrance

2    exercise we conducted I felt that we identified

3    Mr. Jones for the board of UPO, so I felt obligated

4    to assist him to succeed in every possible way.

5    Q.    You recommended to the board Mr. Jones be

6    hired as interim executive director?

7    A.    I recommended that he be considered, yes.

8         The discretion to hire him was that of the

9    board.  They interviewed him.  Yes, I came up with

10   his name and suggested his name to the board on the

11   board's request to me to help, to recommend for

12   them what they can do, and I had tests and reasons

13   I applied to come up with Mr. Jones.

14   Q.    As time went by after Mr. Jones, you made

15   this recommendation that Mr. Jones deal with Mr.

16   Kakeh, did you sense that his welcoming of the

17   recommendation, the feelings he had about it

18   changed?

19   A.    He, in fact, told me that he no longer

20   believed that Mr. Kakeh can produce for him the

21   kind of assistance that he needed in the financial

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

103

1    office.

2         Q.    When did he tell you that?

3         A.    When he was talking about his decision to

4    use another group that he was familiar with, that

5    had done some work for him, right around the first,

6    maybe second or third week.

7         Q.    Are we talking late April of 2004?

8         A.    Mid to late April, correct.

9         Q.    What was your response when he said that

10   to you?

11        A.    Well, the group he identified I recall

12   that my office objected to the involvement of that

13   group primarily because they had also been involved

14   in old management that in our eyes had been become

15   discredited, so I raised an objection to it.

16        Q.    What was the name of the group?

17        A.    I don't recall.

18        Q.    Walker?

19        A.    No, this was before Walker.

20        Q.    F.S. Taylor?

21        A.    Correct.

DEPOSITION OF FUNDE BODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

104

1      Q.    Did that group get involved?

2      A.    They were not at the helm as it was being

3   proposed and Mr. Jones seemed to, at that time,

4   respect the reason, the opinion we had offered as

5   to our concerns with F.S. Taylor being at the helm

6   of the group that would manage financial affairs of

7   the agency.

8      Q.    Was F.S. Taylor already discharged?

9      A.    They still remained involved in some

10  capacity, but we were told that the request for

11  application issued for a qualified person or group

12  to come up to accept the management of that agency,

13  we were told there were three candidates and Walker

14  & Company was selected by the board based on,

15  number one, the credentials, two, the bid they had

16  quoted to do the work for.

17     Q.    Did you object to Walker & Company?

18     A.    We objected to the idea of an outsourced

19  entity, mainly.

20     Q.    You objected to outsourcing?

21     A.    Outsourcing the division mainly on cost

105

1    savings grounds, we asked the question about what

2    UPO was doing about the accounting staff.

3    Everybody was still intact.

4         We felt that we were expending excessive

5    monies of quality control with CSBG funds while

6    maintaining staff that we could be using to do some

7    of this work.

8         Q.    Did UPO continue to employ Walker &

9    Company?

10        A.    It was their prerogative to do so, we

11   could offer opinion and advice.  It was up to the

12   board and to the corporation to decide how they

13   were going to run UPO, correct.

14        Q.    Did you recommend any restructuring of the

15   finance department of UPO other than what you have

16   already mentioned?

17        A.    I know we pointed out the fact that if

18   they were going, it was discussed if they were

19   going to disband the entire finance staff, they

20   would have to demonstrate to us they had given them

21   sufficient training to do that job and they had

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

107

1    toward Amin Kakeh?

2        A.    I couldn't tell you.  I don't know.

3        Q.    Did Mr. Jones express to you, at any time,

4    in any way, shape or form he was considering

5    dismissing Mr. Kakeh or eliminating his position?

6        A.    He did, at some point, yes.

7        Q.    What did he say to you and when?

8        A.    I don't recall when, but I think it was to

9    the effect that he was now going to rely on Walker

10   & Company for information that he needed from the

11   finance office and that he will have to let Mr.

12   Amin go.

13       Q.    Was that in May?

14       A.    It may have been in May, yeah.

15       Q.    Could have been April or May?

16       A.    Correct.

17       Q.    Let me tell you a fact--he got his letter

18   saying the position was eliminated June 4, 2004.

19       A.    It could have been May, my posture when

20   the interim executive director came in was to be

21   available if he requested assistance from me, but I

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

108

1    did not press or impose as I imagined some very

2    quick settling down and some work, there was not

3    much contact other than phone checking in during

4    April.

5        We met face to face maybe a couple of

6    times, so it could have been May.

