# EXHIBIT 17

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Mohammed Amin Kakeh,          *

       Plaintiff,          *     Civil Case No.

v.                            *     1:05-CV-1271

United Planning               *

Organization, Inc.,           *

       Defendant.          /

                Silver Spring, Maryland

                Monday, March 6, 2006

Deposition of:

                SHIRLEY G. FISHER,

the witness, called for oral examination by

Counsel for the Plaintiff, pursuant to notice,

held at the law offices of Zipin & Melehy, 8403

Colesville Road, Suite 610, Silver Spring,

Maryland, beginning at 1:15 p.m., before Donald E.

Brayboy, Court Reporter and Notary Public in and

for the State of Maryland, when were present:



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

14

1    you would like them to.

2         Q.   Uh-huh.

3         A.   And so it may have been a situation

4    where I got the request in not as quickly as I

5    should have.

6         Q.   Uh-huh.

7         A.   Because sometimes things will come up.

8    And it wasn't a situation where it was anybody's

9    fault.  It's just that things didn't happen as

10   quickly as I needed them to happen.

11             So I just went to him to get -- to make

12   sure that I could get reimbursed.

13        Q.   Okay.

14        A.   Yes.

15        Q.   Do you recall when Ben Jennings left

16   employment with UPO?

17        A.   Let me see.

18             I believe, if I recall correctly, I

19   would say in March.  I believe it was in March of

20   2004.

21        Q.   Do you know why he left?

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

15

1    A.    Do I know why he left?

2    Q.    Uh-huh.

3    A.    Only from the tidbits of information

4    that I heard, that there was some problems with --

5    funds may have been in use for purposes other than

6    they were allocated.

7          Quite honestly, since I've not had

8    any -- not seen anything in writing, I really

9    don't know exactly why he was dismissed from his

10   job.

11         Only from what I heard in passing and

12   from what I read in the newspapers.

13   Q.    Okay.  Who did you hear this from, that

14   funds were used for purposes other than they were

15   allocated?

16   A.    There was just kind of some gossip in

17   the agency.  And then I think there was a staff

18   meeting.  Let me see.

19         I believe there was a meeting.  Yes.

20   And I don't know -- maybe a week or so after he

21   actually left the agency there was a meeting that

CONDUCTED ON MONDAY, MARCH 6, 2006

18

1  Columbia --

2      A.    I heard that there was, but I don't -- I

3  can't, you know, I just heard that in passing.

4          You know, UPO is a small agency, very

5  small.  So there's a lot of hearing things in

6  passing.

7      Q.    Uh-huh.  And in this, you know, sort of

8  gossip that's going on, what did you hear was the

9  reason for the investigation?

10     A.    That there was some possible misuse of

11  funds.  I believe that was essentially what it

12  was, that funds had been used for purposes other

13  than what they were intended for.

14     Q.    Did you hear anything about misuse of

15  company credit cards?

16     A.    Oh, that was -- yes.  Yes.

17     Q.    What did you hear?

18     A.    Well, that several staff had -- had --

19  they were able -- that they actually used the

20  cards, that there was a lot of charges on these

21  credit cards.

19

1        And I think that that was one of the

2   things that might have been possibly talked about

3   in that meeting that I'm alluding to, but I'm not

4   sure.

5        Q.   Uh-huh.

6        A.   Just kind of in passing that there was

7   some credit card problems, yes.

8        Q.   Do you remember which staff members were

9   using the credit cards?

10        A.   Shirley Hill, I believe, was one of

11   them.

12        Q.   And what was her position?

13        A.   Shirley was -- I don't know the exact

14   title, but I believe she was a driver for the

15   executive office, for Mr. Jennings and Ms. Mack,

16   and also, I think, another person there by the

17   name of Darlene Booker.

18        That's what I heard.

19        Q.   Who did you hear these things from?

20        A.   From people in passing.  I think that --

21   actually, Shirley told me that she had access to

DEPOSITION OF SHIRLEY FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

20

1  this card, but that she only used it when she was

2  allowed to use it, something like that, that she

3  had permission to use it.  I talked with her.

4      Q.   Do you remember if this was before,

5  during, or after the IG investigation?

6      A.   Probably during, but I'm not sure about

7  that, because I really don't know when it ended.

