# EXHIBIT 23

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x

MOHAMMED AMIN KAKEH,                    :

            Plaintiff,             :

      vs.                           : Case No.

UNITED PLANNING ORGANIZATION,    : 1:05-CV-1271

INC.,                                   :

           Defendant.             :

- - - - - - - - - - - - - - -x


      Pursuant to notice, VOLUME I of the

deposition of SHEILA D. SHEARS was taken on

Thursday, April 13, 2006, commencing at 10:15 a.m.,

at the offices of Melehy & Associates, 8403

Colesville Road, Suite 610, Silver Spring, Maryland

20910, before Judith D. Van Vliet, CSR and Notary

Public.



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

1      A      Around April of 2003.

2      Q      Who hired you?

3      A      Ben Jennings.

4      Q      Did he seek you out or did you apply

5  through the normal process?

6      A      When I came on as a consultant?

7      Q      For UPO?

8      A      Mm-hmm.

9      Q      When were you a consultant for UPO?

10      A      Probably from around October of '02 to

11  April of '04.

12      Q      What were your duties as a consultant?

13      A      What Ben had asked me to do was to take

14  a look at the accounting structure, the

15  organization, to make recommendations about any

16  changes that would help the organization perform

17  more efficiently.  He was concerned that he wasn't

18  getting reports on time and that the reports that

19  he was getting did not give him sufficient

20  information to manage the organization.  So I was

21  asked to take a look at how that was functioning,

1    finance department?

2        A    I can't think of anything else.

3        Q    You said something about reorganization?

4        A    Mm-hmm.

5        Q    What reorganization did you recommend?

6        A    I recommended that some of the staff be

7    assigned different kinds of duties.  I gave them an

8    organization chart.  They at the time lacked backup

9    in terms of, if I had a particular duty or

10   responsibility and I wasn't there, there was nobody

11   to back up what I was doing.  So a lot of times if

12   somebody was out, their job didn't get done, which

13   frequently meant that there was a holdup in the

14   processes of the organization.

15       Q    Okay.  Which staff did you recommend be

16   given different duties?

17       A    I would have to look back at what I had

18   given Ben.  And we met a lot, actually, with Gladys

19   and discussed a number of different organization

20   charts.

21       Q    Did you recommend -- Gladys Mack I

DEPOSITION OF SHELBY WHITEHEAD
Conducted on April 13, 2006

13

1    assume is who you're talking about?

2        A    Mm-hmm.

3        Q    You need to say yes or no.

4        A    Oh, yes.  I'm sorry.

5        Q    That's okay.  And you met with -- did

6    you recommend eliminating any of the staff

7    positions?

8        A    No, not at that time.

9        Q    Did you recommend changing any of Mr.

10   Kakeh's duties?  And this is in spring of '03.

11       A    No, not specifically.

12       Q    What do you mean, not specifically?

13       A    I didn't address specific duties, just

14   organization changes.  And so it would have --

15   anything would have -- it would have shifted some

16   responsibilities on the staff, and I don't remember

17   specifically if that impacted his specific duties.

18       Q    Is there any document that would refresh

19   your recollection on that point?

20       A    Probably some of the organization charts

21   that we had put together, because there were a

Case 1:05-cv-01271-GK    Document 78-34    Filed 02/27/2007    Page 6 of 58
DEPOSITION OF FREDERICK SHEARER
Conducted on April 13, 2006

16

1        A       Probably.

2        Q       Did Mr. Kakeh's duties change at all

3    while you were in a consulting position with United

4    Planning Organization?

5        A       Yeah, to some extent.  Because at one

6    point when the auditors were in, Ben had asked that

7    I be the coordinator with the auditor, which was

8    probably something that Amin had been doing.

9        Q       Anything else that changed with regard

10   to Mr. Kakeh's duties during the period you were a

11   consultant?

12       A       Not that I can recall.

13       Q       And when were these meetings with

14   auditors, what year, what month?

15       A       Well, the auditors would have been

16   performing their year-end audit between January and

17   March of '03.

18       Q       Okay.  And were you a full-time employee

19   then?

20       A       No.  I was a consultant.

21       Q       Oh, you were still a consultant.  Were

17

1    you working full time then or part time?

2        A    Part time.

3        Q    How much were you being paid at that

4    time?

5        A    I have no idea.

6        Q    You don't remember your hourly wage?

7        A    I don't.

8        Q    Does UPO have records of how much you

9    were paid?

10        A    I'm sure they do.  And actually, I had a

11    contract, so they probably have that somewhere as

12    well.

13            MR. MELEHY:  Excuse me a minute.  Off

14    the record.

15            (Discussion held off the record.)

16    BY MR. MELEHY:

17        Q    Were you a consultant anywhere else

18    during the period you consulted with UPO?

19        A    Yes.

20        Q    Where?

21        A    For a company called DMI.  They were

19

1    I don't know, 20 hours a week worth for them.

2        Q    And how many hours per week on the

3    average did you spend working for UPO during the

4    consulting period?

5        A    Probably 24 to 30.

6        Q    Any other consulting jobs you had during

7    the consulting period at UPO?

8        A    No.

9        Q    Okay.  How did you come to be employed

10   as an employee with UPO?

11       A    Ben Jennings and I were members of the

12   same class of an organization called Leadership

13   Washington.

14       Q    Is that how you met?

15       A    Yes.

16       Q    When did you meet Ben Jennings?

17       A    1996.  Well, '95.

18       Q    Did you do any work at UPO prior to

19   2002?

20       A    No.

21       Q    How did you come to be employed full

20

1    time at UPO after the --

2         A    You mean from being a consultant to

3    being an employee?

