# EXHIBIT 24

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------x

MOHAMMED AMIN KAKEH,                 x

          Plaintiff,        x Civil Case No.

          v.                x 1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC., x

          Defendant.        x

------------------------------------ x

Monday, April 10, 2006

Silver Spring, Maryland

The deposition of GLADYS W. MACK called for

examination by counsel for Plaintiff in the

above-titled matter, pursuant to notice, in the

Offices of Zipin & Melehy, 8403 Colesville Road,

Silver Spring, Maryland, before Jonell Easton,

notary public, at 10:26 a.m., when were present on

behalf of respective parties:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

9

1    is essentially it.

2        Q.    You did graduate work in the late 1950s in

3    accounting?

4        A.    Yes.

5        Q.    How many accounting courses did you take

6    then?

7        A.    Probably about three.

8        Q.    Do you have any certifications?

9        A.    No.

10       Q.    When did you graduate?

11       A.    1955.

12       Q.    Did you take any finance or accounting

13   courses?

14       A.    Yeah, I took accounting, no finance, just

15   accounting.

16       Q.    Just one course?

17       A.    I probably had--gosh, I don't remember.  I

18   had at least two, I think only two, I am not sure.

19       Q.    Do you consider yourself to have any

20   expertise in the area of accounting?

21       A.    Yes, from the work and studying I have

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

13

1   that.

2       A.    Okay.

3       Q.    How long did you work with Ben Jennings?

4       A.    From 1992, from 1991, October of 1991

5   until he left in March of 2004.

6       Q.    You are aware of the allegations he was

7   using or attempting to use grant funds or UPO funds

8   for things like boats or a boat, cell phone

9   charges, paying personal parking tickets.  Correct?

10      A.    Yes, I am aware.

11      Q.    When did you became aware he was doing

12  those things?

13      A.    I became aware that he was purchasing a

14  boat in January of 2004, and it was brought to my

15  attention by Sheila Shears, who was CFO at the

16  time.

17      Q.    Did you think that was wrong of him to do

18  that, at that time?

19      A.    I didn't have a judgment on that.  I was

20  told that action was part of a plan to have a

21  nautical program for our customers.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

15

1   question about it with Mr. Jennings.

2       Q.   Raised a, what did you say, raised a

3   question, what do you mean by that?

4       A.   I was aware that funds were being,

5   payments were being made on a boat and that Sheila

6   Shears had raised a question about documents,

7   supporting documents for those payments and those

8   questions had been raised by our auditors, Thompson

9   & Cobb.

10          And as a result of raising the question

11   about the documentation with Ms. Shears, she then

12   raised the question with Mr. Jennings.

13          And it was at that time that she became

14   aware there was a contract for a boat, so it was

15   with regard to providing documentation for the

16   auditors.

17       Q.   That was in January of 2004?

18       A.   I believe so.

19       Q.   This wasn't a CSBG review?

20       A.   No.

21       Q.   You are talking about auditors of UPO?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

17

1    raised questions, there was a memo from auditors, I

2    believe in January of 2004, with a list of

3    outstanding issues and the list included the boat,

4    I know that was the outstanding issue.

5         And there was other issues on the list--I

6    would have to refresh my memory--that the auditors

7    wanted to have details on, and I was aware of that

8    letter.

9    Q.    How did the auditors know about that?

10   A.    I suppose that is what auditors do.

11   Q.    Did they get information from Amin Kakeh

12   or someone else?

13   A.    I assume they got it from their, our

14   records they were auditing.  He would have been

15   custodian of the records, they came from the UPO

16   Office of Finance.

17   Q.    Did you think Amin Kakeh was a competent

18   accountant?

19   A.    Yes.

20   Q.    Your answer is yes with reservations or

21   yes with no reservations?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

27

1      A.   No, it is my understanding, let me say

2   this, I met with Dr. Eboda, I believe, about the

3   18th of February, and he indicated at that time

4   that he had identified--that was when he told me he

5   had identified reviewers and that he was going to

6   initiate the review himself.

7           I believe it was the 19th of February.   I

8   am not real sure.  I know it is the right week.  I

9   am not sure it is the correct day.

10          He indicated he would be initiating those

11  reviews by having discussion with our counsel,

12  Monica Beckham, and with Ms. Shears and that he

13  would, was going to get started on it that week

14  because he was anxious to get started and he only

15  wanted to start by reviewing contracts in counsel's

16  office and by looking at the development of

17  procurement policy being done by Ms. Shears.

18          I think that was the third week in

19  February and the last week in February I got a call

20  from Dr. Eboda who indicated on March 1, he would

21  be at UPO, that he identified these colleagues he

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

28

1    talked about, and they would be at UPO on March 1.

2        Q.    Did you get the impression in March he was

3    doing supplemental follow-up?

4        A.    What?

5        Q.    Did you get the impression that Mr. Eboda

6    was doing a follow-up to his previous review in

7    March, that it was really a two-part process?

8        A.    No.

9        Q.    You thought it was all part of the same

10   plan?

11       A.    Yeah, the plan he announced in fall of

12   2003 and again reiterated in January of 2002, 2004

13   and it had finally come to pass in March of 2004

14   because he had finally identified the people who

15   could do the review.

16       Q.    It is your understanding that, prior to

17   him coming in mid-February to start the review, he

18   had planned all along on using an outside

19   consulting firm?

20       A.    He said so, as indicated by getting the

21   District CFO and on two occasions he said,

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

29

1   indicated he tried to get them and ran out of time

2   because he said he had an outside deadline.

3       Q.   He met, when was the first time he met

4   with you regarding this review?

5       A.   Well, it was in August of a meeting he had

6   with Mr. Jennings, I recall two of those, and Mr.

7   Jennings was on medical leave, I believe.  That

8   started in early February, and so I met with Mr.

9   Eboda twice in February on the review.  That would

10  have been my recollection, about four times.

11      Q.   The first time you met with him in

12  February about the review, who else was in the

13  meeting?

14      A.   I believe it was two of us because he was,

15  he indicated he was about to start the review, he

16  was informing--I think there was a letter.  I think

17  he brought a letter with him regarding that review.

