# EXHIBIT 26

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------------------x

MOHAMMED AMIN KAKEH,                 x

                Plaintiff,           x  Civil Case No.

                v.                   x  1:05-CV-1271

UNITED PLANNING ORGANIZATION, INC., x

                Defendant.           x

------------------------------------ x

                    Monday, February 27, 2006

                    Silver Spring, Maryland


The deposition of DANA JONES called for examination

by counsel for Plaintiff in the above-titled

matter, pursuant to notice, in the Offices of Zipin

& Melehy, 8403 Colesville Road, Silver Spring,

Maryland, before Jonell Easton, Notary public, at

10 a.m., when were present on behalf of

respective parties:



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

10

1       A.   I don't know, sometime after the third

2   Wednesday of March, I don't know the date.

3       Q.   Late March?

4       A.   Yes.

5       Q.   Who interviewed you?

6       A.   The ad hoc management committee.

7       Q.   Who was on that?

8       A.   Alexis Robertson.

9            Judge Annise Waggoner.

10           Judge Raphael Diez.

11           Brenda Kelley.

12           Judge Henry Green.

13           Mr. Nathaniel Howard.

14       Q.   Did they offer you the job in the

15   interview?

16       A.   No.

17       Q.   How did you hear about the job?

18       A.   I got a phone call on the third Wednesday

19   of March from Dr. Tunde Eboda asking if I would

20   consider coming to Washington, D.C. to help them

21   with their problem.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

11

1    Q.    Did you know Mr. Eboda?

2    A.    I had met him the month before at the

3    conference, but I did not know him.

4    Q.    He suggested to you that you apply and you

5    did?

6    A.    He suggested I meet with the board.

7    Q.    Did you meet with the board?

8    A.    I met with the management ad hoc

9    committee.

10    Q.    When were you offered the job?

11    A.    Sometime in late March.

12    Q.    2004?

13    A.    Yes.

14    Q.    And you started your duties on April 5,

15    2004?

16    A.    Yes.

17    Q.    Before you took the job, what were you

18    told about UPO?

19    A.    Before I took the job, I was told there

20    had been alleged improprieties on behalf of the

21    executive management and there were articles in The

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

12

1    Washington Post.  And prior to coming, Dr. Eboda

2    e-mailed me the preliminary draft report of the

3    findings from their review.

4        Q.    So did you have a basic understanding of,

5    before you took the job, of what the alleged

6    improprieties were?

7        A.    Yes.

8        Q.    Did you have any understanding of the

9    involvement of Ben Jennings in those alleged

10   improprieties?

11       A.    Only what I read in the papers.

12       Q.    So did you read an article before or after

13   you found out about it?

14       A.    Actually, I read the article the day

15   before Dr. Eboda called me.

16       Q.    After you took the job, were you given a

17   computer, laptop or desk top?

18       A.    I was given the computer that was in the

19   office.

20       Q.    Did you have a laptop issued to you by

21   UPO?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

13

1    A.    Never.

2    Q.    Did you have a Blackberry?

3    A.    Never.

4    Q.    Did you send or receive e-mail to and from

5    coworkers?

6    A.    Yes.

7    Q.    Did you send email to coworkers?

8    A.    Yes.

9    Q.    What coworkers did you send e-mail to

10   after coming on board?

11   A.    Numerous people.

12   Q.    Gladys Mack?

13   A.    I am sure I did.

14   Q.    Sheila Shears?

15   A.    Perhaps.

16   Q.    Did you learn at some point about Amin

17   Kakeh's charge of discrimination?

18   A.    At some point, yes.

19   Q.    In June of 2004, would you say?

20   A.    I don't know when I learned of his alleged

21   charge of discrimination.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

27

1      Q.    When, in May, did you come to that final

2  decision?

3      A.    Late May.

4      Q.    What was the final decision?

5      A.    Final decision was to outsource the

6  management of the finance office.

7      Q.    At that time, the time you made the

8  decision, who was in the finance office, starting

9  from the top and working your way down?

