# EXHIBIT 40

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - X

MOHAMMED AMIN KAKEH,                    :

           Plaintiff,          :

    v.                                  :

UNITED PLANNING ORGANIZATION, :

INC.,                                   :

         Defendant.           :

- - - - - - - - - - - X

          Silver Spring, Maryland

          Monday, June 19, 2006

Deposition of:

        MONICA BECKHAM, ESQUIRE,

a witness herein, called for examination by Counsel

for the Plaintiff in the above-entitled matter,

pursuant to notice, taken at Melehy & Associates, 8403

Colesville Road, Suite 610, Silver Spring, Maryland,

beginning at 10:10 a.m., before Joan D. Carino, a court

reporter and notary public in and for the State of

Maryland.



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

22

1    They were part of his team, they were the people he

2    brought.

3        Q.   Did he make a request to you for production

4    of any documents?

5        A.   Yes, he did.

6        Q.   In fact he made a request to you that

7    documents be produced regarding a boat purchase that

8    had occurred, correct?

9        A.   That's correct and I provided it to him and

10   to the leader of the team.

11       Q.   And you know about that boat purchase,

12   correct?

13       A.   No, I know there are two documents related

14   to the boat.  The document -- the first document was

15   related to due diligence with regards to a proposal

16   for a marine aquatic learning experience that the

17   agency was working on, meaning United Planning

18   Organization.

19       Q.   A marine aquatic learning experience?

20       A.   Well, it has a formal name but that is what

21   I call it.  I don't think that is the formal name.

23

1    Q.   I have never heard that one before, thank

2    you.

3    A.   In fact they just had, regrettably, the

4    gentleman who had a wonderful program in Alexandria

5    just died last week and there was one in Alexandria

6    and there is one like it in Baltimore, and it was my

7    understanding that the agency was going to try to

8    create that same type of experience for young people

9    in the Washington area.  And that was the gist of the

10   proposal and the purchase.

11   Q.   Was it a fishing boat?

12   A.   Yes, I believe it was.

13   Q.   And so was fishing part of the marine

14   aquatic learning experience?

15   A.   No, I think it was the use of equipment and

16   the use of a boat, not so much fishing.  I wasn't

17   under the impression that there was fishing to be

18   involved in the education process.  It might have been

19   as far as socialization for the young people, I am not

20   quite sure, because I hadn't seen the proposal.

21   Q.   Let me back up for a second.

27

1      A.    I don't know if you have the document.

2      Q.    Not at my fingertips.  Who was the contract

3   with?

4      A.    I can't recall because there were various

5   persons involved.  It was an intent to purchase.

6      Q.    So it was an intent to purchase but it

7   wasn't ironclad in the sense that United Planning

8   Organization was obligated to purchase?

9      A.    No, because it indicated that in the event

10  that United Planning Organization could not, would not

11  receive the grant award, which would mean that they

12  would have to get authorization from the funding

13  source to purchase, and if we did not get that and the

14  financing involved with that and approval for that,

15  they would have to return a deposit.  A deposit was

16  made.

17     Q.    How much?

18     A.    And in fact that deposit, when a demand

19  letter was made, was returned, $10,000.

20     Q.    All right.  So a letter of intent

21  conditioned the purchase upon not only UPO getting the

28

1    grant but if the UPO did get the grant, the

2    authorization of the federal agency?

3         A.   Yes, that would be part of it.  When the

4    grant award -- if in fact a grant award had been made

5    based upon the proposal that United Planning

6    Organization submitted, it's my understanding with

7    that grant and any other grants that we submit that

8    they would approve.  If they approve it that would

9    give you the authorization.  If they didn't, the

10   letter indicated that we would have to have a grant

11   award, so, to buy a boat you would have to get

12   authorization because we didn't have insurance for a

13   boat.

14        Q.   Was this a fishing boat?

15        A.   It was some type of cruiser, yes.

16        Q.   But was it a fishing boat?

17        A.   Yes, you could fish from it.

18        Q.   Okay.  Now, did United Planning Organization

19   get the grant that related to this boat purchase?

20        A.   No.

21        Q.   So the boat purchase never occurred?

29

1       A.    Not to my knowledge, but later on, not at

2    that time, -- well, I can't speak to that.  At a later

3    date Mr. Jennings executed a contract with the vendor

4    to purchase the boat.

