# EXHIBIT 64

## DISTRICT OF COLUMBIA OFFICE OF HUMAN RIGHTS

AMIN KAKEH

Charging Party

v.

UNITED PLANNING ORGANIZATION, INC.

Respondent

Deposition Exhibit No. 6

Beckham

6-19-06

Docket No.: 04-204-P(CN)

### UNITED PLANNING ORGANIZATION, INC.'S POSITION STATEMENT[1]

As set forth in detail below, and as the attached affidavits and exhibits demonstrate, Mr. Amin Kakeh ("Charging Party") is not a victim of discrimination in any respect. First, Charging Party did not apply for the position of Chief Financial Officer ("CFO") of United Planning Organization, Inc. ("UPO"). Second, from the time that he became a Controller for UPO in June 1998, Charging Party has enjoyed annual salary increases, despite his documented hostile, belligerent, and insubordinate conduct to his superiors. Third, at no time were his job duties or responsibilities removed, as his charge of discrimination claims. Fourth, Charging Party's hostility towards his immediate supervisor, UPO's CFO, Sheila Shears, has resulted in her voluntary resignation from UPO. Finally, as a matter of law, Charging Party has not articulated actionable claims of discrimination.

---

[1] This position statement to the District of Columbia Office of Human Rights ("DCOHR") is based upon our understanding and investigation of the facts at this time. By submitting this position statement, United Planning Organization, Inc. in no way waives its right to present new, different, or additional facts, arguments, or objections based upon subsequently acquired information or evidence. Thus, this position statement, while believed to be true and accurate in all respects, does not constitute an affidavit and is not to be used as evidence in any proceeding in connection with the above-referenced charge.

CONFIDENTIAL
MAK 2185

# I.
## BACKGROUND STATEMENT

Charging Party commenced his employment with UPO as Controller on or about June 29, 1998. His initial annual salary was $65,520. Thereafter, based on the concurrence of Gladys Mack, UPO's Deputy Executive Director, Charging Party received annual salary increases. Charging Party's most recent salary is $87,549.93.

The position of Chief Financial Officer ("CFO") was created by UPO in the Spring of 2003, with the full knowledge and support of UPO's Board of Directors, in order to strengthen the executive interface, policy oversight, and leadership of UPO's financial management. UPO concluded that its Office of Finance was not being run efficiently and that it was having difficulty generating timely budgetary and financial reports and data. Moreover, UPO's external auditors, were requesting financial information in order to complete UPO's audit for fiscal year 2003,[2] but for some inexplicable reason, this information was not being assembled and furnished by Charging Party.

Prior to the creation of the CFO position, Ms. Sheila Shears had been successfully interacting with and performing work for UPO as a consultant. As a consultant, Ms. Shears had the opportunity to work with Charging Party on numerous occasions. UPO's former Executive Director, Benjamin Jennings, knowing Ms. Shears' qualifications, asked her to become UPO's CFO. Before accepting the CFO position, however, Ms. Shears met with Charging Party and asked him if he would have a problem with her assuming responsibility for the Office of Finance. Charging Party responded that he

---

[2] Presently, due to Charging Party's refusal and/or inability to furnish UPO's external auditors with requested information, that audit has not yet been completed.

CONFIDENTIAL
MAK 2186

would have no problem with her becoming the CFO, and so, with Charging Party's concurrence, Ms. Shears became UPO's first CFO on April 1, 2003. Exh. 1.

