# EXHIBIT 65

ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,          )

      Plaintiff,               )

          v.               )   No. 1:05-cv-1271

UNITED PLANNING               )

ORGANIZATION, INC.,           )

      Defendant.               )

Silver Spring, Maryland

Tuesday, June 20, 2006

The Deposition of

WILLIAM MULLER ISAAC,

called for oral examination by Counsel for the

Plaintiff, pursuant to notice, held in the Law

Offices of MELEHY & ASSOCIATES, LLC, 8403 Colesville

Road, Suite 610, Silver Spring, Maryland, beginning

at 11:30 a.m., before Cheryl A. Lord, RPR, CRR, a

Notary Public in and for the District of Columbia,

when were present:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

8

1       the finance department?

2           A.    No.

3                 But we were told there will be changes by

4       Mr. Jones.

5           Q.    Mr. Jones told you there would be changes?

6           A.    There would be changes.

7           Q.    Was he specific about what they were?

8           A.    No.

9                 He called us all and told us.

10          Q.    When did he do that?

11          A.    As soon as he came, a couple times.

12          Q.    Was that April or May that he did that?

13          A.    It would be April, but I'm not sure what

14      date.

15          Q.    Okay.  This would be April of 2004.

16                Correct?

17          A.    Right.

18                Even before that, Mr. Jennings used to

19      threaten us that he was going to outsource finance

20      division, several times.

21          Q.    Okay.  Did you work near Mr. Kakeh's

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

9

1  office?

2      A.   Yeah, second door from me.

3      Q.   Did you work near Mr. Quashie?

4      A.   Right.

5      Q.   Did you have a good working relationship

6  with Mr. Quashie?

7      A.   Sure.

8      Q.   Did you talk often to him?

9      A.   Yes.

10     Q.   Did you have a good working relationship

11 with Nona McLean?

12     A.   Yeah, relationship, but we don't have too

13 much contact.  She's in a different situation --

14 position.

15     Q.   Was she in the finance department?

16     A.   No.

17          She wasn't, but in a different room, say

18 about 50 feet away, a different section.

19     Q.   Did there come a time when someone told you

20 there was actually a reduction in force under way in

21 the finance department?

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

11

1    Q.    Position eliminated?

2    A.    Not eliminated, no.

3          I was transferred to Nona McLean's

4    position.

5    Q.    That was a step down for you, wasn't it?

6    A.    Yeah.

7          That's why I resigned.

8    Q.    Okay.  But let me understand:  To your

9    knowledge, was Mr. Quashie -- was Mr. Quashie's

10   position eliminated?

11   A.    No.

12   Q.    Quashie's position was not eliminated and

13   he was not terminated to your knowledge?

14   A.    Right.

15   Q.    And he wasn't transferred to your

16   knowledge?

17   A.    No.

18   Q.    What happened to Nona McLean?

19         Was she terminated, or what was your

20   understanding.

21   A.    She was terminated.

12

1     Q.   Who told you that?

2         Who told you that she was terminated?

3     A.   There was talk among all the people she was

4   not coming in.

5     Q.   Who announced it?

6     A.   I'm not sure.

7     Q.   Do you know why she was terminated?

8         Does it have to do with the fact that she

9   had a relationship with Mr. Jennings?

10    A.   True.

11        And also, she acted kind of angry.  She

12  won't -- submissive to anybody.  She would fight with

13  anybody, or angry and go and tell Mr. Jennings

14  everything.  So it was understanding among people

15  what that relationship is.

16    Q.   There was an understanding among people

17  that she had a relationship with Mr. Jennings?

18    A.   Yeah, that's our understanding.

19    Q.   Okay.  All right.

20        Do you know why she was terminated, or if

21  there was a rumor about it, or --

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

13

1       A.    She was Mr. Jennings' girl.

2       Q.    So she had to go because he was gone.

3             Is that what your understanding was?

4       A.    Right.

5       Q.    Do you know who told you that?

6       A.    General talk.

7       Q.    Were you aware of any plans to terminate

8  Mr. Kakeh in March, April, or May 2004?

9       A.    No.

10      Q.    Were you aware that anybody in supervisory

11 positions such as Ms. Shears, Ms. Mack --

12      A.    No.

13      Q.    -- or Mr. Jones wanted to terminate

14 Mr. Kakeh?

15      A.    No.

16      Q.    To your knowledge, what happened to

17 Mr. Kakeh?

18      A.    During the time he left, he was not in the

19 office.  I think I was on vacation 2 weeks.

