# EXHIBIT 91

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

MOHAMMED AMIN KAKEH,              :

      Plaintiff,              :

vs.                               :   Civil Action No.

UNITED PLANNING ORGANIZATION,     :   1:05-cv-1271(GK/JF)

INC.,                             :

      Defendant.              :

------------------------------x

Silver Spring, Maryland

Tuesday, August 8, 2006

30(b)(6) Deposition of

DANA JONES

called for examination by counsel for the Plaintiff, pursuant to notice, held at the law offices of Melehy & Associates, LLC, 8403 Colesville Road, Suite 610, Silver Spring, Maryland, beginning at 10 a.m., before Lynell C.S. Abbott, Shorthand Reporter and Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

6

1  were, in fact, retained by the Defendant.  Correct?

2      A.   Yes.

3      Q.   Initially, Mr. Isaac was retained.  Correct?

4      A.   Yes.

5      Q.   And Mr. Quashie was also retained.  Correct?

6      A.   Yes.

7      Q.   What are the reasons why Mr. Kakeh was not

8  retained in some capacity with the Defendant?

9      A.   Mr. Kakeh was in the management tier that

10 the firm that we hired to manage the operations of the

11 finance office wanted to place their persons in.  And

12 as a result of that, Mr. Kakeh was not retained.

13     Q.   I am just going to make sure that I

14 understand what you just said.  And if I paraphrase

15 this in a way that's inaccurate, you'll let me know.

16 Okay?

17     A.   Mmm-hmm.

18     Q.   Mr. Kakeh was not retained because the

19 management tier he was in, which was Controller, was

20 to be occupied by the independent contracting firm of

21 Walker & Company.

7

1    A.    Correct.

2    Q.    What was the reason why the Plaintiff was

3  not reassigned to another position with Defendant?

4    A.    Same answer.

5    Q.    The same answer would be that the Plaintiff

6  was not reassigned to another position because the

7  position he occupied, Controller, was to be taken by a

8  member of Walker & Company.

9    A.    Yes.

10         (Marked, Exhibit # 2, Letter, 6/2/04.)

11         BY MR. MELEHY:

12   Q.    Mr. Jones, I am showing you the infamous

13  letter, as we would say.  It's the June 2nd, 2004

14  letter to Mr. Kakeh signed by you informing him that

15  his employment has been terminated due to

16  Reduction-In-Force.  That's correct, right?

17   A.    Correct.

18   Q.    I am going to actually direct your attention

19  to the last paragraph, it's not a full paragraph, of

20  Exhibit 2.  It says, "The competitive levels which

21  control the agreed upon scope of competition in this

DEPOSITION OF DANA JONES
Conducted on August 8, 2006

17

1  And so that's what took place.

2      Q.  Did you have any discussions with Walker &
3  Company about whether Mr. Kakeh could have performed
4  the duties of a general ledger accountant had he been
5  retained or reassigned to that position?

6      A.  No.  And, in fact, what we had said to
7  Walker was that "In the key positions in the
8  organization you have the right to make that
9  decision," because when we got the original proposal
10 from Walker it included the elimination of every
11 position, just as the proposal from F.S. Taylor was a
12 total takeover.  And in the period between the 27th of
13 April and the 27th of May, we had discussions with
14 both the staff and as we met with the principal in
15 Walker to discuss the issues, one of the issues that
16 was brought up was that they would like to very much,
17 based upon references that they had, consider
18 Mr. Quashie in that position.

19     Q.  As opposed to Mr. Kakeh?

20     A.  Yes.  They didn't say as opposed to
21 Mr. Kakeh.  They said, "We would like to consider

DEPOSITION OF DANA JONES
Conducted on August 8, 2006

18

1  Mr. Quashie." We had no discussions about Mr. Kakeh.

2  Q.    So Walker & Company exhibited a clear

3  preference for Mr. Quashie.

4  A.    Yes. Their principal did, yes.

5  Q.    And that was based on what?

6  A.    Based upon, you know, to put it as they

7  shared it at that time or he shared it as that time,

8  "You know, we talk in this industry. And we

9  understand that Mr. Quashie is someone who has skills

10 that we should consider for that role here."

