# EXHIBIT 93

ORIGINAL

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,                          )

                Plaintiff,                    ) No. 1:05-cv-1271

                vs.                          )

UNITED PLANNING ORGANIZATION, INC.,          )

                                 )

                Defendant.                    )

_____ )

                Silver Spring, Maryland

                Wednesday, May 10, 2006

Deposition of:

                    ROY LAYNE,

called for examination by counsel for the Plaintiff,

pursuant to Notice, taken at the law offices of

Melehy & Associates, 8403 Colesville Road, Suite 610,

Silver Spring, Maryland, before Debbie Razavi, CSR,

Registered Professional Reporter, Notary Public in and

for the State of Maryland, commencing at 2:00 p.m., when

were present on behalf of the respective parties:



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

4

1              P R O C E E D I N G S

2    Whereupon,

3              ROY LAYNE,

4    was called as a witness and, having been first duly sworn

5    by the Notary Public, was examined and testified as

6    follows:

7              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8    BY MR. MELEHY:

9         Q.    Mr. Layne, spell your name for the record.

10        A.    R-O-Y, L-A-Y-N-E.

11        Q.    What is your current position with Walker &

12   Company?

13        A.    Partner.

14        Q.    You worked on the contract for services that

15   UPO entered into in and around the spring of 2004?

16        A.    Yes.

17        Q.    You were the person who was in a position to

18   know pretty much the circumstances underlying the

19   contract, how it arose, how it was formed and what it was

20   designed to do?

21        A.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

7

1    the accounting services or the financial management

2    services of the organization.  And the RFP specifically

3    outlined all the various positions and that those

4    positions would be moved under the successful bidder.

5        Q.    I'm showing you what is marked as Layne

6    number 1.  Why don't you take a look at that document.

7    When you have looked at it and are satisfied that you are

8    familiar with its contents, let me know.

9        A.    Okay.

10            (Plaintiff's Exhibit No. 1 was marked

11                    for identification.)

12        Q.    Where in this proposal does it say that UPO

13    was looking for an entity to take over its accounting

14    functions?  Would that be Page 3?

15        A.    I think I saw it somewhere.

16            On Page 2 it says "We are outsourcing the

17    write-up work of the organization."

18        Q.    The write-up work of the organization, what

19    did that mean in your opinion or how did you interpret

20    that?

21        A.    Well, outsourcing the write-up work of the

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

10

1    Exhibit 1, for the record, is the Request for Proposal;

2    correct?

3         A.    Uh-huh.

4         Q.    You need to say "yes" or "no."

5         A.    Yes.

6         Q.    And if I understand you correctly, your

7    interpretation of Walker & Company's interpretation of

8    the proposal is UPO was requesting a company to do the

9    work of the entire finance department?  UPO was

10   outsourcing or seeking to outsource to a private

11   accounting firm the functions of the finance department?

12        A.    Yes.

13        Q.    When you received that document, that Request

14   for Proposal, and you had a chance to read it and

15   interpret it, did you think that that meant that every

16   single employee in the finance department was going to

17   be, or UPO was proposing to let go of everyone in the

18   finance department and replace each and every employee in

19   the finance department with a Walker & Company employee?

20        A.    No.  That's not how we interpret it.

21        Q.    How did you interpret it?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

11

1    A.    That the functions would be outsourced, that

2    the employees working there if we agreed to hire them

3    could be our employees.

4    Q.    I see.  So let me see if I understand.  I

5    think I know where you are going with this.

6          Basically, Walker & Company potentially under

7    this proposal as it was originally submitted would come

8    in to UPO, every employee in the finance department

9    ultimately would be an employee of Walker & Company, not

10   UPO, and that Walker & Company could choose to hire as

11   its own employees some of the existing UPO employees of

12   the finance department?

13   A.    Right.

14   Q.    Now, that's not stated anywhere in this

15   proposal; correct?

16   A.    No.  What was stated -- our interpretation of

17   the proposal is that we had the opportunity to run UPO's

18   finance department.  We could design the finance

19   department, the structure of the finance department

20   however we choose that would make it most efficient.

