# EXHIBIT 97

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF HUMAN SERVICES
FAMILY SERVICES ADMINISTRATION
COMMUNITY SERVICES BLOCK GRANT PROGRAM

# REVISED FINAL REPORT:
# 2004 MONITORING REVIEW OF THE
# UNITED PLANNING ORGANIZATION

March 4, 2005



Yvonne Gilchrist
Director

Ricardo Lyles
Administrator

Tunde Eboda, Ph.D.
Program Manager



PENGAD 800-631-6989

EXHIBIT
6
Tunde Eboda
2/23/2006

# TABLE OF CONTENTS

ACKNOWLEDGEMENTS................................................................3

BACKGROUND ....................................................................5

THE PROCESS ....................................................................8

FINDINGS ........................................................................9

    Governance ................................................................9

    Planning and Communications ................................................13

    Personnel ..................................................................13

    Programs..................................................................15

    Automation ................................................................16

    Financial Management ......................................................16

    Bank Reconciliation ........................................................17

    Cash Disbursement ........................................................17

    Indirect Cost Pool ..........................................................18

    Financial Operations........................................................19

    Cost Containment ..........................................................20

    Accounting System ........................................................21

    Program Compliance........................................................22

    Construction Projects ......................................................22

    Debt Management ..........................................................23

NEXT STEPS ....................................................................25

CONCLUSIONS ..................................................................26

## ACKNOWLEDGEMENTS

The District of Columbia Community Services Block Grant (CSBG) office wishes to acknowledge many individuals, groups, offices, and partners involved in this effort for their on-site contributions, technical assistance, expertise, and support. Particularly worthy of note is the combined experience of state CSBG Directors across the country that proved highly invaluable during this process. The leadership provided by their representative group, the National Association for State Community Services Programs (NASCSP) was essential to the successful undertaking of this effort. The District of Columbia's CSBG office owes a debt of gratitude to the NASCSP Executive Director and the Director of Program Services, Tim Warfield and Ramsey Alwin respectively, for the research and technical assistance that they afforded the CSBG office.

The Mid-Iowa Community Action Agency (MICA), National Services Division led by Magi York, Executive Director, and her team provided unparalleled expertise in the areas of compliance monitoring and program management. Their contribution cannot be overemphasized. We also wish to acknowledge the broad national efforts of the Community Action Partnership, Inc. and the National Community Action Foundation that are focused on community action efficiency and innovation. These agencies help to advance the mission of community action in the country and elevate its relevance in public policy. The leadership, direction and technical assistance through the federal Office of Community Services under Mr. Clarence Carter, Director, and Dr. Margaret Washnitzer, Division Director, are also acknowledged and appreciated. Without these dedicated professionals, the mission of community action would be hard to accomplish.

The District of Columbia Department of Human Services (DHS), through its senior management team, has re-emphasized the importance of outcome measures, monitoring and accountability in all program operations. This atmosphere has been useful in assisting the CSBG office as it moved to implement its statutory mandate of fiscal and program oversight of the use of CSBG by sub-grantee organizations. The support and leadership of the DHS Director, Ms. Yvonne Gilchrist, and the Administrator of the Family Services Administration, Mr. Ricardo Lyles, are very much appreciated. The CSBG office staff members have worked diligently and conscientiously throughout this extended period of program review. They have proved to be an asset to the Department and to public service.

The United Planning Organization (UPO) volunteer Board is credited for agreeing to serve in that capacity and for making the effort since March 11, 2004, the date of the release of the preliminary report by DHS, to address issues identified in the report. To correct operational deficiencies, reestablish improved processes at the organization, and change the agency's permissible culture that contributed to the breakdown of management systems, more action must take place. The Interim Executive Director, Mr. Dana Jones, through his commitment to community action, has offered his expertise, acumen, and energy to seeing that UPO evolve as a strong and viable entity in the future.

These efforts are apparent and appreciated.  Many staff members continue to quietly but competently do a good job under what are clearly difficult circumstances.

Tunde Eboda, Ph.D.
Program Manager
Community Services Block Grant Program
Family Services Administration
D.C. Department of Human Services
Washington, D.C.

# BACKGROUND

A draft preliminary report on the use of Community Services Block Grant (CSBG) funds by the United Planning Organization (UPO), the District's CSBG eligible entity, was shared with the Board of Trustees of UPO at an emergency meeting requested by the state CSBG office on March 11, 2004. The draft preliminary report included significant findings of problems in the use of the CSBG funds by UPO. The report further suggested that there is a need for a major overhaul of the operations of the United Planning Organization. The said preliminary report is hereby formally made a document of record and is incorporated into this final report by reference.

