IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AMIN KAKEH,

        Plaintiff,

    v.

UNITED PLANNING ORGANIZATION, INC.,

        Defendant.

Civil Action No. 05-1271 (GK/JMF)

Next Scheduled Event:
Pretrial Conference – May 15, 2007

**DEFENDANT UNITED PLANNING ORGANIZATION, INC.'S REPLY
TO PLAINTIFF MOHAMMED AMIN KAKEH'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant United Planning Organization, Inc. ("UPO") replies to Plaintiff Mohammad

Amin Kakeh's Opposition to UPO's Motion for Summary Judgment as follows:

As the record amply demonstrates, this case was brought not to vindicate an unlawful

termination, but to ensure that Plaintiff retained his job position while his coworkers were

terminated as part of a reduction-in-force ("RIF").    Plaintiff seeks to be treated more favorably

than the other managers in UPO's Finance Office by casting himself in a multitude of protected

categories.  He contends that he is a whistleblower and a victim of unlawful discrimination.  The

record in this case, however, is devoid of any proof that UPO knew or perceived Plaintiff to have

prompted the D.C. Department of Human Services ("DHS") monitoring review, the federal

Department of Health and Human Services ("DHHS") Head Start review, or the Inspectors

General investigations.  Also, there is no evidence that UPO was motivated to retaliate against

Plaintiff because he refused to comply with an alleged illegal order.  Neither does the record

show that UPO harbored any animus towards Plaintiff because he complained about

discrimination.  To the contrary, the record clearly demonstrates that Plaintiff and the other

managers in the Finance Office were terminated as part of a RIF because UPO in good faith believed that it was critical that the leadership of the Finance Office be replaced in order to address the numerous issues relating to financial controls that were identified in the D.C. DHS monitoring review report and the DHHS Head Start deficiency letter.

In sum, Plaintiff cannot evade summary judgment on his claims under the D.C. Whistleblower Protection Act, the D.C. Human Rights Act, D.C. or the federal False Claims Act, or District of Columbia common law because:

(1) There is no circumstantial or direct evidence that Plaintiff's alleged protected disclosures and refusal to comply with an alleged illegal order were a contributing factor in Dana Jones' recommendation that the management of the Finance Office be outsourced and Plaintiff's employment be terminated pursuant to the RIF;

(2) Plaintiff has failed to create a genuine issue of material fact regarding whether UPO's legitimate business reason for outsourcing the leadership in the Finance Office was a pretext for retaliation under the D.C. Human Rights Act;

(3) As a matter of law, UPO is entitled to summary judgment on Plaintiff's claims under the D.C. and federal False Claims Act because there is no evidence that UPO was aware that Plaintiff was acting in furtherance of an investigation of false claims; and

(4) As a matter of law, based upon the predicate acts, Plaintiff cannot recover for common law wrongful discharge because his exclusive remedies are under the D.C. Whistleblower Protection Act, the D.C. Human Rights Act, the D.C. False Claims Act and the federal False Claims Act.

## I.    DISCUSSION

### A.    Plaintiff's Opposition Is Rife With Inaccurate Statements Of "Fact"

Plaintiff's Opposition is a house built of supposition, conjecture, speculation, and inaccurate statements of fact, as illustrated below.

| Page of Pl.'s Opp'n | Pl.'s Assertion in His Opp'n | Pl.'s Alleged Support for Statement of Material Facts and Genuine Issues ("SOF") | Actual Statements From Record |
|---|---|---|---|
| 12 | "On or about February 19, 2004, Eboda met with Shears, Mack and Jennings and discussed the Plaintiff's allegations that Defendant committed fraud, waste, and abuse." | SOF ¶ 56 (Eboda Dep. at 68, Note from Kakeh, Kakeh's Log of Contacts). | A:  For the whole day, from the time we conducted the entrance interview through later afternoon, maybe 4:00.<br>Q:  You were there 9:00 to 4:00?<br>A:  Thereabouts.<br>Q:  During that time, who did you meet with?<br>A:  I met with Mr. Jennings, Gladys Mack, talked with Ben Jennings.  He conducted, participated in the entrance interview by a telephone call, by phone, speaker phone.<br>Q:  You talked to Ben Jennings, you talked to Gladys Mack?<br>A:  And Sheila Shears.<br>Q:  You talked to Sheila Shears, Gladys Mack and who else?<br>A:  Mr. Amin.<br>Q:  Who else?<br>A:  I don't recall, but I may be able to locate notes that might refresh my memory on that.<br><br>Eboda Dep. at 68:1 – 21.<br><br>*Significance:*  **The deposition citation contains no indication from Eboda that he discussed Plaintiff's allegations of Defendant's alleged fraud, waste, and abuse.  In fact, the citation does not contain any indication of what topics Eboda discussed.**<br><br>***<br>"When I arrived at the office I found T[u]nde with Sheila in a meeting; I did not know about that from inside the company.  I spent several hours with him |

| Page of Pl.'s Opp'n | Pl.'s Assertion in His Opp'n | Pl.'s Alleged Support for Statement of Material Facts and Genuine Issues ("SOF") | Actual Statements From Record |
|---|---|---|---|
| | | | and his assistant and we began preparations to begin the inspection next week.  A meeting with the employees.  And with the auditor at the same time.  Spent most of the day in [illegible fax]."

