UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMED AMIN KAKEH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1271 (GK) |
| | ) | |
| UNITED PLANNING | ) | |
| ORGANIZATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Mohammed Amin Kakeh brings this whistle-blowing case against his former employer, the United Planning Organization, Inc. ("UPO"). Plaintiff alleges violations of the District of Columbia Whistleblower Protection Act ("WPA"), D.C. Code §§ 2-223.01 et seq. (Count I); wrongful discharge under District of Columbia common law (Count II); retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.61 (Count III); retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (Count IV); and retaliation in violation of the District of Columbia False Claims Act ("DCFCA"), D.C. Code § 2-308.16 (Count V). This matter is before the Court on Defendant's Motion for Summary Judgment [**Dkt. No. 73**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant's Motion for Summary Judgment is **granted** as to Count II and **denied** as to Counts I, III, IV, and V.

## I. BACKGROUND[1]

The United Planning Organization ("UPO") is a private, non-profit corporation that addresses issues of poverty in the District of Columbia. It receives funding from both the federal and District of Columbia governments, including Community Services Block Grants ("CSBGs"), which are federal anti-poverty block grants administered by the District of Columbia Department of Human Services ("DHS").

Plaintiff was hired as UPO's Controller in 1998 as an at-will employee. In this role, he was responsible for managing UPO's financial operations and its audit and accounting functions. Plaintiff initially reported to Gladys Mack, who was UPO's Deputy Executive Director at the time. In April 2003, Plaintiff began to report to UPO's newly appointed Chief Financial Officer, Sheila Shears. At this time, Benjamin Jennings was UPO's Executive Director.

In October 2003, Plaintiff sent two memoranda to Jennings complaining that his role had changed following the hiring of Shears and accusing Shears and Mack of harassment and retaliation. UPO treated the memoranda as formal complaints of discrimination, investigated these allegations, and determined them to be baseless.

---

[1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).

In early 2004, DHS commenced a routine monitoring review of UPO's finances. The monitoring review formally commenced on February 19, 2004, when Tunde Eboda, CSBG Program Manager at DHS, met with Jennings, Mack, and Shears. Plaintiff did not attend this meeting. During the review, DHS requested financial and other information from UPO and met with a number of UPO employees, including Plaintiff.

A draft preliminary report of the DHS monitoring review, submitted to UPO's Board of Trustees on March 11, 2004, revealed a number of financial irregularities at UPO. The report noted, among other things, that UPO could not generate timely financial statements, UPO management had circumvented cash disbursement procedures, large amounts of cash disbursements were unsupported, and UPO's liquidity situation had deteriorated. The report concluded that UPO's financial management system did "not meet Federal grant standards." Declaration of Gladys Mack, Nov. 27, 2006, Ex. B (FY 2004 CSBG On-site Monitoring Review Draft Preliminary Report) at 2. As a result of this draft report, the UPO Board on March 11, 2004 both suspended Jennings with pay and appointed Mack as the acting Executive Director. On April 5, 2004, Dana Jones was appointed as UPO's new Executive Director.

Plaintiff alleges that he became aware of this financial mismanagement in 2003. Indeed, Plaintiff first met with Eboda on February 5, 2004, prior to Eboda's meeting with Jennings, Mack, and

3

Shears, and said that UPO was engaging in fraud, waste, and abuse. Between February and May 2004, Plaintiff had a number of additional meetings with Eboda, as well as meetings with other officials from DHS (including from the DHS Inspector General's Office), the United States Department of Health and Human Services ("HHS") Inspector General's Office, and the United States Department of Justice. The parties dispute whether Eboda ever disclosed to UPO that Plaintiff had met with him outside of the scope of the formal DHS monitoring review.

