UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mohammed Amin Kakeh,<br><br>	*Plaintiff*,<br><br>	v.<br><br>United Planning Organization, Inc.,<br><br>	*Defendant*. | Civil Case No. 1:05-cv-1271 (GK/JF) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORTIES
IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE AND
ALTERNATIVLY, REQUEST FOR TRIAL BIFURCATION**

**STATEMENT OF FACTS**

On June 28, 1998, Plaintiff, Mohammed Amin Kakeh, was hired by Defendant, United Planning Organization as Controller. In 2003 and 2004, Plaintiff observed fraud, waste and abuse, which he reported to his superiors and to regulators and law enforcement officials. On June 1, 2004, as a result of his whistle-blowing activities, Defendant terminated Plaintiff. From his date of termination to May 23, 2005, Plaintiff remained unemployed.

Plaintiff, his wife and five children are devout Muslims. Plaintiff is originally from Damascus, Syria and immigrated to the United States in 1975. Is of the Sunni sect. In 1982 year, Plaintiff worked for a non-profit funded by the Libyan government to fill the gap following President Reagan's closure of the Libyan embassy in the United States during the height of the tensions with Libya and its leader, Muammar Kaddafi. Plaintiff's first language is Arabic and he speaks English with a noticeable accent. All the women in the family wear a traditional hijab to cover their heads. The family observes Muslim holidays such as Ramadan.

**A.  Allegation of Child Abuse on October 23, 2004.**

Nabeelah Kakeh is one of Plaintiff's daughters, who currently attends a Muslim private high school.  During the Plaintiff's period of unemployment Nabeelah had successive unexcused absences from school and multiple occasions in which she failed to return home for several days at a time.  On one such occasion in October 2004 after her parents were able to bring her home, Nabeelah testified in her deposition that as a result of her leaving home without permission and failing to wear the traditional hijab covering her head, Plaintiff struck his daughter on her feet with a bat and shaved her head.  Plaintiff's wife witnessed and approved of the form of punishment.  Shaving a woman's head has significance in traditional Islamic culture as a woman appearing in public with a shaved head is not appropriate.  Furthermore, by shaving Nabeelah's hair, it is more likely that she would not appear in public without the headscarf in the future.  Nabeleeh called the police and Plaintiff was arrested on misdemeanor charges of child abuse.  Plaintiff spent 12 days in jail.  He successfully served one year of probation and the charge was dismissed in accordance with Virginia law. (*See* Court Docket Sheet, attached as Exhibit A.)

The October 2004 incident involving Nabeelah, even if scrupulously presented by the Defendant in an un-bias manner, will nevertheless capture and crystallize the high negativity often associated by Americans of Muslim traditions and practices especially as those traditions relate to women.  Plaintiff seeks to prevent this inevitably charged reaction by the jury to ensure objective evaluation of all the evidence.

**B.  Plaintiff's Termination from Manna, Inc.**

Prior to working for Defendant, the Plaintiff worked for a non-profit organization, Manna, Inc., that specializes in building homes for low-income families.  Plantiff was hired as a Controller with the expectation of working for two years in order to accomplish Manna's goals, although no written contract

was signed. After approximately two years, Manna terminated Plaintiff's employment on the basis that Plaintiff's style of management was not conducive to building a strong team.

Dana Jones, the Defendant's Chief Executive Officer and Corporate Designee, unequivocally testified in his two different depositions that Plaintiff's performance was not at all part of the reason why his employment was terminated.

<u>Deposition of Dana Jones on February 27, 2006, P. 37 (Attached as Exhibit B)</u>:

Q: Was your decision to eliminate members of management a result of a decision to eliminate any particular members of management for poor performance?

**A: No, I had no assessment of anybody's performance.**

<u>30(b)(6) Deposition of Dana Jones on August 8, 2006, P. 5 (Attached as Exhibit C)</u>:

Q: Okay. Now, what was the reason why the Plaintiff's employment at UPO ended? Or reasons.

**A: Reduction-In-Force.**

Q: And the reason he was terminated had nothing to do with his job performance. Correct?

