JOHN MCINNES HENDERSON, M. .
DIPLOMATE OF THE AMERICAN BOARD OF FORENSIC PSYCHIATRY
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
304 EAST PENNSYLVANIA AVENUE
FIRST FLOOR
TOWSON, MARYLAND 21286-5313

TELEPHONE (410) 296-1161
FAX (410) 583-1264

# *MEDICAL REPORT*

# *MOHAMMED AMIN KAKEH*

# *May 11, 2006*



**EXHIBIT**

tabbies

D

RE: Mohammed Amin K   a

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ 2

SUMMARY AND CONCLUSIONS ................................................ 5

APPENDIX I .............................................................................. 11

PSYCHIATRIC HISTORY: ......................................................... 11
IDENTIFYING DATA: ........................................................... 11
MARITAL STATUS AND CHILDREN: ....................................... 12
FAMILY HISTORY: ............................................................... 14
SIBLINGS: .......................................................................... 15
SCHOOL PERFORMANCE: ..................................................... 16
WORK PERFORMANCE: ........................................................ 17
LEISURE ACTIVITIES, HOBBIES, RECREATIONS AND ............... 19
PAST TIMES: ...................................................................... 19
PHYSICAL HEALTH HISTORY: ............................................... 19
HOSPITALIZATIONS: ........................................................... 21
SERIOUS ACCIDENTS INCLUDING CAR ACCIDENTS AND HEAD
INJURIES: .......................................................................... 22
ALLERGIES: ....................................................................... 22
MEDICATIONS PRIOR/AFTER THE INCIDENT: .......................... 22
MENTAL HEALTH HISTORY PRIOR TO INCIDENT: ..................... 22
MENTAL HEALTH HISTORY AFTER THE INCIDENT: ................... 22
DRUG HISTORY: ................................................................. 23
FAMILY DOCTOR: ............................................................... 23
LEGAL HISTORY: ................................................................ 23

MENTAL STATUS EXAMINATION ............................................. 24
APPEARANCE AND BEHAVIOR: .............................................. 24
SPEECH: ............................................................................ 24
EMOTIONAL MOOD AND AFFECT: .......................................... 25
THOUGHT CONTENT: .......................................................... 25
SENSORIUM AND INTELLECT: ............................................... 25
JUDGMENT AND INSIGHT: .................................................... 25
CURRENT MEDICAL REGIMEN: ............................................. 26
CURRENT MEDICATIONS: ..................................................... 26
NEUROLOGICAL EVALUATION: .............................................. 26

APPENDIX II ............................................................................ 26

NEUROPSYCHIATRIC TEST RESULTS: ...................................... 26

*RE: Mohammed Amin K.    h*                                          *Page 3*

***Sensitive Medical Information. Should Not Be Shown to Patient or Family!***
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

*APPENDIX III* ........................................................................................... *30*
  **SYNOPSIS OF DOCUMENT REVIEW:**.................................................. *30*
*APPENDIX IV* ........................................................................................... *59*
*APPENDIX V* ............................................................................................ *61*
*APPENDIX VI* ........................................................................................... *63*
*APPENDIX VII* .......................................................................................... *64*
*APPENDIX VIII* ......................................................................................... *65*

JOHN MCINNES HENDERSON, M. ᵗ
DIPLOMATE OF THE AMERICAN BOARD OF FORENSIC PSYCHIATRY
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
304 EAST PENNSYLVANIA AVENUE
FIRST FLOOR
TOWSON, MARYLAND 21286-5313

TELEPHONE (410) 296-1161
FAX (410) 583-1264

May 11, 2006

Alison N. Davis, Esquire
Law Offices of Ford & Harrison, LLP
1300 19th Street, N.W.
Suite 700
Washington, D.C. 20036

Re:   *Mohammed Amin Kakeh v. United Planning Organization*
      *Civil Action No.: 05-1271 (GK/JF)*
      *Superior Court for the District of Columbia*
      DOI:      06/02/2004
      SSN:      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
      DOE:      04/26/2006
      DOB:      06/28/1944

Dear Ms. Davis:

Pursuant to your request I performed a psychiatric evaluation on the above-captioned individual, Mohammed Amin Kakeh on April 24, 2006. This evaluation lasted from 10:00 a.m. until approximately 5:45 p.m. During that time, I spent six hours taking a psychiatric history and performing a mental status examination. Subsequent to that he was given **The Minnesota Multiphasic Personality Inventory-2,** and this required an additional hour and forty-five minutes.

