UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Mohammed Amin Kakeh,

    *Plaintiff*,

v.

United Planning Organization, Inc.,

    *Defendant*.

Civil Case No. 1:05-cv-1271 (GK/JMF)

Next Scheduled Event:
Pretrial Conference
April 8, 2008, 4:15 P.M.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S
FEBRUARY 28, 2008 MEMORANDUM OPINION**

**SUMMARY OF ARGUMENT**

Defendant has no new facts and no new law and has failed to demonstrate that the Court made a clear error of law when it issued its February 28, 2008 order denying summary judgment as to the three whistle-blower counts: Count I (Employees of District Contractors and Instrumentality Whistleblower Protection Act of 1998 ("DCWPA"), D.C. Code §§223.01 *et seq.*), Count IV (Federal False Claims Act, 31 U.S.C. § 3730(h), and Count V (D.C. False Claims Act, D.C. Code §2-308). "[R]econsideration is only appropriate when 'the moving party shows new facts or clear errors of law which compel the court to change its prior position.'" *Carter v. Washington Metropolitan Area Transit Authority,* 503 F.3d 143, 145 (D.C. Cir. 2007)(*quoting Nat'l Center for Mfg. Sci. v. Dep't of Def.,* 199 F.3d 507, 511 (D.C. Cir. 2000). More importantly, however, "'reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.'" *Id.* (Citations omitted.)

Defendant is simply rehashing old arguments and has not pointed the Court to any new controlling law, any new facts or any clear error of law which would justify a change in its

1

decision. Defendant myopically focuses on small portions of Tunde Eboda's testimony and argues that Plaintiff was not a whistle-blower because he was performing his normal job duties when he reported wrongdoing to Eboda and that even if he were, the Defendant has demonstrated as a matter of law that it was unaware that Plaintiff made any protected disclosures to Eboda. (Def. Mem. at 3-8.) Defendant's arguments should be rejected now for the very same reasons they were rejected before. First, Eboda's testimony – from which Defendant selectively quotes – and that of other witnesses establishes that Defendant not only knew about Plaintiff's disclosures to Eboda and his team, but that Defendant's managers – Sheila Shears and Gladys Mack -- actively opposed them, attempted to stop them and when that was not possible advocated vigorously for his termination. Second, Defendant's narrow focus on Plaintiff's protected disclosures to Eboda and his team ignores the larger record of other protected disclosures which in and of themselves would mandate a denial of summary judgment. Plaintiff engaged in whistle-blowing of various types including investigating and reporting wrongdoing to other outside agencies, refusing to follow illegal orders, and investigating and reporting wrongdoing to his supervisors.

**ARGUMENT**

**I.     DCWPA LEGAL PRINCIPALS**

The DCWPA identifies two alternative forms of protected disclosure "protected disclosure" reprisal and "illegal order" reprisal.  D.C. Code §§2-223.01(4,7), 2-223.02; *see Lerner v. District of Columbia*¸362 F.Supp.2d 149, 165-66 (D.D.C. 2005). A plaintiff establishes a *prima facie* case of retaliatory termination for protected disclosure reprisal by showing that: (1) he engaged in whistleblowing by making a "protected disclosure", and (2) the disclosure was a contributing factor in the employer's decision to take or fail to take a personnel action.  *Crawford v. District of Columbia,* 891 A.2d 216, 218-19 (D.C. 2006).  In the case of 'illegal order' reprisal, Plaintiff must show: (1) actual refusal to obey an illegal order; and (2) that the disclosure was a contributing factor in the employer's decision to take or fail to take a personnel action.[1]  *C.f.* D.C. Code §§2-223.02, 2-2230.03; *Anderson v. Ramsey,* 2006 WL 1030155 at *13 (D.D. C. 2006).

