DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Mohammed Amin Kakeh,             *

       Plaintiff,        *     Civil Case No.

v.                               *     1:05-CV-1271

United Planning                  *

Organization, Inc.,              *

       Defendant.         /

Silver Spring, Maryland

Monday, March 6, 2006

Deposition of:

SHIRLEY G. FISHER,

the witness, called for oral examination by

Counsel for the Plaintiff, pursuant to notice,

held at the law offices of Zipin & Melehy, 8403

Colesville Road, Suite 610, Silver Spring,

Maryland, beginning at 1:15 p.m., before Donald E.

Brayboy, Court Reporter and Notary Public in and

for the State of Maryland, when were present:

EXHIBIT
A

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 4

1                P R O C E E D I N G S

2          *    *    *    *    *    *    *

3              SHIRLEY G. FISHER,

4     having been duly sworn, testified as follows:

5     EXAMINATION BY COUNSEL FOR PLAINTIFF:

6  BY MS. McFARLAND:

7          Q.   Ms. Fisher, have you ever had your

8  deposition taken before?

9          A.   Yes.

10         Q.   You're familiar with the process?

11         A.   I am familiar with the process.

12         Q.   Okay.  Please just, if I ask a question

13 that you're unclear on, just ask for

14 clarification, if you will.

15         A.   I'll make sure.

16         Q.   Can you tell me what your position is at

17 United Planning Organization?

18         A.   My title is Head of Competitive Grants

19 Division.

20         Q.   And what's that position entail?

21         A.   That means that I'm responsible for the

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 5

1    oversight of some small grants that are given to

2    the community to provide social services to

3    indigent residents of the District of Columbia.

4         Q.   How long has that been your position?

5         A.   Since February of two thousand -- I'm

6    sorry -- July of 2001.

7         Q.   Were you employed by United Planning

8    Organization before that?

9         A.   Yes.

10        Q.   And what was your position then?

11        A.   I began working for the United Planning

12   Organization on February 9, 1981.  And I was the

13   Director of Substance Abuse Services until -- gee,

14   let me get my dates correct here.

15             I believe it was 1998 that I became the

16   director of a program that was called the

17   Community Transition Program.  It was either '97

18   or '98.

19             For one year prior to the actual

20   beginning of that program, I was acting as the --

21   how would I put it?  -- the liaison between UPO

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 14

1    you would like them to.

2         Q.   Uh-huh.

3         A.   And so it may have been a situation

4    where I got the request in not as quickly as I

5    should have.

6         Q.   Uh-huh.

7         A.   Because sometimes things will come up.

8    And it wasn't a situation where it was anybody's

9    fault.  It's just that things didn't happen as

10   quickly as I needed them to happen.

11            So I just went to him to get -- to make

12   sure that I could get reimbursed.

13        Q.   Okay.

14        A.   Yes.

15        Q.   Do you recall when Ben Jennings left

16   employment with UPO?

17        A.   Let me see.

18            I believe, if I recall correctly, I

19   would say in March.  I believe it was in March of

20   2004.

21        Q.   Do you know why he left?

Page 15

1       A.    Do I know why he left?

2       Q.    Uh-huh.

3       A.    Only from the tidbits of information

4   that I heard, that there was some problems with --

5   funds may have been in use for purposes other than

6   they were allocated.

7            Quite honestly, since I've not had

8   any -- not seen anything in writing, I really

9   don't know exactly why he was dismissed from his

10  job.

11           Only from what I heard in passing and

12  from what I read in the newspapers.

13      Q.    Okay.  Who did you hear this from, that

14  funds were used for purposes other than they were

15  allocated?

16      A.    There was just kind of some gossip in

17  the agency.  And then I think there was a staff

18  meeting.  Let me see.

19           I believe there was a meeting.  Yes.

20  And I don't know -- maybe a week or so after he

21  actually left the agency there was a meeting that

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 18

1   Columbia --

2        A.   I heard that there was, but I don't -- I

3   can't, you know, I just heard that in passing.

4            You know, UPO is a small agency, very

5   small.  So there's a lot of hearing things in

6   passing.

7        Q.   Uh-huh.  And in this, you know, sort of

8   gossip that's going on, what did you hear was the

9   reason for the investigation?

10       A.   That there was some possible misuse of

11  funds.  I believe that was essentially what it

12  was, that funds had been used for purposes other

13  than what they were intended for.

