IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AMIN KAKEH,<br><br>  Plaintiff,<br><br>v.<br><br>UNITED PLANNING ORGANIZATION, INC.,<br><br>  Defendant. | CIVIL ACTION NO. 05-1271 (GK/JMF)<br><br>Next Scheduled Event:<br>Pretrial Conference on 4/28/08 at 10:15 am |

**UNITED PLANNING ORGANIZATION INC.'S OPPOSITION TO PLAINTIFF'S FIRST MOTION *IN LIMINE*** 

Defendant United Planning Organization, Inc. ("UPO"), by and through its undersigned counsel, and, pursuant to LCvR 7(b), files this Opposition to Plaintiff Mohammed Amin Kakeh's ("Plaintiff") First Motion *In Limine* ("Motion"), which seeks to exclude evidence across a wide variety of topics and also requests a bifurcation of the trial into damage and liability phases. As set forth more fully below, Plaintiff's Motion is without merit and should be denied.

I.   **BACKGROUND**

Plaintiff, a former Controller for UPO, brings claims of retaliation pursuant to the District of Columbia Whistleblower Protection Act ("DCWPA"), the District of Columbia Human Rights Act ("DCHRA"), the District of Columbia False Claims Act ("DCFCA"), and the federal False Claims Act ("FCA") against his former employer, UPO, following the termination of his employment in a reduction-in-force in conjunction with the outsourcing of the management of UPO's Finance Office.

In his Motion, Plaintiff seeks to exclude: 1) evidence concerning an incident of alleged child abuse by Plaintiff on October 23, 2004, and Plaintiff's subsequent twelve days in jail, followed by probation; 2) Nabeelah Kakeh ("Ms. Kakeh") as a witness at trial for either party;

3) evidence concerning Plaintiff's termination at a previous employer, Manna, Inc. ("Manna"), including Plaintiff's work performance; 4) evidence concerning Plaintiff's work for the People's Committee, an organization funded by the Libyan government; 5) evidence concerning Plaintiff's alleged work for a member of the Saudi Royal family; 6) numerous opinions by UPO's expert, Dr. Henderson[1]; and 7) references by Dr. Henderson to topics 1, 3, 4 and 5 addressed above. *See* Pl.'s First Mot. *in Limine* at 1-2 (Dkt. No. 96). In addition to requesting the limitation of topics and evidence at trial, Plaintiff requests a bifurcation of trial to liability and damages phases. *See* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. *in Limine* and Alternativly [sic] Req. for Trial Bifurcation at 15-17 (hereinafter, "Memorandum") (Dkt. No. 96-2). Plaintiff simply has not demonstrated sufficient reason to exclude relevant and probative evidence/testimony.

## II.   ARGUMENT

### A.   The Allegation of Child Abuse and Ms. Kakeh's Testimony Are Relevant to Other Potential Causes for Plaintiff's Proclaimed Emotional Distress

Plaintiff has stated a claim for emotional distress and damages, and alleges that he suffered "humiliation, embarrassment, loss of self esteem and has otherwise been damaged psychologically and emotionally by Defendant's actions." *See* Pl.'s Second Am. Compl. at ¶¶ 46, 51, 56, 61 (Dkt. No. 23). By his own admission, during Plaintiff's period of unemployment after termination from UPO, Plaintiff's daughter had numerous instances of unexcused absences from school, failed to return for several days at a time, and refused to wear a traditional Muslim

---

[1] Plaintiff seeks to exclude the following opinions of Dr. Henderson: 1) whether Plaintiff is a credible witness; 2) whether Plaintiff was a trouble-maker at UPO or his past employment; 3) that Plaintiff did not respect his boss because she is a woman; 4) that Plaintiff has trouble working with women; 5) that Plaintiff created chaos at UPO or Manna; 6) the prudency of Plaintiff's decision to pursue this litigation; 7) Plaintiff's extra-marital activities; 8) that Plaintiff is an authoritarian, angry and heavy-handed individual and behaves so with those who do not do things exactly as the Plaintiff feels they should be done; 9) that Plaintiff has little patience and capacity to work out problems through reasonable solutions in social situations; 10) that Plaintiff's insight and judgment is impaired because of his cultural bias; and 11) any opinions that are not related to the issue of Plaintiff's emotional distress damages. *See* Pl.'s First Mot. *in Limine* at 1-2 (Dkt. No. 96).

