UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                           )
MOHAMMED AMIN KAKEH,       )
                           )
            Plaintiff,     )
                           )
     v.                    )     Civil Action No. 05-1271 (GK)
                           )
UNITED PLANNING            )
ORGANIZATION, INC.,        )
                           )
            Defendant.     )
_____)
```

MEMORANDUM OPINION

Plaintiff Mohammed Amin Kakeh ("Plaintiff") brings this whistleblowing case against his former employer, the United Planning Organization, Inc. ("UPO"). Plaintiff alleges violations of the District of Columbia Whistleblower Protection Act ("WPA"), D.C. Code §§ 2-223.01 et seq. (Count I); wrongful discharge under District of Columbia common law (Count II); retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.61 (Count III); retaliation in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (Count IV); and retaliation in violation of the District of Columbia False Claims Act ("DCFCA"), D.C. Code § 2-308.16 (Count V).

On February 28, 2008, Defendant's Motion for Summary Judgment was granted as to Count II. On November 25, 2008, Plaintiff's Consent Motion to Dismiss Count III was granted. A jury trial was held between December 3, 2008 and December 23, 2008. On December

23, 2008, the jury returned a verdict for Plaintiff, and the Court entered judgment in the amount of $891,546 plus costs [Dkt. Entry Dec. 23, 2008].

This matter is now before the Court on three post-trial motions: (1) Plaintiff's Motion to Alter Judgment [Dkt. No. 176], (2) Defendant's Motion for Judgment as a Matter of Law [Dkt. No. 178], and (3) Defendant's Motion to Amend, Alter the Judgment, or for New Trial, or, in the Alternative, Motion for a Remittitur [Dkt. No. 180]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons set forth below, Defendant's Motion for Judgment as a Matter of Law is **denied**, Defendant's Motion to Amend, Alter the Judgment, or for New Trial, or, in the Alternative, Motion for a Remittitur is **granted in part and denied in part**, and Plaintiff's Motion to Alter Judgment is **granted in part and denied in part**.

I. **Background**[1]

UPO is a private non-profit corporation in the District of Columbia. According to its mission statement, the organization's objective is "[t]o provide leadership, support, and advocacy to low income and other eligible residents of Washington, D.C., to assist

---

[1] For purposes of ruling on a motion for judgment as a matter of law, the evidence is examined in the light most favorable to the nonmoving party. Mazloum v. Dist. of Columbia Metro. Police Dep't, 576 F. Supp. 2d 25, 32 (D.D.C. 2008). Accordingly, unless otherwise noted, the facts that follow are taken from Plaintiff's Opposition and from the evidence presented at the fourteen-day trial held in December 2008.

them in achieving self-sufficiency and self-determination, and to enhance generally the quality of life in the local community." Plaintiff was hired as UPO's Controller on June 28, 1998.

UPO contracted with the District of Columbia to manage two anti-poverty programs.  It operated the Head Start program, which provides educational services to low-income children and their families.  In the District of Columbia, the federal government provided 80 percent of the program's operating funds, and the District provided the remaining 20 percent.  The federal government disbursed its 80 percent share of the program costs to the D.C. Department of Human Services ("DHS"), which added the remaining 20 percent and then disbursed the full funding to UPO.

UPO also administered the Community Service Block Grant ("CSBG") program.  The CSBG program was funded entirely by the federal government.  The federal Department of Health and Human Services ("DHHS") disbursed the program funds to DHS, and DHS in turn disbursed the funds to UPO.  UPO then allocated funds to service providers and oversaw their use of the funds.

Between October 1, 2002 and September 30, 2003, DHS disbursed funds from the CSBG grant to UPO on a reimbursement basis: DHS disbursed the funds after UPO provided DHS with receipts showing that expenditures were incurred for purposes that were legitimate under the CSBG grant.  If UPO did not spend all of the grant-allocated money within the fiscal year, it was required to notify

DHS that it had a surplus.  Once it had notified DHS, it could either return these surplus funds to the granting agency or use them for other allowable expenditures.

The CSBG grant for fiscal year 2003 budgeted specific amounts that could be spent on other programs.  During trial, Dana Jones, UPO's present Executive Director, who was hired to begin work on April 1, 2004, testified that, unless there was express written permission from DHS, surplus funds could be applied to other programs only up to the expenditure limit that was budgeted in the grant.  See Def.'s Mot. at 4 ("If included in the original budget, CSBG funds can be used to pay for costs related to other grant programs.").

Tunde Eboda, CSBG Program Manager at DHS, also testified that Defendant needed written permission to "apply surplus CSBG funds to non-enumerated cost overruns" in other programs.  See id. at 4 ("Only allowable costs can be charged to the grant.").  Gladys Mack, UPO's Deputy Executive Director, and Sheila Shears, UPO's Chief Financial Officer, testified that the Iowa Group, a firm hired by Eboda to investigate UPO's financial practices, informed them in March 2004 about this permission requirement.  Pl.'s Opp'n at 11.

Eboda testified that UPO did not have this permission until September 29, 2004.  Mack testified that Defendant had oral permission, but not written permission.[2]

Plaintiff testified that in October 2003, he discovered $748,000 in expenditures that had been improperly billed to the CSBG grant for fiscal year 2003.  He believed that this billing practice constituted fraud.  On October 20, 2003, Plaintiff wrote a memorandum to Mack, Shears, and Ben Jennings, who was then UPO Executive Director, informing them of this discovery.  On the same day, he met with them to detail his concerns.

Plaintiff testified that Jennings ordered him to change the designation of expenditures from "expenditures without a funding source" to "allowable CSBG expenditures."  Id. at 5.  Plaintiff testified that he believed this to be an illegal order because the change would constitute "fraudulent billing."  Id.