7        Q.    When he told you that, did he give you a

8    reason why he wanted to let Mr. Kakeh go?

9        A.    I don't recall what his reasons were, but

10    I remember I sought clarification of whether Mr.

11    Kakeh was being RIFed or whether he was being

12    fired.

13        At that point, Mr. Jones told me Mr. Kakeh

14    produced bad reports for him or something to that

15    effect.

16        My assumption was that Mr. Kakeh was being

17    fired based on poor performance.

18        I later understood from Mr. Jones no, he

19    was being RIFed.

20        Q.    In one conversation you got the impression

21    that, from Mr. Jones, that Mr. Kakeh was being

110

1    think it was just a matter of courtesy, him

2    informing my office.

3        Q.    Let me make sure I understand.

4              You indicated earlier that, at one point,

5    Mr. Jones indicated to you he was letting Mr. Kakeh

6    go and Mr. Kakeh's performance was poor?

7        A.    Not specifically performance, but that he

8    had made, alluded to reports he got from him or

9    reports he was getting from him were wrong or

10   inaccurate.

11       Q.    In other words, he said to you I am

12   letting Mr. Kakeh go and he commented about Mr.

13   Kakeh's poor performance in producing reports?

14       A.    That is fair, yes.

15       Q.    In that conversation, he never mentioned

16   eliminating Mr. Kakeh's position.  Correct?

17       A.    I don't think he had that detailed

18   discussion with us, no.

19       Q.    Later, he told you he had or was going to

20   eliminate Mr. Kakeh's position, RIFing him?

21       A.    My assumption was they were letting Mr.

DEPOSITION OF LARRY KAOUODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

111

1    Kakeh go based on the report, what I call

2    performance deal.

3           I later learned either after he left or

4    somehow I learned that it was not a firing, it was

5    a RIF.

6    Q.    You didn't necessarily learn that from

7    Mr. Jones?

8    A.    I don't recall I did.  I don't know, to be

9    honest.

10   Q.    Could you say when you learned that it was

11   after the fact?

12   A.    Yes, I believe.

13   Q.    When you had the first conversation about

14   letting Mr. Kakeh go and bad financial reports,

15   that was before he was let go?

16   A.    Before he was let go--just a minute.

17          (Witness and counsel confer.)

18          THE WITNESS:  I recall that, in my

19   conversation with Mr. Jones, I sought to clarify

20   whether Mr. Kakeh was being fired or he was being

21   RIFed.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

112

1          And the justification they gave me

2    suggested to me he was going to be fired.

3          On the other hand, what I was also getting

4    was he was going to be RIFed.

5          My assertion was if his work is not good,

6    then the more logical thing would be for him to be

7    fired.

8          I recall that my specific concern was that

9    my exercise was not used as an excuse to do

10   what--they had not developed, as I said, generally

11   relating to the entire accounting division, that

12   the exercise was not used to bitterly dismiss staff

13   without having done what I considered to be staff

14   development, evaluation and a determination who

15   they would keep and not keep.

16          I think that was line of my discussion

17   with him regarding the issue of whether to--

18    Q.   When you had the first discussion with him

19   about letting Mr. Kakeh go, did Mr. Jones mention,

20   during that conversation or prior to it, that he

21   was going to let go other people in the finance

117

1    UPO.

2         We also talked about that, but linking

3    Walker & Company to dismissing Mr. Kakeh, I don't

4    recall in detail that he--if that happened.

5         Q.   So he, Jones, didn't tell you, during that

6    discussion, basically we are letting Mr. Kakeh go

7    so Walker can run the financial department of UPO?

8         A.   I don't recall.

9         Q.   You didn't get that impression that Walker

10   & Company was there to take over Mr. Kakeh's

11   functions?

12        A.   I don't know that I processed that in that

13   way.  I don't recall what was going on in my mind.

14        Q.   You objected to using Walker & Company to

15   staff the financial department?