8  There were so many people running in and out of

9  UPO until I have no idea when it actually ended.

10          But I know that it was for a period of

11  time.  Maybe a month, six weeks, two months.  I

12  don't know the exact time period.

13      Q.   Okay.  Did any of the investigators ever

14  question you?

15      A.   Yes.

16      Q.   Do you remember who it was that

17  questioned you?

18      A.   Ken Marti, M-A-R-T-I, I believe.

19      Q.   Do you remember when that was?

20      A.   Possibly -- I tried to find my daytimer

21  for that period over the weekend.  I must have

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

22

1    Yes, there were some things I was

2    concerned about.  One of the things that I know

3    for sure that occurred was the purchase of a boat.

4    Q.    Uh-huh.

5    A.    And I think that, you know, a lot of

6    people on staff were going fishing on that boat.

7    And certainly I was not under the

8    impression that a social service agency purchased

9    a boat for people to go fishing on.  I don't know

10    what that was all about.

11    Also -- I'm trying to think of some of

12    the things that occurred.

13    One of the people on staff had purchased

14    a -- UPO actually, I believe, they were given

15    houses by Housing and Urban Development to rehab.

16    to sell to --

17    Q.    Uh-huh.

18    A.    -- low-income families in the District

19    of Columbia.  And one of the staff members was

20    allowed to purchase one.  And I just felt that

21    that was inappropriate.

1          I'm trying to think what else I might

2    have talked about.

3          Oh.  So essentially it was basically

4    anything that we had encountered that we felt was

5    inappropriate.

6          People taking trips to Hawaii for -- I

7    think of a couple of board members or one board

8    member, at least, maybe a couple.  There were a

9    lot of trips that people were taking.  And it was

10   usually a select few.  It was not spread across

11   the --

12        Q.    Uh-huh.

13        A.    -- the board.

14        Q.    Who -- you said you knew for sure that

15   they purchased a boat.

16        A.    (Witness nodding head.)

17        Q.    How did you know for sure?

18        A.    Well, actually, one of the staff members

19   at UPO told me.

20        Q.    Who was that?

21        A.    Larry Deneal.  He was a very good friend

24

1    of Mr. Jennings.  Well, I knew the boat, because

2    we used to go fishing on the boat.  And I used to

3    take some of my kids on the boat.  We would pay

4    for it out of our call center.

5         The kids who were in the program, we

6    would take them out so that they could learn

7    some -- well, most of them, they were inner city

8    kids.  They'd never been out on the bay.  So on

9    several occasions I would take the kids out on the

10   boat.

11        And apparently that was -- and that was

12   one of the boats also that UPO had been using for

13   these boat trips that they were taking people

14   fishing, etc., etc.

15        And so Larry told me that the boat was

16   for sale and that Ben had bought the boat.

17       Q.   Do you remember about when this was?  Do

18   you know the composition clearly?

19       A.   Whew.  When would it have been.  I don't

20   know.  Maybe 2003.  I'm not sure.

21       Q.   And what was Larry Deneal's position at

25

1    UPO?

2        A.    I don't know what his title is, but he

3    does -- he is a grants writer for the agency.

4        Q.    Does he still work at UPO?

5        A.    Yes.

6        Q.    Do you know when he started?

7        A.    No.    Probably -- hum -- early '90s,

8    maybe.  I'm not sure.

9        Q.    Okay.

10       A.    Mid '90s.  Quite frankly, I'm not sure.

11       Q.    Did you talk to any other UPO employees

12   about the purchase of the boat?

13       A.    Well, I think it was pretty common

14   knowledge.  Everybody knew that there was a boat.

15       Q.    Uh-huh.

16       A.    And in passing we might speak about a

17   boat.  But -- and then speak about people going

18   out of there fishing on Wednesdays and whatever,

19   you know.

20       Q.    Did you ever talk to Amin Kakeh about

21   the purchase of a boat?

26

1      A.    Probably.

2      Q.    Do you remember any -- do you

3   specifically remember speaking to him about the

4   boat?

5      A.    Not specifically.  But, no, not

6   specifically, no.

7      Q.    You also mentioned that a certain staff

8   member had purchased a house.

9      A.    Uh-huh.

10     Q.    Which staff member was that?

11     A.    That was Vanessa Rawls.

12     Q.    And how did you find out about that?

13     A.    That was -- that was just common

14  knowledge all over the agency.