4         Q    (Nods head.)

5         A    When I had come there, Ben said that

6    they had been trying to fill a VP -- a CFO

7    position.  Apparently they had a guy named Bill

8    somebody who had been in that position previously,

9    and the position had been vacant I think for a

10   couple of years.  And they had been interviewing,

11   they had tried to find someone to fill the position

12   but were unable to do so --

13        Q    Did you say CFO position?

14        A    Mm-hmm.  Mm-hmm.

15        Q    But had been unable to do so?

16        A    Yeah, had been unable to fill the

17   position.  And what he said was that they had been

18   unable to fill the position because they either

19   found people or interviewed people who were not

20   qualified for the position or they couldn't afford

21   the people that they thought were.

21

1      Q      When did you have that discussion with

2   Ben Jennings?

3      A      Probably when I began or before I began

4   as a consultant, in the discussion of that,

5   consulting.

6      Q      Was there talk between you and him of

7   hiring you as a full-time employee prior to the

8   time you became a consultant?

9      A      No.  Because I was clear that that

10  wasn't what I was interested in.

11     Q      What were you interested in at that

12  time?

13     A      I was interested in being a consultant

14  where I controlled my time, my comings, my goings.

15     Q      So Mr. Jennings hired you as a

16  consultant?

17     A      Correct.

18     Q      Okay.  During the time you were a

19  consultant, did he talk to you anymore about hiring

20  you as a full-time employee?

21     A      Not until the spring of '03, when I

22

1    actually did come on.

2        Q    Okay.  And what conversations did you

3    have in the spring of '03?

4        A    It was a conversation about the fact

5    that they really needed somebody full time.

6        Q    He told you that they needed somebody,

7    UPO needed somebody, full time?

8        A    (Nods head.)

9        Q    To do what?

10       A    To do the CFO job, which is to manage

11   the finance organization.

12       Q    Why did Mr. Jennings say they needed

13   somebody full time?

14            MS. DAVIS:  Objection to form.  You can

15   answer.

16       Q    You can answer the question.

17       A    I'm sorry.

18       Q    Why did Mr. Jennings say that UPO needed

19   somebody full time to do the CFO job?

20       A    Because they had been trying to fill

21   that position full time.

1    Did Mr. Jennings comment one way or the other on

2    the content of the financial statements Mr. Kakeh

3    submitted to the auditors in 2003?

4         A    Not to me.

5         Q    Okay.  During that time did Mr. Jennings

6    comment on Mr. Kakeh's work performance?  And I

7    would say this is early 2003.

8         A    He was not happy with the performance of

9    the accounting organization, which Mr. Kakeh was

10   the supervisor.

11        Q    What was he not happy about?

12        A    He wasn't happy with the timing of the

13   reports that he was getting.  He wasn't happy with

14   the analysis that he felt that he needed.

15        Q    What analysis?

16        A    The financial analysis.

17        Q    You mean the financial statements?

18        A    Well, no.  When you -- you know, beyond

19   producing financial statements there is a need

20   sometime for management to have some explanations.

21        Q    Of the financial statements?

27

```
1       A     Yes.

2       Q     And he wasn't getting those?

3       A     That's what he said.

4       Q     Was that one of the reasons why Mr.

5    Jennings wanted to hire you?

6       A     Yes.  And the fact that, I guess by then

7    they had some reporting requirements with the bank

8    that they had not previously had.

9       Q     And those were not being fulfilled?

10      A     Well, they were new requirements.  And I

11   think he wanted to make sure that they were.

12      Q     Do you have any degrees in accounting or

13   finance?

14      A     I do.  I have a B.S. in accounting.

15      Q     From where?

16      A     Central State University in Wilberforce,

17   Ohio.

18      Q     Any graduate degrees?

19      A     I do.  I have a master --

20      Q     From where?

21      A     -- in -- I have an M.B.A., master in
```

28

1    business.

2         Q    From where?

3         A    From Southern Illinois University at

4    Edwardsville.

5         Q    Okay.  Any other degrees?

6         A    No.

7         Q    Okay.  Are you an accountant?

8         A    I am a Certified Public Accountant.

9         Q    When did you get that certification?

10        A    1975, in Maryland.

11        Q    What caused you to take the job as a

12   full-time UPO employee?

13        A    Just a request by Ben and Gladys that I

14   give them time to find someone to fill the position

15   permanently.

16        Q    Was there any discussion of hiring Mr.

17   Kakeh in that position?

18        A    No, not with me.

19        Q    Why didn't they consider Mr. Kakeh for

20   that position, do you know?

21        A    You know, I'll say the same thing to you

29

1    that I said to him:  He would know that better than

2    I would.  I don't know the background of his

3    relationship with them and why they did not.

4         Q    Okay.  So you took the appointment as a

5    one-year appointment?

6         A    Yes.

7         Q    And that was in April of '03?

8         A    Yes, I believe so.

9         Q    Okay.  What duties did you have as the

10   CFO?

11        A    I was responsible for the management of

12   the finance department, which included the

13   accounting organization, the payroll, the grants,

14   billing.

15        Q    What was your salary?

16        A    I think I made a hundred thousand

17   dollars.

18        Q    Did you perform any of Mr. Kakeh's

19   duties when you took that position?

20        A    What does that mean did I perform any of

21   his duties?  I supervised him.  So there may have

30

1    been occasions when there was something that he

2    would normally have done that I may have done.

3        Q    Did he continue to be involved directly

4    with auditors after you took over as CFO?

5        A    Yes.

6        Q    During the time you were there did CSBG

7    perform any reviews of the program?

8        A    They did.

9        Q    How many?

10       A    They did a program review sometime in

11   2003 while I was there.  They did a financial

12   review in 2004.

13       Q    What's the difference?

14       A    Well, the program review, they looked at

15   the programs that they were funding and, you know,

16   how the programs were operating and what they were

17   doing.

18       Q    When you supervised Mr. Kakeh, was he

19   supposed to check with you before he completed a

20   financial statement?