18      Q.   Did he indicate what he needed or what he

19  was going to look at?

20      A.   He said he was going to look at

21  administration and he indicated he was going to

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

30

1   look at contracts and he was interested in

2   procurement policy.  Those two things I remember

3   specifically.

4        Q.   Did he mention anything about a boat or

5   cell phone charges or anything like that?

6        A.   No.

7        Q.   The second time you met with him, who was

8   in the meeting?

9        A.   I think it was the two of us again, I

10  believe, because he was, indicated he had

11  identified the reviewers and they would be coming.

12        I am not absolutely clear that wasn't a

13  phone call.

14        Q.   That was in February of 2004?

15        A.   Yes.

16        Q.   Do you remember if it was prior or on the

17  18th?

18        A.   The second time it was after the 18th, the

19  18th was him indicating he was still trying to get

20  the District CFO, but he was pursuing other

21  avenues, sometime, it would have been the week of

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

31

1    the 20th or so he indicated he had identified the

2    people.

3        Q.    When did he tell you he was not going to

4    use the District CFO?

5        A.    I believe that was, as I said, sometime

6    after the 18th.

7        Q.    Do you remember whether it was in February

8    that he told you that?

9        A.    Yes, it was February.

10       Q.    Do you remember if it was the end of

11   February?

12       A.    It was either the 18th or after.  I don't

13   remember specifically.

14       Q.    When he told you that, did he have someone

15   lined up to help, a consultant, did he indicate to

16   you he had a consultant lined up?

17       A.    No, he told me he was going to pursue his

18   colleagues because they were in town for a meeting.

19       Q.    His colleagues would be the consultants?

20       A.    Well, the lead person is a community

21   action director, I believe, and that person brought

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

38

1    Q.    Did he talk to Mr. Kakeh when he came in?

2    A.    I only know that because Ms. Shears told

3    me that when Dr. Eboda came between the 18th and

4    the 25th, that he had a conversation with Mr.

5    Kakeh.

6    Q.    Do you know if he ever received any

7    financial statement from Mr. Kakeh?

8    A.    I have no idea.

9    Q.    Did he possess, did Mr. Eboda possess a

10   financial statement in February of 2004 or March of

11   2004 that you disagreed with?

12   A.    Dr. Eboda?

13   Q.    Yes.

14   A.    When you say did he possess, what do you

15   mean?

16   Q.    Did he possess a UPO financial statement,

17   did Mr. Eboda possess a UPO financial statement in

18   February or March of 2004 that indicated UPO had

19   projected deficit, to your knowledge?

20   A.    I don't know if he possessed it.

21   Q.    He never told you he had it?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

39

1      A.    Not that I recall.

2      Q.    Mr. Eboda never showed you that he had it?

3      A.    No.

4      Q.    Was a financial statement in existence at

5    that time that indicated, that was February of 2004

6    or March of 2004, that indicated UPO had a

7    projected deficit?

8      A.    Yes.

9      Q.    Who had prepared that financial statement?

10     A.    Well, there were several financial

11   statements that were prepared by Mr. Kakeh, to the

12   best of my knowledge, the initial financial

13   statement prepared by Mr. Kakeh was done, I

14   believe, in December of 2004, December or January

15   that projected a deficit much smaller than the

16   deficit that was shown in the financial statement

17   that was presented in March of 2004.

18     Q.    The financial statement presented in March

19   was prepared by Mr. Kakeh?

20     A.    As far as I know.

21     Q.    That showed how much of a deficit?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

40

1      A.    I don't recall. I think over 3.4 million,

2  I am not absolutely certain.

3      Q.    Did you disagree with that financial

4  statement?

5      A.    I did.

6      Q.    Did you indicate to Mr. Kakeh you

7  disagreed with it?

8      A.    I did.

9      Q.    Did you ask him to change it?

10     A.    I did.

11     Q.    When did you ask him to change it?

12     A.    When I saw it.

13     Q.    When was that?

14     A.    That would have been sometime during the

15  March 1 through March 5 timeframe.

16     Q.    How did you manage to see it?

17     A.    I was in a room and it was being

18  discussed, I was in a room in his area, I don't

19  know if it was in his office, and also present were

20  some of the reviewers, I believe, Mr. Kakeh and

21  Ms. Shears.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

41

1       Q.   Had you seen a financial statement

2   previously?

3       A.   Previous to what?

4       Q.   Had you--okay, let me back up.

5            You said there was a group of people in a

6   room with a financial statement and this financial

7   statement where Mr. Kakeh charges the deficit was

8   $3.4 million was discussed.  Correct?

9       A.   Yes.

10       Q.   In that meeting you were present.

11            Was Mr. Kakeh present?

12       A.   Yes.

13       Q.   Was Mr. Jennings present?

14       A.   No.

15       Q.   Was Mr. Eboda present?

16       A.   I don't think so.

17       Q.   You said some of the reviewers were

18   present?

19       A.   I believe so, I am really not clear on

20   that.

21       Q.   Were you voicing your disagreement with

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

42

1  that financial statement, at that time?

2      A.   I think so.

3      Q.   That financial statement, had you seen

4  that financial statement, that particular one,

5  prior to that meeting?

6      A.   No.

7      Q.   Had Mr. Kakeh prepared that financial

8  statement?

9      A.   Yes.

10     Q.   Who showed you the financial statement?

11     A.   Ms. Shears.

12     Q.   Did she disagree with it, as well?

13     A.   Yes.

14     Q.   Was there ever a time when you told Mr.

15  Eboda he should not seek information from Mr.

16  Kakeh, he should seek information from Ms. Shears?

17     A.   Perhaps, I don't know, maybe that is

18  something I might have said.

19     Q.   Why would you have said something like

20  that?

21     A.   With regard to the official position of

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

46

1    information that Mr. Kakeh produced was firsthand

2    and we later learned that Mr. Kakeh had schedules

3    regarding financial statements that were

4    unavailable to Ms. Shears, and so Mr. Kakeh could

5    produce a statement financial statement and when

6    Ms. Shears would go to find the same financial

7    statement, she would get a different answer than

8    Mr. Kakeh.

9         And we thought that was very strange and,

10   you know, sort of incredible, here two people

11   trying to get the same report from the financial

12   management system and we later learned that Mr.