10      A.    Sheila Shears was CFO.

11            Amin Kakeh was controller.

12            David Quashie was deputy controller.

13            Bill Issacs was senior auditor.

14            Nona McLean was the facilities person.

15            And I think, at the time I made the

16  decision, the payroll clerk had resigned.

17      Q.    Who was that?

18      A.    Sylvia Hogue, H-O-G-U-E.

19            Ododu-Thomas was there.  He was budget

20  chief, I guess that was what he was called.

21            There was Jean Gray, Arthur Gray was a

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

28

1    payroll clerk or voucher auditor, just as Daisy.

2           Christine Lattimore more was like an

3    office clerk.

4           Aaron Smith was in sometimes, an admin

5    assistant position.

6           Henry Kanaghbou was either general

7    accountant or something.

8           And the revenue chief--who was that?

9           There was a lady who worked there named

10   Nona McLean, and Marco Reed, and I think that he

11   was on the line, as well, in that organization

12   chart.

13       Q.   Who did you consider to be management in

14   the finance department?

15       A.   CFO, controller, and deputy controller,

16   facilities person.

17       Q.   Nona McLean?

18       A.   Yes, and the senior auditor.

19       Q.   That was Bill Issacs?

20       A.   Yes.

21       Q.   You indicated you wanted to get rid of,

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

36

1    her resigning, about the fact when she came there

2    she committed only to one year.

3         And I believe that I did have some

4    document indicating she would resign.

5         Q.   After she resigned, she was a given

6    severance package?

7         A.   No.

8         Q.   Any pay beyond June 30?

9         A.   Only what she would have accumulated.

10        Q.   So is it fair to say at the time you made

11   your decision to eliminate the management of

12   finance department, Ms. Shears had told you she was

13   resigning?

14        A.   By the time I made my final decision, yes.

15        Q.   As far as Nona McLean was concerned, were

16   you aware of the fact or any rumors that Ms. McLean

17   was living with Ben Jennings or had been living

18   with Ben Jennings?

19        A.   She told me.

20        Q.   Did that factor into your decision to

21   eliminate her position?

37

1  A. No.

2  Q. Was your decision to eliminate members of

3 management a result of a decision to eliminate any

4 particular members of management for poor

5 performance?

6  A. No, I had no assessment of anybody's

7 performance.

8  Q. Did you actually issue RIF letters to

9 anybody?

10  A. Yes.

11  Q. Did you issue RIF letters to Mr. Kakeh,

12 Mr. Quashie, Bill Issacs and Ms. Nona McLean?

13  A. I believe so, yes.

14  Q. Did you do it all on the same day?

15  A. I don't recall, but I would think I did.

16  Q. Was there any break in the continuity of

17 Mr. Quashie's or Mr. Issacs' employment following

18 their receipt of the RIF letter?

19  A. I doubt there was because we were, the

20 reorganization took place and the timing in which

21 the Walker firm came and identified who was going

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

39

1      A.   I can't recall the sequence, but it was

2  all about the same time, it would have been within

3  the same week probably.

4      Q.   When you issued the RIF letters to various

5  people, did you know, at that time, who Walker &

6  Company wanted to work with?

7      A.   No.

8      Q.   So you didn't know who Walker & Company

9  wanted to work with until after you issued the RIF

10  letters?

11      A.   Correct.

12      Q.   Based on what Walker told you about who

13  Walker wanted to work with, you made the decision

14  to reassign a number of the RIFed people.  Correct?

15      A.   Yes.

16      Q.   So you made the decision where, if at all,

17  to reassign some of the RIFed people after the RIF

18  letters were sent out?

19      A.   Correct.

20      Q.   Who did Walker & Company say they wanted

21  to work with?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

40

1    A.    Quashie and Bill Issacs I recall in

2    particular.

3         And they had a different organizational

4    structure and a number of people were assigned

5    different titles than they had previously.

6         The revenue chief's name is Simlock.

7    Q.    You didn't consider Mr. Simlock a member

8    of the management of the Office of Finance?

9    A.    No.

10    Q.    Did Walker & Company indicate to you why

11    it wanted to work with Mr. Issacs and Mr. Quashie?