5       Q.    Same vender?

6       A.    Yes, there was a separate contract.

7       Q.    Now, this letter of intent that was written,

8    did you look at that, did you see that letter of

9    intent or were you just told about it by Mr. Jennings?

10      A.    No, he showed it to me, he showed it to me,

11   and I believe it was something that he explained that

12   he wanted a letter of intent.  It was a contract that

13   the vendor had provided in my office, I developed the

14   letter of intent because I explained that we could not

15   purchase a boat.

16              (Witness confers with Ms. Davis.)

17          MR. MELEHY:  If you're going to have

18   communications with your lawyer, I would prefer that

19   they not occur at this time.

20          MS. DAVIS:  I am not responding to what

21   she's saying.

DEPOSITION OF MONICA BECKMAN, ESQUIRE
Conducted on June 19, 2006

30

1          MR. MELEHY:  I know.  That is pretty clear.

2          BY MR. MELEHY:

3     Q.    Now, you said there was a later contract to

4    purchase a boat from the same vendor?

5     A.    Yes.

6     Q.    Okay.  And how did that come about?

7     A.    I don't know.

8     Q.    You never saw that later contract, correct?

9     A.    I saw that contract more than a year after

10   it was executed.

11    Q.    But you never saw it before it was executed?

12    A.    No.

13    Q.    Earlier in your deposition you referred to

14   not seeing a contract, you were talking about the

15   second one, not the first one?

16    A.    That's correct.  That's correct.

17    Q.    Okay.  When was it executed?

18    A.    I think it was in January, for some reason I

19   want to say January of '04.  Approximately about that

20   time.

21    Q.    Now, you indicated that Tunde Eboda in I

DEPOSITION OF MONICA MORGAN REGISTER
Conducted on June 19, 2006

31

1    assume March or April of '04 asked you for a copy of

2    the contract for the purchase of the boat.  Did you

3    provide it to him at that time?

4         A.    Yes, I did.

5         Q.    So you saw the contract when you provided it

6    to him?

7         A.    Yes, I did.

8         Q.    That is not one year after it's execution,

9    correct?  You provided the contract to Mr. Eboda in

10   March or April of 2004?

11        A.    Yes, when his review team came in she asked

12   was I aware of a contract for the purchase of a boat.

13   I indicated to them that I was and I gave them a copy

14   of the contract.

15        Q.    Of the January, 2004 contract?

16        A.    I gave them a copy of the contract of intent

17   to purchase as well as -- I can't say for sure whether

18   I gave them the other.  I let them know that I was

19   aware of it.  I might have given it to them.

20        Q.    How did you become aware of the second

21   contract for the purchase of the boat?

DEPOSITION OF MONICA BECKHAM, ESQ.
Conducted on June 19, 2006

32

1    A.    From Sheila Shears.

2    Q.    When did you become aware of it?

3    A.    In January, I would think.

4    Q.    Of which year?

5    A.    '04.  January, the latter part of January,

6    somewhere around there.

7    Q.    Okay.  And you indicated this the contract

8    was executed in or about January of '04, correct?

9    A.    No, yes, of '04, that's right.

10   Q.    Which would have been the same month you saw

11   the contract?

12   A.    No, January of '04 -- wait a minute.  It's

13   '03.  It was executed in '03, I'm sorry.

14         (Discussion off the record.)

15         BY MR. MELEHY:

16   Q.    And what conversation did you have with

17   Sheila Shears about this contract?

18   A.    Sheila had indicated that she had become

19   aware of a contract for the purchase of a boat and she

20   wanted to know did I know about it and my response to

21   her was yes, and I provided her with a copy of the

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

34

1    I had.

2         Q.   Was there any discussion of how Mr. Eboda

3    found out about the boat contract?

4         A.   No.  I would think that -- no. I would think

5    that he was in the finance office, his team was in the

6    finance office conducting a review, our auditors were

7    on site as well, and there was a question about that

8    with the auditors.  So it was a matter that the agency

9    was attempting to respond to various parties about.

10        Q.   Did Ms. Shears indicate to you during this

11   conversation that she had provided this contract to

12   Mr. Eboda?

13        A.   No.

14        Q.   Okay.  Did she indicate at any time that she

15   had provided the contract to Mr. Eboda?

16        A.   No.

17        Q.   Do you know why Mr. Eboda asked you for the

18   contract rather than someone else in the office of

19   finance?