Almost from the beginning of Ms. Shears' assumption of the role of CFO, Charging Party became extremely belligerent and hostile towards her. For example:

(1)     Charging Party was hostile and insubordinate to her in front of staff;

(2)     Charging Party has continuously refused to grant her – and any other UPO employee, including Ms. Mack, UPO's Deputy Executive Director – access to various financial information contained within UPO's computer network;

(3)     Charging Party has thrown things at Ms. Shears and has rejected and refused her requests for help and assistance, stating, for example, "Do it yourself," or calling her "stupid" and "silly;"[3]

(4)     Charging Party has refused to provide his supervisors, including Ms. Mack and Ms. Shears, with information needed by UPO's external auditors to finish the fiscal year 2003 audit;

(5)     Charging Party has undermined the efficient performance of UPO's Office of Finance by refusing instructions from his supervisors;

(6)     Charging Party's numerous conduct and performance deficiencies have resulted in counseling sessions attended by Charging Party, Ms. Mack, Ms. Shears, and UPO's former Executive Director, Benjamin Jennings. At such counseling sessions, Mr. Jennings repeatedly emphasized to Charging Party that Ms. Shears – not he – was in charge of the Office of Finance, and that he had to abide by her instructions. Exhs. 1 and

---

[3] In fact, Charging Party's hostile and repugnant treatment of Ms. Shears has reached a level such that she has submitted her voluntary resignation.

CONFIDENTIAL
MAK 2187

2. Notwithstanding those warnings, however, Charging Party continued to undermine and otherwise disobey Ms. Shears.

Charging Party was not called a "liar" and he was not told that he had "no rights." Exhs. 1 and 2. Contrary to Charging Party's baseless assertions, after Charging Party lied to Ms. Shears about the status of certain financial statements, she approached Charging Party and asked him why he had lied to her. Exh. 1. Ms. Mack also told Charging Party that he could not justify his refusal to attend a requested meeting with her on the grounds that he allegedly had to have UPO's General Counsel present at the meeting. Exh. 2.

Charging Party's persistent insubordination was reflected in a memorandum from Ms. Shears dated January 7, 2004, and in a memorandum from Ms. Mack dated March 30, 2004. Exhs. 3 and 4. As Ms. Mack's March 30, 2004 memorandum to Charging Party indicates, because Charging Party refused and/or was unable to help gather together information needed to complete the 2003 audit, such responsibility was reassigned to Ms. Shears. Exh. 3.

Notwithstanding his continued hostility and insubordination, Charging Party was not demoted and did not suffer a decrease in wages. Consequently, Charging Party's claims that he was discriminated against because of his race, color, sex, religion, and national origin are wholly without merit and must be dismissed as a matter of law.[4]

---

[4] The following additional exhibits are attached hereto:
Exhibit 5 – documents demonstrating Charging Party's repeated insubordination;
Exhibit 6 – position descriptions for the Controller and CFO positions;
Exhibit 7 – relevant documents from Charging Party's personnel file;
Exhibit 8 – Ms. Shears' letter of resignation; and
Exhibit 9 – documents refuting Charging Party's claim that he was excluded from office communications and meetings.

CONFIDENTIAL
MAK 2188

## II.
## LEGAL ARGUMENT

A.  <u>Charging Party's Non-Promotion Claim Is Untimely</u>

Charging Party's claim of non-promotion because of illegal race, color, sex, religion, and national origin discrimination is untimely under Title VII of the Civil Rights Act of 1964, as amended, and is, therefore, barred as a matter of law.

Charging Party alleges that he was denied a promotion on April 1, 2003, yet waited until March 31, 2003 to file his charge of discrimination – more than 300 days from the date of the alleged non-promotion (April 1, 2003).  Pursuant to Title VII, Charging Party's non-promotion claim is time-barred.

"An individual asserting a claim under Title VII must register the grievance with either the Equal Opportunity Commission (EEOC) of the State or local agency having jurisdiction over such claims." *Perry v. Galludet Univ.*, 738 A.2d 1222, 1224 (D.C. 1999) (citing 42 U.S.C. § 2000e(5)(e)(1)).  The would-be plaintiff must file such a grievance with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice; if he chooses instead to file his grievance with a state of local agency, he must do so within 300 days of the occurrence of the alleged unlawful employment practice.  42 U.S.C. § 2000e(5)(f)(1).  As discussed above, since Charging Party waited nearly one year before filing his charge of discrimination with the DCOHR, his April 1, 2003 non-promotion claim under Title VII is time-barred and must be dismissed as a matter of law.