20            When I came back, I was told he was

21 terminated, he was sent out.  Before that, Taylor and

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

15

1      Q.   Is she still there?

2      A.   Yeah.

3          She's transferred to Headstart, her

4  department.

5      Q.   What exactly did Ms. Smith tell you about

6  Mr. Kakeh's departure?

7      A.   She said that he was sent home because he

8  was gathering documents against outsourcing the

9  financing division.

10         And another reason was, Mr. Kakeh never

11  liked Ms. Shears.  He never accepted her.  So there

12  were a lot of fights between them, even the financial

13  statements or anything.  Take anything, they would

14  fight, argue, shout.

15      Q.   Okay.  So did Ms. Smith give you any other

16  reasons why Mr. Kakeh was let go?

17      A.   No.

18      Q.   Did she explain how she knew this?

19      A.   She was the secretary.

20      Q.   Secretary to who?

21      A.   To Kakeh, or he told her -- he told her

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

16

1    and -- I think she had -- she had a letter, a copy of

2    a letter also.

3        Q.   His termination letter?

4        A.   Yeah.

5        Q.   Okay.  So she told you that he was

6    terminated for gathering documents against

7    outsourcing?

8        A.   Yeah.

9        Q.   Did she say anything about him providing

10   information in an investigation by the CSBG people?

11       A.   I knew that before CSBG.

12       Q.   When did you learn that the CSBG people

13   were doing a review of UPO's finances?

14       A.   When they came there.

15       Q.   February?

16       A.   Yeah.

17       Q.   That's February of '04?

18       A.   I don't know -- yeah, '04.

19       Q.   M-hm.  Who told you that the CSBG people

20   were doing an audit -- or doing a review, I should

21   say?

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

17

1    A.    About 10 people came suddenly.  They wanted

2  all the documents.  They asked everybody give the

3  documents, myself, Sharon, give financial documents.

4          And we knew that they were contacted by

5  somebody else, the mishandling of the money, and they

6  were checking everything out.

7    Q.    Who were they contacted by?

8    A.    Contacted -- thinking was that Mr. Kakeh

9  contacted them.  But he was the only one had the

10  documents.

11    Q.    What documents are you talking about?

12    A.    The money spent on boat and transfer funds

13  from bank to bank and bank to -- he knew everything.

14    Q.    Whose thinking was that?

15    A.    That was everybody's thinking.  We know he

16  was copying everything, but he wouldn't tell anybody.

17    Q.    How did you know that?

18    A.    He was in front of my office.

19    Q.    Was Ms. Shears to your knowledge aware that

20  Mr. Kakeh was making these -- providing this

21  information to the CSBG people?

18

1      A.    No, I don't know.

2      Q.    Was Ms. Mack aware of it?

3      A.    I don't know.

4      Q.    Was Mr. Jones aware of it?

5      A.    I don't know.

6      Q.    Was it common knowledge in the office that

7    Mr. Kakeh was providing this information?

8      A.    It's common knowledge.

9      Q.    Did Mr. Quashie know?

10     A.    I don't know.

11     Q.    Who did you talk to about the fact that

12   Mr. Kakeh was providing this information to CSBG?

13     A.    Sharon Smith.  That's who I usually talked

14   to.  She used to be my secretary for 10 years, so I

15   know her.

16     Q.    How did you know it was common knowledge in

17   the office that Mr. Kakeh was providing this

18   information to the CSBG people?

19     A.    Everybody talks about it.  And also even

20   maybe he called a couple meetings without the

21   knowledge of Ms. Shears.

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006

19

1     Q.   Called meetings with who?

2     A.   With the financial division, to have a

3 strategy to fight the administration against the

4 outsourcing or we all will lose job.  So everybody

5 knows that he's doing something.