11 Q.    But Mr. Kakeh had the same skills. Correct?

12 A.    I can't speak to either of their skills. I

13 can say they were in the same job grouping.

14 Q.    So are you telling me that the decision to

15 retain Mr. Quashie was not based on his seniority, his

16 superior seniority within the Group VI category?

17 A.    What I am telling you is what I have

18 maintained from the very beginning. And that is that

19 when we had discussions with Walker about how they

20 would proceed in taking over this responsibility, they

21 presented to us Mr. Quashie's name. We did not

19

1  present his name, Mr. Kakeh's name, Mr. Isaac's name

2  or anyone else. They said based upon their

3  references, that was it.

4      Q. So you made the decision on whether or not

5  to reassign Mr. Quashie. Correct?

6      A. Yes.

7      Q. And you're telling me, are you not, that you

8  made that decision solely on Walker & Company's

9  indication that they wanted to place Mr. Quashie in

10 the general ledger accountant position.

11     A. Yes.

12     Q. And you did not make that decision, that is,

13 the decision to retain Mr. Quashie, because of

14 Mr. Quashie's superior seniority over Mr. Kakeh.

15     A. We gave Walker the authority and the right

16 to select those positions. And we acted based upon

17 Walker's desire to give Mr. Quashie an opportunity.

18 Had UPO filled those positions, UPO would have had to

19 use this policy and the net result would have been the

20 same.

21     Q. So, in essence, you are telling me Walker &

20

1   Company made the decision to retain Mr. Quashie, or
2   the recommendation and you approved it.
3       A.   I did.
4       Q.   Okay. And you are telling me that UPO did
5   not use the policy that says that out of however many
6   people in a particular group, the one with greater
7   seniority has the bumping rights.
8       A.   No, I didn't.
9       Q.   All right. What was the date of the
10  initial, if there was an initial, decision to
11  eliminate the Plaintiff's position?
12      A.   April 20th, 2004. It would have been a
13  recommendation to the Ad Hoc Management Committee.
14      Q.   Was that in writing?
15      A.   I don't recall.
16      Q.   And was that a decision to eliminate just
17  Plaintiff's position or other positions?
18      A.   It was a decision to eliminate the office
19  and to contract it out to F.S. Taylor accounting firm.
20      Q.   It was a decision to eliminate the entire
21  Office of Finance. Is that correct?

22

1   what date.

2   Q.   Was it May?

3   A.   It was in May.

4   Q.   And why did you decide to change the
5   decision?

6   A.   I had been approached by a number of the
7   staff persons who indicated that they, in fact, had
8   not been evaluated, had not been told that they were
9   performing sub-par, and that they were not aware that
10  the finance office had issues; the audits had never
11  been shared with them, and they did not realize that
12  the quality of their work was rated as poorly as it
13  had been or that there were issues until the reviews
14  took place.

15  Q.   Did you have any conversations with Tunde
16  Eboda which influenced your decision one way or
17  another?

18  A.   I had one conversation with Tunde Eboda who
19  cautioned me with regard to the use of F.S. Taylor.
20  His feeling was that because Taylor had done work for
21  the organization, perhaps we would be better served by

23

1   an entirely new firm.

2   Q.   But Tunde Eboda expressed no opinion on
3   whether or not you should be out-sourcing the entire
4   finance department.

5   A.   No, no.  He had an opinion about that.

6   Q.   He did or he didn't?

7   A.   He did.

8   Q.   And what did he say?

9   A.   He said, "You guys have to make the
10  decision, but I don't know what kind of training or
11  guidance these people have been provided."

12  Q.   Is it fair to say he expressed some
13  disapproval of the decision to out-source the entire
14  finance department?

15  A.   He recognized that it was a decision we had
16  to make internally.  And he indicated that, you know,
17  we should look and decide whether or not these people
18  have been provided the appropriate training.

19  Q.   So when you made the decision to recommend
20  to the board a RIF, what precisely -- I'm sorry.  Let
21  me go back.

1   positions.  Correct?