21   Q.    Where does it say that in this proposal?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

14

1      Q.    Who would that have been?

2      A.    Specifically, honestly, I can't say who made

3   the call.  I do know our contact person was Gladys Mack

4   for any questions related to the RFP.

5      Q.    So were you the person who ultimately drew

6   the conclusion about what UPO wanted or was it somebody

7   else at Walker & Company?

8      A.    It was a collective conclusion.  We had about

9   four persons working on this proposal because this was a

10  significant proposal to us, and the decisions were made

11  collectively as to what we believe they are looking for

12  and the approach we should use in presenting our

13  credentials and our ability to perform those services.

14     Q.    Did you have any meetings with UPO people

15  after getting the proposal?

16     A.    No.

17     Q.    Did anybody from your office have any

18  meetings with UPO people prior to -- after getting the

19  proposal?

20     A.    After getting the proposal meaning the RFP?

21     Q.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

15

1      A.    No.  We had questions.  All the questions

2  were over the phone.

3      Q.    They weren't asked by you?

4      A.    I don't recollect calling to ask any specific

5  question because I was not the person who, quote,

6  unquote, "did it."

7      Q.    Did the person who asked questions take

8  notes?

9      A.    I don't know.

10     Q.    How did you find out what the answers to the

11 questions were?

12     A.    In a meeting.

13     Q.    Who conveyed to you what the answers to the

14 questions were?

15     A.    Well, it's difficult to say.  It's not like

16 somebody says "We specifically asked this question and we

17 got this answer."  That is not generally what happens.

18 We have a discussion as to how should we proceed with

19 this and what it is UPO is looking for, and the consensus

20 as to what UPO was looking for was an outside

21 organization to take over their responsibilities of the

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

16

1  finance department, and that they would provide the

2  leadership and the remaining employees to ensure that the

3  functions are provided.

4          Q.   The only contact that anybody from Walker &

5  Company had after getting the RFP was with Gladys Mack of

6  UPO; correct?

7          A.   Yes.  To my understanding, that's who all our

8  questions went to.

9          Q.   Who from your organization spoke to Gladys

10  Mack?

11         A.   I don't know who from my organization spoke

12  to Gladys Mack.

13         Q.   What potential people spoke to Gladys Mack

14  from your organization?

15         A.   Could have been Ron Walker who is a managing

16  partner could be one person.

17         Q.   Who else?

18         A.   Hugh Romney, and Hugh is not with the firm

19  but he was another person.

20              There was one other person.  I think Sidney

21  Cayford.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

17

1       Q.    K-E?

2       A.    C-A-Y-F-O-R-D.

3             He is no longer with Walker & Company.

4       Q.    We have talked about what the original

5  proposal was, what the original RFP requested.  When did

6  you receive the original RFP?

7       A.    Don't recollect.  It may be somewhere based

8  on the fact that it states here that the proposal should

9  be submitted by May 12.  I know it was a short turnaround

10 proposal so I'm not certain.

11      Q.    Would it have been April 2004?

12      A.    Could have been.

13      Q.    Do you have any --

14      A.    Also could have been May 2004.

15      Q.    Do you have any internal documents that show

16 when you received it?

17      A.    Honestly don't know.  I would have to find

18 out.

19      Q.    This is Exhibit 1 I'm showing you.  You have

20 it.  It's the Request for Proposal from UPO.  Did it come

21 to you in the mail?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

22

1    Executive Summary.

2         Q.    Which is what page?  Second page of the

3    Executive Summary.  That's page whatever.  Go ahead.

4         MS. DAVIS:  I think it was the second paragraph of

5    the Executive Summary.

6         THE WITNESS:  "We will in consultation with UPO's

7    senior management assess the existing accounting and

8    finance functions and assemble a team from existing UPO

9    personnel and Walker & Company senior managers and

10   professional staff that will assure accurate and timely

11   reporting of financial and management information."

12              So that's how we were going to develop the

13   team.