The program review was conducted in compliance with requirements under the Community Services Block Grant Act. All 50 states, the District of Columbia, U.S. Territories, and Indian Tribes are the direct recipients (grantees) of the grant from the U.S. Department of Health and Human Services. For the purposes of the CSBG Act, all grantees are referred to as states. At least ninety percent of the grant is mandated pass-through to designated CSBG eligible entities. Section 678B of the CSBG Act further requires that a state conduct the following reviews of eligible entities:

1. *Conduct a full on-site review of each eligible entity at least once during each 3-year period.*

2. *Conduct follow-up review including prompt return visits to eligible entities and their programs that fail to meet the goals, standards and requirements established by the State.*

3. *Conduct other reviews, as appropriate, including reviews of entities with programs that have had other Federal, State or local grants terminated for cause.*

The state CSBG office meets or exceeds this statutory standard. Planning for the fiscal year 2004 compliance monitoring review was at least six months in development. This effort was conducted with involvement from the sub-grantee organization, UPO, with advance notification of intent, time and possible areas of review. An entrance interview was conducted with the UPO management on February 18, 2004, and the monitoring review commenced. Faced with concerns over unavailable documents requested for review, contradictory statements made by management and staff, incomplete and untimely reporting, the monitoring team decided to suspend the review exercise and to seek assistance from an expanded review team composed of experts with specified skills.

The state CSBG office assembled such a team and resumed its review exercise on March 1, 2004. Work continued through March 5, 2004, with an exit interview with UPO Executive Director and executive staff on March 10, 2004. The on-site review included an analysis of program and financial reports, review of training and outcome reports and reviews of minutes of Board meetings. The CSBG office employed the services of experts in the area of finance, board governance and program operations.

Information collected by the state CSBG office during the preceding year suggested that the area of focus would be financial management. The National Association for State Community Services Programs (NASCSP) and the Mid-Iowa Community Action Agency (MICA) proved useful as the District endeavored to structure a team with the requisite financial and community action expertise.

The review team was composed of the following professionals:

> Tunde Eboda, Team Leader, D.C. CSBG Program Manager
> B.C. Tan, D.C. CSBG Program Analyst
> Magi York, Certified Community Action Agency Practitioner & Executive Director, Mid-Iowa Community Action Agency (MICA), National Services Division
> Dan Miller, Certified Public Accountant (CPA)
> Neil Phillips, CPA
> Phil Jarred, CPA
> Jareld Knox, CPA
> Dan Chargo, Accountant
> Bob Carlton, Accountant
> Steve Burnett, Accountant (Trained Head Start Program Reviewer)
> Mary Twitty, Management Specialist (Board Governance & Head Start Program Specialist)
> David Tucker, Management Specialist (former state CSBG Director)
> Owen Heiserman, Management Specialist

The state's record of regular contact and monitoring of the agency is clear and exceeds the minimum statutory standard. The style of monitoring was one of partnership, support, compliance-driven, and trust. The atmosphere was neither adversarial nor heavy-handed.

In fiscal year 1998 through fiscal year 2003, $800,000 was awarded to UPO in technical assistance grants in addition to the mandated pass-through funds. Additionally, approximately $200,000 was devoted to training during the same period. During its 2004 program monitoring and review exercise, the state CSBG office determined that UPO was unable to support all of its previously submitted certifications regarding the $9.7 million in fiscal year 2003 CSBG expenditures. Under the CSBG statute, the state is required to take certain actions to provide UPO with both formal notice and an opportunity to cure, once it has been determined that UPO has failed to comply "with the terms of an agreement, or the state plan, to provide services (as required) or to meet appropriate standards, goals, and other requirements established by the state (including performance objectives)" 42 U.S.C. § 9915(a). The statute also detailed explicitly the steps the state shall follow to ensure proper notice and corrective action.

The state CSBG office could not have a successful program monitoring review exercise if other necessary dynamics had not been in place. Some of these elements included:

1. The oversight agency (regulator) must be stable.
2. The oversight agency must possess a set of priorities that derive from a strategic outcomes approach.
3. Monitoring staff must be equipped with the technical capacity and direction.
4. Relationships and trust between sub-grantee and the oversight agency had to be developed.
5. Data had to be collected over time and analyzed.
6. Training and other intermediate measures had to have been tried and given a chance to work.

All of these components were present in advance of the fiscal year 2004 monitoring review exercise. At the District's initiative and direction, the routinely scheduled review uncovered areas of concern that led to a more in-depth review by the team of professionals assembled by the state CSBG office.

## THE PROCESS

In July 2003, during a regularly scheduled quarterly meeting between the state CSBG office and the executive management staff of UPO, the need to conduct the next monitoring review of UPO was discussed. During the quarterly meeting in December 2003, all parties agreed to February 18, 2004, as the new start date. The state CSBG program staff conducted an entrance interview and began the monitoring exercise. Due to concerns experienced on-site that included unavailability of records, unclear, and contradictory responses by UPO managers to reviewer's questions, an expanded team of professionals was assembled to resume the review exercise on March 1, 2004. This expanded team reviewed UPO's financial system that included internal control systems within the organization for processing accounting data. The review team interviewed key staff and managers involved with relevant functions at the agency. The review team scheduled and interviewed key management personnel and officers of the UPO Board of Trustees. The review team scheduled an interview with UPO's independent auditor, Thompson, Cobb, Bazilio & Associates, P.C.

Subsequently, it was necessary to take a look at other grant-funded programs within the organization. In particular, a cursory review of the Head Start grant, afforded the team the opportunity to receive information that proved useful in understanding practices and processes within the organization.

Under the CSBG statute, the state is required to "establish fiscal control and accounting procedures necessary to assure the proper disbursal of and accounting for CSBG funds, including procedures for monitoring CSBG funds; and ensure that cost and accounting standards of the Office of Management and Budget (OMB) apply to recipients of CSBG funds." 42 U.S.C. § 9916(a)(1)(A) & (B).