Note from Kakeh, dated Feb. 19, 2004 (Ex. 51).

"Tunde Eboda and his assistant – Came to UPO.  I showed Tunde the evidence of the misuse of federal funds with explanation.  He also met with Sheila Shears, CFO of UPO."

Kakeh's Log of Contacts, dated May 27, 2005 (Ex. 47).

*Significance*: **Even Plaintiff's citations to his own self-serving Note and Log of Contacts do not contain any discussion that Eboda discussed the alleged fraud, waste, and abuse with Defendant. Plaintiff's citation to the record is thus inaccurate and misleading in that it attempts to speculate on the topics Eboda discussed with Defendant in this February meeting.** |
| 12 | "Shears, Mack and Jennings knew that Plaintiff shared financial statements with Eboda that showed a sizable deficit and a desire in the part of Defendant to improperly charge non-program related expenses to the CSBG contract." | No citation to the record until three sentences later. | *Significance*:  **None of Plaintiff's citations ever express a "desire" of Defendant's to improperly charge non-program related expenses to the CSBG contract.** |

| Page of Pl.'s Opp'n | Pl.'s Assertion in His Opp'n | Pl.'s Alleged Support for Statement of Material Facts and Genuine Issues ("SOF") | Actual Statements From Record |
|---|---|---|---|
| 13 | "Plaintiff also made protected disclosures directly to Defendant's management, of which Defendant was aware. These disclosures were made to…Roberson…" | SOF ¶¶ 73, 75 | Q:  Once Mr. Kakeh told you all this about the financial situation?<br>A:  That was after March 11, the whole world knew, The Washington Post and everybody.<br><br>Roberson Dep. at 30: 6 – 9.<br><br>**Significance: Plaintiff's memorandum to Roberson was sent on April 1, 2004.  Any discussions Plaintiff had with Roberson about Defendant's financial situation came after the matter became public knowledge because of the Washington Post article. Plaintiff cannot point to any discussions with Roberson before March 11, 2004.** |
| 13 | "Further, Eboda, testified that he reported to Jones…that Plaintiff had made protected disclosures to him." | SOF ¶¶ 72, 73 (Jones Dep. at 10-12) | Q:  Before you took the job, what were you told about UPO?<br>A:  Before I took the job, I was told there had been alleged improprieties on behalf of the executive management and there were articles in the Washington Post.  And prior to coming, Dr. Eboda e-mailed me the preliminary draft report of the findings from their review.<br>Q:  So did you have a basic understanding of, before you took the job, of what the alleged improprieties were?<br>A:  Yes.<br>Q:  Did you have any understanding of the involvement of Ben Jennings in those alleged improprieties?<br>A:  Only what I read in the papers.<br>Q:  So did you read an article before or after you found out about it?<br>A:  Actually, I read the article the day before Dr. Eboda called me.<br><br>Jones Dep. at 11:17 – 12:15. |

| Page of Pl.'s Opp'n | Pl.'s Assertion in His Opp'n | Pl.'s Alleged Support for Statement of Material Facts and Genuine Issues ("SOF") | Actual Statements From Record |
|---|---|---|---|
| | | | *Significance*: **Jones' testimony does not indicate that Eboda disclosed any alleged protected disclosures by Plaintiff. Jones only testified that he had knowledge of alleged improprieties which came through Eboda's report. The report did not identify Plaintiff in any way.** |
| 13 | "Further, Eboda, testified that he reported to Jones and Alex[i]s Roberson, that Plaintiff had made protected disclosures to him. In fact, in Eboda's mind, the fact that the Plaintiff had made protected disclosures was common knowledge at Defendant by March, 2004." | SOF ¶¶ 72, 73 (Eboda Dep. at 91-94, 98) | Q: At that time, is it fair to say, at that time, based on your conversations with the board, Mr. Jennings, Ms. Mack, and Ms. Shears, that they understood that the source of your information, in part, at least, was Mr. Kakeh? <br> A: I think it – everything pointed to him. I know at some point later, I disclosed the fact he was cooperating and being helpful to us. I think I may have done that months later when the new management team was formed. <br><br> Eboda Dep. at 91:13 – 92:1. <br><br> Q: When did you indicate to new management what month of year, that Mr. Kakeh had been cooperating with you? <br> A: …I believe I disclosed to at least one member of that team…Alexis Rober[]son, that Mr. Kakeh had been a highly valuable resource to us and I encouraged her to have a meeting with him and more cooperation or information from him. <br><br> Eboda Dep. at 92:2 - 17. <br><br> Q: What did you say to Dana Jones about Mr. Kakeh's cooperation with you? <br> A: I said that we appreciated it and that it was – we found it highly relevant. <br><br> Eboda Dep. at 98:18 – 21. <br><br> *Significance*: **Eboda's testimony only indicates Plaintiff's helpfulness and cooperation, it does not indicate any protected disclosures by Plaintiff.** |