Shortly after DHS disclosed the preliminary results of its monitoring review to UPO's Board on March 11, 2004, HHS began its own review of UPO's Head Start program. As a result of this review, HHS sent a letter to UPO on April 20, 2004 informing UPO of deficiencies in its program governance and fiscal management, and designated UPO as a "high-risk grantee." Deposition of Dana Jones, Feb. 27, 2006, Ex. 13 (Apr. 20, 2004 Correspondence from Quinetta Penn to Russell Simmons). UPO was required to correct these deficiencies within one year or risk losing its Head Start grant from HHS.

On March 3, 2004 and again on March 25, 2004, Gladys Mack, who was acting Executive Director of UPO as of March 11, 2004, asked Plaintiff to make changes to a UPO financial statement. The parties strenuously disagree about the nature of, and motivation behind, these requested changes. Plaintiff argues he was ordered

to make the changes to fraudulently conceal evidence of fraud, waste, and abuse. According to UPO's version of events, Mack asked Plaintiff to complete UPO's financial statements so that UPO's outside accountants could complete their audit of UPO's finances. It is undisputed that, for whatever reason, Plaintiff refused to comply, and the financial statements were completed without his assistance. There is no evidence that Plaintiff was told he would lose his job if he did not comply with Mack's requests.

On March 31, 2004, Plaintiff filed a discrimination claim with the District of Columbia Office of Human Rights alleging that UPO discriminated against him on the basis of his race (Caucasian), color (light-skinned), gender (male), national origin (Syrian), and religion (Muslim). UPO was aware of the claim and it was discussed by the UPO's Ad Hoc Management Committee on April 20, 2004.

In April 2004, Plaintiff submitted a series of memoranda to UPO management in which he blamed Shears, Mack, and Jennings for the financial mismanagement that had occurred at UPO and denied that he was dragging his feet in producing financial statements. He also attempted to deflect criticism for UPO's problems away from the Finance Office he headed. The memoranda did not reveal any specific instances of fraud or financial mismanagement.

In April 2004, UPO began making preparations to outsource the operations of the Finance Office and begin a reduction-in-force of the Finance Office personnel. On April 15, 2004, UPO's Human

5

Resources Office sent a retention register for all Finance Office personnel to UPO's General Counsel. A few days later, on April 20, 2004, the UPO's Ad Hoc Management Committee voted to recommend to the full UPO Board that the Finance Office be outsourced and that a reduction-in-force be implemented. The Board formally adopted the proposal on April 27, 2004.

Employees in the Finance Office expressed their opposition to the reduction-in-force, and on May 6, 2004, the Board decided to outsource only the management positions within the Finance Office. Following the Board's decision, UPO sent requests for proposals to a number of outside accounting firms. UPO ultimately selected Walker & Company, which proposed replacing the Finance Office's current management with three Walker employees and an Accounting Director drawn from UPO's existing workforce.

UPO's Human Resources Office had an existing reduction-in-force policy that called for employees to be grouped according to job function and pay grade. Those employees with the greatest seniority were ranked at the top of their grouping. UPO claims that it followed this policy in conducting the Finance Office reduction-in-force, and the retention groupings were finalized on May 27, 2004 for the four employees who were subject to the reduction-in-force.

Plaintiff was placed in the same grouping with the Deputy Controller, Davidson Quashie, because they had similar job

functions. Quashie had worked for UPO for almost thirty years -- compared to approximately six years for Plaintiff--and was therefore ranked ahead of Plaintiff in their grouping. Dana Jones, however, testifying as UPO's corporate designee pursuant to Fed. R. Civ. P. 30(b)(6), stated that Quashie was offered the position because Walker & Company specifically requested him, and not because of the operation of UPO's reduction-in-force policy.