**A: Nothing to do with his job performance.**

Plaintiff fears that the Defendant will inappropriately attempt to introduce evidence regarding his termination from Manna at trial as character evidence to show that he was terminated for being a bad employee or because he was unable to get along with co-workers and supervisors when, as Dana Jones made clear, performance is not at all an issue in this case. Given the significant potential for prejudice, Plaintiff seeks an order barring introduction of any evidence related to the termination of Plaintiff's employment at Manna, Inc.

### C. Defendant's Use of Plaintiff's Cultural and Religious Background In the Litigation Thus Far.

While Plaintiff's Muslim faith and his Syrian heritage are not at issue in this case, Plaintiff is concerned that the Defendant may draw on the negativity often associated with Muslim men to persuade the jury. Given the tragic events of September 11, 2001 and its direct impact on the city of Washington D.C., the well known hostility between the United States and Syrian governments, and the strong possibility that Syria harbors and aids terrorists, provides unfortunate fertile ground to play upon prevailing preconceived notions regarding Syrian Muslim men such as the Plaintiff.

It is clear that Defendant intends to defend this case by smearing the Plaintiff as a trouble-making middle-eastern Muslim male who feels a woman's place should be in house, but is a womanizer himself, who is overly aggressive, angry, has suspicious ties to the middle-east, and is conniving the American judicial system by feigning emotional injuries. As outlandish as this is, all of these characterizations appear in the "Medical Report" submitted by Defendant's expert witness, Dr. John Henderson, a psychiatrist, detailing his opinions that he will testify to at trial. (Report of Dr. John Henderson, attached as Exhibit D.)

On the topic of women, in the 5th paragraph of this 58-page report, Dr. Henderson opines that "there are various notes in the [UPO] office material indicating that a woman named Shears was appointed as being in charge of the patient, and, given his cultural background as a middle eastern man, much of the trouble seems to have begun at this point when a woman was appointed as his boss." (Henderson Report at 6.) Dr. Henderson inexplicably refers to male doctors in the report merely by their names, but when referring to female doctors, he adds "woman" before the title: "He saw a woman, a Dr. Price…he saw the woman psychiatrist about three or for times.." compared with "his cardiologist

remains a Dr. Sharma, and a family practitioner named Price, but not the same as the psychiatrist whom he had seen earlier." (*Id*. at 22-23.)

As to his family life, Dr. Henderson casts judgment about the gender roles played by the Plaintiff and his wife throughout the report. For example, Dr. Henderson notes that even though Plaintiff's wife holds a certificate as a medical records specialist, "which is an extremely remunerative and difficult job to fill in most health care institutions", Plaintiff's wife has not worked "at [Plaintiff's] insistence." (*Id*. at 12-13.)

Dr. Henderson also feels compelled to point out that Plaintiff apparently stated when talking of his sisters, that "all the girls are married of course and have children; all the girls are housewives." (*Id*. at 16.) How this information is at all relevant to a medical opinion is baffling. Dr. Henderson also is rather preoccupied with the fact that Plaintiff's wife takes an active role in his medical treatment. The following quotes from Dr. Henderson's report illustrate this point: "a call was made to the patient who stated that he did not write the email [to his Kaiser Doctor] but the emails were written by his wife." (*Id*. at 37.); "[plaintiff] stated that he prefers that his wife answer all questions regarding medications" (*Id*. at 38.); "a variety of telephone calls and email exchanges between Dr. Ryan and the patient and his wife, none apparently serious" (*Id*. at 43); "it is noted that his wife handles the medication." (*Id*. at 50-51.)

Perhaps Dr. Henderson's most shocking revelation is when he leaps to the conclusion that because the Plaintiff's medical records reflect he had continuing dysuria, this urinary pain is caused by "extra marital involvements of some kind."[1] (*Id*. at 31 FN 11.) He also notes that the "Plaintiff spent a lot of money and time [on the litigation] (by choice, instead of spending it to enhance the value of his

---

[1] Dr. Henderson's use of the phrase "of some kind" to describe the Plaintiff's alleged extramarital activities is a perfect illustration of a desperate attempt to smear the Plaintiff's character with baseless accusations related to the Plaintiff's cultural identity. This phrase leaves one to wonder: what kind of extra-marital affair is Dr. Henderson suggesting Plaintiff is involved with?