Prior to the commencement of the psychiatric evaluation I informed the patient that I was seeing him at the request of the defense attorneys in the suit which he had filed against the United Planning

*RE: Mohammed Amin K.    1*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

Organization as Civil Action No.: 05-1271 in Washington, D.C. Superior Court. I informed him that this was a forensic (medico-legal) psychiatric evaluation, and that I was not his treating physician. Therefore, I further informed him that no physician/patient confidentiality pertained to our interview, and anything which he told me could well be relayed to the attorneys who asked for the evaluation, if pertinent. I informed him that if I asked him any questions which he did not wish to answer he merely had to state that he refused to answer and that this was acceptable.

Understanding these considerations, he consented to proceed with the evaluation.

## SUMMARY AND CONCLUSIONS

This now sixty-one year old male of Middle Eastern origin (Damascus, Syria) underwent a forensic psychiatric evaluation with me on April 24, 2006. It is clear, after a lengthy psychiatric interview, that he is not a candid historian, and when some of his statements are compared with the records, they do not mesh. One of the outstanding examples is the comparison between his work record as portrayed by Dr. Edelman, his work record as portrayed to me, and his work record as portrayed in an earlier resume, which is a portion of the medical and legal records (see Appendix IV).

During the interview he was superficially pleasant and agreeable, and appeared to attempt to strike up a "hail-fellow–well-met" relationship with this examiner, but was evasive and non-compliant on many issues concerning his dates, his employment, and the actual circumstances of his departure from UPO, among other things. In fact, he was generally not candid about the majority of his medical

RE: Mohammed Amin K...h                                                    *Page 6*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

history indicating that he had only been taking psychotropic medications since the tension and stress began at UPO, but the medical records indicate that it goes at least back to 1996 when he was having anxiety and stress issues as well as depression.

In general, this is a man who is heavily involved in a vengeful primary and secondary gain attack on his prior employers. As noted in Note No. 45 Appendix III below, there are various notes in the office material indicating that a woman named Shears was appointed as being in charge of the patient, and, given his cultural background as a middle eastern man, much of the trouble seems to have begun at this point when a woman was appointed as his boss.

He is entirely non-introspective in terms of his own psychological dynamics, and assumes no blame for anything which occurred during his employ. According to the history given to this examiner, he entirely fails to recognize any responsibility for stress and disharmony in the workplace, though this is clearly outlined in memos which were sent to him both at Manna and at UPO. Likewise, he circled carefully around the issue of being arrested for the abuse of his teenage daughter.

It is clear from prior records that he is an authoritarian, angry and heavy handed individual, and behaves so with those who do not do things exactly as he feels they should be done, and that he did create chaos and low morale in the accounting department at both Manna and UPO, at least in this examiner's opinion. He is angry, generally has low self-esteem, and a low threshold for, and low tolerance for, frustration with little patience and little capacity to work out problems through reasonable solutions in social situations.

*RE: Mohammed Amin K.    I*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

It is equally clear, in this examiner's opinion, that he has a longstanding personality disorder accompanied by some dysthymia and anxious mood dating back as far as records are available, which is 1996.

I feel that no psychiatric or psychological damage has accrued to him as a result of this layoff of almost eleven months which he projects as his first layoff, completely neglecting an earlier eighteen month layoff, which is clearly mentioned in the earlier medical records (see Appendix V). I feel that his pattern of behavior has changed very little over his career in finance and business management. I do not think he suffered any psychological, psychiatric, or emotional distress which was not already a significant part of his personality, and I do not feel that there was any exacerbation in what is a rigid and fixed personality disorder.

I have evaluated the patient with the following diagnoses from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR[1]). The following Multi-Axial Diagnostic Format[2] has been applied:

---

[1] The Diagnostic and Statistical Manual of The American Psychiatric Association, Fourth Edition-TR, published by the American Psychiatric Association, copyright 2000. This work should be viewed as "work in progress," has been, and will continue to be revised periodically as the complex diagnostic issues in medicine, and particularly in mental health become better understood through advances in research and technology. Any concept that it is definitive in terms of diagnostic formulations is misleading in terms of assuming that the diagnoses currently proffered represent formal or final diagnostic concepts even today, and certainly not for the future.