Under the DCWPA, a 'protected disclosure' is "any disclosure of information, not specifically prohibited by statute, by an employer to a supervisor or a public body, that the employee *reasonably believes* evidences, *inter alia,* gross mismanagement; gross misuse or waste; violation of a federal, state, or local law, rule or regulation, or of a term of a contract. *See* D.C. Code §2-223.01(7)(emphasis added).  The test for 'reasonable belief' under this standard is

---

[1] On page 4 of its memorandum, Defendant states incorrectly that once Plaintiff has shown that his protected disclosures were a contributing factor in the decision to terminate him, Plaintiff bears the additional burden of showing that he would not have been terminated had he not made the disclosures.  However, Defendant is incorrect; it is settled law that the burden of proving that Plaintiff would not have been terminated in the absence of disclosures is on the Defendant and it is onerous – by clear and convincing evidence.  "[O]nce it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 2-223.02 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the employing District […] contractor to prove *by clear and convincing evidence* that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section."  D.C. Code §2-223.03(b) (emphasis added).  *Also see Crawford, supra,* 891 A.2d at 219 ("Thus, after a plaintiff makes a *prima facie* case that his 'protected disclosure' was a 'contributing factor' in his dismissal, the burden shifts to the defendant to show by clear and convincing evidence that the plaintiff's dismissal would have occurred for 'legitimate, independent reasons' even if he had not engaged in activities protected under the Act").

"[C]ould a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the action of the [employer] evidences [illegality]?" *Zirkle*, 830 A.2d at 1259-60. While a purely subjective opinion of the employee is insufficient to constitute a 'reasonable belief,' evidence of reasonable belief of the whistleblower is bolstered where the whistleblower himself has expertise in the subject matter of the disclosure. *Id.* at 1260.

Under the DCWPA, a "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." D.C. Code §2-223.01(2). Whether or not the protected activity was a "contributing factor" with respect to a particular personnel decision is a question of fact for the jury to decide. Contributing factor status can be shown circumstantially, by showing evidence that: (A) the official taking the personnel action knew of the disclosure; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. 5 U.S.C. §1221(e)(1). The MSPB has held that knowledge for purposes of this provision can be either actual knowledge or constructive knowledge, the latter being shown "by demonstrating that an individual with actual knowledge of the disclosure influenced the official accused of taking the retaliatory action." *Easterbrook v. Dept. of Justice,* 85 M.S.P.R. 60 (2000) ¶11.

## II.     THE FALSE CLAIMS ACTS

The District of Columbia Circuit has stated that to make out a successful claim of retaliation under 31 U.S.C. § 3730(h), a plaintiff must demonstrate: "(1) he engaged in protected activity, that is, 'acts done ⋯ in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity. To establish the second element, the employee

4

must in turn make two further showings. The employee must show that: (a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'" *Shekoyan v. Sibley Intern. Corp,* 309 F.Supp.2d 9, 13 (D.D.C. 2004).

"Determining whether an employee has engaged in protected conduct under the FCA is a 'fact specific inquiry.'" *Shekoyan v. Sibley Intern. Corp.*, 409 F.3d 414, 423 (D.C. Cir. 2005). "[A] plaintiff need not inform his employer that he is contemplating filing a qui tam action to come within the protection of section 3730." *Id.* at 15. Instead, "the language of the FCA 'manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." Thus, while the employee 'must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action,' it is not necessary for a plaintiff 'to 'know' that the investigation ⋯ could lead to a False Claims Act suit.'" *Id.* at 423 (emphasis in original, internal citations omitted).[2]

---

[2] There is no requirement that Plaintiff tell his superiors he is investigating a false claim or that he threaten to report the claim to an outside agency:
> [T]here is also no requirement that a plaintiff tell, or threaten, his employer that he will    report    his allegations to the government—or to tell anyone outside of the employing    institution. As the statute does not require the employee to make an outside complaint    in order to render his conduct protected, he cannot be required to advise of or threaten    such a complaint. Moreover, as with a requirement that an employee tell his employer he    is contemplating filing a qui tam suit, a requirement that an employee announce that he has gone outside the institution would undercut the statutory purpose of encouraging employees to expose fraud.