14       Q.   Did you hear anything about misuse of

15  company credit cards?

16       A.   Oh, that was -- yes.  Yes.

17       Q.   What did you hear?

18       A.   Well, that several staff had -- had --

19  they were able -- that they actually used the

20  cards, that there was a lot of charges on these

21  credit cards.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 19

1          And I think that that was one of the

2    things that might have been possibly talked about

3    in that meeting that I'm alluding to, but I'm not

4    sure.

5          Q.   Uh-huh.

6          A.   Just kind of in passing that there was

7    some credit card problems, yes.

8          Q.   Do you remember which staff members were

9    using the credit cards?

10          A.   Shirley Hill, I believe, was one of

11    them.

12          Q.   And what was her position?

13          A.   Shirley was -- I don't know the exact

14    title, but I believe she was a driver for the

15    executive office, for Mr. Jennings and Ms. Mack,

16    and also, I think, another person there by the

17    name of Darlene Booker.

18          That's what I heard.

19          Q.   Who did you hear these things from?

20          A.   From people in passing.  I think that --

21    actually, Shirley told me that she had access to

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 20

1    this card, but that she only used it when she was

2    allowed to use it, something like that, that she

3    had permission to use it.  I talked with her.

4         Q.   Do you remember if this was before,

5    during, or after the IG investigation?

6         A.   Probably during, but I'm not sure about

7    that, because I really don't know when it ended.

8    There were so many people running in and out of

9    UPO until I have no idea when it actually ended.

10         But I know that it was for a period of

11   time.  Maybe a month, six weeks, two months.  I

12   don't know the exact time period.

13        Q.   Okay.  Did any of the investigators ever

14   question you?

15        A.   Yes.

16        Q.   Do you remember who it was that

17   questioned you?

18        A.   Ken Marti, M-A-R-T-I, I believe.

19        Q.   Do you remember when that was?

20        A.   Possibly -- I tried to find my daytimer

21   for that period over the weekend.  I must have

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 22

1              Yes, there were some things I was

2      concerned about.  One of the things that I know

3      for sure that occurred was the purchase of a boat.

4          Q.   Uh-huh.

5          A.   And I think that, you know, a lot of

6      people on staff were going fishing on that boat.

7              And certainly I was not under the

8      impression that a social service agency purchased

9      a boat for people to go fishing on.  I don't know

10     what that was all about.

11             Also -- I'm trying to think of some of

12     the things that occurred.

13             One of the people on staff had purchased

14     a -- UPO actually, I believe, they were given

15     houses by Housing and Urban Development to rehab.

16     to sell to --

17         Q.   Uh-huh.

18         A.   -- low-income families in the District

19     of Columbia.  And one of the staff members was

20     allowed to purchase one.  And I just felt that

21     that was inappropriate.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 23

1              I'm trying to think what else I might

2      have talked about.

3              Oh.  So essentially it was basically

4      anything that we had encountered that we felt was

5      inappropriate.

6              People taking trips to Hawaii for -- I

7      think of a couple of board members or one board

8      member, at least, maybe a couple.  There were a

9      lot of trips that people were taking.  And it was

10     usually a select few.  It was not spread across

11     the --

12         Q.   Uh-huh.

13         A.   -- the board.

14         Q.   Who -- you said you knew for sure that

15     they purchased a boat.

16         A.   (Witness nodding head.)

17         Q.   How did you know for sure?

18         A.   Well, actually, one of the staff members

19     at UPO told me.

20         Q.   Who was that?

21         A.   Larry Deneal.  He was a very good friend

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 24

1    of Mr. Jennings.  Well, I knew the boat, because

2    we used to go fishing on the boat.  And I used to

3    take some of my kids on the boat.  We would pay

4    for it out of our call center.

5            The kids who were in the program, we

6    would take them out so that they could learn

7    some -- well, most of them, they were inner city

8    kids.  They'd never been out on the bay.  So on

9    several occasions I would take the kids out on the

10   boat.

11           And apparently that was -- and that was

12   one of the boats also that UPO had been using for

13   these boat trips that they were taking people

14   fishing, etc., etc.

15           And so Larry told me that the boat was

16   for sale and that Ben had bought the boat.

17       Q.   Do you remember about when this was?  Do

18   you know the composition clearly?