head covering. *See* Pl.'s Memo. at 2. These incidents eventually led to the child abuse incident at issue whereby Plaintiff struck his daughter on the feet with a bat and shaved her head, which prompted Ms. Kakeh to call the police, who arrested Plaintiff on misdemeanor child abuse charges. *See id.*

UPO does not intend to offer evidence of the child abuse allegation or Ms. Kakeh's testimony for the purpose of attacking Plaintiff's character for truthfulness, so his objections to the evidence on FED. R. EVID. 608 and 609 grounds are misplaced. On the other hand, evidence that an event other than Plaintiff's termination could have caused his emotional suffering is "highly probative of damages." *See Bell v. Gonzales*, No. 03-163 (JDB), 2005 U.S. Dist. LEXIS 37879, at *32 (D.D.C. Dec. 23, 2005).

In *Bell*, the Plaintiff sought to exclude evidence of a prior investigation and arrest for solicitation of prostitution as irrelevant and overly prejudicial. Plaintiff specifically argued that the solicitation of prostitution is the type of evidence likely to "lead a jury to decide the case based on emotional factors or moral sensibilities that do not relate to the issues in the case." *See id.* at *34. The court disagreed, denied Plaintiff's motion *in limine*, and ruled that the evidence of the prostitution charge was being offered to show that events other than Plaintiff's reassignment may have caused his alleged emotional harm, thus neither FED. R. EVID. 404 nor Rule 403 precluded the evidence. *See id.* at *33-34; *see also Lewis v. District of Columbia*, 793 F.2d 361, 363 (D.C. Cir. 1986) (denying Plaintiff's motion *in limine* seeking to exclude prior drug use and arrests as they were relevant as potential sources of Plaintiff's emotional suffering).

To support his claim that allowing evidence of the child abuse incident would be unfairly prejudicial under 403, Plaintiff cites to a Kansas decision which did not allow evidence of a child abuse charge. *See* Pl.'s Mem. at 10 (citing *Starling v. Union Pac. R.R. Co.*, 203 F.R.D. 468 (D.

Kan. 2001)). The *Starling* decision is distinguishable as the court noted the party seeking to introduce the child abuse evidence was "conspicuously silent" in its brief opposing the motion *in limine* and made absolutely no argument why the child abuse charge might be relevant to any claims presented in the case. *See Starling*, 203 F.R.D. at 484. In the Joint Pre-Trial Statement filed on June 1, 2007, UPO specifically indicated that Ms. Kakeh would testify regarding Mr. Kakeh's claim for compensatory damages. *See* Joint Pre-Trial Statement at 16 (Dkt. No. 84). Moreover, the *Starling* court denied the plaintiff's motion *in limine* which sought to exclude both plaintiff's and his wife's prior criminal acts because those acts were other potential causes of the plaintiff's claimed emotional distress. *See Starling*, 203 F.R.D. at 484. As such, the court held that the prior criminal acts were "relevant, and further, that no Rule 403-considerations warrant its exclusion at this early juncture." *See id.*

Plaintiff's reliance on an Eleventh Circuit decision which overturned a criminal conviction because of the admission of spousal abuse evidence also is misplaced, as that case was a criminal matter where the objectionable spousal evidence could not help the prosecution prove any element of the government's case. *See* Pl.'s Mem. at 10 (citing *United States v. Hands*, 184 F.3d 1322, 1328 (11th Cir. 1999)). Moreover, despite the fact that the prosecution showed the jury a number of graphic, color photographs taken shortly after the abuse, the court did not make any limiting instruction which would have minimized the prejudicial impact of the evidence. *See Hands*, 184 F.3d at 1329.