Plaintiff then discovered several other expenditures that were mistakenly classified: Jennings had charged four luxury cars to grants using a credit card with a 21 percent interest rate, a $120,000 loan had been made to a member of UPO's Board of Trustees ("Board") using grant funds, a van was assigned to Mack, two sport utility vehicles were purchased for a Board member and charged to grants, officers and Board members had fifty-six cell phones,

---

[2]    According to Plaintiff, Eboda and Plaintiff both contradicted Mack's testimony.

employees and Board members had been paid $200,000 in advances for traveling expenses, and a $65,000 trip to Hawaii for employees, Board members, and their families had been billed to a grant.  Id. at 5, 6.

After discovering these expenditures, Plaintiff changed their designation from "allowable" to "unallowable."  Plaintiff testified that Shears instructed him to charge the CSBG grant for these expenditures and that he considered this instruction to be an illegal order.  Id. at 6.

After receiving this instruction, Plaintiff responded by contacting Eboda and informing him that Defendant had charged unallowable expenditures to the CSBG grant.  Eboda testified that as a result of Plaintiff's disclosures, he investigated Defendant's finances and discovered several unallowable expenditures that had been improperly charged to the CSBG grant.

Plaintiff testified that on March 1, 2004, Eboda told a meeting that included Shears that Plaintiff had assisted him with the investigation.  Later that month, at another meeting attended by Shears, Plaintiff provided the Iowa Group with financial statements showing that UPO had attempted to bill unallowable expenditures to the grant.  Plaintiff's version of the financial statements contradicted the version submitted by Shears: Plaintiff's version included a much larger deficit.  Eboda

testified that it was clear that the statements with the larger deficit were Plaintiff's.  Pl.'s Opp'n at 7.

On an unspecified date, Shears held a meeting that included Plaintiff, Mack, and Jennings.  At this meeting, Jennings asked Plaintiff why he had provided the financial statements to the Iowa Group.  Id. at 8.

On March 11, 2004, Eboda recommended to UPO's Board that Jennings, Shears, and Mack be removed.  Eboda testified that he reached this decision as a result of the information that Plaintiff had provided to him.  The Board decided to remove only Jennings.  Id.

On the same date, Shears wrote a letter of resignation to Jennings, stating her concern that Plaintiff "has been allowed to continue in his position, given his repeated acts of insubordination."  Def.'s Mot., Ex. 4 (labeled "Pl. Ex. 30").  The letter referred to Plaintiff's release of financial statements that were "significantly altered from any previously reviewed by management."  Id.  Shears sent a copy of this letter to Mack.

On March 12, 2004, Mack became Acting Executive Director.  She told Plaintiff to change financial statements so that "unallowable" expenditures could be charged to the grant.  On March 21, 2004, Shears wrote an email to Plaintiff and Mack stating that expenditures charged to the grant are "lower than budgeted, even though there appears to be more than enough related expenses."

Id., Ex. 5 (labeled "Pl. Ex. 80").  Her email specifically asked Plaintiff to provide details about "what deferred revenues are on the balance sheet that should be reversed."  Id.

On March 25, 2004, Mack wrote an email to Plaintiff, reminding him of the urgency of the need to change the classification of expenditures.  Referring to a line of credit that had been extended to Defendant by M & T bank, she wrote, "Amin, we are out of time. I hope you are sensitive to this.  Our continued supportive relationship with the bank depends on these tasks being completed." Id., Ex. 6 (labeled "Pl. Ex. 35").  She stated that she was "requesting that [Plaintiff] book all adjustments that we are currently aware of, including restoring the CSBG revenues . . . ." Id.

Plaintiff testified that he believed Mack's request was an illegal order and that he refused to comply with it.  Mack testified that she believed his refusal to be an act of insubordination and that she informed Jones of this belief.

On April 1, 2004, Defendant appointed Jones to be Executive Director.  Jones testified that when he arrived at UPO, "the house was on fire," meaning that UPO was in great disarray.  Id. at 9. Defendant states that Jones "considered outsourcing the financial management functions as an option before he even began his work at UPO."  Id.

Eboda testified that he told Jones that Plaintiff had assisted in the investigation that led to Jennings' resignation.  On April 5, 2004, Plaintiff met with Eboda, Jones, and Alexis Roberson, a member of the Board's Ad Hoc Management Committee.  Pl.'s Opp'n at 11-12.  At this meeting, Eboda reiterated that Plaintiff had assisted in the investigation and had provided information that helped to instigate the DHS and DHHS audit of UPO's financial practices.  Id. at 12.

On April 6, 2004, Plaintiff met with Jones, Mack, Shears, Monica Beckham, UPO's General Counsel, and employees of F.S. Taylor, a private certified public accounting firm.  At this meeting, the F.S. Taylor employees proposed certain modifications to Defendant's financial statements.  Mack and Shears agreed to these modifications, but Plaintiff did not.  Plaintiff testified that in April 2004, Jones ordered him to charge what he considered to be unallowable expenditures to the grant.

On April 11, 2004, Plaintiff wrote a memorandum to Jones stating that he had "emphasized" at the April 6, 2004 meeting that "the 1.9 million from the CSBG unspent revenue could not be used to cover the deficit of UPO."  Def.'s Mot., Ex. 10 (labeled "Pl. Ex. 41").  Plaintiff believed that UPO needed written approval prior to allocating the surplus funds to the deficit, and he did not believe that UPO had received such permission.  Plaintiff wrote that

> The second "valid" adjustment of applying money to the
> UPO deficit is invalid because this needs an advance

> approval from the CSBG state office to apply the revenue
> to UPO's deficit and that hasn't happened yet.  As you
> can see the total "valid" adjustment of $3 million has to
> be reversed.  UPO is in a deficit situation.

Id.

In the April 11, 2004 memorandum, Plaintiff also stated that
the director of Head Start had asked him to remove three items that
UPO had charged to the grant in fiscal year 2003, but that F.S.
Taylor had recommended that UPO not remove those charges "until the
auditors ask for such changes."  Id.  Jones responded to F.S.
Taylor's recommendation by stating, "I'm not going to tell them
either."  Id.  Plaintiff testified that he considered this response
to be unethical because it "put[] UPO's integrity at serious risk."