16        A.   Only because it was duplicitous, we had

17   staff we were maintaining.  I believed we could

18   have given some support to staff, and I believe

19   they would have been able to, number one, they had

20   the history and they had, at that time, a CFO,

21   controller, and a deputy controller, budget

DEPOSITION OF TONDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

126

1    A.    There was a nearly completed report that

2    we shared with them, consistent with the practice

3    of prior monitoring exercises of sharing the draft

4    report with them before we finally released it.  It

5    will give us an opportunity to be balanced, give us

6    an opportunity to receive comments that will give

7    the report a great deal more balance.

8    Q.    Did you share Exhibit 4, your  August 6,

9    2004 draft, did you share that with UPO before you

10   completed it?

11   A.    I believe we shared it with them before it

12   was marked completed by me.

13   Q.    Before the subsequent draft was completed?

14   A.    Yes.

15   Q.    Did you share that particular document

16   with them before you completed the draft?

17   A.    After this document was developed, we

18   still had reason to go out, maybe as a result of

19   sharing this document, we said go take a look at

20   some more things, put some members of the original

21   team to go out in September.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

127

1       This is all consistent with the practice

2   we have used in the prior years, sharing draft

3   reports.

4       Q.   You shared it with them after it was

5   completed, the August 6, 2004 draft?

6       A.   It is possible.

7       Q.   You don't know for sure?

8       A.   I don't know for sure.  I know we shared a

9   version of the final report with them prior to the

10  final, final report we released.

11      Q.   I will read you a portion of the last

12  paragraph, These efforts are apparent and

13  appreciated.  Many staff members continue to

14  quietly, but competently do a good job under what

15  are clearly difficult circumstances.  We

16  particularly wish to commend the UPO controller,

17  Mr. Amin Kakeh, for his forthrightness and

18  commitment to do the right thing during the on-site

19  review and thereafter, even at peril of losing his

20  job.  The on-site monitoring review team found him

21  both knowledgeable and credible and regrets that he

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

128

1    appeared to be the unfair target of a reduction in

2    force action by the agency.

3          Why did you write the part about He

4    appears to be the unfair target of a reduction in

5    force by the agency?

6    A.    As I stated earlier, I had sought to be

7    clear about what the nature of Mr. Amin's

8    separation was, sought to be clear by talking to

9    Mr. Jones, and I had believed that he was being

10   fired for poor performance.

11         I was then aware that it was, in fact, he

12   was being RIFed.

13         My concern that I sought to resolve was so

14   that not a person that I had identified as

15   cooperating with the monitoring exercise now be

16   RIFed.

17         And I just did not receive a satisfactory

18   response from management that, in fact, they were

19   not doing that because you remember clearly I said

20   Well, if his performance is not good, then the

21   appropriate action I would expect to see was a

129

1    termination based on poor performance.

2          What I seemed to be getting was that he

3    was being RIFed because they no longer had need for

4    his services because they had outsourced to an

5    operation that was going to assume responsibility

6    for operations of the accounting unit.

7          Q.   Why did you refer to the RIF as unfair?

8          A.   Well, I may have interjected in there some

9    emotions based purely on the fact that we had, I

10   had identified this individual to staff, to

11   management as a person that cooperated with me and

12   I felt at the time if his cooperation, if his

13   cooperation with my office was costing him his job,

14   I believe he was doing the right thing and doing

15   the right thing should not cost you your job.

16         Q.   Did you believe his cooperation with you

17   cost him his job at the point you wrote this,

18   August 6, 2004?

19         A.   Yeah, that was what I believed.

20              I was assured that was not the case.

21         Q.   Who assured you?

DEPOSITION OF RODNEY FODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

132

1    community action, has offered expertise, acumen,

2    and energy to seeing that UPO evolve as a strong

3    and viable entity in the future.  These efforts are

4    apparent and appreciated.  Many staff members

5    continue to quietly, but competently do a good job

6    under what are clearly difficult circumstances.

7           We particularly wish to commend the former

8    UPO controller, Mr. Amin Kakeh, for his

9    forthrightness, high ethical convictions

10   professionalism and commitment to his duties during

11   the 2004 on-site monitoring exercise.

12          The state CSBG office found him both

13   knowledgeable and credible and regrets the manner

14   of his separation from the agency in what appeared

15   to be a retaliatory action by UPO management for

16   his cooperation with the state CSBG review team.

17          My question really goes to the last part

18   of the last sentence there, Regrets the manner of

19   his separation from the agency in what appeared to

20   be a retaliatory action by UPO management for his

21   cooperation with the state CSBG review team.