15     Q.    Do you remember, though, how you first

16  found out about it?

17     A.    No.  It's been quite a while ago.  So

18  I'm not sure exactly how the conversation was

19  approached, but from somebody else that worked

20  there.  And I'm not exactly sure at this point who

21  it was.

27

1          But she had indeed purchased a house.

2    And later I found out that, yes, she had.

3        Q.    Okay.  You also mentioned that board

4    members were taking trips to Hawaii.

5          Do you remember which board members that

6    was?

7        A.    Hmmm.  I think one of them has died.  Not

8    just to Hawaii, but to other places.  I'm trying

9    to remember.

10          One of them has since died, but I think

11    he ended up paying his money for the cost of the

12    trip back after all of this investigation began.

13        Q.    You also said that it was just a few

14    people, not spread out across the board.

15        A.    Yes.

16        Q.    Can you just explain what you meant by

17    that?

18        A.    Well, there was usually a group of

19    people --

20        Q.    Uh-huh.

21        A.    -- that went on trips.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

28

1        There were just the same -- usually the

2  same people that were going on the trips.  And

3  instead of other people being asked would you be

4  interested in going to this conference or that

5  conference, it was just usually the same people.

6      Q.   And can you list for me who those people

7  were?

8      A.   Wayne Thompson, Cheryl Christmas,

9  Priscilla Francis -- trying to think -- Thelma

10  Brown went frequently, Vanessa Rawls, and I think

11  Darlene Booker went fairly frequently.  I'm not

12  sure.  But I think so, because there was a board

13  member by the name of Dorothy Brown who went on

14  quite a few of the trips.  And Darlene's job was

15  to kind of take care of her, because she had some

16  medical problems.

17      There were other people, but offhand I

18  don't recall who they were.

19      Q.   Okay.

20      A.   But they were usually the core group

21  that always went.  And then Ben usually went.

29

1      Q.    Did Gladys Mack go on any of these

2   trips?

3      A.    I think she went on a couple, but I'm

4   not real sure how many.

5      Q.    You also said earlier that when you hear

6   things at UPO, it's usually gospel, it's true,

7   because it's a small organization.

8            Can you elaborate on what you meant by

9   that?

10     A.    Well, let me see.  How might I say this.

11    There's a -- let me see.  How would I say this.

12  It seems like everybody kind of knows what every

13  other department is doing at UPO for some reason.

14  And there's a lot of talking back and forth.  It's

15  a small agency and many of the people have been

16  there for a long time.  So there are friendships.

17  You know how this usually is when you're in a

18  small organization.

19           So people will tell you things that are

20  actually going on.  And usually you can find out.

21           And then one, if one is astute, one

1   dates.

2       Q.    Okay.

3       A.    And there was something else I was very

4   concerned with him about, and everybody knew this.

5   This was very -- this had been a situation that

6   had existed for a while, I think that UPO had

7   actually -- Ben Jennings had actually loaned money

8   to Therman Walker, who was treasurer of the board.

9           I mean, that was a concern that many of

10   us had, because, you know, when you're in a social

11   service agency and you want to do what you have to

12   do to positively impact the lives of people who

13   are basically without means of feeding their kids

14   or supporting their family.

15           So we were concerned about that, very

16   concerned about that.

17       Q.    Just to clarify, you said Ben Jennings

18   loaned money.  UPO money?

19       A.    UPO, I guess.  Well, yes, UPO money,

20   yes.  And I hear it was quite a bit of money.

21       Q.    Do you know what grant or funds that

DEPOSITION OF SHIRLEY FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

48

1    in force notice.

2         Q.    Do you know when he told you that?

3         A.    It was the day that he actually received

4    it, because I remember either that day or a couple

5    of days before, another person had received a RIF

6    notice.  And then Amin said to me that he had

7    received his.

8         Q.    Which other person received the RIF?

9         A.    Her name is Nona McLean.

10        Q.    And how did you find out that Ms. McLean

11   had received a RIF notice?

12        A.    She told me.  She was very upset.  She

13   said, however, she had expected it.

14        Q.    Why would she expect it?

15        A.    Well, it was common knowledge that she

16   was Mr. Jennings' friend and that she lived in his

17   house.

18        Q.    So she thought that she was -- she

19   received the notice because she was closely tied

20   to Mr. Jennings?