21       A    Before he issued a financial statement,

31

1   yes.

2       Q    Did you make any changes, typically,

3   when he did that?

4       A    If I had a question about something.

5       Q    Now, you said that in 2003 you didn't

6   comment -- you were not in a position to comment

7   one way or the other on the content of Mr. Kakeh's

8   financial statements, correct?

9       A    Correct.

10      Q    And there was no, other than the

11  internal auditors, there were no financial reviews

12  that were conducted by any funding organizations or

13  anything like that in 2003, correct?

14      A    Not to my knowledge.

15      Q    Okay.  And when Mr. Kakeh prepared the

16  financial statements in 2003, did he show them to

17  you before they were finalized?

18      A    No.  I probably got them at the same

19  time that he turned them over to the auditors.

20      Q    After you got them, that is, the

21  financial statements in 2003, did you discuss any

38

1      Q      Did you see any financial statements

2    that Mr. Kakeh had prepared in January, February of

3    2003?

4      A      Yes.

5      Q      I'm sorry.  2004.

6      A      Mm-hmm.  Yes.

7      Q      Any concerns about those financial

8    statements?

9      A      Yeah.  There was a category on the

10   financials called UPO special.

11     Q      What was that?

12     A      Well, that was my question to Mr. Kakeh,

13   and that is, what does that represent?  And he said

14   that it had the stuff in it that had not been

15   classified.  But it was a very large amount for it

16   to be unclassified.

17     Q      Did it include some of Ben Jennings'

18   credit card charges?

19     A      Yeah.  There were credit card charges

20   that we could not classify at the time.

21     Q      Were you aware of a boat that Mr. --

40

1    Q    How did you find out?

2    A    Amin had given me a list of items and

3    transfers of funds that he could not identify and

4    asked if I could find out from Ben Jennings what

5    those were.

6    Q    Okay.

7    A    So as a result of my inquiries, constant

8    inquiries, to determine what those amounts were, I

9    was given a document that related to the boat.

10    Q    By Ben Jennings?

11    A    Yes.

12    Q    Okay.  Now, this list that Mr. Kakeh

13    gave you, did that list include credit card

14    charges?

15    A    Yes.  As part of the -- my investigation

16    into trying to identify what these transfers, bank

17    transfers were, I did find out that some of them

18    were credit card payments.

19    Q    For what credit card charges?

20    A    Whatever was on the credit card at the

21    time.  There were various, lots of various charges

DEPOSITION OF SHEILA D. SHEARS
Conducted on April 13, 2006

41

1    on the credit card.

2        Q    Okay.  So there were bank transfers,

3    there were credit card charges, there was a boat.

4    Were you aware of UPO's payment of parking fines

5    incurred by Mr. Jennings?

6        A    No.

7            MS. DAVIS:  Objection as to form.  You

8    can answer.

9        A    No.  Not specifically.

10       Q    But the amounts that were paid for the

11   credit card charges, were those large?

12       A    They varied in -- if you took them all

13   together it was a large amount.  I think it was

14   $200,000 or in that range.

15       Q    Okay.  What about the boat, what amount

16   was that?

17       A    The boat was $70,000.

18       Q    Okay.  Were there also cell phone

19   charges that were being paid by UPO for Mr.

20   Jennings' cell phone?

21       A    Yes.

42

1    Q    Were those large also?

2    A    I don't remember his specifically being

3  particularly large.  In fact, my comment to him was

4  that everybody's -- not everybody's, but a lot of

5  the cell -- the cell phone charges in general I

6  thought were too much.

7    Q    Okay.  How much is too much?

8    A    Well, I think we were paying, you know,

9  3- or $400 a month for cell phone bills that I

10  thought if we had a different plan, at a minimum it

11  would reduce those charges.

12    Q    Okay.  Did you inquire of Mr. Jennings

13  what these credit card charges were all about?

14    A    Yes.

15    Q    What did he say?

16    A    He said that his secretary would prepare

17  for me a detailed list of what all the charges were

18  for, with the appropriate receipts attached.

19    Q    Did she do that?

20    A    She started to do that for those amounts

21  that she had the documentation and the backup for.

43

1    Q    Did that include all of the charges?

2    A    No.

3    Q    Did it include most of the charges?

4    A    It included a fair number of them.

5    Q    Okay.  Did you become concerned at that

6  point that Mr. Jennings may have been billing

7  personal expenses to the UPO budget?

8    A    Well, the fact of the matter is most of

9  the credit card documentation I did not receive

10  until after Mr. Jennings was no longer there.

11    Q    Did it indicate that he was billing

12  personal credit card charges to the company?

13    A    There were questionable items on the

14  credit card.

15    Q    When Mr. Kakeh gave you this list, what

16  month was it?

17    A    I don't know the month.  But it was in

18  late 2003, probably in the fall of 2003.

19    Q    Okay.  When you discussed -- so Mr.

20  Kakeh gave you a list of items that were

21  questionable?

44

1        A     No, he gave me a list of wire transfers

2   or money transfers that he could not identify what

3   they were for.

4        Q     And you then spoke to Mr. Jennings about

5   it?

6        A     I did.

7        Q     And that was in 2003?

8        A     Yes.

9        Q     Was Mr. Jennings angry at Mr. Kakeh for

10  that?

11       A     Oh, no.  Hmph-mm.

12       Q     Okay.

13       A     In fact, I'm not sure that he knew the

14  source of the list.

15       Q     Okay.  Did Mr. Jennings ask you where

16  you got it from?

17       A     No, he didn't.

18       Q     Okay.

19       A     Because my responsibility was the

20  accounting department, so it would have been a

21  natural part of what my job was.

45

1    Q    Was there any talk of eliminating Mr.

2    Kakeh's position while you were at UPO?

3    A    Yeah.  As part of the reorganization,

4    you know, when they talked about outsourcing the

5    accounting organization, that would have eliminated

6    a lot of positions.