13   Kakeh had reports that could not be accessed by

14   Ms. Shears on purpose.

15        So it was, if it was that, Ms. Shears, as

16   I indicated, was the agency's financial officer

17   responsible to the District and so it was in that

18   context I wanted Dr. Eboda to speak to her.

19        Also with respect--

20   Q.   When did you find out about the--I'm

21   sorry, go ahead.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

48

1    He may or may not have been in the room

2  when I was having discussions, I can't say.

3    I can say I don't recall he and I had any

4  discussion one on one.

5    Q.   I didn't assume that.  I'm sorry if I gave

6  you that impression.

7    Going back to my earlier question, you

8  indicated the fact Mr. Kakeh was not giving certain

9  schedules and reports to Ms. Shears that really had

10  nothing to do with you possibly going to Mr. Eboda

11  and saying go to Mr. Shears?

12    A.   I knew Ms. Shears was complaining, I heard

13  her say that sometimes I didn't know why that he

14  had created his own secret statement.

15    Let me address the concern I raised about

16  the way the statements were presented and my

17  request they be changed.

18    Q.   Okay.

19    A.   When Mr. Kakeh presented the statement

20  that had the $3.4 million deficit, whatever, it was

21  the first time I had a statement with a deficit

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

49

1   that size and it turned out that it was because Mr.

2   Kakeh had decided he was going to treat the CSBG

3   revenue in a different way than it had ever been

4   treated the whole six years he had been at UPO, in

5   a way there had been no discussion within the

6   agency, with me or anybody else.

7           And I asked him to change it and treat it

8   the way he had always done it for the previous five

9   years and the way the agency had always done.

10          It wasn't I was asking him to do something

11  different.

12          I was asking him to do the same thing he

13  had always done.

14  Q.   Did Mr. Eboda's group raise any concerns

15  about the boat or cell phone charges or the parking

16  fines or anything else that were allegedly improper

17  at UPO?

18  A.   Well, the report from the reviewers did

19  indeed raise concerns about all those things, the

20  preliminary report that was left, that was left

21  with the agency that the board got the opportunity

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

50

1   to review before the reviewers left did mention all

2   those things.

3           But I underscore all those things had been

4   raised by the auditors in the letter of January 17,

5   which I am sure you are aware of this, the raising

6   of those issues by reviewers almost simply

7   repeating what had been raised by the auditors.

8           MR. MELEHY: I will ask you to take a look

9   at the next exhibit, which will be Number 2.

10          (Mack Deposition Exhibit No. 2 was marked

11  for identification.)

12          BY MR. MELEHY:

13      Q.   I will ask you to take a look at that and

14  ask if you recognize it.

15      A.   I do.

16      Q.   That is the final report done by the

17  DIstrict of Columbia Department of Human Services.

18  Correct?

19      A.   That is what it says.

20      Q.   Is it not final?

21      A.   It turned out to be final.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

51

1    Q.   Was it a report that was revised several

2    times, in other words, this report is part of

3    another, a draft that had been revised?

4    A.   This report, as I recall, is a revision of

5    the initial report that the board had seen on

6    March 11.

7    Q.   March 11?

8    A.   2004.

9    Q.   There was also a December report, as well?

10   A.   Correct.

11   Q.   There were at least two revisions?

12   A.   Yes.

13   Q.   UPO had a chance to raise objections to

14   the contents of the report at each stage?

15   A.   Not at each stage, but the report was

16   issued--the second, the first revision was done

17   without UPO's input.

18   Q.   The second revision prior to March 5, 2005

19   was done with UPO input?

20   A.   Yes, I believe so, this is the final one.

21   Q.   You believe so?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

52

1      A.   We did have input.

2      Q.   I believe, I am not certain it is the

3  final one.

4      A.   I believe it is, too.

5      Q.   So UPO had a chance to voice objections to

6  any of the contents of the report it may have

7  considered inaccurate.  Correct?

8      A.   Yes.

9      Q.   Flip to page 5.

10     A.   (Witness complies.)

11          Okay.

12     Q.   Go down the page, last full paragraph, The

13  state CSBG office.

14          Do you see that?

15     A.   Yes.

16     Q.   I will read it, The state CSBG office

17  meets or exceeds the statutory standard.  Planning

18  for fiscal year--

19     A.   Wait, okay.

20     Q.   Last full paragraph, the last paragraph

21  is, Planning for fiscal year 2004 compliance

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

53

1    monitoring review was at least six months in

2    development.  This effort was conducted with

3    involvement from the sub-grantee organization, UPO,

4    with advance notification of intent, time and

5    possible areas of review.  An entrance interview

6    was conducted with the UPO management on February

7    18, 2004, and the monitoring review commenced.

8            Do you agree with that?

9    A.    I spoke to that before.

10   Q.    I am asking if you agree or disagree.

11   A.    It is hard for me to answer yes or no.

12           If Dr. Eboda considers his meeting with me

13   to indicate that he was coming, I think the next

14   day, well, actually, okay, I won't disagree.

15   Q.    Do you agree there was an entrance

16   interview on February 18, 2004 and at that time,

17   the monitoring review done by CSBG group commenced?

18   A.    No.

19   Q.    You don't agree the monitoring review

20   commenced on February 18, 2004?

21   A.    Let me try again.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

54

1       UPO management, February 18, I think that

2   was me by myself, as I indicated before.

3       Now, I need--I really should have a

4   calendar.

5       Q.   Okay, I can get you one.

6       A.   I need to know what day of week that was.

7       MR. MELEHY:  Off the record.

8       (Discussion off the record.)

9       MR. MELEHY:  Have this marked as Exhibit

10  3, please.

11      (Mack Deposition Exhibit No. 3 was marked

12  for identification.)

13      BY MR. MELEHY:

14      Q.   I am handing you a calendar, Ms. Mack.

15      It's January, February, March, April of

16  2004, for the record.