12    A.    They talked to them and felt that they had

13    knowledge they could work with and they could train

14    them to do what they needed to do.

15    Q.    Did Mr. Quashie continue to perform some

16    of the same functions he performed as deputy

17    controller in his new position?

18    A.    Yes.

19    Q.    Did he perform substantially the same

20    functions he had performed previously when he was

21    reassigned to the position of director of

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

44

1    disagreed.

2        Q.    The reduction in force that you initiated

3    and completed in this case, was that for purposes

4    of reorganization?

5        A.    Yes.

6        Q.    Is it fair to say prior to issuing the RIF

7    letters, you did not announce to the organization

8    that you were actually doing a reduction in force?

9        A.    What do you mean by organization?

10       Q.    I mean the employees of the organization.

11             You did not make a company-wide

12    announcement there would be a reduction in force?

13       A.    No, not a company-wide announcement.

14       Q.    Did you make any effort to find Mr. Kakeh

15    a position in the organization?

16       A.    No, I doubt I did.

17       Q.    Why not?

18       A.    I wasn't in the business of finding

19    anybody positions.

20       Q.    You agree that you did not use the

21    reduction in force to eliminate employees with

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

45

1    performance problems?

2        A.    I had no way of evaluating the employees'

3    performance.

4        Q.    You drew no conclusion of what positions

5    were eliminated?

6        A.    I drew conclusions based upon reports and

7    the audit, which reflected the declining quality of

8    the accounting department starting in 2001,

9    repeated in 2002 and disastrous by 2003.

10       Q.    Did you offer any of the RIFed employees

11   outplacement programs?

12       A.    I don't recall.

13       Q.    Did you ever offer Mr. Kakeh any

14   outplacement services?

15       A.    I don't recall.

16             I would take it when you say--do you mean

17   UPO?

18       Q.    I mean externally.

19       A.    No.

20       Q.    Or UPO?

21       A.    I don't recall what UPO did.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

64

1  any of this.

2      Q.   Do you remember signing a letter which

3  said that?

4      A.   Yes.

5      Q.   Do you remember signing a letter which

6  said, in the second paragraph, You will be acting

7  in the procurement manager position until filled?

8      A.   Yes.

9      Q.   Why is it that you signed a letter

10  indicating he will be acting in the position until

11  filled?

12      A.   Very similar to the position, Walker would

13  have had the responsibility to actually make the

14  decision about what persons they wanted to keep and

15  to have opportunity to assess their performance

16  and--their performance of their duties.

17      Q.   Basically, as of June 9, 2004 to your

18  knowledge, Walker had not yet made the decision

19  whether it was going replace the procurement

20  manager, external auditor, Mr. Issacs, with its own

21  people.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

65

1          Is that fair to say?

2     A.   Well, the exterior auditor position did

3   not exist in the organization structure so that

4   wasn't part of Walker's discussion.

5          The question I am assuming we are trying

6   to reach is had they decided whether or not to

7   retain him as procurement manager.

8     Q.   Yes.

9     A.   The answer is no, they had not made that

10  decision, at that time.

11    Q.   If Walker made the decision not to retain

12  him in the procurement manager position, is it your

13  understanding another RIF would follow a RIF of his

14  position?

15    A.   Yes.

16    Q.   His position was never RIFed, correct, I

17  mean after June 9, 2004, Mr. Issacs' position was

18  not RIFed?

19    A.   I don't believe so.  Mr. Issacs retired.

20    Q.   When did he retire?

21    A.   Sometime after receiving this letter.

1      A.   I don't have knowledge as to what the

2  policy says.

3      Q.   Who decided that Mr. Kakeh should be in

4  group six?

5      A.   General counsel's office and human

6  resources office.

7      Q.   Who in the general counsel office decided

8  that?

9      A.   Monica Beckman.

10      Q.   Who in human resources decided that?

11      A.   Richardson, he was the director.

12      Q.   What is his first name?

13      A.   Robert Richardson.

14      Q.   It was not your doing to put Mr. Kakeh in

15  category four?