20        A.   I would think he would ask me because he

21   would ask about all contracts.

44

1   and then grouping II in the middle, so that would be

2   corrected.  Whether that is corrected or not, I'm not

3   sure, I would have to look.  If it was wrong I would

4   have corrected it but the other document would have to

5   be here.

6        Q.   So it's possible you corrected the family

7   grouping?

8        A.   I could have because as I said sometimes the

9   family groupings are wrong, I have seen them where the

10  entrants on duty dates are wrong.  I have seen a

11  paragraph missing with regards to notices and things

12  like that, despite the fact that it is a form, it's

13  just something happens when --

14       Q.   So you reviewed this for correctness,

15  essentially?

16       A.   Yes.

17       Q.   And to your knowledge this letter dated June

18  9th, 2004 RIFing William Isaacs is correct?

19       A.   That is without having the other supporting

20  document.

21       Q.   At the time you reviewed it you reviewed

1    this for correctness at one time and you determined at

2    one time based on the documents that you had that

3    everything in here was correct?

4        A.   That's correct.

5        Q.   All right.  Now, Mr. Isaacs was reassigned,

6    correct, immediately upon this RIF, is that correct?

7        A.   That's correct, yes.

8        Q.   So he was not let go?

9        A.   No.  You can do reassignments with a

10   Reduction-In-Force.

11       Q.   Okay.  Now, it says in the first paragraph

12   it says, This means that as of that date you will be

13   released from your current competitive level by

14   separation from employment.  The reason for this

15   action is that the United Planning Organization is

16   forced to declare a Reduction-In-Force affecting five

17   employees in the Office of Finance which is made

18   necessary due to the reorganization and the

19   abolishment of positions in the Office of Finance".

20   Who are the five employees who were affected?

21       A.   (No audible response.)

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

46

1    Q.    Let me try to make this a little easier for

2    you.  I have a RIF letter for Ms. Nona McLean and I

3    have a RIF letter for William Isaacs.  I have a RIF

4    letter for David Quashie and Amin Kakeh, that is

5    four.  I don't have a fifth RIF letter so who was the

6    fifth person affected?

7    A.    Nona McLean, Henry Kanagbu.

8    Q.    Was he RIFed?

9    A.    I recall that he might have been reassigned,

10   I'm not sure, but for some reason I think that Henry

11   Kanagbu received a letter.

12        MR. MELEHY:  For the record, Alison, I have

13   not received any documentation of Mr. Kanagbu's

14   reassignment.

15        MS. DAVIS:  He was not in the finance

16   management group.  He wasn't among the ones that were

17   RIFed.

18        MR. MELEHY: Okay.

19        THE WITNESS:  Oh, okay.  My recall is not as

20   good.

21        BY MR. MELEHY:

PRECISE REPORTING SERVICES
(301) 210-5092 (877) 4 A STENO

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

47

1    Q.    Do you know whether there was a decision to

2    -- you evidently checked at one point that the five

3    employees number was correct, because it says here

4    five employees?

5    A.    Yes.

6    Q.    Was there a change, did someone change their

7    mind about RIFing Mr. Kanagbu?

8    A.    I am not sure.

9    Q.    All right.  Let's take a look at Exhibit No.

10   2 and for the record that is a RIF letter dated June

11   2nd, 2004 to Nona McLean, correct?

12   A.    Yes.

13   Q.    And could you take the highlighter and tell

14   me which portion of that is language that you inserted

15   in the letter?

16   A.    (Witness complies.)

17   Q.    Now, do you know why Ms. McLean was let go?

18   MS. DAVIS:  Objection, calls for

19   attorney-client communication.

20   MR. MELEHY:  It's been waived.  She's

21   indicating in the letter that she inserted the

48

1    language that she was let go.  It's her language.

2         MS. DAVISON:  I'll instruct the witness not

3    to answer.

4         BY MR. MELEHY:

5    Q.   Was Ms. McLean a member of the management of

6    the Office of Finance?

7    A.   Yes.

8    Q.   Are you sure about that?

9    A.   She was in charge of the facilities

10   management, yes, she was.

11   Q.   Why did you insert the language that you

12   claim is yours?

13        MS. DAVIS:  Objection, instruct the witness

14   not to answer on grounds of privilege.