B.  <u>Charging Party's Claims Are Without Merit</u>

As demonstrated evidenced by the affidavits of Ms. Shears and Ms. Mack, and the documentary evidence provided in connection with this position statement, Charging

CONFIDENTIAL
MAK 2189

Party is not a victim of any discrimination based upon race, color, sex, religion, and national origin for several reasons:

(1)    Charging Party has never been denied any promotions since being hired as Controller of UPO in June 1998 because he did not apply for any promotional opportunities.

(2)    Charging Party was never stripped of his duties and responsibility as Controller. As Charging Party's position description demonstrates, Charging Party was responsible for the management of all fiscal transactions concerning the Office of Finance of UPO;

(3)    Charging Party has not been treated in any discriminatory fashion as evidenced by the fact that notwithstanding his continued insubordination and hostility towards his superiors, including Ms. Shears and Ms. Mack, he was not demoted, and his salary was not reduced; indeed, after Ms. Shears became CFO, as before her arrival at UPO, Charging Party had numerous individuals who reported directly to him;

(4)    Charging Party's insubordination is persistent and documented;

(5)    Charging Party was not deleted from any distribution lists, and was not excluded from relevant financial meetings; and

(6)    Charging Party was directly responsible for the individuals who performed the following duties at UPO: Deputy Controller; Chief Revenue of Reports; Office Coordinator; General Ledger Accountant; General Accountant; and Voucher Auditor.

At most, Charging Party has established that he does not get along very well with authority figures. But a personality clash does not amount to illegal discrimination. *See, e.g., Girten v. McRentals, Inc.*, 337 F.3d 979 (8th Cir. 2003).

DC:50079.1                                    - 6 -                          **CONFIDENTIAL**
                                                                             **MAK 2190**

Moreover, Charging Party's charge of discrimination must fail due to his lack of proof. The theory of his case appears wholly based on faulty reasoning: (1) my supervisors do not like me; (2) I am White, Syrian, male, light-skinned, and Muslim; (3) my supervisors do not like me because I am White, Syrian, male, light-skinned, and Muslim. However, this theory fails as a matter of law. *See, e.g., Crawford v. Medina Gen'l Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996). Yet Charging Party points to no comments or conduct that are objectively indicative of race, color, sex, religious, and national origin discrimination. There is no evidence, apart from Charging Party's self-serving conclusions, that any alleged bad acts in the workplace were in any way related to Charging Party's race, color, sex, religion, and national origin. Likewise, Charging Party had not demonstrated that any of the alleged race, color, sex, religious, and national origin discrimination interfered with his work performance and/or created an objectively intimidating, hostile, or offensive work environment. For these reasons, his charge of discrimination must be dismissed. *Id.*

At the most, Charging Party complains that he was not treated civilly by his supervisors at UPO. Of course, UPO steadfastly denies this. But, even assuming, *anguendo*, it were so, such alleged actions by UPO do not amount to actionable claims of discrimination:

> The workplace is not always a tranquil world where civility reigns. Personality conflicts and angst over disciplinary actions can be expected. Even a certain amount of arbitrary nastiness may be encountered at all levels in all occupations; this is a fact of life we must accept as readily as we recognize that employers and employees on the job interact differently than do friends at a summer picnic.

*Kentucky Fried Chicken Nat'l Management Co. v. Weathersby*, 607 A.2d 8 (Md. 1991).

CONFIDENTIAL
MAK 2191

In short, Charging Party is not the victim of illegal employment discrimination; rather, he is an insubordinate employee trying to self-servingly assign blame to others on account of his own hostile, rude, and unprofessional behavior.

### III.
### CONCLUSION

For all the foregoing reasons, Charging Party's charge of discrimination must be dismissed in its entirety.

Dated: this 16th day of June, 2004        Respectfully submitted,

By: _David A. Rosenberg_ _____
David A. Rosenberg
Kevin M. Kraham
FORD & HARRISON LLP
1300 19th Street, N.W., Suite 700
Washington, DC 20036
TEL (202) 719-2000
FAX (202) 719-2077

Attorneys for Respondent UNITED PLANNING ORGANIZATION, INC.