6     Q.   Okay.  Was it common knowledge that

7 Mr. Kakeh provided information and/or documents to

8 Tunde Eboda regarding his review of United Planning

9 Organization?

10    A.   Who is Eboda?

11    Q.   He works for department of human resources

12 in D.C.

13    A.   I don't know.

14    Q.   Do you know who he is, Mr. Eboda?

15    A.   I've seen him.  I have a recollection of

16 his name, but --

17    Q.   Okay.  Have you ever heard Ms. Shears or

18 Ms. Mack talk about Kakeh in a negative way?

19    A.   Yeah.

20    Q.   When did you hear this?

21    A.   You mean between Shears and Mack?

DEPOSITION OF WILLIAM MOLLER ISAAC
Conducted on June 20, 2006

20

1       Q.    Yeah.

2             Did you hear Shears and/or Mack talk

3       negatively about Kakeh?

4       A.    They always talk about -- Ms. Shears always

5       talk about -- against Kakeh, and Ms. Mack also always

6       talked about -- against Mr. Kakeh.  Mr. Jennings,

7       even the meetings with the finance division and the

8       others, putting him down like a servant, worse than a

9       servant, treated him very bad.

10            Once Mr. Kakeh called me, asked me, what

11      would you do if you were in my position.  A couple of

12      times he asked me this.

13            I told him my experience with Mr. Coker,

14      C-O-K-E-R, that I fought for my right.  You can fight

15      it out or you resign -- or I would resign, I told

16      him. He didn't do either of them, but quietly worked

17      against them, against Mr. Jennings, you know.

18      Q.    What do you mean by, quietly worked against

19      Mr. Jennings?

20      A.    In gathering this materials and informing

21      others.

DEPOSITION OF WILLIAM MOLLER ISAAC
Conducted on June 20, 2006

21

1    Q.    How did you know about that?

2    A.    That's a common understanding, and he was

3  xeroxing.  Sharon Smith knows it.  He asked her for

4  the records of those things.

5    Q.    How soon after you got back from vacation

6  were you given this letter?

7         It's dated June 19th, 2004.

8    A.    That's not the right date -- I got this

9  letter one week earlier than this.

10   Q.    It's not the right date?

11   A.    No.

12        That's the date of the letter, but I got

13 the letter one week earlier to that date.

14        MR. MELEHY:  So let's have this marked as

15 exhibit 1.

16        (DEPOSITION EXHIBIT NO. 1

17         was marked for identification.)

18 BY MR. MELEHY:

19   Q.    All right.  Mr. Isaac, I showed you what's

20 been marked as Isaac number 1, which is a letter

21 dated -- the date at the top is June 9th, 2004.

1      Q.    So you were at work on June 2nd?

2      A.    Right.

3      Q.    That was the same day Mr. Kakeh got his RIF

4    letter?

5      A.    I didn't know that.

6      Q.    But he wasn't there when you came into the

7    office, was he?

8      A.    He was already gone.  He was already gone.

9            One week means approximately.  Could be 10

10    days or so earlier.

11            Okay?

12      Q.    10 days earlier would have been May.

13      A.    Yeah.

14      Q.    You got this letter, this RIF letter in

15    May?

16      A.    10 days -- 10 days earlier.  I can give you

17    the date later on.

18      Q.    So you were in the office at the end of

19    May?

20      A.    Oh, yeah.

21      Q.    Okay.  And you got the -- when did you go

DEPOSITION OF WILLIAM MULLER ISAAC
Conducted on June 20, 2006
Case 1:05-cv-01271-GK    Document 78-72    Filed 02/27/2007    Page 16 of 21

24

1  on vacation?

2      A.   I'd have to find out the date.

3      Q.   Do you want to look at a calendar?

4      I have a calendar I can give you.

5      A.   Look at my calendar.  I wrote everything

6  there.  I look at it.

7      Q.   You didn't bring your calendar with you?

8      A.   No.

9      I can tell you this, what happened --

10 should I tell you?

11     Q.   Sure.

12     A.   Okay.  Geri was my secretary a long time,

13 along with Sharon Smith.  So I knew her well.  She

14 knew me well.  And she gave me the letter and sat

15 down, asked me to read it.