2       A.  No.  I was proposing a new organizational

3   structure that included a different span of control

4   and responsibility in the hierarchy that included a

5   creation of a financial operations officer's position

6   that was separate and apart from the accounting

7   position and that was separate and apart from the

8   grants management function.  So there was no longer a

9   Controller, because the intent of the Controller is to

10  control that function.  But we spread out those duties

11  and responsibilities in this new structure.

12      Q.  So you did not specify to the board which

13  positions were being RIF'd, so to speak.  You just

14  told the board about the new management structure and

15  the fact that Walker & Company or some other

16  independent contractor would occupy those positions.

17      A.  We shared with the board what positions were

18  being RIF'd.

19      Q.  And what positions were those?

20      A.  The positions that, whatever the positions

21  were that had the letters, that got the RIF letters

28

1  and what the status of those positions were.

2    Q.   Let's go through those. One, of course, was

3  the Controller. Right?

4    A.   Yes.

5    Q.   Okay. I'm just going to try to do this

6  fairly quickly by showing you the letters.

7    A.   Sure.

8    Q.   I am showing you Mr. Isaac's letter dated

9  June 9th. Which position was eliminated?

10   A.   External, internal, external auditor,

11 something to that effect.

12   Q.   External Auditor, okay. I am showing you

13 Nona McLean's letter.

14   A.   Facilities Manager or something to that

15 effect.

16   Q.   Facilities/IS Manager?

17   A.   I guess.

18   Q.   And then Mr. Quashie. Acting Deputy

19 Controller would be Mr. Quashie?

20   A.   Mmm-hmm.

21   Q.   Okay. So you actually told the board that

29

those positions would be eliminated.

A. Yes.

Q. And was it your plan at that point that you told the board that Walker & Company would occupy all those positions?

A. Walker & Company would make the decision about who occupied those positions, yes.

Q. Did you tell the board at that point, that is, on May 27th, 2004, that the people occupying those positions would essentially lose their jobs?

A. I don't know. The minutes will have to speak for themselves, I don't know. But there is an official record of what I told the board. So the minutes will speak for themselves

Q. And those would be the May 27th minutes?

A. Yes.

Q. And the board approved that. Correct?

A. Yes.

Q. Had Walker & Company as of May 27th, 2004 made the decision on who would occupy the four positions you have identified, which were Accounting

30(b)(6) DEPOSITION OF DANA JONES
Case 1:05-cv-01271-GK    Document 78-98    Filed 02/27/2007    Page 14 of 19
Conducted on August 8, 2006

31

1        (Marked, Exhibit # 5, Isaac Letter, 6/9/04.)

2        BY MR. MELEHY:

3        Q.   Between May 27th and June 2nd, 2004 was any

4   decision made on whether or not any of the four RIF'd

5   people would be retained or reassigned?

6        A.   I don't know what date it was, but at some

7   point the decision was made to assign Mr. Quashie.  So

8   I don't know what that date was, but that's the only

9   person that I recall.  Isaac was offered under the

10  Walker structure, I think, the opportunity to be the

11  procurement officer and he chose to resign.

12       Q.   But he was, in fact, reassigned.  Correct?

13       A.   Yes.  He was offered an opportunity to be

14  the procurement officer.

15       Q.   So there were four RIF'd people, Nona

16  McLean, Mr. Kakeh, David Quashie, and William Isaac.

17  Correct?

18       A.   Yes.

19       Q.   And of those four, David Quashie and William

20  Isaac were actually reassigned to other positions.

21       A.   Yes.

34

1  was made on or before June 2nd, 2004, when her letter
2  was sent.
3      A.   Yes, according to the letters, yes.
4      Q.   Okay.  Now, with respect to the decisions
5  you made with regard to on or before June 2nd, how did
6  you make the decisions that you made on or before June
7  2nd with regard to Ms. McLean, Mr. Kakeh, and
8  Mr. Quashie?
9      A.   How did I make those decisions?
10     Q.   Well, yeah.  What did you rely on in making
11 the decisions to retain Mr. Quashie on or before June
12 2nd?  How did you arrive at that decision?  Did you
13 consult with Walker & Company or did you just make it
14 on your own?  How did you arrive at that decision?
15     A.   The decision to retain Mr. Quashie came at
16 the recommendation of the principal in Walker &
17 Company.
18     Q.   And who was that?
19     A.   Ron Walker.
20     Q.   And did Ron Walker recommend that you retain
21 Mr. Quashie on or before June 2nd, 2004?