14        Q.    BY MR. MELEHY:  Does that mean that you would

15   be using some existing -- Walker & Company would be using

16   some existing UPO staff employed by UPO as Walker &

17   Company performed its functions at UPO?

18        A.    If we decided to do so, yes.

19        Q.    Those UPO staff members would not be employed

20   by Walker & Company, or they would be?

21        A.    At this point in time, yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

23

1    Q.    Yes, they would?

2    A.    Yes, they would be employed by Walker &

3    Company.

4    Q.    Does it say that expressly in this proposal

5    anywhere that Walker & Company would be employing the

6    existing UPO staff?

7    A.    I can't say specifically that it does.

8    Q.    Let me read you this first sentence in the

9    paragraph again that you read to me because I don't

10   interpret it the same way, and I want to ask you some

11   questions.

12        "We will in consultation with UPO senior

13   management assess the existing accounting and finance

14   functions and assemble a team from existing UPO personnel

15   and Walker & Company senior managers and professional

16   staff that will assure accurate and timely reporting of

17   financial and management information."

18        Are you absolutely certain that the intention

19   of that sentence was to convey that Walker & Company

20   would be acquiring the UPO staff and providing, in

21   essence, 100 percent of the UPO finance office staff?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

24

1     A.    Yes.

2     Q.    That's what you are telling me the intent of

3  that was?

4     A.    Yes.

5          And the reason why I am certain of that is

6  that the reason for producing this would be three pages

7  from the end of this document there is the cost proposal,

8  the fees that you are looking at here.  Those fees were

9  determined by us as to how much we would pay these

10  individuals because they will be working for us.  And

11  that was the reason for putting this in place.  These

12  folks would be working for us.  We had no knowledge of

13  what the various people at UPO were making at that point

14  in time.  We were saying this is -- we have an

15  organization chart.  We said that is the structure we are

16  going to use.  Here is going to be the cost of those

17  folks to you that we are going to have in place.

18     Q.    If you look at the Executive Summary where it

19  says Page 3, "Our approach and position descriptions,"

20  there's a list of positions, Chief Financial Officer,

21  Financial Operations Director, Grants Management

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

28

1    benefits was $161,250; correct?

2          A.    Yes.

3          Q.    And then the profit and overhead allowance

4    for Walker & Company would be about $88,750?

5          A.    Yes.

6          Q.    So the profit made on all of that was

7    $88,000?

8          A.    Yes.

9          Q.    So at the time that Walker & Company

10   submitted its proposal, it was Walker & Company's

11   understanding that when it went in to UPO it was going to

12   determine which positions, which people would stay and

13   which people would go?

14         A.    Yes.

15         Q.    Or maybe I should phrase that question a

16   little differently.  Maybe that's misleading.

17             In other words, Walker & Company would decide

18   at least under this initial proposal which people it

19   would acquire as part of its own staff to do this UPO

20   contract and Walker & Company would be deciding which

21   people it would not acquire and then UPO was free to do

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

29

1    whatever with respect to those people; is that right?

2            A.    That's fair, yes.

3            Q.    Now, had Walker & Company decided when it

4    submitted this initial proposal on May 19, 2004 whether

5    it was going to keep any of the -- had Walker & Company

6    made any decisions one way or another on any of the

7    existing staff of the finance department?

8            A.    Not really because we really didn't know the

9    people.

10            Q.    So you made no decisions whatsoever?

11            A.    Going in it was a matter of we are going to

12    see who is there.

13            Q.    Prior to or on May 19, 2004 did Walker &

14    Company convey to UPO in any way, shape or form that it

15    expected not to acquire any one of the positions, any one

16    or more of the positions specifically?

17            A.    No.

18            Q.    So Walker & Company prior to or on May 19,

19    2004 did not say "We are definitely going to occupy with

20    our own staff the CFO position, Chief Financial Officer

21    position, at UPO"?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

33

1    utilize any UPO staff which based on qualifications would

2    be able to assist you in your task."

3            And then it says "The proposal should include

4    costs and a personnel structure which incorporates the

5    following functions."

6        Q.    But --

7        A.    In other words, UPO is stating here that

8    there must be a strong leader to the team that is going

9    to head the finance department and that whoever is the

10   bidder that's going to submit the proposal and win this

11   bid they must have a strong leader to run the department.