As in the classic grant schema, the sub-grantee (UPO) operates under an approved budget and submits documentation of its grant expenditures for approval by the granting agency, D.C. Department of Human Services (DHS). Where documentation is unclear, the granting agency (DHS) will provide the grantee (UPO) with an opportunity to address the agency's concerns and support its assertion that the expenditures are allowable under the grant.

## FINDINGS

## Findings and Recommendations

This section will address responses made by the United Planning Organization (UPO) to issues and concerns identified by the state CSBG office in its preliminary report of March 11, 2004 to the Board of Trustees of UPO based on the March 1-4, 2004 on-site monitoring review and assessment. Unaddressed items and new findings will be identified. Other steps that would produce quality improvements in each area will also be recommended.

### Governance

| | |
|---|---|
| *Finding:* | The UPO Board By-Laws appear old and outdated. For example, it lacks a provision establishing and enforcing term limits for Board members. |

Since March 11, 2004, the UPO Board of Trustees has taken a number of actions to correct problematic conditions identified in the initial state CSBG assessment visit. The board has addressed each of the original findings. An Ad Hoc Management Committee was designated on March 11, 2004 to exert a high level of oversight of agency management and staff. Two officers of the UPO board either voluntarily resigned or were asked to resign by the board. These were the President, and the Treasurer; three other board members resigned or were terminated from the board; efforts are being made to recruit new board members to fill all vacant Board positions. In addition, the Executive Director was also terminated.

With guidance from the state CSBG office, the Board contracted for the interim executive services of Dana Jones. Mr. Jones is the Executive Director of Southern Maryland Tri-County Community Action Commission, in Hughesville, Maryland. Mr. Jones came to UPO on April 5, 2004 with a contract to serve until September 30, 2004. A contract extension has been approved through December 31, 2004.

The Board tasked a committee of five members to conduct a search for a new executive director. The committee also sought out four additional members from the wider community as committee members. The committee obtained the services of a professional executive recruiting firm to assist the agency its search for the next Executive Director. That effort is currently ongoing.

A By-laws Committee was re-established to address questions raised in the March Assessment. On August 30, 2004, the Board of Trustees approved revisions to their By-laws to bring them into compliance with the requirements of the CSBG Act, and clarifying representation, member selection and termination, officers and their selection. The prior committee structure was replaced with four standing committees. The By-laws removed the Executive Director from serving as the Board Secretary. Term limits have

been set for Board members. Representatives of the low-income community no longer present a conflict by also representing UPO's delegate agencies and UPO's neighborhood development centers that depend upon UPO for funding through CSBG.

Recommendations:

The Board should revisit the By-laws to address the following items:

    1)  Consider redefining responsibility for naming public members of the Board.

By-laws adopted August 30, 2004, vest sole responsibility for naming public members to the Board in the mayor of the District of Columbia. The CSBG reauthorization of 1998 requires that "one-third of the members of the board be elected public officials, holding office on the date of selection, or their representatives." In the case of the number of elected officials available being limited, the Act makes provision for appointive public officials to serve as Board members. The decision could be made by the UPO Board to select these members without ceding selection responsibility to specific public officials because the Act does not specify how public members are to be selected. This allows Boards to seek out public officials they believe would be supportive of the agency's mission and activities.

    2)  Clarify the mechanism for filling vacant Board seats.

According to UPO's revised By-laws, the power given the Nominating Committee and Board to select replacement members for vacant seats (p. 4, Section 6, UPO Board By-laws) might be understood to contradict procedures for selecting public (page 2) and low-income (pages 2-3) representatives. It would be helpful to include language clarifying whether "normal" procedures for selecting public and low-income representatives will be followed when filling vacancies. Such language might be contained in future procedures for low-income representation.

    3)  Develop and approve documents implementing important By-law provisions.

The following documents were mentioned in the By-laws, but were not in evidence during the assessment visit. These need to be produced and approved by the Board:

- Procedure for electing low-income representatives
- Corporate Governance Guidelines
- Code of Business Ethics and Conduct

    4)  Re-visit the By-laws language that may blur the line between governance and management. Relevant sections include the following:

        a.  Article IV, Section 2, a. (page 5) states that the Board chair "shall perform such executive, supervisory and management functions and duties, and execute other powers as may be assigned by the Board."

b. Article IV, Section 7, b., (7) (page 10) states that the Human Resources Committee should "Assist staff members who have administrative responsibilities in the handling of personnel matters...." Subsection (8) (p.10) also states that the Committee should "[B]e involved in labor relations, staff and Board training, etc."

c. The Organizational Development and Assessment Committee is assigned responsibility to "provide instruction and oversight" of the community assessment and strategic plan (Article IV, Section 7, c., (1) and (3), page 11)). The Committee is also tasked to "[E]stablish and implement an internal programmatic review process." (sub-section (7))

5) Have a mechanism for establishing and enforcing term limits and attendance for Board members. The record reflects that some members have been on the UPO Board for twenty years or more. Persistent absenteeism is recorded for certain Board members.

---

*Finding:* Board vacancies exist and remain unfilled for long periods of time. The Board lacks a policy to fill vacant Board seats in a reasonable and defined time period.