| Page of Pl.'s Opp'n | Pl.'s Assertion in His Opp'n | Pl.'s Alleged Support for Statement of Material Facts and Genuine Issues ("SOF") | Actual Statements From Record |
|---|---|---|---|
| | | | **Plaintiff confuses his cooperation with protected disclosures, which are not one and the same thing.** |
| 13 | "On April 5, 2004, Plaintiff met with Jones, Roberson, and Eboda and during the meeting, Eboda openly identified Plaintiff as having assisted his investigation through protected disclosures. Eboda made no secret of the fact that Kakeh and Eboda had been clandestinely meeting." | SOF ¶ 78 | *Significance:* **Eboda's testimony only mentions Plaintiff's helpfulness. Further, there is no testimony from Eboda containing any discussion of "protected disclosures" or "clandestine meetings."** |
| 33 | "Eboda directly disclosed Plaintiff's protected activities to Defendant's Board and senior management." | SOF ¶ 44 | *Significance:* **Plaintiff only relies on citations to his own deposition. However, none of Plaintiff's citations within his own deposition even remotely address Eboda disclosing any information to Defendant's Board or management.** |

## B.     Plaintiff Is Not Entitled To Additional 56(f) Discovery

Plaintiff claims that he cannot present by affidavit the "highly dispositive" testimony of

Robert Richardson, Defendant's former Human Resources Director. *See* Pl.'s Mem. of P. & A.

in Opp'n to Def.'s Mot. for Summ. J. ("Opposition") at 3. Based on Plaintiff's perception that

Richardson would be able to provide information "necessary to legitimately decide the merits of

Defendant's motion for summary judgment," Plaintiff now asks the Court to reopen discovery and allow for Richardson's deposition. *See id.* Plaintiff's request to reopen discovery is merely a last-minute attempt to find support for his claims, a purpose not intended for Rule 56(f). *See Cotton v. Washington Metro. Area Transit Auth.*, No. 01-0801, 2004 U.S. Dist. LEXIS 3829, at *36 (D.D.C. Mar. 3, 2004) (allowing 56(f) discovery when party failed to take advantage of available discovery mechanisms would be an improper authorization of a "fishing expedition"); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1116 (Fed. Cir. 2000) (improper to use 56(f) as a "fishing expedition" to oppose summary judgment). Contrary to Plaintiff's assertions, Plaintiff is not entitled to additional discovery because he has been unnecessarily dilatory in his request to take the deposition of Richardson.

As Plaintiff identified in his own Opposition, "the purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *See* Opp'n at 2; *Bancoult v. McNamara*, 217 F.R.D. 280, 282 (D.D.C. 2003) (citations omitted). Plaintiff had every opportunity to fully conduct complete discovery as discovery began back in August of 2005, and the parties have been granted extensions of discovery on April 3, 2006, June 16, 2006, and July 26, 2006. Discovery finally closed on September 22, 2006, which gave Plaintiff over one year to gather any and all information that would be necessary to oppose Defendant's Motion for Summary Judgment.

It is further undisputed that Plaintiff has known of the existence of Richardson and his potentially relevant knowledge from the very beginning of this matter. On December 23, 2005, Defendant initially disclosed Richardson as someone with personal knowledge of the facts in this matter in its Response to Plaintiff's Interrogatory No. 2. *See* Exhibit 1 (Def.'s Resp. & Objection

to Pl.'s First & Second Sets of Interrogs.). Richardson was also an area of inquiry during the

deposition of Dana Jones on February 27, 2006, and identified as the former Human Resources

Director, and more significantly, as the individual who decided to place Plaintiff in Group VI for

the RIF. *See* Exhibit 2 (Dep. of Dana Jones at 18:2-3, 79:3-13). Richardson was again identified

in the deposition of Monica Beckham, who testified that Richardson would need to be asked

questions posed to her regarding the RIF notices, and identified a fourth time in Defendant's

30(b)(6) deposition on August 8, 2006. *See* Exhibit 3 (Dep. of Monica Scott Beckham at 41:9-

13, 56:1-17); Exhibit 4 (30(b)(6) Dep. of Dana Jones at 37:7-21, 38-40). Despite Plaintiff's

continued knowledge of Richardson and his potentially relevant testimony, Plaintiff elected not

to depose him during the extended period of discovery, even after Plaintiff was granted an

additional three depositions by leave of Court on May 24, 2006.