Four existing Finance Office employees were subject to the reduction-in-force: Davidson Quashie, who had the most seniority, was reassigned to the newly created position of Accounting Director; Plaintiff and Facilities Manager Nona McLean were informed on June 2, 2004 that their employment would be terminated as of June 30, 2004; and Senior Auditor William Isaac was offered reassignment to a lower level position, but instead chose to retire.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is

it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, ___ U.S. ___, 127 S. Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Liberty Lobby, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not...to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249. In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of

8

legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255. In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "the Court must draw all reasonable inferences in favor of the non-moving party." Reeves, 530 U.S. at 150. "To survive a motion for summary judgment, the party bearing the burden of proof at trial...must provide evidence showing that there is a triable issue as to an element essential to that party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)." Arrington, 473 F.3d at 335.[2]

**III. ANALYSIS**

    **A.  Plaintiff Is Not Entitled to Additional Discovery**

As an initial matter, Plaintiff argues that summary judgment is premature because he cannot present an affidavit by Robert Richardson, UPO's Human Resources Director. The Court should therefore permit additional discovery pursuant to Fed. R. Civ. P. 56(f), he argues.

Rule 56(f) "provides that a court _may_ deny a motion for summary judgment or order a continuance to permit discovery if the party opposing the motion adequately explains why...it cannot

---

[2] It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different. Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999); Arrington, 473 F.3d at 337.

present by affidavit facts needed to defeat the motion." <u>Strang v. United States Arms Control & Disarmament Agency</u>, 864 F.2d 859, 861 (D.C. Cir. 1989) (emphasis in original). "[T]he purpose of Rule 56(f) is to prevent railroading the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." <u>Bancoult v. McNamara</u>, 217 F.R.D. 280, 282 (D.D.C. 2003) (internal quotation marks omitted). Requests for additional discovery pursuant to Rule 56(f) are routinely granted, but "the rule is not properly invoked to relieve counsel's lack of diligence." <u>Berkeley v. Home Ins. Co.</u>, 68 F.3d 1409, 1414 (D.C. Cir. 1995). Were it otherwise, parties could "belatedly devise[] new theories to delay resolution of long-pending dispositive motions." <u>Id.</u>

Here, Plaintiff had more than ample opportunity to obtain the requested discovery from Richardson, but chose not to do so. Defendant disclosed the existence of Richardson as a witness with personal knowledge of the facts of the case on December 23, 2005, soon after discovery commenced. Despite discovery extensions Plaintiff received on April 3, 2006, June 16, 2006, and July 27, 2006, and repeated references to Richardson in deposition testimony by other witnesses, he made no effort to take Richardson's deposition. Thus, any failure to depose Richardson or obtain his affidavit is entirely the result of Plaintiff's own lack of diligence. "A request to postpone resolution of a motion for

summary judgment when the party opposing the motion has failed to avail himself of discovery to secure the information should be denied." Rowland v. Walker, 245 F. Supp. 2d 136, 140 (D.D.C. 2003).

Plaintiff also argues that Defendant improperly withheld documents based on improper claims of privilege. Defendant's initial privilege logs were produced to Plaintiff in February 2006, and Plaintiff did not object to the claims of privilege contained in those logs until he filed his Opposition to Defendant's Motion for Summary Judgment in February 2007, despite several opportunities to do so, including a discovery dispute conference held by telephone on March 17, 2006. Once again, this late objection reflects a lack of diligence on the part of Plaintiff. Furthermore, Plaintiff has not adequately explained how the purportedly improperly withheld documents are material to Defendant's Motion. Plaintiff has therefore failed to meet his burden under Rule 56(f) to obtain a continuation of discovery.

Accordingly, Plaintiff's request to extend discovery is **denied.**

### B. Summary Judgment Is Granted on Plaintiff's Common Law Wrongful Discharge Claim (Count II)

Under District of Columbia law, an employer may discharge an at-will employee for any reason, or no reason at all. Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991). A "very narrow" exception to the at-will doctrine exists "when the sole

11

reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." Id. at 34. The so-called Adams exception requires "an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing his job." Thigpen v. Greepeace, Inc., 657 A.2d 770, 771 (D.C. 1995). Plaintiff must prove, by a preponderance of the evidence, that this outright refusal was the "sole reason" for his dismissal. Adams, 597 A.2d at 34.