5

family life)." (*Id*. at 9, 6, ¶2) Combine these bald assertions and the potential juror is left with the impression that Plaintiff's wife is a woman who could be gainfully employed in a lucrative position, but at the Plaintiff's insistence is a mere housewife, while Plaintiff is an unfaithful husband who is recklessly spending money on a "vengeful primary and secondary gain attack on his prior employers" rather than his family. (*Id*. at 6.)

Dr. Henderson uses every opportunity to mention Plaintiff's cultural background and his connection to middle-eastern countries. He consistently notes the geographic location of only one medical test (an MRI) – out of the countless tests referred to in the report – the location being Saudi Arabia. (*Id*. at 32, 48, 52.) Dr. Henderson writes that the Plaintiff worked for a "Saudi Billionaire" with no explanation of its relevance. (*Id.* at 18.) Henderson alleges that the Plaintiff failed to report four different jobs that he held. (*Id*. at 30.) Yet, earlier in his report, he chooses to only highlight Plaintiff's alleged omission as the auditor for a Saudi Royal family member. (*Id*. at 18, FT 6.) In fact, Plaintiff never worked for a member of the Saudi Royal family and the resume that Dr. Henderson reviewed makes no mention of the Saudi Royal family. (*Id*. at 59-60; Affidavit of Amin Kakeh, Attached as Exhibit E.) Plaintiff worked for a company in Saudi Arabia called Jeraisy Group that is similar to Office Depot. (Resume of Amin Kakeh, attached as Exhibit F.)

Of course, Dr. Henderson's description of the alleged incident involving Nabeelah fits congruently with the theme that is apparent throughout his report that the Plaintiff is an overbearing, authoritative man with a male-dominant world view because of his cultural heritage and religion. (*Id*. at 13, 14 FT 5, 21.)

Even though Dr. Henderson is listed in the Joint Pre-Trial Statement by Defendant as a witness who will only testify as to damages, Dr. Henderson's sometimes sweeping opinions constitute character evidence which is designed to cast Plaintiff in a negative light. (*See* Joint Pre-Trial Statement Pg. 21.)

Dr. Henderson writes, "It is clear from prior records that he is an authoritarian, angry and heavy handed individual, and behaves so with those who do not do things exactly as he feels they should be done, and that he did create chaos and low morale in the accounting department at both Manna and UPO, at least in this examiner's opinion." (Henderson Report at 6.)   Dr. Henderson highlights (through the use of bold and/or underlined typing) his opinion that the Plaintiff has "<u>over controlled hostility (emphasis mine)</u>" and "**authoritarian style** (emphasis mine)". (*Id*. at 28, 32).  He also quotes extensively from documents contained within the Plaintiff's personnel file at Manna, Inc. regarding the circumstances of Plaintiff's termination, a fact which is not directly or indirectly relevant in this case. (*Id*. at 32-33.)

      Dr. Henderson summarizes his opinions regarding the Plaintiff by claiming that the Plaintiff's judgment and insight is somewhat impaired "given his cultural and litigation bias." (*Id*. at 25.)  Dr. Henderson's opinion sounds dangerously like a preview of the Defendant's closing argument.

## ARGUMENT

I. **EVIDENCE OF THE INDICDENT INVOLING NABEELAH KAKEH SHOULD NOT BE ADMITTED DUE TO ITS LACK OF PROBABIVE VALUE AND SUBSTANTIAL LIKLIEHOOD OF PREJUDICING THE JURY.**

      The evidence of the Plaintiff's misdemeanor assault and battery charge is not admissible under Rule 609 because it is not a felony and not a conviction.  It is also not admissible under Rule 608 because it is not probative of truthfulness.  Even if determined relevant, evidence of potential child abuse, especially given the cultural context and its impact on American jurors, is highly prejudicial and significantly outweighs any probative value.