[2] **DSM-IV Cautionary Statement**

RE: Mohammed Amin K.   .1                                      *Page 8*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## Axis I

a.   Psychiatric evaluation for forensic purposes.

b.   Longstanding, unrelated dysthymia and generalized anxiety disorder.

c.   Factitious disorder versus malingering *(probably malingering)*.

d.   No post-traumatic stress disorder.

e.   Primary and secondary gain.

f.   Non-compliant with medical treatment and with the psychiatric evaluation.

---

The specified diagnostic criteria for each mental disorder are offered as guidelines for making diagnoses, because it has been demonstrated that the use of such criteria enhances agreement among clinicians and investigators. The proper use of these criteria requires specialized clinical training that provides both a body of knowledge and clinical skills.

These diagnostic criteria and the DSM-IV-TR Classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field. They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts.

The purpose of DSM-IV-TR is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency.

RE: Mohammed Amin Ku

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

**AXIS I**    ***Personality Disorder Not Otherwise Specified:***    With antisocial, compulsive, histrionic and hypochondriacal traits with a .65 stability index for test/retest values after a five year period.

**AXIS III**    ***Physical Conditions:***    Status post myocardial infarction, diabetes mellitus, Athlete's foot, skin rashes, gastro esophageal reflux disorder, at least as diagnosed, and multiple other conditions including urinary tract infection for which he had multiple doctor visits at Kaiser Permanente.

**AXIS IV**    ***Psychosocial Stressors*** -    Marital disharmony especially concerning the chaos with his middle daughter Nabeelah (please see notes regarding police report; also noted in Note No. 86 of Appendix III below); litigation stress on which he spent a lot of money and time (by choice, instead of spending it to enhance the value of his family life).

**AXIS V**    ***Current GAF*** (Global Assessment of Functioning Scale): Current GAF is 85. The same level of function would be true for the prior year.

I hold all of the opinions to a reasonable degree of medical certainty.

In the meantime, if you have any questions or comments, please feel free to contact me at any time. Should you or the Court wish for me to appear and give testimony in person, please feel free to contact me at any time at the above telephone numbers. My e-mail address is

RE: *Mohammed Amin K.   .1*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

drhenderson5@comcast.net.  I would be happy to do so at the Court's
convenience.  In the meantime, I remain,

Sincerely yours,

John M. Henderson, M.D.
JMH/dlb
Enclosures

*RE: Mohammed Amin K*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## *APPENDIX I*

## PSYCHIATRIC HISTORY:

*IDENTIFYING DATA:*

The patient gave his name as Mohammed Amin Kakeh. He stated that his attorney was Omar Vincent Melehy who practices in the Rockville area.

Concerning his trial he stated that he did not know of any trial date, but believed there was a pretrial conference set for November.

He gave his home telephone number as 703-642-8921, and his office telephone number as 202-466-3686, extension 105, and stated that this is Equal Justice Works, a non-profit organization by whom he has been employed since late April or early May of 2005.

He gave his home address as 750[3] Leestone Street, Springfield, Virginia 22151. He stated that he has lived there for the last twelve years with his wife and five children, two of whom are now attending college.

He stated that it is a townhouse, and that he has been renting it.

He drove himself to the office for his evaluation, and was slightly early.

---

[3] His medical records reflect the address as 7050 Leestone Street.

*RE: Mohammed Amin K    h*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

He stated that he was with Kaiser Permanente before when he worked with the United Planning Organization, and he now sees physicians in a group called Northern Virginia Clinical.

He gave his date of birth as June 28, 1944, and stated that he was born and reared in Damascus, Syria. He stated that he came to the United States in 1975, and obtained his citizenship in 1981.

He gave his current age as sixty-one, and added that he had a myocardial infarction (heart attack) in 1998 or 1999, approximately seven or eight years ago.

He gave his Social Security No. as 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.

Queried about his religious background he reported that he was born and reared Muslim, and was of the Sunni sect.

## MARITAL STATUS AND CHILDREN:

He reported that he is married, and he stated that he is married to Toni Lyle Kakeh whom he met in Hattiesburg, Mississippi where he had gone to teach after completing a significant portion of his education. He had known her for about six months before they married in 1980, and his wife is a native Mississippian. He gave her date of birth as August 10, 1957, and her age as forty-eight.

He went on to say that he had a friend who was Professor of Economics at the University of Southern Mississippi in Hattiesburg, Mississippi and that he had met Toni through his friend.