*U.S. ex rel. Yesudian v. Howard University,* 153 F.3d 731, 743 (D.C. Cir. 1998). The test for a plaintiff in a False Claims Act reprisal is not proof of some sort of talismanic, 'magic words' notice recitation of intent to look into False Claims Act issues; Plaintiff instead merely must show that his employer was aware of Plaintiff engaging in activities such as would fall under the definition of protected activities. *Id.* at 742-43. The D.C. False Claims Act should be interpreted similarly.

### III. THERE IS AN ABUNDANCE OF EVIDENCE THAT DEFENDANT KNEW ABOUT PLAINTIFF'S DCWPA DISCLOSURES – PARTICULARLY THOSE MADE TO EBODA

The Court made no clear error of law when it left to the jury the question of whether Defendant had knowledge of Plaintiff's protected disclosures to Tunde Eboda under the three statutes at issue. Defendant focuses almost exclusively on selective portions of Eboda's testimony but ignores other parts. Defendant also ignores Shears's own testimony and actions which demonstrate that she knew Plaintiff had made protected disclosures to Eboda because she took active steps to stop them.

There is no question that Plaintiff's private meetings with Eboda on and after February 10, 2004 involved protected disclosures. (Plaintiff's Statement of Material Facts and Genuine Issues ("PSMF") ¶¶ 49, 50, 56.) Among the documents and other information provided by Plaintiff to Eboda were written financial statements prepared by Plaintiff which showed that Defendant was running a deficit and that it was attempting to charge non-program related expenses to the CSBG grant. (*Id.* ¶ 58.) These disclosures were far more than simply evidence of a disagreement between Plaintiff and his supervisors, as they showed that Defendant was intending to make false claims or engage in fraud, waste and abuse and they were beyond Plaintiff's authority to act as circumscribed by Shears, his supervisor. Prior to these disclosures, Plaintiff had been expressly barred by Shears from sharing such financial statements with Eboda in the absence of her review and approval. By her own admission Shears had not reviewed the financial statements that Plaintiff had shared with Eboda's team. *(Id.* ¶ 37; Shears Dep. at 50-52, attached to Plaintiff's Opposition to Summary Judgment as Exhibit 24.) Further, Plaintiff's disclosures to Eboda were not made in the course of routine financial review, as Defendant suggests, but prior to any review and Plaintiff's disclosures prompted Eboda to conduct a more

extensive financial review using outside experts, a review which exposed significant fraud, waste and abuse and a review in which the Plaintiff participated in a manner prohibited by Shears. (*Id*. ¶ 49.)

More importantly, however, the evidence demonstrated that Mack and Shears were fully aware of Plaintiff's disclosures to Eboda. Defendant conveniently relies upon selective parts of Eboda's testimony and ignores other parts and the record as a whole. For example, on or about February 19, 2004, Eboda met with Sheila Shears, Gladys Mack and Benjamin Jennings and discussed the Plaintiff's allegations that Defendant committed fraud, waste and abuse. (*Id*. ¶ 56.) During that meeting, Shears made the following statements and took the following actions which demonstrated that she was aware that Plaintiff had made protected disclosures: (1) she pointed to financial statements which were clearly authored by Plaintiff and said that they were inaccurate; and (2) she told Eboda to disregard them, not have further contact with Plaintiff and to direct all questions to her. (*Id*. ¶¶ 57, 58.)

Mack and Shears's knowledge of the disclosures to Eboda and their significance is further demonstrated by their subsequent threatening directives to Plaintiff to produce fraudulent financial statements which eliminated or significantly reduced the deficit by recharacterizing CSBG fund advances. (*Id*. ¶¶ 61.) A reasonable fact finder could clearly infer that Mack and Shears could have prepared financial statements themselves, but directed Plaintiff to prepare them so as to give the impression that he had retracted his protected disclosures, another fact which demonstrates their full knowledge of his disclosures to Eboda. Plaintiff refused to "cook the books" and this further infuriated Mack and Shears who together plotted his termination, another fact which suggests that they had full knowledge of his disclousres. (*Id*. ¶¶ 62-64.)