19       A.   Whew.  When would it have been.  I don't

20   know.  Maybe 2003.  I'm not sure.

21       Q.   And what was Larry Deneal's position at

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 25

1    UPO?

2        A.    I don't know what his title is, but he

3    does -- he is a grants writer for the agency.

4        Q.    Does he still work at UPO?

5        A.    Yes.

6        Q.    Do you know when he started?

7        A.    No.    Probably -- hum -- early '90s,

8    maybe.    I'm not sure.

9        Q.    Okay.

10       A.    Mid '90s.    Quite frankly, I'm not sure.

11       Q.    Did you talk to any other UPO employees

12   about the purchase of the boat?

13       A.    Well, I think it was pretty common

14   knowledge.    Everybody knew that there was a boat.

15       Q.    Uh-huh.

16       A.    And in passing we might speak about a

17   boat.    But -- and then speak about people going

18   out of there fishing on Wednesdays and whatever,

19   you know.

20       Q.    Did you ever talk to Amin Kakeh about

21   the purchase of a boat?

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 27

1      But she had indeed purchased a house.

2  And later I found out that, yes, she had.

3      Q.   Okay.  You also mentioned that board

4  members were taking trips to Hawaii.

5      Do you remember which board members that

6  was?

7      A.   Hmmm. I think one of them has died.  Not

8  just to Hawaii, but to other places.  I'm trying

9  to remember.

10      One of them has since died, but I think

11  he ended up paying his money for the cost of the

12  trip back after all of this investigation began.

13      Q.   You also said that it was just a few

14  people, not spread out across the board.

15      A.   Yes.

16      Q.   Can you just explain what you meant by

17  that?

18      A.   Well, there was usually a group of

19  people --

20      Q.   Uh-huh.

21      A.   -- that went on trips.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 28

1          There were just the same -- usually the

2     same people that were going on the trips.  And

3     instead of other people being asked would you be

4     interested in going to this conference or that

5     conference, it was just usually the same people.

6          Q.   And can you list for me who those people

7     were?

8          A.   Wayne Thompson, Cheryl Christmas,

9     Priscilla Francis -- trying to think -- Thelma

10    Brown went frequently, Vanessa Rawls, and I think

11    Darlene Booker went fairly frequently.  I'm not

12    sure.  But I think so, because there was a board

13    member by the name of Dorothy Brown who went on

14    quite a few of the trips.  And Darlene's job was

15    to kind of take care of her, because she had some

16    medical problems.

17          There were other people, but offhand I

18    don't recall who they were.

19          Q.   Okay.

20          A.   But they were usually the core group

21    that always went.  And then Ben usually went.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 29

1      Q.    Did Gladys Mack go on any of these

2   trips?

3      A.    I think she went on a couple, but I'm

4   not real sure how many.

5      Q.    You also said earlier that when you hear

6   things at UPO, it's usually gospel, it's true,

7   because it's a small organization.

8          Can you elaborate on what you meant by

9   that?

10     A.    Well, let me see.  How might I say this.

11   There's a -- let me see.  How would I say this.

12   It seems like everybody kind of knows what every

13   other department is doing at UPO for some reason.

14   And there's a lot of talking back and forth.  It's

15   a small agency and many of the people have been

16   there for a long time.  So there are friendships.

17   You know how this usually is when you're in a

18   small organization.

19          So people will tell you things that are

20   actually going on.  And usually you can find out.

21          And then one, if one is astute, one

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 52

1    Q.   Did you ever see the letter?

2    A.   You know, I'm trying to remember if I

3    saw a copy of that letter or not.  I'm not sure.

4    I may have, but I'm not sure.

5    Q.   Do you know what it said?

6    A.   Essentially that the office was being --

7    that the management and administration of the

8    finance office was being out-sourced, something to

9    that effect.

10   Q.   Did the letter mention anything about

11   the investigation of UPO or any financial

12   mismanagement?

13   A.   I don't know.

14   Q.   Did Mr. Kakeh ever mention to you that

15   he might have received the RIF notice in

16   retaliation for cooperating in an investigation?

17   A.   Yes.

18   Q.   When did he say that?

19   A.   On the day that he got the notice,

20   because I was, you know, I was quite overwhelmed.

21   I respected him.  I liked him a lot.  He was

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 53

1    always very helpful to me.