Since Plaintiff has put forth claims of emotional distress resulting from his termination, UPO is allowed to explore any alternate causes of his emotional distress. His relationship with his daughter during this tenuous period certainly may be at least a contributing cause in Plaintiff's alleged emotional distress. In his discovery responses, Plaintiff has previously

indicated that he has suffered "increase[d] difficulty in interacting with his family members, participating in family life, and coping with normal stresses." *See* Pl.'s Answers to Def.'s First Set of Irrogs. at 23 (attached as Ex. A). Ms. Kakeh is thus a clearly relevant witness to provide testimony on Plaintiff's alleged difficulty interacting with his family and the potential reasons for such purported difficulties.

Finally, Plaintiff argues that a cautionary instruction would be of no utility in this case, but he proffers no sound basis or authority for this belief. Plaintiff contends that "the shocking impact of this evidence is so severe, that once heard, it will be impossible for jurors to ignore the allegation to objectively evaluate the case." Pl.'s Mem. at 10. Plaintiff further surmises that jurors' "preconceived notions and prejudices" are "not part of a conscious thought process" which will "seep[ ] into [their] evaluation of other evidence." *Id.* at 11. Plaintiff's argument that a limiting instruction will be ineffective is based on speculation, hypothesizing and nebulous psychobabble, and consequently, it bears no weight. *See Hands*, 184 F.3d at 1329 (noting curative effect of limiting instruction) (citations omitted).

**B.    Plaintiff's Termination and Work Performance from Manna Are Relevant to Mitigation of Damages**

Prior to his employment with UPO, Plaintiff was the Controller at a non-profit organization, Manna, Inc., that specializes in building homes for low-income families. *See* Pl.'s Mem. at 2. Manna terminated Plaintiff's employment on the basis that his "style of management was not conducive to building a strong team." *Id.* at 3. Plaintiff speculates that UPO will use Plaintiff's termination from Manna as character evidence in conformity with his termination at UPO to show that he was "terminated for being a bad employee or because he was unable to get along with co-workers and supervisors. . . ." *See id.*

Even though his job performance at UPO did not factor in the reduction-in-force of the management of the Finance Office and Plaintiff's subsequent termination, his previous job performance and termination at Manna are relevant to his claim for compensatory damages. Contrary to Plaintiff's claims, UPO does not seek to introduce evidence related to Plaintiff's termination and work performance as character evidence, but as factual information related to Plaintiff's mitigation of damages. Plaintiff's previous employment with Manna, the reasons for his departure, and his performance there all relate to his ability to mitigate any alleged damages he seeks from UPO.

Plaintiff seeks lost income and benefits as the result of his termination from UPO, and UPO is entitled to determine whether his poor work performance and termination for cause from Manna affected his job search. The jury should be able to take into consideration the impact of Plaintiff's employment history, including his tenure with Manna, on a prospective employer's willingness to hire him. A reasonable fact-finder could infer that Plaintiff had difficulty finding employment based on his termination from Manna, whereby that termination, and not his termination from UPO, was causally related to the length of Plaintiff's period of unemployment.

C. **Evidence Relating to Plaintiff's Muslim Background Is Relevant and Not Overly Prejudicial**

Plaintiff believes his Muslim faith and Syrian heritage will be prejudicially used by the jury. *See* Pl.'s Mem. at 4. Plaintiff disparagingly asserts that UPO will use Plaintiff's Muslim background to "play upon prevailing preconceived notions regarding Syrian Muslim men. . . ." *See id.* He further claims that any references to his alleged work for a member of the Saudi Royal family and his admitted work for a Libyan non-profit organization will "fuel the fear and negativity associated with middle-eastern Muslims. . . ", compelling the jury to "make decisions

based upon the Plaintiff's race, culture and religion rather than the merits of the case." *See id.* at 11-12.

Once again, Plaintiff's overly speculative theory of UPO's case seeks to exclude admissible and probative evidence. UPO has no intention of portraying Plaintiff as a radical Muslim. Reference to his religion and national origin is relevant to the charge of discrimination Plaintiff filed with the D.C. Office of Human Rights against UPO based upon his race, color, gender, <u>national origin (Syrian) and religion (Muslim)</u>. *See* Pl.'s Second Am. Compl. at ¶¶ 27, 41, 54-55. Plaintiff claims that UPO terminated his employment, in whole or in part, because he filed a charge of discrimination. *See id.* Reference to or discussion of his Syrian background and Muslim religion are undoubtedly relevant to his charge of discrimination, which is based, in part, on exactly those protected categories. It is inconceivable that UPO can be expected to respond to Plaintiff's allegations of discrimination and retaliation without referencing the underlying basis for those claims.