Id.

Jones decided to outsource the top management of the Finance
Office.  On April 15, 2004, in preparation for the reduction-in-
force ("RIF") necessitated by the outsourcing, UPO's Human
Resources Department sent UPO's General Counsel a list of
"competitive areas."[3]  Id. at 10.  UPO used these "competitive
areas" to determine which employees to retain after the RIF.  Id.
According to Defendant, "[e]mployees with the longest length of
service with UPO were placed at the top of their particular
grouping."  Id. at 10 n.4.

---

[3]     According to Defendant, employees were grouped into
"'competitive areas' according to their duties, functions,
responsibilities and pay schedules."  Def.'s Mot. at 10.

Plaintiff was included in the same "competitive area" as David Quashie, UPO's Deputy Controller, who had worked for UPO since September 23, 1974. <u>Id.</u> at 10.  According to Defendant, Quashie was placed at the top of the competitive area because he had worked at UPO nearly twenty-four years longer than Plaintiff. <u>Id.</u> at 10-11.

On May 6, 2004, Jones recommended to the Board that UPO outsource several positions in the Finance Office, including the Controller position. <u>Id.</u> at 11.  Two members of the Board, Judges Annice Wagner and Henry Greene, testified that the Board never discussed the specific employees who would be affected by the RIF. <u>Id.</u>

On May 12, 2004, Roberson wrote a letter to Eboda "requesting that he facilitate a coordinated investigation by all governmental agencies from which UPO received funding." <u>Id.</u> at 12.  On June 1, 2004, investigators from the Office of Inspector General ("OIG"), as well as employees from DHS, DHHS, the FBI, and the U.S. Attorneys' Office, visited Defendant's office to meet with Plaintiff. <u>Id.</u> at 13.

Beckham testified that she observed the investigators enter Plaintiff's office, that she knew they were OIG investigators, that she assumed they were reviewing financial documents in Plaintiff's office, and that she notified Jones that Plaintiff was meeting with the investigators.  According to Defendant, it was Beckham's

"understanding that the investigators came to UPO because of The Washington Post articles about Mr. Jennings." Id. at 13.

The next day, on June 2, 2004, Jones delivered a RIF notice to Plaintiff. Id. at 13. The notice stated that Plaintiff was "relieved of [his] duties as of June 2, 2004," but that his employment would officially terminate on June 30, 2004. Id.

After a fourteen-day trial in December 2008, the jury returned a verdict for Plaintiff.

## II. Analysis

### A. Defendant's Motion for Judgment as a Matter of Law Is Denied[4]

After the conclusion of a jury trial, a court will not grant a motion for judgment as a matter of law and set aside the verdict "unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." Novak v. Capital Mgmt. & Dev. Corp., 570 F.3d 305, 311 (D.C. Cir. 2009) (internal citations and quotation marks omitted); Gasser v. Dist. of Columbia, 442 F.3d 758, 762 (D.C. Cir. 2006); see Stewart v. St. Elizabeths Hosp., 593 F. Supp. 2d 111, 113 (D.D.C. 2009); see

---

[4] Plaintiff argues that Defendant waived its right to file a motion for judgment as a matter of law. Pl.'s Opp'n at 14-16. However, as Defendant conclusively demonstrates in its Supplemental Memorandum, the Court explicitly informed Defendant during trial that it had not "jeopardize[d] [its] procedural positions in any way at all." Def.'s Supp. Mem. at 2-3 & Ex. 1. Thus Defendant did not waive its right to seek judgment as a matter of law.

Mazloum v. Dist. of Columbia Metro. Police Dep't, 576 F. Supp. 2d 25, 32 (D.D.C. 2008) (internal citations and quotation marks omitted); see also Miller v. Holzmann, 563 F. Supp. 2d 54, 75 (D.D.C. 2008) (citing Scott v. Dist. of Columbia, 101 F.3d 748, 752 (D.C. Cir. 1999)); see Fed. R. Civ. P. 50 (a court may grant a motion for judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue").

Because "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" a court may grant a motion for judgment as a matter of law only if "'under the governing law, there can be but one [] conclusion as to the verdict' -- that it defies reason." Miller, 563 F. Supp. 2d at 75-76 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

In considering a motion for judgment as a matter of law, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Mazloum, 576 F. Supp. 2d at 32 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)); see also Gasser, 442 F.3d at 762. Thus it is necessary to "disregard all evidence favorable to [UPO] that the jury is not

required to believe and give credence to the evidence favoring [Plaintiff]." See Gasser, 442 F.3d at 762.

In this case, Plaintiff alleged that Defendant violated the D.C. Whistleblower Protection Act ("WPA"), the federal False Claims Act ("FCA"), and the D.C. False Claims Act ("DCFCA").  To prove that Defendant violated the WPA, Plaintiff had to establish by a preponderance of the evidence that (1) he made a protected disclosure and/or refused to comply with an illegal order; (2) Defendant took an adverse employment action against him; and (3) Plaintiff's disclosure and/or refusal to comply with an illegal order was a "contributing factor" to Defendant's decision to take the adverse employment action.  As the D.C. Court of Appeals has stated, "the federal whistleblower statute, 5 U.S.C. 2302(b)(8), 'is instructive in interpreting similar state statutes,' including the DC-WPA."  Wilburn v. Dist. of Columbia, 957 A.2d 921, 925 (D.C. 2008) (quoting Crawford v. Dist. of Columbia, 891 A.2d 216, 221 (D.C. 2006)).

To prove that Defendant violated the FCA and the DCFCA, Plaintiff had to establish by a preponderance of the evidence that (1) he engaged in a protected activity, (2) Defendant had knowledge that Plaintiff was engaged in such protected activity, (3) Defendant terminated his employment, and (4) there was a causal connection between the protected activity and Defendant's

termination of his employment.[5]  Once Plaintiff established these elements, a presumption of retaliation arose and the burden shifted to Defendant to provide a legitimate, non-retaliatory reason for Plaintiff's termination.  If Defendant presented a legitimate, non-retaliatory reason, the burden shifted back to Plaintiff to prove by a preponderance of the evidence that Defendant's stated reason was a pretext for retaliation.  See, e.g., U.S. ex rel. Yesudian v. Howard University, 153 F.3d 731, 736 (D.C. Cir. 1998).