133

1          What made you, in December of 2004, change

2    your statement from unfair RIF to the conclusion

3    Mr. Kakeh had been terminated in retaliation for

4    cooperating with your office?

5          A.   I can't say there is any one thing other

6    than the fact this was still, I had many documents

7    in development, I had many iterations of this

8    document beyond talking about drafts that I made,

9    continued to work on.

10         Q.   You don't remember why your statement in

11    the December 1, 2004 draft was different from your

12    statement in the August 6, 2004?

13         A.   Actually, when you were reading, I thought

14    you were reading the same thing.

15              I do recognize now that, I see what you

16    are pointing to.

17              Now, I don't recall any specific reason

18    why, you know, some of the wording might have

19    changed.

20         Q.   Did you share the December 1, 2004 draft

21    with UPO?

Case 1:05-cv-01271-GK    Document 78-13    Filed 02/27/2007    Page 86 of 94
DEPOSITION OF THEODORE BOLDEN
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

137

1    reached out with me verbally either before I think

2    I wrote this letter or after I wrote this letter,

3    but I recall--

4        Q.    Who raised it with you?

5        A.    Mr. Jones.

6        Q.    What did he say and when?

7        A.    I think he said, after I asked him for

8    comments on the report that we had delivered to

9    him, I think he said it was being looked at.

10           And subsequently he told me he had some

11   problems with some of the items contained in the

12   report.

13       Q.    Did he specifically tell you that he had a

14   problem or that he and others at UPO had a problem

15   with that statement on page 4?

16       A.    He did say something about a lawsuit.

17           I was not aware of the lawsuit.

18           I knew about an administrative complaint

19   that was filed with the D.C. Human Rights Agency.

20           He said something about a lawsuit.

21       Q.    He didn't--he wasn't telling you not to

138

1    write that because Mr. Kakeh had brought a lawsuit

2    for retaliatory discharge based on whistle blowing?

3         A.    No, I think he was asking me not to take

4    sides.

5               And I believe my response was to the

6    effect that I was not doing that.

7               What I wrote in there I had shared with

8    him way ahead of time before he got it, to put it

9    in writing, it was nothing that was a surprise to

10   him.

11        Q.    When did you share that with him before

12   you put it in writing December 4, December 1?

13        A.    I shared with him many times my concerns

14   regarding the circumstances they were citing as

15   justification for letting Mr. Kakeh go.

16        Q.    When did you have that conversation with

17   him was my question.

18        A.    The conversation about?

19        Q.    What month, what year?

20        A.    It would be May, in advance of his

21   organization executing the termination action on

Case 1:05-cv-01271-GK    Document 78-38    Filed 02/27/2007    Page 88 of 94
DEPOSITION OF BODL
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

139

1    Mr. Kakeh.

2        Q.    At that time, being May, you told

3    Mr. Jones you thought his action in letting Mr.

4    Kakeh go was in retaliation for cooperating in the

5    investigation your office did?

6        A.    I think I said it would appear that was

7    what they were doing.

8        Q.    Did you actually say that to him?

9        A.    It is entirely possible.  I don't recall

10   definitely, but if we had that conversation and I

11   had that concern, I would have put that concern out

12   there.

13            One of the things I did in this exercise

14   was to be open and candid.

15       Q.    Mr. Jones approached you after your

16   December 1, 2004 report and/or called you, talked

17   to you and said please don't write that in the

18   report or please correct it, the statement about

19   your opinion it was retaliatory discharge.

20            What was your response to him?

21       A.    I don't think he made a request I not say,

DEPOSITION OF TAYDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

143

1    Q.    Let me ask that question in a different

2    way.

3          When you wrote the December 1, 2004

4    report, it was your opinion, was it not, that Mr.

5    Kakeh was the victim of retaliatory discharge based

6    on cooperation with the investigation by your

7    office?

8    A.    Because I had raised that with UPO, I

9    assumed they were firing him based on what they had

10   told me.

11         I said, Well, I hope you guys are not

12   targeting the guy because he cooperated with me.

13         They assured me that was not it.

14         I held onto it in the time I was

15   developing it--it was dated December 1, I imagine

16   the work might have been months earlier.

17   Q.    My question was:  At time you wrote the

18   December 1, 2005 report, it was your opinion, in

19   that report, that Mr. Kakeh had been terminated for

20   cooperating with your office in the investigation.