21        A.    Yes.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

49

1     Q.   Did she say -- you said that there was a

2   reduction in force notice and she was upset but

3   expecting it because she had a relationship with

4   Mr. Jennings?

5     A.   Yes, ma'am.

6     Q.   Was the reason for the notice -- did it

7   indicate it was because of her relationship with

8   Mr. Jennings?

9     A.   I didn't see the actual notice.  I did

10   not have access to that.

11     Q.   Okay.  When you spoke to Amin about his

12   notice, did he seem upset?

13     A.   Amin -- let me see how I can say this.

14     Amin comes from a culture of people that

15   really don't show their feelings that much.

16     Q.   Uh-huh.

17     A.   I was upset.  I felt very badly for him

18   because I know he had a family.  And Amin was a --

19   Amin was a very -- is a very good person.

20     And I felt very sad for him.  Plus I had

21   never, you know, a comptroller getting a RIF

50

1    notice?

2        Q.    Did you find that odd?

3        A.    Yes, very odd.

4        Q.    Why?

5        A.    Well, one, I found it very odd because I

6    recall maybe a few weeks before that RIF notice

7    there was a great deal of talk about UPO

8    contracting out the finance, administration of the

9    finance office to another group.

10            And I know that he really was concerned

11   about the welfare of his staff.  And he

12   actually -- I think he was trying to do everything

13   he could, contacting some people in the city

14   government and on the Hill to keep those people

15   from losing their job, because he figured that

16   they were going to contract out the whole office.

17            And so that was very -- it concerned me.

18   Plus the reduction in force of a comptroller,

19   the head of a finance division?  That just didn't

20   make much sense to me.

21       Q.    Uh-huh.

51

1     A.   And then, of course, a couple of weeks

2     later, after he was gone, in came -- or maybe it

3     wasn't a couple of weeks.  Maybe it was a week or

4     so.  In came the Walker and Company, which was --

5     and then I believe -- I think when he left, there

6     was a woman by the name of Sheila Shears who was

7     placed in his position, acting, or I don't know

8     what her actual title was.  I don't have privy to

9     that.

10     Q.   You said that Amin was concerned about

11     his staff in the finance department and was

12     contacting people in the city government.

13          Which people?  Do you know?

14     A.   I think some council members, maybe.

15     Q.   And how was he contacting them?

16     A.   I think he faxed them a letter.  I think

17     he got his staff together, if I recall correctly

18     and, you know, they composed a letter and faxed

19     it.

20          I do recall that I was told they faxed

21     it to Catania, I believe, Dave Catania.

CONDUCTED ON MONDAY, MARCH 6, 2006

52

1    Q.    Did you ever see the letter?

2    A.    You know, I'm trying to remember if I

3  saw a copy of that letter or not.  I'm not sure.

4  I may have, but I'm not sure.

5    Q.    Do you know what it said?

6    A.    Essentially that the office was being --

7  that the management and administration of the

8  finance office was being out-sourced, something to

9  that effect.

10    Q.    Did the letter mention anything about

11  the investigation of UPO or any financial

12  mismanagement?

13    A.    I don't know.

14    Q.    Did Mr. Kakeh ever mention to you that

15  he might have received the RIF notice in

16  retaliation for cooperating in an investigation?

17    A.    Yes.

18    Q.    When did he say that?

19    A.    On the day that he got the notice,

20  because I was, you know, I was quite overwhelmed.

21  I respected him.  I liked him a lot.  He was

62

1    were okay.

2         And then on one occasion I called him to

3    get -- or to ask him if he could get me the

4    English version of the Koran.  And he did.  And he

5    had -- I think he had something with his -- wrong

6    with his back.  And he couldn't bring it to me.

7         So he called to say that his children,

8    his daughters, one daughter now, goes to the

9    Islamic Girls School in Springfield, at the mosque

10   in Springfield.

11        So they were having a fund-raiser, and

12   he just called me up to say that his wife and the

13   children were going to the fund-raiser and they

14   would like to invite me to go with them and I

15   could get the English copy of the Koran then.

16        And so I met the family one time.  But

17   I've never been to the house.  Just, you know,

18   I've always been, as I said to you before, I'm one

19   of these people that I've got this big heart.  And

20   when I see people that I feel, you know, are in a

21   very, very tough situation, I'm always -- try to

67

1    you don't have anything concrete to -- so it's

2    speculative, if you will.