7    Q    Okay.  But other than, was there talk

8    about specifically terminating Mr. Kakeh or

9    eliminating Mr. Kakeh's position?

10    A    No.

11    Q    You're sure?

12    A    Not that I can recall.

13    Q    Okay.  You never talked about

14    eliminating Mr. Kakeh's position?

15    A    Oh, I certainly did.  But not his

16    position --

17    Q    I just asked you if there was talk about

18    it.

19    A    Not his position.  Him specifically.

20    Q    Well, that's what I mean.  I said was

21    there --

46

1    A    Well, that's not his position.  That's

2    him specifically.

3    Q    Was there any talk of terminating Mr.

4    Kakeh?

5    A    Yes.

6    Q    Okay.  And who talked about it?

7    A    Me.

8    Q    With who?

9    A    With Miss Mack.

10   Q    Okay.  Did you talk with Mr. Jennings

11   about it?

12   A    Yes.

13   Q    When did you start talking about elim --

14   about terminating Mr. Kakeh?

15   A    Probably in the spring of '04.

16   Q    That's the first time you talked about

17   it?

18   A    Yeah.  Yes.

19   Q    Okay.  And why did you -- what caused

20   you to discuss it?

21   A    Mr. Kakeh in the time since I had become

51

1    me and I wanted to know if you have seen them."

2    And I had not seen them.  In fact, as I said to

3    you, he told me they had not been done, and when I

4    asked when they would be done he said "Tomorrow."

5         Q     So he gave them directly to Mr. Jennings

6    instead of you?

7         A     Right.  Well, even after telling me they

8    weren't done.

9         Q     Did he show you all his financial

10   statements prior to sharing them with any

11   third-party auditors?

12        A     No.

13        Q     He didn't.  Was he supposed to?

14        A     Yes.

15        Q     Okay.  Was he authorized to provide

16   Tunde Eboda or his group with financial statements?

17        A     Yeah, the financial statements that we

18   already had, yes.  And that I had seen.

19        Q     Okay.  And he was authorized to share

20   those with Mr. Eboda?

21        A     Yes.

53

1    correct?

2        A    Mm-hmm.

3        Q    In February did Mr. Eboda come in and

4    talk to -- meet with anybody?

5        A    Yes.

6        Q    Who did he meet with?

7        A    He met with me, he met with Amin, he met

8    with a person on the staff -- I think he -- he met

9    with anybody -- he asked to meet with people on the

10   finance staffs, and I don't remember specifically

11   who all he met with.

12       Q    Was there a meeting where you and Miss

13   Mack were present and Mr. Jennings was present on

14   the phone?

15       A    On the phone?

16       Q    Or present partially on the phone?  In

17   other words, was there a meeting that you had with

18   Mr. Eboda where Miss Mack was present and

19   periodically Mr. Jennings was called on the phone?

20       A    I don't recall that specifically but

21   that doesn't mean there wasn't.

54

```
1        Q    Did you take any notes during the

2   meeting that -- during the times you met with Mr.

3   Eboda?

4        A    I only met with Mr. Eboda once.

5        Q    Did you take any notes?

6        A    Yeah, I may have.

7        Q    What did you do with them?

8        A    I don't know.  I probably have them in a

9   box somewhere.

10       Q    Okay.

11       A    Or I've just thrown them away.

12       Q    So you would have them in a box at--

13       A    Maybe.

14       Q    They wouldn't have been left at UPO?

15       A    No.

16       Q    Okay.

17            MR. MELEHY:  Alison, I'm going to ask

18   that those notes be produced.

19            THE WITNESS:  If I have them.

20            MR. MELEHY:  If they exist.

21            THE WITNESS:  Yeah.
```

55

1          MR. MELEHY:  And if you're not going to

2     produce them, please let me know.

3          MS. DAVIS:  If they exist, we'll produce

4     them.

5          MR. MELEHY:  Okay.

6     Q    So when you left UPO you took them with

7     you?

8     A    Yeah, they're just -- it was just -- I

9     had a notebook that I kept notes from different

10    meetings that -- you know, staff meetings or

11    whatever.

12    Q    Okay.  Now, after Mr. Kakeh was

13    terminated, did you ever hear that he filed a

14    discrimination complaint with the office of human

15    rights?

16    A    I did.

17    Q    Okay.  When did you learn --

18    A    Actually, that was before.

19    Q    You heard about that complaint?

20    A    Yes.

21    Q    Did you hear about a subsequent

1      complaint he filed after his termination?

2           A      No.  Not until this.

3           Q      When you met with Mr. Eboda, did he ask

4      you about the boat?  This is in February 2004.

5           A      I don't think he did.

6           Q      Did he ask you about the cell phone

7      charges?

8           A      Nope.

9           Q      Did he ask you about the bank transfers?

10          A      Nope.  When I met with Mr. Eboda, it was

11     like the entrance conference to his team coming in.

12          Q      The entrance interview is what he called

13     it?

14          A      Yeah, right.  And at that time he said,

15     you know, "Here are the kind of things that we're

16     going to be looking for.  We're looking for

17     policies and procedures.  We want to make sure that

18     you have followed all the procedures, so we'll be

19     checking to see that you followed your own

20     procedures.  We need a copy of certain documents."

21          Q      What documents did he ask for?

57

1    A    As I can recall, he asked for our chart

2    of accounts, he asked for a general ledger.  You

3    know, the sort of things that any audit team or

4    review team would need to begin their review.

5    Q    Okay.  Now, was this with his audit

6    team?

7    A    At the time that I met with him?  It was

8    just him and one young lady that works for him.