17      A.   Okay, yes, the meeting with management on

18  the 18th, as far as I can recall, was just Dr.

19  Eboda and me.

20      And he may have described that as an

21  entrance interview with UPO management.  That was a

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

55

1    meeting between the two of us.

2           And at that time, he indicated that he

3    would be in the next day, I believe, because this

4    was the day I left the office at the end of the

5    day.  I didn't return to the 23rd.

6           During that discussion, he indicated he

7    would be coming the next day to talk with some of

8    our UPO managers and he indicated he would be

9    talking with general counsel or our CFO.

10    Q.    Going back to the same paragraph I will

11   read you another part of it, Faced with concerns

12   over unavailable documents requested for review,

13   contradictory statement made by management and

14   staff, incomplete and untimely reporting, the

15   monitoring team decided to suspend the review

16   exercise and to seek assistance from an expanded

17   review team composed of experts with specified

18   skills.

19           I am assuming you disagree with this

20   statement.

21    A.    Let me say when Dr. Eboda came on the

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

69

1    A.    No, not specifically.

2    Q.    Were you critical of Mr. Kakeh's work

3  performance in 2004, at all?

4    A.    Not specifically, I was critical of some

5  of the incompleteness of the work in the office.  I

6  was never, I don't think I was generally, I guess

7  it was no secret that there were issues with the

8  finance office.  Our audits showed various repeat

9  problems and so to that extent, it was common

10 knowledge that the office was not performing as was

11 desirable.

12   Q.    Did you have any discussion, at all, at

13 any time, about terminating Mr. Kakeh's employment?

14   A.    No.

15   Q.    You are absolutely sure?

16   A.    Not that I recall, I don't remember, I

17 know that there was discussion about bringing in

18 the CFO and I do recall supporting the retention of

19 Mr. Kakeh in an organization structure that had a

20 CFO and also a controller.

21   Q.    Whose decision was it to hire Ms. Shears?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

70

1      A.    It was a decision made by Mr. Jennings and

2   supported by me.

3      Q.    Did you have any discussions with

4   Mr. Jones, at any time, about terminating Mr.

5   Kakeh's employment?

6      A.    Not that I recall, you know, there was a

7   lot of discussion about improvements needed in

8   financial management and how to get those

9   improvements accomplished.  There had been

10  discussion over the last three to four year about

11  outsourcing the financial management because it was

12  not working, so this goes back--I don't know, as

13  early as 2001 I believe there was some discussion

14  and it was 2001, maybe 2000 about outsourcing the

15  financial management and the implication of that

16  was that the persons currently employed would be

17  displaced by the outsourcing.

18     Q.    Did you have any discussion with Mr.

19  Jennings, at any time, about terminating Mr.

20  Kakeh's employment for performance reasons?

21     A.    Not that I recall.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

72

1          Well, let me say this, when the

2     reorganization occurred that brought Ms. Shears in,

3     basically it was because the leadership of the

4     office was not accomplishing the goals of the

5     office and the reorganization was to attempt to

6     bring in other resources that would improve the

7     performance of the office.

8          So, you know, had Mr. Kakeh been, had the

9     office been succeeding under the leadership of Mr.

10    Kakeh, the reorganization may not have taken place.

11          The fact he was retained suggested it was

12    felt he could make a contribution to a reorganized

13    office.

14     Q.   At the time Mr. Jennings left, did he have

15    any plans to outsource the accounting department or

16    the finance department or had those plans been

17    scraped?

18     A.   That had been in the planning off and on

19    for five years, four years, for four or five years,

20    right.

21     Q.   It had never been followed through on?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

76

1    Q.   Mr. Quashie constituted leadership?

2    A.   Yes.

3    Q.   Did Mr. Issacs constitute leadership?

4    A.   I think so.  I think he was RIF'd.

5    Q.   But this is all the leadership?

6    A.   Yes, you are asking me for details I am

7  not familiar with.  I know Mr. Quashie, Mr. Kakeh

8  and Ms. Shears.

9    Q.   Mr. Issacs, too?

10    A.   You are putting those words in my mouth.

11    Q.   I am asking you.

12    A.   I don't know the answer to that.

13    Q.   Okay, fair enough.

14         Did Nona McLean constitute leadership of

15  the finance office?

16    A.   Not of the finance office, no, she didn't,

17  she had a leadership position in the one of the

18  sections of the finance office.

19    Q.   But she wasn't part of the leadership of

20  the finance office?

21    A.   Not as it related to outsourcing, no.

DEPOSITION OF GLADYS W. MACK
Conducted on April 12, 2006
Case 1:05-cv-01271-GK    Document 78-35    Filed 02/27/2007    Page 30 of 60

77

1      Q.    Did you make any recommendations about the

2   RIF, who should be RIF'd?

3      A.    Not that I recall.

4      Q.    Mr. Jones made the decision about who to

5   RIF without any input from you?

6      A.    I did not provide any input to the

7   discussion about who.  The RIF came from our, I

8   mean was kind of controlled by the RIF policy that

9   has a certain structure and protocol associated

10  with it.

11     Q.    Do you mean priority?

12     A.    Job family group it is called.

13     Q.    Does that refer to who gets RIF'd?

14     A.    Yes.

15     Q.    It does?

16     A.    Yes.

17     Q.    Was Ms. Shears RIF'd?

18     A.    No, she resigned.

19     Q.    Why wasn't she RIF'd?

20     A.    Because she resigned and she had indicated

21  she was going to resign even before the RIF was

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

78

1    decided upon.

2        Q.    Was Mr. Kakeh RIF'd?

3        A.    I believe so.

4        Q.    Was Mr. Quashie RIF'd?

5        A.    I believe so.

6        Q.    Was Mr. Issacs RIF'd?

7        A.    Yes, but he was RIF'd because his job was

8    being abolished, yes, period.

9        Q.    So he wasn't part, you indicated--I want

10   to say this the right way--the leadership of the

11   finance office as it related to outsourcing--was

12   Mr. Issacs part of that?

13       A.    You asked me before and I told you I

14   didn't think so.  I still don't think so.