16      A.   No, I produced none of the documents or

17  provided none of the interpretation for them.

18           MR. MELEHY:  Excuse me.  I left me

19  documents in the other room.  I will be right back.

20           (Pause in the proceedings.)

21           MR. MELEHY:  Let's have these marked as

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

88

1    you and others including Mr. Eboda.  It is dated

2    April 5, 2004.  Correct?

3        A.   Yes.

4        Q.   Do you know--next to Amin Kakeh's

5    signature, does it appear to be his signature?

6        A.   I don't know his signature.

7        Q.   Did you receive that memo?

8        A.   I don't know.  I will take a look at it

9    and see if I remember it.

10           (Pause in the proceedings.)

11           THE WITNESS:  No.

12           BY MR. MELEHY:

13       Q.   Are you finished?

14       A.   Yes.

15       Q.   Do you recall receiving Exhibit 10, Mr.

16   Kakeh' April 5, 2004 memo?

17       A.   No.

18       Q.   Can you say  you never got it?

19       A.   No.

20           MR. MELEHY:  Have this marked as the next

21   exhibit.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

89

1      (Jones Deposition Exhibit No. 11 was

2  marked for identification.)

3      BY MR. MELEHY:

4  Q.    I am showing you Exhibit 11.

5      It appears to be a memo to you from Amin

6  Kakeh dated April 11, 2004.

7      Do you agree with that?

8  A.    It is marked Exhibit 11.

9  Q.    Yeah.  Do you recall receiving that memo?

10  A.    Yes.

11  Q.    Did you read it?

12  A.    Yes.

13  Q.    Did you do anything as a result of getting

14  it?

15  A.    Yes.

16  Q.    What did you do?

17  A.    I indicated to Sheila Shears and Amin I

18  needed them to work with the auditors, to come up

19  with a trial balance to deal with the issues of how

20  they were recognizing revenue versus cash, which

21  tended to be a discussion, to try to claim as much

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

90

1    earned income as we possibly could.

2            And, at the same time, we looked at the

3    uses of funding that was not spent, CSBG unspent

4    funding referred to in the first full paragraph on

5    page 2, and requested retroactive authorizations to

6    expend that money that actually got the consent of

7    the federal government September 29, 2004.

8            And it was thus applied in the audit for

9    September 30, 2003 and validated by final approval

10   by letter from Yvonne Gilchrist.  And I sought

11   legal advice and opinion on the allowances for the

12   expense authorized from Sue Brown, whether or not

13   they were allowable and whether or not we should

14   seek legal action for those.

15           And ultimately, we released F.S. Taylor

16   from doing bank reconciliations that were the

17   responsibility of the controller's office that were

18   a year in arrears because it was just to expensive.

19       Q.   So F.S. was Taylor was responsible for

20   bank reconciliation?

21       A.   Absolutely.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

91

1      Q.    Who had the idea of hiring F.S. Taylor?

2      A.    I don't know.  It was there when I got

3  there.

4      Q.    Did you recommend they be retained, at

5  least in part, in the Office of Finance?

6      A.    No.

7      Q.    Did you have any discussion with Mr. Eboda

8  about using them to run the Office of Finance?

9      A.    Yes.

10     Q.    What was the nature of those

11  conversations?

12     A.    They were one of the companies who had bid

13  on the opportunity to run it and we had

14  conversations about it.

15         And from those conversations, I learned

16  they had been there, they had not only done this,

17  but they had been paid handsomely to do the cost

18  allocation process.

19         And after looking at their history in the

20  organization, I decided we needed a fresh break.

21     Q.    Did Mr. Eboda recommend against using

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

93

1    with corrections made in my handwriting and

2    punctuation and other errors.  At a minimum it was

3    a draft I did write.

4        Q.   Did you show the draft to anybody?

5        A.   I don't know that I didn'T.  I did produce

6    the draft.

7        Q.   Do you remember sending a final copy?

8        A.   No, I don't remember sending a final copy.

9             If I did, I assume it would have been

10   signed and it wouldn't have been like this.

11       Q.   What was the purpose of this memo when you

12   wrote it?