15        MR. MELEHY:  Privilege has been waived,

16   Counsel.  She put the language in.

17        MS. DAVISON:  The language itself is not

18   confidential but the reason why it was asserted is

19   privileged.

20        MR. MELEHY:  She waives anything as to the

21   subject matter?  I can give you some case law on

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

57

1    Rights?

2         A.    Yes.

3         Q.    And how did you find out about that?

4         A.    Our office received the notification.

5         Q.    Okay.  And was a response or a position

6    statement filed with the department, with the D.C.

7    Office of Human Rights by United Planning Organization

8    in response to that?

9         A.    Yes.

10        Q.    And did you have input into the contents of

11   that response?

12             MS. DAVISON:  Objection to the extent it is

13   attorney-client privileged communication.

14             BY MR. MELEHY:

15        Q.    Did you give input, any kind of input into

16   that response?

17             THE WITNESS:  Can I respond?

18             MR. MELEHY:  You can't talk to your lawyer

19   right now.

20             THE WITNESS:  This is the same question or

21   another question?

58

1          MR. MELEHY:  It's the same question.  There

2    is a question pending.

3          THE WITNESS:  I provided documentation.

4          BY MR. MELEHY:

5      Q.   What kind of documentation?

6          MS. DAVIS:  Objection and instruct the

7    witness not to answer.

8          MR. MELEHY:  Providing documentation is not

9    privileged to any degree at all.

10         MS. DAVISON:  It's privileged to the extent

11   that it's a confidential communication that we had

12   been provided.

13         BY MR. MELEHY:

14     Q.   She said documentation.  What do you mean by

15   documentation?

16     A.   A RIF notice.

17     Q.   Okay.  You provided the RIF notice?

18     A.   Documents that were requested with regards

19   to the complaint.

20     Q.   Did you edit any kind of response that was

21   filed with the D.C. Office of Human Rights?

DEPOSITION OF MONICA DERNOVSEK-GUIRE
Conducted on June 19, 2006

75

1   must document the basis for his judgment.  The agency

2   must establish a single date of issuance of all

3   specific notices in each Reduction-In-Force in each

4   separate competitive area."

5          Are you familiar with that provision?

6      A.  Yes.

7      Q.  "The date must be the same for all competing

8   employees even when circumstances require the agency

9   to issue some individual notices after the uniform

10  date"?

11     A.  Yes.

12     Q.  Do you see that?

13     A.  Yes.

14     Q.  Was that followed in this instance?

15     A.  I would hope so.  Let me see.  (Examines

16  documents.) I have one here with the 9th on it and one

17  with the 2nd on it.

18     Q.  Why don't you identify which ones you are

19  talking about, Mr. Isaacs was released on the 9th?

20     A.  Yes.

21     Q.  As you can see that is one of the documents

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

76

1    produced by United Planning Organization?

2         A.    Yes.

3         Q.    And the notice is supposed to be uniform for

4    all the employees, correct?

5         A.    In the competitive level.  Let me read it

6    again.  "In each separate competitive area."  Yes,

7    they should have been the same date.

8         Q.    For everybody?

9         A.    Yes.

10        Q.    Do you know why Mr. Isaacs' notice was

11   issued on June 9th, 2004?

12        A.    I'm not sure.  I can't recall.  I know in

13   some instances persons weren't available.

14        Q.    Which persons weren't available?  I'm going

15   to show you some other exhibits here, Nos. 3 and 4,

16   which are also RIF notices.

17        A.    (Examines documents.)

18        Q.    What do you mean by persons weren't

19   available?

20        A.    I'm saying on the 9th.  I'm not sure exactly

21   when Mr. Isaacs received his.  The other notices are

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

77

1    all dated for the second.  Why his is the 9th I am not

2    quite sure.  But I was made aware that all people

3    affected might not have been present at the time and

4    that very well might be the reason why his has a

5    different date.

6        Q.   Do you know what happened to Mr. Isaacs?

7        A.   Mr. Isaacs, after he received his

8    notification he resigned.

9        Q.   Okay.  Are you familiar with the term

10   retention register?