CONFIDENTIAL
MAK 2192

## DISTRICT OF COLUMBIA OFFICE OF HUMAN RIGHTS

AMIN KAKEH

      Charging Party

    v.                        Docket No.: 04-204-P(CN)

UNITED PLANNING ORGANIZATION, INC.

      Respondent

## UNITED PLANNING ORGANIZATION, INC.'S RESPONSE TO REQUEST FOR INFORMATION

1.    Respondent's correct name is United Planning Organization, Inc. ("UPO").  UPO is located at 301 Rhode Island Avenue, N.W., Washington, DC  20001.

2.    The enclosed position statement, with supporting affidavits and exhibits, overwhelmingly demonstrates that Amin Kakeh ("Charging Party") is not a victim of discrimination.

3.    All applicable rules and polices, to the extent that such rules and/or policies exist, are referenced in UPO's position statement.

Issue:  <u>PROMOTION</u>

1.    As set forth in UPO's position statement, contrary to what Charging Party maintains in his charge of discrimination, he did not apply for and was not considered for the newly-created position of Chief Financial Officer ("CFO").

CONFIDENTIAL
MAK 2193

The individual selected for the CFO position, Sheila Shears, possesses a CPA degree, whereas Charging Party does not. A copy of Ms. Shears' resume is attached.

2. Ms. Shears, UPO's CFO, is an African American female. She is Christian.

3. Charging Party did not seek a promotion. A copy of the duties and responsibilities of the CFO position is provided herewith. As set forth in UPO's position statement, the CFO manages and is ultimately responsible for UPO's Office of Finance.

4. Charging Party was asked by Ms. Shears if he would have a problem with or otherwise object to her assuming the role of CFO before she formally accepted the position. As set forth in UPO's position statement, Charging Party had no objection whatsoever. Inasmuch as the position of CFO was a newly-created position, there was no formal selection process, since Ms. Shears was asked to fill this position because she had previously consulted with UPO concerning UPO's financial affairs, and UPO's then- Executive Director, Benjamin Jennings, had confidence in Ms. Shears, given her successful track record as a consultant to UPO's Office of Finance.

CONFIDENTIAL
MAK 2194

Dated: this 16<u>th</u> day of June, 2004          Respectfully submitted,

By: _David A. Rosenberg_

David A. Rosenberg
Kevin M. Kraham
FORD & HARRISON LLP
1300 19th Street, N.W., Suite 700
Washington, DC  20036
TEL (202) 719-2000
FAX (202) 719-2077

Attorneys for Respondent UNITED PLANNING
ORGANIZATION, INC.

DC:49992.1

CONFIDENTIAL
MAK 2195

## DISTRICT OF COLUMBIA OFFICE OF HUMAN RIGHTS

AMIN KAKEH

      Charging Party

    v.

UNITED PLANNING ORGANIZATION, INC.

      Respondent

Docket No.: 04-204-P(CN)

## AFFIDAVIT OF SHEILA SHEARS

DISTRICT OF COLUMBIA,

To-wit:

I, Sheila Shears, have been duly sworn according to law, state as follows:

1.     I am a female, am over 18 years of age, have personal knowledge of the facts set forth herein, am competent to testify, and state that said facts are true.

2.     At all relevant times, I was an employee of United Planning Organization ("UPO"). I am the Chief Financial Officer ("CFO") of UPO.

3.     I have reviewed Mr. Amin Kakeh's ("Charging Party") charge of discrimination based upon race, national origin, sex, color, and religion, and I categorically deny that he is a victim of discrimination of any kind whatsoever.