16     I read it, and I told her, not accepting

17 this, give it back to Monica.  She took it back.  And

18 Monica told her, no, you have to give to him.  I

19 don't know that I signed anything or not.  I don't

20 remember that.  You have to give it to him.

21     Then second time, the next day, she brought

1    the letter to me.  So I took the letter.

2         Q.   Who brought it to you?

3              Geri Price?

4         A.   Yes.

5         Q.   And she's your secretary?

6         A.   No, not my secretary.

7         Q.   Geri Price is your supervisor?

8         A.   Geri Price, secretary to Monica Scott.  She

9    used to be secretary years earlier.  So we knew each

10   other very well.

11             Then I had discussed with her -- second

12   time when she came, I discussed with her about this

13   letter, this letter transferring me to another

14   position, which I was not familiar with it, and also

15   it was not permanent.  The position is not permanent.

16   Then why should I go there.  That's the way I talked

17   to Geri Price.

18             Then we discuss it, but she left.  Then I

19   think the same day or the next day, I resigned,

20   effective June 18.

21        Q.   Okay.  You say you resigned effective June

1    18th.

2        A.    M-hm.

3        Q.    Was that the same day you resigned?

4        A.    No.

5              I resigned about --

6        Q.    Approximately what date did you resign?

7              I mean, actually physically resign.

8        A.    One week I gave -- one week.

9        Q.    So if you resigned on June 18th, then

10   you -- well, if you were -- your resignation was

11   effective June 18th, then you actually resigned on

12   June 11th.

13             Correct?

14        A.    Right.  Yeah.

15        Q.    Okay.  That would be June 11th, 2004, when

16   you resigned?

17        A.    Right.

18        Q.    Now, let's reconstruct these events again.

19             How many days before you actually resigned

20   on June 11th did you receive the letter?

21        A.    It's contradiction.

27

1          See, I am sure I received this letter 10

2    days earlier.

3          Q.    Earlier than what?

4          A.    Earlier than this date.

5          Q.    Than June 9th?

6          A.    Yeah.

7          Q.    So that would have been approximately May

8    31st that you received the letter?

9          A.    Right.

10         Q.    And how do you remember that?

11         A.    Because I send a letter back, and 9th is

12    the date I am supposed to report to the other office,

13    but I was there one week earlier in my position -- in

14    my position telling me I had one more week to go

15    there, but I not going there, so I resigned.  So I

16    should resigned earlier than that, you know, the

17    date.

18         Q.    Are you now saying you did not resign on

19    June 11th, 2004?

20         A.    I resigned earlier than that, send a

21    letter.  That should be on the --

28

1      Q.   Okay.  It says -- you handed me a piece of

2  paper showing some things here.

3           6-18-2004, you retired.

4      A.   Yeah.

5      Q.   So that's the date -- that was the

6  effective date of your resignation?

7      A.   Okay.  But applied date would be with the

8  form.

9      Q.   Okay.  When you actually submitted a

10 resignation, did you do it in writing?

11     A.   There's a form.

12     Q.   Oh, there's a form.

13          And you filled it out?

14     A.   Yeah.

15          And signed --

16          MR. MELEHY:  Alison, we don't have that

17 form.

18     A.   -- by Ms. Shears.

19          She will not accept it, and finally she

20 accepted it.  So that date will show you exactly what

21 happened.

29

1    BY MR. MELEHY:

2        Q.    Okay.  So the date you filled out that

3    form, that retirement form, is the date you told them

4    you were resigning?

5        A.    Right.

6        Q.    And who did you tell that you were

7    resigning?

8              Who did you submit the form to?

9        A.    Ms. Shears.

10       Q.    Why did you submit it to Ms. Shears?

11       A.    She was the only one was my supervisor

12   there.  Actually, what happened -- I submitted to

13   Mr. Richardson, Robert Richardson.  I submit the

14   resignation form to Mr. Richardson.

15             He told me there should be -- Ms. Shears is

16   your supervisor, therefore, she has to accept it.  So

17   then I took it to her.

18       Q.    Same day?

19       A.    Same day.

20             Got it signed and gave it to him.

21       Q.    Okay.  Did you feel that you were demoted?