30(b)(6) DEPOSITION OF DANA JONES
Conducted on August 8, 2006

35

1    A.   It would have been before.  Yes is the
2  answer.
3    Q.   Did Mr. Walker or anybody else from Walker &
4  Company make a decision with regard to whether or not
5  to retain Mr. Kakeh on or prior to June 2nd, 2004?
6    A.   No.
7    Q.   Do you remember whether you made the
8  decision to retain Mr. Quashie on the same day
9  Mr. Walker talked to you?
10   A.   No, I don't.
11   Q.   Do you remember what day Mr. Walker talked
12 to you about retaining Mr. Quashie?
13   A.   No, I don't.
14   Q.   Was it before or after May 27th, 2004?
15   A.   I don't know the date.
16   Q.   Which month was it in?
17   A.   I don't know.
18   MR. MELEHY:  Well, I just wanted to point
19 out to counsel that Category No. 5 requires the
20 Corporate Designee to be able to give that
21 information.

1  basically is to proof the letters and make sure
2  they're consistent with the policy.  So we gave the
3  information to HR and HR followed through with the
4  policies and procedures, created the job groupings,
5  did all the rest of that stuff.  But in terms of
6  actual decisions beyond that, no.
7       Q.   Who at HR drafted the four RIF letters in
8  question?
9       A.   Robert Richardson, the former HR Director.
10      Q.   Is he gone now?
11      A.   Yeah.  He retired that year.
12      Q.   Did you at some point communicate with
13 Robert Richardson or anybody else at HR and tell them
14 that you wanted to eliminate Mr. Kakeh's position and
15 not reassign him or take any of the other four RIF
16 actions that we've discussed earlier with regard to
17 Nona McLean, Mr. Isaac and Mr. Quashie?
18      A.   Yes.
19      Q.   When did you have that conversation with him
20 or those conversations with him, if there were more
21 than one?

1    A.   It would have been post-5/27, which is the
2 date that the board approved the action.
3    Q.   Who specifically did the groupings?
4    A.   My understanding is Mr. Richardson.
5    Q.   And he did the groupings after speaking with
6 you.
7    A.   Yes.
8    Q.   And when he did the groupings you had
9 already communicated to him which people would be
10 reassigned and which people would have their jobs
11 eliminated all together.  Is that right?
12         MS. DAVIS:  Objection as to form.  You can
13 answer.
14         THE WITNESS:  I do not believe that when we
15 had our initial conversation all of that had been
16 finalized.  I explained to him what positions would be
17 eliminated.  When, the dates and times, and who was
18 reassigned and the rest, that wouldn't have been in
19 the first conversation.
20         BY MR. MELEHY:
21    Q.   What I'm asking you is as of May 27th did

39

1  you talk to Mr. Richardson or anyone else at HR and

2  communicate to them that you had made decisions on

3  whether or not to retain Mr. Quashie, Ms. McLean,

4  Mr. Kakeh, Mr. Isaac?

5     A.   No. After May 27th I had that conversation.

6     Q.   Do you remember when after May 27th you had

7  that conversation?

8     A.   No. I would think -- and if someone could

9  provide me with a calendar, I could tell you. The

10 board normally met on Thursday nights. So it probably

11 would have been Friday, the next day.

12    Q.   You said there was a meeting on May 24th.

13    A.   27th.

14    Q.   I'm sorry, you're right, 27th, okay. And

15 you are saying that there was a meeting after that?

16    A.   No. I am saying that the board met on May

17 27th and approved the final action and sometime after

18 May 27th I met with Mr. Richardson and shared with him

19 what they had approved.

20    Q.   Okay. And after May 27th in that meeting

21 you told Mr. Richardson, did you not, that you were