12       Q.    So your interpretation was that UPO wanted

13   Walker & Company to put a person in the CFO position who

14   had never been a UPO employee?

15       A.    Walker & Company or whoever was the

16   successful firm, yes.

17       Q.    Were there any other positions that Walker &

18   Company felt that it had to occupy with a person who had

19   never been a UPO employee?

20       A.    Well, we never really looked at that.  Here

21   is what we looked at.  Within the RFP the organizational

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

45

1    Q.    Why didn't you fill in the Financial

2  Operations Director name or the Chief Financial Officer

3  name?

4    A.    Because I wasn't -- it wasn't like I was

5  trying to fill in all the boxes.

6    Q.    Why did you fill in the Accounting Director

7  name?

8    A.    Because it helped that person was a UPO

9  employee so very early since we -- since that person was

10  not leaving then we knew who that position was going to

11  be.  I was trying to get a sense of the UPO employees who

12  were remaining and who they were, who are these people

13  and where were the likely places they would fall.

14    Q.    When you wrote David Quashie in, was he going

15  to be a Walker employee when you wrote his name in?  Did

16  you write his name in because he was going to be a Walker

17  employee?

18    A.    No, because at that point in time I already

19  knew that he was going to be a UPO employee.

20    Q.    Did you ever meet Amin Kakeh?

21    A.    No.  Don't know the person.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

46

1        Q.   Did you ever know that Amin Kakeh was the

2   controller?

3        A.   Yes, I heard that.

4        Q.   When did you hear that?

5        A.   After getting to UPO.

6        Q.   After getting to UPO what were you told about

7   Amin Kakeh?

8        A.   He was the controller, that that position was

9   terminated, and that I was told by lots of other people,

10  by other people working in the department just about him,

11  just talking generally.

12       Q.   Who told you that the controller position was

13  terminated?

14       A.   I think, and I can't be specific, but I

15  believe after we submitted our proposal that in a meeting

16  with Dana Jones and Gladys Mack that that's when I got

17  that information.

18       Q.   You met with Dana Jones and Gladys Mack?

19       A.   Yes.

20       Q.   Was it the day you got there?

21       A.   No.  After we submitted the May 19 proposal

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

47

1    we were called to a meeting by Dana Jones.

2         Q.    What date was that?

3         A.    Honestly, I don't recall.  It was prior to

4    June 1.

5         Q.    So the meeting was in May?

6         A.    Yes.  It may have been, I would say, within a

7    week or so of submitting the proposal.

8         Q.    So it was late May, last week in May

9    approximately?

10        A.    In May.

11        Q.    Would you agree last week in May?

12        A.    Somewhere between the 19th and the 31st.

13   Somewhere between the 19th and the 31st.

14        Q.    During that meeting did Dana Jones and/or

15   Gladys Mack tell you that Mr. Kakeh's controller position

16   was terminated?

17        A.    I think it came up, yes.

18        Q.    Who told you, Gladys Mack or Dana Jones?

19        A.    I can't specifically remember.  It came up in

20   the meeting.  The meeting was not held for that purpose.

21        Q.    So what did they tell you exactly about

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

48

1   Mr. Kakeh's position?

2        A.    My only recollection was his position was --

3   in the reorganization his position was removed.

4        Q.    Would it be accurate to say that they told

5   you in the reorganization his position, that is, the

6   controller position, was eliminated?

7        A.    Controller position was eliminated, and it

8   was controller and a host of other positions were

9   eliminated.  We were focusing on the finance department.

10        Q.    What other positions were eliminated?

11        A.    Once I got in there I understood that there

12   was institutional services, the person who heads that

13   position, that position was eliminated.

14        Q.    What else?  Was the Deputy Controller

15   position eliminated?

16        A.    You know what, I think the position may or

17   may not -- the position may have been eliminated.  I

18   don't know.  I don't know.

19        Q.    Did Mr. Jones or Ms. Mack tell you anybody

20   was reassigned after having their positions eliminated?