---

Since March 11, 2004, two members left the Board because of conflicts of interest. Two additional Board members also voluntarily resigned. The Board has seated six new members recommended by the Nominating Committee. A request has been sent to the Mayor to recommend additional individuals to fill out the public sector slots on the Board. As of September 3, 2004 five Board positions remained to be filled: two public, one private, and two low-income.

The revised By-laws specify that low-income representatives be democratically elected in ten impact area neighborhoods. Board procedures will designate those areas, the election procedures, and a neighborhood group to be charged with holding the election in each area.

Recommendations:

1) Include in the By-laws a clause establishing a 90-day deadline for filling vacant seats.
2) Develop and approve the procedure for electing low-income Board members.
3) Designate low-income neighborhood impact areas.
4) Board members should serve no more than two consecutive terms or a maximum of six years at a time. Future Board tenure should be limited to a single term of three years or less. This term limit should retroactively apply to current Board members at the time of implementation.
5) Establish a minimum attendance policy and other outcome standards for Board members.

11

> *Finding:*   The Finance and Audit Committee do not review UPO's financial statements on a frequent and regular basis and did not provide the full Board with these reports on a timely basis.

In May 2003, the state CSBG office delivered a video presentation and a compendium workbook to the full board of UPO during a training exercise, the core of which was governance and fiduciary responsibility. Again, in April 2004, the Board was trained by the CPA firm Thompson, Cobb, Basilio, and Associates on the guidelines of the federal Sarbanes-Oxley legislation and board responsibilities for fiscal oversight. Additional information was presented on the fiduciary responsibilities of nonprofit boards.

Board members interviewed by the state CSBG review team stated they had been working closely with Mr. Dana Jones to develop ways to present financial information to the board that would facilitate member's understanding of that information. Mr. Jones described his efforts, in conjunction with the accounting consultant, systematically to validate the data in the UPO accounting software. The consultants from Walker and Company, LLC are also reconfiguring the accounting software so that timely, accurate, and appropriate reports can be generated representing all the financial activity of the organization. The assessment team verified that the board materials for the August 2004 meeting contained financial statements for the first nine months (three quarters) of fiscal year 2004.

> *Finding:*   No evidence was presented of a recent training in Results-oriented Management and Accountability training (last training offered was by the state CSBG office in September 2001); a Board Orientation and Training Plan do not exist to introduce new members to community action mandate, roles, and responsibilities.

The revised By-laws approved August 30, 2004, created a Nominating and Board Governance Committee with responsibilities that included training and orienting new Board members and organizing ongoing board training. This group has not been constituted and has not developed these training materials.

Recommendations:

1) Name Nominating and Board Governance Committee members as soon as possible.
2) Develop a new member orientation package.
3) Create for Board approval an annual calendar of Board trainings.

## Planning and Communications

> *Finding:* There appeared to be no integration between UPO's strategic planning process, its organizational structure and development, Board actions, and agency operations.

There appears to be a conflict between UPO's role as an umbrella organization to its delegate agencies controlling CSBG funding to those organizations and also competing with them for other funding. An Organizational Development Assessment Unit has been created within UPO's management structure to support and coordinate community assessment, strategic planning, the implementation of the federal Results-oriented Management and Accountability (ROMA) initiative, management by outcomes, internal accountability, and program quality monitoring. Plans are being made to place internal administrative functions under the direction of a Business Support Unit. An Assets and Employment Unit is also being planned. These changes have been made to improve communication and accountability in UPO top management. Each of the three units named has organization-wide responsibilities.

Contacts have been made with the Executive Development Institute to train staff in that entity's management by outcome accountability system. ROMA training for staff at all levels is being pursued as well.

Recommendations:

1) The strategic plan should serve as a working document, a blueprint for action for the Board and the agency.
2) The agency should continue with its strategic planning process, paying particular attention to the area of Organizational Development.
3) UPO should implement a regular schedule of meetings with its delegate agencies and service provider network partners. These meetings could be occasions for updates and dialog on programs, training, review of achievements, and analysis of community assessment information.
4) The formula used to determine funding of delegate agencies needs to be revisited to assure that they reflect the needs of the communities in-need throughout the District of Columbia.

## Personnel

> *Finding:* Job descriptions did not appear to have received periodic reviews and updates to reflect current job duties and responsibilities; UPO workforce appeared demoralized and lacking faith in its leadership and management.

New job descriptions have been developed for upper management team members, corresponding to restructuring of those positions.

13

UPO has identified need for extensive training in all areas of the organization, but particularly in the fiscal office. The agency submitted to the state CSBG office a request and was approved for training and technical assistance funding. Both board and top management will receive training in managing for outcomes. Fiscal staff will receive additional training in the Solomon accounting software used by the organization. Staff reported that plans are being developed for staff development training across the organization. Such training would unfold through quarterly "all staff" days at which a calendar of topics would be covered annually.

Recommendations:

1) Management and board should be committed tangibly to dealing with its staff fairly, openly, and transparently.
2) All job descriptions should be reviewed and updated regularly to reflect current job duties and responsibilities.
3) A tighter control of time and attendance certification needs to be established to alley the concerns over allegations of irregularities.

| |
|---|
| *Finding:*   No evidence exist that the United Planning Organization ever conducted a wage comparability study and develop a salary schedule to ensure that the agency is competitive in its industry. |

The assessment team was not presented with a wage comparability study.