　　　Given Plaintiff's unjustified delay in seeking the testimony of Richardson, his belief that

the materiality of the deposition is simply insufficient to justify further 56(f) discovery. *See*

*Rowland v. Walker*, 245 F. Supp. 2d 136, 139-140 (D.D.C. 2003) ("it cannot possibly be the law

that a party can forego seeking information by discovery and, when confronted by a motion for

summary judgment, seek discovery it never sought in the first place to defeat the motion"); *Ikossi*

*v. England*, 406 F. Supp. 2d 23, 36-37 (D.D.C. 2005) (56(f) request for additional depositions

was denied where plaintiff had numerous opportunities to conduct depositions but failed to do

so). Courts have denied 56(f) requests even when the discovery sought was admittedly material.

*See Moore v. City of Chicago*, No. 99-C-5145, 2003 U.S. Dist. LEXIS 21168, at *2-3 (N.D. Ill.

Nov. 24, 2003). In *Moore*, the plaintiff failed to depose individuals he was aware of personally

and who were disclosed to him through discovery. The court denied Moore's 56(f) request

because although Plaintiff might not be able to fairly respond to the summary judgment motion

without the requested depositions, plaintiff was only in that position because of his failure to timely depose the individuals. *See id.* Plaintiff has similarly failed to diligently pursue the discovery of evidence he knew from the beginning and throughout the discovery period and in such a case, Plaintiff's 56(f) motion should be denied. *See Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.D.C. 1995) ("56(f) is not properly invoked to relieve counsel's lack of diligence.").

### C.    Plaintiff's Disputes Over Privilege Are Untimely And Should Be Denied

In his Opposition, Plaintiff asserts that he cannot present facts which "Defendant has improperly refused to divulge on the basis of purported privilege." *See* Opp'n at 4.[1]  By claiming that Defendant has withheld documents on "defective privilege claims," Plaintiff has essentially imbedded a motion to compel within his Opposition to Plaintiff's Motion for Summary Judgment.  Such a request is untimely as Plaintiff had numerous opportunities to raise any objections over Defendant's assertion of privilege, but failed to do so.  Plaintiff should have raised any alleged deficiencies at the time the Privilege Logs were produced, not over a year later and in conjunction with Plaintiff's Opposition to Defendant's Motion for Summary Judgment. *See Ben-Kotel v. Howard Univ.*, 156 F. Supp. 2d 8, 19 (D.D.C. 2001) (last-minute discovery disputes to avoid summary judgment are improper); *Williams v. Glickman,* Civ. No. 95-1149, 1996 U.S. Dist. LEXIS 6801, at *3-4 (D.D.C. May 17, 1996) (motion to compel filed after close of discovery and four months after knowing of potential discovery dispute was denied as untimely).

---

[1] Plaintiff has also made issue of the manner in which Defendant has redacted text from produced documents, but nothing in the Federal Rules or caselaw establishes that Defendant's redactions were improper.  However, in the spirit of cooperation, Defendant produced a revised privilege log to Plaintiff on February 19, 2007, which addressed many of Plaintiff's concerns.

Defendant's initial Privilege Log, which Plaintiff claims contained "deficiencies," was provided to Plaintiff as far back as February 10, 2006. Plaintiff had every opportunity to notify opposing counsel of any perceived deficiencies or asserted waiver of applicable privileges at the time the log was produced. However, Plaintiff never raised any issues with Defendant's privilege log at that time and Defendant was never given an opportunity to see whether any corrections needed to be made.

By order of the Court, Plaintiff filed his Statement Regarding Discovery Disputes (Docket No. 34) on March 16, 2006. While he asserted problems with certain aspects of Defendant's document production, at no point did Plaintiff raise any issues related to privilege or the privilege log which was provided to him a month earlier. Plaintiff had an additional opportunity to bring privilege issues to the Court's attention during a discovery telephone conference with Chambers on March 17, 2006, but again failed to do so. Even after discovery closed, additional and revised Privilege Logs were provided to Plaintiff on November 28, 2006, and January 23, 2007. Again, Plaintiff had every opportunity to raise any objections to the log itself or any of the documents Defendant claimed were privileged, but Plaintiff similarly failed to apprise Defendant of any perceived problems. Plaintiff's untimeliness in addressing privileges should not be cured at this late stage of the case and his request should be denied.

**D.    As A Matter Of Law, Defendant Is Entitled To Summary Judgment On Plaintiff's Claim Under The D.C. Whistleblower Protection Act**[2]

As demonstrated below, contrary to Plaintiff's contentions, the record does not show that he made disclosures to public bodies or his supervisors which are protected under the D.C.

---

[2] At the outset, UPO would like to correct Plaintiff's apparent misperception. UPO does not concede that Plaintiff made "protected disclosures" or refused to comply with an alleged "illegal order." Rather, UPO contends that, even if Plaintiff could prove that he made protected disclosures or refused to comply with an illegal order, it is indisputable that that did not lead to his termination from UPO. Further, contrary to Plaintiff's assertion, it is proper to apply the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to the D.C. Whistleblower Protection Act. *Anderson v. Ramsey*, No. 04-56, 2006 U.S. Dist. LEXIS 21034, at *39 (D.D.C. 2006) (Kessler, J.); *Crawford v. Dist. of Columbia*, 891 A.2d 216, 221 (D.C. 2006).