In this case, Plaintiff has not produced any evidence showing that he was presented the "Hobson'[s] choice" of committing an illegal act or losing his job. Mandsager v. Jaquith, 706 A.2d 39, 42 (D.C. 1998). Even assuming that Plaintiff was asked to illegally produce false financial statements, there is no evidence that Plaintiff was faced with such a stark choice. Nor is there any evidence that this refusal was the "sole reason" that Plaintiff lost his position at UPO.

Plaintiff's wrongful discharge claim fails for an additional reason. The Adams exception is itself limited by the doctrine announced in Nolting v. Nat'l Capital Group, 621 A.2d 1387, 1389-90 (D.C. 1993), which holds that even the Adams exception does not apply "where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation." See also Kassem v. Wash. Hosp.

Ctr., ___ F.3d ___, 2008 WL 169784, at *2-3 (D.C. Cir. Jan. 22, 2008).

Plaintiff relies on the WPA, FCA, and DCFCA as the sources of the public policy he contends was violated when he was terminated. However, because each of these statutes provides its own "specific and significant remedy," Plaintiff may not employ the "very narrow" Adams exception. Nolting, 621 A.2d at 1390.

Plaintiff argues that Nolting is inapposite at least with regard to the public policy announced by the DCFCA, because the latter is "not exclusive, and the remedies provided for shall be in addition to any other remedies provided for in any other law or available pursuant to common law." D.C. Code § 2-308.18. Our Court of Appeals recently addressed a very similar argument in Kassem. In that case, the plaintiff brought a wrongful discharge claim under the Adams exception, contending that he was discharged in violation of the public policy set forth in the Energy Reorganization Act, 42 U.S.C. § 5801 et seq. ("ERA"). The plaintiff argued that Nolting did not apply because the ERA provided that the Act "may not be construed to expand, diminish, or otherwise affect any right otherwise available to an employee under Federal or State law to redress the employee's discharge...." Kassem, 2008 WL 169784, at *3 (quoting 42 U.S.C. § 5851(h)).

The Court of Appeals rejected that argument, reasoning that the wrongful discharge claim was not precluded by Section 5851, but

13

instead by District of Columbia common law as set forth in Nolting. Id. The same rationale applies in this case, where the DCFCA provides that it does not preclude "other remedies provided for in any other law or available pursuant to common law." D.C. Code § 2-308.18 (emphasis added). Plaintiff does not have a common law wrongful discharge claim here because "the District's own common law extinguishes [the claim] when the statute giving rise to the public policy at issue contains an alternative remedy." Kassem, 2008 WL 169784, at *3 (emphasis in original). Nolting is therefore fully applicable to this case and precludes Plaintiff's common law wrongful discharge claim.

For these reasons, Defendant's Motion for Summary Judgment is **granted** as to Count II.

### C. Summary Judgment Is Denied as to Counts I, III, IV, and V

There are genuine disputes of material fact that preclude summary judgment as to Plaintiff's remaining counts.

**First**, Defendant argues that it is entitled to summary judgment on Counts I (Whistleblower Protection Act), IV (False Claims Act), and V (District of Columbia False Claims Act) because there is no evidence that UPO was aware of protected disclosures made by Kakeh to Eboda and other government officials. His termination therefore could not have been the result of retaliation, Defendant argues.

14

The record discloses that there is a genuine issue of material fact concerning whether UPO was aware of any protected disclosures. Eboda testified that he told UPO management that Kakeh had been cooperating with him. Deposition of Tunde Eboda, Feb. 23, 2006, ("Eboda Dep.") at 92. In March of 2004, he disclosed to Alexis Roberson, a member of UPO's Ad Hoc Management Committee, "that Mr. Kakeh had been a highly valuable resource to us and I encouraged her to have a meeting with him and get more cooperation or information from him." Id. When asked if he told anyone else of Kakeh's cooperation, he testified "it was clear to me it was out there, I no longer took extra precautions to conceal that it may have happened." Id. at 93. Eboda also testified that he told Dana Jones the following regarding Kakeh's cooperation: "we appreciated it and that it was--we found it highly relevant." Id. at 98. Drawing all reasonable inferences in favor of the Plaintiff, this is sufficient to raise a genuine issue of material fact concerning whether UPO was aware of protected disclosures made by Plaintiff.