**A. General Principles Governing Admissibility of Evidence.**

      "A key purpose of motions *in limine* is to resolve specific evidentiary issues in advance of trial." *U.S. ex rel. El-Amin v. George Washington University*, --- F.Supp.2d ----, 2008 WL 287983,2 Civil Action No. 95-2000, (D.D.C. February 4, 2008). Each party is obligated to demonstrate why certain

evidence is or is not admissible by pointing to specific parts of the record. *Id*. The purpose of a motion in limine is also to avoid the unfairness caused by the presentation of prejudicial or objectionable evidence to the jury, and the obviously futile attempt to "unring the bell." *Greer v. Buzgheia,* 46 Cal. Rptr. 3d 780 (Cal. App. 3d Dist. 2006). Motions in limine also help prevent lengthy arguments at trial that derail the trial process and saves parties the time and costs of preparing and presenting cases for trial. *Palmieri v. Defaria*, 88 F.3d 136,141 (2d Cir. 1996); *Pivot Point Intern., Inc. v. Charlene Products, Inc*, 932 F. Supp., 220, 222 (N.D.Ill.1996); S*ee also, Koller By And Through Koller v. Richardson-Merrell,* 737 F.2d 1038, 1067 (D.C.Cir.1984), *overruled by Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985) (concurring opinion) (motions in limine help to "resolve in advance ... problems that can be reasonably anticipated or expected to arise at the trial").

Only relevant evidence should be admitted at trial. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". Fed. R. Evid. 401. Trial courts have the discretion to exclude relevant evidence if "the probative value is substantially outweighed by the danger of unfair prejudice…" Fed. R. Evid. 403.

For impeachment purposes, only past criminal felony convictions may be admitted for impeachment of a witness if the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 609. Finally, testimony regarding specific acts of misconduct may only be admitted to impeach the credibility of a witness on cross-examination regarding the witness's own character or cross-examination of a character witness if the specific act is probative of truthfulness or untruthfulness. Fed. R. Evid. 608.

### B. The Allegation of Child Abuse is Not Admissible for Impeachment Purposes.

The evidence regarding the October 23 incident is clearly not admissible under Rule 609 because

Plaintiff was never convicted of a felony. A warrant for arrest for a misdemeanor was issued on October 24, 2004 for violation of Virginia code §18.2-57.2, assault and battery of a family or household member. Plaintiff was charged with a misdemeanor, then received probation for which he successfully completed in one year. As a result, the charges were dismissed on December 12, 2005 and he was never convicted. (*See* Court Docket sheet, Attached as Exhibit A.) In addition, a conviction may only be used for the purposes of attacking truthfulness. As discussed more in detail below, the child abuse allegation is not at all probative of truthfulness. Thus, evidence regarding the October 23 incident is not admissible pursuant to Rule 609.

Rule 608 permits inquiry into specific acts of conduct on cross-examination for impeachment purposes in the limited circumstance where the instance of conduct is probative to the issue of truthfulness. Even then, the instance of conduct may not be proved by extrinsic evidence. Rule 608 is inapplicable here first because the alleged conduct, child abuse, does not involve any element of dishonesty and thus is not probative to truthfulness. Next, the ban on use of extrinsic evidence to prove the conduct limits the Defendant to eliciting this evidence solely through cross examination. Both the police report and calling Nabeelah as a witness to testify regarding the October 23 incident constitute extrinsic evidence and may not used pursuant to Rule 608.

**C. Evidence of the Incident involving Nabeelah Kakeh is Highly Prejudicial and Should be Excluded Under Rule 403.**

Given the intense societal stigma regarding child abuse, combined with the current landscape of negativity towards Muslim men, Syria, and cultural practices that are interpreted as misogynist in American society, admitting evidence of the October 23 incident is highly prejudicial. Assuming, *arguendo*, that the evidence is relevant for the limited purpose of either impeachment or as to damages, the small probative value is substantially outweighed by the danger of unfair prejudice.