He stated that she is in good health, but has not worked, at his insistence, since the birth of their first child, twenty-one years ago.

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

She nevertheless continues to hold her certificate as a medical records specialist, which is an extremely remunerative and difficult job to fill in most health care institutions.

He went on to report that they have five children[4], and they are, in order:

1.  Aminah, a daughter, currently age twenty-one and attending American University.

2.  Mohammed, a son, currently age nineteen and attending the University of Virginia.

3.  Nabeelah, a daughter, currently sixteen, living in Springfield, Va., and attending an Islamic School.

4.  Hamsa, a daughter, currently age seven, and in the second grade.

5.  Mustafa, a son, currently age five, and attending pre-school.

He stated that all of his children are in good health mentally and psychiatrically, though some doubt must be cast on this when we review the record of his confrontation with Nabeelah which is provided by Kaiser Permanente on several different provider notes about an event which occurred in the Kakeh home on December 8, 2004. He dismissed the importance of the discipline which he inflicted on her because she had been running away and stayed out all night. Apparently after several of these incidents, the patient cut Nabeelah's hair off and beat her on the feet with a stick. She called

---

[4] See Appendix which is a Kaiser Permanente Provider Note indicating he has 7 children.

RE: Mohammed Amin K.   h                                    Page 14

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.*

the police and he was arrested for assault and battery and spent thirteen nights in prison. More about this incident at a later point.[5]

*FAMILY HISTORY:*

He stated that his mother is alive and well. Her name is Aminah, and she is seventy-five years old and still lives in Damascus. He stated that her health has been generally good throughout her life.

He reported that he lived with his mother and father throughout his childhood, and described it as a hard working childhood but denied any form of abuse by anyone either sexual, physical, emotional or psychological.

He went on to report that his father was named Mohammed Eid Kakeh and died four years ago at the age of seventy-eight. He stated that his father was a railroad inspector and died from natural causes which stemmed from the faulty implantation of an artificial hip which led to uremic failure and septicemia. The patient stated that he flew home to see his father days before his death, in contrast to his inability to do the same when his brother, Maumoon, died in 2004 from a stroke at the age of fifty-seven, and the patient could not afford to fly to Syria to see him because of his entanglement with the United Planning Organization. He blames the United Planning Organization (UPO) for this lapse in respect for his deceased brother.

---

[5] It should be noted that the cutting off of the hair of a female in the Islamic religion is a flagrant denunciation of that individual whether child or adult, and is purported to announce to the world that they are promiscuous or maladaptive in some fashion or other; hence it is an extreme form of expression of the fury which the patient must have felt towards his daughter, and the whipping of the feet with a stick is equally extreme.

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

SIBLINGS:

He stated that he is the eldest of eleven. He stated that he does not remember the birth dates ( even though he states that his is a very close family, but he asserts that he remembers the approximate age of each of the siblings. The sibship, in order, is:

1.    The patient himself.

2.    Maumoon, a Professor of Arabic language at the University of Damascus who, as noted above, died in 2004 at the age of fifty-seven of a stroke.

3.    Rukia, a sister, age fifty-four.

4.    Dalalal, a sister, age fifty-two.

5.    Mustafa, a brother, approximately forty-nine.

6.    Munser, a brother, approximately forty-seven.

7.    Mautaz, a brother, approximately forty-five.

8.    Mazen, a brother, approximately forty-three.

9.    Marwan, a brother, approximately forty.

10.   Maher, a brother, approximately thirty-eight.

11.   Barea, a sister, approximately thirty-five.

*RE: Mohammed Amin K⸱⸱ ⸱n*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

When asked about the professions of the siblings and their status in life he stated that all the girls are married of course and have children; all the girls are housewives.

Concerning his brothers he stated that Maumoon, the deceased brother, was a Professor of Arabic language, that Mustafa is a civil engineer, that Munser is an agricultural engineer, that Mazen is a plant manager, that Marwan is a businessman who owns a store, and that Maher is a tailor who owns his own shop.

*SCHOOL PERFORMANCE:*

He stated that he attended the first through the fifth grades at the Damascus Elementary School, and went on to the middle school and high school which he explained were one single united school.  He did say that this was interrupted briefly by his attendance in middle school when he went to a private school for a year or two.

He went on to report that he was in the top ten of his class when he graduated from high school in 1964, and in the top five in his class when he graduated from Damascus University in 1968.  He received a degree in business and accounting.