Further, Eboda, testified that he reported to Jones and Alexis Roberson, that Plaintiff had made protected disclosures to him. (*Id.* ¶ 72, 73.) In fact, in Eboda's mind, the fact that the Plaintiff had made protected disclosures was common knowledge at Defendant by March, 2004. (*Id.* ¶ 73.) The following excerpts from Eboda's testimony were ignored by Defendant and demonstrate that Defendant had knowledge of Plaintiff's protected disclosures to Eboda:

> Q. At the time, is it fair to say, at that time, based on your conversations with the board, Mr. Jennings, Ms. Mack, and Ms. Shears, that they understood that the source of your information, in part, at least, was Mr. Kakeh?
> A. I think it—everything pointed to him. I know, at some point later, I disclosed the fact he was cooperating and being helpful to us. I think I may have done that months later when the new management team was formed.
>
> ***
>
> Q. Did you indicate this to anybody else, at any time, that Mr. Kakeh had been cooperating with you?
> A. By the time we were substantially into the exercise I no longer, it was clear to me it was out there, I no longer took extra precautions to conceal that it may have happened. As a matter of routine, if any document we were looking at came up, I think I would identify it, if I got it from Mr. Kakeh, I would say I got it from him.
>
> ***
>
> Q. You indicated earlier, maybe a minute ago, when I asked you about whether people at UPO not about the board, but whether management knew Mr. Kakeh was the source of a lot of information, and you indicated that, at the time, I guess you were referring to March or April, it was clear to you this was out there. Do you mean it was clear to you in March or April that members of management knew that Mr. Kakeh had been the source of your information?
> A. That was my belief. The majority of the documents we were looking at came from the finance unit. Ms. Shears was not the author of many of those documents. Mrs. (sic) Amin, by responsibility, had produced those documents and we had a number of those documents.

(Eboda Dep. at 91-95, attached as Exhbit A.)

Other evidence of Shears and Mack's knowledge of Plaintiff's protected disclosures is that Shears and Mack continued to press Plaintiff to retract his disclosures by altering his financial statements and when he did not, plotted his termination. On March 11, 2004, Shears submitted a letter of resignation to Jennings in which she catalogued her many requests to have

the Plaintiff terminated based in part on his issuance of financial statements – statements which she did not approve and which showed an inordinate deficit -- yet another fact indicating that she wished to have him terminated based on his disclosures. (*Id.* ¶ 63.) On March 25, 2004, Mack formally became Acting Executive Director, and that same day demanded that Plaintiff alter the financial statement he had prepared to conceal Defendant's deficit. (*Id.* ¶¶ 67, 70.) On or about March 25, 2004, Mack and Shears accused Plaintiff of insubordination – a terminable offense – for failing to alter the financial statements in the manner that they wished. (*Id.* ¶ 70.) As late as April 6, 2004, during a meeting with Jones, Mack, Beckham, Shears, and Roberson demanded that Plaintiff explain why he was refusing to alter the financial statements. (*Id.* ¶ 79.)

Further, Defendant ignores many other protected disclosures that Plaintiff made during the course of his employment, evidence which itself would justify denial of summary judgment as to Counts I, IV and V. Plaintiff made protected disclosures to Gawad, Marty and Duncan—all agents of public bodies under the meaning of §2-223.01(8)—as well as disclosures to his various supervisors, including Jones, Mack, Shears, Jennings, Beckham, Roberson, and several other members of Defendant's Board and senior staff. (*Id.* ¶¶ 27, 40, 45-56, 59-60, 62, 67-70, 75-76, 79-80, 85-86, 90-91.)