2        Q.    Uh-huh.

3        A.    And I said, oh, this is horrible.  And I

4    said, well, I've been expecting it, because they

5    had actually, someone, a couple of people had more

6    or less pointed a finger at him that he had

7    started this whole thing.

8        Q.    Which people?

9        A.    Some of the people in upper management

10   he was concerned about.  I think primarily people

11   in upper management had -- either they had said

12   something or they acted as if they felt he was the

13   one that had done it.

14       Q.    Do you know who these people were in

15   upper management?

16       A.    No.

17       Q.    Do you know what these people said that

18   would make him think that?

19       A.    No, I don't know.

20       Q.    Did you ever witness upper management

21   acting in a way that would make him think they

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 67

1  you don't have anything concrete to -- so it's

2  speculative, if you will.

3      Q.   Sure.

4           Did you ever have a conversation after

5  Mr. Kakeh left with any other UPO employee about

6  Mr. Kakeh's feelings that he was let go for

7  participating in an investigation?

8      A.   Well, I talked to Doris Stashenko.  I

9  mean, Doris and I, we're not real good friends,

10  but we talk.  And I, you know, kind of kept her

11  abreast of how he's doing.

12           It's pretty much a general feeling there

13  that -- that the RIF was not -- I mean, let's face

14  it.  You have a RIF in an agency and only two

15  people are RIF'd?  You wonder why.

16      Q.   Uh-huh.

17      A.   There's something else that just

18  occurred to me now.  I recall that Mr. Kakeh was

19  concerned because he was not able to get a job.

20  He went on many interviews, or some interviews.  I

21  don't know how many.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 72

1    general duties?

2         A.    The only thing I did see because I was

3    around the fax and he did fax a letter that I told

4    you about being concerned about the out-sourcing

5    the finance office.

6         Q.    Uh-huh.

7         A.    When he was trying to help.  I did see

8    him fax -- I believe it was to one of the council

9    members.  And I think he also faxed it to the

10   president of the board at that time.

11              But other than that, no.  Anything else,

12   no.

13        Q.    What fax machine did he use to fax this

14   letter?

15        A.    It was a fax machine at finance.

16   Because I went around there to fax something.  I

17   don't have a fax.  I didn't have a fax machine at

18   my disposal at that time, so I often used finance

19   fax machine and their copy machine.

20        Q.    Uh-huh.

21              Was anyone, any other UPO employee, in a

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

Page 73

1    position to see him faxing that letter?

2        A.    I don't know.  I don't know.

3        Q.    Is the fax machine in a closed room?

4        A.    No, it's in an open area.  It's by --

5    it's in an open area right by the -- a printer.

6        Q.    That's the only document you ever saw

7    him fax?

8        A.    Yes.

9            MS. McFARLAND:  Okay.

10            I have no further questions.

11            THE WITNESS:  Thank you.

12            MS. McFARLAND:  Thank you very

13    much.

14        EXAMINATION BY COUNSEL FOR THE DEFENDANT:

15    BY MS. DAVIS:

16        Q.    I just have a couple of questions, just

17    to make sure we're clear on the record.

18            You talked -- you mentioned that

19    Mr. Kakeh told you that he'd received a RIF

20    notice?

21        A.    Yes, ma'am.

DEPOSITION OF SHIRLEY G. FISHER
CONDUCTED ON MONDAY, MARCH 6, 2006

77

1    STATE OF MARYLAND        )
                             )    ss
2

3    COUNTY OF PRINCE GEORGE'S)

4         I, DONALD E. BRAYBOY, a Notary Public in

5    and for the County and State aforesaid, duly

6    commissioned and qualified, the reporter before

7    whom the foregoing deposition was taken, do hereby

8    certify that the witness whose testimony appears

9    in the foregoing deposition was sworn by me; that

10   said deposition is a true record of the testimony

11   given by said witness.

12        I further certify that I am neither

13   counsel for, related to, nor employed by any of

14   the parties to the action in which this deposition

15   was taken; and further that I am not a relative or

16   employee of any attorney or counsel employed by

17   the parties hereto, or financially or otherwise

18   interested in the outcome of this action.

19

20                              Donald E. Brayboy

21   My commission expires:  April 1, 2007

PRECISE REPORTING SERVICES
(301) 210-5092 (877) 4 A STENO