Moreover, Plaintiff's paranoia regarding "preconceived notions" of Muslim men should not be credited. *See United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 51 (1st Cir. 2004) (denying FED. R. EVID. 403 objection that evidence of alleged domestic violence incident was used for nothing more than to stir up "anti-Muslim" fervor); *United States v. Khalil Abdul Hakim*, No. 02-CR-131, 2002 U.S. Dist. LEXIS 18151, at *12-13 (E.D. Pa. Sept. 24, 2002) (Plaintiff's request for a new trial based on references to his Islamic religion was nothing more than "rank speculation" as he could not show any evidence of his religious beliefs seriously affected the fairness, integrity, or public reputation of his trial). As with Plaintiff's former employment at Manna, his previous work for a Libyan non-profit organization and his alleged

work for a Saudi Royal family member is relevant to what jobs Plaintiff was qualified to both seek and attain after his termination with UPO.

### D.     Dr. Henderson's Opinions Are Relevant to Plaintiff's Damages Claims

Rule 702 of the Federal Rules of Evidence provides for the presentation of expert witnesses and states that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702.  The Federal Rules embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact" and Rule 702 regarding expert witnesses specifically "embraces this policy and has a liberal policy of admissibility."  See Lanni v. State of New Jersey, 177 F.R.D. 295, 300 (D.N.J. 1998) (allowing testimony of a forensic psychiatrist to proffer an opinion outside technical expertise as it assisted the trier of fact in understanding the relevant conditions and issues of causation) (citations omitted).

It is an abuse of discretion to exclude expert testimony simply because the proposed expert is not the "best qualified" or because the proposed expert does not have the specialization that the court considers the "most appropriate."  See id. at 301.  Only when an expert's testimony amounts to "rampant speculation" should it be excluded as it is not proper for a court to exclude expert testimony "merely because the factual bases for an expert's opinion are weak."  See Boyar v. Korean Airlines Co., Ltd., 954 F. Supp. 4, 7 (D.D.C. 1996) (citations omitted).  When expert testimony is merely based on weak factual bases, that testimony is appropriately challenged on cross examination which essentially goes to the weight, not the admissibility, of the testimony. See id. at 7-8.

Dr. Henderson is a psychiatrist with a specialty in forensic psychiatry. *See* Def.'s Rule 26(a)(2)(B) Disclosures at 1 (attached to Plaintiff's Mot. *in Limine* at Exhibit G). Forensic psychiatry is a "branch of medicine focusing on the interface of law and mental health." *See United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266, at *48 n.24 (D. Md. Jan. 13, 2006) (citations omitted). A forensic psychiatrist such as Dr. Henderson is a medical doctor who has completed years of additional training in the understanding, diagnosis, and treatment of mental disorders with additional training and/or experience related to the interface of mental health (or mental illness) and the law. *See id.* A forensic psychiatrist integrates "clinical experience, knowledge of medicine, mental health, and the neurosciences to form an independent, objective opinion." *See id.*

As noted in its expert disclosures, Dr. Henderson will testify regarding his opinion on Plaintiff's emotional distress damages. *See* Def.'s Rule 26(a)(2)(B) Disclosures at 1. While Plaintiff claims that Dr. Henderson is not a "sociologist, an anthropologist, Islam expert, gender studies expert, or an employment law expert," Dr. Henderson does not need to be an expert in those areas to render relevant opinions which address those topics. *See Wright v. United States*, 250 F.2d 4, 9 (D.C. Cir. 1957) ("The expert's qualifications being conceded, the court should be reluctant to exclude from evidence any relevant opinion which the expert feels able to give on the basis of observed or hypothetical facts. Of course, the fact basis of the opinion is a circumstance to be considered by the trier of the facts in determining the weight to be given to the opinion.")