Defendant argues that if the Court does not set aside the jury's verdict, there will be an "improper broadening of the scope of the whistleblower laws to encompass activities and conduct beyond the clear language of the statutes."  Def.'s Mot. at 2.  According to Defendant, "no reasonable juror could have found that UPO separated Plaintiff . . . from employment on June 30, 2004 because he engaged in protected activity under the whistleblower laws."  Id.

Defendant makes several assertions in support of this argument.  First, it argues that Plaintiff did not make a protected disclosure, as the term is defined by the WPA, because any disclosures he made were pursuant to his "regular job duties" and "Plaintiff did no more than make suggestions and voice his

---

[5]  The elements of the FCA and the DCFCA are substantively similar, but not identical.  For purposes of the Motions now before the Court, the distinctions between the two are not relevant.  In addition, as stated supra, the federal statute provides a helpful guide for interpreting the D.C. statute.

dissatisfaction with Mr. Jones's decisions." Id. at 17-18.

Both the facts and the law prove Defendant's argument wrong. According to the WPA, a disclosure is "protected" by the statute if it is

> any disclosure of information . . . by an employee to a supervisor or to a public body that the employee reasonably believes evidences . . . [g]ross misuse or waste or public resources or funds . . . [or a] violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature.

D.C. Code 2-223.01(7) (emphasis added). According to the clear language of the statute, a disclosure is "protected" when made to a supervisor. See id. As Plaintiff correctly states, the "Findings and declaration of purpose" section of the WPA states that "the Council declares as its policy to . . . [p]rotect employees from reprisal or retaliation for the performance of their duties." D.C. Code 1-615.51. Moreover, Plaintiff's testimony constituted far more than "mere suggestions" and clearly stated that he believed the actions he was challenging were unlawful.

As Jones and Eboda both testified, it was reasonable for Plaintiff to believe that written permission was required before UPO could apply surplus CSBG funds to "non-enumerated cost overruns" in other programs. Pl.'s Opp'n at 4. Eboda testified that it was reasonable to believe that UPO did not have this permission. Id.

Second, Defendant argues that "Plaintiff did not have a reasonable belief that he was objecting to a violation of a federal, state, or local law, rule, or regulation" because "[t]here is no evidence that Plaintiff identified a specific act on the part of UPO which was illegal during his employment." Def.'s Mot. at 22. Defendant argues that the "record demonstrates that no one at UPO issued an illegal order to Plaintiff." Id. at 23.

The actual legality of UPO's billing practices is not the issue. Instead, as the statute makes clear, the focus of the inquiry is whether Plaintiff held a reasonable belief that the practices were illegal, i.e. a "violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature." D.C. Code 2-223.01(7).[6]

_____

[6] Plaintiff and Defendant argue extensively about the regulations that governed Defendant's participation in the CSBG program. Plaintiff argues that 45 C.F.R. Part 92 governed because Defendant received a "federal grant given directly to the states." Pl.'s Opp'n at 29 (emphasis in original). Defendant argues that it was governed by 45 C.F.R. Part 74, which applies to federal grants to nonprofit organizations. Def.'s Mot. at 24. The Court need not resolve the merits of this legal issue because the applicable statutes require only a reasonable belief in illegality, not actual illegality. See, e.g., D.C. Code 2-223.01(7) ("Protected disclosure" means any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or to a public body that the employee reasonably believes . . . .") (emphasis added).

During the trial, Plaintiff testified that he stated numerous times that he believed Defendant was directing him to violate the billing and accountability practices required by the CSBG program. Jones and Eboda testified that written permission was required prior to billing cost overruns to the CSBG grant. Plaintiff testified he did not believe UPO had this permission. Mack testified that UPO had oral permission but did not have written permission. The testimony from Jones, Eboda, and Mack corroborates Plaintiff's belief and clearly shows its reasonableness. Plaintiff's April 11, 2004 memorandum also corroborates his testimony. Accordingly, a reasonable juror could conclude that written permission was required, that UPO did not have it, and that in spite of lacking this permission, Plaintiff was ordered to charge unallowable expenditures to the grant.

Third, Defendant argues that disclosure to a supervisor is not protected activity and that Plaintiff's disclosures would have been protected only if they had been revealed to the Board. Def.'s Mot. at 18 ("To become a [sic] protected conduct, Plaintiff was required to report any perceived wrongdoers to those persons who were in a position to remedy the alleged wrongdoing.").

Even if the Board bore the ultimate responsibility for making the decision to outsource, Jones had the authority to develop an implementation plan and, once it was approved by the Board, to execute it. UPO's management developed the rules for determining

18

who would be "riffed" and thereby substantially influenced the final determinations about which employees would be terminated. While the Board focused its attention on the general procedures which would govern the RIF, rather than which specific employees would be terminated, Jones and upper management were well aware of how the RIF procedures would affect certain employees.  Thus, a reasonable juror could conclude that Jones was in a position to remedy Plaintiff's termination.  Huffman v. Office of Pers. Mgmt., 263 F.3d 1341, 1350 (Fed. Cir. 2001) ("The purpose of the statute is to encourage disclosures that are likely to remedy the wrong.").

Fourth, Defendant makes a similar argument with regard to the FCA and DCFCA.  It argues that "Plaintiff's conduct was not in furtherance of an FCA and/or DCFCA claim because he was simply doing his job."  Def.'s Mot. at 29.