21   A.    That was my belief.

DEPOSITION OF TUNDE EBODA
CONDUCTED ON THURSDAY, FEBRUARY 23, 2006

147

1    to Yvonne Gilchrist?

2        A.    Yes, I helped draft this letter.

3        Q.    To your knowledge, everything is true?

4        A.    Yes, I am familiar with it.

5        Q.    Finally, Exhibit 11, a memo dated

6    April 29, 2004, Russell Simmons, UPO board trustee

7    from the finance department staff, looks like Mr.

8    Kakeh's signature.

9              You are cc'd?

10       A.    Yes.

11       Q.    You have seen it before?

12       A.    Yes.

13       Q.    I have a couple of questions about Head

14   Start.

15             After Amin Kakeh met with you a couple of

16   times before the February 18 entrance interviews,

17   did you contact the Head Start program?

18       A.    Yes, I did.

19             Did you say after--

20       Q.    After Amin made disclosures to you, did

21   you contact Head Start?

148

1    A.    Yes.

2    Q.    Before or after February 18?

3    A.    We have a standing arrangement to share

4  information when we go out and do visits.  This was

5  the first chance that we had, and I believe I told

6  them I was going to the field, this is something

7  that the federal oversight office encouraged us to

8  do.

9    Q.    Do you know when you contacted Head Start?

10   A.    I think I contacted them as a matter of

11 concern as to what I am finding on the ground would

12 be, after my initial February visit and before my

13 March 1 continuation of the exercise, and

14 subsequently, we had a few more contacts.

15   Q.    It was after your February 18 visit?

16   A.    Yes, if I contacted them before, it would

17 be simply as a matter, trying to live up to that

18 arrangement that programs funding the same agency

19 share information and were, planned to be on the

20 ground and that kind of thing.

21        That would be preliminary casually

154

1    after we left, the Head Start bureau came in to

2    conduct a regularly scheduled review of the Head

3    Start program.

4            I had an arrangement to have lunch with

5    someone, with the person leading the finance team

6    on the Head Start review, and I had introduced Amin

7    to them and invited him to join us for a meeting we

8    had.

9        Q.    So you introduced Amin to the Head Start

10   people in April or March?

11       A.    That was in April, I don't recall, it

12   could have been March.  I think it was right

13   after--we got--no more than a few days or a week

14   from when we left, they came.

15       Q.    Where did you meet when he was present?

16       A.    On the campus of Howard University.

17       Q.    Did UPO people know you had a meeting with

18   him and Head Start?

19       A.    I don't know that they did.  I had no

20   reason to discuss it.

21       Q.    You didn't tell anybody about that

157

1    there are issues of a technical nature we don't

2    have expertise in, yes, customarily we will find

3    that expertise and make that part of this team.

4            At the time I was developing this, we were

5    not on the ground pealing the layers and, to an

6    extent, it still hadn't hit us.  We started the

7    exercise, yes, I know we have to drill deep.

8            It is still customary.  It is not unheard

9    of.

10    Q.    When you had met at Howard University, why

11    did you invite Amin Kakeh to meet with Head Start?

12    A.    I revealed to Head Start the extent he was

13    cooperating.  Whether I initiated it or they did

14    it, it was clear to me that they knew him and the

15    meeting was brief.

16            As I recall, Head Start had a structure

17    and training they go to before they send folks out

18    and it is very specific, and they were going to do

19    their thing, so them asking to meet with me or me

20    asking Amin to join us for that meeting was simply

21    to make it firsthand some of the things Amin had

165

1    couldn't be sure.

2        Q.    You mentioned in your meeting with Mr.

3    Kakeh at Jefferson Memorial, he showed you

4    documents that related to wire transfers and a

5    boat, I believe?

6        A.    He showed me documents.  I don't recall

7    specifically what those documents were relating

8    to--certainly not specifically related to wire

9    transfers.

10            The deficit I know was a concern that was

11   initially raised.

12            Wire transfer and boats were things that

13   came up subsequently not necessarily at this first

14   meeting.

15       Q.    As you delved deeper, how did you

16   determine that CSBG used funds inappropriately for

17   certain expenditures?

18       A.    We tried to match what the UPO financial

19   statements was telling us with the budget, CSBG

20   budget that was submitted.  There was a significant

21   discrepancy between what they budgeted and what was