3         Q.   Sure.

4              Did you ever have a conversation after

5    Mr. Kakeh left with any other UPO employee about

6    Mr. Kakeh's feelings that he was let go for

7    participating in an investigation?

8         A.   Well, I talked to Doris Stashenko.  I

9    mean, Doris and I, we're not real good friends,

10   but we talk.  And I, you know, kind of kept her

11   abreast of how he's doing.

12             It's pretty much a general feeling there

13   that -- that the RIF was not -- I mean, let's face

14   it.  You have a RIF in an agency and only two

15   people are RIF'd?  You wonder why.

16        Q.   Uh-huh.

17        A.   There's something else that just

18   occurred to me now.  I recall that Mr. Kakeh was

19   concerned because he was not able to get a job.

20   He went on many interviews, or some interviews.  I

21   don't know how many.

70

1    was.  But, you know, I think if you would give him

2    a chance, I did say to them that he is a very,

3    very -- I can attest to the fact that he is a very

4    honest, very good person.  I know that he is a

5    devout Muslim.  I know he prays five times a day.

6    I know they go to the mosque, because he told me

7    this.

8              Plus I know when I was there at the

9    fund-raiser, I talked about that everybody seemed

10   to know the family and has a lot of respect for

11   them.

12             So I said to him, I hope that you'll

13   give this man a chance.  He's got a family that he

14   needs to take care of.

15             And so after talking with the guy, I'm a

16   pretty persuasive person, I mean, I just, you

17   know, and basically I just said to him I hope -- I

18   mean, I think it's something to do -- I don't

19   recall the name of the firm, but it's something to

20   do with justice.

21             So I kind of used that word itself,

1    justice.  I said, look, you know, here's a man who

2    is honest, decent.  He's a Muslim.  Do you have

3    any Muslims on staff?

4            No.

5            Well, you ought to give him a chance.

6    That would be a more diverse staff.

7            And at the end he said to me, you know,

8    I think I know what I'm going to do.  And so he

9    didn't say, yes, he was going to hire, no, he

10   wasn't.  But I had said, well, I'm sure you are

11   going to do the right thing.

12           So actually I did give the reference.

13   Q.   Did you mention anything during the

14   course of giving a reference, or did the person

15   calling you, about Mr. Kakeh's allegations that he

16   left, he was let go in retaliation for

17   participating in an investigation?

18   A.   I don't believe so.  I don't believe so.

19   Q.   Okay.  In March or April of 2004, around

20   that time frame, did you ever see Amin Kakeh fax

21   documents to government agencies outside his

72

 1    general duties?

 2        A.    The only thing I did see because I was

 3    around the fax and he did fax a letter that I told

 4    you about being concerned about the out-sourcing

 5    the finance office.

 6        Q.    Uh-huh.

 7        A.    When he was trying to help.  I did see

 8    him fax -- I believe it was to one of the council

 9    members.  And I think he also faxed it to the

10    president of the board at that time.

11            But other than that, no.  Anything else,

12    no.

13        Q.    What fax machine did he use to fax this

14    letter?

15        A.    It was a fax machine at finance.

16    Because I went around there to fax something.  I

17    don't have a fax.  I didn't have a fax machine at

18    my disposal at that time, so I often used finance

19    fax machine and their copy machine.

20        Q.    Uh-huh.

21            Was anyone, any other UPO employee, in a

DEPOSITION OF AGUILLARD
CONDUCTED ON MONDAY, MARCH 6, 2006

74

1      Q.    Were you involved in the process of

2  issuing of the RIF notices?

3      A.    No, no.

4      Q.    And you mentioned that you were aware

5  that Mr. Jennings had made a loan to Therman

6  Walker.

7            Do you know when you first learned about

8  that loan?

9      A.    It was quite sometime ago.

10     Q.    Was it prior to 2004?

11     A.    Yes.

12     Q.    Prior to 2003?

13     A.    I'm not sure exactly when it was, but I

14  think it might have been 2002 or 2003 sometime.

15  I'm not sure of the exact date.  I can't be sure

16  of the date.

17     Q.    And you mentioned some trips to

18  Hawaii --

19     A.    Uh-huh.

20     Q.    -- that people had gone on and you

21  identified several employees.