9    Q    Okay.  And what was your understanding

10    of what -- of why Mr. Eboda and his group came to

11    UPO to do a review in February?

12    A    That that was his job, that he had not

13    done --

14    Q    That was preplanned?

15    A    Mm-hmm.  That he had not done a

16    financial review since he had been there, or

17    something like that, and that, you know, for the

18    first time they were going to do a financial

19    review, and that was part of his responsibility as

20    the administrator of the CSBG contract.

21    Q    Okay.  Did the nature of his review

67

1    be charged with a crime?

2        A     I had no conversation with Ben Jennings

3    after March the -- was it the 11th or something

4    that he left.  So.

5        Q     At the time the FBI interviewed you

6    about the boat, did you believe at that time that

7    the boat purchase was a legitimate purchase by UPO?

8        A     I never believed that the boat purchase

9    was a legitimate purchase.

10       Q     Now, did the FBI, when they interviewed

11   you, talk about the credit card charges?

12       A     I don't recall.  To be honest with you,

13   and this is the God's honest truth, there were so

14   many people asking so many questions about the same

15   things and I can't really tell you what

16   specifically they asked about.  But since that was

17   part of everybody else's questions, I would guess

18   that they had asked about the credit cards as well.

19       Q     When you met with the FBI, was the

20   inspector general in that meeting too?

21       MS. DAVIS:  Objection; asked and

84

1        Q      Oh, I'm sorry.  I was looking at one

2   thinking it was two.  Do you recognize Shears

3   Exhibit 2?

4        A      Mm-hmm.

5        Q      That is a letter written from you to Ben

6   Jennings, correct?

7        A      Mm-hmm.

8        Q      Signed by you.  And the date of that

9   letter, that letter was written and delivered to

10  Mr. Jennings on March 11th?

11       A      Correct.

12       Q      And why does it have your home address

13  at the top?

14       A      Because that's where I live.

15       Q      I mean why didn't you just write him a

16  memo?

17       A      Well, official resignation letters

18  shouldn't be a memo, it should be an official

19  letter.

20       Q      Okay.  Let's talk a little bit about

21  this memo and what you meant by various things.

85

1          MS. DAVIS:  Are you referring to Exhibit

2   No. 1 or 2?

3          MR. MELEHY:  Yes.  This letter.  Yeah,

4   sorry.

5       Q     It says, the first sentence says, I'm

6   going to read it for the record, "Over the past

7   week in our discussions concerning the financial

8   issues raised by the CSBG review team, the question

9   of why Amin Kakeh has been allowed to continue in

10  his position, given his repeated acts of

11  insubordination including the issuance of financial

12  statements that had been significantly altered from

13  any previously reviewed by management, has surfaced

14  several times."  You wrote that, correct?

15      A     I did.

16      Q     And that statement was truthful,

17  correct, when you wrote it?

18      A     That's correct.  Because I was probably

19  in my last meetings with him.

20      Q     Okay.  So you're referencing discussions

21  which occurred within the previous seven days, that

DEPOSITION OF HELEN SHEAR
Conducted on April 13, 2006

86

1    is, the seven days preceding March 11th, 2004,

2    correct?

3           A      Mm-hmm.

4           Q      Yes?

5           A      Yes.  I'm sorry.

6           Q      Okay.  Does that refresh your memory on

7    whether you had more than one meeting with Mr.

8    Jennings concerning Mr. Kakeh's employment?

9           A      Well, no, because these meetings weren't

10   about his employment.  They were about the

11   financial issues raised by the CSBG.

12          Q      Now, why is it that you wrote, "...in

13   our discussions concerning the financial issues

14   raised by the CSBG team, the question of why Amin

15   Kakeh has been allowed to continue in his position,

16   given the repeated acts of insubordination,..."

17   et cetera, "has surfaced several times."

18          A      Right.

19          Q      It's true, isn't it, that during the

20   discussions about the financial issues raised by

21   the CSBG team, the question of why Mr. Kakeh was

1    allowed to continue in his position surfaced

2    several times, correct?

3        A    Right.

4        Q    Okay.  And you said, "Each time the

5    question has come up your response has been a

6    reference to his charge of harassment and

7    discrimination lodged against me and Gladys Mack."

8    So you, is it fair to say that each time you raised

9    this question with Mr. Jennings, Mr. Jennings

10   referred to his charge of harassment and

11   discrimination filed against you and Miss Mack?

12       A    Yeah, he would say, you know, "We can't

13   do anything right now until that's settled."

14       Q    Okay.  The next sentence says, "As a

15   result, I am tendering my resignation, effective

16   April 30, 2004 in hopes that it will allow you to

17   move forward with the changes needed in the finance

18   office and to put and end to the paralysis brought

19   about by these unfounded charges."  Now, what did

20   you mean by "the changes needed"?

21       A    As I indicated before, we had spoken a

DEPOSITION OF SHEILA D. SHEARS
Conducted on April 13, 2006

88

1  number of times about reorganizing the finance

2  office, and the CSBG and the Head Start audits both

3  pointed out deficiencies in the finance and

4  accounting area that needed to be addressed.

5      Q    So the changes you're talking about here

6  would be reorganization of the finance office?

7      A    As well as the changes related to how

8  you fix the systems.

9      Q    Okay.  Were you referring to the

10  elimination of Mr. Kakeh's position in that last

11  sentence in the first paragraph?

12      A    Not specifically.

13      Q    Okay.  Then how, if he were -- how would

14  there be an end to the paralysis brought about by

15  these unfounded charges?  How would the paralysis

16  end?

17      A    If what was keeping us from moving

18  forward was the fact that Amin had filed a

19  harassment suit, there was a contentious

20  relationship between the two of us, if that's what

21  was holding the organization up from reorganizing

DEPOSITION OF CHARLES SHEARS
Conducted on April 13, 2006

89

1  or doing whatever they needed to do in finance, I'm

2  stepping aside.