15       Q.    I didn't--I wanted to make it clear I had

16   asked, I wasn't sure I had asked it as accurately

17   as that.

18       A.    Yeah.

19       Q.    Do you know whether Nona McLean was?

20       A.    If she was RIF'd?

21       Q.    Yes.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

79

1      A.   I don't think so.

2      Q.   Do you know why?

3      A.   Her position was abolished as was Mr.

4  Issacs'.

5      Q.   She wasn't RIF'd as part of the--well,

6  never mind.

7           Was Mr. Quashie, why was Mr. Quashie

8  RIF'd?

9      A.   Because his position was abolished.

10     Q.   Was his position replaced by Walker &

11 Company?

12     A.   I can't answer that.  I mean there was a

13 position in the Walker & Company proposals and how

14 Mr. Quashie came to be in a position similar to one

15 in the proposals, I can't say.  You would have to

16 ask someone else who was familiar with the details

17 of the RIF and how it worked.

18     Q.   Mr. Quashie and Mr. Issacs were reassigned

19 immediately.  They never had a break in service

20 because of the RIF.  Correct?

21     A.   You should ask human resources people

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

80

1  about that.  I am not qualified to answer the

2  question.

3      Q.  You work with them?

4      A.  Right.

5      Q.  You know Mr. Quashie is still there?

6      A.  Yes.

7      Q.  You know he never left?

8      A.  I know he never left.

9      Q.  You don't how that happened?

10     A.  I don't understand how the RIF worked and

11 what the protocol was.

12     Q.  You don't have any idea why Mr. Quashie

13 wasn't RIF'd and was reassigned and Mr. Kakeh was

14 RIF'd and not reassigned?

15     A.  I can't speak to that.

16     Q.  Did Ms. McLean have a relationship with

17 Mr. Jennings?

18     A.  I believe so.

19     Q.  She lived with him.  Correct?

20     A.  I believe so.

21     Q.  She wasn't RIF'd.  Was she?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

85

1        Q.    Was Ms. Shears on your floor or the other

2   floor?

3        A.    She was on the other floor.

4        Q.    And she helped with the transition?

5        A.    Of course, she was there.

6        Q.    To what degree did she help with the

7   transition?

8        A.    I don't know.

9        Q.    What was your understanding of why Mr.

10   Kakeh left UPO?

11        A.    Well, I think he left because he was

12   RIF'd, I believe.

13        Q.    Mr. Kakeh, to your knowledge, was not

14   terminated for performance reasons?

15        A.    Mr. Kakeh was RIF'd because his job was

16   abolished.

17        Q.    That is it?

18        A.    That is what the record will show.

19        Q.    That is what you have believed and you

20   continue to believe.  Correct?

21        A.    That is what the record shows.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

86

1      Q.    That is what--you say that now, but that

2   was your understanding all along--the record showed

3   that.  Right?

4      A.    I don't understand.

5      Q.    You always believed that Mr. Kakeh was

6   RIF'd since?

7      A.    What do you mean I always believed he was

8   RIF'd?  I always knew, not I believed it, I knew

9   it.

10     Q.    Okay.  That was my question.

11     A.    All right.

12     Q.    You never believed or had the impression

13  he was terminated for performance-related reasons?

14     A.    He was RIF'd because his position was

15  abolished.

16     Q.    You never had the impression that Mr.

17  Kakeh was RIF'd for performance-related reasons.

18  Correct?

19     A.    Correct, but the leadership of office was

20  changed because the office was not functioning

21  properly and the record also shows that.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

89

1        Q.    This would have been in February of 2004.

2        A.    I don't know, I don't know, Mr. Jennings

3    was out nearly that entire month and I may or may

4    not have had a conversation with him on the phone

5    with Mr. Eboda.

6            I don't remember one.  I wouldn't say I

7    didn't.

8        Q.    Do you recall asking Mr. Kakeh to change

9    the financial statement?

10       A.    Yes.

11           MR. MELEHY:  Excuse me.

12           (Pause in the proceedings.)

13           MR. MELEHY:  Let's have this marked as the

14    next exhibit, Mack Exhibit Number 4.

15           (Mack Deposition Exhibit No. 4 was marked

16    for identification.)

17           MR. MELEHY:  Have these two marked as the

18    next two exhibits.

19           (Mack Deposition Exhibits Nos. 5 and 6

20    were marked for identification.)

21           BY MR. MELEHY:

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

92

1    3.781 million?

2        A.    Yes.

3        Q.    To your knowledge, was that statement

4    prepared by Mr. Kakeh?

5        A.    I assume so.

6        Q.    Did you see that statement in and around

7    March of 2004?

8        A.    I believe so.

9        Q.    Did you disagree with it?

10       A.    I did.

11       Q.    Did you ask Mr. Kakeh to change it?

12       A.    Yes.

13       Q.    Did you ask him or did you direct him?

14       A.    I directed him.

15       Q.    Looking at Exhibit 4, Mack 4, is that the

16   statement he did in response to your directive to

17   correct the statement of financial position?

18       A.    Well, I can't say this was it, it was done

19   two months later, perhaps it is.

20       Q.    Is it your recollection the corrections

21   here are approximately what was done?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

93

1      A.    Yes.

2      Q.    So the deficit went from 3.7 million to

3   approximately 731,000.  Correct?

4      A.    Yes.

5      Q.    You indicated earlier that Mr. Kakeh had

6   done things differently than he had done in the

7   past with regard to the March of 2004 financial

8   statement?

9      A.    Right.

10      Q.    What had he done that was different from

11   what he had done in the past specifically?

12      A.    I am surprised you haven't given me the

13   statement prior to March which was prepared by Mr.

14   Kakeh because they do--Exhibit 5 looks more like

15   Exhibit 4 than Exhibit 6.

16      Q.    Tell me what specifically he did that was

17   different, what did he do in 2004 that was

18   different than what had been done previously?