13       A.   Amin had given me a letter at some point

14   indicating he was shocked at a comment I made at a

15   meeting with the auditors, why I wouldn't tell

16   them--I remember specifically they said you have

17   not recognized for whatever period you can claim

18   and while you haven't done it at this point, you

19   can claim this revenue.  I am certainly not going

20   to tell them we didn't recognize it, I am not going

21   to tell them.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

94

1    He sent me a letter how it was unethical

2  for me to say that to them.

3    My comment was basically I am not going to

4  tell them we didn't do our jobs.  If we have a

5  right to claim it, they will see it on the report.

6    It was, I would say, reflective of the

7  quality of the dialogue that took place in the

8  meetings with auditors we would have once a week to

9  try to get the trial balance because there was no

10  completed revenue schedule.

11    And even after all of this was done, in

12  2005, we had still had to go back and make

13  corrections as far as 2000.

14    So we were having difficulty recognizing

15  revenue and trying to come to the fund balance.

16    On one hand, UPO had a massive deficit and

17  on the other hand, it had all of this unused

18  revenue.

19    What I was trying to do was to see if

20  there were allowable costs we could deal with.

21  That is what this memo speaks to.  It speaks to

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

95

1    basically what led to the second discussion I had

2    with Amin and his willingness, if I was willing to

3    indicate he had nothing to with it--I would like to

4    say this is reflective of my position at that time

5    and it still remains to this day reflective of my

6    position.

7        Q.   One of the reasons you wrote this memo is

8    because Amin Kakeh was concerned that a large

9    portion, if not all of the deficit was not

10   reimbursable with grant funds?

11       A.   He expressed that, yes.

12       Q.   You disagreed with him?

13       A.   I disagreed, yes.

14       Q.   He expressed that because he believed it.

15   Correct?

16            MS. DAVIS:  Objection.

17            Calls for speculation.

18            THE WITNESS:  I wouldn't know why.

19            BY MR. MELEHY:

20       Q.   Take a look at the paragraph, the third

21   paragraph says, in part, My memo April 7 was

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

99

1      A.   Sure.

2      Q.   I am following the advice of two CPAs

3  working in house and will await the decision of the

4  audit firm.  Your charge of ethical comment is

5  incorrect, in poor taste without full disclosure of

6  the facts.

7          What unethical comment are you referring

8  to?

9      A.   He wrote a memo about unethical comment

10  about not telling them.

11     Q.   Who?

12     A.   Head Start.

13     Q.   About what?

14     A.   About the fact we were going to claim the

15  $300,000 we had earned.

16     Q.   What do you mean not telling them?

17     A.   As I communicated to you about ten minutes

18  ago, in the meeting that we are referencing, they

19  said we could claim $300,000 because we hadn't

20  claimed it before.

21     Q.   Who?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

103

1      A.    Okay.

2      Q.    It is true that part of the $300,000

3   amount you were seeking to get from Head Start

4   included $186,000 paid to consultant Sue Brown,

5   correct?  You can look at page 2.

6      A.    Yes, I just looked at it.

7            As matter of fact, I do not believe, I am

8   not certain, I don't believe we were allowed to

9   bill for Sue Brown.  I think we were asked to take

10  that out.

11           I don't remember what the actual amounts

12  were that were deemed by the CPA to be allowable.

13     Q.    You think $186,000 for Sue Brown was not

14  part of the 300,000 you were seeking to get

15  reimbursement for from Head Start?

16     A.    To the best of my knowledge, that is

17  correct.

18     Q.    Charges from F.S. Taylor Services were

19  sought to be billed to the Head Start program.

20  Correct?

21     A.    I don't know.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

107

1      A.   That is what he shared with me.  My only

2   knowledge of why UPO was reviewed came from him.

3      Q.   Did he tell you that UPO was being

4   reviewed because Mr. Kakeh had made disclosures to

5   him?

6      A.   Never in my entire tenure of knowing him.

7      Q.   Did he tell you he had private meetings

8   with Mr. Kakeh?