11       A.   Yes.

12       Q.   Is there a retention register attached to

13   Exhibit 4 which is Mr. Kakeh's RIF letter?

14       A.   The retention register is maintained by the

15   HR department.  They get the job family groupings.

16   The retention register has people's names on it so

17   that is not released for general use, it is not

18   attached to the notice itself.  The employee would

19   go --

20       Q.   Is this the retention register?

21       A.   No, that is the job family grouping.

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

80

1          AFTERNOON SESSION          1:30 p.m.

2          BY MR. MELEHY:

3     Q.    Would you have a look at Beckham Exhibit 7,

4     part 2.5.

5     A.    (Examines document).

6          Yes.

7     Q.    It says, "To help relieve the economic

8     insecurity of an affected employee, management should

9     utilize the full extent of UPO's resources to develop

10    and establish outplacement programs to locate jobs for

11    those persons who cannot be placed within the Agency.

12    This program should not be limited to those employees

13    not yet released but should also include released

14    employees as well."

15         Do you see that?

16    A.    Yes.

17    Q.    And in June of 2004 and May of 2004 that

18    policy was in effect, correct?

19    A.    Yes.

20    Q.    And Mr. Kakeh did not receive outplacement

21    services, correct?

81

1      A.   I couldn't answer that.  HR would have to

2  have that discussion.

3      Q.   And you don't know if Nona McLean received

4  outplacement services, do you?

5      A.   I don't know.  That is something, the

6  outplacement, for example, employees are provided with

7  listings of jobs available in the D.C. Department of

8  Employment Services and any assistance that the agency

9  can give, meaning the HR department, they attempt to

10  do that, but they would have to speak to that.

11      Q.   All right, I'm going to go through some

12  parts of Mr. Jones' deposition again.  If you could

13  I'm going to ask you to turn to page 46 of the

14  deposition.  At the top it says,

15          Question,  "I want to understand, again,

16  just make sure I understand all the reasons why Mr.

17  Kakeh was not reassigned.

18          You indicated that Walker & Company

19  identified RIFed employees with whom it wanted to work

20  and those RIFS -- Mr. Kakeh was not among those

21  identified by Walker & Company?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

82

1        Answer, correct.

2        Question, Is that the sole reason why Mr.

3    Kakeh was not reassigned to some other position in the

4    finance department?

5        Answer, Right, the Walker firm decided it

6    had to have, at a minimum, its own people in the

7    number one and number two positions.  It proposed a

8    reorganization in its bid package that included a

9    grant management position and they brought in a staff

10   person to fill that role until such time as a person

11   was hired.  And they made their choices about whom

12   could assume roles beyond that in the organizational

13   structure."

14       Do you agree that that is the reason why Mr.

15   Kakeh was not reassigned?

16       I really don't want you to read any other

17   part of the depo, I just want you to answer my

18   question.

19   A.   That's correct.

20   Q.   Okay.  Moving on to page 59, line 11 of Mr.

21   Jones' deposition reads as follows,?

1       Q.   And my question to you is is his answer

2   correct as to why Mr. Quashie remained in that

3   position through June 30th, 2004?

4       A.   That's correct.

5       Q.   Now, there is another question and the other

6   question is, "Mr. Quashie continued in his position

7   through June 30th and -- under another name but in the

8   same position after June 30th, 2004?"

9            Answer, "Correct."

10      A.   Where are you?

11      Q.   I'm on the bottom of 59 extending to the top

12  of page 60 in Mr. Jones' deposition.

13      A.   Okay.

14      Q.   You agree with that, correct?

15      A.   Yes.

16      Q.   And you agree that Mr. Quashie was placed in

17  another position which had the same duties after June

18  30th, 2004?

19      A.   I would say they were similar.  I would have

20  to look at the job description.

21      Q.   But you agree that Mr. Jones' answer in that

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

86

1    respect is substantially correct?

2       A.   Yes.

3       Q.   Now, going down further, page 60, line 10,

4    this is a question to Mr. Jones again, this is Mr.

5    Jones' deposition.

6            Question, "You said, you will be acting in

7    this position until filled.  What did you mean?"

8            Answer, "Until a permanent person filled

9    it."

10           Question, "He was permanent?"

11           Answer, "He was the person that Walker

12   selected."

13           Question, "It would have been, Walker was

14   the one making the selection, basically?"

15           Answer, "Correct."

16           Do you agree with that, that Walker was the

17   one that selected Mr. Quashie for the position?

18      A.   Yes.

19      Q.   Okay.

20      A.   I agree to what he stated here in response

21   to the question, yes.