CONFIDENTIAL
MAK 2196

4.      The position of Chief Financial Officer ("CFO") was created by UPO, with the full knowledge and support of UPO's Board of Directors, in order to strengthen the executive interface, policy oversight, and leadership of UPO's financial management.  UPO's Board concluded that its Office of Finance was not being run efficiently and that it was having difficulty generating timely budgetary and financial reports and data.  At that time, I had been a consultant for UPO for some period of time, given my expertise and background in finance and accounting.  In that regard, I have worked closely with Charging Party, who was then UPO's Controller, and I had no problems getting along with him prior to becoming UPO's CFO.  During my one-year tenure as a consultant, Charging Party and I got along fine.

5.      UPO's Board concluded that its Office of Finance was not being run efficiently and that it was having difficulty generating timely financial reports and data.  As a result, the Board decided to create the position of CFO.  I was asked by the former Executive Director, Benjamin Jennings, to become UPO's CFO.  Before doing so, I met with Charging Party in order to determine if he would have a problem working with me should I accept that position.  He indicated that there would be no such problems and so I agreed to become UPO's CFO.

CONFIDENTIAL
MAK 2197

6.    Virtually from the outset of my assuming the role of CFO, Charging Party began

to treat me with the utmost disrespect, hostility, belligerence, and he took steps to

undermine my authority within UPO, and particularly, UPO's Office of Finance.

For example, on one occasion, when I requested that he produce certain reports

for me, he stated, "Do it yourself."  On another occasion, when I asked for his

assistance, he said, "I am not your clerk."  On another occasion, he called me

"silly" and "stupid."

7.    On numerous occasions, Charging Party has belittled me and insulted me in front

of staff.  Because of his refusal to accept the fact that, as CFO, I was his

supervisor and was in charge of the Office of Finance, I requested that Mr.

Jennings hold a meeting with Charging Party and me to address Charging Party's

attitude towards and treatment of me.  On several occasions, Mr. Jennings held

such meetings.  As I recall, Ms. Gladys Mack, UPO's Deputy Executive Director,

also attended some of these meetings.  At these meetings, Mr. Jennings reiterated

to Charging Party time and time again that I was in charge of the Office of

Finance, not he, and that he was to support me in any way that I requested.  Mr.

Jennings also emphasized to Charging Party that there are not two people

ultimately responsible for the performance of the Office of Finance, but rather, the

CONFIDENTIAL
MAK 2198

CFO – and the CFO alone – has this responsibility. Along those lines, in a June 2003, meeting, Ms. Mack reiterated these sentiments to Charging Party. In each of those meetings, Mr. Jennings also emphasized to both Charging Party and me that we needed to get along in order to make the Office Finance function as efficiently and smoothly as possible.

8.  With respect to the claims Charging Party makes in his charge of discrimination, I offer the following. First, I am not aware of any financial meetings that he was allegedly not invited to. Certainly, when a meeting was called which involved input from the Controller, Charging Party was given advanced notice of such meetings. Second, to the best of my knowledge and belief, Charging Party was included in all distribution lists that pertained to either his job as Controller and/or the jobs of those people who reported him; including the Deputy Controller, the Chief of Revenue and Reports, the Office Coordinator, the General Ledger Accountants, the General Accountant, and the Voucher Auditor.

9.  In October, 2003, UPO was beginning to prepare documents needed to produce timely, complete, and accurate audited financial statements to our lender, as well as to our outside funding sources. As Controller, Charging Party was responsible for the generation of those documents. As CFO, I generated an October 29, 2003

CONFIDENTIAL
MAK 2199

memorandum to the Office of Finance. In that memo, I indicated that due to the

need for the increased emphasis on cash flow management, and to enable

Charging Party to focus on the audit issues confronting UPO, all cash

management and budget issues would be handled by me. I implemented this

policy to give Charging Party sufficient time to produce the requested

information. In my memorandum of October 29, I also emphasized that Charging

Party and Mr. Davidson Quashie, UPO's Deputy Controller, would, as before,

continue to handle General Ledger activity, financial statement production, tax

issues, audit coordination and the day today operations of the Finance Office. At

no time were Charging Party's job duties stripped or taken away from him.

Rather, once the position of CFO was created and filled, I was ultimately

responsibility for the performance of the Office of Finance.