21        A.    No.  In fact, I remember when I got there I

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

50

1   Ms. Mack or Mr. Jones had been eliminated?

2        A.    In the meeting at that point in time I think

3   it was those two positions really.

4        Q.    The controller?

5        A.    Right, and this other institutional services,

6   but it didn't really fall under us.

7        Q.    Mr. Henry Kanaba's position?

8        A.    I found out about that when I got in there.

9        Q.    They didn't tell you about that in the

10  meeting; they only told you in the meeting about two

11  positions?

12       A.    That's my recollection.

13       Q.    That would be Gladys Mack and/or Dana Jones

14  told you, basically, to recap your testimony, that two

15  positions -- let me just ask a question that summarizes

16  what you said.

17            Sometime between May 19 and May 31 you had a

18  meeting with Dana Jones and Gladys Mack; correct?

19       A.    Yes.

20       Q.    During that meeting among other things Gladys

21  Mack and/or Dana Jones informed you that two positions in

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

51

1    the office of finance had been eliminated; one was the

2    controller and one was the director of institutional

3    services?

4        A.    I don't think that position was in the office

5    of finance, but, yes.

6        Q.    So at the meeting with Dana Jones and Gladys

7    Mack in May 2004 they informed you that one position in

8    the office of finance had been eliminated and that

9    position was the controller's position; correct?

10       A.    That's my recollection.

11       Q.    Did they say it had been done or did they say

12   it was going to be done?

13       A.    Honestly, I don't remember.  I know when I

14   got there on the first day that the person ahead of that

15   position was not there.  I don't know who the person

16   was.  I never met them.  Other than his name, I don't

17   know the person.

18       Q.    You got there what date?

19       A.    I think the contract stated June 1

20   effectively.  I think that was -- I can't remember, but I

21   think that's the day we started, June 1.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

53

1                    (Recess taken.)

2        Q.    BY MR. MELEHY:  Did there come a time when

3    the desires of UPO changed as far as what it wanted for

4    the finance department?

5        A.    Yes.

6        Q.    When was that?

7        A.    In that meeting that I attended.

8        Q.    What basically was told to you and who told

9    you?

10       A.    Within the same meeting with Gladys Mack and

11   Dana Jones what was said to us was looking at this

12   structure that they, UPO, wanted to retain all the

13   employees who would fit the boxes at the bottom of our

14   structure.  And that in what we have as our Accounting

15   Director they would like us to accept one of their

16   persons, that person being David Quashie, to be that

17   Accounting Director and that Walker & Company would fill

18   the other three positions.

19       Q.    Let's be very specific here.  I want to make

20   sure I understand you.

21             We are looking at Layne Exhibit 3, and we are

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

54

1    looking at this chart which you have been referring to

2    with your handwriting on it called United Planning

3    Organization Financial Organization Chart.  And it has

4    Chief Financial Officer at the top and several boxes

5    underneath; correct?

6        A.    Yes.

7        Q.    Underneath the Chief Financial Officer layer,

8    which is the top layer, to the left Accounting Director,

9    in the middle Financial Operations Director, and on the

10   right Grants Management Director; correct?

11       A.    Yes.

12       Q.    Now, are you telling me that -- let me finish

13   this because I want to say it for the record.

14             The third layer consists of from the left to

15   the right Staff Accountant, Accounts Payable, two of

16   them, Payroll Accountant, Billing Accountant, Budget

17   Monitoring Accountant?

18       A.    Yes.

19       Q.    And are you telling me that during this May

20   meeting UPO indicated, Dana Jones and/or Gladys Mack

21   indicated to you that they wanted to have the Accounting

1      Q.    In that May meeting was that your intention

2  or was it your intention to use a Walker & Company

3  employee who had never been a UPO employee to occupy

4  those positions?

5      A.    When we prepared the proposal it was our

6  intention initially to have Walker employees slated for

7  the Accounting Director, Financial Operations Director

8  and the Grants Management Director because we did not

9  have an idea who the employees were at UPO.

10     Q.    And I understand that.  You have said that

11  before.