Recommendations:

1) A wage comparability study should be completed at the earliest possible date.
2) Job descriptions need to be reviewed for correct classification.
3) The fiscal policy manual revision being considered for approval needs to reflect current job titles, as well as any changes to them in the future.
4) A revised salary schedule should be presented for the board's approval.

| |
|---|
| *Finding:*   UPO engages in the practice of contracting to use consultants for long periods of time and subsequently hiring the consultants to fill permanent positions without an open and competitive recruitment process. |

The assessment team verified that seventeen consultant contracts have been terminated. A number of consultants have been converted to employee status. The interim management made a commitment that it would refrain from this practice.

Recommendations:

1. The Personnel Policy Manual should contain a section defining the terms and conditions under which consultant services can be sought. Those terms should specifically address circumstances in which long-term relationships with

consultants would be acceptable. Contracts beyond a specified time period might be made subject to board review and approval.

2. Contract and procurement practices at UPO should be in-line with federal and District rules and regulations, or other similarly proven standards of practice. All contracts executed since March 11, 2004 should be submitted to the state CSBG office for review within 30-days of the release of this report.

## Programs

> *Finding:* UPO self-reported that it delivered an unduplicated service count of approximately 20,000 units of service in fiscal year 2003. The CSBG review team noted that this number was inadequate based on the available resources and the needs of poor and low-income residents of the District of Columbia.

UPO reports that it leveraged approximately 20,000 additional unduplicated service count for the same period using other sources funds that was not captured under the CSBG count. Agencies with considerably smaller CSBG awards, serve a greater number of CSBG customers according to the fiscal year 2002 CSBG Statistical Report prepared by the *Center for Community Action Research* with the assistance of *Economic Opportunity Studies, Inc.*, both based in Washington, DC.

## Recommendations:

1) UPO should conduct a needs assessment exercise to better direct its service delivery and afford UPO customers the opportunity to participate in program planning and design.
2) A greater portion of UPO resources should be devoted to activities that directly help to ameliorate poverty and causes of poverty in the District of Columbia.
3) An unduplicated service count of customers served by UPO should be reported to the state CSBG office monthly.
4) All outstanding and delinquent reports for FY 2004 and FY 2005 should be brought up-to-date and submitted to the state CSBG office within 30-days of the release of this report.

> *Finding:* Large volumes of unsupported disbursements clearing various bank accounts appear to be paying for credit card balances and it is difficult to determine what expenditures were procured.

In order to sufficiently address this finding, it would require skills and authority possessed by investigative agencies. To this end, and since the CSBG office lacks the authority to subpoenas records from financial institutions federal guidelines in these matters were invoked. Federal regulations require that a federal funds grantee report any suspicion of misuse of federal funds to an appropriate federal agency and request further review and investigation. The state CSBG office on April 27, 2004, following established protocol, made a request through the District of Columbia Department of

Human Services, Office of Investigation and Compliance to the District of Columbia Office of Inspector General. On May 12, 2004, the board of directors of UPO passed a resolution and joined in this respect by requesting an Inspector General's review of the agency. Following that resolution, several federal agencies, the Federal Bureau of Investigation (FBI) and the District of Columbia initiated investigations. Since March 11, 2004, UPO has implemented some corrective action plans for Head Start, Foster Grandparents, and the Community Services Block Grant programs.

Recommendations:

1) UPO should restrict its use of automated wire transfer of funds to emergency situations only.
2) UPO should institute a policy guiding the use of credit cards at the agency and associated payments.
3) Other recommendations may follow when the District of Columbia inspector general's report is published.

## Automation

| | |
|---|---|
| *Finding:* | The Community Action Statistical Access (CASA) system does not integrate data from other programs (such as Head Start and the Aging Program.) |

CASA is an outcome-based data collection and reporting system established in part with the use of CSBG through the state CSBG discretionary funds.

Recommendations:

1) The CASA system should be expanded to capture outcome data from other programs.
2) The CASA system, as a web-based data management system should be accessible to the state CSBG office for reporting and review purposes.

The assessment team did not address use of the CASA system in any further detail.

## Financial Management

| | |
|---|---|
| *Finding:* | There was no proper separation of duties for processing financial information. |

The state's review team found that there are enough employees within the fiscal department for a proper separation of duties for processing financial information. However, we found that senior management frequently circumvented the internal control systems, thereby threatening the integrity of the controls. Additionally, we also noted that the financial management practices at UPO did not meet federal grant standards.

**Recommendations:**

1) UPO should ensure that adequate employees are trained in the finance office to allow for a proper separation of duties.
2) UPO should implement financial management practices that are consistent with federal grant standards.
3) UPO should establish a system of oversight that ensures compliance with the agency fiscal internal control measures.

## Bank Reconciliation

> *Finding:* Transactions clearing several bank accounts could not be reconciled to the general ledger.

UPO retained the services of an outside accounting firm to assist in completing the bank reconciliation and matching this to the general ledger. The review team did not conduct tests of any of the reconciled bank statements.

The cost effectiveness of using outside accounting firms in lieu of available cheaper alternative approaches is a point of some concern. The use of accounting contractors that did not rely on an open competitive process, the outsourcing of UPO's accounting functions at the cost of approximately $500,000 per annum, and the contract and procurement process used to select the contractors are all equally of concern. A full cadre of staff, equipment and materials are being provided by UPO at additional costs.