Whistleblower Protection Act and that those alleged protected disclosures contributed to UPO's decision to terminate his employment. Even if UPO had been aware of Plaintiff's alleged protected disclosures, which it strenuously denies, it is indisputable that UPO would have made the same decision to outsource the Finance Office's management function, and consequently terminate Plaintiff's employment.

        1.    <u>Plaintiff Has Failed To Demonstrate That He Made Protected Disclosures</u>

Plaintiff asserts that he made protected disclosures to public bodies and his supervisors. Contrary to Plaintiff's assertion, an employee who merely is performing his normal duties and expressing disagreement does not make disclosures which are protected under the D.C. Whistleblower Protection Act. The employee must engage in conduct which would lead the employer to rationally believe that the employer would be sanctioned. *Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341, 1346-53 (Fed. Cir. 2001).

Plaintiff contends that he began making "protected disclosures" to Benjamin Jennings in 2001 when he allegedly objected to misappropriations relating to the CSBG grant. Pl.'s SOF at ¶ 27. Complaints to a supervisor about a supervisor's conduct do not constitute a "protected disclosure." *Id.* at 1348-49. Plaintiff further alleges that he made protected disclosures in multiple memoranda in October 2003. Pl.'s SOF at ¶ 40. A close examination of these memoranda show that Plaintiff was merely voicing his dissatisfaction with his supervisor's decision regarding the operations of the Finance Office. These memoranda are silent regarding gross mismanagement, waste and abuse. Nor is there evidence that Plaintiff made disclosures that would have led his supervisors to believe that they might be subjected to discipline. *Huffman* at 1346-53. An employee's disagreement with supervisors over job-related activities are a normal part of a job, and do not constitute "protected disclosures."

> Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision.

*Willis v. Dep't of Agriculture*, 141 F.3d 1139, 1143 (Fed. Cir. 1998). Accordingly, as a matter of law, Plaintiff did not make protected disclosures to Jennings or any other supervisors or managers at UPO.

Further he alleges that in April 2004 he made "protected disclosures" to Alexis Roberson, the head of the Ad Hoc Management Committee, and Jones, the Interim Executive Director, in memoranda and during a meeting. Pl.'s SOF at ¶¶ 75-76, 78. Plaintiff fails to provide any evidence that the information which he shared led them to believe that he was disclosing gross mismanagement, waste or abuse which was not already known as a result of the preliminary report from the D.C. Department of Human Services.

2.  Plaintiff's Conclusory Allegation That He Refused To Comply With An Illegal Order Is Insufficient To Survive Summary Judgment

Plaintiff contends that his refusal to change financial statements was a refusal to comply with an illegal order. Plaintiff fails to provide any particularity regarding the alleged illegality of Mack's request. *Zirkle v. Dist. of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003).

3.  Plaintiff Has Failed To Demonstrate That His Alleged Protected Disclosures And/Or Refusal To Comply With An Unlawful Order Were A Contributing Factor In UPO's Decision To Outsource the Management In The Finance Office And Eliminate The Management Positions

Assuming Plaintiff had a reasonable belief that there was evidence of gross mismanagement, waste and abuse at UPO and made "protected disclosures," and he refused to comply with an illegal order, which UPO denies, Plaintiff has failed to demonstrate that the alleged disclosures were a contributing factor in UPO's decision to terminate his employment when the management positions in the Finance Office were outsourced to Walker & Company

LLP in June 2004.  The record is devoid of any direct or circumstantial evidence that Jones, who recommended the outsourcing of the Finance Office management, or any member of the Board of Trustees who approved the decision to outsource, knew that Plaintiff was making protected disclosures or had refused to comply with an alleged illegal order.  Instead, the record shows that Plaintiff, motivated by self-preservation, took advantage of the prescheduled DHS monitoring review to paint himself as indispensable to UPO.

Plaintiff relies solely on conclusory and unsubstantiated allegations and conjecture regarding UPO's alleged awareness of his alleged whistleblowing conduct which are insufficient to defeat summary judgment.  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Plaintiff contends that he made protected disclosures to Tunde Eboda, Sam Gawad, Kenneth Marty and FBI Agent Duncan, agents of public bodies, and his supervisors, Dana Jones, Gladys Mack, Sheila Shears, Benjamin Jennings, Monica Scott Beckham, Alexis Roberson and various other members of UPO's Board and senior staff.  Yet, none of those witnesses have provided sworn testimony that they were aware of the protected disclosures or informed UPO that Plaintiff had made such protected disclosures.[3]

A review of the record demonstrates the extent to which Plaintiff has misconstrued the facts of this case in a futile attempt to prove that his alleged "protected disclosures" were a contributing factor to the decision to terminate his employment pursuant to the RIF:

a.      Plaintiff contends that he made protected disclosures to Jennings, but it is undisputed that Jones was not involved in the decision to outsource the Finance Office managers and terminate Plaintiff's employment.  It is undisputed that Jones did not become an employee of

---

[3] Noticeably absent from the record is sworn testimony from Gawad, Marty, Duncan, Jennings or members of the Board of Trustees.