Summary judgment is therefore inappropriate as to Counts I, IV, and V.[3]

---

[3] Without citing any supporting authority, Defendant also argues that Plaintiff is not an employee covered by the WPA. The WPA applies to any "person who is a former or current employee of any entity that has a contract with the District government to supply goods or services and who is engaged in performing such contract." D.C. Code § 2-223.01(3)(B). Plaintiff clearly falls within this definition, as he was engaged in performing services under contracts between UPO and the District of Columbia.

15

**Second**, there remain genuine disputes of material fact regarding Plaintiff's claim under the DCHRA (Count III).[4] The Plaintiff has set forth adequate evidence to establish a prima facie case of retaliation and the Defendant has articulated a legitimate rationale for Plaintiff's termination, namely, that it occurred pursuant to a reduction-in-force due to outsourcing of management positions in UPO's Finance Office. See e.g., Goss v. George Washington Univ., 942 F. Supp. 659, 664 (D.D.C. 1996) (finding that a termination resulting from a reduction-in-force constitutes a legitimate reason for an employment action). The McDonnell Douglas burden-shifting framework therefore falls from the case.

---

[4] Claims brought under the District of Columbia Human Rights Act are governed by the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Ottenberg's Bakers, Inc. v. District of Columbia Comm'n on Human Rights, 917 A.2d 1094, 1102 (D.C. 2007).  Under McDonnell Douglas, the plaintiff must first make a prima facie showing of retaliation. Id.  If the plaintiff succeeds in doing so, the burden shifts to the defendant who must "'articulate some legitimate, nondiscriminatory reason' for its employment action." Id. (quoting McDonnell Douglas, 411 U.S. at 802).  Once the defendant has done so, "the presumption...raised by the prima facie case is rebutted" and "drops from the case." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).  For purposes of surviving summary judgment, the plaintiff must then show that there is a genuine issue of material fact concerning whether the proffered legitimate reason was false and that defendant's actions were intended as retaliation from a "combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered evidence for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff." Id. at 1289.

16

Viewing the evidence as a whole in the light most favorable to the Plaintiff, as the Court must in considering a motion for summary judgment, there are genuine disputes of material fact concerning Plaintiff's DCHRA claim that require resolution at trial. Plaintiff has shown a close temporal proximity between the discrimination claim he filed with the District of Columbia Office of Human Rights on March 31, 2004, and UPO's decision in April 2004 to make preparations to outsource the operations of the Finance Office and to conduct a reduction-in-force.

There are also inconsistencies between Defendant's explanation that Plaintiff's termination was a result of the reduction-in-force and other evidence in the record. Dana Jones, testifying as UPO's corporate designee pursuant to Fed. R. Civ. P. 30(b)(6), stated that the decision to retain Davidson Quashie and terminate Plaintiff was <u>not</u> due to UPO's reduction-in-force policy. Rather, Jones testified that Quashie was offered the position because Walker & Company specifically requested him. Jones' testimony obviously casts serious doubt on Defendant's explanation for Plaintiff's termination.

Taken together, this evidence is sufficient to raise a genuine issue of material fact concerning Plaintiff's DCHRA claim. Summary judgment is therefore inappropriate on Count III.

**IV. CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment [**Dkt No. 73**] is **granted** as to Count II and **denied** as to Counts I, III, IV, and V.  An Order shall accompany this Memorandum Opinion.


February 27, 2008
/s/
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**