Courts faced with a request to admit evidence of child abuse and spousal abuse have refused to do so based on Rule 403. In a case involving an employee who sued his employer under the Federal Employers Liability Act for a train collision, the plaintiff filed a motion in limine to prevent the defendant from using a child abuse charge that did not result in a conviction to impeach the plaintiff. *Starling v. Union Pacific Railroad Company*, 203 F.R.D. 468 (D.Kan.2001.) The Court granted the plaintiff's motion holding that even assuming the evidence was relevant, the danger of unfair prejudice substantially outweighed its probative value. *Id*. at 482. Similarly, the 11th Circuit overturned a criminal conviction based on harmful error of a Defendant in a drug case where evidence of spousal abuse was admitted in violation of Rule 403. *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999). The Court stated that "The public stigma attached to a husband who beats his wife is significant…The domestic violence evidence in this case was particularly likely to incite the jury to an irrational decision because it was graphic and arresting." *Id.* at 1328-9.

The factual circumstances surrounding the allegation of Plaintiff's child abuse poses a particular danger that the jury will make an irrational decision tainted by this inflammatory evidence. Child abuse alone is a crime that causes strong negative reactions in a way that other crimes with more severe penalties do not. Further, the October 23 incident also conjures negative images of Muslim men and other cultural stereotypes that have no place in a decision on the merits.

Instructing the jury to only consider the evidence in relation to damages and/or impeachment will be ineffective in mitigating the harm caused by hearing this evidence. Courts have held that in some cases, providing a limiting instruction to the jury may minimize the possibility of prejudicial harm. *See E.g., Keister v. Dow Chemical Co*, 723 F.Supp. 117 (E.D.Ark.1989); *Dallas v. Goldberg*, 143 F.Supp.2d 312 (S.D.N.Y. 2001). But here, the shocking impact of this evidence is so severe, that once heard, it will be impossible for jurors to ignore the allegation to objectively evaluate the case. Furthermore,

many of the preconceived notions and prejudices that the individual jurors may have are not part of a conscious thought process. The danger of these biases seeping into the jurors' evaluation of other evidence will not be stopped through a limiting instruction. In fact, the limiting instruction will further underscore the shocking nature of the allegation as seen from a traditional American perspective.

Finally, the Plaintiff is not only concerned about the impact of the child support allegation itself, but of how this evidence may play into a larger theme of bias based on his culture, religion and race. The report provided by Defendant's expert witness, Dr. Henderson, underscores this concern. Dr. Henderson directly links Plaintiff's culture and religion with Plaintiff's alleged unwillingness to submit to a female boss at UPO and his termination from Manna, Inc. Capitalizing upon prevailing negative images of the Plaintiff's culture and religious preference is wholly inappropriate. A jury instruction limiting the use of the child abuse allegation is simply not an effective tool to neutralize the damaging impact of this evidence.

Because of the highly prejudicial and provocative nature of the child abuse allegation and the minimal probative value, Rule 403 compels that the evidence must be excluded.

## II.   EVIDENCE OF PLAINTIFF'S ALLEGED ASSOCIATION WITH THE SAUDI ROYAL FAMILY AND PEOPLE'S COMMITTEE SHOULD BE EXCLUDED.

The gross inaccuracy that the Plaintiff worked as an accountant for a member of the Saudi Royal family and worked from approximately three years at the People's Committee, a non-profit organization funded by the Libyan government under Kaddafi has no bearing on the issues of the case and thus no probative value. The Defendant has not proffered any basis for which this testimony many be relevant. Plaintiff is concerned that if the jury is presented with this evidence, it will fuel the fear and negativity associated with middle-eastern Muslims in this highly vigilant and charged culture given the events of September 11, 2001. This perception will compel the jury to make decisions based upon the Plaintiff's

race, culture and religion rather than the merits of the case.