He went on to explain that when a particularly gifted student graduated from the University in Syria he was appointed to a government job rather than having to apply for one, and he was appointed to a government job as an auditor and worked for the government for three years.

RE: Mohammed Amin K.   .1

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

WORK PERFORMANCE:

Continuing his work, he then went into the military service as an antiaircraft officer presumably as a reservist, which would have been a term of three years in the service after which he would come back to his normal life with the job.

However, this ordinary progression of events, according to the patient, was interrupted in that Hafez Assad who subsequently became the dictator of Syria insisted for the first time in 1974 that the military vote in an election. Hafez Assad was apparently the only candidate, and the patient states that he voted against him and for doing so wound up in jail for several months, as it was not a secret ballot.

After being released from jail he went back to his job as an auditor until 1974 which was when the first American Embassy was established in Syria after the Israeli war. He stated that he had friends in Detroit and eventually went there. He stated that he also corresponded with schools in Britain, and stated that he had a good friend from UCLA who told him that UCLA would be too expensive for him in Southern California, and that he should go to Baton Rouge, Louisiana where they had a good English program. Hence, he left Syria, apparently somewhat surreptitiously in May of 1975, and came to the United States through Europe.

He continued by stating that he knew his future wife Toni for about six months at the University of Southern Mississippi in Hattiesburg, Mississippi and stated that he wanted to be a hospital administrator, and take the necessary courses for that. His friend who was

*RE: Mohammed Amin K.... .1*

***Sensitive Medical Information. Should Not Be Shown to Patient or Family!***
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

apparently elevated in the administration at the University of Southern Mississippi wanted to send him to Tulane University in New Orleans, but it was too late for the application that year so Dr. Yarrow, his friend, sent him to the University of Houston, and he wound up in Beaumont where he also could not get accepted because of the lateness of his application. He went on to Detroit where he was accepted and got a Master's Degree at the University of Detroit.

He reported that he did not like Detroit because it was cold, gloomy, snowy and rainy so much of the year, but he did finish his degree, and then returned to the University of Southern Mississippi, which is the time at which he met his future wife.

He found that he was making too little money at the University of Mississippi and became in latter 1985 until 1990 the Controller of St. Mary's College in Southern Maryland where he remained until 1990.[6]

He stated subsequently to this examiner that he and his wife went overseas to Saudi Arabia, and he became a finance director for one of their centers.

He stated that he worked for a Saudi billionaire and remained in Saudi Arabia with his wife for four and one half years. He reported that he received good pay, housing, free transport, a free automobile, but felt that the lifestyle was too restrictive, and returned to the United States and became employed by Manna Corporation in about 1995.

---

[6] Like many other dates, including the resume in his reviewed records, the dates are difficult to reconcile, and quite puzzling sine he omitted 4½ to 5 years as an auditor for a member of the Royal Family.

*RE: Mohammed Amin K.     a*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations and utilized only by personnel authorized under the law. This material must be destroyed or returned to the authorizing agency for proper handling.*

Manna Corporation is another non-profit organization that builds low income housing. He reported "I gave them two years." "A friend of mine told me that the UPO was looking for someone, and I went there in 1998. I affected a lot of changes, and I changed their computer system from MS DOS to Windows." He reported that he remained at UPO from 1998 until June of 2004 when he was "riffed."

He neglected to point out something which the records make clear, and that is that Manna had decided to fire him because he was causing such chaos in the accounting department.

## LEISURE ACTIVITIES, HOBBIES, RECREATIONS AND PAST TIMES:

It is very difficult to get him to describe anything that he does or has done which qualifies in this category (except for walking and riding an exercise bicycle at doctor's order as part of his cardiac health regime, and that only intermittently) as he stated that he worked fourteen hours a day for Manna and continued the same for UPO until he managed to cut it back to ten to twelve hours, and finally to eight and one half hours where he works now at Equal Justice Works.

## PHYSICAL HEALTH HISTORY:

He reported that he smoked until 1998 when he had his myocardial infarction, but medical records indicate that it continued longer than this and was a problem. He stated that his salary at UPO was about $88,000 a year before taxes and his salary now at the Equal Justice Works is about $80,000 a year. However, he classifies himself as a "clerk" in his job at Equal Justice because he has no support staff.