Plaintiff has far more than met his burden of showing sufficient evidence for a jury to conclude that he made numerous and material protected disclosures in the months that preceded his termination, that Defendant was fully aware of all of them and that Defendant terminated his employment as a result.

### IV. PLAINTIFF ENGAGED IN PROTECTED ACTIVITY UNDER THE FALSE CLAIMS ACTS AND DEFENDANT WAS AWARE OF IT

Plaintiff also engaged in conduct protected under the False Claims Acts. Specifically, Plaintiff as far back as 2003 was engaged in active attempts to investigate indicia of financial

9

misconduct on the part of Defendant. (PSMF ¶¶ 40, 42, 44.) Based on diligent investigations, Plaintiff was able to determine by the end of 2003 that Defendant and its agents had made numerous false statements, certifications, and other filings to agencies of the Federal and District of Columbia Governments in order to procure financial benefit. (*Id.* ¶¶ 44-49.) Beginning in January 2004, Plaintiff made numerous and detailed disclosures of Defendant's myriad false statements to agents of both the District of Columbia and Federal Governments. (*Id.* ¶¶ 44-50, 53-56, 59-60, 68, 78, 84-86, 90-91.) Plaintiff also opposed illegal orders of Defendant, a fact which was clearly known to Defendant. Defendant became aware of Plaintiff's protected investigatory, disclosure and oppositional activities on or before March 2004. (*Id.* ¶¶ 73.)

Plaintiff had also disclosed to Beckham, Mack and Defendant's auditors his intent to potentially seek assistance outside UPO as part of his protected investigations of Defendant's financial improprieties as far back as November 2003, and Defendant was well aware of Plaintiff's disclosures of CSBG improprieties to Eboda by March 2004. Eboda directly disclosed Plaintiff's protected activities to Defendant's Board and senior management. (*Id.* ¶ 44.) In addition to these express disclosures, Defendant also was aware of Plaintiff's protected activities based on its observations of Plaintiff's conduct. (*Id.* ¶92.)

**V.    DEFENDANT'S ARGUMENT THAT PLAINTIFF WAS ENGAGED IN NORMAL JOB DUTIES RATHER THAN WHISLE-BLOWING WHEN HE REPORTED WRONGDOING TO EBODA IS WITHOUT MERIT**

Principally focusing on the Eboda disclosures, Defendant argues once again that even if it knew about Plaintiff's reports of wrongdoing to Eboda, Plaintiff could not have engaged in whistle-blower activities because his disclosures to Eboda were part of his normal job duties and at best customary disagreements with his supervisors.   Defendant relies in part on two cases from the Federal Circuit, *Huffman v. Office of Personnel Management,* 263 F.3d 1341, 1346-53 (Fed. Cir. 2001) and *Willis v. Department of Agriculture,* 141 F.3d 1139, 1143 (Fed. Cir. 1998). These cases are not binding on this Court and they involve a different statute than the DCWPA, the federal WPA, 5 U.S.C. § 2302, which has several significant distinctions.   While the DCWPA has two different theories—'protected disclosure' reprisal and 'illegal order' reprisal— only one of those two ('protected disclosure') is incorporated into 5 U.S.C. §2302(b)(8). *Compare* 5 U.S.C. §2302(b)(8) *to* D.C. Code §§2-223.01(4,7), 2-223.02.   Additionally, the DCWPA by its express terms includes disclosures to supervisors (§ 2-223.01(7)), while the federal WPA does not (§ 2302 (b)(8)).   This demonstrates the intent of the drafters of the DCWPA to make all disclosures protected, including all disclosures made to supervisors and renders *Huffman* and *Willis* inapplicable.