Dr. Henderson is eminently capable to opine on the reasons and causal factors for Plaintiff's alleged emotional distress damages. Each and every topic Plaintiff seeks to exclude regarding Dr. Henderson's testimony relates to these damages issues and the alleged harm UPO

has caused Plaintiff.  Dr. Henderson personally evaluated Plaintiff on April 24, 2006 for nearly eight hours, a process that included the taking of a psychiatric history, performing a mental status examination, and the administration of the Minnesota Multiphasic Personality Inventory-2 test. *See* Henderson Medical Report at 4 (attached as Ex. D to Pl.'s First Mot. *in Limine*).  As such, Dr. Henderson's evaluation and opinions regarding Plaintiff are indeed based on his specialized skill, knowledge, and expertise using scientific and technical methodology and should be admitted.  *Compare United States v. Falcon*, 245 F. Supp. 2d 1239, 1243-44 (S.D. Fla. 2003) (court excluded forensic psychiatrist testimony because the expert did not administer any psychological tests, did not conduct an extended clinical interview, review any relevant empirical research or speak with any witnesses).

E. **The Trial Should Not Be Bifurcated as The Parties Have Already Incurred Time, Expense and Resources to Prepare for Trial**

Plaintiff's final request in his Motion is that the "trial should be bifurcated into a liability phase and damages phase so that the jury will not be confused and use Dr. Henderson's testimony and the Nabeelah Kakeh incident to determine liability." Pl.'s Mem. at 15-16.  The question of whether to bifurcate specific claims, affirmative defenses, or issues for hearing or trial should be raised early in the pretrial stages of litigation before discovery is launched.  *See* 8-42 MOORE'S FEDERAL PRACTICE Civil § 42.23.  By considering bifurcation early in the case management agenda, the parties can formulate an efficient discovery plan, thereby saving costs. *See id.*  In the parties' Meet and Confer Statement, they proposed that there <u>should not</u> be a bifurcation of the trial and/or discovery.  *See* Local Civil Rule 16.3 Report to the Court at 4 (Dkt. No. 11) (emphasis added).  The parties proceeded accordingly and have subsequently spent a significant amount of time, resources and costs to conduct discovery and prepare for a trial that addresses both liability and damages.

Contrary to Plaintiff's erroneous belief that UPO will not be prejudiced by a trial bifurcation, UPO would not have needed to incur the costs and time to retain experts that would speak to damages if bifurcation was agreed upon from the outset. Not only have the parties spent significant time and resources and incurred costs to prepare for a non-bifurcated trial, so has the Court. Just like Plaintiff's request for additional discovery on the eve of summary judgment, which this Court denied, Plaintiff's motion for a bifurcated trial is yet another eleventh-hour request that is the result of Plaintiff's own lack of diligence. *See* Mem. Op. to Order on Mot. for Summ. J. at 10 (Dkt. No. 91). Granting Plaintiff's bifurcation request would merely reward Plaintiff's lackadaisical approach to this litigation. *See Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001) ("bifurcation remains the exception rather than the rule.")

## III.  CONCLUSION

Plaintiff's Motion seeks to exclude relevant and probative evidence pertinent to his claims and UPO's defenses. Moreover, Plaintiff's last-minute request to bifurcate the trial into separate damages and liability phases unfairly prejudices UPO and flies contrary to the position the parties previously represented to this Court, and Plaintiff has failed to provide good cause for his belated request. As such, UPO respectfully requests that the Court deny Plaintiff's First Motion *in Limine*. A proposed order denying Plaintiff's Motion is attached hereto.

Dated: April 4, 2008

Respectfully submitted,

By: /s/ Alison N. Davis
    Alison N. Davis
    D.C. Bar No. 429700
    adavis@fordharrison.com
    David A. Rosenberg
    D.C. Bar No. 433405
    drosenberg@fordharrison.com
    Kevin M. Kraham
    D.C. Bar No. 459077
    kkraham@fordharrison.com

FORD & HARRISON LLP
1300 19th Street, N.W., Suite 700
Washington, D.C. 20036
(202) 719-2000
(202) 719-2077 (Facsimile)

Attorneys for Defendant United Planning Organization, Inc.