As our Court of Appeals stated in Yesudian,, an employee engages in protected activity when he discloses fraud and corruption, as opposed to making a "complaint about mere regulatory compliance."  153 F.3d at 744-45.  In this case, Plaintiff repeatedly stated that he believed that Defendant's billing practices were fraudulent and would result in billing the CSBG grant for unallowable expenditures.  He consistently framed these differences as matters of fraud and ethics, rather than routine disagreements about regulatory compliance.  Therefore there was sufficient evidence for a reasonable juror to conclude that

Plaintiff was engaging in protected activity.

Fifth, Defendant argues that "[t]here simply is no evidence that Plaintiff used language that would lead Mr. Jones to believe that Plaintiff made protected disclosures." Def.'s Mot. at 19. Defendant argues that to be covered by the WPA, Plaintiff's disclosures must use "the language or terminology of fraud, waste, or misuse." Id.

As Plaintiff correctly states, however, Plaintiff was not obligated to use "magic words" to trigger the protections of the WPA. As the WPA indicates, a disclosure is protected if the employee "reasonably believes" that he is revealing a gross misuse of public funds or a violation of a law, rule, regulation, or contract term. D.C. Code 2-223.01(7).

Sixth, Defendant argues that Plaintiff did not disclose to Jones any information that "was not already known as [sic] result of the prior year-end audit reports, Mr. Eboda's preliminary report, the Head Start monitoring review and/or The Washington Post articles." Def.'s Mot. at 21. Even if this information was already public and even if Jones already had knowledge of it, Plaintiff was the one responsible for disclosing it in the first instance. Defendant introduced no evidence to contradict Plaintiff's testimony that his disclosures were the driving force behind the investigation by the federal and D.C. governments into the financial practices at UPO.

20

Seventh, Defendant argues that evidence that UPO knew of Plaintiff's protected activity was "conspicuously absent in this case." Id. at 2. For example, Defendant states that it had no knowledge of the protected disclosures because Plaintiff "failed to explain" why he refused to follow "directives." Id. at 3. Defendant argues that it concluded he was simply an "insubordinate and disgruntled employee" and that "Plaintiff at no point indicated that these concerns arose because of potential violations of a law, rule or regulation, or gross management, misuse, fraud, waste or abuse." Id. at 3, 10.

However, Beckham testified that she observed OIG investigators enter Plaintiff's office, that she knew they were OIG investigators, that she assumed they were reviewing financial documents in Plaintiff's office, and that she notified Jones that Plaintiff was meeting with the investigators. Moreover, Shears and Mack attended a meeting at which Jennings acknowledged that Plaintiff had provided financial statements to the Iowa Group.

In addition, Eboda testified that on several occasions, he provided UPO with knowledge that Plaintiff was engaging in protected activity. On March 1, 2004, Eboda told a meeting that included Shears that Plaintiff assisted him with the investigation into UPO's finances. On April 5, 2004, Plaintiff met with Jones, Roberson, and Eboda. At this meeting, Eboda reiterated that Plaintiff had provided information that was critical to the

21

investigation.  Pl.'s Opp'n at 10.

At approximately the same time as Eboda was informing UPO that Plaintiff had provided information that served as the basis for his investigation, Plaintiff was telling Jones and Mack that he would not employ the billing practices they requested.  In his April 11, 2004 memorandum to Jones, for example, Plaintiff wrote that "the 1.9 million from the CSBG unspent revenue could not be used to cover the deficit of UPO."  Def.'s Mot., Ex. 10 (labeled "Pl. Ex. 41").  It is reasonable to conclude that these two separate strands of information -- that Plaintiff provided Eboda with information essential to his investigation into UPO's billing practices and that Plaintiff was refusing requests from Jones and Mack to improperly bill certain expenditures to the grant -- provided UPO with knowledge that Plaintiff was engaging in protected activity. For all these reasons, the evidence introduced by Plaintiff would allow a reasonable juror to infer that Defendant had knowledge of Plaintiff's protected activity.

Eighth, Defendant argues that Plaintiff has not established that his protected activity was a contributing factor in UPO's decision to terminate Plaintiff.  Id. at 25-26.  In making this claim, Defendant rests heavily on its earlier argument that it had no knowledge of Plaintiff's protected activity.  Id. at 26-27.

The evidence does not support Defendant. When Defendant first began planing to outsource the Finance Department, it contemplated

22

outsourcing the entire department.  Over time, this plan changed,
and when it was finally implemented, Plaintiff was the only
employee in the Finance Office who was, in fact, terminated.  A
reasonable juror could certainly conclude that Plaintiff became the
focus of the RIF in the Finance Office as a result of his protected
activity.

Most importantly, a reasonable juror could easily conclude
that the short duration -- one day -- between the OIG's visit to
Defendant's office and Plaintiff's termination demonstrates that
Defendant knew of Plaintiff's protected activity and that the
termination was motivated by a desire to retaliate against him.

Defendant also argues that because Jones testified that he
began thinking about outsourcing the Finance Office before he was
hired as UPO's Executive Director, the final decision to terminate
Plaintiff was not made as a result of his protected activity.

However, Jones' testimony was riddled with inconsistencies and
directly contradicted by the testimony of other witnesses.  He
testified that he decided to retain Quashie and terminate Plaintiff
based solely on the recommendation of Ron Walker ("Walker"),
Managing Partner of Walker & Company, rather than the RIF policy.[7]

In contrast to Jones' testimony, Beckham testified that Jones
told her that Plaintiff was terminated on the basis of the RIF

---

[7]  On May 19, 2004, in response to a request from UPO, Walker
& Company submitted a proposed restructuring of the Finance Office.
Def.'s Mot. at 12.

policy.    Roy  Lane  ("Lane"),  Walker's  former  partner,  also
contradicted Jones' testimony.  Lane testified that he and Walker
met with Jones and Mack and that during that meeting, Jones and
Mack stated that they had already terminated Plaintiff and that
they wanted to retain Quashie.  He also testified that he never
recommended that Quashie be retained.