3      Q    I'm missing the connection between you

4  stepping aside and the paralysis ending.

5      A    The paralysis was because of the

6  relationship between he and I.

7      Q    So you thought the organization would

8  run more smoothly if you weren't there?

9      A    Well, I thought it could move forward.

10      Q    You thought Mr. Kakeh could be --

11      A    I thought a --

12      Q    -- terminated?

13      A    No, I didn't say that.

14      Q    Okay.  Well, let's move to the --

15      A    Because if I thought he could be

16  terminated, why would I leave?  That doesn't make

17  sense.

18      Q    Well, by ending the paralysis, you were

19  referring to outsourcing the accounting department?

20      A    Whatever, outsourcing, reorganizing,

21  whatever they needed to do to address the issues

90

1    that had been brought up by the two reviews.

2        Q    And essentially a reorganization would

3    mean Mr. Kakeh would lose his job?

4        A    Not necessarily.  A reorganization could

5    have been anything.  Could have been anybody losing

6    their job, or not.  It could have been them moving

7    from one job to another.

8        Q    Okay.  The last sentence of the second

9    paragraph says, "I hope my leaving assists you in

10   removing a major roadblock to your continued

11   progress toward correcting the deficiencies in the

12   finance office."  What did you mean by "removing a

13   major roadblock"?

14       A    The major roadblock was the relationship

15   between Mr. Kakeh and myself and how it was

16   affecting the organization.

17       Q    Okay.  So you thought by your departure

18   that the organization could make more progress

19   toward correcting the deficiencies in the finance

20   office?

21       A    Yes.

DEPOSITION OF SHIRLEY C. SHERMAN
Conducted on April 13, 2006

96

1        A       Yes.

2        Q       And that opinion, you held that opinion

3    in May of 2004 as well, correct?

4        A       I held that opinion until he left.

5        Q       Okay.  Did you voice that opinion to

6    Gladys Mack in April of '04?

7        A       Perhaps.

8        Q       Okay.

9        A       Probably.

10       Q       Did you voice that opinion to Gladys

11   Mack in May of 2004?

12       A       Probably.

13       Q       Did there come a time when Mr. Jones

14   decided to do a reduction in force?

15       A       I don't think there was a decision by

16   Mr. Jones.  At that time the -- there was a

17   management committee as well that the board had,

18   and the board -- that management committee was

19   looking at changes in the finance organization, and

20   I think as part of that they looked at outsourcing

21   and reductions in force.

100

1        A    They were going to run the accounting

2    organization until -- for a year, I believe the

3    contract that they had was for a year, until the

4    organization could be restructured and new people

5    put in place, including me.

6        Q    Okay.  So was Walker & Company going to

7    take over the entire finance department or were UPO

8    employees going to perform some of the functions?

9        A    UPO employees were performing some of

10    the functions.

11        Q    Okay.

12        A    And one of the things I think that they

13    were responsible for doing was evaluating the

14    performance of those employees while they were

15    there.

16        Q    So they could determine whether to keep

17    some on or let them go and replace them?

18        A    Correct.

19        Q    Did they ever, did Walker & Company ever

20    have a chance to evaluate Mr. Kakeh's performance?

21        A    I don't think he was there when they

DEPOSITION OF SHEILA A. SHEARS
Conducted on April 13, 2006

106

1        A    No.

2        Q    Did he ever admit to you that she lived

3   with him?

4        A    No.  We never had that conversation.

5        Q    Okay.  And she was also let go, correct?

6        A    Yes.

7        Q    Okay.  Why was she let go?

8        A    Because that position was eliminated.

9        Q    Okay.  Why was it eliminated?

10       A    Because part of the functions were moved

11  to another office, and then the other function that

12  was left was just the mailroom, and her staff had

13  really been reduced to about two people.

14       Q    Okay.  And Mr. Isaac, his position was

15  eliminated also, correct?

16       A    Yes.

17       Q    And why was his position eliminated?

18       A    Because that was going to be merged in,

19  I think, with something else in the office.

20       Q    Okay.

21       A    Or moved, actually.  He did contract.

1    Q    Walker & Company specifically proposed

2  to keep Mr. Quashi but let Mr. Kakeh go?

3    A    I think.

4    Q    Okay.  Where did you hear that from?

5    A    Well, Walker & Company made an

6  organization -- recommendation about the structure

7  of the organization when they came in.

8    Q    Didn't Walker & Company propose to take

9  over the entire finance department?

10    A    Yes.

11    Q    And wasn't what happened --

12    A    And to retain some of the employees.

13    Q    But that didn't happen until later, did

14  it, the decision to retain some of the employees to

15  work with Walker & Company?

16    A    No, I think that was from the beginning.

17    Q    Do you know if Walker & Company

18  indicated anywhere in writing that Mr. Quashi

19  should stay and Mr. Kakeh should go?

20    A    I do not.

21    Q    Okay.  Do you know if Miss Mack was

CONTINUED DEPOSITION OF SHEILA CRUICHSHANK
Conducted on May 2, 2006

126

1          Q.    Do you know when you actually communicated

2    to someone at UPO you were resigning effective

3    May 16?

4          A.    I don't recall, but it would have been

5    very close to this date, may have been May 1, it

6    would have been very close.

7          Q.    If you recall, I can show you an exhibit,

8    we have Exhibit 2 here from your deposition.

9               Is that, there is no date, but I believe

10   you identified this as having a specific date,

11   Exhibit 2, your resignation, it was to be effective

12   April 30?

13         A.    Correct.

14         Q.    You wrote that when?

15         A.    That was March.

16         Q.    The 11th?

17         A.    Yes, thank you, March 11.

18         Q.    On March 11, you submitted a letter of

19   resignation saying you were going to resign

20   April 30, 2004, when you revised your resignation

21   effective date, do you believe it was after

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

127

1    April 30?

2        A.    Probably not.

3        Q.    Before April 30?

4        A.    Well, the board asked me to stay on, no,

5    it probably wasn't before April 30.  It was

6    probably May 1, in that timeframe.