19      A.    What he did was to, in the March 3 balance

20   sheet, he only recognized, okay, one thing that is

21   different on the March 3 balance sheet, he had

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

94

1    deferred, under liabilities he had deferred

2    contract on grant revenue and $3 million and the

3    May--

4        Q.    Where are you now?

5        A.    I am on Exhibit 6.

6        Q.    Line?

7        A.    Under current liabilities deferred

8    contract and grant revenue.

9        Q.    Okay.

10       A.    He has, 2003, 3,073,675.

11       Q.    Okay.

12       A.    On Exhibit 4, same line, he has 1,984,822.

13       Q.    What does defer, deferred contracts and

14   grant revenue represent?

15       A.    That means revenue that had been received

16   but not earned and the May shows a lower number was

17   received and not earned.

18       Q.    What was the dispute over?  Specifically,

19   what does that number represent, first of all?

20       A.    It--while the detail is not here, this

21   probably represents CSBG funds that would be

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

95

1    included in the, would be included in the revenue

2    which UPO received, but it was not expended and so

3    it had to be carried forward.

4       Q.   Was a number, this wasn't counted as true

5    earnings so it inflated the deficit?  Is that what

6    you are saying?

7       A.   No, well, yeah, okay, it was received, but

8    not earned, it said and so--

9       Q.   What money was that specifically that was

10   reallocated from or changed, in other words, it is

11   the $3 million in the March of 2004 statement,

12   there is 1.9 million in the May 5 statement?

13      A.   Right.

14      Q.   What was specifically, what does this

15   number represent, what kind of revenue?

16      A.   Probably would be CSBG revenue.

17      Q.   Understood.

18           Why the change, why is $1.9 million being

19   booked in here, but $3 million in March of 2004?

20      A.   I was trying to find the offset, let me--I

21   am trying to show where that additional million

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

104

1    Q.    Are you sure?

2    A.    Yes.  Well, let me ask you this, when you

3    mean--I am assuming that if the office was being

4    reviewed, Mr. Kakeh, as part of his responsibility

5    in the office, was cooperating.

6    Q.    I am not asking about assumptions.

7          I am asking whether Mr. Eboda specifically

8    said to you, at any time in 2004, that Mr. Kakeh

9    had been cooperative and helpful in the

10   investigation.

11   A.    Not to my recollection.

12   Q.    In any meeting which you attended which

13   Mr. Eboda was present, did he ever indicate to you

14   that Mr. Kakeh had provided certain documents to

15   him?

16   A.    I was present I think, but I was present

17   in a meeting with Mr. Kakeh and Ms. Robinson and

18   Mr. Kakeh brought a tremendous number of documents

19   with him to that meeting and so I was aware he was

20   sharing documents with the board.  I think Mr.

21   Eboda was there also.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

106

1    with me.  He told me he would not share them with

2    me only with the board, so that was a meeting that

3    was set up so he could share the documents with the

4    board, and Dr. Eboda was there.

5        Q.    Was he authorized to share those documents

6    with Mr. Eboda at the time you just described?

7            MS. DAVIS:  Objection.  Form.

8            You can answer.

9            THE WITNESS:  I did not authorize him.  He

10   took it upon himself to present these documents and

11   he said that there were problems.

12           And I asked him both in email and later

13   personally to explain what the problems were.

14           And, as I said, he indicated he would not

15   explain it to me.

16           BY MR. MELEHY:

17       Q.    Explain them to you privately outside the

18   presence of Mr. Eboda, is that what you were asking

19   him to do?

20       A.    Not in that meeting, I am talking about

21   there was another meeting where we had some other

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

109

1    A.    Sure.

2    Q.    That was discussion held in May of 2004?

3    A.    April or May, I don't know.

4    Q.    What did Mr. Jones propose doing about the

5    problem?

6    A.    I don't know, nothing that--I don't know,

7    perhaps he asked Mr. Kakeh to cooperate or I don't

8    know.

9    Q.    I am talking about what did Mr. Jones

10   propose to you as far as a solution to the problem

11   you pointed out to him about Mr. Kakeh not

12   cooperating with you?

13   A.    Nothing in particular because Mr. Kakeh

14   had had an opportunity to since he would not

15   cooperate with me, he had an opportunity to carry

16   out his wish to share the documents with the board.

17   Q.    Was it sharing documents with the board or

18   was it sharing documents with Mr. Eboda?

19   A.    As I indicated to you, my knowledge Mr.

20   Eboda, Ms. Robinson and Mr. Kakeh was in the room

21   together when the documents were shared is my

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

110

1    recollection.

2        Q.    Did Mr. Jones express to you the fact that

3    Mr. Kakeh was not producing accurate financial

4    information--that is a general question.

5            Withdraw it.

6            Did you discuss with Mr. Jones your

7    concerns about the fact Mr. Kakeh's financial

8    statements were not accurate?

9        A.    If you are referring to the statement that

10   showed the $3.7 million deficit, yes, I did indeed

11   share that with Mr. Jones.

12       Q.    When did you bring that to his attention?

13       A.    Probably when he showed up April 5.

14       Q.    Did he seem concerned?

15       A.    Sure, the concern was that Mr. Kakeh had

16   taken it upon himself to decide how the financial

17   statements were going to be presented.

18           It was a presentation issue, rather than

19   present it in the way the agency had always done

20   and when Mr. Jones came in support of my argument

21   that it has always been done that way, I presented

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

111

1    ten years of audits showing it had been done in

2    that manner, five of those years, it had been done

3    by Mr. Kakeh in the way I asked for them to do

4    done.   It was an anomaly worth remarking

5    upon--statements had been changed.

6         Q.   Mr. Eboda acquired possession of financial

7    statements which indicated there was a large

8    deficit.   Correct?

9         A.   I assume so.

10        Q.   You did not approve of delivery of those

11   documents to Mr. Eboda.   Correct?

12        A.   Correct.

13        Q.   In your opinion, Mr. Kakeh should have

14   allowed you and/or Ms. Shears to review and change

15   the financial statements before they were given to

16   Mr. Eboda?

17             MS. DAVIS:   Objection.   Form.

18             You can answer.

19             THE WITNESS:   Well, I wouldn't have done

20   the change, I would have expected him to change

21   them to make them conform with what had been agency

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

112

1    practice and policy.