9      A.   Never in my entire tenure.

10     Q.   Did you know Mr. Kakeh provided him with

11  financial statements?

12     A.   Never beyond the meeting April 5, in which

13  he provided financial information in the meeting

14  with Ms. Robertson, myself and Mr. Eboda.

15     Q.   He who?

16     A.   Mr. Kakeh provided.

17     Q.   You knew, April 5, Mr. Kakeh provided the

18  financial statements people were looking at that

19  day?

20     A.   Yes.

21     Q.   Did you authorize him to provide that

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

111

1      Q.   Is it a letter sent to Alexis Robertson

2  from Mr. Eboda?

3      A.   Yes.

4      Q.   Dated June 1, 2004.

5      A.   Yes.

6      Q.   Are you cc'd on this?

7      A.   Yes.

8      Q.   Did you receive it?

9      A.   Yes.

10     Q.   Do you know when you received it?

11     A.   On or about June 1.

12     Q.   In this letter, Mr. Eboda is denying UPO's

13 fiscal year 2003 CSBG budget deficit in the amount

14 of about a million dollars.  Correct?

15     A.   Yes.

16     Q.   What, as a result of that denial, how did

17 UPO obtain payment for the $1 million deficit, how

18 did it cover the $1 million deficit?

19     A.   I think it needs to be put in the

20 appropriate process.

21     Q.   Okay.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

112

1      A.   UPO had money, it was an issue of

2  recognition of its use of money as allowable.

3           UPO filed an appeal to this decision and

4  an approval was granted for this amount and more,

5  once it was determined that all expenditures were

6  allowable and acceptable.

7      Q.   When was that appeal finalized?

8      A.   September 29, 2004.

9      Q.   When the denial was received by you, was

10  that before or after you made the decision to RIF

11  the employees from the Office of Finance?

12      A.   After.

13      Q.   Is the decision to RIF them documented

14  anywhere other than the letters themselves?

15      A.   Not to my knowledge.

16      Q.   There were two articles in The Washington

17  Post, correct, about UPO?

18      A.   At least.

19      Q.   One was April 19 and one was March 23,

20  2004?

21      A.   I don't know the dates.

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

116

1    A.    Correct.

2    Q.    So Walker & Company communicated that to

3    you and, as a result, you made the decision to RIF

4    Ms. Shears, Mr. Kakeh, Mr. Issacs and the deputy

5    controller, Mr. Quashie, as well as Nona McLean?

6    A.    No, Shears resigned, and I made the

7    decision to RIF the others that you referred to.

8    Q.    Based on Walker & Company's recommendation

9    that it place its own people in the number one and

10   number two slots in the finance department?

11   A.    No, the RIFs were based upon my decision

12   to replace the management team.

13   Q.    That has nothing to with what Walker &

14   Company had recommended?

15   A.    As I testified earlier, no, I made the

16   decision to replace the management team.  I allowed

17   Walker & Company to make a decision about what

18   staff it used after the RIF.

19   Q.    So prior to the RIF, Walker & Company had

20   not recommended to you that it replace the top two

21   positions in the Office of Finance, the controller

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

121

1          A.    They wanted to come in and bring their

2     people in and assess the situation, three, four

3     people and assess the situation.

4          Q.    At the time you made the decision to RIF

5     Mr. Kakeh, you had not received a recommendation

6     from Walker & Company that it replace at a minimum

7     the top two people in the Office of Finance?

8          A.    Other than the proposal they replace

9     everybody?

10         Q.    Correct.

11         A.    I don't believe so.

12         Q.    So at the point when you decided to RIF

13    Mr. Kakeh, you had no idea which positions in

14    Office of Finance Walker & Company was going to

15    staff, if any?

16         A.    I had no indication which positions they

17    would staff with external people and--no, I didn't.

18         Q.    So why did you make the decision to RIF

19    Mr. Kakeh, if you didn't have that information?

20         A.    Because I made decision to RIF four

21    positions and accept the resignation of a fifth, so

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

122

1    that I could afford to pay for external management

2    of activities.   I wanted firms that--

3        Q.   At the time you made the RIF decision when

4    you issued the letters, you didn't know whether

5    either of those firms was going to staff Mr.