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

91

1    A.    That's correct.

2    Q.    And you did all this on January 11th, 2005,

3    correct?

4    A.    Yes.

5    Q.    Okay.  And enclosed in your fax is a letter,

6    a draft letter dated December 16th, 2004 from Dana

7    Jones to Yvonne Gilchrist, Director of Human Services,

8    correct?

9    A.    That's correct.

10    Q.    And at the time you sent this fax, which was

11    January 11th, 2005 you hadn't yet, the agency had not

12    yet sent out this December 16th, 2004 draft letter,

13    correct?

14    A.    They had not sent it out.

15    Q.    It had not, well, in other words this letter

16    still was a draft, it had never become final?

17    A.    It went out as a draft.

18    Q.    But it didn't go to Yvonne Gilchrist as a

19    draft, did it?

20    A.    I believe so, I think it might have gone out

21    as a draft, I believe, because at that time the

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

92

1    documents -- I had been informed that first of all

2    that this final report, the December 1, '04 final

3    report, I had been informed that it wasn't a final

4    report.

5        Q.    Okay, but --

6        A.    And so it was considered a draft at that

7    point, even though it didn't have "draft" on it, but

8    --

9        Q.    Now, attached to your letter is something

10   called "Attachment 1"?

11       A.    Yes.

12       Q.    "Comments on final report"?

13       A.    Let me clarify that.  Do you see this last

14   sentence, it says, "UPO is concerned that the

15   inaccuracies could prejudice your investigation and

16   lead to legal recommendations based on erroneous

17   information despite the fact that the report was

18   forwarded to you as "Draft"." The agent had called me

19   and informed me that they had gotten a draft report

20   and we had discussions back and forth because we had

21   gotten it as a final and we weren't aware of it being

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

94

1   a paragraph containing statements regarding Mr. Amin

2   Kakeh, the former Controller of United Planning

3   Organization."  The last sentence of that paragraph

4   reads: "The state CSBG office regrets the manner of

5   his separation from the agency in what appeared to be

6   a retaliatory action from United Planning Organization

7   management for his cooperation with the state CSBG

8   review team."

9         Did you write that?

10  A.   Did I write that?

11  Q.   The first paragraph.

12  A.   (No audible response.)

13  Q.   What I just read.

14  A.   No.

15  Q.   Who wrote it?

16  A.   The report came out under the signature of

17  Dr. Bowden.

18  Q.   Who wrote this language here quoting the

19  report, was that you who wrote it?

20  A.   I can't recall.  I might have.  I know we

21  were, let me put it this way, we were asked to comment

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

95

1  on the report, on this particular session in the

2  response to the letter.  I might have, in all

3  likelihood I probably drafted this section.

4       Q.  Okay.  You drafted this section?  Okay.

5       A.  I said I might have.  I can't recall.  The

6  reason I say that is because there were a lot of

7  reports that we were responding to.  So this report,

8  you had other reports coming in from other agencies

9  and I would go through the reports and on those

10  sections, some sections were assigned to finance for

11  their input on a report, any comments that they had

12  with regards to the report.  And this would be a

13  comment that I would make, I would say that, yes.

14       Q.  Okay.  Why did you fax these things, the

15  draft letter, to Yvonne Gilchrist?

16       I'm sorry, why did you fax the draft to

17  Shelley Elliott?

18       A.  She requested it.

19       Q.  Why did you fax the draft to Hans Martin?

20       A.  He requested it.  They wanted to know the

21  status.  I would keep them up to date on the

97

1    this draft letter, you indicated that it went out and

2    the draft letter requested among other things a change

3    in Mr. Eboda's statement that the state CSBG office

4    regrets the manner of his separation from the agency

5    in what appeared to be a retaliation against Mr. Kakeh

6    by United Planning Organization management for his

7    cooperation with the state CSBG team, is that

8    correct?

9            MS. DAVIS:  Object to form.  You can

10   answer.

11           THE WITNESS:  Ask the question again,

12   please.

13           BY MR. MELEHY:

14   Q.    You requested that the Department of Human

15   Services retract that statement in the report, in

16   other words take that statement out that the state

17   CSBG office regrets the manner of Mr. Kakeh's

18   separation from the agency in what appeared to be a

19   retaliatory action by United Planning Organization for

20   his cooperation with the state CSBG team, is that

21   correct?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

100

1    A.   No.

2    Q.   So you don't know what Mr. Eboda based his

3    opinion on, do you?