10.    On or about October 14, 2003, I asked Charging Party where some outstanding

financial statements were. He told me that he had not yet prepared them but that

he would do them the next day. I returned to my office and received a call from

Benjamin Jennings, UPO's then-Executive Director. Mr. Jennings informed me

that he had the very financial reports that Charging Party had told me he had not

yet completed. I became upset because I realized immediately that I had been lied

CONFIDENTIAL
MAK 2200

to by Charging Party, and I approached him about this. During this encounter,

Charging Party screamed at me and said he was not going to let me get credit for

work that he dad done. At no time did I call him a "liar." I simply asked him

why he had lied to me about not producing the requested reports when, in fact, he

had produced them and provided them to Mr. Jennings.

11.    On or about October 15, 2003, I politely asked Charging Party to return a call to a

particular vendor. He threw the telephone note back on my desk and shouted,

"Do it yourself," or something to that effect. I became extremely upset with his

disrespect and belligerent behavior, and told him to never throw anything on my

desk again. I then indicated that I felt he had a problem and that I thought perhaps

he should pray in order to calm down. I was aware that he prayed every day and I

was extremely respectful of this. In response to my suggestion that perhaps he

needed to pray in order to regain his composure, Charging Party yelled that I

should go pray instead.

12.    I learned approximately one month ago that Charging Party alone controlled the

master access to all financial data within UPO's computer system. However,

despite being asking to share the master access code, he steadfastly refused to do

so.

CONFIDENTIAL
MAK 2201

13.    Due to Charging Party's ongoing refusal to comply with my requests for

information and financial statements, and his continued belligerence, hostility,

and insubordination, I generated a memo to Charging Party dated January 7,

2004. A copy of this memorandum is attached to UPO's position statement.

14.    Despite Charging Party's unabated hostility and belligerence towards me, and

others at UPO, he was not demoted, and his salary was not reduced.

15.    Because of Charging Party's harsh treatment of and attitude towards me, I have

decided to resign from UPO. A copy of my resignation letter is attached to

UPO's position statement.

*       *       *

CONFIDENTIAL
MAK 2202

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Affidavit are true.

SHEILA SHEARS
Chief Financial Officer
United Planning Organization, Inc.

Washington, District of Columbia

I HEREBY CERTIFY, that on this 15th day of June, 2004, before me personally appeared SHEILA SHEARS, and made oath in due form of law that the matters and facts set forth in the foregoing Affidavit are true and correct as therein stated and acknowledged that the said Affidavit is in fact her act and deed and that she has full understanding thereof.

NOTARY PUBLIC

My commission expires: COMMISSION EXPIRES: 9/30/08

CONFIDENTIAL
MAK 2203

DISTRICT OF COLUMBIA OFFICE OF HUMAN RIGHTS

AMIN KAKEH

         Charging Party

    v.                           Docket No.: 04-204-P (CN)

UNITED PLANNING ORGANIZATION, INC.

         Respondent

## AFFIDAVIT OF GLADYS MACK

DISTRICT OF COLUMBIA,

To-wit:

I, Gladys Mack, have been duly sworn according to law, states as follows:

1.    I am a female, am over 18 years of age, have personal knowledge of the facts set

forth herein, am competent to testify, and state that said facts are true.

2.    At all relevant times, I was an employee of United Planning Organization.

("UPO"). I am the Deputy Executive Director at UPO.

3.    I have reviewed Mr. Amin Kakeh's ("Charging Party") charge of discrimination

alleging race, national origin, sex, color, and religious discrimination, and I

categorically deny that he is a victim of discrimination of any kind whatsoever.

4.    To begin with, as discussed in detail in UPO's position statement, the position of

Chief Financial Officer ("CFO") was created by UPO, with the full knowledge

-1-

CONFIDENTIAL
MAK 2204

and support of UPO's Board of Directors, in order to strengthen the executive

interface, policy oversight, and leadership of UPO's financial management.