12        But when you say "Walker & Company

13  employees," you mean people who were never employed by

14  UPO?

15     A.    At that point in time, yes.

16     Q.    And people who were then current employees of

17  Walker & Company?

18     A.    Yes.

19     Q.    That was your intention before you went into

20  this May meeting with Dana Jones and Gladys Mack?

21     A.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

57

1        Q.      So during the meeting did you convey that

2   intention to them?

3        A.      Well --

4        Q.      Or had that been conveyed to them previously

5   in your proposal?

6        A.      No.  When the proposal was sent to them it

7   said "Here is what the structure is going to be."  We

8   never had to present to them who was going to fill those

9   positions and we never did that.

10       Q.      The first time you brought the news to them

11  about what your intentions were, was it in the May

12  meeting with Dana Jones and Gladys Mack?

13       A.      We didn't really have to tell them that.

14  They asked us to come to their meeting and they said to

15  us "We accepted" -- we already knew they accepted us as

16  the firm that was going to do the -- provide the

17  services.  And then they invited us to this meeting and

18  said "We would like to propose a change to your

19  structure."  Whereas, the original intent was that all

20  the folks on this would be Walker & Company employees,

21  they wanted to change that so that, one, all the folks on

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

58

1    the third row of the organizational chart would be UPO

2    employees and that the Accounting Director's position

3    would be David Quashie.

4          Q.    It was your understanding that UPO previously

5    had a Grants Management Director position before this

6    proposed reorganization?

7          A.    I don't know.  They had a function called

8    Grants Manager.  As to whether they had someone in that

9    position, I don't know.

10         Q.    Now, did they tell you -- when you walked

11   into that meeting, was that the first discussion that

12   occurred?

13         A.    As far as change in the structure, yes.

14         Q.    What was the first things you discussed with

15   Dana Jones and Gladys Mack?

16         A.    In walking into that meeting?

17         Q.    Yes.

18         A.    We said "Thank you very much for giving us

19   the opportunity to serve you."

20         Q.    Did they tell you that Amin Kakeh's position

21   was being eliminated and he was being let go prior to the

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

59

1    discussion of the structural issues you identified?

2         A.    I honestly don't remember.

3         Q.    So they told you that Amin Kakeh was going

4    and David Quashie was staying; correct?

5         A.    In a nutshell, yes.

6         Q.    Did you agree to do what they asked?

7         A.    As far as the structure?

8         Q.    Yes.

9         A.    Yes.

10        Q.    So when you came in who occupied the Chief

11   Financial Officer position?

12        A.    I did.

13        Q.    Then who occupied the Financial Operations

14   Director position?

15        A.    Meseret Tegefu.

16        Q.    Who occupied the Grants Management Director

17   position?

18        A.    Initially Hugh Romney.

19        Q.    Hugh Romney was who?  A Walker Company

20   employee?

21        A.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

65

1    A.    Between the 19th -- again, I'm going back to

2    when we prepared the proposal, it was our intention that

3    at the beginning the folks who were slated to occupy

4    those three positions were going to be Walker & Company

5    employees.

6    Q.    But at the May meeting you had agreed with

7    Dana Jones and Gladys Mack that your folks employed by

8    you would occupy these three positions, CFO, Financial

9    Operations Director and Grants Management Director?

10    A.    At that meeting, yes.

11    Q.    That decision was never changed after that?

12    A.    Yes.  Because eventually the Walker --

13    Q.    No.  The decision to initially staff those

14    positions with Walker & Company folks.  I know you have

15    already explained that other people succeeded the Walker

16    & Company folks.

17          All I'm asking you is the decision as to

18    which positions would be occupied by Walker & Company

19    folks as of June 1, 2004 was made in the May meeting?

20    A.    I'm going to go back to my original answer

21    that says the decision was made prior to May 19.  Our

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

66

1    decision was made prior to May 19.  The only thing that

2    changed was that UPO employee was going to occupy the

3    Accounting Director.  Walker & Company employees, all

4    somebody selected by Walker & Company, was going to

5    occupy the other three positions.

6         Q.    But in the proposal Walker & Company had

7    proposed to occupy more than those three positions --

8    correct? -- with its own staff?