**Recommendations:**

1) Typically, community action agencies confronted with similar situations have opted to utilize the services of not-for-profit management groups within the CSBG network to address the shortcomings in agency financial operations. UPO should explore alternative approaches to managing its finance operations with a view to getting the best value for their money.
2) The process for selecting outside contractors should be open, transparent, and competitive.
3) As a condition of awarding short-term management contracts to accounting contractors, UPO should ensure that the contractor train in-house UPO staff to assume the financial functions of the unit.

## Cash Disbursement

> *Finding:* Certain unallowable expenditures appear to be charged to the CSBG program.

The review team had previously questioned certain costs such as vehicle fines, vehicle parking violations, professional services fees to consultants and contractors, conference

fees and miscellaneous direct expenses. UPO has subsequently re-evaluated these items and removed those costs that were inappropriately charged to the CSBG program.

The review team examined the general ledger and accepted the validation by UPO's external auditor that all unallowable expenditures have been removed. The state's review team had also questioned credit card payments clearing several bank accounts that do not appear to have adequate documentation. Citing past practices at UPO, the Chief Financial Officer (CFO) moved credit card charges to a special account to be addressed through the use of unrestricted funds. The review team had concerns about some of these transactions. If the expense lacked documentation, it was charged to UPO's unrestricted fund account. As the preliminary report stated, unrestricted and inappropriate use of the credit cards included payments for significant expenditures not related to the mission of the Community Services Block Grant to ameliorate poverty and causes of poverty in the District of Columbia.

UPO, however, had no other sources of income substantial enough to absorb these expenses. The review team looked at this practice and raised our concerns during the exit interview with the interim management. If any items were charged to grant funds without adequate supporting documentation, the integrity of the grant management process is tainted. During the exit interview, the Interim Executive Director of UPO informed the team that UPO's independent auditor would bear financial responsibility, if after performing a 100% test of credit card transactions and completing UPO's audit and issuing findings, unallowable costs are still charged. In the opinion of the state CSBG office, this issue remains a concern.

Recommendations:

1) UPO should ensure that a product, outcome, or service ties legitimately to the funding source and demonstrate such to all granting agencies.
2) UPO should ensure that a uniform standard existed for addressing and substantiating how credit card expenses are to be addressed.
3) A direct expenses report for the period 10/1/03 through 3/31/04, which was managed under the previous executive director's tenure, should be submitted to the state CSBG office within 30-days of the release of this report. The report should be an original printout from the accounting software system and should include all schedules and supporting documentation.

### Indirect Cost Pool

| | |
|---|---|
| *Finding:* | There appears to be over-expenditure in the indirect cost pool that had not been allocated among various UPO programs. |

UPO's un-audited trial balance had originally shown an over expenditure in the indirect cost pool that had not been allocated among the various programs. Upon inquiry with UPO's Controller, the reviewers learned that charges were allocated to each grant

according to either what was contained in the program's respective budget or what is allowable under the provisionally approved indirect cost rate.

UPO requested the services of an outside accounting firm that determined that the amounts in the indirect cost pool should be allocated to the various fund sources in order to reflect the total amount of the expense of providing services to each program. The review team examined the entries posted to the UPO general ledger and did not *per se* question the methodology or the allocation of funds. The provisionally approved indirect cost rate is a useful guide.

In most cases, the allocation of the actual indirect cost incurred exceeded the amounts originally budgeted. For example the original indirect cost rate was submitted with anticipated indirect cost of $3,003,858. Actual indirect cost for the fiscal year ended September 30, 2003, was $3,557,410. This reflected a difference of $553,552 over the budgeted amount. Whether or not a funding source will allow the actual indirect cost (increased charges) allocated to their programs will be a matter to be addressed with each funding source.

Recommendations:

1) The state CSBG review team concurs with UPO's decision to use an outside accounting firm to recommend cost pool allocation methods.

2) Each program that UPO operates needs to be consulted in writing to determine if their funding sources will approve the resources to cover the expenses charged as indirect costs.

3) There are concerns about the distribution of funds between direct services and administrative and indirect costs. UPO should remove all discrepancy between the allocations proposed in its budget and the actual expenditures for administrative and indirect costs.

Financial Operations

*Finding:*   Each month, UPO's financial management data either did not receive a proper review or were not corrected in a review process.

Twelve agency bank accounts have been closed. Several certificates of deposit totaling over *one million dollars* were recaptured by M&T Bank as collateral against the agency's defaulted line of credit. The assessment team identified twelve remaining accounts. The agency is in the process of revising the designation of authorized signatories. All checks other than payroll checks will now contain two signatures.

Under the direction of interim executive director Dana Jones, UPO has instituted a variety of new policies and procedures to produce tighter internal control of financial, human, and program resources. Management restructuring has reduced the number of persons reporting to the executive director to ten from more than thirty. It has consolidated activities with organization-wide impact into five offices, with major

19

programmatic responsibilities exercised by a pre-school and day-care division and an operations division. A general counsel, a public policy analyst, and a public awareness specialist will provide support to the Chief Executive officer.

The fiscal department, the accounting software, and financial reporting practices are all being reviewed, revised, and restructured with the help of an accounting consultant, Walker and Company, LLC. New policies have been issued in memoranda form for vehicle use, cellular phone use, and travel. A draft accounting manual and a draft procurement manual have been proposed to the board.