UPO and the Interim Executive Director until April 5, 2004, after Jennings was removed as the

Executive Director on March 11, 2004.  Pl.'s SOF at ¶¶ 69-72.  There is no evidence that Jones

had any communications with Jennings regarding Plaintiff, much less the information which

Plaintiff shared with Eboda.

       b.      Nowhere in the record does it indicate that Eboda informed Jones or the Board

that he "had been clandestinely meeting" with Plaintiff.  Eboda testified:

> Q:    Was it known at UPO, at any time, that he met with you in
> early February and/or provided documents and other information
> to you, at that time?
>
> A:    I did not disclose that.  I don't know if anybody else was
> aware of that.

*See* Exhibit 5 (Dep. of Tunde Eboda 97:9-14; 98:4-99:6).  All UPO knew, according to Eboda,

was that Plaintiff had provided him financial documents.  *See id.* (Dep. of Tunde Eboda at 97:15-

18).

       c.      The record does not indicate that Eboda reported to Jones and Roberson that

Plaintiff had made protected disclosures to him.  His testimony was:

> A:    I believe that I disclosed to at least one member of that
> team, the co chair of the ad hoc management team, Ms. Alexis
> Roberson, that Plaintiff had been a highly valuable resource to us
> and I encouraged her to have meeting with him and get more
> cooperation or information from him.
>
>                   *       *       *
>
> Q:    They were aware of the fact you had gotten some
> documents from Mr. Amin?
>
> A:    Prior to my visit?
>
> Q:    Yes.
>
> A.    I did not disclose that, but I did disclose that I had talked to
> him, the initial status, I think the time I may have been completely

open about Mr. Amin was first when the old management was no longer at the helm of the organization. The ad hoc management was there and when the interim executive director was hired at the beginning of April, I also disclosed it.

Q:    You mean Dana Jones?

A:    Yes.

Q:    What did you say to Dana Jones about Mr. Kakeh's cooperation with you?

A:    I said that we appreciated it and that it was – we found it highly relevant.

Q.    Did you disclose to him Mr. Kakeh had cooperated with you in early February by providing you information?

A:    Nothing specific other than he was somebody we talked to and I encouraged him to talk to Mr. Kakeh.

*See id.* (Dep. of Tunde Eboda at 92:12-17; 98:4-99:6). Eboda, not Plaintiff, has the personal knowledge regarding whether Eboda disclosed to Jones or the Board that he had met clandestinely with Plaintiff or disclosed that Plaintiff had shared with him information about gross mismanagement, waste or abuse. Eboda did not disclose such knowledge.

Further, Eboda's conjecture that UPO knew Plaintiff had made protected disclosures is not enough. Only Jones or the Board have the personal knowledge regarding whether they had concluded that Plaintiff had made protected disclosures to public bodies. Finally, there is no evidence that Jones relied on Shears or Mack in making his recommendation that UPO outsource the management of the Finance Office, nor is there evidence that UPO was on notice that Plaintiff was making protected disclosures.

4.    Assuming UPO Knew That Plaintiff Had Made Protected Disclosures, The Undisputed Facts Show That UPO Would Have Terminated Plaintiff's Position Even Had He Not Allegedly Made Protected Disclosures

The record is clear that Plaintiff's termination was an inevitable result of the reorganization prompted by DHS's and DHHS's monitoring reviews.  Plaintiff does not dispute that DHS's draft preliminary report identified numerous deficiencies in UPO's financial system. Plaintiff also does not dispute that those findings, compounded with DHHS's grantee deficiency letter, made it critical for UPO to reevaluate its Finance Office and to implement an aggressive plan to rectify the shortcomings.

Plaintiff does not dispute that Jones and the Board made the decision to abolish the management positions in the Finance Office pursuant to UPO's RIF procedures.  Rather, he attempts to taint the process by accusing Shears and Mack of influencing the decisionmaking process.  His unsubstantiated allegations that Shears and Mack harbored animus towards him because of alleged protected disclosures and his refusal to comply with an illegal order, and that they influenced Jones' recommendation to outsource the Finance Office, are not enough to survive summary judgment.  Further, the record fails to show that the Board harbored any animus towards Plaintiff or that Plaintiff received harsher treatment than Nona McLean, the other Finance Office manager whose employment was terminated.

**E.    As A Matter Of Law, UPO Has Demonstrated That It Did Not Terminate Plaintiff Because Of His DCOHR Complaint**

In an effort to distract the Court from the record which overwhelmingly shows that UPO terminated Plaintiff for a legitimate, nonretaliatory reason, Plaintiff's opposition pumps out a smoke screen of hyperbolic possibilities unsupported by anything other than his own supposition.  As the Court is well aware, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). No such evidence exists here, and summary judgment in UPO's favor is appropriate.