### III. VARIOUS OPINIONS OF DR. HENDERSON SHOULD BE EXCLUDED FROM EVIDENCE.

Plaintiff seeks to exclude the following opinions of Dr. Henderson: (1) his opinion on whether Plaintiff is a credible witness; (2) his opinion on whether Plaintiff was a trouble-maker at UPO or his past employment; (3) his opinion that Plaintiff did not respect his boss because she was a woman; (4) his tacit opinion that Plaintiff has trouble working with women; (5) his opinion that Plaintiff created chaos at UPO or Manna, Inc.; (6) the prudency of the Plaintiff's decision to pursue this litigation; (7) speculation about Plaintiff's extra marital activities; (8) his opinion that the Plaintiff is an authoritarian, angry and heavy handed individual and behaves so with those who do not do things exactly as the Plaintiff feels they should be done; (9) his opinion that the Plaintiff has little patience and little capacity to work out problems through reasonable solutions in social situations; (10) his opinion that the Plaintiff's insight and judgment is impaired because of his cultural bias; (11) any opinion by Dr. Henderson that is not related to the issue of Plaintiff's emotional distress damages in this case.

Finally, Plaintiff requests that Dr. Henderson be ordered not to refer to the following facts: (1) Plaintiff's previous employment at Manna, Inc; (2) The October 23, 2004 incident involving Nabeelah Kakeh; (3) Plaintiff's employment with the People's Committee, an organization funded by the Libyan government; (4) Plaintiff's alleged employment by a member of the Saudi Royal family.

#### A. Expert Testimony is Only Admissible if it Involves *Expertise*.

Federal Rule of Evidence 702 states that "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise…" An expert's opinion is helpful only to the extent the expert draws on some

special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert. *See United States v. Lundy,* 809 F.2d 392, 395-96 (7th Cir.1987). The D.C. Circuit Court of Appeals has held "that where the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." *Henkel v. Varner,* 138 F.2d 934, 935 (1943); *See also*, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962).

Under Federal Rule of Evidence 703, facts or data relied upon by an expert witness need not be admissible in evidence in order for the opinion to be admissible. Given that experts are given special latitude to testify to matters based upon inadmissible evidence, courts should ensure that, among other things, the expert will give testimony that will assist the jury. *U.S. v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987).

  **B.**  **Dr. Henderson's Proffered Testimony Exceeds the Scope of His Expertise and Invades the Purview of the Jury.**

Dr. Henderson is a psychiatrist with a specialty in forensic psychiatry. Dr. Henderson is not a sociologist, an anthropologist, Islam expert, gender studies expert, or an employment law expert. In Defendant's Rule 26(a)(2)(B) Disclosure for Dr. Henderson, Defendant represents that "Dr. Henderson will testify regarding his opinion on Plaintiff's emotional distress damages". (*See* Defendant's Rule 26(a)(2)(B) disclosure, attached as Exhibit G at 1.) Nevertheless, based upon the Plaintiff's cultural heritage and religious background, Dr. Henderson casts doubt upon the strength of the Plaintiff's legal claims and the veracity of Plaintiff's allegations that form the basis of those claims. Specifically, Dr. Henderson is absolutely not qualified to testify as to these matters under Rule 702 and should be precluded from offering testimony that is not directly related to Plaintiff's claim of compensatory

damages.

By permitting Dr. Henderson to testify to these matters identified in 1-11 above, it invades the purview of the jury and permits admission of otherwise inadmissible evidence under the guise of an expert opinion. For example, Dr. Henderson opines that "given his cultural background as a middle-eastern man, much of the trouble seems to have begun at this point when a woman was appointed his boss." (Henderson Report at 6.) This opinion is not related to any psychiatric or mental health condition for which Dr. Henderson is an expert. Indeed, this opinion does not involve the application of science in any form and rather involves facts of general knowledge that the jury is qualified to assess.

Dr. Henderson's opinions that Plaintiff is "non-introspective…fails to recognize any responsibility for stress and disharmony in the workplace, though this is clearly outlined in memos which were sent to him both at Manna and UPO" is another example where Dr. Henderson fails to base his opinion upon any specialized knowledge, skill or experience. Dr. Henderson merely read documents provided to him by the Defendant and based solely on those documents deduced that the Plaintiff caused stress and disharmony at both Manna, Inc. and UPO. He gratuitously concludes that by virtue of pursuing this lawsuit, Plaintiff refuses to take responsibility for that stress and disharmony. These are matters that the jury is just as competent to consider and weigh the evidence as Dr. Henderson. The jury does not need the assistance of a psychiatrist to determine the cause of the stress and disharmony at UPO and ultimately that conclusion is not relevant.