*RE: Mohammed Amin K. ı*

---

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.*

---

He stated that he has had multiple health problems, many of which were preexisting by many years. He did, however, emphatically state that the eleven months of unemployment between UPO and Equal Justice Works was the most stressful year in his life. He stated that prior to the confrontation with UPO[7] he had six to seven hours of good sleep per night, but during the year of unemployment he had only two to three hours, something which is contradicted by the records which shows that he went into periods of hypersomnia.

He stated that he lost a lot of weight, and that his favorite foods were of no interest to him. He stated that he dropped from 185 pounds to 165 pounds.

In terms of his hedonia, he claimed that it was poor, and his enjoyment of life during that eleven months of unemployment was extremely poor. Similarly, he claimed that his libido and sex drive went to zero during that eleven months, and there was no sexual activity at all. He stated that it has now returned to 30% or so of the preexisting level[8]. He also reported that he had decreased memory and concentration during the eleven months of unemployment, and spent every waking hour applying for work, afraid that his letters would not be good enough. He did, however, state that he made no trips for interviews, but spoke with people on the phone who, according to his history, immediately began to avoid him as soon as they learned he was involved in litigation with UPO.

---

[7] He, however, blames UPO for his 1998 heart attack.
[8] He does not know, or fails to consider the fact that his multiple medications (see attached chart), especially the anti-depressant SSRI inhibitors are noted for suppressing both sex drive, and the ability to perform sexually. Further, a number of the medications he is on can cause depression, and problems with concentration, as well as irritability and personality changes (e.g., Coreg, which causes depression, confusion, dizziness, drowsiness in a significant number of patients, along with lisinopril, ), so as with all medications there is a risk-benefit ratio consideration, especially when used in such a plethora of configurations as the patient is on.

RE: Mohammed Amin K. ...1

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

He reported that his sleep has returned to a good healthy pattern now, even though he is still experiencing litigation stress, which bothers him to some degree whenever he has a conference with his attorney. He states that nevertheless his sleep pattern, appetite, sex drive, etc. are still all improving.

At this point, he gave as an example of his difficulties at home the problem with his middle daughter, Nabeelah, who started acting out, and when he corrected her (implying only verbally) she started calling the police. This led up to the incident described earlier when he was arrested and spent thirteen nights in jail for cutting off her hair and whipping the bottom of her feet with a stick.

He gave his height as five feet, seven inches, and his weight as 175-180 pounds currently.

He states that he takes a number of medications for his blood pressure, and these are self-evident on the medication list sheet (see attachment below with patient's multiple medications).


HOSPITALIZATIONS:

He reported several hospitalizations for his stomach, his heart, and lower back pain, and in fact the medical/legal records are approximately eight inches high, and were in view on this examiner's desk, and pointed out to the patient during the evaluation.

RE: *Mohammed Amin K.    a*                                          *Page 22*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## SERIOUS ACCIDENTS INCLUDING CAR ACCIDENTS AND HEAD INJURIES:

He denied ever having any broken bones, head injuries, losses of consciousness or other serious illnesses.

## ALLERGIES:

He stated that he has a nasal allergy, but is vague about the attribution. He nevertheless takes Flonase twice a day.

## MEDICATIONS PRIOR/AFTER THE INCIDENT:

His medications are listed on Appendix VI, and he has been on a similar medication list both before and after the incident in question.

## MENTAL HEALTH HISTORY PRIOR TO INCIDENT:

Denied, but a review of the records reveals that he was seen by his family physician for panic attacks, anxiety and depressive moods.

## MENTAL HEALTH HISTORY AFTER THE INCIDENT:

He saw a woman, a Dr. Price[9], after refusing multiple times to go to any psychiatrist. He went to a social worker, however, who insisted that he see a psychiatrist, and he saw the woman psychiatrist about three or four times but felt he got nothing out of it.

---

[9] Note that records Susan L. Price, M.D., the psychiatrist, are not being released by Plaintiff's attorneys because they are saying she is a "fact witness."

*RE: Mohammed Amin K.    .1*

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

The medications which he had been prescribed both before and after the incident in question were selective serotonin reuptake inhibitor antidepressants, and were Paxil and Prozac, among others.

DRUG HISTORY:

Denied, including alcohol.

FAMILY DOCTOR:

None except his cardiologist remains a Dr. Sharma, and a family practitioner named Price, but not the same as the psychiatrist whom he had seen earlier.