Even if the Court concludes that these cases are applicable to the interpretations of the DCWPA, Defendant has neglected to mention the language in *Huffman* which establishes that Plaintiff's disclosures to his supervisors were protected disclosures even under the more restrictive federal WPA standards. The *Huffman* Court explained that there are situations when an employee exercising normal job duties may also be engaged in making protected disclosures:

>It is important, however, to distinguish three quite different situations. *First,* there is the situation in which the employee has, as part of his normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels. A law enforcement officer whose duties include the investigation of crime by government employees and reporting the results of an assigned investigation to his immediate supervisor is a quintessential example. . . . Extending the WPA's protections to such situations would be inconsistent with the WPA's recognition of the importance of fostering the performance of normal work obligations and subjecting employees to normal, non-retaliatory discipline.
>
>\*\*\*
>
>*Second,* there is the situation in which an employee with such assigned investigatory responsibilities reports the wrongdoing outside of normal channels. An example is a law enforcement officer who is responsible for investigating crime by government employees who, feeling that the normal chain of command is unresponsive, reports wrongdoing outside of normal channels. This is clearly a disclosure protected by the Act, and the Act's core purposes are served by such a disclosure.
>
>\*\*\*
>
>*Third,* there is the situation in which the employee is obligated to report the wrongdoing but such a report is not part of the employee's normal duties or the employee has not been assigned those duties. The government argues here that the petitioner was obligated her to report all wrongdoing . . . and that his reports of wrongdoing are not protected disclosures. We cannot accept the government's contention.

*Huffman, supra,* 263 F.3d at 1352, 1354.

Plaintiff's disclosures to Eboda are clearly protected even under the more restrictive federal WPA standards for several reasons. First, the federal WPA does not make opposition to an illegal order a protected disclosure, which the DCWPA does. In this case, Plaintiff clearly made DCWPA protected disclosures opposing illegal orders from Shears and Mack to fraudulently alter financial statements. Second, *Huffman* makes it unmistakably clear that Plaintiff's disclosures to Eboda were outside of normal channels and therefore protected despite any relationship that they may have to the duties of his position. Plaintiff contacted Eboda and met with him away from his office. Plaintiff did so because he believed that Defendant's top management would be unresponsive to his concerns, precisely the type of action which makes

12

the disclosure protected.  Plaintiff then made additional disclosures to Eboda which again were outside of normal channels since he was not tasked by Shears with being Eboda's point of contact nor was he authorized by Shears to share financial statements with Eboda unless she had approved them.  Shears had in fact barred Plaintiff from sharing any financial statements with Eboda and expressly made herself rather than Plaintiff his point of contact.  Thus, Plaintiff's disclosures to Eboda  fell within *Huffman* situations two – going outside of the normal chain of command – and three – reporting wrongdoing that is outside his normal duties even though he may have been obligated to report such wrongdoing by virtue of his position as Comptroller and Certified Public Accountant.

Defendant relies upon three other published opinions from outside this jurisdiction to support its claim for reconsideration.  They include *Skare v. Extendicare Health Services,* 515 F.3d 836 (8th Cir. 2008); *Freeman v. Ace Telephone Association*, 404 F.Supp. 2d 1127 (D. Minn. 2005); and *Deneau v. Manor Care, Inc.,* 219 F.Supp. 2d 855 (E.D. Mich. 2002).  None of those opinions provide Defendant with any support.  Each involves a state whistle-blower statute with different language and objectives and each involves employees in very different positions than that of Plaintiff with a very different set of responsibilities.

In short, Plaintiff engaged in protected whistle-blowing activities by disobeying illegal orders, complaining to third parties and the Board and complaining to his supervisors.

## CONCLUSION

For the reasons stated, Defendant's Motion for Partial Reconsideration of the Court's February 28, 2008 Order should be denied.

Respectfully Submitted,

 /s/Vincent Melehy
Vincent Melehy, Esq.
D.C. Bar No. 415849
Melehy & Associates, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Phone: (301) 587-6364
Fax:    (301) 587-6308
Email: ovmelehy@zmdlaw.com

*Attorney for Plaintiff*