Jones' testimony during trial was impeached with statements he
made during his deposition.  In his deposition, he stated that
Walker made his recommendation to retain Quashie after June 2,
2004, the date when Plaintiff received his RIF letter.  However,
the RIF letter stated that Defendant would terminate Plaintiff and
retain and reassign Quashie.  During trial, Jones testified that
Walker made his recommendation to retain Quashie before the RIF
letters were delivered.

Although Defendant disputes Plaintiff's characterization of
the evidence, it was up to the jury to make factual determinations,
to assess the credibility of the witnesses, to evaluate the
plausibility of the arguments advanced by the attorneys on each
side, and to weigh the evidence.  To the extent that Defendant
presented evidence contradicting Plaintiff's, a reasonable juror
could conclude that Plaintiff's evidence was more credible than
Defendant's.

For these reasons, viewed in the light most favorable to
Plaintiff, the nonmoving party, there was ample evidence from which

24

a reasonable juror could conclude that Defendant violated the WPA, the federal FCA, and the DCFCA when it terminated Plaintiff. Defendant has not introduced evidence sufficient to satisfy its considerable burden to show that the jury's verdict should be set aside.

**B.    Defendant's Motion to Amend, for a New Trial, or, for a Remittitur Is Granted in Part and Denied in Part**

**1.    The Court Entered Three Separate Awards of Back Pay and Compensatory Damages**

At the conclusion of the trial, the jury returned a verdict for Plaintiff. On the verdict form, the jury wrote "$122,132.00" for the WPA back pay award and "$175,050.00" for the WPA compensatory damages award. For the federal FCA back pay and compensatory damages awards and for the DCFCA back pay and compensatory damages awards, it wrote "same as."[8]

The in-court recitation of the verdict was similar. When the jury returned from its deliberations, the foreperson read its verdict in open court. When the Court asked about the compensatory damages and back pay awards under the FCA and DCFCA, the foreperson replied that the jury had agreed to the "same amount." Defs.' Reply at 31-32.

----

[8]   Eight jurors signed the majority verdict form. One juror signed a minority verdict form, awarding $40,000 in back pay for the WPA claim and $108,000 in compensatory damages. For the back pay and compensatory damages awards under the federal FCA, he wrote "same." For the DCFCA, he wrote "$108,000" for the back pay award. On the compensatory damages line, he wrote "$40,000." Below that, but still in the space for compensatory damages, he wrote "same."

When the Court entered the judgment, it entered separate awards for the WPA, federal FCA and DCFCA claims: i.e. three separate back pay awards of $122,132 and three separate compensatory damages awards of $175,050. Thus, a total award of $891,546 was entered [Dkt. No. 169].

### 2.    The Jury Awarded Plaintiff a Total of $122,132 in Back Pay and $175,050 in Compensatory Damages

Defendant argues that the Court should amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) or order a new trial because "manifest injustice will occur because the judgment is inconsistent with the jury's true verdict." Def.'s Mot. at 36. According to Defendant, the jury's responses on the verdict form are so ambiguous that "the true verdict is in doubt." In the alternative, Defendant moves the Court to order a new trial to provide additional instructions on after-acquired evidence or to grant a remittitur to correct the "excessive" damages awarded by the jury. See id. at 41, 42 (arguing in the alternative that a new trial or remittitur should be ordered if the Court determines that the judgment should not be amended).

In response, Plaintiff argues that "a trial judge cannot reduce the amount of a jury verdict because of an ambiguity stemming from the structure of the special verdict form." Pl.'s Opp'n at 40. Plaintiff further argues that the Court should not "second guess the jury's decision to award $525,150 in compensatory damages." Id. at 49.

26

If a jury's verdict is so "opaque" so as to make any attempt to determine the jury's intent "speculative," then a court may order a new trial. See Carter v. Dist. of Columbia, 795 F.2d 116, 135 (D.C. Cir. 1986).

However, when a jury's verdict is clear, a court may not set it aside. See Daskalea v. Dist. of Columbia, 227 F.3d 433, 444 (D.C. Cir. 2000) ("A jury verdict must stand unless it is 'beyond all reason' or 'so great as to shock the conscience.'"). In particular, if there is disagreement about the meaning of a jury's verdict, the court must first "attempt to reconcile the jury's findings, by exegesis if necessary . . . before we are free to disregard the jury's special verdict and remand the case for a new trial." Gallick v. Baltimore & Ohio. R.R. Co., 372 U.S. 108, 119 (1963); Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); Snyder v. Trepagnier, 142 F.3d 791, 800 (5th Cir. 1998) ("Only if there is no view of the case that will make the jury's answers consistent may we set aside its decision.") (citations omitted); Palmer v. City of Monticello, 31 F.3d 1499, 1505 (10th Cir. 1994) ("If there is any view of the case which makes the answers consistent, the case must be resolved in that way."). "[I]t is the duty of courts to attempt to harmonize the answers, if it is possible under a fair reading of them." Gallick,

27

372 U.S. at 119.

It is clear that primary responsibility for the present confusion lies with Defendant.  Defendant never objected to the verdict form,[9] nor did it request an instruction on the impermissibility of duplicative awards.  Defendant also failed to request clarification of the jury's verdict before it was discharged.  Had it been requested, a poll of the jury or an instruction to resume deliberations could have easily resolved any questions.  See, e.g., Headspeth v. United States, 910 A.2d 311, 320 (D.C. 2006) ("The jury poll is the primary device for uncovering the doubt or confusion of individual jurors.") (internal citations and quotation marks omitted).

Despite Defendant's failures to bring these issues to the Court's attention prior to the jury's discharge, it is clear that the jury intended to award Plaintiff only one award for back pay and one award for compensatory damages.  Three facts support this conclusion.