7        Q.    Who, when you revised your, the effective

8    date of your resignation to May 16, 2004, who did

9    you communicate that to?

10       A.    Mr. Jones.

11       Q.    Why did you revise your resignation date?

12       A.    At the original date, as you are probably

13   aware, there was some events that took place after

14   I resigned with regard to Mr. Jennings' resignation

15   and the board, the person who was running it, I

16   can't recall what her position was, called.

17             They asked that I stay on until they had

18   an opportunity to find a replacement and get all

19   the audit stuff completed.

20       Q.    Alexis Roberson?

21       A.    Yes.

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

128

1    Q.   Alexis Roberson asked you to extend your

2    effect date to May 16?

3    A.   Yeah, that may have been done through

4    Gladys Mack.

5         I don't recall the exact circumstances.

6    Q.   Did there come a time when you further

7    extended your resignation date?

8    A.   From?

9    Q.   May 16 to June 30?

10   A.   Yes.

11   Q.   Why did you do that?

12   A.   Mr. Jones asked that I delay the May 16

13   date until some future date.

14        By June 30, we had kind of finished

15   everything and they had brought in the new team.

16   Q.   The Walker & Company team?

17   A.   Correct.

18   Q.   When did Walker & Company come in?

19   A.   I want to say they came June 1, I think I

20   spent about a month transitioning with them.

21   Q.   Did anybody ask you to stay on beyond June

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

130

1    A.    I did.

2    Q.    How many?

3    A.    One, which he refused to sign.

4    Q.    Do you remember approximately when that

5    was completed?

6    A.    I do not.

7    Q.    Was it in 2004?

8    A.    I don't remember.

9    Q.    Why were you asked to stay on to May 16?

10   A.    Because we still had auditors working on,

11   trying to complete the audit.

12   Q.    You mean the Thompson Cobb auditors?

13   A.    Yes.

14   Q.    What exactly did you do to assist with the

15   Walker & Company transition?

16   A.    I don't know, worked with them to let them

17   know what the daily routines were, what systems we

18   were using and what I knew of them, what you would

19   transition with anybody who is taking over what you

20   do, you tell them what it is you are doing and how

21   it works.

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

133

1    client.

2           MS. DAVIS:  This is the first opportunity

3    she has had to look at that.  She has never seen

4    the document before.

5           MR. MELEHY:  Has she had an opportunity to

6    look at it and consult with counsel, if she needed

7    to?

8           MS. DAVIS:  Yes.

9           BY MR. MELEHY:

10    Q.    You have not seen this document before?

11    A.    It doesn't look familiar.

12    Q.    To your knowledge, is this a document

13    complied by Amin Kakeh?

14    A.    I would say that only because I know he

15    put versions on the bottom of the statements, that

16    would be the only way I could tell.

17           MR. MELEHY:  Have that marked as an

18    exhibit.  That would be Exhibit 6.

19           (Shears Deposition Exhibit No. 6 was

20    marked for identification.)

21           BY MR. MELEHY:

140

1    A.    No.

2    Q.    Do you agree that the deficit was

3    approximately $1.7 million for fiscal year 2003,

4    that is the figure contained in Exhibit 6, the

5    February 5, 2004 financial statement?

6    A.    I believe that, once we went through all

7    of the unclassified amounts of money, that we had a

8    number that might have been lower than that.

9    Q.    Do you remember what the number was, do

10   you know?

11   A.    No, I really don't, I don't know.

12   Q.    Do you know if Mr. Kakeh shared the

13   February 52004 or March 3, 2004 financial statement

14   with Tunde Eboda or his group?

15   A.    The one with the $3 million deficit, I

16   believe it was one we had issue with Amin about

17   sharing with them, but I can't be sure which

18   statements were which.

19   Q.    Do you know one way or the other whether

20   Amin Kakeh shared the February 5, 2004 financial

21   statement with Tunde Eboda or his group at any

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

141

1  time?

2      A.   I don't recall the date specifically.

3      Q.   We had an issue with him sharing--you

4  think it was the March 3, 2004 statement, who is

5  we?

6      A.   Ms. Mack and Mr. Jennings, myself.

7      Q.   When you submitted your resignation on

8  March 11, did you know Mr. Jennings was going to be

9  let go?

10     A.   I did not.

11     Q.   Was it purely coincidental you submitted

12  your resignation on the same day he was let go?

13     A.   It was.

14          MR. MELEHY:  Have this marked as the next

15  exhibit.

16          (Shears Deposition Exhibit No. 8 was

17  marked for identification.)

18          BY MR. MELEHY:

19     Q.   I am showing you a memo dated February 25,

20  2004, marked Shears Number 8, to several people

21  from Gladys Mack and you are one of the recipients.

149

1   Thompson Cobb.

2       Q.   Whose decision was it to pull the

3   questionnaire, to rescind its transmission to Mr.

4   Kakeh?

5       A.   It would have been Mr. Jones.

6       Q.   Did he talk about that decision with you?

7       A.   Not specifically, I can recall not

8   specific to Mr. Kakeh, if we had discussion, it

9   would have been all the questionnaires not Mr.

10  Kakeh's questionnaire specifically.

11      Q.   Do you remember, on March 30, where Ms.

12  Mack told Mr. Kakeh he was no longer responsible

13  for the Thompson Cobb audit and you would be in

14  charge?

15      A.   I don't know about the date, but that

16  probably did occur.

17      Q.   Do you know why, why was he initially

18  placed in charge of the audit?