2           BY MR. MELEHY:

3       Q.    That would have been, as you articulated,

4    when you reviewed them, you said, you have done

5    these things wrong, you need to change them and

6    then you can share them with Mr. Eboda?

7       A.    And the reviewers, right.

8       Q.    Mr. Eboda objected to the outsourcing of

9    the finance department.  Correct?

10          Withdraw.

11          There was a proposal at one point to

12   completely outsource the financial department?

13      A.    Yes.

14      Q.    To replace everybody in it with F.S.

15   Taylor or Walker & Company.  Correct?

16      A.    On three different occasions over the five

17   years prior.

18      Q.    Mr. Eboda objected to that.  Did he not?

19      A.    I don't know.

20      Q.    The board objected to that.  Correct?

21      A.    Well, well, that was an evolutionary

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

113

1    process.  I think, at one point, the board voted to

2    do that and then, at a later time, the board

3    modified the decision and decided to only outsource

4    the leadership as opposed to the entire office.

5        Q.   Did Mr. Eboda object to any outsourcing of

6    the finance department?

7        A.   I am not aware of it.

8        Q.   To your knowledge, was any effort to

9    preserve documents related to Mr. Kakeh following,

10   strike.

11           Do you remember Mr. Kakeh filing a charge

12   of discrimination related to the RIF with the

13   Office of Human Rights?

14       A.   That is not my recollection, no, sir.

15       Q.   You don't remember him filing anything

16   like that?

17       A.   I remember him filing a discrimination

18   claim.

19       Q.   That is what I am talking about.

20       A.   It was not my understanding it was related

21   to the RIF.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

114

1    Q.    You don't remember him filing one related

2    to the RIF?

3    A.    No.

4    Q.    Was any effort made to preserve documents

5    to, in the case of Mr. Kakeh's RIF, documents

6    related to it or his employment?

7    A.    Efforts made by whom?

8    Q.    UPO.

9    A.    I don't understand.

10    Q.    Was any effort made to preserve notes,

11    emails, any documents related to Mr. Kakeh's

12    termination from UPO?

13    A.    I was not part of any effort.  I don't

14    know if there was one.

15    Q.    In April of 2004, did you and Ms. Shears

16    discuss the review by CSBG with Mr. Jones?

17    A.    It is likely we did.

18    Q.    Was the entire staff--there was potential

19    outsourcing of the finance department?

20    A.    Entire finance staff?

21    Q.    No, the entire staff of UPO.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

120

1      Q.   When you have finished reading, let me

2    know.

3      A.   Okay.

4      Q.   For the record, Number 7 is a, appears to

5    be a letter written to Ben Jennings from Sheila

6    Shears.  Correct?

7      A.   Yes.

8      Q.   And you are cc'd on it?

9      A.   Yes.

10      Q.   Do you remember getting a copy?

11      A.   Yes.

12      Q.   She is saying she is resigning effective

13    April 30, 2004.  Correct?

14      A.   Yes.

15      Q.   This letter was written prior to April 30,

16    2004.  Correct?

17      A.   Yes.

18      Q.   Probably prior to the time that Mr. Jones

19    came on board when Mr. Jennings was still at the

20    helm?

21      A.   Yes.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

122

1    continue in his position, given his repeated acts

2    of insubordination including the issuance of

3    financial statements that had been significantly

4    altered from any previously reviewed by management,

5    has surfaced several times.

6        Do you have any disagreement with what Ms.

7    Shears said in that first sentence?

8    A.    No.

9    Q.    It says, Each time the question has come

10   up, your response has been a reference to his

11   charge of harassment and discrimination lodged

12   against me and Gladys Mack.

13       Do you recall Mr. Jennings making

14   reference to charges by Mr. Kakeh of harassment and

15   discrimination against you and Ms. Shears?

16   A.    Again.

17   Q.    Do you remember charges of discrimination

18   being lodged by Mr. Kakeh against you and

19   Ms. Shears?

20   A.    Yes.

21   Q.    When did he do that?

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

123

1    A.    I believe that was in October 2003.

2    Q.    Each time the question has come up, your

3  response had been reference to his charges of

4  harassment and discrimination lodged against me and

5  Gladys Mack.

6        What question is she referring to here?

7    A.    I assume the question in the previous

8  sentence.

9    Q.    The question of why Amin Kakeh has been

10  allowed to continue in his position?

11    A.    I assume.  You can read it as can I.

12    Q.    It says, Each time the question has come

13  up, your response has been a reference to his

14  charge of harassment and discrimination lodged

15  against me and Ms. Mack.

16        Is it fair to say there was some

17  discussion between Ms. Shears and Ms. Jennings

18  about whether Mr. Kakeh could continue in his

19  position?

20    A.    All I know is what I read.

21    Q.    You worked with Ms. Shears and you worked

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

124

1    with Mr. Jennings?

2        A.    Right.

3        Q.    Did Ms. Shears or Mr. Jennings talk to you

4    about possibly terminating Mr. Kakeh?

5        A.    Ms. Shears talked about her inability to

6    work with Mr. Kakeh and how fractured the

7    relationship was, yes.

8        Q.    Did Ms. Shears also talk about the

9    question of why Mr. Kakeh has been allowed to

10   continue in his position?

11       A.    Not with me.

12       Q.    She certainly did in this communications,

13   didn't she, which you were cc'd on?

14       A.    No, that is she said each time it has come

15   up, she had raised it with Mr. Jennings, I assume,

16   since the letter is to him.

17       Q.    Okay.

18             And you never witnessed her raising that

19   issue with Mr. Jennings?

20       A.    You know, I honestly can't say I did or

21   that I didn't.

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

127

1      Q.   Last sentence, As a result, I am tendering

2    my resignation, effective April 30, 2004 in hopes

3    that it will allow you to move forward with the

4    changes needed in the finance office and to put an

5    end to the paralysis brought about by these

6    unfounded charges.

7           Do you have any idea how her resignation

8    would allow Mr. Jennings to move forward with

9    changes needed in the finance department and put an

10   end to the paralysis brought about by the charges

11   of discrimination?