6    Kakeh's position.   Correct?

7        A.   Wrong, I testified that each of those

8    firms submitted proposals to staff the entire

9    organization, so at a minimum the functions that he

10   held they had demonstrated a capacity and

11   willingness to provide people to do it.

12       Q.   You said earlier you didn't know what

13   position either firm was going to staff?

14       A.   I didn't know which positions at the end

15   they would staff, but in the proposals, each bid

16   indicated they had the capacity to do it all.

17       Q.   Correct.

18       A.   So if  someone can do it all, you can

19   assume they have the capacity to do one.

20       Q.   You didn't know for sure whether UPO was

21   going to hire them to do that.   Correct?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

124

1     A.    I think that position was, to my

2  recollection--don't hold me, I don't have the

3  numbers in front of me, but I think it was merely

4  that person was making somewhere in the

5  neighborhood, about $20,000 less.

6     Q.    What was the person making who replaced

7  the CFO, the Walker & Company person?

8     A.    I don't know, but I know it was more than

9  what Ms. Shears made.

10    Q.    Do you know what Sheila Shears made?

11    A.    Top of my head, I don't, I want to say

12  100,000, but I don't know.

13    Q.    Currently, Walker & Company is no longer

14  performing services in the Office of Finance.

15  Correct?

16    A.    Correct.

17    Q.    The work is being done by inhouse people?

18    A.    Correct.

19    Q.    You have a controller?

20    A.    No.

21    Q.    What is the position called?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

130

1        A.    Yes, I did.

2        Q.    Did you read it?

3        A.    Yes, I did.

4        Q.    Did you have any reaction to that portion

5    of the report dealing with his reasons about why

6    Mr. Kakeh was terminated?

7        A.    I turned it over to the general counsel

8    for reactions.

9        Q.    What did the general counsel do?

10        MS. DAVIS:  Objection.  Attorney client

11    privilege.

12        BY MR. MELEHY:

13        Q.    Do you know if the general counsel wrote a

14    letter to Mr. Eboda requesting that he change that?

15        A.    I don't think the general counsel

16    communicated with Mr. Eboda about that.

17        Q.    Do you know if it was changed?

18        A.    Yes, it was.

19        Q.    Do you know why it was changed?

20        A.    The second report issued by the Director

21    of Human Services for D.C., Yvonne Gilchrist, did

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

134

1     A.   I don't recall, may have.

2     Q.   Why would you have done that, if you did

3  it?

4     A.   Sequence of order, order and authority,

5  responsibility.

6     Q.   Is Nona McLean a member of management?

7     A.   According to the organization chart, she

8  was a manager.

9     Q.   Manager of what?

10    A.   Facilities.

11    Q.   What was her position?

12    A.   I would have to look, I think it says

13 facilities manager.

14    Q.   It does, facilities manager, Office of

15 Finance.

16         Why did you determine that she was someone

17 that should be RIFed?

18         MS. DAVIS:  Objection.

19         Asked and answered.

20         BY MR. MELEHY:

21    Q.   As opposed to some of the other people?

DEPOSITION OF DANA JONES
CONDUCTED ON MONDAY, FEBRUARY 27, 2006

135

1      A.    The core people who were identified on the

2  organization chart as managers were RIFed, and, in

3  fact, the responsibilities for facilities was

4  turned over to another office external to finance.

5      Q.    So was the reason for her RIF different

6  from the reason for the RIFs of Mr. Kakeh, Mr.

7  Issacs, Mr. Quashie?

8      A.    They were all RIFed under the same

9  process.

10     Q.    Understood, but Ms. McLean was not an

11 integral part of the management of the Office of

12 Finance?

13     A.    But she was listed as one.

14     Q.    But there were listed managers in the

15 Office of Finance.  Correct?

16     A.    Yes.

17     Q.    Some of those other people were not RIFed?

18     A.    I don't know if they were listed as

19 managers or chiefs.  I would have to look at the

20 organization chart.  I don't know anybody who was.

21     Q.    I will get a copy.