4    A.   I would say that Mr. Eboda, I would not know

5    where he got his opinion from, that's correct, I would

6    not know how he got his opinion.  All I know is that

7    his opinion was put in the final report and I did not

8    think that the final report was the document which he

9    should use to express his opinion.

10   Q.   You indicated that you had a problem with

11   the December 1st, 2004 report of DHS, correct?

12   A.   That is this report, that is what these

13   comments are related to.

14   Q.   Was there a later report that did not

15   contain the language you objected to regarding Mr.

16   Kakeh's termination?

17   A.   That's correct.

18   Q.   And why was it that that later report was

19   issued without that language?

20   A.   I would think that that was a determination

21   that the District of Columbia Department of Human

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

101

1    Services came to, they made that determination, as

2    they did, and on all the other comments, because these

3    weren't the only comments with regards to the report.

4    And some comments remained and some did not.

5         Q.   So based on the objections that you

6    forwarded to the Department of Human Services the

7    language of the report of December 1st, 2004 was

8    changed?

9         A.   Yes, it was.

10        Q.   To not include a reference to Mr. Eboda's

11   opinion about the reasons Mr. Kakeh was let go?

12        A.   That's correct.  And the only person who

13   could answer that would be the head of that

14   department, Ms. Gilchrist.

15        Q.   Do you know who made the decision to change

16   the language in that report?

17        A.   No, the only person who would know that

18   would be Yvonne Gilchrist.

19        Q.   Did you have any meetings with any

20   officials -- did you have any meetings where people

21   other than United Planning Organization people were

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

108

1    had previously been done.

2        Q.    And the purpose of that meeting was to have

3    a discussion with Mr. Kakeh about how he should

4    prepare the financial statement?

5        A.    Yes.  He indicated that he was not going to

6    do it the way that Ms. Shears or Ms. Mack were saying

7    that it should be done.

8        Q.    Did he explain why?

9        A.    He said that he didn't think that it was

10   correct, that that wasn't the way to do it and that he

11   wasn't going to cook the books.  And then I asked him,

12   I said I'm sure no one was asking him to cook books.

13   I asked him why would he say that because we have

14   auditors there, we have reviewers there and no one

15   would suggest or tell anyone to cook books.

16       Q.    Do you have a degree in finance?

17       A.    No.

18       Q.    Any training in accounting?

19       A.    Other than seminars, yes.

20       Q.    So would you have been in a position to

21   determine whether the financial statement was done

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

106

1    I had and explained to them what I had.

2         Q.    Any other documents besides the one related

3    to the boat and Watkins Security?

4         A.    I can't recall for sure but whatever it is

5    that they asked, if I had it, I gave it to them.

6    Because a lot of it was conversation and explaining to

7    them what that document was.

8         Q.    Okay.   Did Mr. Eboda ever talk to you about

9    a financial statement showing a deficit?

10        A.    No, he didn't talk to me about finance.

11        Q.    Did you ever hear of a financial statement

12   drafted by Mr. Kakeh that showed a deficit at United

13   Planning Organization?

14        A.    I know that I had a discussion, I was in a

15   meeting with Mr. Kakeh, Sheila Shears and Gladys Mack

16   related to a financial statement.

17        Q.    When was that?

18        A.    I don't know if it was the latter part of

19   March or in the first part of April.   I'm not sure.

20        Q.    What was discussed at the meeting?

21        A.    What was discussed was how the financial

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

110

1    Mr. Kakeh expressed concern that he was being told to

2    do something incorrectly, that is financial reporting

3    in an incorrect way, correct?

4         A.    Yes.

5         Q.    And my question to you is since he expressed

6    that you were not in a position in that meeting to

7    determine whether his concerns had merit or not?

8         A.    No.

9         Q.    Okay, and I take it that Ms. Shears and Ms.

10   Mack indicated that his concerns had no merit during

11   that meeting?

12        A.    No, I don't think they -- what --.

13        Q.    When he said you're making me cook the

14   books?

15        A.    Yes, they indicated that they weren't doing

16   that.

17        Q.    Did you get the feeling that the

18   relationship between Ms. Shears and Ms. Mack and Mr.