UPO's Board concluded that its Office of Finance was not being run efficiently

and that it was having difficulty generating timely budgetary and financial reports

and data.

5.    At that time, Sheila Shears had been a Consultant with UPO for some period of

time. Ms. Shears possesses great expertise and a solid background in finance and

accounting. As a consultant, Ms. Shears worked closely with Charging Party,

who was then UPO's Controller, and, as far as I knew, Ms. Shears had no

problems getting along with Charging Party prior to becoming UPO's CFO.

Ms. Shears was asked by UPO's former Executive Director, Benjamin Jennings,

to become CFO. Before doing so, Ms. Shears met with Charging Party in order to

determine if he would have a problem working with her if she were to accept the

CFO position. Charging Party indicated that there would be no such problems,

and Ms. Shears became CFO.

6.    Ms. Shears has indicated to me that on numerous occasions, Charging Party has

belittled her and insulted her in front of staff. Because of his refusal to accept the

fact that she was his supervisor and was in charge of the entire Office of Finance,

CONFIDENTIAL
MAK 2205

Ms. Shears requested that Mr. Jennings, the former Executive Director, hold a

meeting with Charging Party to address Charging Party's attitude towards and

treatment of Ms. Shears.  On several occasions, Mr. Jennings held such meetings.

I also attended some of those meetings.  At those meetings, Mr. Jennings

reiterated to Charging Party time and time again that Ms. Shears was in charge of

the Office of Finance, not he, and that he was to support Ms. Shears in any way

that she requested.  Mr. Jennings also emphasized to Charging Party that there are

not two people ultimately responsible for the performance of the Office of

Finance, but rather, the CFO – and only the CFO – has that responsibility.  Along

those lines, in a June 2003, meeting, I reiterated the same thing to Charging Party.

In each of these meetings, Mr. Jennings also emphasized to Charging Party and

Ms. Shears that they needed to get along in order to make the Office of Finance

function as efficiently and smoothly as possible.

7.     In response to Charging Party's charge of discrimination, I offer the following.

First, I am not aware of any financial related meetings that he was not invited to.

Certainly, when a meeting was called which involved input from the Controller,

Charging Party was given advanced notice of such meetings.  Second, to the best

of my knowledge and belief, Charging Party was included in all distribution lists

-3-

CONFIDENTIAL
MAK 2206

that pertained to his position of Controller and/or the positions of those

individuals who reported to him; including the Deputy Controller, the Chief of

Revenue and Reports, the Office Coordinator, the General Ledger Accountants,

the General Accountant, and the Voucher Auditor.

8.    In October, 2003, UPO was beginning to prepare documents needed to produce

timely, complete, and accurate audited financial statements to our lenders, as well

as to our outside funding sources for Fiscal Year 2003.  As Controller, Charging

Party was responsible for the generation of those documents.  Ms. Shears

generated an October 29, 2003 memorandum to the Office of Finance.  In that

memo, Ms. Shears indicated that due to the need for the increased emphasis on

cash flow management, and so as to enable Charging Party to focus on the audit

issues confronting UPO, all cash management and budget issues would be

handled by her.  She implemented this policy to give Charging Party sufficient

time to produce the necessary documents.  In her memorandum of October 29,

she also emphasized that Charging Party and Mr. Davidson Quashie, UPO's

Deputy Controller, would, as before, continue to handle General Ledger activity,

financial statement production, tax issues, audit coordination and the day-to-

-4-

CONFIDENTIAL
MAK 2207

day operations of the Finance Office. At no time were Charging Party's duties stripped or taken away from him. Rather, once the position of CFO was created and filled, the ultimate responsibility for the performance of the Office of Finance rested with Ms. Shears.

9.     I learned approximately one month ago that Charging Party, alone, controlled the master access to all financial data in UPO's computer system. However, despite being asking to share the master access code, he steadfastly refused to do so.

10.    According to Ms. Shears, due to his ongoing refusal to comply with requests for information and financial statements, his continued belligerence and hostility and insubordination, Ms. Shears generated a memo to Charging Party dated January 7, 2004. A copy of that memo is attached to UPO's position statement.