9         A.    In the proposal everyone was going to be

10   working for Walker & Company.

11        Q.    You list in your proposal, you say "Acting

12   CFO, Ronald Walker."  That's on Page 14 of your

13   proposal.  And then on Page 15 you say "Roy Layne, acting

14   CFO."  I guess those are alternate people?

15        A.    At that point in time, yes.

16        Q.    In your proposal as to the position of Audit

17   Manager, Accounting Director -- I'm sorry.  That would be

18   Dominic Owusu?

19        A.    Yes.

20        Q.    That's a Walker & Company guy?

21        A.    Yes.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

69

1    staff or Walker's staff would occupy a certain position?

2        A.    Not at a point in time when we submitted the

3    proposal.

4        Q.    UPO changed its mind, did it not?

5        A.    Right.

6        Q.    And you abided by that; correct?

7        A.    Yes.

8        Q.    Because UPO was calling the shots; they were

9    the contractor; right?

10        A.    Because Walker & Company was also going to

11    make the same assessment and maybe initially start with

12    those employees.   UPO said "We want to keep these

13    employees."   It wasn't a problem for Walker & Company.

14        Q.    If UPO said "We want to keep our employees in

15    the second tier entirely," would you have said "No, you

16    can't"?

17        A.    Absolutely.

18        Q.    Why would you have said that?

19        A.    Because then what UPO is saying to me is all

20    we want is a Chief Financial Officer.   That is not what

21    we came in there to do.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

70

1    Q.    You would say go on the contract?

2    A.    We would say we need enough people in the

3  leadership to make sure that we have full responsibility,

4  we would be able to take full responsibility of what is

5  happening in the department.

6    Q.    But it was still UPO's decision to make?  You

7  could have said "no" and left the contract, but they were

8  the ones that were dictating the terms of the contract?

9    A.    It was their contract.

10    Q.    Yes.

11    A.    Yes.

12    Q.    Did they tell you at some point during this

13  May meeting that they didn't want you to acquire the

14  personnel that had occupied the lower level or the third

15  tier?

16    A.    They did not want us?

17    Q.    You indicated that it was Walker's intention

18  at the beginning of this contract to use some of its own

19  staff for a number of positions and that Walker would

20  then potentially acquire, either use its already-existing

21  staff or acquire some UPO staff and make them Walker

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

71

1    employees so that Walker ultimately occupied the entire

2    finance department; correct?

3        A.    Make sure I'm clear.  It was our intent that

4    at the first tier and second tier definitely going to be

5    Walker employees.  At the third tier we wanted to be in a

6    position to start the job knowing that there are people

7    there to do the job.  So at that point in time we would

8    have accepted on day one of the contract all the UPO

9    employees.

10        Q.    As Walker employees?

11        A.    As Walker employees and then make an

12    assessment as to who would eventually stay.

13        Q.    You could have made the determination who to

14    terminate and who not to terminate?

15        A.    Yes.

16        Q.    Did UPO tell you at some point they didn't

17    want to do it that way?

18        A.    At the meeting.

19        Q.    At the May meeting?

20        A.    Yes.

21        Q.    So they told you they didn't want Walker to

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

72

1   occupy the Accounting Director position or the third tier

2   as we have described it on the chart?

3       A.   They didn't actually tell it to us like that.

4       Q.   You understood that that's what they wanted?

5       A.   They said they wanted to -- yes, they wanted

6   to propose a different structure and here was an

7   alternate.

8       Q.   The structure they proposed meant that Walker

9   & Company would actually staff fewer positions than you

10  had originally contemplated?

11      A.   Yes.  As far as our actual employees, yes.

12      Q.   You're certain that the Financial Operations

13  Director was replaced in August '05?

14      A.   Accepted a position.

15      Q.   Accepted.  Okay.

16      A.   Yes.

17      Q.   Accepted the position then.  Not August '04;

18  correct?

19      A.   No.

20      Q.   The contract was signed June 30 --

21  correct? -- 2004?

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

77

1        Q.    Let's return to the one you were just looking

2    at, the chart you were looking at.