Recommendations:

1) UPO should translate reform initiatives in managing financial operations to standard agency policies.
2) UPO should establish a system of routine review of all financial processes to ensure conformity to agency policies.
3) UPO should clearly delineate the amount of funds passed-through to delegate agencies, neighborhood development centers, and other subcontractors. The amount and percentage of indirect costs charged on these passed-through funds should be fully disclosed.
4) The source of the one million dollar collateral recaptured by M&T Bank should be disclosed and forwarded to the state CSBG office.

## Cost Containment

| | |
|---|---|
| *Finding:* | UPO utilizes a high number of consulting services, some of which could be deemed by the Internal Revenue Service as employer-employee relationships; the practice of making loans to outside parties does not appear proper; and, heavy cell-phone usage at the agency is wasteful and unjustifiable. |

Seventeen consultant contracts have been cancelled. Six positions have been eliminated. Out-of-town travel has been limited and made subject to prior approval. A plan has been put in place to collect approximately $70,000 of travel advances that could not be reconciled, $30,000 of which had been recouped. All credit card accounts but one has been cancelled. The remaining card is used exclusively for facilities maintenance expenses.

Legal actions have been filed to recover non-allowable costs from the North Capital Area Business Association and the DC Community Prevention Partnership. A demand letter has been sent to the Senior Citizens Counseling and Delivery Service.

A new cell phone use policy has been instituted. Phones have been recovered from staff and board members. Usage must be justified for program activities only. Monthly charges have been reduced from $13,600 to $3,600 per month. A program to make

hardship loans to employees has been cancelled, along with the practice of salary advances.

All five vehicles formerly assigned to the executive office have been reassigned or disposed off.

Recommendations:

1) Policy changes (vehicle use, cell phones, travel advances, employee loans) need to be formally incorporated into organizational manuals, after approval by the board of directors.
2) Reports generated by the accounting software need to be in agreement with the agency's general ledger. Reports need to include revenue and expenses, reported on an accrual basis, by program, compared to budgeted amounts. Reports need to reflect monthly as well as program year-to-date totals for all programs in the organization.
3) Variances from budgeted expenses should be investigated and explained, with proper and timely budget modifications submitted to the board and grantors, if needed.

## Accounting System

| Finding: | The agency was unable to substantiate reports submitted to the state CSBG office and reconcile them to the agency's accounting general ledger. |
|---|---|

Bank reconciliation has been brought to current status. The minutes of the last board meeting before the September 7, 2004 follow-up review, contained quarterly financial statements for the first three reporting periods of the current fiscal year. The board and program managers are receiving budget-to-expense financial statements.

Following the initial assessment, concern was expressed about the adequacy of the accounting software used by UPO. Subsequent experience, and the technical assistance of the accounting firm Walker and Company, LLC, has determined that the software is adequate for the near term. Walker has reconfigured the software to link all balance sheet components and to generate useful, timely, and accurate budget-to-expense financial statements. It has been determined, however, that the fiscal staff need intensive and ongoing training in use of the software to obtain full benefit from it.

The application itself is four or five years old. There is a chance the software may not be supported in the future. The company supporting the current accounting software program has changed ownership twice in recent years.

Recommendations:

1) Replacement of accounting software may be initiated.
2) Accounting function needs and cost-benefit analysis discussions should begin and be incorporated into long-range planning.
3) Financial reports for payment submitted to the state CSBG office must reflect actual expenditures or must be reconciled in a timely manner.

## Program Compliance

| | |
|---|---|
| *Finding:* | The financial management system of the United Planning Organization does not meet Federal grant standards. |

UPO was required to obtain the services of an independent auditor to validate requests for funds drawn down through the Head Start Payment Management System. The same firm issued a certification of the adequacy of UPO's financial system and its internal controls. Investigations by the inspectors general of the departments of Housing and Urban Development and Health and Human Services, as well as the Corporation for National and Community Service, have not produced legal or administrative remedies.

Recommendations:

1) Internal control systems must be included in the agency's policy manual.
2) To avoid the circumvention of approved procedures by employees of the agency, proper control and reporting mechanisms should be instituted.

## Construction Projects

| | |
|---|---|
| *Finding:* | Cost overruns exists in at least two UPO's three construction projects and UPO has failed to meet its financing commitment to raise $1.5 million dollars towards the projects. |

The District of Columbia's Community Services Block Grant program had previously discussed construction projects in the preliminary report and the possibility of costs exceeding projections. There is a general consensus within the interim management team that this is probably the case. In 2001, UPO relocated its headquarters to the former Safeway grocery store site located at 301 Rhode Island Avenue, N.W. The renovation of the administrative headquarters facility appeared to be on budget prior to capitalization of interest financing costs and other related expenses. The CSBG office had included these expenses as part of the total cost of the project as capitalized on UPO's financial statements. The remaining two projects associated with this initiative, the Anacostia Community Services Center is completed and recently opened (August 2004), and Petey Greene Community Service Center is ongoing and nearing completion. It is projected that when final costs are tallied, they will exceed the budgeted amounts. These

developments remain a significant area of concern and require professional analysis and review by experts in the fields of construction development and financing.