The D.C. Circuit has recognized that courts "may not 'second-guess' an employer's personnel decision absent demonstrably discriminatory motive." *Kilpatrick v. Paige*, 193 F. Supp. 2d 145, 156 (D.D.C. 2002) (Urbina, J.) (quoting *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). UPO has demonstrated the impossibility of Plaintiff's claim that his employment was terminated pursuant to a RIF because he filed a complaint of employment discrimination. His termination was part of a RIF which was administered in accordance with UPO's objective RIF procedures. Plaintiff has furnished no legal or rational basis for this Court to interfere with that decision. To permit a case to proceed to trial on nothing more than Plaintiff's subjective beliefs and his desperate wish that a jury disbelieve incontrovertible evidence and UPO's witnesses is inconsistent with governing law and a waste of judicial resources.

Once one wades through Plaintiff's profusion of conclusory allegations and conjecture regarding the alleged inconsistencies in the RIF process, it becomes clear that Plaintiff mixes apples and oranges in a futile attempt to satisfy his burden of proving pretext. The record demonstrates that Plaintiff's termination arose out of two distinct decisionmaking processes. Therefore, regardless of whether UPO or Walker & Company decided to retain Quashie, Plaintiff's employment would have been terminated under UPO's neutral RIF policy.

First, the undisputed facts show that only after weighing the options for UPO to improve its financial controls to the satisfaction of the regulators and assessing various proposals to

provide outsourced accounting services, Jones recommended to the Board that the management of the Finance Office be outsourced to Walker & Company. There is no evidence in the record that Jones suggested this tact because Plaintiff had complained about discrimination. Second, the record shows that once the Board approved the outsourcing of the Finance Office, Human Resources set in motion the RIF process by preparing the retention register. There is no evidence that Human Resources was involved in the awarding of the contract to Walker & Company. There also is no evidence that Human Resources was aware of discussions between UPO and Walker & Company regarding the restructuring of the Finance Office. There is no evidence that Jones participated in the preparation of the retention register.

Resting on unsubstantiated conclusory allegations, Plaintiff contends that the RIF was not executed in accordance with UPO's past practice. He contends that Davidson Quashie[4] and he should not have been in the same job group. Pl.'s SOF at ¶ 117. He also disagrees with UPO effecting the RIF based upon Quashie's acting capacity. Plaintiff, however, provides no admissible evidence to support this assertion. Plaintiff's disagreement with the job groupings, in and of itself, is not sufficient to defeat summary judgment.

Unable to avoid the fact that only one out of the four managers in the Finance Office impacted by the RIF had his position abolished and was reassigned to a new position in the reorganized Finance Office, Plaintiff strains to try to show that a retaliatory motive resulted in the termination of his employment and Nona McLean's. Relying on rumors and conjecture, Plaintiff ascribes a retaliatory motive to McLean's termination based upon an alleged relationship with Jennings, UPO's former Executive Director who was terminated as a result of the highly critical DHS preliminary report. Even if it were true that UPO wanted to get rid of

---

[4] Plaintiff contends that Quashie bumped him. The record, however, fails to show that Quashie replaced Plaintiff as the Controller. In fact, there was no Controller in the reorganized Finance Office. *See* Exhibit 6 (Dep. of Roy Lane at 40:15-18).

McLean because of her relationship with the Executive Director, and UPO denies that motivation, such conduct is not unlawful under the DCHRA.  Moreover, it is indisputable that the RIF also negatively impacted William Isaac.  The record shows that he declined the offer of a position in the reorganized Finance Office because it would have been a demotion.  There is no evidence in the record that UPO sought to demote Isaac in retaliation for engaging in protected activity under the DCHRA.

F.    **Plaintiff's Conclusory Allegations And Speculation Are Not Sufficient For Plaintiff To Defeat Summary Judgment On His Claims Under the D.C. And Federal False Claims Acts**

Once again, Plaintiff relies on conclusory allegations and speculation to try to prove that UPO had knowledge of his "protected activity."[5]  While there is no "magic word" for alerting an employer to the fact that an employee is cooperating in an investigation of alleged false claims, there must be sufficient information to put the employer on notice.  *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.D.C. 1998) ("nonetheless, a plaintiff still must show that his employer was aware of his protected activity.  Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement – just as it does not constitute protected activity in the first place.").  Unless the employer is aware that the employee is investigating fraud, the employer cannot possess the retaliatory intent necessary to establish a violation of the False Claims Act.  *See id.* at 744.  There is no such evidence in the record.

For example, Plaintiff provides no admissible evidence that he told Monica Scott Beckham and Gladys Mack that he would seek assistance from federal or local authorities if he was compelled to change the financial statements.  Further, Plaintiff relies on testimony of Eboda

---

[5] Contrary to Plaintiff's allegations, there is no evidence in the record that UPO made false claims.  Plaintiff himself does not cite to the record to support his conclusory allegations that UPO made false claims.

to support his allegation that UPO had actual or constructive knowledge of his cooperation in an investigation of false claims. As the testimony set forth above clearly shows, Eboda never provided any information to UPO from which the decisionmakers could infer that Plaintiff was disclosing alleged fraudulent conduct at UPO.