Dr. Henderson relied, in part, on a completely inaccurate account of the Plaintiff's work history – working for a member of the Saudi Royal family – to reach his opinion that the Plaintiff is not credible. This exemplifies the overarching problem with permitting Dr. Henderson's opinions on matters that are reserved to the jury. Plaintiff's alleged work for a member of the Saudi Royal family is a fact not subject to cross-examination, is not relevant and not admissible. Yet, it contributed to Dr. Henderson's

ultimate opinion of the client's credibility.

Because the opinions in 1-11 are outside the scope of Dr. Henderson's expertise, invades the purview of the jury and are unduly prejudicial, Plaintiff requests that these matters are excluded.

### C. Dr. Henderson's Speculation that Plaintiff had Extra-Marital Affairs Should not Be Admitted.

Dr. Henderson's speculation regarding the Plaintiff's extra-marital activities is not reliable, not scientifically based, irrelevant, outside the scope of his expertise, and highly prejudicial. By reviewing Plaintiff's medical records which describe Plaintiff's recurring pain while urinating, Dr. Henderson speculates that Plaintiff is having an extra-marital affair. First, Dr. Henderson is a psychiatrist; he is not a urinary tract specialist or a sexually transmitted disease ("STD") specialist and is thus not qualified to determine the medical cause of urinary pain. Next, Dr. Henderson's opinion is based upon a non-scientific method because if STD is a possible source of the Plaintiff's pain then clearly the proper diagnostic method is to test for STD's, not gross speculation. Even assuming, *arguendo*, the Plaintiff did have an STD, Dr. Henderson assumes it is due to the Plaintiff's extra-marital activities which is another baseless assumption that is not grounded in any scientific process. Whether the Plaintiff has an STD, has ever had an STD or is engaging or has engaged in an extra-marital affair has no bearing on any fact at issue in this case. Evidence of this nature has one purpose – to smear the reputation of the Plaintiff – which is intended to be highly prejudicial.

### IV. ALTERNATIVELY, THE TRIAL SHOULD BE BIFURCATED TO LIABILITY AND THEN DAMAGES.

As stated above, Plaintiff requests that this Court exclude from evidence certain testimony of Dr. Henderson and the incident involving Nabeelah Kakeh. If the Court denies that request, the Plaintiff requests, in the alternative, that the trial is bifurcated to a liability phase and damages phase so that the jury will not be confused and use Dr. Henderson's testimony and the Nabeelah Kakeh incident to

determine liability. While trial bifurcation alone will not eliminate the danger of unfair prejudice, it will limit the prejudice solely to the issue of damages and will help insure that the jury at least makes an objective decision on the Defendant's liability.

### A. General Legal Principles Governing Trial Bifurcation.

Separate trials may be ordered when the court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of … issues." Fed. R. Civil P. 41. "The court has considerable discretion to order separate trials in implementation of the purposes of the rule, namely, to further convenience, avoid delay and prejudice, serve the ends of justice, reduce the expenses of the parties, and save the time of the court." *U.S. v. American Tel. & Tel. Co.,* 83 F.R.D. 323, 335 (D.C.D.C. 1979). For a trial bifurcation to be justified, only one of the applicable criteria – convenience, to avoid prejudice or for expedition and economy – need be met. *Saxion v. Titan-C-Manufacturing, Inc.,* 86 F.3d 553, 556-7 (3rd Cir. 1979). When looking at whether to bifurcate a trial, the court should consider whether 1) the issues to be tried separately are significantly different from one another; 2) whether separable issues require testimony of different witnesses and different documentary proof; 3) whether party opposing the severance will be prejudice if it is granted; 4) whether party requesting severance will be prejudiced if it is not granted. *Cashman v. Montefiore Medical Center*, 191 B.R. 558 (S.D.N.Y. 1996).

### B. Trial Bifurcation is Necessary to Avoid Prejudicial Effect of Evidence Relating to Child Abuse Allegation and the Defendant is Not Prejudiced by the Bifurcation.