LEGAL HISTORY:

He denied ever having been in a lawsuit prior to the confrontation with the UPO and he denied lawsuits by anyone else in his family.

He states that he has a valid Virginia Driver's License, and a copy of this appears in this examiner's chart.

He states that he owns a red van, the year and make of which he was uncertain, but that he had to sell their second car when he ran into financial difficulties after having been "riffed" by UPO[10].

---

[10] He continued to maintain that he had never had a period of unemployment be fore, something which the records contradict.

RE: *Mohammed Amin K.* ₁

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## MENTAL STATUS EXAMINATION

*APPEARANCE AND BEHAVIOR:*

This is an alert, neatly but casually dressed Arabic male who is superficially cooperative, but with much underlying hostility. He nevertheless puts up a good and quite sociable front, and becomes quite verbose to the point where he controls the interview keeping it away from sensitive subjects, and directing it to some degree where he wants to go. He maintains good eye contact throughout the interview, and has a distinct Arabic accent, though he is occasionally difficult to understand. However, he repeats clearly and understandably when this examiner requests.

Exploration of his ability to concentrate and attend is tested during the psychiatric history and mental status evaluation and he shows no difficulties in any of these areas, though he is evasive and misleading regarding material he does not wish to discuss in detail.

He does portray himself in the victim's role, as the hapless "fall guy" for UPO. He even goes so far as to say that "UPO caused my heart attack."

*SPEECH:*

His speech is coherent, goal directed, and organized with a quite reasonable vocabulary for someone who has English as a second language. His speech is characterized by a subtle bias built in for his own position in this litigation. There is no example of aphasia either receptive or expressive, and no dysarthria.

*RE: Mohammed Amin K.    1*

**Sensitive Medical Information. Should Not Be Shown to Patient or Family!**
*This material must be considered extremely confidential under the HIPPA regulations
and utilized only by personnel authorized under the law. This material must be destroyed
or returned to the authorizing agency for proper handling.*

## EMOTIONAL MOOD AND AFFECT:

He presents with an underlying, longstanding, unrelated dysthymia with anxiety which stems from childhood or early adulthood at the very latest. There is, however, only minimal flattening, blunting or constriction of affect, and his mood is level throughout evaluation and the testing.

## THOUGHT CONTENT:

He clinically appeared to be dependent in orientation, and histrionic with significant exaggeration concerning the multiple discomforts inflicted on him by his former employers. He himself assumes no responsibility, but feels that the blame is entirely theirs. He is neither suicidal nor homicidal. There is no evidence of paranoid ideation, delusions, hallucinations or thought disorganization. There is a repetitive tendency during the psychiatric interview and mental status examination to focus on physical problems.

## SENSORIUM AND INTELLECT:

He is oriented in all three spheres to time, person and place, and has a wide knowledge about world affairs, both here and abroad. Both recent and remote memory are intact as are intermediate and immediate memory. His intelligence quotient is clinically assessed as well above average.

## JUDGMENT AND INSIGHT:

This is difficult to assess as he is not candid as a historian; it is, however, estimated to be fair to good given his cultural and litigation bias.

RE: Mohammed Amin K.    .i

*Sensitive Medical Information. Should Not Be Shown to Patient or Family!*
*This material must be considered extremely confidential under the HIPPA regulations*
*and utilized only by personnel authorized under the law. This material must be destroyed*
*or returned to the authorizing agency for proper handling.*

## CURRENT MEDICAL REGIMEN:

He is seeing his family doctor and his cardiologist for studies relating to his heart and continuing medication which includes Coumadin, a medication which requires regulation.

## CURRENT MEDICATIONS:

These are listed above under "Medications."

## NEUROLOGICAL EVALUATION:

It is essentially within normal limits. There is no ataxia, antalgia, and extra ocular musculature is intact. There is no dysmetria, dysarthria, or paresis and the general neurological evaluation is entirely within normal limits. Psychological testing includes the MMPI-2 which will be covered under Neuropsychiatric Test Results at a later point.

## APPENDIX II

## NEUROPSYCHIATRIC TEST RESULTS:

➤ There was no objective issue of neurocognitive dysfunction from this patient beyond subjective complaints of poor memory, attention and concentration, which were difficult to evaluate because of his lack of candor. He was given one of the oldest, most reliable objective psychological tests in the world, which is the MMPI-2, now in its first revision in 1989 or 1990 and is now called the Minnesota Multiphasic Personality Inventory-2.