First, the award of $891,546 that was originally entered by

---

[9]  Defendant argues that it did not waive its right to object to the verdict form because "the verdict form is not the per se issue.  The primary issue is that the foreperson either misunderstood the Court's questions in open court or this Court misunderstood the answer, and the issue did not come to light until the parties spoke with the jurors and received the completed verdict form."  Def.'s Reply at 33-34.  Defendant is correct that the current issue is the Court's interpretation of the verdict form, not the form itself.  Nonetheless, had Defendant addressed these concerns prior to the jury's discharge, the issue could have been addressed so as to avoid the confusion that ensued.

the Court -- which included $366,396 in back pay -- is inconsistent with the evidence introduced at trial.   Plaintiff's own damages expert testified that Plaintiff accrued a maximum of $122,132 in back pay damages.   Def.'s Mot. at 44.   The jury obviously credited that testimony and awarded precisely that amount.   As Plaintiff concedes, an award of $366,396 in back pay is "larger than the amount a jury could tolerably have awarded."   Pl.'s Opp'n at 49.

Second, the jury's entries on the verdict form indicate that it intended to provide Plaintiff with only one award of back pay and compensatory damages.   In the entries for the federal FCA and DCFCA claims, the jury wrote "same as 1a" and "same as 1b."   The word "same" indicates that it did not intend to award any additional damages for those counts.   While it is true, in hindsight, that a clearer verdict form might have been used, it is also true that the jury indicated that it wished to award one total award of $122,132 in back pay and $175,050 in compensatory damages for the WPA, federal FCA, and DCFCA.

Third, under the case law, Plaintiff may not, in any event, receive duplicative awards under three separate statutes for what is essentially the same injury.

It is well-settled that a plaintiff is not permitted to recover multiple awards for the same injury.   E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 297 (2002) ("As we have noted, it 'goes without saying that the courts can and should preclude double

29

recovery by an individual.'") (quoting <u>Gen. Tel. Co. of the Northwest v. E.E.O.C.</u>, 446 U.S. 318, 333 (1980)); <u>Anderson v. Group Hospitalization, Inc.</u>, 820 F.2d 465, 473 (D.C. Cir. 1987) ("This portion of the order, therefore, grants Anderson a double recovery to which she is not entitled."); <u>United States v. Project on Gov't Oversight</u>, 572 F. Supp. 2d 73, 77 (D.D.C. 2008) ("[T]he Court declines to award the government another judgment against him in the same amount arising out of the same conduct -- that would amount to a double recovery."); Miller, 563 F. Supp. 2d at 144 n.144 ("The law disfavors double recovery as unjust enrichment."); United States, ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 505 F. Supp. 2d 20, 23 (D.D.C. 2007) ("[T]he Court holds that the government may not pursue its equitable claims since they would result in a double recovery."); United States v. Smith, 297 F. Supp. 2d 69, 72 (D.D.C. 2003) (citing several cases for the proposition that restitution does not include a double recovery).[10]

---

[10] In <u>Burger v. International Union of Elevator Constructors Local No. 2</u>, 498 F.3d 750, 753 (7th Cir. 2007), the court ordered a new trial on damages because it was unclear whether the jury awarded $25,000, $50,000, or $75,000 in back pay. The trial court used a verdict form much like the one in the present case: the form listed each count, and then included a line beside each count for the jury to enter the damages award. <u>Id.</u> As a result, when the jury entered $25,000 on one line and $50,000 on the second, the total intended award was not clear. <u>Id.</u> The court ordered a new trial on damages because no reasonable interpretation of the verdict form could be "squared with the requirement that Burger's lost wages must be the same regardless of whether liability exists under count one, count two, or both counts." <u>Id.</u> at 754. In this case, unlike in <u>Burger</u>, there is a "reasonable interpretation" of
(continued...)

Our case does not present that problem, since the jury ordered the same amounts in back pay under each of the three statutes.  To allow Plaintiff to recover three separate awards of back pay and three separate awards of compensatory damages would obviously provide him with a triple recovery -- for which there is, as Plaintiff concedes, no evidentiary basis.

In addition, the compensatory damages figure of $175,050 is reasonable and has an evidentiary basis.  A figure of three times that -- $525,150 -- would clearly be excessive and does not have an evidentiary basis, given the fact that Plaintiff was ultimately able to find another equally challenging position with a slight increase in pay.  Most importantly, the jury's language indicates that it was including the "same" amount for each and every count, demonstrating that it concluded that $175,050 was a single appropriate amount.  As noted earlier, Plaintiff cannot receive a duplicative award for the same injury.

For these reasons, it is clear as a matter of law that the jury intended to award a total of $122,132 in back pay and $175,050 in compensatory damages, rather than three times that amount.  The Court erred in initially entering a verdict of $891,546.

---

[10](...continued)
the verdict form that is consistent with the prohibition on double recoveries.  Interpreting the verdict form so as to permit only one award of back pay is not only reasonable, but is also more consistent with the evidence introduced at trial and with the jury's own entries on the verdict form.

Accordingly, the judgment is amended to reflect the jury's intended award of $122,132 in back pay and $175,050 in compensatory damages. Because the Court finds that as a matter of law, the jury awarded a total of $122,132 in back pay and $175,050 in compensatory damages, neither a new trial[11] nor remittitur[12] is ordered.

C.   **Plaintiff's Motion to Alter or Amend the Judgment Is Granted in Part and Denied in Part**

Plaintiff requests that the Court double the back pay award under the federal FCA and under the DCFCA. Plaintiff argues that "both the FFCA and DCFCA require the Court to award two times the lost back pay if the jury finds a violation." Pl.'s Mot. at 1. In response, Defendant argues that "Plaintiff's belief that additional back pay is mandated is not supported by the plain meaning of the statutes, case law, or legislative history." Def.'s Opp'n at 1.

---

[11] Because the Court determines that Plaintiff is entitled to the relief he seeks on other grounds, see supra, it is unnecessary to address Defendant's argument that the Court erred when it provided an after-acquired evidence instruction on back pay but not on compensatory damages or punitive damages.