19      A.   Because that was considered part of what

20  he was responsible for, to coordinate with Thompson

21  Cobb, he was responsible for making sure they had

CONTINUED DEPOSITION OF SHEILA M. SHEARS
Conducted on May 2, 2006

150

1    all of the information they needed for their audit.

2        Q.   Do you agree, on March 30, Mr. Kakeh was

3    told he was no longer responsible for the audit?

4        A.   I don't know specific date, but I do

5    recall that happened.

6        Q.   In your earlier testimony, page 13, I

7    would welcome you reading that if you would like,

8            You may want to read the previous page.

9            Basically, it says here, Did you recommend

10   to eliminate any positions, and you said no.

11           I want you to confirm that by reading,

12   probably starting bottom of page 12 moving to page

13   13.

14           Let me know whether that is your answer.

15       A.   Okay.

16           (Witness complies.)

17       Q.   You did answer, correct, you had not

18   recommended his position be eliminated?

19       A.   It says at that time, I was trying to look

20   back.

21       Q.   On November 28, 2003, you did not

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

151

1    recommend that.  Did you not?

2        A.   Yes.

3        Q.   It is your position you made no such

4    recommendation in 2004?

5        A.   Oh, I did.

6        Q.   You did?

7             In 2004, what did you recommend, what

8    positions did you recommend be eliminated?

9        A.   I probably recommended that Mr. Kakeh be

10   eliminated.  That was when I wrote a reprimand, in

11   2004.

12       Q.   That he specifically be eliminated?

13       A.   Correct.

14       Q.   Do you remember an April 14 meeting

15   between you, Mr. Kakeh and Mr. Jones?

16       A.   Approximately, April 14?

17       Q.   Tell me the subject.

18            Did Mr. Kakeh offer to resign in the

19   presence of Mr. Jones at any time or you?

20       A.   I think he did.

21       Q.   Was that, could that have been the

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

163

1      Q.    What kind of information?

2      A.    Probably financial information,

3  worksheets, things of that nature.

4      Q.    Not providing information to Thompson Cobb

5  in a timely manner or to whom?

6      A.    To, probably to me, to Thompson Cobb or to

7  F.S. Taylor because they were working on some

8  worksheets and information.

9      Q.    Were you getting this information from

10  Ms. Mack or did you have firsthand knowledge?

11      A.    Firsthand knowledge, my office was next

12  door.

13      Q.    Where did you acquire that firsthand

14  knowledge?

15      A.    When I would ask for information or

16  something from Mr. Kakeh and he was not responsive.

17      Q.    What kind of information did you ask for

18  from him that he was non responsive?

19      A.    Probably worksheets or some financial

20  information, maybe, may have been a question about,

21  you know, at that time, I think we were working on

1   says it went to all UPO managers, I did not receive

2   it, I saw a copy from another manager and contrary

3   to what this document has, it was not signed by

4   anybody.

5       Q.   So you didn't know who it was from?

6       A.   No.

7       Q.   Which manager gave it to you?

8       A.   Probably Wayne Thompson, if I can recall,

9   showed it to me.

10      Q.   Who do you think wrote it?

11      A.   I have no idea.  It was unsigned, that was

12  my question who is this from, you know.

13      Q.   Did you conduct inquiries in the financial

14  department to find out if the employees were upset

15  about the outsourcing?

16      A.   Yes.

17      Q.   Were they truly upset about the

18  outsourcing?

19      A.   Yes, they were, but I reminded them that

20  I, I reminded them, they were told they were

21  looking into outsourcing, but that it did not

CONTINUED DEPOSITION OF SHEILA D. SHEARS
Conducted on May 2, 2006

168

1    necessarily mean they would be out of jobs.

2        Q.    You explained to them that just because

3    the department would be outsourcing didn't mean

4    they would be out of a job?

5        A.    Yes.

6        Q.    What reason did you give?

7        A.    First of all, whoever they were going to

8    outsource to would come in and evaluate based on

9    what had to be done and who was doing it and they

10   could be kept on to do that work, as well.

11       Q.    It was contemplated, as of April 29, 2004

12   that it might be a partial not complete

13   outsourcing?

14            MS. DAVIS:  Objection.  Form.

15            You can answer.

16            THE WITNESS:  It was part of the agreement

17   with what is the company's name--Ron White, is it

18   White, I'm sorry, my mind went blank, Walker &

19   Company.

20            Walker & Company, that they would come in

21   and not replace the entire staff, that they would

CONTINUED DEPOSITION OF SHEILA BY SHEARS
Conducted on May 2, 2006

169

1    take a look at the department before they did

2    anything and that could result in some of those

3    folks remaining in place.

4              BY MR. MELEHY:

5        Q.    You indicated, in your last deposition,

6    you may have notes of some meetings with Mr. Eboda

7    or his group?

8        A.    Yes, and I was unable to find those.  I

9    had some notebooks in a box.  I think I have thrown

10   the box away.

11       Q.    Do you know when you threw it away?

12       A.    No, I have been on a decluttering tear, my

13   husband and I, I think it was with some other boxes

14   we probably threw away in the last--I don't know,

15   six months.

16       Q.    The notes that were in those boxes, did

17   those concern meetings with Mr. Eboda and his group

18   or others?

19       A.    Yeah, they were notes I would take for my

20   meetings, staff meetings, whatever I would take

21   notes, any meeting I would have had with them would

174

1   I guess that would have been in March or so, and

2   yes, he did.

3          MR. MELEHY:  Give me a couple of minutes,

4   I'm winding up here.

5          (Discussion off the record.)

6          MR. MELEHY:  I am through asking questions

7   of this witness.

8          The only thing that could open this back

9   up is if I got new documents that had a bearing, I

10  would ask the court before doing it.

11         Thank you for coming.

12         Off the record.

13  (Whereupon, the deposition was adjourned at 11:54

14  a.m.)

15         (Reading and signing waived.)

16

17

18

19

20

21