12     A.   It is--no.

13     Q.   You don't know what she is talking about?

14     A.   No, not really, I think she described the

15   paralysis, what caused it.

16     Q.   She says unfounded charges.

17     A.   I have no idea.

18     Q.   Paralysis brought about by unfounded

19   charges.

20          Earlier, she talked about charges in

21   reference to charges of harassment and

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

128

1    discrimination and lodged against you and

2    Ms. Shears.

3            Isn't it logical she is referring back to

4    charges of discrimination?

5        A.   Yes, sure.

6        Q.   How would her resignation allow UPO to

7    move forward--other than to allow the termination

8    of Mr. Kakeh, how would her resignation allow the

9    termination of Mr. Kakeh?

10       A.   Let me say I don't know what this means,

11   so I am not going to speculate.

12       Q.   Refer back to that, did Ms. Shears ever

13   express to you, at any time, she thought her

14   resignation would allow you to terminate Mr. Kakeh?

15       A.   No.

16       Q.   Do you have any conceivable notion of how

17   her resignation could allow UPO to terminate Mr.

18   Kakeh?

19       A.   I can't imagine.

20       Q.   You can't imagine it ever--

21       A.   I don't know.  She was making that

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

129

1  reference.

2      Q.    How do you get to the conclusion her

3  resignation would allow--As a result, I am

4  tendering my resignation in hopes it would allow

5  you to move forward and put an end to the

6  paralysis.

7          Last sentence, I hope my leaving assists

8  you in removing a major roadblock to your continued

9  progress toward correcting the deficiencies in the

10  finance office.

11          I read that major road to be because of

12  Mr. Kakeh.

13          Maybe you read it differently?

14      A.    I don't know.

15      Q.    When Walker & Company came in to--well,

16  back up.

17          At one point, it was decided Walker &

18  Company would perform at least some of the

19  functions in the finance department.  Correct?

20      A.    Correct.

21      Q.    When Walker & Company bid to take over,

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

130

1    the proposal was for taking over the entire finance

2    department.   Correct?

3        A.    Right.

4        Q.    Between then and the time they took over,

5    there was a whitling down and they took over only

6    certain functions in the finance department.

7    Right?

8        A.    Right.

9        Q.    Was Walker & Company to identify who they

10   wanted to work with in the finance department?

11       A.    Well, Walker & Company, in the revised

12   proposals Walker & Company was to be responsible

13   for leadership of the office as opposed to the

14   entire, all the functions of the office.

15       Q.    Was Walker & Company, were they the people

16   who decided who they wanted to work with, who was

17   going to stay and who was going to go?

18       A.    Well, let me tell you my understanding,

19   because I don't know for sure.

20             I will tell you my understanding and that

21   is that Walker & Company was given a contract to

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

135

1          THE WITNESS:  That is not really what

2    occurred.  That may be the result.  I don't think

3    that was the thinking that got to that result.

4          BY MR. MELEHY:

5      Q.   Why didn't Walker & Company just come in

6    and replace Mr. Quashie, who was part of the

7    leadership, why wasn't he replaced?

8      A.   I can't speak to that.

9      Q.   You agree that through the RIF, Walker &

10   Company did not replace the entire leadership, just

11   some portion?

12          MS. DAVIS:  Objection.  Form.

13          THE WITNESS:  They had authority to

14   replace the entire leadership.  The decision was

15   not up to UPO, it was up to them, and they made the

16   decision.

17          BY MR. MELEHY:

18     Q.   Walker & Company decided they could use

19   the services of Mr. Quashie?

20     A.   Clearly.

21     Q.   If UPO decided they couldn't use the

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

155

1    one copy was retained by UPO.

2        Q.   So you had three meetings with the Eboda

3    team between March and May?

4        A.   May have been later than May, but it was

5    the subsequent months.

6        Q.   You had six or seven meetings total with

7    the executive team?

8        A.   Two or three meetings with the Eboda team

9    and like three meetings with the investigators.

10       Q.   Right, Ken Marty and the FBI and IG?

11       A.   I don't believe the FBI was in those

12   meetings, but they were generally the IGs, I know

13   one with DHS, with HUD and D.C. and the committee,

14   that other--there was another organization--three

15   or four IGs were at one meeting where we presented

16   our quality improvement plan.

17       Q.   What timeframe did those meetings take

18   place?

19       A.   All of those meetings occurred between, I

20   would say the March to June timeframe.

21       Q.   Was UPO being told that criminal charges

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

158

1    showed up.  Correct?

2        A.    I think so.

3        Q.    That was April or May?

4        A.    I don't know.  I don't know whether it was

5    April or May.  I think it was April, but I am not

6    for sure.

7        Q.    How long did that investigation last, the

8    FBI investigation where they were actively

9    investigating?

10       A.    I don't know and I don't want to

11   speculate.

12            I know they were there for several weeks,

13   maybe four weeks, five weeks, I don't know.

14       Q.    Is it fair to say they were there in April

15   or May of 2004?

16       A.    Yes.

17       Q.    And the three meetings you had with the

18   IGs--I assume one was D.C. and one was federal.

19   Right?

20       A.    Yes, and a couple of federal.

21       Q.    Those meetings went from when to

DEPOSITION OF GLADYS W. MACK
Conducted on April 10, 2006

159

1    when--month to month?

2        A.   I would say they were completed by July,

3    and those meetings were an opportunity for UPO to

4    present the improvements that had been made since

5    that initial CSBG report.

6        Q.   Were those meetings taking place in May of

7    2004?

8            And, to be specific about that, were they

9    taking place in June of 2004?

10       A.   I can't be specific about that.

11       Q.   They ended in July?

12       A.   That is my guess.  I would rather not

13   guess.

14           That information is available and specific

15   dates are available.  I just don't have them.

16           MR. MELEHY:  I have no further questions.

17           MS. DAVIS:  I have no questions for the

18   witness.

19       (Signing having been waived, the deposition of

20   Gladys W. Mack was adjourned at 4:12 p.m.)

21