19   Kakeh was strained?

20        A.    At that time yes, I did.

21        Q.    Did you get the feeling that they considered

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

111

1   him insubordinate for refusing to follow their

2   directions regarding the financial statement?

3       A.   Yes.  And I indicated that everyone needed

4   to calm down.

5       Q.   Did anyone yell?

6       A.   Yes.

7       Q.   Who yelled?

8       A.   Mr. Kakeh.

9       Q.   Did Ms. Shears or Ms. Mack yell?

10      A.   No, they looked at me and they were saying

11  "we are not asking you to do that" and they were

12  going through the process, whatever the process is,

13  that they had done previously and that Mr. Kakeh had

14  done previously, because it was my understanding that

15  what was being done was the same thing with regards to

16  recognizing certain revenues and things that had been

17  done previously.  That was just my understanding.

18      Q.   And the way Mr. Kakeh wanted to do it would

19  have resulted in the calculation of a larger deficit,

20  correct?

21      A.   (No audible response.)

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

112

1       Q.    Because Mr. Kakeh did not want to recognize

2   certain revenues, isn't that correct?

3       A.    That's correct.

4       Q.    So the deficit that he would have calculated

5   using his method would have been larger than the

6   deficit that would have been calculated if he had used

7   Ms. Shears' and Ms. Mack's method?

8       A.    That's correct, there was a difference of

9   opinion on how that would be done and that is what I

10  took that meeting to be, a difference of opinion.

11      Q.    And you didn't weigh into that meeting at

12  all in terms of -- you didn't weigh into that

13  difference of opinion at all, did you?

14      A.    No, I indicated that everyone needed to calm

15  down.

16      Q.    So everyone there was upset?

17      A.    They were upset, yes. I mean, it wasn't

18  pleasant.

19      Q.    Did you take notes during that meeting?

20      A.    No.

21      Q.    Did you have any more meetings with Mr.

113

1    Kakeh?

2        A.   No, not that I can recall.

3        Q.   Did you have any more meetings with Ms.

4    Shears and Ms. Mack where you discussed the financial

5    statement?

6        A.   No, I don't recall, no.

7        Q.   Did Ms. Mack or Ms. Shears remark to you

8    that Mr. Kakeh was insubordinate?

9        A.   They indicated that they felt he was, yes.

10       Q.   Both of them did?

11       A.   Yes.

12       Q.   At what time did they indicate that?

13       A.   At that time.

14       Q.   Later?

15       A.   No.

16       Q.   Just at that time, at the meeting?

17       A.   Yes.

18       Q.   At that time.

19       Q.   Did they do it in Mr. Kakeh's presence?

20       A.   Yes.

21       Q.   Did they accuse him?

DEPOSITION OF MONICA BECKHAM, ESQUIRE
Conducted on June 19, 2006

114

1      A.    That is why I told everyone to calm down.

2      Q.    Did they accuse him of insubordination in

3  that meeting, expressly?

4      A.    No.

5      Q.    So did they say "you are being

6  insubordinate" or "you are not following my

7  directions" or anything like that?

8      A.    I would say that -- let me think for a

9  minute.  They were saying that would be --

10     Q.    That would be insubordinate?

11     A.    Yes, something like that.

12     Q.    Who said that, Mack or Shears?

13     A.    I'm not sure because at some point in time

14  all three persons were talking at the same time.  That

15  is why I indicated that everyone needed to calm down,

16  and I could say that everyone an that agency was under

17  a great deal of stress at that time and I thought it

18  was one of those meetings where everyone was under

19  stress to a certain degree.

20     Q.    Did anyone threaten Mr. Kakeh with

21  termination in that meeting?

1    generally.

2        A.    Yes.

3        Q.    Okay.  And it's also your role to make sure

4    that management properly articulates the rationale for

5    the RIF, correct?

6        A.    That's correct.

7        Q.    And it's your role to make sure that

8    management follows its own RIF policies when it does a

9    RIF, correct?

10        A.    Yes.

11        Q.    Did you talk to any persons, any

12    non-management officials of United Planning

13    Organization about Mr. Kakeh's job performance?

14        A.    No.

15        Q.    Did you have any conversations with any

16    non-management personnel at United Planning

17    Organization about the reasons for Mr. Kakeh's

18    termination?

19        A.    No.  Non-management?  No.

20        Q.    Okay.

21            THE WITNESS:  Could I ask you what you