11.    Despite Charging Party's continued hostility and belligerence towards Ms. Shears and his continuing failure to cooperate with me, as well as others at UPO, he was not demoted, his salary was not reduced, and his job title was not changed.

12.    Because of Charging Party's abysmal treatment of Ms. Shears, she has decided to resign from UPO. A copy of Ms. Shears' resignation letter is attached to UPO's position statement.

CONFIDENTIAL
MAK 2208

13.    As set forth in a memorandum of October 20, 2003, I politely asked Charging

Party to see me concerning a number of financial items.  This request took place

on October 15, 2003.  At the time, Charging Party told me that he was involved

with his daily prayer but would come to see me when he was finished praying.

However, two hours later, he had not come to see me and he did not call me to

explain his absence.  So, I again politely called him and asked him why he had not

come to see me.  He said that he had gotten caught up with certain things (he did

not elaborate).  In short, Charging Party refused to meet with me.  He repeatedly

stated that he did not have to meet with me without the presence of UPO's

General Counsel.  Inasmuch as my requested meeting was not personal in nature,

but rather, was business related, I did not feel that it was appropriate for him to

condition his meeting with me on the presence of a third party.  An October 20,

2003 memorandum summarizes Charging Party's refusal to meet with me.  I

should add that Charging Party's refusal to meet with me, as set forth in my

October 20 memorandum, is just one example of the numerous occasions on

which Charging Party was insubordinate, and disrespectful towards me.  Contrary

to what he asserts in his charge of discrimination, at no time did I tell Charging

-6--

CONFIDENTIAL
MAK 2209

Party that he had "no rights" at all. I did indicate to him that he did not have a right to refuse to meet with me about a task related to a work assignment.

14.     On or about June 23, 2003, at a staff meeting, I informed the Office of Finance that Ms. Shears would oversee the entire Office and that she was ultimately responsible for its performance. At no time did I – or UPO – strip Charging Party of his duties, responsibilities, and supervisory functions as UPO's Controller. Despite numerous meetings between UPO's former Executive Director, Benjamin Jennings, Ms. Shears, and Charging Party, during which Mr. Jennings would explain that Ms. Shears – not Charging Party – was in charge of the Office of Finance, Charging Party could not accept the fact that it was Ms. Shears who was in charge of the Office of Finance. Lastly, it is indeed ironic that Charging Party maintains that UPO has discriminated against him. In point of fact, despite his continued belligerence, hostility, and insubordination, he has never been demoted and he has not suffered a reduction in pay. Moreover, I recommended that his salary be increased, and my recommendation was approved by UPO's former Executive Director.

15.     On March 30, 2004, I again requested additional financial information from Charging Party. As in the past, in March 2004, he was behind in furnishing me

-7-

CONFIDENTIAL
MAK 2210

with certain important financial information.  So, in an effort to file the

information that our auditors needed to finish their audit for fiscal year 2003, I

assigned Ms. Shears responsibility for completing the audit.  As my March 30,

2004 memorandum reads, a copy of which is attached to UPO's position

statement, Charging Party refused to accept this reassignment of duties.  As my

memo explains, I made this delegation because of Charging Party's ongoing

refusal to furnish me with important and requested financial information pertinent

to the 2003 audit.

*        *        *

CONFIDENTIAL
MAK 2211

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Affidavit are true.

_____
GLADYS MACK
Deputy Executive Director
United Planning Organization, Inc.

Washington, District of Columbia

I HEREBY CERTIFY, that on this 15th day of June, 2004, before me personally appeared Gladys Mack, and made oath in due form of law that the matters and facts set forth in the foregoing Affidavit are true and correct as therein stated and acknowledged that the said Affidavit is in fact her act and deed and that she has full understanding thereof.

_____
NOTARY PUBLIC

My commission expires: COMMISSION EXPIRES: 9/30/08

DC:49995.1

-9-

CONFIDENTIAL
MAK 2212