3        MS. DAVIS:  Which exhibit?

4        MR. MELEHY:  That would be Exhibit 3 which is the

5    Walker & Company Proposal.

6        Q.    Looking at the chart of the costs of various

7    employees, let me see if I understand.  Your charge to

8    UPO for the Chief Financial Officer would be $125,000

9    plus profit?

10       A.    That's plus fringe, plus profit, yes.

11       Q.    What would that amount be?

12       A.    We didn't do it individually.

13       Q.    I understand.  What would that amount be?

14       A.    You mean --

15       Q.    What would the total cost of the Chief

16   Financial Officer be to UPO?  What was the total cost?

17       A.    We didn't price it.

18       Q.    I would like you to do that.

19       A.    Okay.

20       Q.    Do you want a calculator?

21       A.    Sure.

DEPOSITION OF ROY LAYNE
Conducted on May 10, 2006

78

1       Q.      I'll get you one.

2               Off the record.

3               (Recess taken.)

4       MR. MELEHY:  During the break, Mr. Layne calculated

5   the costs to UPO of Walker & Company providing the Chief

6   Financial Officer, the Financial Operations Director and

7   the Accounting Director position.

8       Q.      Correct?

9       A.      Yes.

10      Q.      What were the calculations for the Chief

11  Financial Officer?

12      A.      $179,687.

13      Q.      That's with fringe benefits and profit built

14  in?

15      A.      Yes.

16      Q.      What about the Financial Operations Director?

17      A.      $122,187.

18      Q.      What about the Accounting Director?

19      A.      $107,812.

20      Q.      Is Walker & Company currently performing any

21  work for the United Planning Organization?

94

1       Q.      What month?

2       A.      It could either have been sometime around

3    December or the early part of first quarter of '05.

4    Either December '04 or first quarter of '05.

5       Q.      Which would mean January, February or March

6    of '05?

7       A.      Right.

8       Q.      Was that recommendation followed?

9       A.      No.  It wasn't specifically a "I recommend

10   that you fire these people."

11      Q.      What was it?

12      A.      It was "We did an assessment and here are

13   some folks who are just not working out."

14      Q.      Meaning that their performance was

15   unsatisfactory in your mind?

16      A.      Right.

17      Q.      And UPO was wasting their money by having

18   them?

19      MS. DAVIS:  Objection as to form.

20      Q.      BY MR. MELEHY:  Let's stick with the first

21   one.

95

1              In your mind their performance was

2    unsatisfactory?

3         A.    Yes.

4         Q.    Did you recommend they would be replaced by

5    other people?

6         A.    No.

7         Q.    You did not recommend that they be replaced?

8         A.    I told them that those folks, their

9    performance was not satisfactory.

10        Q.    In your mind if they were terminated did

11   their positions -- did their positions need to be filled?

12        A.    If they were terminated?

13        Q.    Yes.

14        A.    Yes.

15        Q.    Do you know why your recommendation was not

16   followed through on?

17        MS. DAVIS:  Objection.

18        Q.    BY MR. MELEHY:  Were you told why?

19        A.    Not specifically.

20        Q.    Were you told that your recommendation would

21   not be accepted?

1      A.    No.

2      Q.    Are those three people still there?

3      A.    Don't know but could be.

4      Q.    When did you leave UPO?  June 1, '05?

5      A.    No.  I worked with UPO through what I would

6  call on a regular basis meaning could have been about

7  twice a week or so through September of '05.

8      Q.    That was after the controller, the CFO, was

9  replaced?

10     A.    After the CFO was hired, yes.

11     Q.    In September '05 were those folks, that is,

12 Sharon Smith, Daisy Bellamy and Odu Thomas still there?

13     A.    Yes.  Each of those folks worked with the

14 company over 30 years.

15    MR. MELEHY:  I don't have any more questions other

16 than the outstanding questions related to documents which

17 you will get back to me.

18    MS. DAVIS:  I will get back to you.

19    MR. MELEHY:  On or about May 20.

20    MS. DAVIS:  Yes.

21    (Thereupon, the deposition was concluded at