Financing was arranged for all three projects as a package for which $10,480,000 million in enterprise zone facility bonds were issued. The agency committed to raising $1.5 million for the project, which it has not done. A line of credit obtained from M&T Bank for construction financing has absorbed the costs not covered by agency fundraising. Additionally, the Anacostia and Petey Greene projects have experienced unforeseen delays and additional costs.

UPO has been in continuous negotiations with M&T Bank since April to make arrangements to pay off the line of credit. UPO has also approached other banks about assuming the outstanding construction debt.

Recommendations:

1) The UPO should continue to pursue other alternative re-financing of construction projects that includes all known costs.
2) The debt repayment structure for these projects must be included in an agency-wide budget that will show how the organization intends to cover these costs in its future operations.

Debt Management

| | |
|---|---|
| *Finding:* | UPO bears a substantial debt burden and has a deficit situation for fiscal year 2003 (the program year in review). The size of UPO's debt and deficit are unclear due to constantly shifting draft financial reports presented by UPO to the state CSBG review team. |

UPO has conducted internal investigations to identify its outstanding debt. This debt was incurred from a variety of causes: construction overruns, defaulted loans and advances to organizations made without legitimate authorization, non-allowable expenses, and allowable expenses made in addition to budgeted, anticipated spending levels. UPO reports that it has initiated a number of lawsuits against former employees and board members, as well as other organizations, to recover non-allowable expenses.

UPO has also engaged in discussions with different financial institutions about the possibility of transferring its business – and its construction financing – from M&T Bank.

UPO's capacity to develop manageable arrangements to deal with its debt is affected by whether it received permission from the state CSBG office to retroactively reprogram CSBG funds for fiscal years 2002 and 2003. The result of that decision affected the audit for 2003, which in turn will condition the organization's relationships with other granting agencies and with its financial institutions.

23

UPO requested and was granted a one-time retroactive reprogramming of year-end unexpended CSBG funds to cover budget overruns in other programs. This issue was a concern to the state CSBG office for the stated fiscal years 2002 and 2003. Year-end reprogramming is an exceptional remedy that should not take the place of instituting rigorous budgeting and expense control in other programs. Co-funding of other programming from CSBG, when appropriately anticipated and justified, is appropriate.

Recommendations:

1) The UPO should submit to the state CSBG office annually a budget that reflects accurately the amount of CSBG funds it expects to use to co-fund other programs. This will entail submitting to the state CSBG office budgets showing the total costs of proposed co-funded programs. It will include explanations of why CSBG funds are needed to supplement these programs to achieve the level of service budgeted, and why the proposed level and quality of service exceeds what would be possible using program funding only.

2) Co-funding proposals should be made a part of the CSBG grant application. Co-funding amounts could be modified later through normal budget amendment processes.

## NEXT STEPS

A new Executive Director was slated to be in place by September 30, 2004. The process to produce a candidate is actively being pursued by UPO. In addition to this effort, the following actions should also take place:

1. An updated Quality Improvement Plan (QIP) should be submitted by UPO to the state CSBG office for approval within 30-days of receipt of this report. The QIP should detail steps, timeframes, and outcomes that address the issues outlined in this report.

2. UPO should submit an accounting of all expenditures related to each of the three facility projects undertaken by UPO using CSBG waiver funds.

3. UPO should determine a strategy for the recovery of funds that were inappropriately used by the agency for the period of review (FY 2003). UPO should submit a plan to the state CSBG office that seeks to recover those costs that have been ruled unallowable.

4. The state CSBG office should develop a contingency plan that assures the delivery of services to low-income residents that are current or future customers of UPO.

5. The state CSBG office should identify technical assistance funds and make them available to support an approved technical assistance request by UPO.

6. The state CSBG office should develop a plan that do not restrict CSBG customers in the District of Columbia to a sole source CSBG eligible entity.

7. The state CSBG office should introduce a monthly cost reimbursable payment arrangement with UPO for a minimum of one program year. The onset of this arrangement will be communicated under separate cover during fiscal year 2005.

8. The state CSBG office should, at its cost and option, appoint an independent professional body to validate all financial requests and reports presented to it by UPO for action.

9. UPO should submit all notice and minutes of all Board meetings within 30-days of such meeting, and submit a quarterly report of reform initiatives instituted at the agency beginning in fiscal year 2005 to the state CSBG office.

10. UPO should clarify in a report to the state CSBG office, within 30-days of the receipt of this report, the source of the approximately one million dollars it used to collaterized its line of credit with M&T Bank. Included should be the consequences of M&T Bank's recapture of these funds as a result of UPO's default status.

CONCLUSION

As a result of developments associated with the fiscal year 2004 on-site monitoring review of the United Planning Organization, the state CSBG office had serious concerns about UPO's ability to run an efficient and effective CSBG program operation for the period under review. In order for UPO to emerge from what amounts to a crisis, it must employ extraordinary steps to correct deficiencies, restore confidence, regain the role of helping to ameliorate poverty and causes of poverty in the District, and position itself for the challenge of meeting the needs of poor and low-income residents of the District of Columbia. UPO, its interim management, and its re-committed Board of Directors have begun to do that. Many of these new actions are exemplified by the new procedures and processes outlined in the report of findings.

UPO should not linger in its period of interim management for a protracted length of time. It should move forward to a new and permanent management with vigor, innovation, and enthusiasm for carrying out the mandates of the CSBG Act.