Plaintiff's chastising of UPO for relying on the investigation of the Inspectors General is unwarranted. UPO does not concede by observing Plaintiff with the Inspectors General that it learned he was acting in furtherance of an investigation of false claims. Rather, other than the investigation by the Inspectors General, the record lacks evidence of any other event which arguably made UPO aware that it was or could be under investigation for fraud. Even Eboda testified that his office did not investigate gross mismanagement, waste, abuse or fraud.

**G.    Plaintiff's Wrongful Discharge Claim Is Barred By Statutory Remedies**

For the reasons set forth in UPO's Memorandum in Support of it Motion for Summary Judgment (at 25-27), Plaintiff's wrongful discharge claim is barred by statutory remedies. *See e.g., Nolting v. Nat'l Capital Group*, 621 A.2d 1387, 1389 (D.C. 1993) (declining to recognize a public policy tort cause of action where statutory provisions contained specific remedy to compensate allegedly aggrieved individual). Indeed, Plaintiff concedes that his wrongful termination claim is preempted by the D.C. Whistleblower Protection Act, Opp'n at 46, making dismissal of Plaintiff's wrongful termination claim appropriate. Moreover, Plaintiff claims that he was subjected to the RIF because of his alleged protected disclosures *and* because UPO allegedly "requested that Plaintiff produce a fraudulent financial statement" and he refused to prepare such a statement, Pl.'s Second Am. Compl. at ¶ 49, in violation of the D.C. Whistleblower Protection Act and the False Claims Acts. Since Plaintiff has not alleged that the *sole* reason for his discharge was his alleged refusal to violate the law, his attempt to advance a

tort remedy based on a public policy exception to the employment-at-will doctrine must fail. *Mastrangelo v. Nat'l Passenger R.R. Corp.*, Civ. No. 01-0582 (TFH), 2006 U.S. Dist. LEXIS 8168, at *11 (D.D.C. Feb. 22, 2006).

Nothing in Plaintiff's Opposition changes the fact that the D.C. Whistleblower Protection Act and the False Claims Acts provide specific remedies for Plaintiff's alleged harms. Since Plaintiff has the Acts available as a remedy to him, and as set forth above, his wrongful discharge claim fails as a matter of law.[6]

## II.    CONCLUSION

Despite Plaintiff's best efforts to detract from the material issues in this case, UPO is entitled to judgment as a matter of law. Plaintiff cannot support a claim that but for alleged protected disclosures or refusal to comply with an illegal order UPO would not have terminated his employment. There is no direct evidence that UPO retaliated against Plaintiff because he complained about discriminatory conduct. There also is absolutely no admissible circumstantial evidence that UPO's legitimate reason for terminating his employment was pretextual. Plaintiff also fails to state a wrongful discharge claim under D.C. law. As such, there are no genuine issues of material fact in dispute, and UPO is entitled to summary judgment.

---

[6] *Nolting* at 1389; *see also, e.g., Cooke v. Catholic Univ. of Am.*, Civ. No. 97-2555 (LFO), 1998 U.S. Dist. LEXIS 18567, at *13-14 (D.D.C. Nov. 20, 1998) (granting summary judgment to employer on wrongful discharge claim because claim was merely a tort claim seeking to subvert the exclusive statutory enforcement mechanism underlying the employee's discharge); *Lawson v. South Carolina Dep't of Corr.*, 532 S.E.2d 259, 261 (S.C. 2000) ("[W]hen a statute creates a substantive right (i.e. the Whistleblower statute) and provides a remedy for infringement of that right, the plaintiff is limited to that statutory remedy. Since appellant alleges a wrongful discharge only on the ground of his whistleblowing, he is limited to his remedy under the Whistleblower Act.") (citations omitted); *DeMuro v. Philadelphia Hous. Auth.*, No. 98-3137, 1998 U.S. Dist. LEXIS 20412, at *17 (E.D. Pa. Dec. 22, 1998) (holding "it is well-settled that the courts will not entertain a separate common law action for wrongful discharge where specific statutory remedies are available" and dismissing wrongful discharge claim because it was preempted by state whistle-blowing statute).

Dated: April 19, 2007                    Respectfully submitted,


                                         By:____/s/ Alison N. Davis_____
                                             Alison N. Davis, DC Bar No. 429700
                                             Kevin M. Kraham, DC Bar No. 459077
                                             David A. Rosenberg, DC Bar No. 433405
                                             FORD & HARRISON LLP
                                             1300 19th Street, N.W., Suite 700
                                             Washington, DC  20036
                                             Tel  (202) 719-2000
                                             Fax  (202) 719-2077

                                             Attorneys for Defendant UNITED PLANNING
                                             ORGANIZATION, INC.


DC:65682.2