Any evidence related to the October 23 incident regarding Plaintiff's alleged child abuse is highly prejudicial and may not be mitigated by a limiting instruction to the jury, as discussed above. Furthermore, the proffered testimony of the Defendant's expert inappropriately includes matters relevant to liability, as described above. The Defendant is not prejudiced by trial bifurcation into a liability and

16

damages phase.

### C. Trial Bifurcation is More Judicially Efficient and Economical.

The obvious benefit in terms of efficiency and economics in separating the liability and damages phase of the trial is that if the jury finds in favor of the defense on liability, the entire trial will be significantly shortened. However, even if both phases of the trial are necessary, the liability and damage issues are so distinct and separate, that the overall length of the trial is likely to be the same if only one trial was held. In fact, of the Plaintiff's 16 witnesses, 7 relate to the damages issue only, 8 to the liability issue and one, the Plaintiff himself, would testify during both phases. (*See* Joint Pre-Trial Statement, Pgs. 6-11). For the Defendant, of the 36 named witnesses, only two are related to damages and none of the defense witnesses are related to both damages and liability. (*See* Joint Pre-Trial Statement, Pgs. 11-21.) Therefore, to prevent unfair prejudice and in the interest of economy, the trial should be bifurcated.

## V.    EVIDENCE RELATED TO TERMINATION OF PLAINTIFF'S EMPLOYMENT FROM MANNA, INC. IS IRRELEVANT AND SHOULD NOT BE ADMITTED.

### A. General Law Governing Admissibility of Character Evidence.

Only relevant evidence should be admitted at trial. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". Fed. R. Evid. 401. Trial courts have the discretion to exclude relevant evidence if "the probative value is substantially outweighed by the danger of unfair prejudice…" Fed. R. Evid. 403. Evidence of a person's character or a trait of character is never admissible for the purpose of action in conformity therewith. Fed. R. Evid. 404. (committee notes for 2006 amendment discussing the absolute bar on use of character evidence in civil cases to prove conformity.)

### B. Evidence Regarding Plaintiff's Termination from Manna is Irrelevant, Improper Use of Character Evidence and Prejudicial.

Evidence of the Plaintiff's termination from Manna, Inc. is not relevant to the issues presented in this case. Defendant's own Chief Executive Officer and Corporate Designee emphatically stated during two different depositions that Plaintiff's job performance had nothing to do with his termination. Thus, Defendant's job performance at his prior employer, Manna, Inc. does not tend to prove or disprove any fact related to Defendant's termination from UPO and thus should be excluded.

Any attempt to introduce evidence related to the Plaintiff's termination from Manna as character evidence to prove Plaintiff's conduct while working for Defendant is impermissible. This is precisely the situation that is prohibited under Rule 404 because of the evidence's tendency to confuse and mislead the jury and its prejudicial effects. Fed. R. Evid. 404 (committee notes for 2006 amendment discussing policy behind Rule 404.)

Even if the court determines that the evidence has some minimal probative value, the prejudicial effect of this evidence is substantial. The jury is likely to apply a knee-jerk understanding that because the Plaintiff was fired from his previous job, then the firing from the second job was probably justified. Furthermore, because the reasons for the Manna termination was due to Plaintiff's demanding management style, then news of the Manna termination will inappropriately lead the jury to conclude that Plaintiff is a "difficult" employee who deserved to lose his job. Decisions based on this irrational and emotional responses contradict the notion of a fair and unbiased trial.

**CONCLUSION**

For the reasons stated, the Motion should be granted.

                                      Respectfully Submitted,

                                      _/s/_____
                                      Vincent Melehy, Esq.
                                      D.C. Bar No. 415849
                                      Regan Rush, *pro hac vice*
                                      California Bar. No. 222837
                                      Melehy & Associates, LLC
                                      8403 Colesville Rd., Suite 610
                                      Silver Spring, MD 20910
                                      Phone: (301) 587-6364
                                      Fax:    (301) 587-6308
                                      Email: ovmelehy@melehylaw.com
                                      rrush@melehylaw.com

                                      *Attorneys for Plaintiff*