[12] A court may order remittitur "only if the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Daskalea, 227 F.3d at 444 (internal citations and quotation marks omitted). Remittitur is not appropriate here for two reasons. First, the Court is not "unconditionally reduc[ing]" damages awarded by the jury, but is rather correcting an error in the entry of judgment. Second, because the Court determines that Plaintiff is entitled to the relief he seeks on other grounds, see supra, it is not necessary to consider Defendant's alternative request for remittitur. Nonetheless, it is worth noting that Plaintiff "agreed that the Court should grant a remittitur and reduce the back pay award from $366,396.00 to $122,132.00." Pl.'s Reply at 1.

The federal FCA states that "relief <u>shall</u> include reinstatement with the same seniority status such employee would have had but for the discrimination, [and] 2 times the amount of back pay."  31 U.S.C. § 3730(h) (emphasis added).  The DCFCA uses similar language.  It states that an employer found liable under the DCFCA "<u>shall</u> be liable for the relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the discrimination, [and] two times the amount of back pay . . . ."  D.C. Code § 2-308.16(c) (emphasis added).

A court "must presume that the legislature says in a statute what it means and means in a statute what it says there." <u>Dodd v. United States</u>, 545 U.S. 353, 357 (2005) (internal citations and punctuation omitted).  When a court interprets the D.C. Code, it may look to an analogous federal statute as a guide. <u>See</u> <u>Wilburn</u>, 957 A.2d at 925.

It is well-settled that when a statute uses the term "shall," it creates a mandatory duty. <u>See, e.g.</u>, <u>Lopez v. Davis</u>, 531 U.S. 230, 231 (2001) ("Congress used "shall" to impose discretionless obligations"); <u>see</u> <u>Green v. Bock Laundry Mach. Co.</u>, 490 U.S. 504, 525 n.32 (1989) ("The process by which Congress changed the District of Columbia Code to provide that impeaching evidence 'shall,' not 'may,' be admitted . . . makes it evident that this mandatory language was intended."); <u>Zivotofsky v. Sec'y of State</u>,

571 F.3d 1227, --- (D.C. Cir. 2009) ("Section 214(d) is plainly mandatory . . . 'Shall' has long been understood as 'the language of command.") (quoting <u>Escoe v. Zerbst</u>, 295 U.S. 490, 493 (1935)) (additional citations omitted); <u>Leonard v. Dist. of Columbia</u>, 801 A.2d 82, 84-85 (D.C. 2002) ("[T]he normal rule is that verbs such as "must" or "shall" denote mandatory requirements . . . unless such construction is 'inconsistent with the manifest intent of the legislature or repugnant to the context of the statute.") (internal citations and quotation marks omitted).

The federal FCA uses the term "shall" to introduce the list of the types of relief available under the statute.  Our Court of Appeals explicitly recognized the legal consequences of this term, stating that "all the § 3730(h) remedies are phrased in mandatory language (the employee "shall be entitled," etc.)." <u>Yesudian</u>, 270 F.3d at 972.  Thus, it is clear that the federal FCA creates a mandatory duty to award Plaintiff twice the amount of back pay awarded by the jury.

The DCFCA imposes the same obligation.  In the DCFCA, the word "including" introduces a list of several different types of relief, including "two times the amount of back pay."  D.C. Code § 2-308.16(c).  Defendant argues that  "[t]wo times the amount of back pay is <u>merely illustrative</u> of the manner in which an employee can be made whole and not a statutory requirement that each and every type of relief listed is mandatory."  Def.'s Opp'n at 9 (emphasis

in original).

The language of the statute is plain, however, that the "relief necessary to make the employee whole" includes two times back pay. The statute uses no language to suggest that the list of types of relief is intended to be "merely illustrative." The specific types of relief are not listed to provide an illustration of options that might be available, but are instead listed to show the options that must be available to an employee in order to "make [him] whole." Because this list contains an award of "two times the amount of back pay," a party found liable of a violation of the DCFCA is obligated to pay the plaintiff double the amount awarded by the jury.

Although it is clear that the Court is required by both the federal FCA and the DCFCA to double the back pay award, one issue remains unresolved: should Plaintiff receive two separate awards of two times back pay, one for the federal FCA and one for the DCFCA, or should Plaintiff receive only one award of two times back pay.

Awarding Plaintiff separate damages awards under the federal FCA and DCFCA would result in a duplicative recovery. As stated supra II.B.2, a plaintiff is not permitted to recover multiple damages awards for the same injury. See id. (citing Waffle House, Gen. Tel., Anderson, Project on Gov't Oversight, Miller, Bill Harbert Int'l Constr., and Smith). Accordingly, Plaintiff is entitled to only one award of two times back pay.

35

The jury awarded $122,132 in back pay.  See supra II.B.2.  For the reasons stated above, Plaintiff is entitled to a total back pay award of two times the jury's award, or $244,264.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Judgment as a Matter of Law is **denied**, Defendant's Motion to Amend, Alter the Judgment, or for New Trial, or, in the Alternative, Motion for a Remittitur is **granted in part and denied in part**, and Plaintiff's Motion to Alter Judgment is **granted in part and denied in part**.  The judgment is amended as follows: Defendant is liable to Plaintiff for a total of $244,264 in back pay and a total of $175,050 in compensatory damages.  The total award for back pay and compensatory damages is $419,314.[13]

---

[13]    Defendant submitted, on August 31, 2009, a Notice of Supplemental Authority in support of the two Motions under consideration at this time.  Defendant cites to Gross v. FBL Financial Svcs., Inc., 129 S.Ct. 2343 (2009), to buttress its argument under the Federal and District of Columbia False Claims Acts.  Gross is distinguishable for at least two reasons:  first, it involved the Age Discrimination in Employment Act, 29 U.S.C. § 623(a), and this case does not arise under that statute; and second, in its reasoning, the Court replied upon the existence of a disparate treatment claim, and that is not the claim in this case.

An Order shall accompany this Memorandum Opinion.


                                        /s/
September 9, 2009                       _____
                                        Gladys Kessler
                                        United States District Judge

**Copies to: Attorneys of record via ECF**